# Exhibit A

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| NATIONAL ASSOCIATION FOR GUN RIGHTS, ROBERT C. BEVIS, and LAW WEAPONS, INC., d/b/a LAW WEAPONS & SUPPLY, an Illinois corporation; <br><br> Plaintiffs, <br><br> v. <br><br> CITY OF NAPERVILLE, ILLINOIS, a municipal corporation; <br><br> Defendant. | ) ) ) ) Case No. _____ ) ) ) ) ) ) ) ) ) ) ) |

## COMPLAINT

Plaintiffs submit the following Complaint against Defendant City of Naperville, Illinois (the "City").

### I. PARTIES

1. Plaintiff National Association for Gun Rights ("NAGR") is a nonprofit membership and donor-supported organization qualified as tax-exempt under 26 U.S.C. § 501(c)(4). NAGR seeks to defend the right of all law-abiding individuals to keep and bear arms. NAGR has members who reside within the City. NAGR represents the interests of its members who reside in the City. Specifically, NAGR represents the interests of its members whose Second Amendment right to acquire arms is burdened by the City's prohibition on the commercial sale of certain semi-automatic firearms. For purposes of this Complaint, the term "Plaintiffs" is meant to include NAGR in its capacity as a representative of its members.

2. Plaintiff Robert C. Bevis is a business owner in the City and a law-abiding citizen of the United States.

1

3. Plaintiff Law Weapons, Inc. d/b/a Law Weapons & Supply is a duly registered Illinois corporation which operates in the City engaged in the commercial sale of firearms.

4. Defendant City of Naperville, Illinois is a municipal corporation with an address of 400 S. Eagle Street, Naperville, Illinois 60540.

5. Defendant is or will enforce the unconstitutional provisions of the Ordinance against Plaintiffs under color of state law within the meaning of 42 U.S.C. § 1983.

### III. JURISDICTION AND VENUE

6. The Court has original jurisdiction of this civil action under 28 U.S.C. § 1331, because the action arises under the Constitution and laws of the United States. The Court also has jurisdiction under 28 U.S.C. § 1343(a)(3) and 42 U.S.C. § 1983 since this action seeks to redress the deprivation, under color of the laws, ordinances, regulations, customs and usages of the State, of rights, privileges or immunities secured by the United States.

7. Plaintiffs' claims for declaratory and injunctive relief are authorized by 28 U.S.C. §§ 2201 and 2202, respectively, and their claim for attorneys' fees is authorized by 42 U.S.C. § 1988.

8. Venue in this judicial district is proper under 28 U.S.C. § 1391(b)(2), because a substantial part of the events or omissions giving rise to Plaintiffs' claims occurred in this district.

### IV. GENERAL ALLEGATIONS

9. The Second Amendment to the United States Constitution declares that "the right of the people to keep and bear arms shall not be infringed." U.S. CONST. Amend. II; *see also D.C. v. Heller*, 554 U.S. 570 (2008) ("*Heller*"); *McDonald v. City of Chicago*, 561 U.S. 742 (2010)

("*McDonald*"); and *New York State Rifle & Pistol Ass'n, Inc. v. Bruen*, 2022 WL 2251305 (U.S. June 23, 2022) ("*Bruen*").

10. The right to keep and bear arms recognized in the Second Amendment is made applicable to the states by the Fourteenth Amendment. *McDonald, supra*.

11. This action challenges the constitutionality of Chapter 19 of Title 3 of the Naperville Municipal Code (the "Ordinance"). A copy of a draft of the Ordinance considered by the Naperville City Council at its meeting on August 16, 2022, is attached hereto as Exhibit A. On information and belief, the text of the Ordinance is identical to this draft.

12. Section 3-19-1 of the Ordinance defines the term "assault rifle." Section 3-19-2 of the Ordinance states: "The Commercial Sale of Assault Rifles within the City is unlawful and is hereby prohibited." Section 3-19-3 of the Ordinance provides for substantial penalties for any violation of its provisions.

13. The term "assault rifle" as used in the Ordinance is not a technical term used in the firearms industry or community for firearms commonly available to civilians. Instead, the term is a rhetorically charged political term meant to stir the emotions of the public against those persons who choose to exercise their constitutional right to possess certain semi-automatic firearms that are commonly owned by millions of law-abiding American citizens for lawful purposes. Plaintiffs refuse to adopt the City's politically charged rhetoric in this Complaint. Therefore, for purposes of this Complaint, the term "Banned Firearm" shall have the same meaning as the term "assault rifle" in Section 3-19-1 of the Ordinance.

14. Plaintiffs and/or their members and/or customers desire to exercise their Second Amendment right to acquire the Banned Firearms within the City for lawful purposes, including, but not limited to, the defense of their homes. When the Ordinance becomes

3

effective on January 1, 2023, Plaintiffs and/or their members and/or customers will be prohibited from exercising their Second Amendment rights in this fashion. The outright ban on commercial sale of the Banned Firearms set forth in the Ordinance is unconstitutional on its face.

15. The Second Amendment protects the right of law-abiding citizens to own weapons in common use by law-abiding citizens for lawful purposes. *Heller*, *supra*, at 627.

16. "The right to possess firearms for protection implies a **corresponding right to acquire** and maintain proficiency in their use . . ." *Ezell v. City of Chicago*, 651 F.3d 684, 704 (7th Cir. 2011) (emphasis added).

17. There is a venerable tradition in this country of lawful private ownership of semiautomatic rifles such as those the commercial sale of which is banned by the Ordinance. The Supreme Court has held as much. In *Staples v. United States*, 511 U.S. 600 (1994), the Court noted that semiautomatics, unlike machine guns, "traditionally have been widely accepted as lawful possessions. " *Id*., 511 U.S. 611-12 (identifying the AR-15 – the archetypal "assault weapon" – as a traditionally lawful firearm). The vast majority of States do not ban this type of semiautomatic rifles deemed "assault rifles" in the Ordinance.

18. Millions of law-abiding citizens choose to possess firearms such as the Banned Firearms. *Duncan v. Becerra ("Duncan IV)"*, 970 F.3d 1133, 1147 (9th Cir. 2020) [1] ("Commonality is determined largely by statistics."); *Ass 'n of N.J Rifle & Pistol Clubs, Inc. v. Atty. Gen. N.J.*, 910 F.3d 106, 116 (3d Cir. 2018) (finding an "arm" is commonly owned because "[t]he record shows that millions . . . are owned"); *New York State Rifle & Pistol Ass*

---

[1] , *reh'g en banc granted, opinion vacated*, 988 F.3d 1209 (9th Cir. 2021), and *on reh'g en banc sub nom. Duncan v. Bonta*, 19 F.4th 1087 (9th Cir. 2021), *cert. granted, judgment vacated*, 142 S. Ct. 2895 (2022)

4

'n, Inc. v. Cuomo*, 804 F.3d 242, 255 (2d Cir. 2015) ("Even accepting the most conservative estimates cited by the parties and by amici, the assault weapons . . . at issue are 'in common use' as that term was used in *Heller*."); *Heller v. D.C. ("Heller II")*, 670 F.3d 1244, 1261 (D.C. Cir. 2011) ("We think it clear enough in the record that semi-automatic rifles . . . are indeed in 'common use.' "). This is demonstrated by the AR-15 and other modem semiautomatic rifles, which epitomize the firearms that the City bans.

19. The AR-15, as just one example among many of a Banned Firearm, is America's "most popular semi-automatic rifle," *Heller II*, 670 F.3d at 1287 (Kavanaugh, J., dissenting), and in recent years it has been "the best-selling rifle type in the United States," Nicholas J. Johnson, *Supply Restrictions at the Margins of Heller and the Abortion Analogue*, 60 HASTINGS L.J. 1285, 1296 (2009). Already in early 2013, sources estimated that there were five million AR-15s in private hands. Dan Haar, *America's Rifle: Rise of the AR-15*, HARTFORD COURANT (Mar. 9, 2013), https://bit.ly/3whtDTj (last visited August 25, 2022); *see also Duncan v. Becerra ("Duncan III")*, 366 F. Supp. 3d 1131, 1145 (S.D. Cal. 2019). [2]

20. The government may impose "conditions and qualifications on the commercial sale of arms." *Heller*, 554 U.S. 626; *Ezell*, 651 F.3d at 701, *quoting Heller*. Nevertheless, an ordinance flatly prohibiting the commercial sale of firearms "would be untenable under *Heller*." *United States v. Marzzarella*, 614 F.3d 85, 92 n.8 (3d Cir. 2010).

---

[2] *aff'd*, 970 F.3d 1133 (9th Cir. 2020), *reh'g en banc granted, opinion vacated*, 988 F.3d 1209 (9th Cir. 2021), and on *reh'g en banc sub nom. Duncan v. Bonta*, 19 F.4th 1087 (9th Cir. 2021), *cert. granted, judgment vacated*, 142 S. Ct. 2895 (2022), and *rev'd and remanded sub nom. Duncan v. Bonta*, 19 F.4th 1087 (9th Cir. 2021), and *cert. granted, judgment vacated*, 142 S. Ct. 2895 (2022)

5

21.     In *Bruen*, the Court held that when the Second Amendment covers an individual's conduct, the government must demonstrate that the regulation is consistent with this Nation's historical tradition of firearm regulation in order for it to be valid. *Bruen*, 142 S. Ct. at 2126.

22.     In this regard, this Court has already held that flat prohibitions on the sale of firearms are not supported by this nation' history and traditions. In *Illinois Ass'n of Firearms Retailers v. City of Chicago*, 961 F. Supp. 2d 928 (N.D. Ill. 2014), this Court invalidated an ordinance banning the commercial sale of firearms. It stated:

> Although the City argues that 'state bans of the sale of even popular and common arms stretch back nearly 200 years,' [] the only historical support that it musters are three statutes from Georgia, Tennessee, and South Carolina banning the sale, manufacture, and transfer of firearms within their borders. *See* [] Georgia Act of Dec. 25, 1837, ch. 367, § I; [] Tennessee Act of Mar. 17, 1879, ch. 96, § 1 [], South Carolina Act of Feb. 20, 1901, ch. 435, § 1. But these isolated statutes were enacted 50 to 110 years after 1791, which is 'the critical year for determining the amendment's historical meaning.' *Moore*, 702 F.3d at 935. These statutes are thus not very compelling historical evidence for how the Second Amendment was historically understood. And citation to a few isolated statutes – even to those from the appropriate time period – 'fall[ ] far short' of establishing that gun sales and transfers were historically unprotected by the Second Amendment. *Ezell*, 651 F.3d at 706. **The City's proffered historical evidence fails to establish that governments banned gun sales and transfers at the time of the Second Amendment's enactment**, so the Court must move on to the second step of the inquiry.

*Id.*, 961 F. Supp. 2d at 937 (emphasis added). Accordingly, the Court entered an injunction against enforcement of the prohibition on commercial sales.

23.     It does no good for the City to argue that its residents could acquire the Banned Firearms in other cities. This Court rejected this argument in *Illinois Ass'n of Firearms Retailers*. It stated:

> The City argues in response that these ordinances do not ban acquisition, but merely regulate where acquisition may occur. [] It is true that some living on the outskirts of the City might very well currently live closer to gun stores now than they would absent these ordinances. But *Ezell* makes clear that this type of

6

       argument 'assumes that the harm to a constitutional right is measured by the extent to which it can be exercised in another jurisdiction. That's a profoundly mistaken assumption.' 651 F.3d at 697. It was no answer there that plenty of gun ranges were located in the neighboring suburbs, or even right on the border of Chicago and the suburbs. Instead, the Seventh Circuit drew on First Amendment jurisprudence to reason that Second Amendment rights must be guaranteed within a specified geographic unit – be it a city or a State. *See id*. ('In the First Amendment context, the Supreme Court long ago made it clear that 'one is not to have the exercise of his liberty of expression in appropriate places abridged on the plea that it may be exercised in some other place.'' (quoting *Schad v. Borough of Mt. Ephraim*, 452 U.S. 61, 76–77, 101 S.Ct. 2176, 68 L.Ed.2d 671 (1981)).

*Id*., 961 F. Supp. 2d 928, 938–39.

24.    This Court's holding in *Illinois Ass'n of Firearms Retailers* consistent with the Supreme Court's analysis in *Bruen*. In *Bruen* the Court cited with approval the case of *Drummond v. Robinson*, 9 F.4th 217, 226 (3rd Cir. 2021). *Id*. 142 S. Ct. at 2133. In *Drummond* the Third Circuit held that a city's ordinance prohibiting the operation of a commercial gun club was an "outlier" thus not supported by the nation's history or tradition of firearms regulation. 9 F.4th at 232.

25.    Millions of law-abiding citizens own and use for lawful purposes semi-automatic firearms such as the Banned Firearms Plaintiffs wish to acquire. The Ordinance's prohibition on the sale of the Banned Firearms is an historical outlier. Therefore, by definition, the Ordinance is not consistent with the nation's history and tradition of firearm regulation. Accordingly, the Ordinance violates the Second Amendment.

26.    There is an actual and present controversy between the parties. The Ordinance infringes on Plaintiffs' right to keep and bear arms under the Second Amendment. Defendant denies these contentions. Plaintiffs desire a judicial declaration that the Ordinance, facially and/or as applied to them, violates their constitutional rights. Plaintiffs should not be forced to choose between risking criminal prosecution and exercising their constitutional rights. The risk of

criminal prosecution on account of exercising a constitutionally protected right unlawfully chills the exercise of that right and thus violates the Constitution even if the criminal defendant ultimately prevails.

27. Plaintiffs are or will be injured by Defendant's enforcement of the Ordinance insofar as those provisions violate Plaintiffs' rights under the Second Amendment. If not enjoined by this Court, Defendant will enforce the Ordinance in derogation of Plaintiffs' constitutional rights. Plaintiffs have no plain, speedy, and adequate remedy at law. Damages are indeterminate or unascertainable and, in any event, would not fully redress any harm suffered by Plaintiffs because they are unable to engage in constitutionally protected activity due to Defendant's present or contemplated enforcement of these provisions.

## V. FIRST CLAIM FOR RELIEF
### Right to Keep and Bear Arms
### U.S. Const., amends. II and XIV

28. Paragraphs 1-29 are realleged and incorporated by reference.

29. The Ordinance burdens Plaintiff's Second Amendment rights by prohibiting their acquisition of the Banned Firearms at commercial firearms stores in the City. The City's regulation is not consistent with the nation's history and tradition of firearm regulation. There are significant penalties for violations of the Ordinance.

30. These restrictions infringe on the right of the people of the City, including Plaintiffs, to keep and bear arms as guaranteed by the Second Amendment and made applicable to the states and its political subdivisions by the Fourteenth Amendment.

31. The Ordinance's prohibitions extend into Plaintiff Bevis' and his store's customers' homes, where Second Amendment protections are at their zenith, as it burdens their right to acquire arms for the defense of their homes.

8

32. Defendant cannot satisfy its burden of justifying these restrictions on the Second Amendment right of the People.

## VI. PRAYER FOR RELIEF

Plaintiffs pray that the Court:

33. Enter a declaratory judgment pursuant to 28 U.S.C. § 2201 that the Ordinance is unconstitutional on its face or as applied;

34. Enter preliminary and permanent injunctive relief enjoining Defendant and its officers, agents, and employees from enforcing the Ordinance;

35. Award remedies available under 42 U.S.C. § 1983 and all reasonable attorneys' fees, costs, and expenses under 42 U.S.C. § 1988, or any other applicable law;

36. Award actual compensatory and/or nominal damages; and

37. Grant any such other and further relief as the Court may deem proper.

Respectfully submitted this 7th day of September 2022.

*/s/ Jason R. Craddock*
Jason R. Craddock
Attorney at Law
2021 Midwest Rd., Ste. 200
Oak Brook, IL 60523
(708) 964-4973
cradlaw1970@gmail.com
or craddocklaw@icloud.com

Barry K. Arrington*
Arrington Law Firm
3801 East Florida Avenue, Suite 830
Denver, Colorado 80210
(303) 205-7870
barry@arringtonpc.com
*Admission Pro Hac Vice Pending*
*Attorneys for Plaintiffs*

Exhibit A

# ORDINANCE NO. 22 - _____

## AN ORDINANCE
## ADDING CHAPTER 19
## (REGULATION OF THE COMMERCIAL SALE OF ASSAULT RIFLES)
## OF TITLE 3 (BUSINESS AND LICENSE REGULATIONS) OF
## THE NAPERVILLE MUNICIPAL CODE

### RECITALS

1. **WHEREAS,** on July 4, 2022, 7 people were murdered, and 46 others were injured during a mass shooting that took place during an Independence Day parade in Highland Park, Illinois. The shooter used an AR-15-style semi-automatic rifle with three 30-round magazines to fire 83 shots into the parade crowd from the rooftop of a local store. A 22-year-old suspect has been arrested and charged.

2. **WHEREAS**, on May 24, 2022, 21 people were murdered (19 children and 2 staff members), and 18 others were injured during a mass shooting that took place at Robb Elementary School in Uvalde, Texas. The 18-year-old shooter used an AR-15-style semi-automatic rifle.

3. **WHEREAS**, on May 14, 2022, 10 people were murdered, and 3 others were injured during a mass shooting that took place in a grocery store in Buffalo, New York. The shooter used an AR-15-style semi-automatic rifle. An 18-year-old suspect has been arrested and charged.

4. **WHEREAS**, on August 3, 2019, 23 people were murdered, and 23 others were injured during a mass shooting at a Walmart store in El Paso, Texas. The shooter used an AK-47–style semi-automatic rifle. A 21-year-old suspect has been arrested and charged.

5. **WHEREAS,** on October 27, 2018, 11 people were murdered, and 6 others were injured during a mass shooting that took place at the Tree of Life synagogue in Pittsburgh, Pennsylvania. The shooter used an AR-15-style semi-automatic rifle. A 46-year-old suspect has been arrested and charged.

6. **WHEREAS**, on February 14, 2018, 17 people were murdered (14 students and 3 staff members), and 17 others were injured during a mass shooting that took place at Stoneman Douglas High School in Parkland, Florida. The 19-year-old shooter used an AR-15-style semi-automatic rifle.

7. **WHEREAS,** on November 5, 2017, 26 people were murdered, and 22 others were injured during a mass shooting that took place at the Sutherland Springs church in Sutherland Springs, Texas. The 26-year-old shooter used an AR-15-style semi-automatic rifle.

8. **WHEREAS**, on October 1, 2017, 60 people were murdered, and approximately 867 were injured during a mass shooting that took place at a music festival in Las Vegas, Nevada. The 64-year-old shooter used 24 firearms, including AR-15-style and AR-10-style semi-automatic rifles to fire more than 1,000 bullets.

9. **WHEREAS**, on June 12, 2016, 49 people were murdered, and 58 others were injured during a mass shooting that took place at the Pulse Nightclub in Orlando, Florida. The 29-year-old shooter used an MCX-style semi-automatic rifle.

10. **WHEREAS,** on December 2, 2015, 14 people were murdered, and 24 others were injured during a mass shooting that took place at the Inland Regional Center in San Bernardino, California. The 28-year-old and 29-year-old shooters used AR-15-style semi-automatic rifles.

11. **WHEREAS**, on December 14, 2012, 27 people were murdered (20 children and 6 staff members), and 2 others were injured during a mass shooting that took place at the Sandy Hook Elementary School in Newtown, Connecticut. The 20-year-old shooter used an AR-15-style semi-automatic rifle.

12. **WHEREAS**, there have been many other mass shootings during the last decade, and it has become an unacceptable fact of life that no municipality is exempt from the reality that its citizens are at risk.

13. **WHEREAS**, commonplace in mass shootings are the use of lawfully purchased assault rifles. The U.S. Department of Justice describes assault weapons as "semiautomatic firearms with a large magazine of ammunition that were designed and configured for rapid fire and combat use." Assault rifles are exceptionally deadly firearms and have immense killing power.

14. **WHEREAS,** like many of the municipalities that have encountered mass shootings involving assault rifles, Naperville has a vibrant commercial area, public parks, restaurants, movie theaters, music venues, parades, elementary, middle and high schools both public and private, colleges and universities, houses of worship of many denominations, and other places where members of the public gather with an expectation of safety.

15. **WHEREAS,** the Second Amendment to the United States Constitution provides that: "A well regulated Militia, being necessary to the security of a free State, the right of the people to keep and bear Arms, shall not be infringed". However, no fundamental right is set forth in the United States Constitution for persons or entities to engage in the commercial sale of assault rifles.

16. **WHEREAS**, in 1994, the U.S. Congress passed the Federal Assault Weapons Ban ("AWB"), a United States federal law which prohibited the possession and sale of assault weapons and large-capacity magazines (limiting magazines to ten rounds).

Several constitutional challenges were filed against provisions of the ban, but all were rejected by the courts. The AWB expired in 2004, in accordance with its sunset provision, and attempts to renew or replace the AWB have been unsuccessful.

17. **WHEREAS**, currently, seven states and Washington, D.C. prohibit assault weapons. Federal appellate courts have decided four cases concerning the Second Amendment and assault weapons, each time reaching the same conclusion that assault weapon bans are constitutional (the D.C. Circuit upheld the District of Columbia's ban in 2011, the Second Circuit upheld New York and Connecticut laws in 2015, the Seventh Circuit upheld Highland Park's local ordinance in 2015, and the Fourth Circuit upheld Maryland's ban in 2017).

18. **WHEREAS**, assault rifles did not exist when the United States Congress ratified the Second Amendment in 1791. Civilian-owned assault refiles were rare prior to 2004. The proliferation of civilian-owned assault rifles began within only the last 18 of the 231 years since the ratification of the Second Amendment. That recency of assault rifles combined with the recent proliferation of mass shootings and the common use of assault rifles in said mass shootings indicates that assault rifles are uncommon and unacceptably dangerous.

19. **WHEREAS,** the Illinois legislature has limited the ability of public bodies to enact laws to protect the public from assault weapons that are used in mass shootings that have devastated many communities and countless individuals.

20. **WHEREAS,** in 2013, the Illinois General Assembly enacted legislation amending the Firearm Owners Identification Card Act ("FOID Act"). As part of the 2013 amendment of the FOID Act, the state legislature granted municipalities only ten (10) calendar days to enact local ordinances regulating the possession or ownership of assault weapons.

21. **WHEREAS**, if a municipality could not, or did not, pass a local ordinance within the ten-day window, the legislature provided that a municipality could not thereafter pass an ordinance pertaining to the possession or ownership of assault weapons:

> Any ordinance or regulation, or portion of that ordinance or regulation, that purports to regulate the possession or ownership of assault weapons in a manner that is inconsistent with this Act, shall be invalid unless the ordinance or regulation is enacted on, before, or within 10 days after the effective date of this amendatory Act of the 98th General Assembly. [430 ILCS 65/13.1(c)]

Case: 1:22-cv-04775 Document #: 65-11 Filed: 09/07/22 Page 13 of 20 PageID #:1343

**23. WHEREAS,** the City of Naperville did not pass an assault weapon ordinance regulating the possession or ownership of assault weapons within the ten days allotted by the state legislature.

**24. WHEREAS,** the City of Naperville is a home rule unit of local government under the laws and Constitution of the State of Illinois.

**25. WHEREAS,** under the Constitution of the State of Illinois, home rule units of government have broad authority to pass ordinances and promulgate rules and regulations that protect the public health, safety, and welfare of their residents unless the state legislature specifically states that state legislation preempts home rule authority.

**26. WHEREAS,** the 2013 FOID Act preempts home rule municipalities relative to *regulation of the possession or ownership* of assault weapons in a manner that is inconsistent with that Act. However, the FOID Act does not preempt home rule municipalities from regulating the Commercial Sale of Assault Rifles within their jurisdiction. Therefore, the City retains its broad home rule authority to legislate with respect to commercial sales.

**27. WHEREAS,** in an effort to protect the public health, safety, and welfare, the City of Naperville has a clear and compelling interest in exercising its home rule authority as set forth herein.

**NOW THEREFORE, BE IT ORDAINED BY THE MAYOR AND CITY COUNCIL OF THE CITY OF NAPERVILLE, DUPAGE AND WILL COUNTIES, ILLINOIS, in exercise of its home rule authority that:**

<u>SECTION 1</u>: **Recitals incorporated.** The foregoing Recitals are hereby incorporated in this Section 1 as though fully set forth herein.

<u>SECTION 2</u>: **Amendment adding Title 3, Chapter 19 to the Naperville Municipal Code.** Title 3 (Business and License Regulations) of the Naperville Municipal Code is hereby amended by adding the Chapter and language as follows:

### TITLE 3 -BUSINESS AND LICENSE REGULATIONS

### CHAPTER 19 – REGULATION OF THE COMMERCIAL SALE OF ASSAULT RIFLES

SECTION:

3-19-1: - DEFINITIONS

The following words and phrases shall, for the purposes of this Chapter, have the meaning ascribed to them by this Section, as follows:

| ASSAULT RIFLE: | Means any of the following, regardless of country of manufacture or caliber of ammunition accepted:<br><br>(1) A semiautomatic rifle that has a magazine that is not a fixed magazine and has any of the following:<br>    (A) A pistol grip.<br>    (B) A forward grip.<br>    (C) A folding, telescoping, or detachable stock, or is otherwise foldable or adjustable in a manner that operates to reduce the length, size, or any other dimension, or otherwise enhances the concealability, of the weapon.<br>    (D) A grenade launcher.<br>    (E) A barrel shroud.<br>    (F) A threaded barrel.<br><br>(2) A semiautomatic rifle that has a fixed magazine with the capacity to accept more than 10 rounds, except for an attached tubular device designed to accept, and capable of operating only with, .22 caliber rimfire ammunition.<br><br>(3) Any part, combination of parts, component, device, attachment, or accessory that is designed or functions to accelerate the rate of fire of a semiautomatic rifle but not convert the semiautomatic rifle into a machinegun.<br><br>(4) All of the following rifles, copies, duplicates, variants, or altered facsimiles with the capability of any such weapon thereof:<br>    (A) All AK types, including, but not limited to, the following:<br>     (i) AK, AK47, AK47S, AK–74, AKM, AKS, ARM, MAK90, MISR, NHM90, NHM91, Rock River Arms LAR–47, SA85, SA93, Vector Arms AK–47, VEPR, WASR–10, and WUM.<br>     (ii) IZHMASH Saiga AK.<br>     (iii) MAADI AK47 and ARM.<br>     (iv) Norinco 56S, 56S2, 84S, and 86S.<br>     (v) Poly Technologies AK47 and AKS.<br>     (vi) SKS with a detachable magazine.<br>    (B) All AR types, including, but not limited to, the following:<br>     (i) AR–10.<br>     (ii) AR–15.<br>     (iii) Alexander Arms Overmatch Plus 16.<br>     (iv) Armalite M15 22LR Carbine.<br>     (v) Armalite M15–T.<br>     (vi) Barrett REC7. |

|  |  |
|--|--|
|  | (vii) Beretta AR–70.<br>(viii) Black Rain Ordnance Recon Scout.<br>(ix) Bushmaster ACR.<br>(x) Bushmaster Carbon 15.<br>(xi) Bushmaster MOE series.<br>(xii) Bushmaster XM15.<br>(xiii) Chiappa Firearms MFour rifles.<br>(xiv) Colt Match Target rifles.<br>(xv) CORE Rifle Systems CORE15 rifles.<br>(xvi) Daniel Defense M4A1 rifles.<br>(xvii) Devil Dog Arms 15 Series rifles.<br>(xviii) Diamondback DB15 rifles.<br>(xix) DoubleStar AR rifles.<br>(xx) DPMS Tactical rifles.<br>(xxi) DSA Inc. ZM–4 Carbine.<br>(xxii) Heckler & Koch MR556.<br>(xxiii) High Standard HSA–15 rifles.<br>(xxiv) Jesse James Nomad AR–15 rifle.<br>(xxv) Knight's Armament SR–15.<br>(xxvi) Lancer L15 rifles.<br>(xxvii) MGI Hydra Series rifles.<br>(xxviii) Mossberg MMR Tactical rifles.<br>(xxix) Noreen Firearms BN 36 rifle.<br>(xxx) Olympic Arms.<br>(xxxi) POF USA P415.<br>(xxxii) Precision Firearms AR rifles.<br>(xxxiii) Remington R–15 rifles.<br>(xxxiv) Rhino Arms AR rifles.<br>(xxxv) Rock River Arms LAR–15.<br>(xxxvi) Sig Sauer SIG516 rifles and MCX rifles.<br>(xxxvii) Smith & Wesson M&P15 rifles.<br>(xxxviii) Stag Arms AR rifles.<br>(xxxix) Sturm, Ruger & Co. SR556 and AR–556 rifles.<br>(xl) Uselton Arms Air-Lite M–4 rifles.<br>(xli) Windham Weaponry AR rifles.<br>(xlii) WMD Guns Big Beast.<br>(xliii) Yankee Hill Machine Company, Inc. YHM–15 rifles.<br>(C) Barrett M107A1.<br>(D) Barrett M82A1.<br>(E) Beretta CX4 Storm.<br>(F) Calico Liberty Series.<br>(G) CETME Sporter.<br>(H) Daewoo K–1, K–2, Max 1, Max 2, AR 100, and AR 110C.<br>(I) Fabrique Nationale/FN Herstal FAL, LAR, 22 FNC, 308 Match, L1A1 Sporter, PS90, SCAR, and FS2000.<br>(J) Feather Industries AT–9. |

Page **6** of **10**

|  | (K) Galil Model AR and Model ARM.<br>(L) Hi-Point Carbine.<br>(M) HK–91, HK–93, HK–94, HK–PSG–1, and HK USC.<br>(N) IWI TAVOR, Galil ACE rifle.<br>(O) Kel-Tec Sub-2000, SU–16, and RFB.<br>(P) SIG AMT, SIG PE–57, Sig Sauer SG 550, Sig Sauer SG 551, and SIG MCX.<br>(Q) Springfield Armory SAR–48.<br>(R) Steyr AUG.<br>(S) Sturm, Ruger & Co. Mini-14 Tactical Rifle M–14/20CF.<br>(T) All Thompson rifles, including, but not limited to, the following:<br>    (i) Thompson M1SB.<br>    (ii) Thompson T1100D.<br>    (iii) Thompson T150D.<br>    (iv) Thompson T1B.<br>    (v) Thompson T1B100D.<br>    (vi) Thompson T1B50D.<br>    (vii) Thompson T1BSB.<br>    (viii) Thompson T1–C.<br>    (ix) Thompson T1D.<br>    (x) Thompson T1SB.<br>    (xi) Thompson T5.<br>    (xii) Thompson T5100D.<br>    (xiii) Thompson TM1.<br>    (xiv) Thompson TM1C.<br>(U) UMAREX UZI rifle.<br>(V) UZI Mini Carbine, UZI Model A Carbine, and UZI Model B Carbine.<br>(W) Valmet M62S, M71S, and M78.<br>(X) Vector Arms UZI Type.<br>(Y) Weaver Arms Nighthawk.<br>(Z) Wilkinson Arms Linda Carbine.<br><br>(8) All belt-fed semiautomatic firearms, including TNW M2HB and FN M2495.<br><br>(9) Any combination of parts from which a firearm described in subparagraphs (1) through (8) can be assembled.<br><br>(10) The frame or receiver of a rifle described in subparagraphs (1) through (9).<br><br>Assault Rifles as defined herein do not include firearms that: (i) are manually operated by a bolt, pump, lever or slide action; or (ii) have been rendered permanently inoperable. |

Page **7** of **10**

| | |
|---|---|
| BARREL SHROUD: | A shroud that is attached to, or partially or completely encircles, the barrel of a firearm so that the shroud protects the user of the firearm from heat generated by the barrel but excluding a slide that encloses the barrel. |
| COMMERCIAL SALE OF ASSAULT RIFLES: | The sale or offer for sale of an Assault Rifle when the sale requires the seller to have a valid certificate of license issued pursuant to the Illinois Firearm Dealer License Certification Act (430 ILCS 68/5-1 et seq.). |
| DETACHABLE MAGAZINE: | An ammunition feeding device that can be removed from a firearm without disassembly of the firearm. |
| FIXED MAGAZINE: | An ammunition feeding device that is contained in and not removable from or permanently fixed to the firearm. |
| FOLDING, TELESCOPING, OR DETACHABLE STOCK: | A stock that folds, telescopes, detaches or otherwise operates to reduce the length, size, or any other dimension, or otherwise enhances the concealability, of a firearm. |
| FORWARD GRIP: | A grip located forward of the trigger that functions as a pistol grip. |
| LAW ENFORCEMENT OFFICER: | A person who can provide verification that they are currently employed by a local government agency, state government agency, or federal government agency as a sworn police officer or as a sworn federal law enforcement officer or agent. |
| PISTOL GRIP: | A grip, a thumbhole stock or Thordsen-type grip or stock, or any other characteristic that can function as a grip. |
| THREADED BARREL: | A feature or characteristic that is designed in such a manner to allow for the attachment of a device such as a firearm silencer or a flash suppressor. |

### 3-19-2: - PROHIBITION OF THE COMMERCIAL SALE OF ASSAULT RIFLES

1. The Commercial Sale of Assault Rifles within the City is unlawful and is hereby prohibited.

2. The provisions of this Chapter shall not apply to the Commercial Sale of Assault Rifles to:

    2.1. Any federal, state, local law enforcement agency;

    2.2. The United States Armed Forces or department or agency of the United States;

    2.3. Illinois National Guard, or a department, agency, or political subdivision of a state; or

    2.4. A Law Enforcement Officer.

### 3-19-3: - ENFORCEMENT

Any person or entity who violates any of the provisions set forth or referenced in this Chapter shall be subject to the following:

1. A fine of one thousand dollars ($1,000.00) for a first offense within a 12-month period, and a fine of two thousand five hundred dollars ($2,500.00) for a second or subsequent offense within a 12-month period.

    1.1. Each day that a violation of this Chapter continues shall be considered a separate and distinct offense and a fine shall be assessed for each day a provision of this Chapter is found to have been violated. Notwithstanding the forgoing, the escalation of fines as set forth above shall not occur until a prior adjudication of a violation against the same person or entity has been entered.

2. Any violation of the provisions of this Chapter may be deemed a public nuisance and abated pursuant to all available remedies, including but not limited to injunctive relief. In addition to the penalties provided for in Section 3-19-3:1 above, the City shall be entitled to reimbursement for the cost of the City's reasonable attorney's fees and all costs and expenses incurred by the City to abate any entity operating as a public nuisance. Said attorney's fees and said costs and expenses shall be paid to the City within sixty (60) days of issuance of a bill therefor unless an alternate timeframe is agreed to in writing by the City Manager.

    **SECTION 3**: **Savings clause**. If any provisions of this Ordinance or their application to any person or circumstance are held invalid or unenforceable by any court of competent jurisdiction, the invalidity or unenforceability thereof shall not affect any of the remaining provisions or application of this Ordinance which can be given effect without

the invalid or unenforceable provisions or application. To achieve this purpose, the provisions of the Ordinance are declared to be severable.

**SECTION 4**: **Effective date and Pre-existing purchasers.** This Ordinance shall take effect on January 1, 2023, (the "Effective Date"), except as follows:

> Any person that can demonstrate to the satisfaction of the City Attorney that the Commercial Sale of an Assault Rifle was completed prior to the Effective Date of January 1, 2023, which means that prior to January 1, 2023, the purchaser completed an application, passed a background check, and has a receipt or purchase order for said purchase, without regard to whether the purchaser has actual physical possession of the Assault Rifle, shall be considered a pre-existing purchaser. For said pre-existing purchaser, the delivery of physical possession of the Assault Rifle may be completed, even if such activity would otherwise be in violation of the new provisions of Chapter 19 (Regulation of the Commercial Sale of Assault Rifles) of Title 3 (Business and License Regulations). Notwithstanding the foregoing, if physical possession of the Assault Rifle will not occur until more than sixty (60) days following the Effective Date of this Ordinance, that person is not a pre-existing purchaser and said purchase shall constitute a violation of the provisions of this Chapter.

PASSED this _____ day of _____, 2022.

    AYES:

    NAYS:

    ABSENT:

    APPROVAL this _____ day of _____, 2022.

 

_____
Steve Chirico
Mayor

ATTEST:

_____
Pam Gallahue, Ph.D.
City Clerk