**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHEREN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

| | |
|---|---|
| CUTBERTO VIRAMONTES, an individual and resident of Cook County, Illinois, *et al.*, | |
| Plaintiffs, | Case No.      1:21-cv-04595 |
| v. | Assigned Judge:    Rebecca R. Pallmeyer |
| THE COUNTY OF COOK, a body politic and corporate, *et al.*, | Designated Magistrate Judge:    Susan E. Cox |
| Defendants. | |

## DEFENDANTS' LOCAL RULE 56.1 STATEMENT OF UNDISPUTED MATERIAL FACTS IN SUPPORT OF THEIR MOTION FOR SUMMARY JUDGMENT

Defendants, the County of Cook, Toni Preckwinkle in her official capacity, Kimberly M. Foxx in her official capacity, and Thomas Dart in his official capacity, by their attorney, Kimberly M. Foxx, State's Attorney of Cook County, and through her Assistants, pursuant to Local Rule 56.1, present their Statement of Undisputed Material Facts in support of their motion for summary judgment state as follows:

1.      On May 24, 2022, Roy Guerrero, M.D., a Uvalde area pediatrician, reported to his office for a routine day. *The Urgent Need to Address the Gun Violence Epidemic: Hearing Before the H. Comm. on Oversight and Reform*, 117th Cong. 8-10 (2022) (statement of Dr. Roy Guerrero, Pediatrician, Uvalde, Tex.), attached hereto as *Exhibit 1*.

2.      By 12:30 p.m., Dr. Guerrero found himself racing to the hospital only to find the parents of his patients sobbing and shouting their childrens' respective names, desperately begging for news of their survival.  *Id.*

1

3.        Dr. Guerrero made his way to the surgical area, searching for information about one of his patients.  *Id.*

4.        What he found "was something no prayer will ever relieve: two children whose bodies had been pulverized by bullets fired at them, decapitated, whose flesh had been ripped apart, that the only clue as to their identities was blood-spattered cartoon cloths still clinging to them []."  *Id.*

5.        As he waited with his fellow Uvalde doctors, nurses and first responders for children that could be saved, "they never arrived. All that remained was the bodies of 17 more children and the two teachers who cared for them." *Id.*

6.        On that fateful day, children and educators were attacked in an elementary school, murdered in an act of domestic terror by an assailant carrying an AR-15 rifle, a weapon regulated by the Cook County Blair Holt Assault Weapon Ordinance ("the Ordinance"), attached hereto as Exhibit 2; *Expert Report of Louis Klarevas* ("Klarevas") at Table 4, attached hereto as Exhibit 3; *Declaration of Professor John J. Donohue* ("Donohue") at ¶61, attached hereto as Exhibit 4.

7.        More people have died or been injured in mass school shootings in the United States from 2000 to 2018 than in the entire twentieth century.  Exhibit 4 Donohue at ¶ 48.

8.        The assault weapons, in conjunction with high-capacity magazines, as defined under the Ordinance are capable of inflicting significant carnage upon civilians in a short period of time.  *Expert Report of James E. Yurgealitis* ("Yurgealitis") at p.31,32, attached hereto as Exhibit 5.

9.        The assault weapons prohibited by the Ordinance are identical to military firearms except for the ability to fire on a fully automatic mode. Exhibit 5 Yurgealitis at p.21.

10.     The ability to convert a civilian AR-15 style gun into a fully automatic weapon is an additional factor that makes the weapons unusual. Exhibit 4 Donohue at ¶100.

11.     During the period of 2012 to 2017, the Bureau of Alcohol, Tobacco, and Firearms recovered 814 machine gun conversion parts. During the period of 2017-2021, the Bureau recovered 5,454 machine gun conversion parts, a 570% jump. *National Firearms Commerce and Trafficking Assessment*, Vol. 2, p. 4, attached hereto as Exhibit 6.

12.     Plaintiff Cutberto Viramontes seeks to own a Smith and Wesson Military & Police AR-15 style semiautomatic rifle, which is banned by the Ordinance. *Complaint* at ¶ 40, attached hereto as Exhibit 7.

13.     Viramontes intends to possess a semiautomatic rifle for lawful purposes, particularly self-defense. Exhibit 7 Complaint at ¶ 40; *Deposition of Cutberto Viramontes* 6:20-22; 55:10-14, attached hereto as Exhibit 8.

14.     Viramontes lives in a two-unit apartment building. Exhibit 8 Viramontes Dep. 8:7-12.

15.     Plaintiff Christopher Khaya seeks to own an Israel Military Industries Galil AR-15 style semiautomatic rifle, which is banned by the Ordinance. Exhibit 7 Complaint at ¶ 42.

16.     Khaya intends to possess a semiautomatic rifle for lawful purposes, particularly self-defense. Exhibit 7 Complaint at ¶ 42; *Deposition of Christopher Khaya* 7:17-22, attached hereto as Exhibit 9.

17.     Khaya resides in an apartment in a building containing three other apartments. Exhibit 9 Khaya Dep., 7:23-8:3.

18.     Khaya currently owns a .22 caliber semi-automatic Rossi rifle and a Smith and Wesson handgun. *Id.* 34:12-35:9; 48:17-49:20.

19.     The organizational Plaintiffs maintain that their members seek to obtain or use semiautomatic rifles in Cook County that are banned by the Ordinance. Exhibit 7 Complaint at ¶ 43.

20.     Assault weapons, whether rifles or handguns, are a poor choice for home defense or personal protection. Exhibit 5 Yurgealitis at 28.

21.     Assault rifles were not designed for, and are not particularly suitable for, home defense in short range close quarter situations. *Id.* at 29.

22.     Assault weapons and large capacity magazines facilitate excessive discharge of ammunition with a resultant risk to uninvolved individuals. *Id.* at 28.

23.     In a home defense capacity, AK and AR type rifles present a problem of overpenetration of common household materials. *Id.* at 30.

24.     The residents of Cook County are concentrated at a population density of 5,583 people per square mile.

  https://www.census.gov/quickfacts/fact/table/chicagocityillinois,US/PST045221

25.     The population density within the City of Chicago is 12,059.8 people per square mile. https://www.census.gov/quickfacts/fact/table/chicagocityillinois,US/PST045221

26.     The purpose and best use of assault weapons is to kill with extreme speed and efficiency, not self-defense or hunting. *Declaration of Chief Larry Snelling* ("Snelling") at ¶ 18, attached hereto as Exhibit 10.

27.     Firearms other than assault weapons are more suitable for personal defense than are assault weapons. *Expert Report and Declaration by Phil Andrew* ("Andrew") at p.8, ¶¶24.25, attached hereto as Exhibit 11; Exhibit 5 Yurgealitis at p.28–29.

4

28. Home defense and/or retail robbery situations are rarely, if ever, lengthy shootouts with extensive exchanges of gunfire. Exhibit 5 Yurgealitis at p.28.

29. Most confrontations involve gunfire at close range, and most law enforcement agencies emphasize a 3–10-yard line of fire during their firearm training qualifications. Exhibit 11 Andrew at p.8.

30. Although there are over 300 million firearms in the United States, victims of violent crimes do not defend themselves with a firearm in 99.2% of attacks. Exhibit 4 Donohue at ¶ 115.

31. The firearms industry and pro-firearms groups hold the position that brandishing a firearm and not using it is enough to stop a perpetrator in the vast majority of violent criminal acts. *Id.* at ¶¶ 116–118.

32. Legally armed civilians and private security have had limited impact in stopping assault weapon attacks. Exhibit 11 Andrew at p.9.

33. Other weapons, such as a pump action shotgun or an eight-shot revolver, have stopping power, low probability of over penetration, and ease of use. Exhibit 5 Yurgealitis at p.28.

34. A shotgun disperses shot in a conical pattern, expanding in an ever-larger pattern as it travels, as opposed to a round from an AR-15, which travels like a laser beam. *Deposition of James Yurgealitis* ("Yurgealitis Dep."), 92:1-7, attached hereto as Exhibit 12.

35. A shotgun's conical shot pattern has more utility in a home defense scenario, for example, in a darkened house where the homeowner may be feeling the effects of adrenaline. Exhibit 12 Yurgealitis 92:1-17.

## Witnesses

36.     Phil Andrew is a public safety and crisis management specialist, a licensed attorney, and a detective. Exhibit 11 Andrew at ¶¶ 3-4, 6-7.

37.     Andrew was a Special Agent of the Federal Bureau of Investigation for 21 years. *Id.* at ¶¶ 3-4, 6-7, 9-10, 12-15.

38.     Dr. Christopher Colwell is the Chief of Emergency Medicine at Zuckerberg San Francisco General Hospital and Trauma Center. *Declaration of Christopher B. Colwell, M.D.* ("Colwell") at p.1, attached hereto as Exhibit 13.

39.     Dr. Colwell has over 30 years of experience treating gunshot wounds, including treating the victims of the shootings at Columbine High School in Colorado, a movie theater in Aurora, Colorado, and the UPS facility in San Francisco. Colwell at 3. [N]ot one of the injuries from assault weapons that he has managed has come in the setting of self-defense. *Id.* at p.3.

40.     John Donohue is the C. Wendell and Edith M. Carlsmith Professor of Law at Stanford Law School and was formerly a tenured chaired professor at both Yale Law School and Northwestern Law School. Professor Donohue teaches courses evaluating the nature of gun regulation in the United States and its impact on crime. Exhibit 4 Donohue at ¶¶ 3-5.

41.     Dr. Stephen Hargarten is an emergency medicine specialist and a faculty member at the Comprehensive Injury Center at the Medical College of Wisconsin. He has practiced emergency medicine for over 35 years and conducted research on wound ballistics that involved shooting different styles of firearms at a gelatin standardized muscle tissue

simulator. *Report of Stephen W. Hargarten, MD, MPH* ("Hargarten") at ¶ 1, ¶ 8-12, and Viramontes 03545, attached hereto as Exhibit 14.

42.     James Yurgealitis is a consultant and technical advisor in the field of firearms forensics. Exhibit 5 Yurgealitis at Viramontes 04176-4177.

43.     Yurgealitis is a former Special Agent of the Bureau of Alcohol, Tobacco, and Firearms where he served as the Program Manager for Forensic Services at the ATF National Laboratory Center, as well as a Special Agent of the Federal Bureau of Investigation, the U.S. Secretary of State, and the U.S. Department of State. *Id.* at Viramontes 04176-4177.

44.     Louis Klarevas is a security policy analyst and research professor at Teachers College, Columbia University. Exhibit 3 Klarevas at ¶¶ 1-4.

45.     Klarevas is a founding member of the Columbia University Scientific Union for the Reduction of Gun Violence (SURGE) as well as a member of the Regional Gun Violence Research Consortium at the State University of New York's Nelson A. Rockefeller Institute of Government. *Id.* at ¶¶ 1-4.

46.     Klarevas has served on the faculties of the George Washington University, the City University of New York, New York University, and the University of Massachusetts. He is a former Defense Analysis Research Fellow at the London School of Economics and Political Science and a United States Senior Fulbright Scholar in Security Studies at the University of Macedonia. *Id.* at ¶¶ 1-4.

47.     Dr. Martin Schreiber is a Colonel in the U.S. Army Reserve and the Chief of the Division of Trauma, Critical Care, & Acute Care Surgery, a Professor of Surgery, and the trauma medical director at Oregon Health & Science University. *Declaration of Martin A.*

*Schreiber, MD FACS FCCM COL, MC, USAR* ("Schreiber") at Viramontes 003958, 03964, attached hereto as Exhibit 15.

48.　　Dr. Schreiber has served in Afghanistan twice and in Iraq once caring for combat injuries. *Id.*

49.　　Dr. Jillian Peterson is an associate professor of criminology and criminal justice and the Director of the Forensic Psychology program at Hamline University. *Expert Report of Jillian K. Peterson, PhD for Cook County State's Attorney's Office* ("Peterson") at Viramontes 03908, attached hereto as Exhibit 16.

50.　　Dr. Peterson is the Co-founder and co-president of The Violence Project Research Center, which is best known for its public database of mass shooters in the U.S. *Id.*

51.　　Saul Cornell is the Paul and Diane Guenther Chair in American History at Fordham University, where he teaches constitutional history to undergraduates, graduates, and law students of the Fordham Law School. *Expert Report of Professor Saul Cornel* ("Cornell") at Viramontes 004185, attached hereto as Exhibit 17.

52.　　Professor Cornell has been a senior visiting research scholar at Yale Law School, the University of Connecticut Law School, and Benjamin Cardozo Law School. He has been widely published on the topic of the Second Amendment and gun regulation. *Id.*

53.　　Dr. Diana Palmer is a licensed mental health provider, clinical supervisor, and part-time lecturer in the Doctor of Law and Policy program at Northeastern University. She holds a doctorate degree in Law and Policy. *Expert Report and Declaration by Dr. Diana Palmer* ("Palmer") at ¶¶ 1,2 , attached hereto as Exhibit 18.

54.　　Chief Larry Snelling is the Chief of the Chicago Police Department's Bureau of Counterterrorism. He has been a member of the Chicago Police Department since 1992.

He is responsible for over twenty units, including the Intelligence Section, Special Weapons and Tactics (SWAT), Firearms Investigation Team, Canine Unit, Public Transportation Unit, Airport Operations, Marine Operations Unit, Mounted Unit, Gang Investigations Unit, and Bomb Squad of CPD.Exhibit 10 Snelling at ¶¶ 1-3, 6.

### Medical Implications of Injuries Caused by Assault Weapons

55.     Injuries caused by assault weapons and events in which assault weapons are used are consistently more serious than those caused by non-assault weapons. Exhibit 13 Colwell at p.1.

56.     Gunshot wounds from assault weapons, such as AR-15s and AK-47s, increase the likelihood for morbidity as well as difficulty in triaging and managing injuries. *Id.* at p.2.

57.     Conversely, handgun injuries produce less harm to the human body and are generally survivable unless the bullet penetrates a critical organ or major blood vessel. Exhibit 15 Schreiber at p.2.

58.     Victims of assault weapons are at greater risk for immediate and long-term complications from both damage caused by the velocity of the bullets and the number of wounds involved. Exhibit 13 Colwell at p.2,3.

59.     The killing capacity of a weapon is primarily determined by the kinetic energy imparted by the bullet, its effective range, and the rate at which the weapon fires projectiles. Exhibit 15 Schreiber at p.2.

60.     The muzzle velocity of an AR-15 is approximately 3,200 feet per second compared to approximately 1,200 feet per second for a 9mm Baretta. The kinetic energy of an AR-15 is 1,303 foot pounds, compared to 400 foot pounds for a 9mm Baretta. *Id.* at 2; Exhibit

5 Yurgealitis at p.16. The effective range of an A-R15 is approximately 400–500 yards compared to up to 50 yards for a typical handgun. Schreiber at 3.

61.     The energy release with a bullet from AR 15 style rifles (5.56 NATO bullets) is over three times greater than from bullets from a Thompson Machine gun rifle (.45 ACP bullet). Exhibit 14 Hargarten at ¶¶ 11, 12.

62.     When a projectile fired by an AR-15 penetrates the human body, it creates not only a permanent cavity the size of the bullet, but also a temporary cavity radiating radially from the permanent cavity path caused by the dispersion of kinetic energy. *Id.* at ¶ 10; Exhibit 15 Schreiber at p.2.

63.     The temporary cavity can be up to 11–12.5 times larger than the diameter of the ammunition. Exhibit 5 Yurgealitis at p.17.

64.     The temporary cavity of the 5.56 NATO bullet is over three times the size of the .45 caliber bullet's temporary cavity from the Thompson Machine gun. Exhibit 14 Hargarten at ¶¶ 11, 12.

65.     An AR-15's kinetic energy release and resulting permanent and temporary cavities are more destructive than a bullet fired by a Thompson machine gun, with direct implications for injury and death. *Id.* at ¶ 13.

66.     The "yaw" of assault rifle ammunition (the deviation of the bullet's axis in relation to its trajectory) also contributes to the creation of both temporary and permanent large wound cavities in the human body. Exhibit 5 Yurgealitis at p.16.

67.     5.56 bullets will yaw upon contacting tissue. Conversely, handgun bullets travelling at a lower velocity do not typically yaw upon contact with tissue and do not create as large

of a wound cavity nor commensurate destruction of tissue. *Id.* at 16; Exhibit 12 Yurgealitis Dep. 67:12-24.)

68.     The yaw effect of assault rifle ammunition can also cause the bullet to fragment upon striking human bone, which contributes to additional tissue damage not immediately adjacent to the cavity itself.  Exhibit 5 Yurgealitis at p.16.

69.     The fragmentation of assault rifle ammunition can amplify the effects of the temporary cavity, increasing the severity of the wound. *Id.*at p.17.

70.      Organs such as the liver and spleen are more severely lacerated because of the development of temporary cavitation. Exhibit 14 Hargarten at ¶ 14; Exhibit 15 Schreiber at p.2.

71.      Patients with assault rifle injuries frequently have multiple organs injured as well as major blood vessels. They often require massive blood transfusions due to tremendous blood loss and require a series of operations, instead of just one as is common with handguns. Exhibit 15 Schreiber at p.2.

72.      When patients with assault rifle injuries survive, they require prolonged hospitalizations and follow-up and suffer much greater disability for the rest of their shortened lives. *Id.*

73.      Bullets from AR 15 style rifles are also more likely to fracture bones due to their higher energy release. Exhibit 14 Hargarten at ¶ 14.

74.      Assault rifle blasts to the extremities frequently result in amputations, Exhibit 15 Schreiber at p.2, even where an injury to the same body part caused by a handgun would be treatable. Exhibit 13 Colwell at p.3.

75.     Children who are shot by an AR-15 style bullet have extremely high mortality rates, partially due to having a smaller torso and lower blood reserve than teenagers or adults. Exhibit 14 Hargarten at ¶ 15.

76.     The effective of an AR-15 is approximately 400–500 yards, compared to 50 yards for a typical handgun. Exhibit 15 Schreiber at p.3.

77.     Assault weapons, especially when equipped with large capacity magazines, can also fire more shots faster, often causing more victims per event and more injuries per victim. Exhibit 13 Colwell at p.3.

78.     The fact that there are multiple victims when assault weapons are involved adds to the complexity of managing cases as triage of multiple potentially serious injuries is often involved which can lead to delays in transport and treatment while resources are being used for multiple real or potential victims. *Id.*

79.     Injuries caused by assault weapons are more likely to require implementation of disaster plans which focus resources on doing the greatest good for the greater number of victims, potentially limiting resources for other patients who may also need assistance. *Id.* at p.2.

80.     These complex and difficult triage decisions are rarely, if ever, necessary when non-assault weapons are involved. *Id.* at p.3.

81.     The injuries produced by assault type weapons frequently exceed the capabilities of civilian trauma systems and trauma surgeons. Exhibit 15 Schreiber at p.3.

82.     When first introduced, military-style AR-15 types of weapons were not especially popular. Exhibit 17 Cornell at p.22.

12

83.     The patent on the AR-15 expired in the late 1970s, which led to competition in the marketplace. Exhibit 5 Yurgealitis at p.14,15.

84.     In the 1980s, gun manufacturers began branding military-style firearms with the label "assault" weapons to make them more marketable to civilians. *Id.* at 18–19; Exhibit 3 Klarevas at ¶ 14; Exhibit 4 Donohue at ¶ 90.

85.     After the 1994 federal ban expired in 2004, legislation provided broad immunity to gun manufacturers, which allowed for a torrent of consumer advertising designed to highlight the battlefield appeal of modern assault weapons. Exhibit 4 Donohue at ¶ 84.

86.     Gunmakers developed a set of marketing strategies linking these products to their origins in the military. Exhibit 17 Cornell at p.22.

87.     Marketing campaigns used to sell assault weapons have utilized images of military assault capabilities. *Id.* at 23.

88.     The gun industry marketed assault weapons with depictions of combat and phrases like, "The closest you can get without having to enlist," and "Forces of opposition, bow down." Exhibit 4 Donohue at ¶¶ 85, 87.

89.     Adam Lanza, the perpetrator of the Newtown killings, used a Bushmaster AR-15 type weapon marketed with the slogan "Consider Your Man Card Reissued." *Id.* at ¶ 91; Exhibit 17 Cornell at p.23.

90.     The overall configuration of "copycat" AR rifles remains identical to the original production design adopted in the 1960s. Exhibit 5 Yurgealitis at p.15, 17, 18.

91.     Shooters using assault weapons do not need a high level of firearm proficiency, professional training, or practice to inflict mass death and injury at close and longer ranges because they are able to fire rapidly with high-capacity magazines and remain accurate at

ranges well beyond 100 yards with little skill development. Exhibit 10 Snelling at ¶ 12; Exhibit 11 Andrew at p.6.

92.     Seventy percent of adults in the United States do not own any firearms at all. Exhibit 4 Donohue at ¶ 25.

93.     The rise in popularity of assault weapons and their accessories is a recent development in American gun culture. Exhibit 17 Cornell at p.21.

94.     As of December 2019, assault rifles made up approximately 4% of all firearms in circulation in American society. Exhibit 3 Klarevas at ¶ 27.

95.     The average civilian assault-rifle owner owns three or more assault rifles, and 27% of owners have bought four or more. Exhibit 4 Donohue at ¶ 86.

96.     The U.S. accounts for 5% of the world's population but has had one-third of the public shootings that have occurred worldwide since the late 1960s. *Id.* at ¶ 67.

97.      Of all firearm homicides in the U.S. in 1993, 17.9% were committed with long guns. That percentage doubled to 35.6% by 2018. *Id.* at ¶ 36.

98.      Since January 1, 1980, 1,195 people have died in the United States in mass public shootings, defined as shootings resulting in four or more casualties where the act occurred largely in a public setting and did not involve an underlying criminal objective. Exhibit 3 Klarevas at ¶ 23.

99.      Since January 1, 1980, 1,126 people have died in the United States in mass shootings that involved 6 or more fatalities regardless of motive or location, known as high fatality mass shootings. *Id.*

100.     746 of those deaths occurred after the expiration of the federal ban in 2004. (*Id.*, Ex. B.)

101.     There were an average of 2.7 events public mass shootings per year in the 1980s, rising to an average of 4.5 events per year from 2010 to 2013. Exhibit 4 Donohue at ¶ 41.

102.     The eight deadliest acts of criminal violence in the United States since September 11, 2001 have been mass shootings. Exhibit 3 Klarevas at ¶ 24. Seven of those mass shootings involved assault weapons. *Id.* at ¶ 28.

103.     2010 to 2019 was the worst decade on record in terms of frequency and lethality of mass shootings in the United States. *Id.* at ¶ 25.

104.     Assault weapons are disproportionately used in mass shootings relative to their use in other gun homicides. Exhibit 16 Peterson at p.8.

105.     Over half of high-fatality mass shootings and mass public shootings in the last five years involved assault weapons. Exhibit 3 Klarevas at ¶ 26.

106.     Over 70% of deaths in high-fatality mass shootings and mass public shootings in the last five years were from incidents involving assault weapons. *Id.*

107.     In 2019, 75% of high-fatality mass shootings and 57% of all mass public shootings were committed with assault rifles, far outpacing the relative prevalence of assault rifles in American society. *Id.* at ¶ 27.  Extended magazines were used in a fifth of all mass shootings with more than 4 fatalities from 1999 to 2022. Exhibit 16 Peterson at p.11.

108.     Since 1980, high fatality mass shootings without an assault weapon had an average death toll of 8.0 fatalities per shooting. High fatality mass shootings with an assault weapon had an average death toll of 13.5 fatalities per shooting. Exhibit 3 Klarevas at ¶ 29.

109.     Since 1980, mass public shootings without an assault weapon had an average death toll of 6.0 fatalities per shooting. Mass public shootings with an assault weapon had an average death toll of 10.6 fatalities per shooting. *Id.*

110.    Since 2012, high fatality mass shootings without an assault weapon had an average death toll of 7.8 fatalities per shooting. High fatality mass shootings with an assault weapon had an average death toll of 18.1 fatalities per shooting. *Id.*

111.    Since 2012, mass public shootings without an assault weapon had an average death toll of 6.2 fatalities per shooting. Mass public shootings with an assault weapon had an average death toll of 13.9 fatalities per shooting. *Id.*

112.    Mass shootings presently pose the deadliest threat of individual acts of violence in America in the post-September 11 era, and the problem is growing. *Id.* at ¶ 43.

113.    Mass shootings involving assault weapons, on average, have resulted in a substantially larger loss of life than similar incidents that did not involve assault weapons. *Id.* at ¶ 43.

114.    Restrictions on assault weapons have the potential to significantly reduce the frequency and lethality of mass shootings. *Id.* at ¶ 43; *see also* Exhibit 4 Donohue at ¶ 67.

115.    Between January 1, 1990 and June 30, 2022, states that prohibited assault weapons experienced 44-percent and 14-percent decreases, respectively, in high-fatality mass shooting and mass public shooting incidence rates.  Exhibit 3 Klarevas at ¶ 37.

116.    Between January 1, 1990 and June 30, 2022, states with assault weapons bans experienced 57 percent fewer high-fatality mass shootings involving the use of an assault weapons and 32 percent fewer mass public shootings involving the use of assault weapons. *Id.* at ¶ 38.

117.    In the ten years the federal assault weapons ban was in effect, gun massacres resulting in 6 or more deaths fell significantly compared to the ten years prior. In the ten

years after the ban expired, gun massacres skyrocketed to levels higher than before the ban was in place. Exhibit 4 Donohue at ¶¶ 74–76, citing Klarevas.

118.    There is not the slightest evidence that the federal assault weapons ban compromised the safety of law-abiding citizens. Exhibit 4 Donohue at ¶ 104.

119.    Deaths per gun massacre increased 90% in the ten years after the federal ban was allowed to expire. *Id.* at ¶ 80.

120.    There have been 15 gun massacres with 6 or more deaths since 2014, killing 272 people, and each one involved assault weapons and/or high capacity magazines that would have been prohibited under the federal ban had it still been in effect. *Id.* at ¶ 81.

121.    In the five-year period from 2014-2019, the number of fatalities in gun massacres involving 6 or more deaths topped the amount that occurred in the ten years after the ban expired (2004-2013). *Id.* at ¶ 78.

122.    Mass shooters who use assault rifles are likely influenced by two psychological phenomena: the weapons effect and social proof. Exhibit 16 Peterson at p.12–13.

123.    The weapons effect is a concept that states that the mere presence of weapons increases aggressive thoughts and aggression. *Id.*

124.    Social proof is a concept stating that people tend to mimic those who came before when they do not know what to do. In the context of mass shootings, this means many mass shooters conform to expectations of what mass shooters do, and one mass shooting creates social proof for the next mass shooting, until eventually there is a generalized knowledge about mass shootings. *Id.* at 13.

125.    In 2018, the FBI announced that the active shooter problem in the United States was growing. Exhibit 4 Donohue at ¶ 45.

17

126.     According to the FBI's data, the number of active shooter incidents has doubled from 2017 to 2021, from 30 to 61. *Id.* at ¶ 46.

127.     The number of mass shootings is higher following the termination of the federal assault weapons ban in 2004. *Id.* at ¶ 47.

128.     After the federal ban lapsed in 2004, the gun market was flooded with increasingly more powerful weaponry that allowed mass killers to kill even more quickly with predictable results. *Id.* at ¶ 77.

129.     The decade after the ban lapsed saw a 266 percent increase in mass shooting incidents and a 347 percent increase in fatalities, even as overall violent crime continued downward. *Id.* at ¶ 77.)

### Cook County's Ordinance

130.     In November 2006, the Cook County Board of Commissioners enacted, and in July 2013 they revised, the Blair Holt Assault Weapons Ban ("the Ordinance"). Exhibit 7 Complaint at ¶ 18; Exhibit 2 Ordinance.

131.     The Ordinance defines "assault weapon" and "large-capacity magazine" and makes it illegal to "manufacture, sell, offer or display for sale, give, lend, transfer ownership of, acquire, carry or possess" either item in Cook County. Exhibit 2 Ordinance; Exhibit 7 Complaint at ¶ 19.

132.     Under section 24-211(1)(A)–(E) of the Ordinance, an assault weapon includes a "semiautomatic rifle that has the capacity to accept a large capacity magazine detachable or otherwise" as well as at least one of the following: only a pistol grip without a stock attached; any feature capable of functioning as a protruding grip that can be held by the non-trigger hand; a folding, telescoping, or thumbhole stock; a shroud attached to the

barrel, or that partially or completely encircles the barrel, allowing the bearer to hold the firearm with the non-trigger hand without being burned, but excluding a slide that encloses the barrel; or a muzzle break or muzzle compensator. Exhibit 2 Ordinance at § 24-211(1)(A)–(E); Exhibit 5 Yurgealitis at p.22.

133. Under section 24-211(2), an assault weapon includes a "semiautomatic pistol or any semi-automatic rifle that has a fixed magazine, that has the capacity to accept more than ten rounds of ammunition." Exhibit 2 Ordinance at § 24-211(2); Exhibit 5 Yurgealitis at p.24.

134. Under section 24-211(3), an assault weapon has the capacity to accept a detachable magazine as well as at least one of the following: any feature capable of functioning as a protruding grip that can be held by the non-trigger hand; a folding, telescoping, or thumbhole stock; a shroud attached to the barrel, or that partially or completely encircles the barrel, allowing the bearer to hold the firearm with the non-trigger hand without being burned, but excluding a slide that encompasses the barrel; a muzzle brake or muzzle compensator; or the capacity to accept a detachable magazine at some location outside of the pistol grip. Exhibit 2 Ordinance at § 24-211(3); Exhibit 5 Yurgealitis at p.24–25.

135. Under section 24-211(4), an assault weapon includes a semiautomatic shotgun with one more of the following: only a pistol grip without a stock attached; any feature capable of functioning as a protruding grip that can be held by the non-trigger hand; a folding, telescoping, or thumbhole stock; an ability to accept a detachable magazine. Exhibit 2 Ordinance at § 24-211(4); Exhibit 5 Yurgealitis at p.25.

136. Under section 24-211(5), an assault weapon includes any shotgun with a revolving cylinder. Exhibit 2 Ordinance at § 24-211(5).

137.    A semiautomatic rifle or shotgun which includes only a pistol grip increases the ability of the operator to conceal the firearm, to maneuver the firearm in confined space, and to fire from positions other than the shoulder. Exhibit 5 Yurgealitis at p.22,26.

138.    Semiautomatic rifles with a pistol grip and without a shoulder stock are used in the military. Exhibit 12 Yurgealitis Dep., 27:10-28:9.

139.    A protruding foregrip allows the operator to better control recoil and muzzle climb, thus increasing the hit probability of successive shots. Exhibit 5 Yurgealitis at p.22,26.

140.    Rifles with protruding foregrips or forward grips are military-style firearms as opposed to sporting style firearms. Exhibit 12 Yurgealitis Dep., 28:21-29:13.

141.    A folding and/or telescoping stock facilitates easier or more comfortable firing from positions other than the shoulder and allows the operator to more easily conceal or maneuver the rifle in a confined space. Exhibit 5 Yurgealitis at p.23,26.

142.     Folding, telescoping, and thumbhole stocks are not common features on sporting rifles. Exhibit 12 Yurgealitis Dep., 29:14-18.

143.    A shroud or handguard that encircles the barrel protects the gas tube/ piston mechanism from inadvertent damage, protects the operator from injury due to a hot barrel or other component, and provides additional grip space for the operator to steady the rifle. Exhibit 5 Yurgealitis at p.23,26.

144.    Barrell shrouds or handguards are more common on military firearms than sporting rifles. Exhibit 12 Yurgealitis Dep., 29:19-30:10.

145.    A muzzle brake can allow the operator to regain control of the rifle more rapidly after firing by venting escaping gases upward at the end of the barrel. Exhibit 5 Yurgealitis at p.23,26.

146. Muzzle brakes and muzzle compensators are not common features on sporting rifles. Exhibit 12 Yurgealitis Dep., 31:2-6.

147. A secondary added grip increases stability in controlling a pistol. Exhibit 5 Yurgealitis at p.24.

148. A folding, telescoping, or thumbhole stock increases stability in controlling the pistol. *Id.*

149. Modern firearms with a detachable magazine forward of the pistol grip provide a second grip point, increasing stability and allow more controlled rapid fire. *Id.* at p.25.

150. Increased controllability can result in more effective shot placement by the operator and require less time to acquire successive targets. *Id.* at p.24.

151. Most traditional hunting rifles or sporting rifles do not have the ability to accept or use detachable magazines with varying capacities. Exhibit 12 Yurgealitis Dep., 34:19-24.

152. The Ordinance also lists specific examples of banned assault weapons. Exhibit 2 Ordinance at § 54-211(7)(a); Exhibit 7 Complaint at ¶ 26.

153. Any person who legally possessed an "assault weapon" or "large-capacity magazine" prior to enactment of the Ordinance must remove it from county limits, modify it to render it permanently inoperable, or surrender it to the Sheriff. Exhibit 2 Ordinance at § 54-212(c); Complaint at ¶ 21.

154. Violation of the County Ordinance is a misdemeanor, carrying a fine ranging from $5,000 to $10,000 and a term of imprisonment of up to six months. Exhibit 2 Ordinance at § 54-214(a); Complaint at ¶ 23.

155. Controlling for population, the states that have prohibited assault weapons experienced 57% fewer high fatality mass shooting incidents involving assault weapons

and 32% fewer mass public shooting incidents involving assault weapons than states without assault weapons bans for the period of January 1, 1990 through June 30, 2022. Exhibit 3 Klarevas at ¶ 38.

156.    The states that have prohibited assault weapons experienced 68% fewer fatalities resulting from high fatality mass shooting incidents involving assault weapons and 57% fewer fatalities resulting from mass public shooting incidents involving assault weapons than states without assault weapons bans for the period of January 1, 1990 through June 30, 2022. *Id.*

157.    Controlling for population, and including shootings that did not involve assault weapons, the states that have prohibited assault weapons experienced 44% fewer high fatality mass shooting incidents with firearms of all kinds and 14% fewer mass public shooting incidents with firearms of all kinds than states without assault weapons bans for the period of January 1, 1990 through June 30, 2022. *Id.* at ¶ 37.

158.    By population, the states that have prohibited assault weapons experienced 54% fewer fatalities resulting from high fatality mass shootings involving firearms of all kinds and 37% fewer fatalities resulting from mass public shootings involving firearms of all kinds than states without assault weapons bans for the period of January 1, 1990 through June 30, 2022. *Id.* at ¶ 37.

159.    Cook County has experienced less frequent and less lethal high-fatality mass shootings and mass public shootings than the rest of the United States since implementing the assault weapons ban in 1993. *Id.* at ¶ 40.

160.    Cook County has not seen a high-fatality mass shooting or mass public shooting involving an assault weapon since the ban. *Id.* at ¶ 40.

161.     The high-fatality mass shootings and mass public shootings perpetrated without an assault weapon that have occurred in Cook County since the ban have an average death toll of 6.0 per incident and 5.5 per incident, respectively. *Id.* at ¶ 40.

162.     The average death toll of high fatality mass shootings and mass public shootings in the entire United States is 10.1 and 7.4, respectively. *Id.* at ¶ 40.

163.     If the federal assault weapons ban had remained in place after 2004 and the country had moved toward a more complete ban, many of the gun tragedies of recent years would have been far less deadly and damaging to countless individuals who have been maimed and injured throughout the United States. Exhibit 4 Donohue at ¶ 114.

164.     The FBI's analysis of active shooters over age 18 found that 65% had no adult convictions prior to the active shooting event. *Id.* at ¶ 50.

165.     One in five assault weapons owners do not lock up their assault rifles, and more than 30% do not secure their ammunition. *Id.*at ¶ 86.

166.     Teenage gunmen who are not eligible to possess assault weapons may take weapons from relatives who legally possess them and use them to commit mass shootings, as was the case in at least 20 of the 32 school shootings with at least three victims dead or injured that have occurred since 1990. *Id.* at ¶ 50; *see also Id.* at ¶106.

167.     Approximately 400,000 guns fall into the possession of criminals each year when they are lost by or stolen from law-abiding citizens. *Id.* at ¶ 108.

168.     Many of the most horrific and notorious mass shootings were perpetrated by law-abiding citizens armed with assault weapons: Stephen Paddock (Las Vegas, 59 killed); Omar Mateen (Pulse Nightclub, 49 killed); Adam Lanza (Sandy Hook Elementary, 26

killed); James Holmes (movie theater, 12 killed); Buffalo, New York supermarket (10 killed); Uvalde, Texas elementary school (21 killed). *Id.* at ¶ 109.

**Impact on the Community**

169.     Survivors of mass shootings report a broad range of emotions, such as anger, sadness, fear, frustration, helplessness, and an eroded sense of safety and trust, as well as symptoms of depression, anxiety, cognitive issues, and post-traumatic stress disorder. Exhibit 16 Peterson at p.14; *see also* Exhibit 4 Donohue at ¶ 48.

170.     The National Center for Post-Traumatic Stress Disorder states that 28% of people who witness a mass shooting develop PTSD and another third will develop acute stress disorder. Exhibit 16 Peterson at p.14.

171.     Some studies have found that as many as 95% of mass shooting survivors develop PTSD in the aftermath. *Id.*

172.     In communities where a mass shooting occurs, at least 5 to 10% of people who were not primary victims develop PTSD. *Id.*

173.     Because mass shootings are seemingly random and unpredictable, these events cause helplessness, making them more traumatic than nearly all other causes of injury and death in the healthy populations that are exposed. *Id.*

174.     Nearly half of all adults in the United States fear becoming a victim of a mass shooting. *Id.* at p.15.

175.     Approximately 80% of U.S. adults report feeling stressed about mass shootings. *Id.* at p.15.

176.     As of 2018, three out of four youth in America reported mass shootings being a primary source of stress. *Id.* at p.15.

177.     Around 20% of youth report the potential of a school shooting causes them daily stress. *Id.* at p.15.

178.     Following the 1984 San Ysidro McDonald's shooting in which 21 people were killed by a gunman with a semi-automatic Uzi, 12.6% of female members of the broader community who were not directly involved in the shooting showed symptoms of PTSD. *Id.* at p.15.

179.     Public mass shootings are particularly high-visibility events that are quite shocking to the public and unsettling to the sense of public safety. Exhibit 4 Donohue at ¶ 61.

180.     It is abundantly clear that the horrors of mass shootings such as the killing of 20 students and 6 teachers at Sandy Hook Elementary, 19 elementary students and 2 teachers in Uvalde, Texas, and 10 people who died in a hate crime in Buffalo, New York, have inflicted psychological distress far beyond the contours of those small communities and indeed caused suffering throughout the entire country. *Id.*

181.     Studies consistently show that mass shootings can lead to increased levels of post-traumatic stress disorder, anxiety, and depression. *Id.* at ¶ 62.

182.     The 2008 shooting at Northern Illinois University that left five people dead and 17 wounded led to a dramatic increase in PTSD symptoms among the university's students. *Id.* at ¶ 62.

183.     In Norway, stress reactions were increased among the general population after a shooting in 2011 left 67 people dead and 32 wounded. *Id.* at ¶ 63.

184.     Children and people who have experienced previous trauma or psychological disorders are more susceptible to mental health problems or PTSD after a mass shooting. *Id.* at ¶ 65.

185. One study found that local exposure to fatal school shootings increased youth antidepressant use by 21.4% in the following two years. *Id.* at ¶ 66.

186. Rifle caliber assault weapons prohibited under the Ordinance pose a significant risk to law enforcement officers. Exhibit 5 Yurgealitis at p.32.

187. Firearms based on the AR-15 design are the weapon of choice in 85% of mass shootings resulting in four or more victims. Exhibit 11 Andrew at p.4.

188. Domestic terrorists, extremists, and private militias with hate-related ideologies are attracted to and encouraged to acquire assault weapons based on the assault weapons' unique characteristics. *Id.*

189. Perpetrators of targeted violence arm themselves with assault weapons because they require limited professional training, they are effective at a distance, and because they are marketed as military-police style weapons. *Id.*; *see also* Exhibit 4 Donohue at ¶ 69.

190. Perpetrators seek to look cool, intimidate and embrace the appeal of the military or police wannabe due to intentional marketing tie-in by manufacturers. Exhibit 11 Andrew at p.4; *see also* Exhibit 4 Donohue at ¶ 69.

191. An assailant with an assault rifle is able to kill and injure twice the number of people compared to an assailant with a non-assault rifle or handgun. Exhibit 11 Andrew at 4. "[F]rom a public safety perspective, once an attack begins with an assault weapon, it is already worst-case scenario." Exhibit 11 Andrew at 3. "Death and severe injury is not avoidable." Exhibit 11 Andrew at p.3.

192. An assault weapon transforms terrorists, criminals, deranged people, or disconnected teens with poor coping skills and an intent to kill into killing machines. Exhibit 11 Andrew at p.6.

193.    Mass shooters frequently express the view that assault weapons will make others realize they are powerful. Exhibit 4 Donohue at ¶ 69.

194.    The shooter who perpetrated a mass shooting at a high school in Parkland, Florida left a recording on his Instagram including the statement, "With the power of the A.R. you will know who I am." *Id.* at ¶ 94.

195.    The ability to kill or injure more people with an assault rifle has coincided with a sharp increase in mass shootings and related casualties, representing a significantly increased public safety threat and a decreased ability to effectively stop and respond to attacks with assault weapons without significant casualties and injuries. Exhibit 11 Andrew at p.4.

196.    The general public and particularly large public venue events, schools, and workplaces are at greater risk today due to the limits of reasonable and practical law enforcement and crisis planning efforts to mitigate the threat of an individual or group using assault weapons to attack. Exhibit 11 Andrew at p.5.

197.    The widely endorsed "run, hide, and fight" active shooter response has limitations based on the crisis environment, the mindset of situational leaders, the age and capacity of those participating, and the attackers' participation, surprise, and position, and still results in death and injury even with training and practice. Exhibit 11 Andrew at p.6.

198.    "Law enforcement response, armed security, and concerned citizen response have proven to be slow for the few minutes that Assault Weapon attacks transpire and have low effectiveness in preventing death and injury in confrontations involving assault weapons… Attacks with assault weapons result in death and injury even with on-duty and off-duty law enforcement, armed security, and lawfully armed citizens present or in immediate vicinity

or response." Exhibit 11 Andrew at p.7. Law enforcement response to assault weapon-involved attacks requires highly aggressive officer responses, including specialized weapons, the surging of personnel, increased perimeters, and the mindset to undertake the force of violent action. Exhibit 11 Andrew at 7.

199.    These incidents increasingly require tactics such as charging structures with armored vehicles, use of explosives, robots, and drones with explosives. Exhibit 11 Andrew at 6.

200.    In the 2016 mass shooting at Pulse Nightclub, law enforcement used an armed personnel carrier (BearCat) to breach the wall after learning the shooter had an assault rifle. *Florida Department of Law Enforcement, Ninth Judicial Circuit, Use of Force Investigation Case #: OR-27-0258*, ("Orlando Report") attached hereto as Exhibit 19, p.13,24.

201.    The "good guy with a gun" actually requires significant training and expertise to confront an attacker safely and still rarely has the opportunity to respond under the surprise circumstances. Exhibit 11 Andrew at p.7, 8.

202.    A well-placed attacker with an assault weapon is devastatingly effective and decreases the opportunity for effective law enforcement response, as demonstrated in the 2017 Las Vegas concert attack. *Id.* at p.8.

203.    Approximately one in five police officers killed in the line of duty were killed with an assault weapon, despite the relative rarity of use of assault weapons in crime in general. Exhibit 4 Donohue at ¶ 132.

204.    Law enforcement officers are aware of the higher rate of deaths and injuries of officers due to assault weapons, aware that assault weapons are being used to target law

enforcement officers, and aware of the fact that not all body armor provides adequate protection in a shoot-out. Exhibit 11 Andrew at p.8.

205. This contributes to stress and hinders recruitment, retention, and performance. *Id.*; *see also* Exhibit 4 Donohue at ¶132.

206. Individuals who believe firearms will be present at a protest are less likely to attend, carry a sign, or vocalize their views at the protest than individuals who do not believe firearms will be present. Exhibit 18 Palmer at p.11. This is true for both gun owners and non-gun owners. *Id.*

207. Individuals who did not believe firearms would be present at a protest tended to say that their reasons for attending a protest included wanting to be heard, to influence others, support a cause, participate in a civic duty, and effect change. *Id.* at p.12.

208. Individuals who did believe firearms would be present at a protest tended to not believe they would be able to make a difference or not to believe that making a difference was worth the risk they perceived was posed by the firearms. *Id.* at p.12–13.

209. People who were less likely to attend, carry a sign, or vocalize their views at a protest if they believed firearms may be present perceived that firearms at a protest would be used to intimidate or threaten them if the people with the firearms did not agree with their point of view. *Id.* at p.8,9.

210. Even individuals who believe they are responsible gun owners do not trust other people with guns in a protest environment. *Id.* at p.10.

211. Research also shows that instructors on campus reported a chilling effect on speech when students were armed not necessarily due to any overt action on the student's part, but

as a result of instructors' perceptions of the aggressive potential of the student due to campus carry. *Id.* at 9.

212.    Both students who own guns and those who do not report feeling that the presence of legal guns on campus would negatively affect classroom debate and decrease feelings of safety. *Id.* at p.10.

213.    The Chicago Police Department regularly recovers assault weapons and has recovered assault weapons that have been converted to fully automatic fire. Exhibit 10 Snelling at ¶ 12.

214.    Because assault weapons allow a shooter to hit within a larger area and at a higher velocity, many victims of assault weapons are not the intended targets but innocent bystanders, including bystanders shot through cars or walls. This has occurred in Chicago. *Id.* at ¶ 14–15.

215.    Gangs in Chicago are eager to procure assault weapons to intimidate other gangs or respond in kind to shootings involving assault weapons because they are more powerful and accurate. *Id.* at ¶ 17.

216.    Gangs in Chicago see it as a sign of weakness not to possess assault weapons and seek to avoid that appearance. *Id.* at ¶ 17.

217.    There is no rational reason for members of the public in Chicago to own assault weapons, even for self-defense. *Id.* at ¶ 18.

218.    Prior to 2008, the Chicago Police Department did not assign assault rifles to police officers. Due to the prevalence of assault weapons on the street rising in recent years, CPD now maintains a small number of assault rifles. *Id.* at ¶ 19.

219.     Most CPD officers do not carry assault weapons as part of their job duties and are not trained with them. *Id.* at ¶ 20.

220.     The first officer responding to an active shooter incident involving an assault weapon in Chicago will likely have weaker firepower than the assailant. *Id.* at ¶ 20.

221.     Standard police equipment has minimal effect on ammunition fired from assault weapons, and ammunition from assault weapons can travel through most bullet proof vests and standard protective equipment used by law enforcement. *Id.* at ¶ 13-14, 21.

222.     Situations involving an assailant with an assault weapon require officers to wear the highest level of protective equipment, such as the highest level of bullet-proof vests with added trauma plates. *Id.* at ¶ 22.

223.     The highest level of protective equipment can be prohibitively expensive and, for CPD officers, would have to be purchased out-of-pocket. *Id.* at ¶ 23.

224.     An officer outfitted with equipment that stops a shot fired from an assault weapon can still suffer significant trauma because of the high velocity with which he was hit. *Id.* at ¶ 22.

225.     Hits from assault weapons to parts of the body that are not covered by a vest will have a much higher likelihood of causing death or serious injury as compared to hits from other firearms. *Id.* at ¶ 22.

226.     Due to the weight of the highest level of body armor and the fact that such body armor limits the wearer's mobility, it is not practical to require all officers to wear this equipment, if it were available, except after it has been confirmed that a shooter possesses an assault weapon. *Id.* at ¶ 23.

227.     CPD has adjusted its large event and domestic terrorism preparations to address assault weapons and mass shootings. *Id.* at ¶ 24.

228.     The rise in mass shootings and the increased prevalence of assault weapons has led to CPD to dedicate increasingly large amounts of resources and time to securing events and the general safety of the public. *Id.* at ¶ 25.

229.     In preparation for 2022's Lollapalooza music festival, CPD asked residents near Grant Park to stay off their rooftops and instituted other safety precautions designed to address concerns from assault weapons from both within and without the perimeter. *Id.* at ¶ 26.

230.     A threat to Lollapalooza was reported in 2022, which caused CPD to have to decide whether to evacuate everyone to outside the secure perimeter, where the potential shooter could be waiting for the crowd with an assault weapon. *Id.* at ¶ 27.

231.     No matter how prepared or well-equipped CPD is, it is virtually impossible to guarantee a mass shooting with an assault weapon will be stopped. *Id.* at ¶ 28.

**History of Firearms Regulations in the United States 1700-1900**

232.     The dominant understanding of the Second Amendment and its state constitutional analogues at the time of their adoption in the Founding period forged an indissoluble link between the right to keep and bear arms with the goal of preserving the peace. Exhibit 17 Cornell at p.3.

233.     At the time of the drafting of the Second Amendment, regulation was not understood to be an "infringement" on the right to bear arms, but rather the necessary foundation for the proper exercise of that right as required by the concept of ordered liberty. *Id.* at p.6.

234.     The common law Americans inherited from England acknowledged that the right to self-defense was not unlimited and was designed to preserve the peace. *Id.* at 7.

235.     The long-standing prohibition on dangerous and unusual weapons reflects the principle of *in terrorem populi,* which was a concept inherited from English common law. *Id.* at p.11.

236.     According to the concept of *in terrorem populi*, the key determinant of legality was whether a particular weapon would provoke a terror and undermine the peace. *Id.* at p.11.

237.     Statutory law in England and the United States functioned to secure the peace and public safety. *Id.* at p.7.

238.     There was no serious homicide problem or other societal ill comparable to the modern gun violence problem for Americans to solve in the era of the Second Amendment. *Id.* at 7.

239.     Levels of gun violence among those of white European ancestry in the era of the Second Amendment were relatively low compared to modern America. *Id.* at 8.

240.     At the time of the Second Amendment, the guns most Americans owned were those most useful for life in an agrarian society such as fowling pieces and light hunting muskets. *Id.* at 8.

241.     Eighteenth-century muzzle loading weapons were not effective tools of interpersonal violence and were seldom used to commit crimes because they took time to load and could not be stored loaded. *Id.* at p.8.

242.     Keeping guns loaded in the eighteenth century was not a viable option. *Id.* at p.8.

243.     The black powder used in eighteenth-century weapons was corrosive and attracted moisture. *Id.* at p.8.

244.  Average citizens could theoretically stockpile gunpowder in their homes or places of business. Stephen Porter, *Accidental Explosions: Gunpowder in Tudor & Stuart London,* available at https://www.historyextra.com/period/tudor/accidental-explosions-gunpowder-in-tudor-and-stuart-london/

245.  In London, a gunpowder explosion at Tower Hill in 1552 killed seven, an explosion at Crooked Lane in 1560 killed eleven, another at Fetter Lane in 1583 killed three, another at Tower Street in 1650 killed 67 and destroyed fifteen houses, and in 1715 over a hundred houses on Thames Street were destroyed in a fire caused by a gunpowder explosion that leveled a house. Stephen Porter, *Accidental Explosions: Gunpowder in Tudor & Stuart London*, available at https://www.historyextra.com/period/tudor/accidental-explosions-gunpowder-in-tudor-and-stuart-london/

246.  In the famed Gunpowder Plot of 1605, Guy Fawkes and his coconspirators amassed 36 barrels of gunpowder to level the House of Lords. *See generally,* Alan Haynes, *The Gunpowder Plot* (History Press 1994).

247.  In England, the explosion at Crooked Lane led to an outright ban on gunpowder storage in houses, though that ban was later modified to allow storage of two pounds of powder. *See*, supra, Porter.

248.  At the time of the Founding, the States regulated the possession and storage of gunpowder as part of the exercise of their police power. Exhibit 17 Cornell at p.12-14.

249.  At the time of the Second Amendment, over ninety percent of weapons owned by Americans were long guns. *Id.* at p.9.

250.  The production and marketing of guns increased and was greatly advanced technologically in the nineteenth century. *Id.* at p.10.

251.     As cheaper, more dependable, and easily concealable handguns proliferated in large numbers in the nineteenth century, Americans began sporting them. *Id.* at p.10.

252.     As a result of the new technology and increased availability of guns, new laws were passed in the mid-1800s to limit the sale of weapons and the use of weapons that threatened the peace. *Id.* at p.10.

253.     Most courts upheld limits on the right to keep and bear arms. *Id.* at p.10.

254.     The primary limit identified by courts in evaluating gun laws was whether the law negated the ability to act in self-defense. *Id.* at p.10.

255.     The history and tradition of arms regulation has always recognized that the ability to inspire terrorem populi is a legitimate justification for regulation. *Id.* at p.23.

256.     The power to regulate firearms and gunpowder has always been central to the police power. *Id.* at p.12–14.

257.     Throughout Anglo-American legal history, government applications of the police power were marked by flexibility. *Id.* at p.15.

258.     Throughout Anglo-American legal history, communities were able to adapt to changing circumstances and craft appropriate legislation to deal with shifting challenges. *Id.* at p.15.

259.     As compared to the Revolution-era drafters, who feared standing armies and sought to entrench civilian control of the military, the Constitution writers in the era of the Fourteenth Amendment were motivated by the proliferation of especially dangerous weapons. *Id.* at p.16.

35

260.     The language of the right-to-bear-arms provisions in Reconstruction-era state constitutions began to reflect that the police power of the state could be used to regulate firearms. *Id.* at p.16.

261.     The 1868 Texas Constitution included language that underscored the connection Anglo-American law had recognized between the right to keep and bear arms and the regulation of guns. *Id.* at p.16.

262.     Sixteen state constitutions adopted during this period employed language acknowledging states' police power authority over firearms. *Id.* at p.16.

263.     Driven in part by the violence of the Reconstruction period, post-Civil War legislatures also enacted a range of new laws to regulate arms. Exhibit 17 Cornell at p.17, 18.

264.     The number of laws enacted regulating firearms increased by over four hundred percent from antebellum levels. *Id.* at p.17.

265.     The Reconstruction period witnessed an intensification of firearms regulation. *Id.* at p.18.

266.     Republicans in this time sought to protect the rights of African Americans to bear arms but were also insistent on enacting regulations aimed at public safety following the violence of the Reconstruction period. *Id.* at p.18.

### The Advent of Semi-Automatic Weapons

267.     The first assault weapon or assault rifle was a German Sturmgewehr Model 1944 used by the German military in World War II.  Exhibit 5 Yurgealitis at p.11.

268.     A semiautomatic firearm utilizes the energy generated by firing a cartridge to power the firearm's cycle of fire and reload the next cartridge to be fired without any action by

the user. This is in contrast to pump action, bolt action, or lever action weapons, all of which require the user to manually reload (by pumping a forearm piece or pulling a bolt or lever, e.g.) the next cartridge after firing. *Id.* at p.8–10.

269.     The assault weapons prohibited by the Ordinance were developed for use in war or are direct descendants of weapons developed for use in war. *Id.* at p.11–15, 19, 29.)

270.     Weapons designed for military use are designed to be maximally effective, i.e., to deliver reliable lethality or the ability to incapacitate a chosen target. *Id.* at p.21.)

271.     The assault weapons adopted by the U.S. military used 5.56mm/.223 caliber ammunition. *Id.* at p15.

272.     The 5.56mm/.223 caliber ammunition is smaller and lighter than the ammunition used in rifles prior to the advent of assault weapons. *Id.* at p.15.

273.     The 5.56mm/.223 caliber ammunition allowed a soldier to carry more ammunition and allowed the firearms to accommodate larger capacity magazines. *Id.* at p.15,16.

274.     Despite being smaller, the 5.56mm/.223 caliber ammunition traveled with the same muzzle velocity as the larger ammunition—approximately 3,200 feet per second. *Id.* at p.16.

275.     Typically, the 5.56mm/.223 caliber ammunition used in assault weapons will rotate on its axis ("yaw") when it hits human tissue. *Id.* at p.16.

276.     Handgun bullets travel at a lower velocity and do not typically experience yaw. *Id.* at p.16.

277.     When the military tested the 5.56mm/.223 caliber cartridge, they found that it had the capability to create a horrendous wound channel in a human target given the smaller size of the bullet. Exhibit 12 Yurgealitis Dep., 65:15-19.

278.     An M855A1 5.56mm/.223 caliber cartridge, which is used by the U.S. Army and readily available to the public, is capable of penetrating a concrete block at 20–40 yards and 3/8-inch-thick steel plate at 300 yards. Exhibit 5 Yurgealitis at p.30,31.

279.     In 2017, a shooter at the Sutherland Springs Baptist Church killed 26 people by standing outside the church and shooting an AR-15 254 times through the walls of the building. Exhibit 4 Donohue at ¶ 60.

280.     Many of the features and accessories specifically banned by the Ordinance allow a shooter to more easily conceal and/ or stabilize a semi-automatic rifle. Exhibit 5 Yurgealitis at p.22–26.

281.     The ability to fire an increased quantity of cartridges without reloading, which is afforded by a high-capacity magazine, increases the lethality and effectiveness of assault rifles. *Id.* at p.26.

282.     Assault rifles were not designed for traditional hunting, nor was 5.56mm/.223 caliber ammunition. *Id.* at p.27.

### Regulations on Firearms in the Late 19th Century and After

283.     At the beginning of the 20th century, changes in technology, consumer behavior, and society in the early decades of the 1900s created a novel gun-violence problem. Exhibit 17 Cornell at p.19.

284.     The emergence of fully automatic and semi-automatic weapons in the early decades of the twentieth century exacerbated urban crime. *Id.*

285.     As rapid-fire weapons, including semi-automatic and fully automatic weapons proliferated and undermined public safety, new laws were crafted to mitigate their harms. *Id.*

286.     Historically, legislation has only been deemed necessary once new weapons become popular enough to cause a problem that requires government action. *Id.*

287.     Restrictions on weaponry have historically followed growing criminal abuse and social harm, rather than at the time these weapons are first introduced. Exhibit 4 Donohue at ¶ 32; Exhibit 17 Cornell at p.19.

288.     Although fully automatic weapons like the Tommy gun became available for civilian purchase after World War I, they were not immediately perceived to present a sufficient public safety concern to prompt regulation. Exhibit 17 Cornell at p.19,20.

289.     In the 1920s and 1930s weapons like the "Tommy gun" became a preferred weapon for gangsters. Exhibit 4 Donohue at ¶ 33.

290.     The first group of state restrictions on weapons deemed inappropriate for civilian use were adopted in the 1920s and 1930s. *Id.*

291.     It was not until the mid-to-late 1920s, when fully automatic weapons became the preferred weapons for gangsters, that states moved to restrict them. Exhibit 17 Cornell at 20.

292.     As states restricted fully automatic weapons in response to "gangsterism" in the 1920s, many semi-automatic weapons were also restricted. *Id.*

293.     In the 1920s, multiple states passed new laws banning fully automatic machine guns. *Id.*

294.     By the early 1930s, more than half the states had passed some type of prohibition on fully automatic or semi-automatic weapons. *Id.*

295.     Multiple states embraced the view that fully automatic and semi-automatic weapons should be classified as "machine guns" for legal purposes. *Id.*

296.     A 1933 Minnesota law's definition of machine gun included "any firearm capable of automatically reloading after each shot is fired, whether firing singly by separate trigger pressure or firing continuously by continuous trigger pressure; which said firearm shall have been changed, altered, or modified to increase the magazine from the original design as manufactured by the manufacturers thereof, or by the addition thereto of extra and/or longer grips or stocks to accommodate such extra capacity, or by the addition, modification, and/or attachment thereto of any other device capable of increasing the magazine capacity thereof[.]" *Id.* at p.20,21.

297.     A 1934 South Dakota law defined machine guns as weapons "from which more than five shots or bullets may be rapidly, or automatically, or semi-automatically discharged from a magazine." *Id.* at p.21.

### The Rise of Assault Weapons in the United States

298.     In 1957, the Army invited Armalite's chief gun designer, Eugene Stoner, to produce a lightweight, high-velocity rifle that could operate in both semi- and fully-automatic modes with firepower capable of penetrating a steel helmet or standard body armor at 500 yards. Exhibit 4 Donohue at ¶¶ 96, 132.

299.     Stoner devised the AR-15 to meet these specifications. *Id.* at ¶ 96.

300.     One of its designers stated that the AR-15 assault rifle was originally engineered to generate "maximum wound effect." *Id.* at ¶ 101.

301.     A confidential ARPA report in July 1962 noted that the AR-15 was subject to comprehensive field evaluation under combat conditions in Vietnam and that the "lethality of the AR-15 and its reliability record were particularly impressive." *Id.* at ¶ 97.

302.     In December 1963 the Army adopted the AR-15 and rebranded it the M-16. *Id.* at
¶ 99; *see also* Exhibit 5 Yurgealitis at p.13,14.

303.     Colt, a firearms manufacturer, proposed the sale of its assault rifles on the civilian
market in 1963. Exhibit 5 Yurgealitis at p.17.

304.     The civilian version of the assault rifles did not include the capability to fire fully
automatic but maintained the same appearance, physical features, and semiautomatic rate
of fire. Exhibit 4 Donohue at ¶ 100; Exhibit 5 Yurgealitis at p.17–18.

305.     In the 1980s, sharp increases in crime occurred as more powerful weaponry started
to proliferate and led to a second round of restrictions limiting magazine capacity and
banning assault weapons. Exhibit 4 Donohue at ¶ 33.

306.     The rise of mass shootings in the last decades of the twentieth century impacted
firearms regulation. Exhibit 17 Cornell at p.21.

307.     Defining "assault weapons" has been contentious issue in political debate over gun
regulation. *Id.*

308.     Some in the gun rights community argue that "modern sporting rifles" share
features with other guns including hunting rifles. *Id.* at p.22.

309.     Because of the propensity of the 5.56mm/.223 caliber round to create significant
damage upon impacting living tissue, it is not generally considered nor favored as a hunting
cartridge. Exhibit 5 Yurgealitis at p.17.

310.     The development of the AR-15 was tied to the strategic requirements of the
American military to find a replacement for heavier World War II era rifles. Exhibit 17
Cornell at p.22.

311.    As social, economic, and technological changes have occurred, government has responded with evolving gun regulation. Exhibit 17 Cornell at p.26.

312.    California banned assault weapons after the Stockton School Massacre in 1989, in which a gunman killed 5 children and injured 32 others in less than 3 minutes with an AK-47-type assault rifle. *Id.* at p.21; Exhibit 3 Klarevas at ¶ 31.

313.    New Jersey (1990), Hawaii (1992), Connecticut (1993), and Maryland (1994) passed assault weapons restrictions or bans soon after the Stockton Massacre. Exhibit 3 Klarevas at ¶ 31.

314.    In September 1994, the United States Congress enacted a nationwide ban on assault weapons, which prohibited the manufacture, importation, possession, and transfer of assault weapons not legally owned prior to the date the law took effect. *Id.* at ¶ 33.

315.    The federal assault weapons ban included a 10-year sunset provision. Cognizant that the federal ban may be allowed to expire, Massachusetts and New York enacted their own state assault weapons bans prior to its expiration. *Id.* at ¶ 34.

316.    The District of Columbia enacted an assault weapons ban after the federal ban expired. *Id.* at ¶ 34.

317.    Currently eight state-level jurisdictions within the U.S. ban assault weapons: California, New Jersey, Hawaii (assault pistols only), Connecticut, Maryland, Massachusetts, New York, and the District of Columbia. *Id.* at ¶ 35.

318.    California, New Jersey, and Hawaii's bans have been in place for over 30 years. *Id.* at ¶ 35.

319.    Over a quarter of the U.S. population is subject to an assault weapons ban. *Id.* at ¶ 35.

320.     18 U.S.C. 924(c) provides an additional ten-year sentence for the use of a semi-automatic assault weapon during a crime of violence or drug trafficking offense. 18 U.S.C. 924(c).

321.     Much of the current controversy over bans or restrictions on dangerous or unusual weapons revolves around the AR-15 and similar types of weapons. Exhibit 17 Cornell at p.22.

322.     The debate over restrictions on dangerous and unusual weapons focuses heavily on technological factors, which obscures the fact that legislative efforts to ban those weapons fit squarely within the long Anglo-American tradition of limiting public access to weapons capable of provoking terror. *Id.*

323.     The statutes at issue in this case are analogous to a long-established tradition of firearms regulation in America, beginning in the colonial period and stretching across time to the present. *Id.* at 26.

324.     The maximum range of an M16 is 3,000 meters, and the effective range is 550 meters. Exhibit 5 Yurgealitis at p. 30.

https://www.tecom.marines.mil/portals/120/docs/student%20materials/fmst%20manual/m16.doc [1]

325.     The civilian AR-15 in 5.56mm ammunition retains the same performance characteristics in terms of muzzle velocity, range, etc.) as the military M16. Exhibit 5 Yurgealitis at p.29.

---

[1] Pursuant to Fed. R. Evidence 201(b)(2) the Court can take judicial notice of facts that can be accurately and readily determined from sources whose accuracy cannot be reasonably be questioned.

326.     The M-16 performing in semi-automatic mode fires at a rate of 45-65 rounds per minute. *Id.* at p.30.

327.     The M-16 performing in automatic mode fires at a rate of 150-200 rounds per minute. *Id.* at p.30.

### The Challenge of Policing in Public Spaces

328.     There are more than 1,000 sworn staff under Chief Snelling's supervision, and he serves as the Incident Commander for all major events in Chicago, including protests, festivals, concerts, etc. Exhibit 10 Snelling at ¶ 6.

329.     Chief Snelling also ensures that the CPD assists the FBI and other law enforcement agencies in defending against international and domestic terrorism. *Id.* at ¶ 8.

330.     As a member of the CPD, Chief Snelling possesses decades of experience with firearms, including assault weapons. *Id.* at ¶ 10. He has been present on crime scenes involving individuals shot or murdered by assault weapons an regularly receives and reviews reports of shootings in Chicago involving assault weapons. *Id.*

331.     Chicago has experienced a significant increase in the number of shootings involving assault weapons in the last ten years, and CPD recovers assault weapons regularly. *Id.* at ¶ 11.

332.     Gangs in particular seem to be in a race to procure assault weapons to intimidate other gangs or respond in kind to shootings involving assault weapons. *Id.* at ¶ 17.

333.     Gangs prefer assault weapons because they are more powerful and accurate, thus increasing the likelihood of fatalities. *Id.* at ¶ 17.

334.     There has also been an increase over the last several years of social media posts, meant to intimidate others and/or glamorize gang violence, depicting individuals brandishing assault weapons. *Id.* at ¶ 17.

335.     Assault rifles are the weapon of choice for mass shootings in public spaces, because they allow a person to kill or injure as many people as possible in a short time, much more than with a handgun or non-semi-automatic rifle. *Id.* at ¶ 24.

336.     Most officers do not carry assault weapons as part of their job duties, nor are they trained with them, so an officer first responding to an active shooter incident involving an assault weapon will have weaker firepower than the assailant. *Id.* at ¶ 20.

337.     CPD has thus adjusted its large event and domestic terrorism preparations to address assault weapons and mass shootings. *Id.* at ¶ 24.

338.     The rise in mass shootings and the increased prevalence of assault weapons has required CPD to dedicate increasingly large amounts of resources and time to securing public events and the general safety of the public. *Id.* at ¶ 25.

339.     No matter how prepared or well-equipped CPD is, it is virtually impossible to guarantee a mass shooting with an assault weapon will be stopped. *Id.* at ¶ 28.

Dated March 3, 2023

KIMBERLY M. FOXX
*Cook County State's Attorney*
*Counsel for Defendants*

By s/ *Jessica M. Scheller*

JONATHON BYRER
Supervisor, Appeals & Special Projects
DAVID A. ADELMAN
Supervisor, Affirmative & Complex
Litigation Section
JAMES BELIGRATIS
ELIZABETH BROGAN
SILVIA MERCADO MASTERS
EDWARD M. BRENER
Assistant State's Attorneys
Civil Actions Bureau
500 W. Richard J. Daley Center Place
Chicago, IL 60602
(312) 603-6934
(312) 603-5463

JESSICA M. SCHELLER
Chief; Advice, Business & Complex
Litigation Division
PRATHIMA YEDDANAPUDI,
Supervisor; Advice, Transactions &
Litigation Section
MEGAN HONINGFORD
JESSICA L. WASSERMAN
Assistant State's Attorneys
megan.honingford@cookcountyil.gov
jessica.wasserman@cookcountyil.gov

## <u>CERTIFICATE OF SERVICE</u>

The undersigned, an attorney, hereby certifies that on March 3, 2023, she caused to be filed through the Court's CM/ECF system the foregoing document, a copy of which will be electronically mailed to the parties of record.


<u>s/ *Jessica M. Scheller*</u>