# EXHIBIT 1

# THE URGENT NEED TO ADDRESS THE GUN VIOLENCE EPIDEMIC

## HEARING

BEFORE THE

## COMMITTEE ON OVERSIGHT AND REFORM HOUSE OF REPRESENTATIVES

ONE HUNDRED SEVENTEENTH CONGRESS

SECOND SESSION

JUNE 8, 2022

## Serial No. 117–84

Printed for the use of the Committee on Oversight and Reform



Available on: *govinfo.gov*,
*oversight.house.gov* or
*docs.house.gov*

U.S. GOVERNMENT PUBLISHING OFFICE

47–803 PDF        WASHINGTON : 2022

## COMMITTEE ON OVERSIGHT AND REFORM

CAROLYN B. MALONEY, New York, *Chairwoman*

ELEANOR HOLMES NORTON, District of Columbia
STEPHEN F. LYNCH, Massachusetts
JIM COOPER, Tennessee
GERALD E. CONNOLLY, Virginia
RAJA KRISHNAMOORTHI, Illinois
JAMIE RASKIN, Maryland
RO KHANNA, California
KWEISI MFUME, Maryland
ALEXANDRIA OCASIO-CORTEZ, New York
RASHIDA TLAIB, Michigan
KATIE PORTER, California
CORI BUSH, Missouri
SHONTEL M. BROWN, Ohio
DANNY K. DAVIS, Illinois
DEBBIE WASSERMAN SCHULTZ, Florida
PETER WELCH, Vermont
HENRY C. "HANK" JOHNSON, JR., Georgia
JOHN P. SARBANES, Maryland
JACKIE SPEIER, California
ROBIN L. KELLY, Illinois
BRENDA L. LAWRENCE, Michigan
MARK DESAULNIER, California
JIMMY GOMEZ, California
AYANNA PRESSLEY, Massachusetts

JAMES COMER, Kentucky, *Ranking Minority Member*
JIM JORDAN, Ohio
VIRGINIA FOXX, North Carolina
JODY B. HICE, Georgia
GLENN GROTHMAN, Wisconsin
MICHAEL CLOUD, Texas
BOB GIBBS, Ohio
CLAY HIGGINS, Louisiana
RALPH NORMAN, South Carolina
PETE SESSIONS, Texas
FRED KELLER, Pennsylvania
ANDY BIGGS, Arizona
ANDREW CLYDE, Georgia
NANCY MACE, South Carolina
SCOTT FRANKLIN, Florida
JAKE LATURNER, Kansas
PAT FALLON, Texas
YVETTE HERRELL, New Mexico
BYRON DONALDS, Florida
VACANCY

RUSS ANELLO, *Staff Director*
GRETA GAO, *Chief Oversight Counsel*
ELISA LANIER, *Director of Operations and Chief Clerk*
CONTACT NUMBER: 202-225-5051
MARK MARIN, *Minority Staff Director*

———

# C O N T E N T S

_____

|  | Page |
|---|---|
| Hearing held on June 8, 2022 ................................................................... | 1 |

Witnesses

**Panel 1**

Zeneta Everhart, Mother of Zaire Goodman, Buffalo, New York
Oral Statement ........................................................................................ 6

Roy Guerrero, M.D., Pediatrician, Uvalde, Texas
Oral Statement ........................................................................................ 8

Miah Cerrillo, Fourth Grade Student at Robb Elementary School, Uvalde, Texas
Oral Statement ........................................................................................ 10

Felix Rubio and Kimberly Rubio, Parents of Lexi Rubio, Uvalde, Texas
Oral Statement ........................................................................................ 11

Lucretia Hughes Klucken (minority witness), DC Project, Women for Gun Rights
Oral Statement ........................................................................................ 12

**Panel 2**

The Honorable Eric Adams, Mayor, New York, New York
Oral Statement ........................................................................................ 14

Greg Jackson, Jr., Executive Director, Community Justice Action Fund
Oral Statement ........................................................................................ 16

Becky Pringle, President, National Education Association
Oral Statement ........................................................................................ 17

Joseph Gramaglia, Police Commissioner, Buffalo, New York
Oral Statement ........................................................................................ 18

Nick Suplina, Senior Vice President for Law & Policy, Everytown for Gun Safety
Oral Statement ........................................................................................ 20

Amy Swearer (minority witness), Legal Fellow, The Heritage Foundation
Oral Statement ........................................................................................ 22

*Opening statements and the prepared statements for the witnesses are available in the U.S. House of Representatives Repository at: docs.house.gov.*

INDEX OF DOCUMENTS

————————

*The documents entered into the record are listed below, and are available at docs.house.gov.*

* *New York Times* article regarding mass shootings; submitted by Rep. Lynch.

* *Christian Science Monitor Weekly* article; submitted by Rep. Sessions.

* *FiveThirtyEight* article; submitted by Rep. Sessions.

* *Fox News* article, "West Virginia Woman With Pistol Shoots, Kills Man at Graduation Party: 'Saved Several Lives'," submitted by Rep. Clyde.

* *Wall Street Journal* article, "Why 'Do Something' Won't Work," submitted by Rep. Foxx.

* Testimony of Stephen Willeford from a May 25, 2022, Senate Judiciary Committee Hearing; submitted by Rep. Biggs.

* John Lott of Crime Research Prevention Center Report; submitted by Rep. Biggs.

* *Washington Examiner* article regarding the Buffalo shooter; submitted by Rep. Biggs.

* *New York Times* article, "The Mass Shootings Where Stricter Gun Laws Might Have Made A Difference," submitted by Rep. Tlaib.

* Article regarding Uvalde shooter; submitted by Rep. Speier.

* A 2015 Study, "Preventing School Violence, Assessing Armed Guardians, School Policy and Context;" submitted by Rep. Pressley.

* A 2019 report, "Cops and No Counselors," submitted by Rep. Pressley.

* Letters from the Federal School Discipline and Climate Group and other community-based organizations regarding mass policing and trauma-informed services; submitted by Rep. Pressley.

# THE URGENT NEED TO ADDRESS THE GUN VIOLENCE EPIDEMIC

———————

**Wednesday, June 8, 2022**

HOUSE OF REPRESENTATIVES,
COMMITTEE ON OVERSIGHT AND REFORM,
*Washington, D.C.*

The committee met, pursuant to notice, at 10:05 a.m., in room 2154, Rayburn House Office Building, and via Zoom; the Hon. Carolyn Maloney [chairwoman of the committee] presiding.

Present: Representatives Maloney, Norton, Lynch, Connolly, Krishnamoorthi, Raskin, Khanna, Mfume, Ocasio-Cortez, Tlaib, Porter, Bush, Brown, Davis, Wasserman Schultz, Welch, Johnson, Sarbanes, Speier, Kelly, Lawrence, DeSaulnier, Pressley, Comer, Jordan, Foxx, Hice, Grothman, Cloud, Gibbs, Higgins, Norman, Sessions, Keller, Biggs, Clyde, Franklin, LaTurner, Fallon, Herrell, and Donalds.

Also present: Higgins of New York and Jackson Lee of Texas.

Chairwoman MALONEY. The committee will come to order.

Without objection, the chair is authorized to declare a recess of the committee at any time.

I now recognize myself for an opening statement.

Today we will examine the destruction and heartbreak that gun violence is causing across our country. I want to express my deep gratitude to each of our witnesses for being here today. I am particularly grateful to our witnesses who will be discussing the loss of their loved ones and their personal experiences from recent mass shootings in Uvalde, Texas, and Buffalo, New York.

Despite their pain, these witnesses expressed their strong desire to share their stories with this committee and the public. I know that I speak for every member of this committee when I say that we are inspired by your bravery. For a parent, there is no greater pain than the loss of a child. But across the country, this gun violence is claiming the lives of our children and loved ones in places where they should be safe: our schools, our supermarkets, even our churches and our synagogues.

Gun violence is the leading cause of death for children in our country. As a society, we are failing our children and we are failing each other. This out-of-control gun violence is a uniquely American tragedy.

[Chart]

Chairwoman MALONEY. As you can see in this chart, in 2019, the United States suffered 17 times more gun deaths than the next highest G7 country. We stand alone in mass shootings. Other countries pass sensible gun safety laws and protect their children, and

no other country comes close to the number of school shootings we have.

Between 2009 and 2018, the U.S. had 288—288—school shootings. All other G7 countries combined had just five. Some of my colleagues across the aisle have blamed the violence on mental illness. They have blamed violent video games. They have blamed family values. They have even blamed open doors. They have blamed everything, but guns, but we know the United States does not have a monopoly on mental illness, video games or any other excuse. What America does have is widespread access to guns. That includes assault weapons, which were designed to kill as many enemy soldiers on the battlefield as possible, as quickly as possible. Yet in many states, these weapons of war can be purchased by an 18-year-old just by walking into a store.

Assault weapons were used in the recent massacres, in Buffalo, Texas, and Tulsa, just as they were in Parkland, Newtown, San Bernardino, Orlando, Las Vegas, and so many other mass shootings. These weapons have no place in our communities. No civilian needs an assault rifle, and the Second Amendment does not protect the right to own a weapon of war. It is time that we banned assault rifles from our streets, from our communities, from our homes. But if we are going to truly address the gun crisis, we need to be honest about why our country has failed to act sooner.

The truth is the gun industry is making billions of dollars selling the weapons that are killing our children, and they are fighting tooth and nail to keep doing it. That is why I have launched an investigation into five leading gun manufacturers that sell assault weapons used in mass shootings. We need to know why these communities are marketing military weapons to civilians and how much they are profiting from the death of our children.

Of course, mass shootings are just one part of this crisis. We can't forget that gun violence is a steady drumbeat in so many of our towns and cities, especially in marginalized communities. Black men make up more than half of all gun victims in the United States, despite making up less than six percent of the population. Latinos are twice as likely to be killed by a gun and four times as likely to be wounded by a gun as white Americans. We need transparency into how guns are reaching the hands of criminals, which is why this committee has been working to identify the gun dealers that are selling the most guns used in crimes, including across state lines.

Today, the House is voting to pass commonsense gun safety legislation, which is a crucial first step in addressing this crisis. I am particularly grateful this bill will include key provisions similar to a bipartisan bill I first introduced more than 10 years ago, with the strong support of former chairman, Elijah Cummings. My bill will make gun trafficking a Federal felony and strengthen penalties for straw purchasers, which will help stop the flow of guns into the hands of criminals.

My goal for today's hearing is simple. I am asking every member of this committee to listen with an open heart to the brave witnesses who have come forward to tell their stories about how gun violence has impacted their lives. Our witnesses today have endured pain and loss, yet they are displaying incredible courage by

3

coming here to ask us to do our jobs. Let us hear their voices. Let us honor their courage. Let us find the same courage to pass commonsense laws to protect our children.

I now recognize the distinguished ranking member, Mr. Comer, for an opening statement.

Mr. COMER. Thank you, Chairwoman Maloney. All of our hearts go out to the victims and the families in Uvalde, Texas, and Buffalo, New York. To those who are testifying before us today, there are no words to describe the horror you have faced and the deep anguish you feel. The American people grieve with you.

As elected representatives in Congress, it is our obligation to work to ensure that these violent crimes and tragedies never happen again. Americans of all backgrounds should be empowered to defend themselves against rising violence. The increased violence we have witnessed since the summer of 2020 is unacceptable. Murders and aggravated assaults are all up. This is a trend we must reverse. We have recently witnessed several high-profile senseless acts of murder and mayhem that have impacted all Americans, including, tragically, our defenseless and innocent schoolchildren. We must respond to those heinous acts and provide justice for the families.

At the same time, we recognize that violence occurs in many of our communities on a daily basis, impacting Americans across the United States from every background. Too often tragedies are politicized for partisan gain. And we have seen many seek to leverage these crimes and their victims to push for radical left-wing policies or to buttress their campaigns to get elected. Instead of rushing to score political points at the expense of our justice system working properly, we must learn from these senseless acts of violence and take concrete action to reduce violence in the future. We owe it to the families of the victims. They deserve justice, and we owe it to the American people. We must and can prevent similar tragedies.

We all want to live in a country where we can achieve our American Dream without the threat of violence in our communities. We must work together to deliver sensible solutions to secure our schools, protect our most vulnerable among us, and bring to justice those responsible for these heinous crimes. Our local officials cannot defund our police, and our prosecutors cannot be soft on crime. I believe that we must carefully consider the security posture of vulnerable targets sought out by evil people. We must ensure that every American has a safe environment in which to live their lives in peace. And that requires thinking creatively about solutions to harden our infrastructure, enforce our existing laws, and work to foster a culture that values conflict resolution and dialog over violence.

I strongly believe that there is an important place for law-abiding gun owners to serve in protecting themselves, their families, and their communities from violence. Our Second Amendment is an important tool in securing our individual rights to self-defense. Knee-jerk reactions to impose gun control policies that seek to curtail our constitutional right to bear arms are not the answer. Gun ownership is on the rise in America. People want to protect themselves and their families. We should commend all law-abiding gun owners who safely use, store, and carry those firearms, not vilify

4

them for blatantly political purposes. I also believe we must continue to empower our law enforcement professionals to serve and protect our communities honorably. As I said before, defund the police and soft on crime prosecution policies have been a failure across the board.

Efforts to divert violent criminals out of the criminal justice system have failed, leading to the victimization of the very communities those policies were promised to help. Violent criminals should be in jail, not back on the streets to reoffend and terrorize. We must recommit ourselves to pursuing justice and keeping violent criminals off our street.

Thank you, Chairwoman Maloney, and I yield back.

Chairwoman MALONEY. The gentleman yields back. I want to clarify that I support the Second Amendment. I support law-abiding gun owners. I don't support lax gun laws that allow guns to get into the hands of criminals and unstable people.

I now recognize the gentlelady from California, Ms. Porter, for an opening statement.

Ms. PORTER. I represent a community in mourning. Less than one month ago in Laguna Woods, a gunman locked the doors to the Geneva Presbyterian Church and opened fire on my community's tight-knit Taiwanese congregation. This shooting was an undeniable tragedy, but under different circumstances, it could have been an unimaginable massacre. Unlike the shooters involved in Buffalo, the shooter in Laguna Woods did not carry an assault rifle equipped with high-capacity magazines. He was armed with nine-millimeter handguns that forced him to reload. That difference gave a hero, Dr. John Chang, a chance to stop the carnage. He sacrificed his life to stop the shooter, and his bravery was remarkable, but we cannot depend on a hero's bravery to save lives. Law enforcement has determined that the gunman was ready to kill every person in the church. Had he been armed with a military-style assault rifle, he may have done so. There is no telling how many more lives would have been lost.

Shootings involving assault weapons are six times as deadly as shootings involving handguns, and when assault weapons are equipped with high-capacity magazines or bump stocks, the death toll rises even further. California has banned these weapons for years. Our laws have saved lives, including members of Geneva Presbyterian Church. Congress must follow California's lead.

I yield back.

Chairwoman MALONEY. The lady yields back. I now recognize the gentleman from Louisiana, Mr. Higgins, for an opening statement.

Mr. Higgins of Louisiana. Thank you, Madam Chair. It is a sober day in Congress as we reflect upon the challenges our Nation faces. In 2005, as a young cop, I was dispatched to reports of a man down in the street in a part of the city that was crime ridden and dangerous. I found a victim, a teenager, and I held the mortal wound in the back of his head, whispered prayer into his ear as his life flowed from his body. He died there in my arms on the street. He was killed by an axe handle.

I am prayerful for America, I am prayerful for healing, and I am prayerful for discernment amongst this body and my colleagues. As a law enforcement officer, I know what it means to swear an oath

5

to protect and serve my community and my Nation and the importance of bringing justice to the families of those who suffer at the hands of evil. And it is essential that the fundamental freedoms—First Amendment, Second Amendment, Fourth Amendment—are always protected and preserved by this body.

I was sworn as a man, I swore an oath to uphold the Constitution of the United States, and I will never back down from defending that Constitution, including the rights of law-abiding Americans to keep and bear arms.

Madam Chair, I thank you for this hearing today, and I yield.

Chairwoman MALONEY. The gentleman yields. Now we will introduce our witnesses. I would like to turn it over to the gentleman from New York, Mr. Higgins, to introduce our first witness.

Without objection, Mr. Higgins is authorized to participate in today's hearing. He represents Buffalo. And you are now recognized, Mr. Higgins.

Mr. Higgins of New York. Thank you, Madam Chair, and Ranking Member, the honorable members of the Oversight and Reform Committee.

The Greek tragic poet, Aeschylus, says that we suffer our way to wisdom. He says we suffer our way to wisdom. To live is to suffer. To endure the suffering is to give meaning to the suffering. We have a problem in this country, and unless we learn from the tragic events of the last three weeks, who are we as a people? In this brave group of panelists from two cities that were devastated, the destruction beyond human comprehension, we have to find a way to deal with this.

In Buffalo, the shooting started at 2:30 in the afternoon and was concluded in two minutes and three seconds. One shooter, a semiautomatic weapon, 13 people shot, 10 dead, one shooter. If you look for a common denominator in all of these, it is typically someone that should never have had a gun with a high-capacity weapon to kill as many as people—as many people—as quickly as possible.

Zeneta Everhart is here. She is a friend and a proud citizen of the city of Buffalo. Zeneta is with us today as the mother of the Buffalo mass shooting survivor, Zaire Goodman. Zaire was working at the Tops Friendly Market that was targeted by a white supremacist racist, deranged gunman. Zaire is also a colleague in government. She is the director of diversity and inclusion for my friend and colleague, New York State Senator, Tim Kennedy. Zeneta's story is both tragic and magic, and with that it gives me great honor to present to the committee, Zeneta Everhart.

Chairwoman MALONEY. Thank you. And after Ms. Everhart, we will hear from Dr. Roy Guerrero, who is a pediatrician in Uvalde, Texas. Then we will hear from Miah Cerrillo, who is a 4th grader at Robb Elementary School in Texas. Miah will be sharing her experience in a pre-recorded video. Her father, Miguel, is with us in the room today and will be making brief remarks after his daughter's video, then he will excuse himself. Next we will hear from Felix and Kimberly Rubio, who are the parents of Lexi Rubio, who tragically lost her life in the Texas shooting.

I now recognize the gentleman from Georgia, Mr. Hice, to introduce our last witness on this panel.

6

Mr. HICE. Thank you, Madam Chair. It is my honor to recognize Lucretia Hughes. She is part of my constituency, an incredibly bright light in our 10th District, and she has an extremely compelling story. I just wanted to publicly recognize Lucretia. I want to thank you for being here today. I know it is hard to share the story that you come to us with, but we are grateful that you are here. Madam Chair, I want to say thank you for just these few seconds to recognize Lucretia Hughes and welcome her here.

I yield back.

Chairwoman MALONEY. Thank you. The witnesses will be unmuted, so we can swear them in. Please raise your right hand.

Do you swear or affirm that the testimony you are about to give is the truth, the whole truth, and nothing but the truth, so help you God?

[A chorus of ayes.]

Chairwoman MALONEY. Let the record show that the witnesses answered in the affirmative. Thank you.

And without objection, your written statements will be made part of the record.

With that, Ms. Everhart, you are now recognized for your testimony. Please testify, Ms. Everhart.

## STATEMENT OF ZENETA EVERHART, MOTHER OF ZAIRE GOODMAN, BUFFALO, NEW YORK

Ms. EVERHART. Thank you, Chairwoman. Zaire Mysaun Goodman, my son, or, as I like to call him, "The Kid," was shot and injured by a domestic terrorist on Saturday, May 14, 2022, at the Tops grocery store where he was an employee in a historically Black community on Jefferson Avenue in Buffalo, New York. Zaire, "The Kid," is now a 21-year-old man. He is pure joy. He is everything that is good in this world. And as I sit here before you today, I can hear my son telling me to stop being extra and get to the point. I was going to tell you all a bunch of fluffy funny stories about Zaire, but I have a message, so I will get to the point.

As director of diversity and inclusion with New York State Senator Tim Kennedy's office, stories of gun violence and racism are all too familiar, but now these stories are Zaire's stories. These problems literally knocked on my front door. These are issues that as a country we do not like to openly discuss. Domestic terrorism exists in this country for three reasons. America is inherently violent. This is who we are as a Nation. The very existence of this country was founded on violence, hate, and racism with the near annihilation of my native brothers and sisters. My ancestors brought to America through the slave trade were the first currency of America. Let me say that again for the people in the back. My ancestors, the first currency of America, were stripped off their heritage and culture, separated from their families, bargained for on auction blocks, sold, beaten, raped, and lynched. Yet I continuously hear after every mass shooting that this is not who we are as Americans and as a Nation. Hear me clearly. This is exactly who we are.

Education. The majority of what I have learned about African-American history, I did not learn until I went to college and I had to choose those classes. Why is that? Why is African-American his-

7

tory not a part of American history? African-Americans built this country from the ground up. My ancestors' blood is embedded in the soil. We have to change the curriculum in schools across the country so that we may adequately educate our children. Reading about history is crucial to the future of this country. Learning about other cultures, ethnicities, and religions in school should not be something that is up for debate. We cannot continue to white-wash education, creating generations of children to believe that one race of people are better than the other. Our differences should make us curious, not angry. At the end of the day, I bleed, you bleed. We are all human. That awful day that will now be a part of the history books, hopefully. Let us not forget to add that horrific day to the curriculum that we teach our children.

Guns. The 18-year-old terrorist who stormed into my community armed with an AR–15, killing 10 people and injuring three others, received the shotgun from his parents for his 16th birthday. For Zaire's 16th birthday I bought him a few video games, some head-phones, a pizza, and a cake. We are not the same.

How and why and what in the world is wrong with this country? Children should not be armed with weapons. Parents who provide their children with guns should be held accountable. Lawmakers who continuously allow these mass shootings to continue by not passing stricter gun laws should be voted out. To the lawmakers who feel that we do not need stricter gun laws, let me paint a picture for you. My son, Zaire, has a hole in the right side of his neck, two on his back, and another on his left leg caused by an exploding bullet from an AR–15. As I cleaned his wounds, I can feel pieces of that bullet in his back. Shrapnel will be left inside of his body for the rest of his life.

Now I want you to picture that exact scenario for one of your children. This should not be your story or mine's. As an elected official, it is your duty to draft legislation that protects Zaire and all of the children and citizens in this country. Commonsense gun laws are not about your personal feelings or beliefs. You are elected because you have been chosen and are trusted to protect us, but let me say to you here today, I do not feel protected.

No citizen needs an AR–15. These weapons are designed to do the most harm in the least amount of time. And on Saturday, May 14, it took a domestic terrorist just two minutes to shoot and kill 10 people and injure three others. If after hearing from me and the other people testifying here today does not move you to act on gun laws, I invite you to my home to help me clean Zaire's wounds so that you may see up close the damage that has been caused to my son and to my community.

To the families of Ruth Whitfield, Pearl Young, Katherine Massey, Heyward Patterson, Celestine Chaney, Geraldine Talley, Aaron Salter, Andre Mackneil, Margus Morrison, and Roberta Drury, I promise that their deaths will not be in vain. Zaire and I promise to use our voice to lift their names, and we will carry their spirit with us as we embark on this journey to create change. I know that their collective souls watched out for Zaire that day, and I am eternally grateful to them for that.

To the east side of Buffalo, I love you. I am speaking directly to my people, to my hood. From Bailey, to Broadway, to Kensington,

8

to Fillmore, to Delavan, to Jefferson, and every street in between, just like the potholes that we want filled in—yes, I keep it real—together we will continue to fill those streets with love. No matter what people say about the East Side of Buffalo, we will not be broken. I was born there, raised there. I raised my son there. I still live there, and I do the majority of my professional work on the East Side of Buffalo. I vow to you today that everywhere I go, I will make sure that the people hear the real stories of our people. For too long, our community has been neglected and starved of the resources that we so greatly need. I promise that I will not stop pushing for more resources to be funneled into the East Side of Buffalo. Each and every person that lives within that community, we are family, not a perfect community, but I know that we are love.

To the greater Buffalo area, to everyone from around the country and the world who have reached out and loved on us, on behalf of Zaire, Zaire's father, Damien Goodman, my mother, my father, my sisters, my brothers, and myself, we thank you. We thank you for all of your thoughts and your prayers. Thank you for all of the love and support you have shown us during this difficult time. But I also say to you today with a heart full from the outpouring of love that you also freely gave us, your thoughts and prayers are not enough. We need you to stand with us in the days, weeks, months, and years to come and be ready to go to work and help us to create the change that this country so desperately needs.

And I will end with a quote from Charles Blow in his book The Devil You Know: "Race, as we have come to understand it, is a fiction, but racism, as we have come to live it, is a fact." The point here is not to impose a new racial hierarchy, but to remove an existing one. After centuries of waiting for white majorities to overturn white supremacy, it is clear to me that it has fallen to Black people to do it themselves, and I stand at the ready.

Zaire, this is for you, Kid. Happy birthday.

Chairwoman MALONEY. Thank you. Dr. Guerrero, you are now recognized for your testimony.

## STATEMENT OF ROY GUERRERO, PEDIATRICIAN, UVALDE, TEXAS

Dr. GUERRERO. Thank you. Thank you, Chairwoman. My name is Dr. Roy Guerrero. I am a Board-certified pediatrician and was present at Uvalde Memorial Hospital, the day of the massacre on May 24, 2022, at Robb Elementary School. I was called here today as a witness, but I showed up because I am a doctor because many years ago I swore an oath, an oath to do no harm. After witnessing firsthand the carnage in my hometown of Uvalde, to stay silent would have betrayed that oath. Inaction is harm. Passivity is harm. Delay is harm. So, here I am, not to plead, not to beg or convince you of anything, but to do my job and hope that by doing so, it inspires the members of this House to do theirs.

I have lived in Uvalde my whole life. In fact, I attended Robb Elementary School myself as a kid. As often is the case with us grownups, we remember a lot of the good and not so much of the bad, so I don't recall homework or detention. I remember how much I loved going to school. What a joyful time it was. Back then

were able to run between classrooms with ease to visit our friends, and I remember the way the cafeteria smelled at lunchtime on hamburger Thursdays.

It was right around lunchtime on a Tuesday that a gunman entered the school through a main door without restriction, massacred 19 students and two teachers, and changed the way that every student at Robb and their families will remember that school forever. I doubt they will remember the smell of the cafeteria or the laughter ringing in the hallways. Instead, they will be haunted by the memory of screams and bloodshed, panic and chaos, police shouting, parents wailing. I know I will never forget what I saw that day.

For me that day started like any typical Tuesday in our pediatric clinic: moms calling for coughs, boogers, sports physicals right before the summer rush. School was out in two days, then summer camps would guarantee some grazes and ankle sprains. Injuries that could be patched up and fixed with a Mickey Mouse sticker as a reward. Then at 12:30, business as usual stopped, and with it, my heart. A colleague from the San Antonio Trauma Center texted me and said, "Why are pediatric surgeons and anesthesiologists on call for a mass shooting in Uvalde?" I raced to the hospital to find parents outside yelling children's names in desperation and sobbing as they begged for any news related to their child. Those mothers' cries I will never get out of my head.

As I entered the chaos of the ER, the first casualty I came across was Miah Cerrillo. She was sitting in the hallway, her face was still clearly in shock, but her whole body was shaking from the adrenaline coursing through it. The white Lilo and Stitch shirt that she wore was covered in blood and her shoulder was bleeding from the shrapnel injury. Sweet Miah, I have known her my whole life. As a baby, she survived major liver surgeries against all odds, and once again, she is here as a survivor, inspiring us with her story today and her bravery. When I saw Miah sitting there, I remember having seen her parents outside. So, after quickly examining two other patients of mine in the hallway with minor injuries, I raced outside to let them know that Miah was alive. I wasn't ready for their next urgent and desperate question: "where is Elena?"

Elena is Miah's eight-year-old sister who was also at Robb at the time of the shooting. I had heard from some of the nurses that there were two dead children who had been moved to the surgical area of the hospital. As I made my way there, I prayed that I wouldn't find her. I didn't find Elena, but what I did find was something no prayer will ever relieve: two children whose bodies had been pulverized by bullets fired at them, decapitated, whose flesh had been ripped apart, that the only clue as to their identities was blood-spattered cartoon cloths still clinging to them, clinging for life and finding none.

I could only hope these two bodies were a tragic exception to the list of survivors, but as I waited there with my fellow Uvalde doctors, nurses, first responders, and hospital staff for other casualties we hoped to save, they never arrived. All that remained was the bodies of 17 more children and the two teachers who cared for them, who dedicated their careers to nurturing and respecting the awesome potential every single one, just as we doctors do.

10

I will tell you why I became a pediatrician, because I knew that children were the best patients. They accept the situation as it is explained to them. You don't have to coax them into changing their lifestyles in order to get better or plead them to modify their behavior as you do with adults. No matter how hard you try to help an adult, their path to healing is always determined by how willing they are to take action. Adults are stubborn. We are resistant to change even when the change will make things better for ourselves, but especially when we think we are immune to the fallout. Why else would there have been such little progress made in Congress to stop gun violence?

Innocent children all over the country today are dead because laws and policy allows people to buy weapons before they are legally old enough to even buy a pack of beer. They are dead because restrictions have been allowed to lapse. They are dead because there are no rules about where guns are kept, because no one is paying attention to who is buying them. The thing I can't figure out is whether our politicians are failing us out of stubbornness, passivity, or both.

I said before that as grownups, we have a convenient habit of remembering the good and forgetting the bad, never more so that when it comes to our guns. Once the blood is rinsed away from the bodies of our loved ones and scrubbed off the floors of the schools, and supermarkets, and churches, the carnage from each scene is erased from our collective conscience, and we return again to nostalgia, to the rose-tinted view of our Second Amendment as a perfect instrument of American life, no matter how many lives are lost.

I chose to be a pediatrician. I chose to take care of children. Keeping them safe from preventable diseases, I can do. Keeping them safe from bacterial and brittle bones, I can do. But making sure our children are safe from guns, that is the job of our politicians and leaders. In this case, you are the doctors and our country is the patient. We are lying on the operating table riddled with bullets, like the children of Robb Elementary and so many other schools. We are bleeding out, and you are not there.

My oath as a doctor means that I signed up to save lives. I do my job, and I guess it turns out that I am here to plead, to beg, to please, please do yours.

Chairwoman MALONEY. Thank you. We will now play the video from Miah.

[Video shown.]

Chairwoman MALONEY. Mr. Cerrillo, you are now recognized.

### STATEMENT OF MIGUEL CERRILLO, FATHER OF MIAH CERRILLO

Mr. CERRILLO. Hello. Today I come because that girl was my baby girl, but she is not the same little girl that I used to play with, and run with, and do everything because she was daddy's little girl. I have five kids, and she is middle child. I don't know what to do because I think I would have lost my baby girl. My baby girl is the world because not only once, but twice she came back to us. She is everything, not only for me, but her siblings and her mother.

11

I thank you all for letting me be here and speak out, but I wish something will change not only for our kids, but every single kid in the world because schools are not safe anymore. Something needs to really change. Thank you.

Chairwoman MALONEY. Thank you for your testimony, and I understand you are now leaving. We thank you for sharing your story. Thank you.

And Mr. and Mrs. Rubio, you are now recognized for your testimony.

### STATEMENT OF FELIX RUBIO AND KIMBERLY RUBIO, PARENTS OF LEXI RUBIO, UVALDE, TEXAS

Ms. RUBIO. I am Kimberly Rubio. This is Felix Rubio. We are the parents of Alexandria Aniyah, best known as Lexi Rubio, and five other children who all attended Uvalde Public Schools during the 2021–2022 school year: Kalisa, who completed high school this year; Isaiah, who attends Uvalde High School; David, Morales Junior High; Jahleela, Flores Elementary; and our two youngest children, Julian, 8 and Lexi, 10, who were at Robb Elementary.

On the morning of May 24, 2022, I dropped Lexi and Julian off at school a little after 7 a.m. My husband and I returned to campus at 8 a.m. for Julian's award ceremony and again at 10:30 a.m. for Lexi's award ceremony. Lexi received the good citizen award and was also recognized for receiving all A's. At the conclusion of the ceremony, we took photos with her before asking her to pose for a picture with her teacher, Mr. Reyes. That photo, her last photo ever, was taken at approximately 10:54 a.m. To celebrate, we promised to get her ice cream that evening. We told her we loved her and we would pick her up after school. I can still see her walking with us toward the exit. In the reel that keeps scrolling across my memories, she turns her head and smiles back at us to acknowledge my promise, and then we left. I left my daughter at that school, and that decision will haunt me for the rest of my life.

Afterward, Felix dropped me off at my office, the Uvalde Leader-News and returned home because it was a rare day off for him between normal shifts and security gigs he takes to help make ends meet. I got situated at my desk and began writing about a new business in town when the news office started hearing commotion on the police scanner, a shooting on Diaz Street near Robb Elementary. It wasn't long before we received word from my son's teacher that they were safe, secure in the classroom. Once evacuated from campus, the children reunited with parents and guardians at the Civic Center. My dad picked up Julian from the Civic Center and took him to my grandmother's house. One of our Robb kids was safe.

We focused on finding Lexi. Bus after bus arrived, but she wasn't on board. We heard there were children at the local hospital, so we drove over to provide her description. She wasn't there. My dad drove an hour and a half to San Antonio to check with the University Hospital. At this point, some part of me must have realized that she was gone in the midst of chaos. I had the urge to return to Robb. We didn't have our car at this point, and traffic was everywhere. So I ran. I ran barefoot with my flimsy sandals in my hand. I ran a mile to the school, my husband with me. We sat outside

12

for a while before it became clear we wouldn't receive an answer from law enforcement on scene. A San Antonio firefighter eventually gave us a ride back to the Civic Center where the district was asking all families who had not been reunited with their children to gather. Soon after we received the news that our daughter was among the 19 students and two teachers that died as a result of gun violence.

We don't want you to think of Lexi as just a number. She was intelligent, compassionate, and athletic. She was quiet, shy unless she had a point to make. When she knew she was right, as she so often was, she stood her ground. She was firm, direct, voice unwavering. So today, we stand for Lexi, and as her voice, we demand action. We seek a ban on assault rifles and high-capacity magazines. We understand that for some reason, to some people, to people with money, to people who fund political campaigns, that guns are more important than children. So, at this moment we ask for progress. We seek to raise the age to purchase these weapons from 18 to 21 years of age. We seek red flag laws, stronger background checks. We also want to repeal gun manufacturers' liability immunity.

You have all seen glimpses of who Lexi was, but I also want to tell you a little bit about who she would have been. If given the opportunity, Lexi would have made a positive change in this world. She wanted to attend St. Mary's University in San Antonio, Texas on a softball scholarship. She wanted to major in math and go on to attend law school. That opportunity was taken from her. She was taken from us.

I am a reporter, a student, a mom, a runner. I have read to my children since they were in the womb. My husband is a law enforcement officer, an Iraq War veteran. He loves fishing and our babies. Somewhere out there, there is a mom listening to our testimony, thinking, "I can't even imagine their pain," not knowing that our reality will one day be hers unless we act now.

Thank you for your time.

Chairwoman MALONEY. Thank you for your testimony.

Ms. Hughes, you are now recognized for your testimony.

## STATEMENT OF LUCRETIA HUGHES KLUCKEN, DC PROJECT, WOMEN FOR GUN RIGHTS

Ms. HUGHES KLUCKEN. Honorable Chairwoman Maloney, Ranking Member Comer, distinguished members of the committee, thank you for allowing me to be here today to address the violence in our country. My name is Lucretia Hughes Klucken. I have four children and nine grandchildren. On the night of April 2, 2016, my family got a phone call that would change our lives forever. My ex-husband answered the phone and let a blood curdling scream, a scream of pain from the depths of his soul. He screamed, he cried, "He is gone. He is gone."

Our 19-year-old son Emmanuel went to a party early that night. After we got the call, we were frantic. We called his phone. No one answered. We called even the police. I went to Facebook and I had to ask, "Is my son dead?" I found out that he was shot point-blank in the head and killed while playing dominos. No one spoke up for

13

weeks, and the killer was on the run. No one was going to snitch, but that is the street life.

Words can't describe how hard it is to bury a child, I ache for anyone and all who have done the same. My son's death was a result of a criminal with an evil heart and a justice system failing to hold him accountable for the laws he had already broken. You see, a convicted felon killed my son with an illegally obtained gun. Our gun control lobbyists and politicians claim that their policies will save lives and reduce violence. Well, those policies did not save my son. The laws being discussed are already implemented in cities across this country. We have decades of evidence proving they do not work. St. Louis, New York, Chicago, Washington, Atlanta are gun control utopias, and they are plagued with the most violence. Ten more laws, 20 more laws, 1,000 more won't make what is already illegal more wrong or stop criminals from committing these crimes.

And you all are delusional if you think it is going to keep us safe. I am a walking testimony of how the criminal justice system and the gun control laws, which is steeped in racism, by the way, have failed the Black community. By the age of 25, I had already went to 18 young Black men's funeral at the age of 25. I have one Black man in jail, one Black man in the grave, and my young grandson going to be raised without a father. And it is a curse on the Black community and everyone else's.

Something has to change. Thoughts and prayers and calls for more gun control isn't enough. How about letting me defend myself from evil? You don't think that I am capable and trustworthy to handle a firearm. You don't think that the Second Amendment doesn't apply to people that look like me? Who and you who would call for more gun controls are the same ones that are calling to defund the police? Who is supposed to protect us? We must prepare to be our own first responders to protect ourselves and our loved ones. I am a legal, law-abiding citizen, and I don't need the government to save me.

I teach people how to use a firearm. I empower others to look at me to understand that Second Amendment is their right. I am a proud member of the D.C. Project, Women for Gun Rights. We believe that education is the safety, not ineffective legislation. We support meaningful solutions that will actually save lives. We support the Safe Student Act, H.R. 7415, which would immediately make school safer in hindsight of Parkland. We saw failure of the government at every level, failing the students. Students saw something and they said something, and the school did not act. Police were called to his residence over 30 times, and they did not act, and finally the police did not go into the school that fateful day and failed to protect those kids. We need to secure our schools, and we got to secure this building like you all do. What is the difference?

We call on Congress to ban gun-free zones, fund nonpartisan firearm education programs, like KidSafe Foundation, and non-governmental mental health organizations like Hold My Guns. And in closing, I claim that nothing in these bills do anything to make us safer or address the mental health crisis in this country. Despite living with the heartache of losing my son on a daily basis, I believe it is our God-given right to defend ourselves from any act of

14

violence. Making it more difficult or even more expensive for me, and people that look like me, and other law-abiding citizens will not make us safer. It will embolden the criminals. Gun owners are not the enemies, and these gun control policies are not the solution.

Thank you. Thank you.

Chairwoman MALONEY. Thank you. Thank you all for your powerful and meaningful and gut wrenching testimony.

You are excused, and we will pause while we seek the next panel for their testimony.

[Pause.]

Chairwoman MALONEY. The meeting will resume. We are now ready for our second panel, and I would like to introduce our witnesses. The first witness is the Honorable Eric Adams, who is the mayor of the city of New York. Then we will hear from Greg Jackson, who is the executive director of the Community Justice Action Fund. Next, we will hear from Becky Pringle, who is the president of the National Education Association. Next, we will hear from Joseph Gramaglia, who is the police commissioner of Buffalo, New York. Then we will hear from Nick Suplina, who is the senior vice president for law and policy at Everytown for Gun Safety. Finally, we will hear from Amy Swearer, who is the legal fellow at the Edwin Meese Center for Legal and Judicial Studies in the Heritage Foundation.

The witnesses will be unmuted so that we may swear them in. Please raise your right hand.

Do you swear to affirm that the testimony you are about to give is the truth, the whole truth, and nothing but the truth, so help you God?

[A chorus of ayes.]

Chairwoman MALONEY. Let the record show that the witnesses answered in the affirmative. Thank you.

Without objection, your written statements will be made part of the record.

With that, Mayor Adams, you are now recognized for your testimony. Thank you for coming.

[No response.]

Mr. ADAMS.

[Inaudible.]

Chairwoman MALONEY. Turn on your mic.

## STATEMENT OF THE HONORABLE ERIC ADAMS, MAYOR, NEW YORK, NEW YORK

Mr. ADAMS. Thank you. Thank you very much. Again, I want to thank you, Madam Chairwoman Maloney, for the invitation to testify today. I also want to thank all the members of the House Committee on Oversight and Reform, members from the New York City congressional delegation, and everyone who has testified today, especially those who have so bravely shared their stories of losing loved ones to gun violence. I was particularly touched by hearing the husband and wife that lost their baby girl. As a father with one son, it was extremely impactful to all of us.

I am Eric Adams, and I am honored to appear before you today as the 110th mayor of the great city of New York to discuss the ways we can protect public safety and prevent gun violence.

15

Ladies and gentlemen, it is high noon in America, time for every one of us to decide where we stand on the issue of gun violence; time to decide if it is more important to protect the profits of gun manufacturers or the lives of our children; time to decide if we are going to be a Nation of laws or confederation of chaos, and we must do it now. It is high noon in America, our country, the country I love. The clock is ticking every day, every minute toward another hour of death.

I am here today to ask every one of you and everyone in this Congress to stand with all of us to end gun violence and protect the lives of Americans. We are facing a crisis that is killing more Americans than war, a crisis that is now the No. 1 cause of death for our young people, a crisis that is flooding our cities with the illegal guns faster than we can take them off the street. The New York City Police Department has taken over 3,000 illegal guns off our streets this year alone, but the guns just keep coming. This is a crisis that transcends party lines and affects both rural and urban communities. I know this firsthand as the co-chair of Everytown's non-partisan Coalition on Mayors against Illegal Guns.

No matter what our party affiliations, we are united in our mission to stop crime, save lives, and bring an end to gun violence because this isn't about blue versus red. This is about right versus wrong. Whether it is on the street wearing a badge or in these chambers taking a vote, we must stand for what is right.

First, we need Congress to take the handcuffs off the Bureau of Alcohol, Tobacco, Firearms and Explosives, known as ATF, and let them do their jobs. That means confirming President Biden's nominee as soon as possible. We must work together to dam all the rivers that lead this to the sea of violence. Commonsense gun reform must become the law of the land. I am pleased that today the House will vote on H.R. 7910, the Protecting Our Kids Act, and I urge the passage of the gun violence prevention package for consideration in the city. I also urge the Senate to pass H.R. 8, the bipartisan Background Checks Act of 2021, and H.R. 1446, the Enhanced Background Checks Act of 2021. These are bipartisan gun safety bills that will make our cities and our people safer.

I stand with President Joe Biden in calling on Congress to act now to regulate or ban assault weapons in this country. Even if we only raise the age required to buy one of these weapons, lives will be saved. We need Congress to direct Federal aid to localities and states that support not just law enforcement and violence prevention, but also access to high-quality healthcare, childcare, education, and housing. We must build the society while youth on a path to fulfillment, not a road to ruin.

As mayor, my greatest responsibility is protecting the lives and the safety of the people of New York City. This is my call, and my duty, and my life's work. I did it as a police officer in a uniform and wearing the badge, and I do it now as the elected leader of our largest American city, but I need your help to further protect our people and to save lives. The time is right now. It is high noon in America.

Chairwoman MALONEY. Thank you. Mr. Jackson, you are now recognized for your testimony. Mr. Jackson?

16

### STATEMENT OF GREG JACKSON, JR., EXECUTIVE DIRECTOR, COMMUNITY JUSTICE ACTION FUND

Mr. JACKSON. Thank you, Chairwoman Maloney, Ranking Member Comer, and the rest of the committee for inviting me on this really important topic. My name is Greg Jackson. I am the executive director for the Community Justice Action Fund, the only national gun violence advocacy organization led by survivor of color, but I am not here by choice. I am here by circumstance.

In 2013, just miles from this chamber, I was shot as an innocent bystander while I was simply walking home, and when I arrived at the hospital, I wasn't welcomed with nurses and surgeons. No, I was met with investigators. They questioned me as a suspect first and a patient second. I spent 21 day is in the hospital, six months learning how to walk again. But what was most terrifying and tragic was that when I turned on the TV, I was watching Members of Congress have the same debates that we are having right now. That was nine years ago.

Every year, over 110,000 people are shot or killed by gun violence. So, that means nearly a million lives have been directly devastated since I laid in that hospital, looked up at that television and watched the members of this chamber debate this topic. Most of the stories of those who have been impacted by gun violence like mine will never make the headlines. You know, just two miles from here, Makiyah Wilson was shot, 10 years old while going to get ice cream. Karon Brown, one of my mentees, who hosted his own Stop the Violence event in this neighborhood, was shot down that same summer and killed in front of a McDonald's. And Pamela Thomas, here in D.C., who was so afraid of gun violence in her community that she wrote her own eulogy, just to be shot by a stray bullet in front of her son.

These stats are not stats. These are stories of real people, real people that are dying in our streets every single day. Every day, 110 Americans are killed with guns and 200 are shot and wounded. And we have talked a lot about this being the No. 1 cause of death for all youth, surpassing car accidents, drug overdoses and COVID–19. But amid this pandemic, we have also seen a 35-percent increase in homicides, and this still remains the No. 1 cause of death for Black men, the No. 2 cause of death for Latino men, and the No. 2 cause of death for Black women. We are here because we cannot and let's not hide from the harsh truth. Gun violence is destroying communities around the country, and every day, families experience firsthand the devastation gunfire brings. To eliminate gun violence, we must swiftly recognize that this is a public health crisis that deserves a public health response.

At Community Justice, we address gun violence by focusing on those who have been most impacted by the crisis, and we urge Congress to invest in community-based solutions that we know can address those public health risk factors, that can reduce the risk factors of those impacted by gun violence, but also address the root causes. But we also strongly urge that any supply side approach not only focus on the shooter, but on the supplier and the source of firearms that are flooding into our communities.

In moments of crisis, Congress has proven to be as resilient as the American people and take action. When coronavirus struck our

17

country, Congress authorized bipartisan legislation to provide resources and regulations to save lives. When Ukraine was in crisis, Congress sprang into action and mobilized bipartisan authorization to authorize immediate aid, economic investments, mental health resources, and other services to support those communities. But I am here to say that we are in crisis in America today. Each time we did the hard thing because it was the right thing to do, and this crisis is no different. This crisis now has taken away grandparents in Buffalo, elementary kids in Uvalde, fathers in Chicago, mothers in Atlanta, nephews in Chicago, even pastors in Charleston, and we are here still asking for action.

There are three direct things that we know can be done. First, we must acknowledge this as a public health crisis and craft policies to combat it as such. Second, we must advance commonsense legislation that not only addresses the hardware, but promotes community-based solutions to end gun violence, such as the Break the Cycle of Violence Act. And last, I urge you to create a select committee on the gun violence crisis to investigate the health impacts of gun violence and its disproportionate impact on Black and brown communities across the country.

Now is the time to take action before another person loses their life, before another child opens his last textbook, before another parent hugs that child for the last time, and also before someone like me isn't alive to ask you to do so.

Thank you, Madam Chairwoman.

Chairwoman MALONEY. Thank you. Ms. Pringle, you are now recognized for your testimony.

**STATEMENT OF BECKY PRINGLE, PRESIDENT, NATIONAL EDUCATION ASSOCIATION**

Ms. PRINGLE. Good morning, Chairwoman Maloney, Ranking Member Comer, and committee members. I appreciate the opportunity to offer testimony on behalf of the 3 million members of the National Education Association and all devoted educators who teach and nurture and protect our students.

As a teacher with three decades of experience, I am frustrated, I am heartbroken, I am angry that this is where we are 23 years after Columbine. On April 20, 1999, I had been a middle school science teacher in Pennsylvania for 23 years. No experience or training had prepared me for the questions my middle-level learners asked me as I joined my fellow teachers in shock and disbelief of the carnage that ended the lives of 12 students and one teacher. The only thing that comforted us was the belief that this society would never let it happen again. But the list continued to grow, didn't it? Virginia Tech, Sandy Hook, Marjory Stoneman Douglas, and now Robb Elementary: kids were celebrating at the end of a successful school year. For dying teen children and two teachers, it would be the last day of their lives.

These massacres occurring in suburban, urban, and rural schools are not isolated incidents. Tallying up the number of killed or wounded children does not begin to tell the full horrific story. Camille, a student who survived Sandy Hook, experienced severe panic attacks for years. She is one of the more than 311,000 students exposed to gun violence since Columbine. Their trauma will

18

likely endure for the rest of their lives. Students across our country are writing goodbye notes and wills just in case. Unfortunately, their fear is perfectly rational.

Here in America, we are 25 times more likely to die by gun than people in other developed nations. So, the question we must ask: is this who we are? Is it? Our country has already experienced nearly 240 mass shootings in 2022 alone, but that number does not begin to capture the scope of this epidemic. Every day, gun violence kills 111 people. That means that we can expect 22,255 more deaths by guns this year. Inaction equals acceptance of the unacceptable, and this crisis is worse in Black and Latino communities where 78 percent of adults or their loved ones who are victims of gun violence. The evidence is clear. Where there are more guns, more people are killed by guns every single day.

The politicians who fail to take action ignore the majority of Americans who want stricter gun laws. You tell our children protecting them matters less than protecting the status quo. A high school teacher in Arlington, Texas, survived a workplace shooting in a corporate setting only to experience school shootings himself and countless lockdowns. He is now leaving our profession with these words: "As much as I love teaching, I can't fully represent and protect my students. I am not going to be the educator they need." Enough with so-called solutions that do not address the problem. We cannot place enough armed guards at every school building in America to protect our babies. We cannot ask educators to carry weapons and wear body armor while teaching and nurturing our students because by the time someone has shown up with a military weapon, it is already too late. We need for our students more resources, not more revolvers.

You can help us to not only heal, but to hope. Pass commonsense gun control legislation so that not one more community is shattered and not one more anguished parent, like we heard today, has to lay a precious child to rest. Our children deserve the chance to grow and to thrive to live into their brilliance.

Thank you for what I know you will do for our babies.

Chairwoman MALONEY. Thank you. Commissioner Gramaglia, you are now recognized.

### STATEMENT OF JOSEPH GRAMAGLIA, POLICE COMMISSIONER, BUFFALO, NEW YORK

Mr. GRAMAGLIA. Chairwoman Maloney, Ranking Member Comer, and distinguished members of the committee, thank you for the opportunity to participate in today's hearing. I appear before you today as a police commissioner in Buffalo, New York. It is also my privilege to testify on behalf of the Major Cities Chiefs Association. We are here today to discuss gun violence epidemic plaguing our Nation. This hearing comes in the aftermath of multiple mass shootings that have devastated communities throughout the country, including my home city and Buffalo. Our communities are hurting, and we must continue to support them, the loved ones of the victims, and our brave first responders.

On May 14, 2022, an 18-year-old white supremacist invaded our city and inflicted terror on the Black community in a way never seen in Buffalo's history. He legally purchased a military-style

19

weapon and body armor and then spent months practicing his shooting skills. He entered the Tops Supermarket and opened fire on civilians, striking 13 and killing 10. He livestreamed this with a GoPro he had affixed to his helmet. Retired Buffalo Police Officer, Aaron Salter Jr., who I posthumously promoted to lieutenant and issued the department's highest honor, the Medal of Honor, was working Tops security that day. Aaron was helping an elderly shopper leave with her groceries when the shooting began. He did his best to warn customers while in a completely defensive position. He engaged the shooter as he entered, hitting him with at least one shot. It is often said that a good guy with a gun will stop a bad guy with a gun. Aaron was the good guy and was no match for what he went up against, a legal AR–15 with multiple high-capacity magazines. He had no chance.

Assault weapons like the AR–15 are known for three things: how many rounds they fire, the speed at which they fire those rounds, and body counts. This radicalized 18-year-old adult should have never been able to have access to the weapons he used to perpetrate this attack, and laws needs to be enacted to ensure it never happens again.

Buffalo Police Officers responded to Tops and were able to take the shooter into custody within minutes. I have no doubt in my mind that their swift response time and handling of the situation saved lives. I would like to publicly thank them and the rest of the Buffalo Police Department for the heroism they showed on that day. Buffalo is known as the city of good neighbors. We are a resilient, culturally diverse community. We came together after this horrific tragedy, and we will continue to heal together. However, no city should have to go through this, and it is time to make changes to a system that is leaving blood on the sidewalks of our communities every day.

In 2018, the MCCA adopted a firearms violence policy that would help mitigate the threat of gun violence without infringing on the constitutional rights or weakening due process. These reforms include requiring universal background checks, strengthening NICS definitions and improving access to records, supporting the use of extreme risk protection orders, aggressively prosecuting straw purchasers and prohibited possessors, and banning assault weapons and high-capacity magazines. Polling shows the majority of Americans support these commonsense reforms, and Congress must act immediately to close the loopholes in our current system and the gaps that allow easy access to military-style weapons.

Events like the Buffalo massacre, the shooting in Uvalde that took 21 lives, including 19 children, and the mass shootings in Laguna Woods and Tulsa are the situations that capture headlines. However, we must remember that gun violence epidemic extends well beyond these events. The grim reality is that shootings have become a daily occurrence in American cities. Emerging trends, like ghost guns and guns modified with switches, continue to pose a challenge for law enforcement. Congress must update our laws to account for these new threats and carnage that has accompanied them. It will be nearly impossible to address the gun violence epidemic without first addressing the underlying violent crime problem. Unfortunately, the proactive policing to help drive down vio-

20

lent crime has become a luxury for many departments. Law enforcement needs additional resources to bolster its response to violent crime, and overall lack of accountability for violent offenders is contributing to rising gun violence. In some major cities DAs are not prosecuting serial firearm offenders, and judges continue to release offenders on low or no bond. To address these challenges, Congress must provide resources for U.S. attorney's offices to support additional Federal prosecutions as appropriate.

Police chiefs see the horror of gun violence every day. Members of Congress share our solemn duty to protect the public. The MCCA will continue to call on elected representatives to issue politics and take the necessary steps to address the gun violence epidemic. Your leadership is needed now more than ever. Thank you.

Chairwoman MALONEY. Mr. Suplina, you are now recognized for your testimony.

[No response.]

Chairwoman MALONEY. Turn on your mic, please.

## STATEMENT OF NICK SUPLINA, SENIOR VICE PRESIDENT FOR LAW & POLICY, EVERYTOWN FOR GUN SAFETY

Mr. SUPLINA. Good morning, Chairwoman Maloney, Ranking Member Comer, and distinguished members of the subcommittee. My name is Nick Suplina. I am senior vice president for law and policy at Everytown for Gun Safety. We are the largest gun violence prevention organization in the country. I am honored to be here today and grateful for the spotlight you are shining on America's gun violence crisis.

Once again, we are grieving. Frequent public mass shootings terrorize the country and are a uniquely American problem. Mass shootings often focus the public's attention and our grief, and with good reason, but they represent a small fraction of all gun deaths in this country, which include other homicides, suicides, and unintentional shootings. Every single day, some 110 Americans are killed with a gun and 200 more physically wounded. We estimate that one-half of all Americans have been touched by gun violence, either directly or someone they care for. In other words, we are a Nation of gun violence survivors.

To be clear, this burden has not been borne equally. Talking about our children, guns are now the leading cause of death for children and teens. I am talking about people of color. Black Americans experienced 10 times the homicides of their white counterparts. Clearly, we are in the middle of a serious public health crisis, one that is crying out for sensible gun policy solutions, especially at the Federal level. And while gun deaths are hitting all-time highs, the gun industry is breaking profit records year after year. The gun industry uses fear to sell guns, and it believes that mass shootings are great for gun sales. They are making money on these tragedies right now.

So, when we talk about the shootings in Uvalde and Buffalo, when we talk about the toll of gun violence on our children, when we talk about the disproportionate impact on Black Americans, when we talk about how gun violence costs taxpayers, survivors' families, employers, and communities—$280 billion a year—we need to also talk about how the $9 billion civilian firearms industry

21

is shielded from the scrutiny and accountability that has led other industries to better and safer practices.

The gun industry, for its part, has innovated not to make guns or us safer, but to make them more dangerous, more likely to evade regulation, more profitable. Instead of designing firearms that can't be fired if stolen, or that make it easy for law enforcement to trace, gun makers have created modifications to mimic automatic fire. They have created impossible-to-trace ghost guns that help circumvent background checks, and they have designed AR–15s that can be modified in minutes to bypass the state's assault weapons law as we saw in Buffalo. And now in a crowded field, gun manufacturers are trying to market in increasingly brazen ways, often touting the deadliness of products, glorifying combat, and attempting to appeal to younger and younger audiences.

Finally, let's not forget the industry has done almost nothing to take steps to prevent diversion of guns into the criminal market and to gun traffickers. Between 2016 and 2020, over 1 million of the industry's firearms were recovered by law enforcement in connection to crimes. More and more of these guns carry the telltale signs that they were purchased with the intent to traffic or illegally use them, yet the industry is rarely held accountable. This committee's investigation found a dealer in Georgia where 10 percent of the guns that sold ended up on crime scenes—10 percent. And we wonder why it is so easy for criminals to get guns.

So, why is no one holding the gun industry accountable for its dangerous practices? In 2005, at the behest of the NRA, Congress passed the Protection of Lawful Commerce in Arms Act, which insulates the industry from most legal threats. And again, at the behest of the NRA, Congress passed the Tiahrt Amendment, a budget rider that purports to limit sharing of data about guns used in crimes, which keeps the industry out of the conversation about how criminals get armed. These laws have to go.

In spite of these barriers, I am heartened that public and private actors in legislatures, city halls, courts across the country are taking action to reveal the gun industry's role in gun violence, and I am grateful to this committee's investigation into gun trafficking and its recent letters to gun manufacturers. I hope you have the CEOs appear here for testimony because America hears every day from the families who have lost loved ones to gun violence, and our country deserves to hear from the CEOs who are profiting off of their loss and pain.

Thank you.

Chairwoman MALONEY. Thank you. And, Mrs. Swearer, you are now recognized for your testimony.

Ms. SWEARER. Madam Chairwoman and distinguished member——

Chairwoman MALONEY. We can't hear your mic.

Ms. SWEARER. Madam Chairwoman and distinguished members.

Chairwoman MALONEY. We still can't hear you. Turn your mic on. Pull it closer to——

Ms. SWEARER. It says it is on.

Chairwoman MALONEY. It is not on.

Ms. SWEARER. The green light is on. I will try to speak a little bit louder.

22

## STATEMENT OF AMY SWEARER, LEGAL FELLOW, THE HERITAGE FOUNDATION

Ms. SWEARER. Madam Chairwoman and distinguished Members of Congress, my name is Amy Swearer, and I am a legal fellow at the Heritage Foundation where my scholarship focuses on the Second Amendment and gun violence prevention. I have testified before various legislatures after several mass shootings: Parkland, Virginia Beach, El Paso, and unfortunately, too many others, and I hope to God this is the last time I ever have to testify before a legislative body after a mass shooting again.

I fear that it won't be. My fear that it won't be is because the conversation has become predictable. An unspeakably horrific event, like Uvalde or Buffalo, happens, reflexively, almost compulsively, calls for Congress to pass a whole host of gun control measures, largely targeting peaceable law-abiding citizens. Should anyone dare question the constitutionality, practicality, or even the effectiveness of any of these policies, their opposition is immediately framed as callous obstructionism, and their legitimate concerns are brushed aside as "bullshit." Any viable alternatives are deemed frivolous without so much as a passing thought to their usefulness. And so, I will once again run through all of the serious problems with commonly proposed gun control measures. It is all detailed in my written submission, which I hope you read.

Semi-automatic rifles are the type of firearm least often used to commit acts of gun violence. Pistol grips and barrel shrouds don't make them any more or less deadly in the context of mass shootings. While these features can and do make a difference in the context of lawful self-defense for civilians, which is why millions of peaceable Americans own them, standard capacity magazines are commonly possessed by law-abiding citizens for lawful purposes. The few rigorous studies on their prohibition have found that the evidence for their success at lowering rates of gun violence is inconclusive at best.

The context in which mass public shootings occur renders magazine limits effectively useless at saving lives. Eighteen-to 20-year-olds are legal adults, otherwise endowed with all of the rights and duties of citizenship, including the right to keep and bear arms. Even if it were constitutionally appropriate to punish a mass of responsible young adults because a handful of them committed atrocities, the vast majority of mass public shooters are 21 or older.

And then I will repeat the same viable alternatives that would be far more effective in a far more immediate way, again, detailed in the written submission that I hope you read. Take violent crime seriously under existing Federal laws and encourage your state and local counterparts to do the same. Authorized schools to shift the over $100 billion in unused COVID relief funds to physical security improvements, the hiring of arm trained staff and the hiring of licensed mental health professionals; promote responsible gun ownership without simultaneously imposing financial burdens on gun owners or hindering their ability to immediately respond to violent threats; invest in the Nation's mental health infrastructure to combat the two-thirds of gun deaths that are suicides, and the list goes on.

23

Now Congressmen, I am fully aware that when you are burying your child, nuanced policy discussions are irrelevant. It shouldn't matter to a 4th grader hiding under her desk, covering herself in her dead classmate's blood, whether the real problem here is a barrel shroud or the several dozen missed opportunities to intervene along the way. But it should matter to you because you are the ones making public policy decisions. Many of you are the ones implying that a lot of victims would be alive today but for a mass shooter's pistol grip and a background check that he already passed. Many of you are the same ones mocking anybody for "talking about doors," when a single locked door in Uvalde would likely have saved 21 lives, and when all of us just walked in here today into this building with its limited public access points, its one-way locking security doors, and its plethora of armed officers.

What happened in Uvalde and in Buffalo is horrific? It is horrifying. No one should ever have to experience that type of unfathomable trauma, and I cannot even begin to imagine what those families are going through right now. Everybody with a soul has it shattered over acts like this, and we have seen it shattered every single time from Columbine to Parkland to Uvalde. This didn't get easier for us. We did not grow numb somewhere along the way to the reality of this. It is not as though our family members don't also teach 4th graders or we don't also send our kids to school. It is not as though we don't also shop in grocery stores, or go to country music festivals, or work in hospitals, as though we don't also feel the tremendous, horrible weight of these tragedies somewhere deep inside of our souls because we do.

Now we oppose these policies precisely because the lives of these victims matter, because the grief of their loved ones is real, because we all want thriving communities with families flourishing instead of burying their children. The opposition has always been and is still today a genuine concern that these policies suffer from serious constitutional and practical defects, that they will not have the impact and promise people they will. And we have always proposed alternatives that would be more effective and less constitutionally suspect. We have rarely been met with our open ears, and I hope for the Nation's sake that today is different, because I would really love to never testify after a mass shooting again.

Thank you.

Chairwoman MALONEY. Thank all of you for your very important testimony. I now recognize myself for questions.

As a mother, it is hard to find words to express the grief and outrage I feel, and others feel in this room, listening to the stories from our witnesses today. No child should be cut down by a gun. Lexi Rubio should have been able to grow up, live her dreams, become a lawyer, major in math, visit Australia. Eleven-year-old Miah should not have been forced to cower in fear as she watched her teachers and friends massacred. And the close-knit, vibrant Jefferson Avenue community in Buffalo, many of whom came today to stand with us, should not be forced to reckon with the violent death of friends and loved ones gunned down by a racist with an assault weapon. We are in a crisis, but we are not powerless. Congress just needs to find the courage to act, and I hope we find it

24

today when we pass on the sensible and vote on these sensible gun reform bills.

Let's start with assault weapons. The shooters in Uvalde and Buffalo were too young to buy alcohol, but they both purchased assault weapons legally. Ms. Pringle, as an educator, your organization represents millions of teachers, some of whom have witnessed horrific gun violence, some of whom have been murdered and its aftermath. Would banning assault weapons save the lives of teachers and students?

Ms. PRINGLE. It absolutely would.

Chairwoman MALONEY. There are many other commonsense steps that we can take. We can strengthen background checks, raise the minimum age to buy a gun, require waiting periods. Commissioner Gramaglia, you are on the frontlines against gun violence every day in Buffalo. Would these commonsense measures save the lives of police officers and others in your community?

Mr. GRAMAGLIA. It absolutely would.

Chairwoman MALONEY. Mayor Adams, New York City already has adopted many gun safety measures, and you have moved quickly to take further action. But guns from other states lacks gun laws keep flowing into New York. Why is it so important that we pass Federal gun safety laws?

Mr. ADAMS. As we indicated, we removed 3,000 guns off our streets, but in addition to that, we have witnessed an over 240 percent increase in what is called ghost guns. If we don't have a combined effort with the intervention items we are putting in place, the prevention, and also stop the flow, many of the guns that we are witnessing are purchased or stolen from outside our state. One gun in particular, a suspect was found with a gun, and it was stolen on July 27, 2020. It was used in six acts of violence, individual cases, individuals shooting into a random crowd. The gun found its way on the streets of New York. So, it is more than what we do locally. We need assistance with the partnership with the Federal Government to stop the flow of guns in our cities.

Chairwoman MALONEY. Other countries have taken commonsense steps to keep guns away from criminals, and they have succeeded in saving countless lives. We stand alone in the world with the number of mass shootings and deaths from guns. And as you can see in this chart, the American people overwhelmingly support gun safety reform. So, Mr. Suplina, in your view, why has Congress failed to adopt these commonsense measures that most Americans and most countries in the world have adopted?

Mr. SUPLINA. Well, to put it bluntly, Chairwoman, the gun lobby presents a formidable obstacle in this country. Oftentimes, and you have heard it already today, the Second Amendment is used as a reason to not advance commonsense gun reforms, even while the Court has not said that the very reforms that you are proposing would violate. Quite the opposite, the courts have upheld over and over and over again. So, the lobby ceases its job to make every gun law one step closer to confiscation, which is a lie; conspiracies abound about the government coming to take your guns, and that gets into the head of well-meaning lawmakers who are afraid that, you know, people will believe that those myths are true. They are

25

not true. We can do an awful lot to save American lives by passing these laws.

Chairwoman MALONEY. We have lost too many lives to gun violence. It is long past time for Congress to act.

I now recognize the gentleman from Georgia, Mr. Clyde.

Mr. CLYDE. Thank you, Chairwoman Maloney and Ranking Member Comer, for holding this hearing today so we can highlight the need for additional school security to protect our children. I joined the Nation in mourning for the 19 children and two adults who senselessly lost their lives due to an evil act committed about two weeks ago. While every loss of life is a tragedy, no one should weaponize or politicize the abhorrent act to punish law-abiding citizens.

For almost 250 years, since the founding of our Nation, countless hundreds of thousands of men and women have sacrificed their lives to provide the freedoms we enjoy today. Indeed, those freedoms were bought at a very high price and must be guarded continuously so they can be passed on to future generations. If we allow emotion to drive our actions, actions that have Constitution-altering consequences, we will destroy the very foundation of our country and break faith with those who gave everything that we would be free. Evil deeds do not transcend constitutional rights. It is the other way around. Constitutional rights are the ones that transcend evil deeds.

What occurred in Uvalde and other communities like Sandy Hook and Parkland was nothing short of heartbreaking tragedies and evil deeds, heartbreaking and evil for the loss of innocent life, but also because, from what I have seen in the news about Uvalde, I believe it was mostly preventable. We don't know all the facts yet because the investigation is still ongoing. But I hope that this hearing is truly looking for legitimate, functional, and effective answers and not just a bunch of left-wing talking points to fill the "do something, do anything" mentality that I have heard coming from the Biden administration.

The White House Press Secretary, Ms. Jean-Pierre, said on Tuesday, May 31, that President Biden is uninterested in pursuing tighter security at schools in the aftermath of the Uvalde tragedy: "I know there has been conversation about hardening schools. That is not something that he believes in," said Ms. Jean-Pierre. One of the things I have learned during my three overseas tours of military combat was that the harder the target you are, the less likely you will be engaged by the enemy. That is a proven fact and just commonsense that applies across multiple aspects of life. For that to not be a part of the administration's focus just shows how seriously out of touch the Democrat leadership is with reality.

You know, I want to echo Ms. Hughes' remarks from the previous panel. Schools should be hard targets. Violent criminals should never, ever have been able to gain access to the inside of the schools. That means schools across the Nation should implement sensible security measures, like keeping doors locked, a single point of entry, better security technology, and a volunteer force of well-trained and armed staff, in addition to a school resource officer. And where a school staff person has additional responsibility, they should receive additional compensation.

26

A retired military officer from my district, an Army colonel, sent me an email a few days ago, and I want to read a short section of it. "I am absolutely convinced that the single most effective method to eliminate school shootings is to take away all the signs that declare all schools are gun free zones and do away with all laws that require such postings." Replace those signs with signs using these words or similar words. "We love our children and will do anything to protect them. Accordingly, selected teachers and staff are armed and trained to protect our children. Proceed at your own peril. You will be stalked." The rationale for this dramatic change in policy is really quite simple. Gun free zone signs don't protect anyone. They take away the law-abiding citizens' capability to be a force in helping to protect the children, and they protect the would-be a shooter because they believe they will be unopposed.

From June 1950 through June 2019, 94 percent of mass shootings occurred in gun free zones. If a would-be school shooter doesn't know who is armed and who is not, they would likely move to a more vulnerable target. Most potential school shooters are coward at heart. They do not want to face a challenge to what they are trying to do. They want to be in control with no opposition. They do not like to be confronted by someone who has to face off against them because that confrontation would preclude a school shooter wannabe from being able to take any unopposed action.

For those who say that teachers or staff will likely not take up arms to protect their students, I say they will. There have been too many documented cases where teachers have heroically given their lives to protect their students. It is time to give them the tools and help them to better protect those children so they have a fighting chance to survive an encounter with someone who is bent on harming them. And for the record, if someone is intent on harming someone else, they will use whatever is available to do the job, be it a hammer, a knife, or whatever. There is a lot of insight in the words of this Army colonel. He also knows the difference between a hard target and a soft, easy target, and he knows the advantage of that difference.

Ms. Swearer, you were involved in Heritage Foundation School Safety Initiative, which was developed after the 2018 Parkland shooting, correct?

Ms. SWEARER. Yes, sir.

Mr. CLYDE. In your opinion, what do you believe should be done to secure our schools from violent criminals to ensure that our students have a safe place to learn?

Ms. SWEARER. Well, I think, as I mentioned in my testimony, and then again in my written submission, there are several avenues that can be taken, including physical security improvements. You know, again, it has become popular to mock people for talking about doors and those sorts of things, but these are basic security components of the rest of our everyday lives. We see them in apartment complexes. We see them in the building we walked into today. We see them in most corporate buildings that we walk into on any given day.

You know, in terms of having a quicker armed response, I think schools should have the flexibility to decide how that happens. If you look in my written submission, any footnote, there are, just

27

from the last couple of years, a good number of examples. And it is just a smattering of them because I didn't want the footnote to be 12 pages of armed responses saving lives whether from school resource officers, or from including, in one case, from an armed staff member who stopped a kidnapping and then prevented an armed individual from entering the school where other children were. And I think, again, a key component of this is not just looking at physical security, but also, you know, I've mentioned having the adequate mental health resources. We are not talking about blaming mental illness, but we are talking about when you look at one, what it means for humans.

Chairwoman MALONEY. The gentleman's time has expired.

Ms. SWEARER. I would end by saying looking at licensed mental health professionals in schools.

Mr. CLYDE. Thank you very much. I yield back.

Chairwoman MALONEY. The gentleman from Massachusetts, Mr. Lynch is recognized for five minutes.

Mr. LYNCH. Thank you, Madam Chair. Thank you for holding this hearing. I want to thank the panel of distinguished witnesses. Thank you for coming before this committee to help us with our work. I also want to thank the previous panel. The families of the victims who had the courage and selflessness, I think, to, despite their pain, come here with the sole purpose of preventing other families from suffering a similar loss, so I thank them.

Madam Chair, I would like to ask unanimous consent to submit for the record a report and analysis conducted by Quoctrung Bui, Alicia Parlapiano, and Margot Sanger-Katz over at *The New York Times*. It is an analysis of 106 mass shootings since Columbine in this country.

And I want to read an excerpt that describes best what they found.

To quote this report, "If the key gun control proposals now being considered in Congress had been law since 1999, four gunmen younger than 21 would have been blocked from legally buying the rifles they used in mass shootings. At least four other assailants would have been subject to a required background check instead of slipping through a loophole. Ten others might have been unable to steal their weapons because of the efforts required to encourage safer gun storage, and 20 individuals might not have been allowed to legally purchase the large-capacity magazines that they use to upgrade their guns, helping them to kill on average 16 people each." Taken together, those four measures might have changed the course of at least 35 of those 106 mass shootings, a third of such episodes in the United States since the massacre at Columbine High School in Colorado, that *New York Times* analysis has found, and those 35 shootings killed 446 Americans.

Mr. Suplina, there has been references made to the fact that someone could cause damage with a hammer or a knife. I would wonder if you could talk about AR–15 style firearms and their ammunition and how different they are and the greater vulnerability in creation in society. I know you have written on this in the past, and if you could go over that for a bit just to educate people who are not familiar with that type of weapon.

28

Mr. SUPLINA. So, this type of weapon, which is derived from a military-style, a military weapon, presents increased risk, as I believe the commissioner said earlier, because of their speed of bullet, their handling, their ability to accept high-capacity magazines, and they are designed and are advertised to be able to inflict mass amount of damage in a short period of time. They are also unique in the damage that is done to the human body when you use one of these. A handgun, even at a sometimes larger caliber, won't do the damage to human tissue. I am not a physician, but you did hear from one earlier who described in great detail what a semi-automatic rifle with multiple rounds can do.

So, these are unique threats. There is a reason why they are used in mass shootings because those shooters want to inflict maximum damage.

Mr. LYNCH. Thank you. I do want to add a quote from a trauma surgeon at the University of Arizona, who agrees with your assessment. He said that the damage from an AR–15 on the body "looks like a grenade went off in there."

Madam Chair, I am so sorrowful for the loss of Lexi Rubio and so many others, and so many we have heard in previous mass shootings. You know, I will support the package of restrictions that we will consider in the next couple of days here in Congress to restrict the use of assault weapons and high-capacity magazines, and I will vote for the background checks that I think are necessary. And I respect my colleagues' rights to defend the Second Amendment, but I will note when in defending the Second Amendment you have to go to military experts and battlefield commanders for advice on how to protect our kids while they are in school, we got a problem. We have got a problem. Think about that, that you are going to military battlefield commanders, combat veterans for advice on how to protect our kids while they are sitting in school trying to learn.

I just urge my colleagues to think hard on this and consider supporting the package of bills that we have before the Congress this week. Thank you, and I yield back.

Chairwoman MALONEY. The gentleman yields back.

The gentleman from Texas, Mr. Sessions, is now recognized.

Mr. SESSIONS. Madam Chairman, thank you very much, and I want to thank the gentleman from Kentucky, the ranking member, for really what I think is the thoughtful opportunity for us to handle what is a difficult circumstance.

I am a Texan and I was about some 100 miles from Uvalde. I know Uvalde very well. I spent a good bit of time in San Antonio growing up. As soon as I heard about what happened, I immediately went about convening some 10 counties worth of superintendents, mayors, county judges, law enforcement people, sheriffs, deputy sheriffs, school resource officers. I did not sit back and wait to find out what this hearing might develop. I did not wait to find out what someone else thinks is a good idea. I tend to think that, back home, people have the best answers. I say differently. I think Texans have answers for Texas problems.

Madam Chairwoman, I do not want to chastise anybody today. I want to thank each of our people who have showed up, not only from Buffalo, but from New York City and others who have taken

29

time to be here today. I do not wish to challenge anyone. But, Madam Chairwoman, I would like to insert into the record an article from the *Christian Science Monitor Weekly*, June 11, and also an article which I have provided to you from *FiveThirtyEight*, which is a website that they present information. For the panel, the *FiveThirtyEight* article said, "We have known how to protect, prevent a school shooting for more than 20 years."

Chairwoman MALONEY. Without objection.

Mr. SESSIONS. Thank you, Madam Chairman. In fact, as I went about looking at this, which I had not previously, I did a good bit of review myself, and I found out that there is the National Center for School Safety. It is at the University of Michigan in the School of Public Health. And they state this before and still, the information that we do have access to these studies, seem to be saying that, yes, by developing a positive school climate, by educating students on how to say something, and speak up or find a trusted adult is having a positive effect, not just on attitudes, but also self-efficiency, something we need to approach as we talk about behavior.

We learned at my meeting that I had in Waco, Texas, that this is not a decision that the shooters, by and large, make. That is a snap judgment. They go about this planning effort and plan these school shootings out. They happen to be people who have become isolated in school, had been picked on, been made fun of, had been bullied, and these people go off into, by and large, a deep hole where they are not able to effectively balance their lives. This is a public issue problem in our schools of mental health issues.

I go to schools probably every two weeks, and my observations that I have publicly stated, are that I have seen our schools. There are a lot of children, a lot of young adults, who are tested in ways where I think they are reaching out for help. I think one of the things that we should go to is looking at the studies that have been out here, and I would hope our schools and our experts that are on these panels today, including you, Chief, and including you, Mayor, would include these studies and go back to the schools, and let's identify in our schools where there is something we can make better. This article also says our work on projects is in progress, and it talks about how talking to students. Every day when I grew up, we would recite the Pledge of Allegiance to the flag, taking a few minutes.

Now, I know we have heard testimony that everything about America is racist, but I think that in our classrooms, we need to talk about our Nation, our rights and our responsibilities, but taking time every day to be nice to each other, leaving notes knowing each other and then listening to people who emanate and identifying people who have problems. It is my hope, Madam Chairwoman and our ranking member, that instead of taking to the floor this immediate action, we would really listen to you and other experts.

Madam Chairwoman, I would like to see if we would call Justin Heinze, who is director of National Center for School Safety, assistant professor at the University of Michigan School of Public Health, I believe we need professionals who have studied these things. I say this as an opportunity to each one of you. I want to

30

thank you. We listen to you and I hope you will hear us back. Thank you very much, and may God bless the people of Uvalde, Texas who are struggling through this at this time in our Nation.

Madam Chairwoman, I yield back my time.

Chairwoman MALONEY. The gentleman yields back.

The gentleman from Illinois, Mr. Krishnamoorthi is recognized.

Mr. KRISHNAMOORTHI. Thank you, Madam Chair. Commissioner Gramaglia, thank you for your service to the people of Buffalo. I was born in India, and I immigrated first to Buffalo, New York, and so the fact that you said that it is the city of good neighbors is very poignant for me. I am very sorry for the loss of all those lives in Buffalo.

The shooter in Uvalde used a what is called a Daniel Defense DDM V7 rifle. It is a style of AR–15 rifle. It markets that rifle as "a perfect rifle for everybody." This particular picture comes from their Twitter account on May 16, 2022. Now, Commissioner, guns are the leading cause of death among young people aged 24 and under. Guns kill far more kids than cigarettes, but we don't let cigarette companies market to children. Sir, you don't think it is appropriate for Daniel Defense or any manufacturer to market AR–15-style rifles, or handguns, or any other weapons to children, correct?

Mr. GRAMAGLIA. I think that picture behind you is very disturbing is what it I, and, no, I don't believe that that should be the case.

Mr. KRISHNAMOORTHI. And why do you find that picture disturbing?

Mr. GRAMAGLIA. Many children in our country, because of a lack of safe storage on weapons, have either accidentally taken their own lives or somebody else in that household or another friend within that house who is there visiting. It is disturbing.

Mr. KRISHNAMOORTHI. Shortly after the Daniel Defense rifle was used in the Uvalde shooting, this picture was taken down from their Twitter account, and indeed their Twitter account was made private. I think they had second thoughts about advertising in this manner as well.

Ms. Swearer, in 2019, while testifying before the House Judiciary Committee, you went viral. In a viral video talking about the lethality of AR–15s, you said your mother "struggled to hit a stationary target from 6 yards out under ideal conditions, and then she picked up an AR–15 and I watched my mother put a fist-sized grouping of lead in the center mass of the target 20 yards out. When accuracy and stopping power matter, they are simply better." You said that, correct, Ms. Swearer?

Ms. SWEARER. Yes, I did.

Mr. KRISHNAMOORTHI. This is a picture of the 19 children and two teachers who died in Uvalde, Ms. Swearer. You mentioned the AR–15 stopping power, but I got to believe these little children were not the ones you were talking about stopping, correct?

Ms. SWEARER. No, I was talking about stopping the individual who showed up to shoot them, who did show up to shoot them——

Mr. KRISHNAMOORTHI. And the——

Ms. SWEARER. Who did show up to shoot that individual was a bunch of law enforcement officers with an AR–15.

31

Mr. KRISHNAMOORTHI. And Ms. Swearer, your mic is not on, but——

Ms. SWEARER. The green light is on.

Mr. KRISHNAMOORTHI. I can hear you, Ms. Swearer. It is good. I can hear Ms. Swearer.

Mr. CONNOLLY. [Presiding.] Perhaps you could switch with Mr. Suplina for a minute if his mic is working.

Mr. KRISHNAMOORTHI. Can you please suspend the time?

Mr. CONNOLLY. The witness needs to be heard.

Mr. KRISHNAMOORTHI. Restore the time, please.

Mr. CONNOLLY. Thank you.

Ms. SWEARER. Congressman——

Mr. KRISHNAMOORTHI. Can I repeat the question and then you can say the answer?

Mr. CONNOLLY. Yes, and if we could just stop the clock for a minute because we lost some time there.

Mr. KRISHNAMOORTHI. Could we change the placards to——

Mr. CONNOLLY. Mr. Krishnamoorthi, do you want to repeat the question?

Mr. KRISHNAMOORTHI. Yes. Ms. Swearer, when you talked about the stopping power of these AR–15s, it wasn't these children that you were talking about stopping, obviously.

Ms. SWEARER. No, I was referring to individuals like the one who went into that building and spent 78 minutes shooting them. And I hope, as was the case in Uvalde, that the people who show up to stop shooters like that have the AR–15 precisely for its stopping power, and that is exactly what happened in Uvalde. That is why cops are routinely exempt from these prohibitions and these threats in a civilian context——

Mr. KRISHNAMOORTHI. Ms. Swearer, this man legally purchased these AR–15 rifles, correct? In this particular case, the shooter had legally purchased these AR–15 rifles and was able to stop and obviously end these lives forever.

Ms. SWEARER.

[Inaudible].

Mr. KRISHNAMOORTHI. Now, Commissioner Gramaglia, I want to address you again, Commissioner. You know, guns are often billed as essential to maintaining the freedoms we enjoy in America. They are an iconic part of America to a lot of people, but cars have long been central to American life as well. And what we have seen interestingly is that, here is a picture of traffic deaths versus deaths from firearms, and at one time traffic deaths far exceeded firearms in 1950, but over time, traffic deaths have gone down, while firearm deaths have remained relatively constant. Now, of course, with regard to the right to bear arms, that is in the Constitution, but it is not an absolute right. That is why we outlaw machine guns and we regulate firearms in other ways.

Sir, with regard to traffic deaths and cars, the imposition of rules, and regulations, and laws, along with private industry adapting safer ways to drive and devices to make them safer, have led to a reduction in traffic deaths, but the same cannot be said for firearms. Isn't that right?

Mr. GRAMAGLIA. I believe you are correct, yes. In looking at the traffic deaths going down, regulations, both in vehicle safety, air-

32

bags, speed enforcement, other things of that nature, have led to safer roads.

Mr. KRISHNAMOORTHI. And what would that lead you to believe should happen with regard to firearms?

Mr. GRAMAGLIA. Some sensible regulations to limit the carnage that is happening on our streets.

Mr. KRISHNAMOORTHI. Thank you, Commissioner.

Mr. CONNOLLY. Thank you. The gentlelady from North Carolina, Ms. Foxx, is recognized for her five minutes of questioning.

Ms. FOXX. Thank you, Mr. Chairman. The horrific and heart-breaking tragedies that occurred in Uvalde and Buffalo has shaken the Nation. We are all made in God's image, and I continue to pray for our society and for the families of the men, and women, and children who were senselessly murdered. We must be thoughtful in how we discuss and address this issue. When the Federal Government acts in haste, the room for error is exponentially compounded. This problem should be diagnosed in its entirety before we endeavor to place proposals on the table. The simple truth is that top-down legislative actions from Washington do not provide the states the due deference they deserve. The latitude of the states to make decisions that best suit their constituencies must be respected.

The Second Amendment was intended both to empower individuals and also to shield them from the Federal Government exerting undue influence. Unfortunately, over time, the underlying principle of the Second Amendment has been distorted and misconstrued by Washington bureaucrats who simply want it stripped away from law-abiding citizens. This cannot be allowed to happen.

I now yield the balance of my time to the gentleman from Georgia, Mr. Clyde, who has a tremendous amount of experience with these issues.

Mr. CLYDE. Thank you very much, Virginia. I would like to ask Mr. Gramaglia. In your sworn testimony, you say of a retired Buffalo police officer, Aaron Salter, Jr., his service weapon was no match for the military-style weapons and armor the perpetrator was equipped with. Yet your Buffalo police officers responded to Tops a minute after receiving the 9–1–1 call and were able to take the shooter into custody within a minute of arriving at the scene. That is impressive. That is very impressive that your officers were able to do that, and this gentleman armed with an AR–15 style rifle. What is the Buffalo officer's standard service weapon?

Mr. GRAMAGLIA. A Glock 40-caliber.

Mr. CLYDE. A Glock 40-caliber pistol.

Mr. GRAMAGLIA. Yes.

Mr. CLYDE. So, they responded with a Glock 40-caliber pistol and were able to subdue this gentleman in one minute.

Mr. GRAMAGLIA. They were able to do that because as he exited the store, he had the AR–15 pointed up underneath his chin, and then through what I thought was very calm de-escalation language, he surrendered his weapon and put it down. Had he pointed it at the officers, we think we would have had a different scenario here.

Mr. CLYDE. OK. But that 40-caliber weapon is completely capable of stopping someone with an AR–15, correct?

Mr. GRAMAGLIA. Well, he had military-style body armor and a tactical helmet on. He was shot at least one time that we had un-

33

covered through our evidence and that had no effect on him. I also watched the video, both the store surveillance video that has not been released and the GoPro video that was downloaded, which showed the confrontation between——

Mr. CLYDE. But the 40-caliber pistol that the officers carry is plenty enough to stop an armed shooter, correct? It is all about shot placement, isn't it?

Mr. GRAMAGLIA. It is and it isn't.

Mr. CLYDE. All right. Thank you. I appreciate that. Ms. Swearer, actually, have mass shootings or school shootings been carried out with other weapons other than AR–15s?

Ms. SWEARER. Yes, Congressman, they have.

Mr. CLYDE. OK. What other weapons, and what is the primary weapon, if you will?

Ms. SWEARER. So, the primary weapon is actually a plurality, are handguns alone. Another, you know, sort of larger segment are several variations of firearms, some combination of rifles, handguns, shotguns, and then a smaller percentage are rifles alone.

Mr. CLYDE. OK. Thank you very much. So, handguns are still very, very potent firearms. Madam Chairwoman, I would like to introduce this article into the record and I request unanimous consent. It is a *Fox News* article, May the 28, 2022, and it is entitled, "West Virginia Woman With Pistol Shoots, Kills Man at Graduation Party: 'Saved Several Lives.'"

Chairwoman MALONEY. Without objection.

Mr. CLYDE. All right. Thank you.

Mr. CLYDE. You know, what happened in Uvalde was an incredible tragedy, and it had a very terrible ending. But something very similar happened the very next day, that Wednesday in Charleston, West Virginia, and a particular woman in West Virginia fatally shot a man who had begun firing an AR–15 rifle into a crowd of dozens. The woman was attending a West Virginia party, she drew her pistol, and fired on the convicted felon. No one at the party was injured, and the gentleman obtained his weapon illegally. Criminals will obtain their weapons however they want. They will get them illegally. More gun laws are not going to stop that, not in any way, shape or form, because criminals simply do not obey the law.

Chairwoman MALONEY. [Presiding.] The gentleman's time has expired.

Mr. CLYDE. I yield back.

Ms. FOXX. Madam Chair, I would like to ask permission to insert into the record an article, "Why 'Do Something' Won't Work," from *The Wall Street Journal*, Thursday, June 2, 2022.

Thank you.

Chairwoman MALONEY. Without objection.

Chairwoman MALONEY. The gentleman from Virginia, Mr. Connolly, is now recognized.

Mr. CONNOLLY. I thank the Chair, and I thank our witnesses for being here today.

I was the chairman of Fairfax County when the Virginia Tech massacre occurred. At that point in American history, that was the worst gun massacre in our history. I buried six young children, students that week—six. I am still in touch with many of the families

34

years later, and the emptiness in their hearts and souls cannot be filled. It is a tragedy that lives with them forever. Those children were killed by a mentally ill person who should not have had access to weapons but did. He wasn't a criminal. He was mentally ill.

We hear excuse after excuse that gun laws don't work. The Australian experience would suggest otherwise. After a series of massacres in their country, Australia adopted some strict gun laws. They don't have the massacres weekly we do. It changed behavior because it changed access to weapons and ammunition. We have heard the answer is arm our teachers, that be the solution. Ms. Pringle, you deal with teachers? Would that be a good solution from your point of view?

Ms. PRINGLE. Absolutely not. We know that the majority of not only our teachers, but our parents, do not believe that arming teachers would in any way prevent the carnage that we have seen for over 23 years. I just want you to imagine, I was a middle school teacher. My responsibility was to ensure that every student was nurtured and that they could learn, come to school ready to learn every day. And now the suggestion that I, as a teacher, would be responsible for carrying a weapon and making a split decision, split-moment decision about whether I was going to shoot someone or not, whether that responsibility would be mine to bear, that is a distraction from what we know we need to do in this country, which is to pass comprehensive gun control laws, something we have never done. In the short time that we did ban assault rifles, assault weapons, we saw that carnage go down, didn't we? Yes, we did. But we have never passed comprehensive gun legislation in this country, and we need to do it now.

Mr. CONNOLLY. Thank you. Mayor Adams, welcome.

Mr. ADAMS. Thank you.

Mr. CONNOLLY. Mayor Adams, you are the mayor of, I think, the largest city in the United States?

Mr. ADAMS. Yes.

Mr. CONNOLLY. Would it be a good idea, from your point of view, as the mayor of that city and your commitment to reducing crime in that city, to arm our teachers in all of your schools in New York City? Would that be a solution from your point of view?

Mr. ADAMS. No, and I think the facts show that. Between 1996 to 2010, one study found that police officers were three times more likely to die from gun violence with a heavy flow of guns in their city. So, it is harmful to the law enforcement community, it is harmful to our civilians, and it is harmful to our children.

Mr. CONNOLLY. Mr. Gramaglia, police commissioner, would arming teachers help your force? Would it have made a difference in your community in Buffalo?

Mr. GRAMAGLIA. I think what we have to be careful on is to not militarize our schools and make students feel like they are in a system where they are surrounded by weapons in an institution where they are supposed to be learning. I certainly agree with hardening our targets, making sure our schools are safe buildings, having a strong school resource program where school resource officers are engaging with their students, are building trust within their students. But I think we have to caution against over-weaponizing our

35

schools. It causes fear in our students, and I think we need to engage our students in these conversations.

Mr. CONNOLLY. And just real quickly, and Ms. Pringle's point, the use of weapons and the decision to use them for law enforcement could be a split-second judgment, and that requires careful training, does it not?

Mr. GRAMAGLIA. It is a considerable amount of training for absolute split-second decisions that are second-guessed for years on.

Mr. CONNOLLY. Thank you. I yield back.

Chairwoman MALONEY. The gentleman yields back.

The gentleman from Georgia, Mr. Hice, is recognized for five minutes. Mr. Hice?

Mr. HICE. Thank you, Madam Chair. Just for the record, from what I can research and understand, there are some 300,000 or so crimes committed every year of violent crimes in which guns are a part of the situation. There are between 500,000 and 3 million incidences a year where guns prevent violent crimes from taking place.

So, let us clarify here, the issue is not gun violence. Guns are not the issue. We have a people violence problem who misuse guns and other means whenever they intend to harm individuals. And the answer to this situation when you have violent people, the answer is not defunding the police. The answer is not pitting one group of Americans against another, which we see far too often these days. The answer is not ignoring the rule of law. The answer is not releasing criminals into our streets or allowing them into our country. The answer is not a lack of consequences for those who commit crimes and being soft on crime, for those who commit violent crimes. We have got to look at the problem, which is violent people. And at some point in this country we have got to recognize that there is great value in upholding the rule of law. We have got to recognize and teach that there is a such thing as moral absolutes, not the least of which is respecting one another, respecting life. We have got to, in the midst of this conversation, I believe, embrace religious beliefs.

Look, there are risks that come with a free society. We all understand that. But we have a moral and a spiritual crisis in this country right now, and that is reflected in violent people that we see more and more. But it is impossible for us to have a system of government which we have in this country where we have limited government and maximum freedom if we do not have a citizenry that is capable of self-governing their own lives with an authentic understanding of right and wrong. And so for us to take out of the equation any mention of moral absolutes or the role that our founders mentioned and described as indispensable supports to our system of government, which is religion and morality, then I believe we are making a mistake in all of this discussion. These things cannot be ignored.

Mayor Adams, let me real quickly begin with you, and if we can go quickly, New York City is certainly one of the leading examples of gun restrictions and gun restrictive measures in the United States. "Yes" or "no?"

Mr. ADAM. Yes.

Mr. HICE. Your mic was off.

36

Mr. ADAM. Yes. I am sorry. Yes.

Mr. HICE. And yet, we all know New York has continued in recent years to see a rise in crime. "Yes" or "no?"

Mr. ADAMS. Yes.

Mr. HICE. OK. In January of this year you released in a press statement regarding your blueprint to end gun violence in New York City, you had in that a quote that says this, "It is illegal to carry a gun in our city, yet police officers take them off the streets every day in record numbers." You made that statement, correct?

Mr. ADAMS. Yes, it mainly comes from Georgia.

Mr. HICE. Right. And so here we still have in a city that has a greatest among the greatest gun restriction laws in the country, a rise in crime and guns being carried off the streets in record numbers every day. It doesn't appear that the attempts that are produced by the gun restrictions are having any effect of keeping bad people from getting guns, and taking the constitutional rights away from American citizens only helps criminals is I guess what I am getting to.

And Ms. Swearer, let me come to you. If we continue down this path of restricting gun rights from American citizens, making it easier for criminals to have targets, knowing that there will not be guns by legal citizens there to defend themselves, what kind of impact will that have in the long run?

Ms. SWEARER. First, I want to make sure. Is my mic still not on?

Mr. HICE. Can we put a pause?

Chairwoman MALONEY. Use your neighbor's mic. Use your neighbor's mic. Maybe that will work better.

Ms. SWEARER. My apologies. I was told the issue had been taken care of.

Congressman, to answer your question. Criminals are rational actors. You know, you look at the studies on this and the way in which criminals operate. Obviously, they don't want to confront someone with a firearm any more than we would want to if we were criminals. They are rational actors. You know, you mentioned the statistics on defensive gun uses. I think that is important to point out. I would also note how much lower that is, you know, considering there are a number of states that essentially do not allow ordinary law-abiding citizens to protect themselves with firearms in public and/or who make it far more difficult for individuals to keep and bear arms even inside their own homes. And so that could be considerably higher under different circumstances. You know, that said, again, I appreciate you pointing that out, but, again, criminals are rational actors. To pretend otherwise is borderline silly. So, of course——

Chairwoman MALONEY. The gentleman's time has expired.

Mr. HICE. Thank you. Thank you, Madam Chair.

Chairwoman MALONEY. The gentleman from Maryland, Mr. Raskin, is now recognized.

Mr. RASKIN. Thank you, Madam Chair. Buffalo, Uvalde, Sandy Hook, Tree of Life, Mother Emanuel Church, El Paso, Walmart, Pulse nightclub, Las Vegas, Columbine, the bloodbath continues. In the history of our species, a number of civilizations have practiced or allowed human sacrifice, including the sacrifice of children: the Carthaginians, the Mesopotamians, the Incas, the Aztecs. Will we

37

be recorded as such a society that accepts the sacrifice of innocents?

Gun violence is the No. 1 cause of death of children in the United States of America today, which makes us globally unique. We have rates of gun violence and gun death 20 times higher than other industrialized nations like France, the United Kingdom, Israel, Norway, Sweden, Japan. No other Nation comes close to what we see here even though we have comparable levels of mental health problems and mental illness. Will we continue to accept the slaughter of innocents, including innocent children, as acceptable collateral damage for loyalty to a completely bogus and distorted misreading of the Second Amendment and what the Supreme Court has said about it?

Justice Scalia in the Heller decision was emphatic that reasonable gun safety regulation is perfectly consistent with the Second Amendment rights. Justice Scalia said he specifically rejected the view advanced by a number of our colleagues today, saying that the right of gun ownership is not unlimited. No, Justice Scalia stated, the Second Amendment right is "not a right to keep and carry any weapon whatsoever in any manner whatsoever, and for whatever purpose." He enumerated a partial list of reasonable regulations, including a ban on carrying concealed weapons, the possession of firearms by felons, the mentally ill, and other dangerous people, laws forbidding the carrying of firearms into schools and government buildings and other public places, laws imposing the conditions and qualifications on the sale of firearms, such as background checks. All of these things, he said, are perfectly consistent with the Second Amendment right.

It is not different from other rights we have, like the First Amendment where you have an absolute right to speak but you don't have a right to set up a demonstration with loudspeaker system in front of the White House at 2 o'clock in the morning and keep the President's family up. We accept reasonable time, place, manner regulations with respect to all rights. Now, our colleagues invite us to believe the Second Amendment is some kind of policy straitjacket, but they won't read or quote the decision by Justice Scalia himself, who wrote the most elaborate defense and explication of the majority's view of the Second Amendment in D.C. *v.* Heller in 2008.

Mr. Suplina, in 2005, Congress gave the gun industry unprecedented and unique immunity from civil lawsuits for crimes committed with their products. No other industry has got anything like that. Could you explain what that immunity protection means for the gun industry and how it has blocked commonsense laws to end gun violence in our country?

Mr. SUPLINA. Yes, Congressman, thank you. The law, PLCAA, which you cite, has given near-blanket-immunity to the gun industry. And the result has really had a profound impact on what we know about the gun industry's role in gun violence, as well as any accountability for the industry. So, acts that would have led to either litigation that would have exposed truths, like happened with the tobacco industry with accountability, like happened in the automobile industry, safety practices that would have improved at

38

these manufacturers because there was a risk of doing nothing, just simply does not exist with the gun industry——

Mr. RASKIN. Well, what reckless marketing and sales practices has the gun industry engaged in because of this blanket of immunity that has been bestowed upon them?

Mr. SUPLINA. Well, you know, there are several, and the marketing is getting increasingly reckless, increasingly desperate as the field gets more crowded. But also in terms of distribution practices, I have heard several times today about how easy it is for criminals to get guns as if that is some act of magic, but these guns are all starting with gun manufacturers and gun sellers. We know that certain gun manufacturers are fueling gun shops that are selling disproportionately into illegal markets. And the gun industry is protected by PLCAA because they say, oh, we are following the law. Well, the numbers speak for themselves.

Mr. RASKIN. OK. And then finally, Chief, you were interrupted before. Well, what do you make of this claim that we shouldn't have laws governing, for example, a universal criminal background check because criminals don't follow the law? Is that an argument against having any law against murder, rape, assault, because criminals by definition don't follow the law?

Chairwoman MALONEY. The gentleman's time has expired, but the gentleman may answer.

Mr. GRAMAGLIA. So, the universal background checks is a simple process that is going to have those that want to legally obtain their guns with their constitutional rights to obtain those guns. Criminals absolutely are not going to follow that. The more guns that we keep flooding in without background checks, without proper adherence to get those guns through straw purchases and other manners, that is how we are flooding the market so that criminals can obtain those guns.

Mr. RASKIN. And Justice Scalia emphasized that there could be regulations for commercial sale——

Chairwoman MALONEY. The gentleman's time has expired.

Mr. RASKIN. Thank you. I yield back.

Chairwoman MALONEY. The gentleman from Texas, Mr. Fallon, is now recognized.

Mr. FALLON. Thank you, Madam Chair. We hold hearings on all sorts of topics for all sorts of reasons, sometimes for political reasons, or even worse, sometimes for political theater aimed at attaining political currency, currency which will then be spent on winning an upcoming election. Other times hearings are held to actually solve a problem.

We are here today because of the tragedies in Buffalo and the horrific loss of life in my home state of Texas, in Uvalde, a beautiful American community ripped apart by a troubled and evil coward. And when lives are lost and innocence is stolen, particularly when children are the victims, it is natural to want to assess and focus blame, who did this and how did this happen. And I am no different than any American. I am heartbroken and I am furious. Those innocent children are gone, and the indescribable suffering in the families is beyond words. We have a President that says continually that he must do something, we must do something. Many

39

Democrats are arguing that: we must do something. Now we need to do something effective that will keep our children safer.

As I mentioned, when a senseless tragedy like this happens, blame is thrown around. Some people want to blame guns, some people want to blame gun manufacturers, some people want to blame, believe it or not, the Constitution. Some people want to blame an entire political party, and all this couldn't be more misplaced. The shooter is the only one to blame. So, when the President and many Democrats are claiming that guns are the problem and their readily available supply is the culprit, well, the more guns in America, the argument goes, the more dangerous America becomes, but the actual facts belie this thinking. In 1969, so about 50 years ago, there were 180 million firearms in this country. Today it is about double. Twenty-nineteen it was about 365 million. Yet the murder rate back then was 9.6 per 100,000, the murder rate in 2019 anyway was 5 per 100,000, so twice the number of guns, and yet the murder rate was cut in half. The truth is that guns have always been readily available in this country, but mass shootings and, particularly, mass shootings of schools, were non-existent or at least extremely rare until they became a grisly recent phenomenon.

So, what has changed in the last 50 years? There has been a noticeable breakdown of the family, there has been an erosion of faith, and there has been a seismic drop in social interactions in large measure due to the overuse of these dang smartphones and the proliferation of social media, which is probably better described as antisocial media. Senseless mass shootings are not committed by well-adjusted, successful, socially polished people. They are committed by disturbed, unstable loners with mental disease.

[Inaudible background noise.]

Mr. FALLON. Madam Chair, can I get my time back?

Chairwoman MALONEY. Yes.

Mr. FALLON. Thank you.

[Inaudible background noise.]

Mr. FALLON. Thank you. Senseless mass shootings are committed by unstable, disturbed loners with mental disease. Refusing to address better mental health services, especially for young people, is to do a disservice at best, and it is a dereliction of duty at worst. The focus, sadly, by the Democrats is to restrict guns or prohibit their legal possession entirely. A Democratic Member of Congress in a committee hearing just recently said, "We will not rest until we have taken weapons of war out of circulation in our communities."

So, do restrictive gun laws or prohibitions work? The most dangerous nations on the planet, according to the World Bank and the United Nations, are El Salvador, Jamaica, Venezuela, and Honduras. And what else do they have in common? It is also nearly impossible for an average citizen to own a firearm, and yet they are terribly perilous places to be. Believe it or not, some Democratic-controlled cities in our country with restrictive gun laws are even more dangerous than the aforementioned countries. St. Louis has a higher murder rate than El Salvador. Baltimore does as well, and Detroit is a more lethal and dangerous place to go and visit or live than Venezuela.

40

So, passing prohibitions, I mean it just simply didn't work. Doing something doesn't work. Doing something effective is a path that we should and must take. History has shown us when you disarm law-abiding citizens, you create not more safety but more peril. The inconvenient truth for some on this committee and in this chamber is that more firearms in the hands of law-abiding citizens make us all safer. So, let us talk some real solutions.

We must harden our schools with controlled access and single point of entry with tiered entry procedures. The main office should be located directly by the front door, which is single-access entry. Classroom doors should automatically shut and locked like hotel room doors do. Let's support and foster a robust school marshal program where qualified and volunteer teachers and staff go through proper training to be armed on campus. Let's increase the number of SROs in our schools. Let's leverage technology by putting cameras in schools much like Frisco, Texas did 15 years ago when I was on a city council, and they had a command center and a mobile command center, and any threat could be immediately detected, tracked, and eliminated forthwith. We need a rapid response plan and a rapid response force to be trained to world-class standards. And also law enforcement doctrine must change so when there is a threat, the schools aren't besieged, but, rather, our heroes in blue advance using honed techniques, and teamwork, and technology, and eliminate the threat as soon as possible.

Our goal should be to protect our children. No parent, educator, citizen, legislature, or Nation has a higher calling. Let us look at real and effective solutions and shelve the divisive rhetoric because American children deserve nothing less. Thank you, Madam Chair. I yield back.

Chairwoman MALONEY. The gentleman's time has expired. Thank you.

The gentleman from California, Mr. Ro Khanna, is now recognized.

Mr. KHANNA. Thank you, Madam Chair. Like so many on this committee and around the country, I was deeply moved, not as a politician, as a father, by the testimony this morning of the families of victims. Kimberly Rubio, who lost her precious daughter, Lexi, cut through all the talking points, all the debate, and asked the central question before our Congress and our country. As she put it, what do we value more, children or our guns? It is really that simple.

I want to talk about the commonsense reforms on guns, but as the representative of Silicon Valley, I feel I also have a duty to talk about some of the role of social media in this massacre. With the Uvalde shooter on Instagram having a group chat where there is conversation of school shootings, where there is conversation of threats of violence, where he is bragging about getting assault weapons, why is there no action? And let us be very clear. These are minors. He was a minor when he did this. It is not the same free speech rights. Mr. Suplina, do you think companies like Instagram should have some responsibility in group chats when minors are involved and you have explicit discussion of school shootings, to do something?

41

Mr. SUPLINA. I think the role of social media companies is an important one, and you are right to point it out Congressman. Instagram, Facebook, these are often where we see the earliest warning signs of a potential mass shooter, as well as other social media platforms where these incidences are discussed. There are often multiple people in the chat. And I do want to also mention, with respect to the Buffalo shooter, for instance, he cited YouTube for the videos that allowed him to modify the firearm that he had to accept detachable magazines which he used to deadly effect. So, social media companies do have a role to play here.

Mr. KHANNA. And just like my colleague, Mr. Raskin, said, that the right of the Second Amendment is not absolute, it is important to recognize that the right of the First Amendment is not absolute. Under Brandenburg, you can't have things that incite violence, and there are greater protections for minors. I mean, it is crazy to me that you can have people under 18 talking about shootings and mass shootings, and these companies are taking no action. So, we need to have regulation that gets to the heart of this.

Mrs. Swearer, I am trying to understand your position, and I just want to ask you some simple "yes" or "no" questions to understand where you are coming from. Is it your view that someone who has committed a violent felony should be able to purchase a gun? "Yes" or "no."

Ms. SWEARER. No.

Mr. KHANNA. Is it your view that someone who is a serial rapist should be able to purchase a gun? "Yes" or "no."

Ms. SWEARER. Very clearly, no.

Mr. KHANNA. Is it your view that someone who is a drug trafficker should be able to purchase a gun? "Yes" or "no."

Ms. SWEARER. No, and these are becoming insulting.

Mr. KHANNA. Well, I mean, so would you support any laws that would make sure that violent felons, serial rapists, or people who are drug traffickers will not get access to guns?

Ms. SWEARER. If they are written and narrowly tailored to approach that issue without burdening the rights of law-abiding citizens or criminalizing low-risk transfers between responsible citizens, yes, I am more than willing to look at that law.

Mr. KHANNA. That is exactly what the background checks do, I mean, because right now what you have, a case is that the background checks do not cover a lot of the sales to violent felons, to serial rapists. And I just want to be clear. When the Republican Party, their position, by opposing H.R. 8, is they are for violent felons, serial rapists still being able to purchase these guns.

Ms. SWEARER. No, they are not.

Mr. KHANNA. Yes, they are. This is——

Ms. SWEARER. No, they are not. They are against low-risk transfers being criminalized——

Mr. KHANNA. Please, it is my, ma'am. It is my time. I am reclaiming my time. This is——

Mr. COMER. Point of order, Madam Chair. The position of Republicans is that valid criminals be in jail.

Mr. KHANNA. Well, no, the position is——

Ms. WASSERMAN SCHULTZ. Madam Chair, the gentleman has not stated a valid point of order.

42

Mr. KHANNA. The position, H.R. 8, all H.R. 8, at its core, said is that violent felons are still getting these guns, serial rapists are still getting these guns. And the law and order party that has demagogued the issue of law enforcement and policing, that party is saying we are OK with violent felons still getting these guns, we are OK with serial rapists still getting these guns, and all the Congress or the Democratic side is trying to do is to close those loopholes. To say that violent——

Ms. SWEARER. I respectfully refer you to my testimony on this very bill before the Senate Judiciary Committee last year where I explained how that is a grotesque characterization of our opposition to that bill.

Mr. KHANNA. Ma'am, I am saying that we in this Congress——

Chairwoman MALONEY. The time has expired.

Mr. KHANNA. I am saying that there is not——

Chairwoman MALONEY. The gentleman's time has expired.

Mr. KHANNA. Well, she kept interrupting me.

Chairwoman MALONEY. OK. All right, but then.

The gentleman from Pennsylvania, Mr. Keller, is now recognized.

Mr. KELLER. I would first like to take a moment to thank all our panelists, this panel and the previous panel, for your testimony.

We have seen some horrific acts in the Commonwealth of Pennsylvania. We saw a devastating shooting in Philadelphia on Saturday, and I continue, and we all should, offer prayer for the families across the Commonwealth of Pennsylvania and across our Nation that have been affected by these acts committed by violent criminals, skyrocketing crime in our cities. That is what we need to focus on. New York City saw a 16.2 percent increase in violent criminals shooting others in March 2022. That is up from a year before. San Francisco saw a 31 percent rise in homicides. In Chicago, violent criminals were responsible for shooting 47 people on Memorial Day weekend alone.

There is a trend here. Crime is rising in cities that have the most restrictive laws on firearms and have the least severe criminal enforcement penalties on the books. And in fact, cities that don't enforce the laws that are on the books. The District Attorney in San Francisco has dismissed over 40 percent of felony convictions since 2020, and in Philadelphia, homicides have increased 58 percent, during District Attorney Larry Krasner's tenure. However, only 21 percent of crimes when violent criminals shot another person since 2015 have led to criminal charges, and less than one-tenth of those incidents resulted in convictions. Philadelphia Police are making record amounts of arrests for crimes committed by violent people with guns, yet Krasner's office has dismissed or withdrawn more violent cases every year he has been in office. The bottom line is, when you fail to enforce the law and hold criminals accountable, you get criminal behavior.

So, Ms. Swearer, how does failure to prosecute past or current crime affect crime rates in the future?

Ms. SWEARER. Well, it certainly emboldens criminals and reasonably allows them to believe that there is a very little chance that they will be punished or in any way held accountable for their crimes.

43

Mr. KELLER. Many of the proposals we are discussing today are widely implemented across the municipalities where crime spikes are happening. Would limiting law-abiding citizens' right to own a firearm curb these disturbing trends?

Ms. SWEARER. No, it would not. And I would also point out the reality of most gun violence is not that it is being perpetrated by people who lawfully purchase and possess their firearms. It is largely perpetrated by individuals with long histories of violence, who obtain their firearms already through illegal and illegitimate channels that are not addressed by universal background checks because they are already circumventing the law regarding those background checks. It is a very low-reward endeavor, even if it is like 100 percent enforceable.

Mr. KELLER. OK. What measures should be taken to ensure victims and their families are not legally ignored in favor of defendants?

Ms. SWEARER. I would again refer to some of my previous testimony because I know our time is short. Previous testimony that I have given before the Senate Judiciary Committee on gun violence in Chicago, I think a lot of that is still applicable to your question. You know, from a Federal perspective, as I said, we continue to enforce Federal laws and hold criminals accountable at a Federal level when possible and encourage state and local counterparts, some of whom have done a horrific job of this to do the same.

Mr. KELLER. So, I just have a question. There is what's called the NICS system, and when you purchase a firearm, I don't know how many people in this room have ever gone through a background check, but it does ask questions. I know it was brought up earlier about criminals being able to purchase guns. Is it not already illegal for rapists, and murderers, and people who have done domestic violence and convicted of these things, isn't it already illegal for them to purchase firearms?

Ms. SWEARER. To purchase and to possess, assuming they are felons and have not had their rights restored to them under existing state or Federal processes. So, there is no process under Federal law, so it would just be under the state.

Mr. KELLER. OK. But the point is, we are not saying that criminals should have laws. We are saying criminals should be put in jail, and law-abiding citizens should be allowed to lawfully possess firearms.

Ms. SWEARER. That is certainly what I am saying, and that is my understanding of what every member who was opposed H.R. 8 is saying as well.

Mr. KELLER. Thank you, and I yield back.

Chairwoman MALONEY. The gentleman yields back.

The gentleman from Maryland, Mr. Mfume, is recognized for five minutes.

Mr. MFUME. Thank you very much. Madam Chair, there is an old saying that your pain is where your passion is, and so let me just go back to where we started almost three hours ago at the beginning of this hearing and talk for a second about the pain that I felt, as I hope many of you did, listening firsthand to the accounts of witnesses and victims from Uvalde and from Buffalo.

44

Listening to them, I am still stunned and heartbroken. The gun carnage that continues in schools, and supermarkets, and movie theaters, in churches, on the streets of my Baltimore, in the streets of cities all over this country is a cross, ladies and gentlemen, that we all bear whether we want to or not. The gun laws that we hope will be passed today, I hope are seen as a beginning, not the end, only as a beginning. Otherwise, I really believe that we are doomed in our fight against murderers and their guns and the evil and the pain that they spread.

I want to acknowledge and thank the gentleman from Louisiana, Mr. Higgins, the commissioner from Buffalo, and the mayor of New York, all of whom served in law enforcement and saw firsthand how difficult it is to deal with the violence perpetrated by guns, and particularly assault weapons. And I want to associate my remarks with those of Mayor Adams when he said let the ATF do its job in rounding up so many illegal guns that are on our streets and to finally confirm a nominee.

Madam Chair, you will remember 1994. We were members of this body. We worked for a whole year—a whole year—to put together and pass an assault weapons ban. And the only reason it wasn't permanent was because we weren't able to get enough people, members on the other side of the aisle, unfortunately, to go along with that. And so the compromise was a 10-year ban on assault weapons, which expired in 2004. I am just shocked that 18 years has gone by and this body does not move to reestablish that.

In 1999, as a president of the NAACP, I filed suit against the gun industry. It took us three years to get to court because the NRA did everything they could to keep it from not happening, and finally, in 2003, we went to court. I testified in Brooklyn, New York, for over a week, but we didn't have the weight we needed, and the NRA was a bigger force than we could deal with, and so we lost that. But the Judge to his credit said this does not prohibit the fact that there certainly will be other lawsuits like this. The NRA heard those words and took them to heart and spent the next 18 months putting in place an absolute immunity on the gun industry and, unfortunately, was able to get this Congress to pass it and signed into law. It is just unbelievable that we will give absolute immunity to any industry in this country, particularly when there is harm and personal injury.

So, I think more than anything else, I was stunned a little while ago in hearing the gentleman, my colleague on the other side of the aisle, saying that he had sought out advice from a military commander about how to protect schools and that the advice was harden the target. And, Ms. Swearer, when you were asked to comment on that, you said absolutely harden the target. Well, that is fine except how do you harden a supermarket? How do you harden a church? How do you find a way to go out and harden movie theaters? If the only answer is hardening the target, we have already capitulated.

And I am telling you, I am so glad that so many people are focused on this hearing around the country so they can see firsthand what is going on here. We have a problem that is not going to go away. Every year it gets worse. And so until we are prepared to

45

do what we were sworn constitutionally to do, to protect this country from enemies, foreign and domestic, we would have failed.

Madam Chair, I yield back.

Chairwoman MALONEY. The gentleman yields back.

The gentleman from Louisiana, Mr. Higgins, is now recognized. Mr. Higgins.

Mr. Higgins of Louisiana. Thank you, Madam Chair. Commissioner Gramaglia, I am looking at your presented statement, sir, say you support confiscating guns from individuals determined to be a threat to themselves or others, determined to be. So, by this legislation my colleagues are putting forth, my understanding of the letter of that law, which I 1,000 percent oppose, as would our founding fathers, the letter that our law says an anonymous tip from a citizen, so this was law. Commissioner, would you go to your neighbor's home and confiscate his legally owned weapons? A man that was not under criminal investigation, nor under arrest, would you do it?

Mr. GRAMAGLIA. The red flag laws would——

Mr. Higgins of Louisiana. That is a "yes" or "no," brother. I got five minutes to make. I don't have a statement here.

Mr. GRAMAGLIA. It is more than a "yes" or "no" answer. It would be——

Mr. Higgins of Louisiana. We will move on then. If you cannot say, yes, you would confiscate weapons from an American citizen that was subject to this law that my colleagues intend to push through this Congress, and you said in your statement, that you would confiscate those weapons if an American was determined to be, your quote, a threat to themselves or others, quoted in that law, determined to be, is defined by an anonymous tip that an American citizen, a threat to themselves or others. You are a police commissioner, a Thin Blue Line brother, sworn to uphold the Constitution, and you are saying you would seize those weapons. I see that as a problem.

I am going to bring us back in time to World War II: America's population, 140 million. Fifteen million men came home from World War II with deep scars and significant skills. They bore the invisible wounds of war. There was weapons everywhere. I talk about mental challenge. My father was one of those men who was a Navy pilot in World War II. He came back from the war and built his family. I am the 7th of his 8 children. I was born in 1961. We had guns everywhere. There was virtually no regulation. Any child in the 1950's could buy a weapon from any seller if daddy sent him with the money. We didn't have mass shootings. It wasn't until 1968 in America that serial numbers were even required on weapons sold in this country. You ordered weapons through the Sears catalog by the mail. In the 1970's I attended a high school, large rural school. Virtually every vehicle in the parking lot was a pickup truck, and almost everyone had a rifle or shotgun on the back glass and a pistol under the seat, and we didn't have school shootings.

1979, I began college. One of the jobs I had to work my way through college was as a carpenter. We restored historical buildings. We had to determine in the process of that work what was the original cuts to these homes, residential homes built 75, 85, 100 years ago. You could tell by the saw cut if it was a mechanical cut,

46

an electric cut, or a hand cut. By such observations, we knew exactly how that house was originally built. And to my amazement, as a young man beginning college in Louisiana, working, to my amazement, you know what I discovered, Madam Chair? You know what these houses did not have that were built 100 years ago in cities in America? You know what they did not have, Commissioner? Locks. Locks.

Now I ask you all, what happened to that country, man, the country where homes were built in cities with no locks, a country where guns were everywhere and virtually not regulated at all, where millions of Americans, 14 million Americans came back? It is 11 percent of the population at the time after World War II with incredible skills of war and weapons of war, as you call them, everywhere, but we didn't have mass shootings. And here we sit today where an entire once proud Democratic Party is presenting unbelievably unconstitutional laws to press upon our Nation. And we have a police commissioner that says he would go home to home and confiscate legally owned weapons if he got a tip.

Madam Chair, I yield my speech, but I will not yield my opposition to these unconstitutional laws.

Chairwoman MALONEY. The gentleman's time has expired.

The gentlelady from New York, Ms. Ocasio-Cortez, is recognized.

Ms. OCASIO-CORTEZ. Thank you, Madam Chairwoman, and thank you to all of our witnesses. I apologize if I go quickly. We have just got five minutes and a lot of work to do.

Let's talk facts here. There was a lot of discussion about New York City. There is no discussion about gun violence in New York City. Without discussing the iron pipeline that is Florida, Georgia, South Carolina, North Carolina, Virginia, Pennsylvania, and honorary mention to Ohio where 70 percent of likely illegal trafficked guns found in New York City come from. There is no discussion about gun violence in Chicago without talking about Indiana because the violence and the mothers that we have to comfort are losing children due to the guns, and the carnage, and the lawlessness unleashed by those states. I will move on.

Every week in recent memory, we have had at least one mass shooting. Ms. Pringle, you are the president of the National Education Association. You represent teachers. Between 2009 and 2018, how many school shootings did the United States have?

Ms. PRINGLE. Two hundred eighty-eight.

Ms. OCASIO-CORTEZ. Two hundred eighty-eight. Now let's look globally. Our G7 partners—Canada, France, Germany, Italy, Japan, and the United Kingdom—combined, how many school shootings did those countries have?

Ms. PRINGLE. Five, 50 times more.

Ms. OCASIO-CORTEZ. Five in almost 10 years. Two hundred eighty-eight versus five. This is not normal. Not only is it not normal, it is internationally embarrassing and delegitimizing to the United States because for all the billions and trillions that this body authorizes in the name of national security, we can't even keep our kids safe from their schools being turned into a war zone.

Now let's talk about why. Let's talk about one thing, more important to lobbyists and the gun industry than children, than houses of faith, than human beings. Let's talk about profit. Mr. Suplina in

47

2020, 22.8 million guns were sold, reflecting a 64 percent increase from 2019, correct?

Mr. SUPLINA. Correct.

Ms. OCASIO-CORTEZ. In one year. And across the board, gun manufacturers and ammunition companies began to see record profits. Is that right?

Mr. SUPLINA. That is correct.

Ms. OCASIO-CORTEZ. Now, let's put that into context. In 2020 again, more than 45,000 Americans died by gunfire, reflecting an almost threefold increase from 2015. Are those statistics correct?

Mr. SUPLINA. That is accurate.

Ms. OCASIO-CORTEZ. So, in your view, are you seeing a correlation between gun profits and gun deaths in the United States?

Mr. SUPLINA. Yes.

Ms. OCASIO-CORTEZ. This is about blood money. Between 2019 and 2021, two years, leading gun manufacturer Sturm and Ruger saw gross profits double to almost $280 million. In fact, during an earnings call, their CEO called the sales boom "historic, ferocious," and that "the future was bright." A month after that, an AR–556 pistol murdered 10 people at a supermarket in Boulder, Colorado. Those profit margin, $280 million, go to lobbying. Is that correct? Much of that goes to lobbying, correct?

Mr. SUPLINA. Significant amounts go to lobbying, correct.

Ms. OCASIO-CORTEZ. And can you remind us what the gun industry is lobbying against when it deploys these lobbying resources?

Mr. SUPLINA. They are lobbying against every law that would regulate firearms.

Ms. OCASIO-CORTEZ. And can you briefly tell us how gun companies have poured extra profits directly into lobbying against gun reform? And as an advocate in this space, what have you seen? Just name rattle off some of the measures that they have, just a few that they have lobbied against.

Mr. SUPLINA. Lobbied against, they have lobbied against background checks on all gun sales, which would, in fact, as was mentioned earlier, it would be criminal to obtain a firearm from a law-abiding citizen without a background check. The criminal would be breaking the law, but we could stop that. They have lobbied against red flag laws, which would temporarily deprive, after due process, a firearm from somebody who poses a threat to their selves or others. That is a court adjudication, everything.

Ms. OCASIO-CORTEZ. Thank you. Thank you very much. For context, the NRA spent about $250 million in 2020 alone. That is more than twice the entire salary of Congress combined in one year, lobbying against gun safety laws. There is also this discussion about do anything, but again, but that these are about violent people, but yet we aren't doing anything about addressing the actual root causes of misogyny where two-thirds of mass shootings are connected to domestic violence or the emergence of white supremacy radicalization, mass incarceration, and poverty, and the connections between that and mass shootings in our communities.

I yield my time. Thank you, Madam Chair.

Chairwoman MALONEY. The gentlelady's time has expired.

The gentleman from Wisconsin, Mr. Grothman, is recognized for five minutes.

Mr. GROTHMAN. Thank you very much. The last couple of weeks, I had a chance to go down to Mexico, and they brought up an issue that I wasn't really expecting to hear, but a couple of Border Patrol guys pointed out to me that the firearms were very, very regulated in Mexico. And you do a little Google search, and you find out in the recent article in *The Wall Street Journal*, the first six or first nine months in 2019, Mexico, with some wildly difficult laws, had a murder rate of six times that in the United States. Not six percent more. That's 60 percent more. But assuming you got it right, maybe he was cherry picking the year, I don't know, six times as many murders as in the United States. I assume the Mexican officials who put these laws into effect, thought they were going to save lives at the time, that they made it so difficult for law-abiding Mexicans to get a hold of a firearm, but obviously the results of their laws was not to make Mexico safer. There are thousands, probably tens of thousands of people who have died now in Mexico under the current rules connected to ownership of guns.

We have also in this country had a dramatic increase in the number of deaths from guns the last two years since kind of the beginning or at least expansion of the I Hate Police Movement, which I blame for all the young people and not so young people who have died in the last two years in this massive increase of murders that we have seen almost unprecedented.

First of all, I would like Ms. Swearer to comment a little bit on the Mexican statistic and comment on the dramatic increase in the number of homicides in this country in the last two years, not because it is easier to own guns, but kind of because a lot of the rhetoric coming out of this building of this anti-police rhetoric.

Ms. SWEARER. Congressman, I will respectfully refrain from commenting on the statistics you pointed out from Mexico. I am not overly familiar with any of the underlying causes. I will, you know, to the greater point, say Mexico is, to my awareness, one of the only other countries in the world with a right to "keep and bear arms," which is sort of a misnomer in that country, as you point out. So, it is a fundamentally different understanding of what that means than clearly in our country. I am sorry. Please remind me of the second aspect.

Mr. GROTHMAN. Well, the massive increase in murders in this country in the last few years.

Ms. SWEARER. I think it is hard to pin that down to any, like, one simplistic notion of what is causing that. Certainly, I think problems with policing and calls to defund the police, loss of trust between communities and police members, that all plays a role, as I pointed out in my written submission.

Mr. GROTHMAN. OK.

Ms. SWEARER. I think it is a number of things.

Mr. GROTHMAN. Yes. I will give you another question then. This week, I will be reintroducing something called the Student and Teacher Safety Act, which will allow schools to use existing grants they have, meant, in part, for improving school conditions and learning to improve or boost school safety following the evolving shooting. The White House press secretary said that President Biden does not believe in hardening schools to provide more security resources or law enforcement officers. If these measures can be

49

effective in preventing another mass shooting, why do you think the President is not open to hardening schools this way?

Ms. SWEARER. I cannot read the President's mind, but my guess is he would rather focus on other ways of addressing it. I would also very quickly like to point out to reference something Congressman Mfume said, to seem to infer that we only care about or have only mentioned one aspect of a greater issue, which is focusing on physical security. Congressman, I respectfully don't know if you were not here for my opening statement or have not read my written submission, but I respectfully have pointed out roughly a dozen other issues as well. This is comprehensive in nature. It is not one thing or the other. It is both——

Mr. MFUME. I have been here for three hours since before the hearing started. I heard your testimony. My reference was to schools, and my reminder was the——

Mr. COMER. Madam Chair, I think——

Chairwoman MALONEY. The gentleman is not recognized.

Mr. MFUME. Well, the witness addressed me, Madam Chair.

Chairwoman MALONEY. OK.

Mr. GROTHMAN. Could you give me another few seconds back? Someone jumped in there. Well, if President Biden is going to stand between us and trying to improve the physical security in school districts, can you give us other ideas that we can use to prevent these tragedies?

Ms. SWEARER. Sure. As I mentioned in both my written and oral testimony, I think we can focus very clearly on building up the Nation's mental health infrastructure, both specifically in schools and generally across the board. We are talking about two-thirds of gun deaths every year that are suicides, which clearly plays into an aspect of mental health, which is problematic. We are talking about with mass shootings, individuals who clearly show signs of being a danger to themselves or others, but who are otherwise, you know, not felons yet and oftentimes cannot be involuntarily civilly committed. So, looking at, you know, targeted interventions with adequate means of due process and also just behavioral risk assessment.

We talked about Instagram and threats on Instagram. What is concerning to me is that so many people saw so many signs, especially in Uvalde, and it appears that nobody reported them, or knew to report them, or knew how to report them, or didn't think anything would be done about it. And that——

Chairwoman MALONEY. The gentleman's time has expired.

OK. The gentlelady from California, Ms. Porter, is now recognized.

Ms. PORTER. Ms. Swearer, in 2019, you testified on Representative Cicilline's bill, the assault weapons ban, before Congress. At the 2019 hearing, Representative Jim Jordan asked you if law-abiding people will be less safe to protect themselves if that bill was passed. Do you remember your response?

Ms. SWEARER. I have a general idea of what I would have said under that circumstance, but, no, I don't remember my specific words.

50

Ms. PORTER. You said, "I think worse than that, sir, you will see millions of otherwise law-abiding citizens become felons overnight"——

Ms. SWEARER. Yes.

Ms. PORTER [continuing]. "for nothing more than having scary looking features on firearms."

Ms. SWEARER. It is true.

Ms. PORTER. I was quite surprised by your answer. You read the bill before you came to Congress to testify against it, yes?

Ms. SWEARER. If we are referring to the ban on assault weapons, correct, yes.

Ms. PORTER. So, you knew that the bill would allow any gun owner to maintain possession of any semiautomatic assault weapon that was lawfully possessed before the bill became law?

Ms. SWEARER. No. So, that is the case under that bill. The problem is anytime that is transferred to anybody else——

Ms. PORTER. Madam Chair, would you please instruct the witness that the time belongs to me?

Ms. SWEARER. If you don't want to hear an answer to my question, I am not sure what is being asked.

Chairwoman MALONEY. The gentlelady has reclaimed her time.

Ms. PORTER. You said "yes" in response to my question that you knew the bill would allow the gun owner to maintain possession of any semiautomatic assault weapon that was lawfully possessed before the bill becomes law. Ms. Swearer, I respect that we have different opinions on Representative Cicilline's assault weapons law, but we cannot have different facts. We have a duty to debate the merits of proposal. You falsely testified under oath for that bill——

Ms. SWEARER. Would you like to hear the explanation of why I said that?

Ms. PORTER. No, I have not yielded, Ms. Swearer.

Chairwoman MALONEY. Suspend.

Mr. COMER. Madam Chair, if she is going to ask questions, shouldn't she let the witness have——

Chairwoman MALONEY. The gentleman is not recognized.

Ms. PORTER. You falsely testified under oath——

Mr. BIGGS. Point of order. Point of order.

Chairwoman MALONEY. What is the gentleman's point of order?

Ms. SWEARER. I have been accused of falsely testifying under oath, and I would like address it.

Mr. BIGGS. The gentlewoman has accused her of perjury. Is she going to hold to that, or are you going to allow the witness to respond to that accusation of criminal conduct?

Chairwoman MALONEY. You have not come forward with a significant point of order. Ms. Porter will continue.

Ms. PORTER. I asked you if that bill was correct, if the bill would allow any gun owner to maintain possession, and you said "yes," yet you testified that the bill would allow people to become felons overnight. Earlier today you testified that you hoped that this was the last time you testify before Congress for the sake of our Nation and the integrity of this Congress——

Ms. SWEARER. I said Congress, after a mass shooting, trying to figure out how to solve a problem, that we are all heavily invested in solving——

51

Ms. PORTER. Ms. Swearer, I have not asked the question.

Ms. SWEARER. How dare you.

Ms. PORTER. Reclaiming my time. How dare you misstate the law——

Ms. SWEARER. How dare you ask a question——

Ms. PORTER [continuing]. as legislation——

Ms. SWEARER [continuing]. that you do not even want an answer to.

Ms. PORTER. Ms. Swearer, I am moving on. I am a lifelong consumer protection advocate. From 2015 to 2020, there were at least 2,070 unintentional shootings by children. Seven hundred sixty-five of those children died. A consumer product that causes this much harm to the public, would normally be subject to a recall. But Federal law prohibits the Consumer Product Safety Commission, the agency responsible for protecting the public from dangerous products, from regulating guns. This is absurd. After one child died using a Peloton treadmill last year, the Consumer Product Safety Commission intervened and recalled the product, but when hundreds of children die using guns, there is no Federal response. There is no Federal safety standard for guns even though 40,000 Americans hurt or kill themselves or other people in hundreds of accidents every year. Instead of regulating guns like any other consumer product, Federal law protects gun manufacturers.

A teenager can watch a video online and learn how to modify a rifle to make it more deadly. And the gun industry avoids any liability if that teenager uses that modified rifle to fire repeatedly and rapidly at innocent people, even though their products could be designed to prevent unsafe modifications. I want to give an example. In 2001, a 13-year-old boy named Billy accidentally shot his father's handgun and killed his friend, Josh. Billy mistakenly thought that gun was unloaded because he had removed the gun's magazine. Josh's family sued the gun manufacturer for failing to warn Billy and other consumers that their product could be fired without a magazine. It is a simple case. It should have been decided by a jury as is provided under the Constitution. Instead, because of the gun industry's immunity, the gun manufacturer was able to dismiss the case without a trial.

If a pharmaceutical company failed to warn customers about the known risks of one of their drugs, they could face thousands of lawsuits. But we allow the gun industry to sell weapons without taking any precautions to protect children and families from fatal accidents. Mr. Suplina, do you think the gun industry would do more to protect children if Congress ended their immunity?

Mr. SUPLINA. Absolutely.

Ms. PORTER. Would ending the gun industry's immunity put gun manufacturers out of business?

Mr. SUPLINA. No, it would not.

Ms. PORTER. In the 1990's, lawsuits forced big tobacco to pay for the harm they caused by marketing cigarettes. Just last year, Big Pharma agreed to pay $26 billion for communities devastated by opioids.

Mr. Higgins of Louisiana. Madam Chair, her time has expired.

Ms. PORTER. Victims of gun violence also deserve their day in court. They deserve justice. I yield back.

52

Chairwoman MALONEY. The gentlelady's time has expired.

Mr. COMER. Madam Chair——

Ms. WASSERMAN SCHULTZ. Madam Chair, I have a parliamentary inquiry.

Mr. COMER. Madam Chair. Madam Chair, I have point of order. Madam Chair, point of order. Again, Ms. Porter accused our witness of perjury. That is a very serious accusation, accused her of lying.

Ms. WASSERMAN SCHULTZ. Madam Chair, the gentleman has not stated a proper point of order.

Mr. COMER. No, I am stating it.

Ms. WASSERMAN SCHULTZ. That is not a proper point of order.

Mr. COMER. My point of order is we just had a woman from Congress accuse a witness of perjury and didn't give the witness time to response.

Ms. WASSERMAN SCHULTZ. Madam Chair, the gentleman is not stating a proper point of order.

Chairwoman MALONEY. So, the gentlelady will suspend.

Mr. COMER.[Inaudible].

Chairwoman MALONEY. The gentleman from Texas, Mr. Cloud, is recognized. Mr. Cloud, you are now recognized.

Mr. CLOUD. I thank you all for being here. Thank you, Madam Chair, and obviously this is a tragedy that is heartbreaking for all of us. And naturally, coming out of this as we look for solutions, emotions are naturally high because we are all grieved by the fact that we see this in our Nation. There are going to be 1,000 reasons why we are asking and the investigations are ongoing, obviously. Even the conclusions we could come up with well, of course, never answer the cry of a parent who has lost a child. And I think any of us who have children can understand that our hearts just break for what we have seen.

As we move forward, we have to continue to figure out how we propose solutions that actually create solutions. Very often in this Congress, we do things out of a best of intent and have the worst of results. There is a lot of data that points to the fact that gun control leads not to more safer communities, but to more dangerous communities. For example, one of the proposals out there right now is to raise the age of being able to own a rifle, and in our Federal society, we have many states, and so we are able to kind of test these things out. And as far as I know, the only peer-reviewed article study that has been done on that, it was in the Journal of Law and Economics. He talked about it and looked at it and said, if anything, there was a six percent increase from states who began to implement age requirements or raised age requirements. So, we have to tread passionately, but very carefully as we continue to address this from a policy perspective.

I would like to bring up a topic that I think needs to be added to this conversation, and Representative Hice and Higgins touched on this quite a bit, because a lot of times here in Congress, well-measured politicians like to get away with measuring our personal compassion. Usually, it is on a spending bill. So, we will measure our personal compassion by how much money of other people's money we spend, and generally, it is the more money we spend, the

53

more compassion we have, in a sense. I have always found that absurd.

In the same way as we do this, it would be wrong for us, just out of the sake of doing something, to measure our personal compassion by how much of other people's constitutional rights we take from them and give to the Federal Government. And it is important to point out in history that any time a Federal Government takes authority, it is always for altruistic reasons. The danger comes when the next person in charge is or what happens after that, and many times that power is taken under good intentions and then used nefariously much, much later, so we have to be very careful about that. We have to keep history and context in mind in all of this.

And the other thing I would say is that we should not think that any of this is monocausal. There is not one thing that caused this. There are a lot of things. But one thing I would like to throw into the mix of this, because if there is a common denominator as we look across these, it is not age so much. It is not the firearm used at the time or even how it was required. As much as it is, we see when we look at crime in our communities, when we look at the societal decline, we are in decline as a Nation when it comes to the moral and societal decline in our Nation. There is no doubt about it.

And one of the biggest factors that is a common denominator across much of this is simply broken homes, fatherlessness. A DOJ study from the Journal of Research in Crime and Delinquency report said the most reliable indicator of violent crime in the community is the proportion of fatherless homes. A 2019 meta study in the Journal of Psychology, Crime and Law found that growing up in single-parent families is associated with elevated risk of involvement in crime by adolescents. A 2019 study from the Pew Research Center finds that the U.S. has the world's highest rate of children living in single parent households. The National Fatherhood Initiative has compiled some data, and adolescents from fatherless homes are more likely to commit crimes. They are more likely to end up in prisons. They are more likely to end up in poverty, and so we have to figure that out.

For a long time, our Government has subsidized even and promoted policies that continue to break down the home, and we have to do what we can to make sure we come back to this. And I would just like to give whatever time remains to Ms. Swearer to address the perjury charges that have been made against you.

Chairwoman MALONEY. The gentleman's time has expired.

Mr. CLOUD. Oh, my apologies.

Chairwoman MALONEY. The gentlelady from Florida, Ms. Wasserman Schultz, is now recognized.

Ms. WASSERMAN SCHULTZ. Thank you, Madam Chair. Gun manufacturers didn't always market weapons to civilians, and, until recently, trade shows didn't make military-style guns available to the general public. Now gun makers aggressively market AR–15-style weapons to civilians and actively tie them to military and law enforcement weapons. Smith & Wesson, America's largest gun manufacturer, even developed a name for this marketing ploy, calling it the "halo effect." Now I want to draw your attention to the screen.

54

[Slide]

Ms. WASSERMAN SCHULTZ. Mr. Suplina, I want to ask you about one advertisement that I find troubling. This one. This is an ad for a Daniel Defense MK18, a high-speed military-style AR similar to the Daniel Defense AR used at the Robb Elementary School shooting in Uvalde. The ad states, "use what they use" and that the gun features "military adopted technology." Mr. Suplina, do you believe the associations made in this advertisement are appropriate for a civilian?

Mr. SUPLINA. No, but they are very effective at selling military-style weapons to the civilian population.

Ms. WASSERMAN SCHULTZ. Reports on this gun indicate that it is favored by special forces. I would like to ask Daniel Defense why the same-style guns being used in war zones should be marketed to everyday people. It is clear who gunmakers are marketing to. Fred Guttenberg lost his 14-year-old daughter Jamie in the Marjory Stoneman Douglas High School massacre in my own community. Fred filed an FTC complaint alleging that Smith & Wesson mimicked first-person shooter video games in its advertising materials to attract adolescents and young adults. A Smith & Wesson M&P 15 223-caliber rifle was used in the Parkland massacre.

Mr. Suplina, what level of culpability should gun manufacturers have when they market human killing machines to a civilian customer base?

Mr. SUPLINA. Again, this is now unfortunately, increasingly the norm among gun manufacturers to market using, you know, video game style ads. Daniel Defense itself referenced popular video games in its advertising and in its advertisements, and they should be held accountable for this.

Ms. WASSERMAN SCHULTZ. Thank you. Commissioner Gramaglia, I would like to turn to you next. I want to put another advertisement on the screen.

[Slide]

Ms. WASSERMAN SCHULTZ. This is an advertisement for a Bushmaster XM–15. Is that the same gun that was used in the mass shooting at the Tops supermarket on May 14?

Mr. GRAMAGLIA. Yes, it was.

Ms. WASSERMAN SCHULTZ. This advertisement shows a soldier with a Bushmaster, and it states, "versatility on the range during patrol." Your officers were actually on patrol that day, and many of them responded to the active shooter scene with far less advanced weaponry. How do you prepare officers to protect themselves in the public from military-grade killing machines every day? I know it was referenced that, you know, no problem that they had, you know, adequate weapons to be able to defend themselves, but is that the case?

Mr. GRAMAGLIA. Against this weapon? No. We have active shooter vests that we have in our patrol cars. You can't wear them on a regular basis. They are far too heavy. It is something that you would have to grab and put on if you have the time to do it.

Ms. WASSERMAN SCHULTZ. Thank you. President Pringle, I want to turn to you. You have worked closely with teachers and students for years on combating gun violence. Without meaningful gun reform, students are forced to practice mass shooting drills. Just this

55

week, and I know we stood together yesterday and you heard me talk about the high school students from my children's high school alma mater, to mark the success of their fundraising drive, to put Stop the Bleed kits in every classroom in that high school campus. I mean, those are kits that are meant to triage a bleeding wound. Students now prep for the time that they have in school in the event that they are facing an active shooter, and that they may bleed to death from gunshot wounds. What kind of traumatic effect does normalizing gun violence through these reactive measures have on students?

Ms. PRINGLE. We have seen over the years an increase in anxiety and increase in the number of students who are seeking additional assistance from our mental health professionals. We are seeing an increase in the amount of students who are coming to our schools with all kinds of social and emotional learning gaps because they have been subjective to overly aggressive drills, and looking at social media and TV, and seeing other students suffer and die at the hands of gun violence.

Ms. WASSERMAN SCHULTZ. Marketing mass killing machines to a civilian customer base by using imagery and words that suggests that is the purpose of their product is gross and immoral, but it is just what gun companies do now in order to profit from a market beyond their older male customer base. The Second Amendment does not absolve gun manufacturers the responsibility to market their products responsibly. And children should not be doing fundraisers for Stop the Bleed kits instead of making sure that they can have a fun prom, doing car washes, baking, having bake sales, to make sure that their life on campus as students is improved, as opposed to their life on campus doesn't end and they have to use a Stop the Bleed kit that they have raised money for.

Chairwoman MALONEY. Yes. The gentlelady's time has expired.

Ms. WASSERMAN SCHULTZ. Thank you. I yield back.

Chairwoman MALONEY. As previously was stated at the beginning of the hearing, Mayor Adams has a hard stop at 1:30. Mayor Adams, thank you so much for joining us here today, and for your testimony, and for your service. You are excused. Thank you so much.

Mr. ADAMS. Thank you very much.

Chairwoman MALONEY. Mr. Biggs is now recognized. Mr. Biggs?

Mr. BIGGS. Thank you, Madam Chair. You know, last week I thought I had heard it all when one of the Democrats threatened to end the filibuster, wanted to pack the Supreme Court, and said that they would confiscate guns. In order to do that, they would basically emasculate the Senate as an institution and also emasculate the Supreme Court as well. I thought that was interesting. It was pretty bad, but then we have here someone actually accusing a witness, and actually taking out of context, a witness who testified previously and accusing her of perjury, following that, though. But I got to tell you, the most egregious thing that the Democrats did today is they took a person, a young person, little Miah, she was traumatized two weeks ago, still suffering under obvious PTSD as she testified in that video, and bringing that poor little girl to relive this.

56

And we are going to hear about how traumatic, and I don't say they are not traumatic, these raising money for Stop the Bleed kits is, then it is particularly pernicious and outrageous to take an 11-year-old child, who graphically described how she spread a classmates' blood upon her and feign her own death, to make her relive that. If we are talking about PTSD, you just prolonged the agony of that little child. For what? For your own political gain, your own political purpose. That is despicable.

And over the course of more than nine hours last week, my colleagues on the Judiciary Committee, my Democrat colleagues made it clear that they don't believe any American should have access to the means to protect themselves and their families. Democrats opposed the Republican amendment that would allow victims of domestic violence to purchase firearms. They opposed the Republican amendment that would allow the spouses of active duty and deployed military to purchase firearms. And again, they promoted ending the filibuster, packing the Supreme Court, and confiscating guns from law-abiding citizens.

And they gave their entire game away by making clear that neither Congress nor the Supreme Court will stand in the way of their radical mission. Their proposed solutions to the problem of violent crime in this country is to make felons out of law-abiding citizens under the age of 21, to make felons of law-abiding citizens who own firearms in homes with children, and to make felons of law-abiding citizens who own or purchase magazines that hold more than 10 rounds of ammunition. The most common fire in this country sells 15 round magazines. Their proposed solutions are to force law enforcement officers to ignore due process and restrict law-abiding citizens to have the means to protect themselves and their families from threats. And make no mistake: my Democratic colleagues intend on total infringement on America's Second Amendment rights.

Ms. Swearer, before you answer the most pertinent question I think that we are going to hear from you in just a second, I want you to tell me, can you define "defensive use?"

Ms. SWEARER. Defensive use? And I am assuming you mean lawful defensive.

Mr. BIGGS. Yes.

Ms. SWEARER. It would be a use of a firearm that is to defend oneself lawfully against criminal actions by another.

Mr. BIGGS. How often is lawful defensive use of firearms in this country?

Ms. SWEARER. According to a 2013 report by the CDC, almost all, with very few exceptions, but the most rigorous studies and almost all of them show that it is somewhere between 500,000 and 3 million times a year. I think it is roughly probably around an average of a million, myself.

Mr. BIGGS. Do you believe that is firearm use for self-defense, defense of others, or for the protection of property saves lives?

Ms. SWEARER. Yes, it objectively saves lives.

Mr. BIGGS. Now, you were accused by someone who took out of context something you testified in 2019 of effectively committing a crime and committing perjury before Congress. Would you please like to respond to that?

57

Ms. SWEARER. Congressman, respectfully, and I appreciate the opportunity, but we have wasted enough time on political games today. And I would like to get back to the merits of actually talking about solutions.

Mr. BIGGS. Very good. Now, I am going to go forward now, and, Madam Chair, I am going to submit, please, the following items for the record: the testimony of Stephen Willeford before the Senate Judiciary Committee on May 25, 2021.

Mr. Willeford is a good guy with a gun, who heroically confronted and stopped a mass shooter in Sutherland Springs, Texas. I also submit a 2019 study by John Lott of the Crime Research Prevention Center. His study examines data on the rate of shootings and accidents in schools that allowed teachers to carry firearms, which founds zero cases of someone being wounded or killed from a public mass shooting at a school that allows teachers to carry firearms. And third, an article by the *Washington Examiner* that the Buffalo shooter was an eco-socialist racist who hated Fox News and Ben Shapiro.

Mr. BIGGS. With that, I yield back.

Chairwoman MALONEY. Without objection, the gentleman yields back.

The gentleman from Georgia, Mr. Johnson, is now recognized. And we have been called for votes, so after him, we will recess.

Mr. JOHNSON. Thank you, Madam Chair, for holding this hearing, and I would like to thank the witnesses, particularly those on the first panel, for their testimony. I was very moved by what each of them had to say.

Americans have grown weary, frustrated, and frightened by the ever-intensifying cascade of gun violence afflicting our country, and they are sick and tired of their elected leaders continuing to do nothing to address the carnage. The fact of the matter is that the gun lobby, led by the NRA and the gun manufacturers that fund it, exert great influence on politicians to support its policy, which is that the only way to stop a bad guy with a gun is a good guy with a gun. You know, I mean, if that holds true then, you know, it just doesn't make sense in a civilized society. And I would submit to you that every person with a gun makes us unsafe as opposed to more secure.

This stopping a bad guy with a good guy with a gun just has not worked to allow the floodgates to remain open for gun dealers to flood our streets with weapons that are more powerful than what was available last week. That policy, Madam Chair, has been a deadly failure, and if we continue the unbridled flow of firearms flooding our Nation's streets, we will continue to see rising rates of gun violence in America. No other country has a problem like the gun violence problem plaguing our country. And policymakers who stand in the way of doing something to address the problem should be ashamed of themselves, and they need to be voted out of office and replaced with leaders who are willing to stand up to the NRA and pass commonsense gun reform laws.

It is common sense to impose a ban on the manufacture and sale to the public of military-assault weapons meant for use on the battlefield. It is common sense to mandate universal background checks by closing the gun show loophole, and it is commonsense to

raise the age the purchase of firearms from 18 to 21. But for some reason, my colleagues insist on doing nothing to reverse what is a tide of a failed policy. It allows greedy firearms manufacturers to maintain their ever-growing profits by flooding our streets with weapons of war, and they continue to ignore the impact of their inaction, hiding behind the Second Amendment as if it were the Bible. They proclaim any attempt to pass gun safety legislation infringes on their right to carry. Well, what about the right to live of the 19 children and two teachers killed in Uvalde? The 10 shoppers killed in Buffalo, New York, what about their right to live? What about the right to live with almost countless others who have died from street gun violence? How much more blood should be shed before we and Congress take action?

Madam Chair, the House has acted to pass laws on universal background checks, but our legislation has stalled in the Senate because of the filibuster, and Congress today will pass commonsense gun legislation. I should say Democrats in Congress will pass commonsense gun law today and pass it on to the Senate where it will be met with the filibuster. The overwhelming majority of Americans support the types of commonsense gun safety reforms under consideration this week, and failure to act is unconscionable. Failure is an insult to the countless dead children and shattered families and communities. Failure is an insult to the people we are here to represent, and I join my colleagues in their fervent thoughts and prayers, and beg my colleagues to match their thoughts and prayers with equally fervent action.

Mr. Gramaglia, a paper released by the International Association of Chiefs of Police noted that when the Biden assault weapons ban was in place between 1994 and 2004, the number of assault weapons traced to crimes fell by a dramatic 66 percent. Since the assault weapons are often used against police officers and the IACP is supportive of the assault weapons ban or the assault rifle ban, what message does it send when Republicans who loudly proclaim their support for law enforcement refuse to even discuss banning of assault weapons?

Mr. GRAMAGLIA. You know, my issue here is that we need to reduce the amount of bloodshed on our streets, and the damage that these weapons cause will lead to more bloodshed on the streets. It is more victims that are being struck, and it is something that needs to be banned.

Mr. JOHNSON. Thank you, and I yield back.

Chairwoman MALONEY. The gentleman's time has expired.

The gentleman from Florida, Mr. Donalds, is recognized for five minutes.

Mr. DONALDS. Thank you, Madam Chair, and, Madam Chair, also, thank you for the indulgence before we have to go vote. I heard a lot today. I don't want to do too much speechifying because we do that too often here.

Ms. Swearer, it has been referenced a lot today actually, about the need for universal background checks and closing the "gun show loophole." Can you actually explain in detail what that policy actually means?

Ms. SWEARER. Sure. So, universal background checks start with this general conception of what could be, you know, at its core, le-

59

gitimate. Right now, most gun sales, whether it is brick and mortar gun stores, whether it is a bought over the internet, anything that occurs interstate, those require a background check under existing law. The only exception is for intrastate sales between private sellers, and that is largely because they do not have access to the next system. They cannot, like fossil fuels, call up the FBI and say, hey, can you run a background check.

Mr. DONALDS. Now, could that theoretically be a way, that interstate sale for individuals who are otherwise prohibited, to obtain firearms?

Ms. SWEARER. Sure. As I point out, the problems with HRA and all of those other bills is that this is a low-reward endeavor. This is already not how most criminals are obtaining their firearms. They are already obtaining them through the black market, through informal channels that are not in any way shape or form addressed by interstate private sales. And on top of that, things like HRA would criminalize a whole host of responsible, temporary, low-risk transfers between law-abiding citizens. Like, if your buddy wants to borrow your hunting rifle, or, you know, you are going on a month-long trip to Europe and you want your guns to be secured in your friend's safe next door, you would have to go through a background check, legally transfer title of your guns to that individual, and then legally transfer title back to yourself when you are done. So, that is the problem.

Mr. DONALDS. So, Ms. Swearer, real quick. So, the policy of universal background checks, would that have stopped the shooter in Uvalde from acquiring his weapon?

Ms. SWEARER. It would not have stopped the shooter in Uvalde.

Mr. DONALDS. Well, would it have stopped the shooter in Parkland from acquiring his weapon?

Ms. SWEARER. It would not have stopped, with perhaps one lone exception, a single mass public shooter in the last 20 years because they all either passed or were capable of passing background checks, and that is the problem.

Mr. DONALDS. The shooter in Sandy Hook, the Newtown shooting, did that shooter kill his mother and take the guns?

Ms. SWEARER. Yes, he did, and I forget his age, but he otherwise did not have a disqualifying history.

Mr. DONALDS. The shooter in Uvalde, did he actually shoot his grandmother in the face before he went to perpetrate the crimes in Uvalde?

Ms. SWEARER. To my knowledge, yes.

Mr. DONALDS. Folks, here is the deal. One of the things that we have seen through all these mass shootings, I was a member of the State Legislature during the Parkland shooting, so I was in the legislature during that time period. The one thing that is crystal clear is these mass shooters that target our schools are all psychopaths. They are psychotic. In Parkland, the red flags were there for everybody to see. The school district did not act. That came out in the Parkland report. The site itself was not secured. That came out in the Parkland report. In Uvalde, the back door was open. It was open, wide open. The perpetrator shot his grandmother in the face. That is insane.

60

I know this bill, the proposed bill, today or tomorrow they are talking about raising the age to buy rifles from 18 to 21. Are we now going to say that a 19-year-old who is a legal adult in the United States does not have the mental capacity to own a shotgun or an AR–15, but they have the mental capacity to enlist in the military? They have the mental capacity to actually sign legal contracts, they have the mental capacity to be treated as an adult by law enforcement, and they also have the mental capacity to vote in the United States, but they don't have the mental capacity to own a shotgun or to own a rifle and not inflict harm on their fellow man?

Look man, I got three sons. Two of them are school age now. When these shootings occur, man, they hurt me because I could only imagine what it is as a parent. I am a parent, but I also understand that I have a responsibility as a legislator to actually defend the Constitution of the United States. The Constitution of the Second Amendment is there. It is our responsibility to defend it.

And if we look at the data from the mass shootings that have occurred in the United States over the last 20 years, the one constant, especially when it comes to schools, is that these shooters are young. They are mentally disturbed, and the vast majority of people who are in their age group would not even think or go down the pathway of committing these atrocities. We don't pass laws because of the "one or two psychopaths." We only pass laws in order to maintain the actual legal momentum of freedom in the United States. The Second Amendment is not there to stop psychopaths, to be perfectly honest with it. It is not. That is not its purpose. The purpose of the Second Amendment is clear. It is to protect the constitutional rights of American citizens.

These shootings are awful. They are awful, but the data is clear about how to find the people that actually do this, and the measures put in front of us would not have actually stopped these shootings. I yield back.

Chairwoman MALONEY. The gentleman's time has expired.

Votes have been called to allow members to vote. The committee will stand in recess until the end of the first vote series.

The committee stands in recess.

[Recess.]

Chairwoman MALONEY. The committee will reconvene.

The gentlelady from Michigan, Ms. Tlaib, is recognized for five minutes.

Ms. TLAIB. Thank you so much, Chairwoman, and thank you so much for all of you for being here.

Sometimes Congress often feels like it is in its own little world separated from the rest of the country, but I hope this morning, hearing the witnesses' strength and courage, inspires meaningful action here. The biggest fear I have as a Member of Congress, but also just really a mother in America, is that when Buffalo and Uvalde stops being in the headlines, everyone here will go on and do nothing. Other violent shootings never reached those national headlines, like the four shootings in the span of a week in the city of Ecorse in my district.

With that in mind, I want to really talk about AR–15s. A few weeks ago in Buffalo, one person armed with an assault rifle car-

61

ried out a racist act of terrorism in a historically Black community. And you may have heard my colleague from California, Congresswoman Porter, talk about how the shooter there having to re-round or reload the gun actually helped save lives because they have a ban on AR–15s in the state of California.

So, Mr. Suplina, the gunmen in each of these kind of mass shootings use assault weapons to carry out their attacks, correct?

Mr. SUPLINA. Correct.

Ms. TLAIB. In a span of one minute, how many people could a person kill with an AR–15?

Mr. SUPLINA. I don't know the answer to that question, but the answer is with the right high-capacity magazine, these are designed to inflict the maximum amount of damage in that time.

Ms. TLAIB. And Buffalo was about two-and-a-half minutes, something of that sort?

Mr. SUPLINA. Correct.

Ms. TLAIB. How many people? Ten?

Mr. SUPLINA. Correct.

Ms. TLAIB. Ten that killed. How many were injured?

Mr. SUPLINA. Three more.

Ms. TLAIB. And Ms. Everhart testified about the damage to those even that survive?

Mr. SUPLINA. That is correct.

Ms. TLAIB. Talk about that, because I am just thinking of the little 4th graders and 5th graders that survived the shooting and what is happening, of not only the trauma, but their livelihood of having that kind of trauma to your body.

Mr. SUPLINA. Gun violence in America is deaths, it is injuries, and it is the community trauma that starts at the scene of these crimes and ripples out. And we too often don't talk about those that survive their wounds but have to live with them forever, and the family members who need to take care of them. We don't talk about the costs on society, that, you know, loss of work, loss of mental well-being, costs to our society, not to mention those that aren't hit by a bullet but whose lives are forever changed.

Ms. TLAIB. So, many of my friends who are in the military service and been trained to use AR–15s tell me that there is this big opposition to call them weapon of war, but they are, correct?

Mr. SUPLINA. They are not only weapons of war, but they are literally designed and based on weapons in current use in the military, correct.

Ms. TLAIB. One of the things, and if I may, Chairwoman, to enter from *The New York Times*, article, "The Mass Shootings Where Stricter Gun Laws Might Have Made a Difference."

Chairwoman MALONEY. Without objection.

Ms. TLAIB. You know, I have not thought about that. I was more focused on banning assault weapons, but as they went through, they said four gunmen were the under the age of 21 that purchased their weapons legally, and they went on to say, you know, the number of people that were killed. And it even goes on to talk about the use of, like, so-called assault weapons or weapon of war, as some of my veterans in my community call them, that the easy access to them is even mind boggling for those that serve our country, but even in some of these committees had no idea that is how

62

accessible they are, that lot of the parents don't even realize that this person was able to just go to the corner department store and get it. The American people don't realize how accessible these weapons of wars are.

Mr. SUPLINA. The reason that the country currently requires you to be 21 to own a handgun is because the country came to understand the lethality of handguns and use in crime. The reason the country did not raise the age on long guns is because what comes to mind is the hunting rifle that you use, you know, in a rural area that 18-year-olds are more than capable of learning to shoot on. These are AR–15s. These are designed for people with military training, and, yes, in most places, you can walk in as an 18-year-old into a department store and buy one.

Ms. TLAIB. Thank you. Ms. Pringle, really quickly. I told you, in tears, breaking down of friends I have known for a long time as teachers buying literally ladders to bust the window down to be able to climb out of their classroom in situations like what we saw in Texas. What are you hearing from teachers other than that, because I hear them talking about getting bullet proof vests for not——

Chairwoman MALONEY. The gentlelady's time has expired. Ms. Pringle may answer, briefly.

Ms. PRINGLE. I am hearing from teachers all over this country that what is being asked of them, to stand in the gaps to protect students is unacceptable, that they should not be the ones responsible for trying to protect them against assault weapons that are killing students in two minutes, four minutes, all of the students and the adults were killed in Columbine. We should not bear that burden. That is not our responsibility. Our responsibility is to teach our students.

Chairwoman MALONEY. Thank you. The gentleman from South Carolina, Mr. Norman, is recognized. Mr. Norman?

Mr. NORMAN. Thank you, Madam Chairman. Ms. Pringle, are you familiar with the NEA's section, an end to policing in schools?

Ms. PRINGLE. What are you referring to?

Mr. NORMAN. The provision that basically, it is a call to action for police-free schools.

Ms. PRINGLE. The NEA has not taken a position on police-free schools. What we have done is we have taken a position on ensuring that every student, everyone has access to a quality education, and that they attend a safe, and supportive, and nurturing environment in which every one of them can learn.

Mr. NORMAN. But as far as it relates to having police officers armed, does that make students safer at the schools in your opinion, as being head of the NEA?

Ms. PRINGLE. Having police officers armed?

Mr. NORMAN. Uh-huh.

Ms. PRINGLE. I don't understand your question. You mean generally having police officers armed?

Mr. NORMAN. In schools, are children more safe if the resource officers and/or armed police are armed?

Ms. PRINGLE. We have school resource officers in our schools where we work and engage in making sure that they have the training and the support that they need——

63

Mr. NORMAN. You are not answering my question.

Ms. PRINGLE [continuing]. so that they can engage with our student's social, and emotional, and academic life.

Mr. NORMAN. OK. So, you do not agree that armed resource officers or police make children safer?

Ms. PRINGLE. We believe that when you are in a school environment——

Mr. NORMAN. OK. You are not going to answer the question.

Ms. PRINGLE. I did answer the question.

Mr. NORMAN. No, you didn't. You——

Ms. PRINGLE. Yes, I did.

Mr. NORMAN. Well, let me put it to you again, Ms. Pringle. Do you think trained school personnel, who are trained and are permitted to carry concealed weapons, are more of a threat to students or would they keep our students safer? This will be the last question I ask——

Ms. PRINGLE. Our teachers throughout this country overwhelmingly reject the idea of arming teachers in our schools. More guns in schools mean more killings.

Mr. NORMAN. OK. So, no teacher with a concealed weapon, and I assume since you didn't answer, no resource officers ought to have a gun. The only one that should have guns are the people that come in there to do harm is basically what you are saying.

Ms. PRINGLE. I did not say that. I didn't say that.

Mr. NORMAN. Yes, you did not answer the question. Ms. Swearer, the International Journal of Policing Strategies and Management concluded that the presence of a school resource officer reduces the fear of crime among students, and it increases the safety among the students. Is that a true statement?

Ms. SWEARER. I believe, based on the evidence, that it is.

Mr. NORMAN. There is no question about that, is there?

Ms. SWEARER. No. Again, I believe the evidence is pretty unequivocal.

Mr. NORMAN. And if armed teachers or really the police had gone in earlier, the carnage would not have been as grave, correct?

Ms. SWEARER. I think especially when you look at the preventable blood loss and the ability to get first aid to students who spent 78 minutes not receiving that first aid, yes, that is incredibly important.

Mr. NORMAN. And you would think that arming teachers and administrators would have quicker responses to stopping school shooters, right?

Ms. SWEARER. Obviously we should look at ways of ensuring that we don't get to that point. But yes, when that point has been reached, the armed response and the quickness of that response is, at that point, the primary thing that matters in terms of saving lives.

Mr. NORMAN. Just like it has gotten to the point in this country under liberal administrations and the Democrats who want to disarm the police, we have got to have police officers in churches, of all places, who are armed, which is a sad day in this country.

I want to yield the balance of my time to Mr. Clyde.

Mr. CLYDE. Thank you to my colleague from South Carolina.

64

Ms. Swearer, Democrats have advocated for a gun buyback program like the one in Australia. Do you think this would work in the United States?

Ms. SWEARER. No. I think the research on the Australia ban has one of several things that has been greatly mischaracterized today. Yes, rates of gun violence generally dropped, but it did so in every developed country around the world during that time, including in the United States, even though our number of guns per capita almost doubled during that time. Additionally, when you look at mass shootings before that ban and after that ban, before the ban they were very rare in Australia comparatively, especially compared to the United States. Those types of shootings were overwhelmingly not carried out by the types of weapons that were banned. And so there doesn't even seem to be some sort of logical connection even if you are looking at again these statistically low incidences. Thank you.

Chairwoman MALONEY. The gentleman's time has expired.

The gentleman from Maryland, Mr. Sarbanes, is now recognized.

Mr. SARBANES. Thanks very much, Madam Chair. I want to thank the witnesses for being here today. I want to acknowledge, as others have done, the powerful testimony that we heard from the first panel today. As we know, we heard this statistic now many times today, each year more than 45,000 Americans are killed by guns, and nearly 10 percent of those killed are children for whom gun violence is now the leading cause of death in the United States. Yet for nearly 25 years, until 2019, the strength of the gun lobby up here on Capitol Hill prohibited the CDC from conducting research on gun violence, effectively preventing us, the Federal Government, and Congress, and others, from treating gun violence as the public health crisis that it is. In addition to the human toll, gun violence is draining our public health system. According to GAO, gun violence costs the U.S. $1 billion per year in initial hospital costs alone. Medicaid and other public programs shoulders 60 percent of those costs, so we are paying for this violence.

To meaningfully address the gun violence epidemic in our country, as we have been saying again, and again, we must pass commonsense reforms while also investing in evidence-based prevention strategies and working with communities to address the complex and systemic issues that drive gun violence. And when I say commonsense, what I have in mind is many of the measures that we are going to have on the floor today as part of this legislative packet and tomorrow. "Commonsense" to me means when you ask the average person out there in the country, including by the way, the average law-abiding gun owner, does it make sense to do this, they say, absolutely, it makes sense. They do not fear these measures because they know that, overall, it will create a more rational world and country for us to live in.

And we have heard much about the Second Amendment. No one is here to try to amend or take away the Second Amendment right. The First Amendment is also very important to us, and we know that there are some limitations that are placed there. We don't allow people to yell fire in a crowded theater. So, as sacrosanct as

65

these amendments are, we can put rational commonsense measures in place to achieve the right balance.

Mr. Jackson, you are a gun violence survivor, as you so compellingly testified earlier, and you are an advocate for reform. Most recently, as I understand, you had been on the ground in Buffalo, working to help the community recover from a horrific mass shooting that we saw there a few weeks ago. Can you describe what you have been seeing there in the weeks since the tragedy, and what you know, based on your experience, is coming for that community in the weeks and months and years ahead in terms of dealing with this? And speak, if you could, to this sense of powerlessness that so many people feel when they look at Washington, this idea that please do something real that can make a difference, just something.

Everyone knows this problem is too complicated to flip a switch on. You can't solve it overnight, but it is this sense of being powerless in the face of gun violence because I think it is so demoralizing to individuals, certainly to many Members of Congress, and I am sure to communities like Buffalo and others that are experiencing this pain. So, if you could speak to that, I would very much appreciate it.

Mr. JACKSON. Yes, thank you. You know, when I arrived at Buffalo, for folks who don't know a lot about the community, 80 percent of the African-American community is concentrated in one part of Buffalo, and when we got there, we saw instantly how far-reaching this trauma had impacted people throughout the community. The first vigil I went to, there was over 600 people there, torn apart. Every person you met was either a family member, a neighbor, a church member, went to school with someone, was coached by someone. Ms. Pearl Young was the first lady of our church, so you think about the generations that she touched. I met one young man who was the nephew of Heyward Patterson, who had eight children and couldn't even bring them to the funeral because he didn't want them to be re-traumatized by what had happened.

And we talk about violence and its impact. Yes, 10 people were impacted and killed, yes, we know those families, but what we don't see is the trauma that ripples through the entire community. We had people literally on their knees crying. We had folks, senior citizens in walkers coming to memorials in tears, individuals screaming at the sky in anger. And while there were hundreds of cameras, there were very little people there to help them. There were very little victim services, support services. There were very little people to provide trauma care for those who have been impacted. And what we are most concerned about now is what does that ripple of trauma look like. We know violence is a disease, but now in Buffalo, we have an entire community, and I would argue the entire Black community across the country, who have been exposed to this disease. And I think it reinforces the extent of this public health crisis and why it is so urgent that we take a comprehensive public health approach to support those who have been directly impacted, as well as those who are impacted indirectly by this trauma.

Chairwoman MALONEY. The gentleman's time has expired.

Mr. SARBANES. Thank you for your——

66

Chairwoman MALONEY. The gentleman from Kansas, Mr. LaTurner, is now recognized.

Mr. LATURNER. Thank you, Madam Chairwoman. We have four children, a preschooler, a 2d grader, a 4th grader, and a 5th grader. I was heartbroken by what happened in Uvalde and in Buffalo, and I join all Americans in praying for these victims' families, but not just praying for the victims' families, but willing to come to the table to try to find meaningful solutions that can prevent this from happening again. After events like this occur, many lawmakers seek simple solutions to complicated issues. However, Congress must focus on the root cause of violence by prioritizing mental health and school safety resources, and by disincentivizing rising crime in cities. Now is the time to come together, to use and improve on the tools at our disposal, and find new ways to ensure that this never happens again rather than spend time on proposals that will not fix this problem and seeks to rob law-abiding citizens of their rights guaranteed by our Constitution.

Ms. Swearer, Federal school safety grants and programs have become more plentiful and accessible over the past several years. SchoolSafety.gov, for example, is a central location where HHS, DOJ, DHS, and the Department of Education collect actionable safety recommendations for schools. The site also has a grants finder tool to help administrators navigate a growing collection of Federal grant programs related to school safety. Speaking from your research and experience, are resources like this helpful for state and local educational agencies. And are they being utilized?

Ms. SWEARER. They are absolutely helpful. You know, again, we have talked about the benefits of all of these things at various times today. In terms of their underutilization, I do not have the data in front of me. I suspect the answer is it is being underutilized. I suspect that based on the continued problems that we do see, but I also know that plenty of schools are availing themselves of that, and I think that is of great benefit to the safety of their students and teachers and staff members.

Mr. LATURNER. Would you care to comment on ways in which we can encourage more participation, more utilization of these resources?

Ms. SWEARER. Well, first, I think the publicity of, you know, enabling schools to know that they are out there, but also of helping schools and school districts understand the importance of looking in these directions. Like, even if you think you can magically snap your fingers and tens of millions of assault weapons will disappear tomorrow and that that will make a meaningful difference, the reality is you are still going to have threats in the meantime because, realistically, it is going to take decades for that to come out of circulation. You are still going to have the underlying problems. You are still going to have other weapons. In the meantime, this is still a viable option for those immediate threats. Even if you disagree with me on it, everything else related to gun control, this is still a viable option for the here and the now in the immediate context of protecting life.

Mr. LATURNER. What types of warning signs could be recognized in students who may consider carrying out acts of violence in schools? And how do Federal grants help teachers, resource offi-

67

cers, administrators, and counselors identify students' mental health crises and prevent acts of violence?

Ms. SWEARER. So, a lot of these students, especially in a school shooting context, but just generally across the board for people who commit acts of mass public violence, they have long histories at that point of showing themselves to be a danger to themselves or others, either inflicting self-harm, harming animals, having suicidal tendencies, you know, showing other concerning signs of violent behavior. I think you have seen the quintessential examples of this in Uvalde and in Parkland. When you look at the data on thwarted school shootings, and thwarted mass public shootings, it is sort of like this chain link of prevention, right, where you had people who were able to recognize those signs, say, hey, this is a concern, be able to take it to someone with the authority, to do something to intervene, it was taken seriously. And then there was a mechanism in place to intervene. And so, you know, any sort of process that helps that, all of those links along that chain come together is important because that is how you save lives. That is how you successfully intervene because those options for intervention are so often and so clearly there.

Mr. LATURNER. Undoubtedly, you are right, that there are ways to intervene, and we ought to encourage that and incentivize and provide resources for it at the Federal level. I just have a little bit of time left. What are some ways that technology can play a role in improving school safety?

Ms. SWEARER. Yes, I am not quite sure what you mean by "technology," whether you mean social media or——

Mr. LATURNER. I mean social media, and I mean physical security on campus.

Ms. SWEARER. Sure. So, some of it is just the physical security of being able to buzz people in and out and making sure that there is secure access and security cameras, and using best practices for physical safety, some of which involves the best practices for technology. But again, I mean, we have referenced social media. You know, I am not a big tech expert, but certainly whatever it takes, that when these——

Chairwoman MALONEY. The gentleman's time has expired. OK.

Ms. SWEARER. It is the same, finding the signs of dangers wherever they come from, whether it is——

Mr. LATURNER. Thank you.

Chairwoman MALONEY. The gentlelady from California, Ms. Speier, is now recognized for five minutes.

Ms. SPEIER. Thank you, Madam Chair. Thank you for your leadership. I must say that this has been a very tough hearing to listen to. First of all, let me thank all the witnesses who are here, and the first panel in particular. I am haunted by what Dr. Guerrero said, that he went into the emergency room and one of the dead children was decapitated. Think about that, decapitated.

Commissioner, when you went into the Tops grocery store, I think we spend too much time sanitizing what assault weapons does to the body. Can you give us some descriptions of what you saw on the ground when you got to Tops?

Mr. GRAMAGLIA. I won't just get into that description, but I have been at——

68

Ms. SPEIER. No, I want you to. I want us to hear it.

Mr. GRAMAGLIA. Yes, I want to expand on that. I have been to numerous shootings throughout my career that were the result of high-powered rifles, assault rifles and the cavernous holes that they leave in bodies. Decapitation is a pretty good explanation for it. Some people couldn't be buried with an open casket. Yes, the damage was absolutely devastating, and not just in that one, but, as I said, in other homicide scenes that I have been to, it is a devastation. It is incredible.

Ms. SPEIER. I am a victim of gun violence. I know what it does to a body, and I cannot believe that my colleagues don't recognize that prohibiting the sale of an assault weapon until the age of 21 isn't going to save lives. It is the impulsive actions by 18-year-old, probably men, that have cost 30 people's lives just in the last month. And we are not supposed to be hardening schools. They are not supposed to be prisons.

Ms. Pringle, let me ask you, in your conversations with the teachers in the 199 incidents of gun violence on school grounds just last year, and the more than 311,000 students since Columbine that have been victims of gun violence experience, what does that inform you? What do the teachers tell you?

Ms. PRINGLE. I met with survivors from, teachers from Sandy Hook and from Parkland, and students from Parkland and when I was in Houston, in Texas. And what they said to me reflected what teachers all over this country are saying, and that is that the impact to the school community is forever.

Ms. SPEIER. Is forever.

Ms. PRINGLE. It doesn't end. It is forever. And the idea of turning our schools into prisons, into places where they are not conducive to teaching and learning, that is not the solution to this problem. We all know what the solution to this problem is. It is comprehensive gun reform in this country. We know what it is. We are not supposed to be holding our students and our teachers responsible. We all heard Mr. Reyes crying from his bed in the hospital, saying, "I didn't protect my students. I didn't protect my students." He should not be burdened with that. We are asking for Congress to do its job right now.

Ms. SPEIER. Thank you, Ms. Pringle. Mr. Jackson, you, too, are a victim of gun violence. Does that trauma ever leave you?

Mr. JACKSON. Not one day. Anytime you hear a loud sound, anytime you see an argument or a fight or even a movement of a crowd, I am triggered over and over again, and I don't even need that. Every day we turn on the news and we see how prevalent violence is in our communities. You know, we say over 100,000 people have been shot or injured by gun violence, but I really think that is a low estimate because in my community alone, I know at least eight people who have been directly impacted. And every morning I wake up, I have to apply ointment to my wound. I have to watch news as a reminder of this crisis, and then I also have to listen to politicians in chambers like this make excuses about why they can't take action. All of that is triggering.

Ms. SPEIER. Thank you, Mr. Jackson. I would like to submit for the record this article that references that the young man in Uvalde, who massacred 19 children and two teachers, had $5,000

69

worth of guns and ammunitions, and he was working at an In-n-Out Burger restaurant.

And the question, Madam Chair, that we need to ask is, where did he get the money for that? I yield back.

Chairwoman MALONEY. The gentlelady yields back.

The gentlewoman from Illinois, Ms. Kelly, is now recognized.

Ms. KELLY. Thank you, Madam Chair. The first thing, I would like to take a moment to respond to my Republican colleague's comment that Democrats are using children as political props. These are the same tired arguments used by the gun lobby to prevent meaningful change after Sandy Hook, after Parkland. When victims and survivors speak up and demand change, the gun industry and its supporters in Congress question their motives. It is frankly shameful. Despite suffering unimaginable pain, our witnesses wanted to share their story, even the young lady. They had dared to hope that their trauma and heartbreak could be turned into something good. They are pleading with us to do our jobs. All I am asking my colleagues to do is open your hearts and listen, and I hope we still have enough humanity in this body to do this.

We have been talking a lot about mass shootings, and I want to thank all the witnesses. I have long talked about the everyday gun violence that exists in our communities. The city of Chicago faces this every weekend, really every day. Over Memorial weekend, 42 people were shot, and 33 people were shot this past weekend. Tackling this issue will take community-based approaches.

Mr. Jackson, thank you for sharing your story and the work we have done together. Your organization uses community-based approaches to fight everyday gun violence through community intervention programs. Can you talk about the structural factors that drive gun violence in a community?

Mr. JACKSON. Yes, thank you. You know, we are big proponents for community-based violence intervention strategies because we know that can reduce the risk factors and address the root causes of violence. Over the course of the pandemic we saw a 39 percent increase in homicides in the Black community. And that is not because there were less policing. That is not because sentencing wasn't harsh. That was because the other root causes of violence were intensified. When we look at the lack of access to safe spaces, economic inequality, housing instability, the reinforcement of poverty, all of those fueled violence. And then on top of that, we poured in this flood of guns into our communities. We talked about New York earlier. Eighty-four percent of the guns in New York come from outside of the state, and that is what our communities are going through every single day. We are being flooded with firearms into the communities that are most vulnerable.

And these community-based violence intervention strategies focus on victim services for those who have been impacted, supporting their families, providing therapeutic care for those traumatized, providing intervention tactics that work with folks in the hospitals to prevent them from retaliating. We know that 40 percent of the people who have been shot, within five years will be shot again or killed without any form of intervention, and hospital-based violence intervention does this, as well as cognitive behavioral therapeutic programs that work with those who are most at

70

risk, who maybe have had a violent history and help them shift their lifestyle through therapeutic and behavioral changes. In certain communities we have seen violence reduced by 60 percent, and I have a whole list of examples which I can submit to the record, but we know these programs work.

What we also know is that the Federal Government has not been investing in these efforts and has not been funding these efforts that we know bring peace to our community, and that is why we have been working together to push such legislation.

Ms. KELLY. And hopefully we can change that and get Steven Horsford and Senator Booker's legislation passed. Commissioner, you helped your community heal after the horrible mass shooting last month, that you are helping them to heal, but you also see the destruction reoccurring on violence in Buffalo. Can you talk about how your police department works with organizations to implement community violence intervention strategies?

Mr. GRAMAGLIA. I am a strong believer in the Violence Interrupters' strategy. We work very closely with them. They get out in the community. They can say and do things that we can't because they are credible messengers. We use them a lot in place of where police officers might go to handle a situation. They are also very helpful in getting guns turned in at times. But the problem we have is, as my colleague, Mr. Jackson, said, the flood of guns that are coming into our communities, the ghost guns that are coming into our communities.

And one of the scariest things I just heard the other day at a gun meeting in my department is that about a half a dozen ghost guns recently were firing fully automatic, not because they had a switch on them, because they were being modified and not modified properly, I guess if that is a term to use for a ghost gun. But it is the flood of guns that are coming in, where are they coming from. And we don't want to take guns away from law-abiding citizens. We want to stop the flow of guns coming in.

Ms. KELLY. Well, I have a trafficking or purchasing bill I am going to run and talk about in a little bit because, representing Chicago, we have the same problem. And really quickly to Ms. Swearer, how do you explain the number of gun owners who support what we are trying to do, or the number of Americans that support, Democrat or Republican, doesn't matter, Independents? But I was at a press conference yesterday, and a swarm, they had shirts on of "Gun Owners Support Gun Safety." That is what we are talking about.

Ms. SWEARER. It is because it is not until you actually explain to them what existing laws are and how these laws fail to actually accomplish those goals. When you actually do that, those numbers drop repeatedly. And actually, I believe I saw, it might have been *The New York Times*, had an article precisely on this today. It is just because people don't understand what is being talked about when you reference an assault weapon or universal background check. And so when that is explained to them, that number actually drops off considerably.

Ms. KELLY. Well, the——

Chairwoman MALONEY. The gentlewoman's time has expired.

Ms. KELLY. The head of the Gun Violence Prevention Task Force is a gun owner. Val Demings is a gun owner. Many people on the task force, and they certainly know the legislation, and they are still pushing it. I yield back.

Chairwoman MALONEY. The gentlelady yields back.

The gentleman from Kentucky, Mr. Comer, is recognized.

Mr. COMER. Thank you, Madam Chair, and, again, I want to thank our witnesses for being here today. This has been a very robust discussion, very difficult issue, brings out a lot of emotion. I appreciate everything that you all are discussing and fighting for. I had the opportunity to go first in questions, and I like to go toward the end because I like to listen to the debate, try to learn, listen to what other people say and pick up some points that people make. And one of the points that Ms. Ocasio-Cortez made was that some of the guns, when we referenced the amount of gun violence in New York City, that a lot of those guns were coming from outside New York City, and I would say that is probably right.

We have in Kentucky a fentanyl problem, and I think just about every congressional district has a fentanyl problem. Our law enforcement tells us that fentanyl is coming across the border, and, you know, it is frustrating for us because we have had 100,000 deaths with fentanyl, and we believe that could be reduced by securing the border. But as I was thinking about that, I wonder if we ban certain types of weapons, Ms. Swearer, just wondering, I wonder if the Mexican drug cartel, who is profiting from all the illegals crossing into the United States, they are profiting from all the fentanyl and much of the crystal meth that is in the United States, I wonder if it is possible that they would get into the gun business?

Ms. SWEARER. Well, I think that might be the least of the worries at that point. I mean, you would still have 400-million plus privately owned firearms in this country. There would need to be some sort of coherent enforcement plan. Americans routinely do not turn in these weapons. I mean, you look at, I think it was New Jersey, when they banned magazines capable of 10 or 15 rounds, nobody turned those in. Out of a million of them, nobody turns those in. You know, the people who do turn them in, let's say we are even twice as successful as Australia, you still have 200 million guns in this country, most of them now in the hands of the lesser law-abiding segment of society who didn't bother to turn them in, who didn't turn in their assault weapons.

So, I mean, and we would be holding hearings, too, about, you know, who is this being enforced against. If I may be blunt, these laws are less likely to be enforced against white suburbia. We are now going to be having hearings about how they are being enforced against poor people of color, and that helps no one. So, I mean, I am not going to get into speculations about drug cartels, but I will say we will have several other problems that would be primary.

Mr. COMER. What do you think, Mr. Swearer, that we should do instead of passing gun control laws to make our community safer?

Ms. SWEARER. I think, again, as I have outlined, one of the first things you can do is focus on the mental health and the well-being of communities, I mean, things that help communities flourish, whether it is focusing on mental health, two-thirds of gun deaths

72

are suicides. As Mr. Jackson noted, you know, there are a lot of issues that are interrelated. It is very seriously interrelated with violence and violent crime. Focusing on stemming those issues, whether it is access to safe spaces, whether it is mental health, whether it is educational and job opportunities, the things that make families and communities flourish are the things that reduce violent crime. And, again, it does more than reduce violent crime, because now we are talking about human flourishing on top of that.

Mr. COMER. My friend, Ro Khanna, also mentioned about violent criminals having guns, and, you know, our position is violent criminals should be in jail. I think that is the position of everyone on this side of the aisle. How can we empower law enforcement professionals and our criminal justice system to bring violent criminals to justice and keep them off our streets?

Ms. SWEARER. Well, I think, you know, I am hesitant to actually blame law enforcement for a lot of those issues.

Mr. COMER. I am not blaming law——

Ms. SWEARER. Right, no, no. I mean, at the end of the day, you know, what happens to them afterwards, that is out of the hands of law enforcement. That is local prosecution.

Mr. COMER. Exactly.

Ms. SWEARER. That is, you know, dealing with laws, about the parameters of what those prosecutors can and can't do, you know.

Mr. COMER. Right.

Ms. SWEARER. So, I think it is more complex than that, you know, and it is going to come down to what state or locality we are talking about where that problem might exist, but that is that is a major focus, yes.

Mr. COMER. That is very good. I agree. There is a trend in a lot of the cities where there is the most violence with guns. These cities have strict gun control laws already in the books that the criminals aren't abiding, but they also have many prosecutors, including the one in San Francisco who was recalled last night, who had been very lax on criminals. I think the criminal justice system was created to try to help people that had been unfairly incarcerated for minor things like marijuana possession. I think there should be bipartisan support for people who are in prison for little things like marijuana possession to be let go. I support that, but I think it has gone too far. And we have criminals now that are that are on the street, and that is not good. In the name of COVID, a lot of prisoners in this town, Washington, DC, were let out, and we have seen, you know, a spike in crime.

So, I think that there are many points we need to consider moving forward, and, Madam Chair, I am wrapping up. Obviously we need to invest in school security. We need to invest in resource officers. We need to have better-trained school resource officers, and we need to share data on mental health issues and any potential threats with kids from social media and things like that. Thank you——

Chairwoman MALONEY. The gentleman's time has expired.

The gentlelady from Michigan, Mrs. Lawrence, you are now recognized.

73

Mrs. LAWRENCE. Thank you so much. History teaches us a lot of things. We have heard our educators, and our community organizers, our law enforcement talk about the stagnant action of nothing. So, we will have someone like Ms. Swearer come in and say that it is not the guns, the guns are not the problem, keep them coming, everybody has that right, and we move forward. Then there is another shooting, but it is not the guns. You can't kill someone in multiple rounds without a weapon.

We own cars in America. In order to own a car in America, you first have to buy it and get a registration for it. In order for you to operate a car, you have to take a test, and you have to follow laws. If you fail to do that, that car is taken from you. It is a car. It is not a gun. And we are still talking about background checks. Yes, we need to talk about mental illness, but what happens after we do all our prayers and best wishes, which I can say my colleagues on the other side are beautiful at prayers and best wishes, but never bring forth a bill that would address this crisis in America.

It is unacceptable. We cry when we think about these babies. We heard the descriptions of these bodies where a person, who was clearly unfit to own a gun, walked in and legally purchased a gun at 18, and used that gun within hours to not only kill his family, shoot or injure his family, but others. It comes a point of time when this deflect, deflect, don't do it because if they pass one law, it is a slippery slope, I have heard it, don't let them take away your guns, that is our right. When in America, when we have more guns than people, does the sickness of operating and owning a gun kicks in that we in America have a problem?

I know for a fact if you drive a car you bought, and you have to put on a seatbelt. We don't care if it is uncomfortable. We don't care if you don't like it. You have to put that seatbelt on, and if you don't put that seatbelt on, if you repeatedly do it, we will take away your license to drive that car. First of all, we studied the deaths and we found out how many people die in car crashes, and you know what? We said we want to stop the deaths in car crashes, and look at all the innovation: airbags seatbelts. We stepped up as America.

And we keep talking about our faith in God and how we love people and equality. How can we say we love God when we take a gun and shoot and kill people, and if someone does it, you sit back and drop your hands, say prayers and best wishes? It is time. It is time for us as America and this body to stand up and confront the fact that it is sick. It is sick to think that if I have a gun, nothing is going to happen to me, and I become a gigantic figure. I had a member tell me that his five-year-old wanted a pink gun for her birthday—five-year-old—and he said, when you get old enough for your fingers to operate the gun, I will buy you a gun. And he did, and he thought that was a good thing. And I am sitting here saying, you know, I would stand up in court and say you needed to go to jail, a five-year-old with a gun, and the only purpose of a gun is to kill something.

So, you are giving a five-year-old, who is not mentally capable of making decisions, a gun. That is sick. It is no way you can rationalize that. And you have homes throughout America, they have

74

their gun in the back of the car, they are wearing open carry. It is like the Wild, Wild West. We have evolved as a country. We have all these technology and advancements, but we are literally going back to the Wild, Wild West where we stand up and we have a shoot down in the middle of the street, people die, and we just walk away and blow the smoke off the gun. It is unacceptable.

And I know I am supposed to be asking questions, but if I can just impact one person. And like my colleague said there is large number of Americans who say can you just do something other than prayers and best wishes. If someone shot and killed your child, you would not be sitting here wanting to hear about my constitutional right to own a gun. Well, I will give my prayers and best wishes for you because when you lose a child over gun violence, it is unacceptable. I yield back my time——

Chairwoman MALONEY. The gentlelady yields back.

And the gentlelady from Massachusetts, Ms. Pressley, is now recognized.

Ms. PRESSLEY. Thank you, Madam Chair. And thank you to all of our witnesses here today, especially our survivors, those who shared their pain, their grief, and their trauma. I really do look forward to a day where our families and our children, children like little Miah, will no longer have to relive their trauma simply to compel action because only in America do we normalize mass shootings and the trauma left behind.

Now, when a partner loses a spouse, we ascribe the word "widow" or "widower." When a child loses their parent, we use the word "orphan." There is no word to describe a parent who has suffered the devastating sorrow of losing a child. The unimaginable pain, grief, and trauma of burying your own baby, it just goes against the natural order of things. And with gun violence now the leading cause of death for children's society, now we are searching for a word, for what do we call a surviving parent who has been robbed of their child due to a massacre? Only in America.

So, whether it is our babies learning in Uvalde, our elder's grocery shopping in Buffalo, or neighbors in my district, the Massachusetts 7th, whose experience don't always make national headlines but do deserve just as much attention, it is long past time to treat gun violence as the public health crisis that it is. We must do something about these damn guns. And yet predictively some are resorting to deflection and distractions, touting failed policies that do more harm than good, like arming teachers and militarizing police in our schools.

Ms. Pringle, very eloquently, earlier today you said we need resources, not revolvers, in our schools, but yet we spent $1 billion over the last two decades to grow our school police. Mr. Pringle, in your experience does adding more police to schools end mass shootings, yes or no?

Ms. PRINGLE. No.

Ms. PRESSLEY. I completely agree with you, and so do the majority of experts that have studied the impacts of police in schools.

Chairwoman, I ask for unanimous consent to enter the following documents into the record: a 2015 study titled, "Preventing School Violence, Assessing Armed Guardians, School Policy and Context," a 2019 report titled, "Cops and No Counselors," and a series of let-

75

ters from the Federal School Discipline and Climate Group and more than 500 community-based organizations on the need to end the mass policing of our students, and instead invest in trauma-informed services that make our schools and children safe.

Chairwoman MALONEY. Without objection.

Ms. PRESSLEY. Since Columbine, our country has approached the problem of school shootings by funding school police, $1 billion, thousands of school police officers, when 90 percent of our students can't access a school nurse, a social worker, or a guidance counselor, and more than two decades later, we find ourselves in the same spot as before. Only in America. So, instead of contributing to the safety, the data shows that police in schools can have the opposite effect and actually result in making many students feel less secure.

Ms. Pringle, what have you heard from educators and students about policing schools, especially from students who are Black, brown, LGBTQ, or disabled?

Ms. PRINGLE. Our teachers, and, in fact, all of our educators are focused on making sure that they create a safe, welcoming environment for every single student. We know that our Black, and brown, and indigenous students are disproportionately impacted by the inequities in every single social system in this country.

Ms. PRESSLEY. Ms. Pringle, I am sorry, I am going to reclaim my time because I am losing it here. I apologize.

Ms. PRINGLE. Go ahead.

Ms. PRESSLEY. Just "yes" or "no." Outside of more police, some have recommended arming teachers, hardening our schools, and even constructing schools so that they only have one door. Is this a good idea?

Ms. PRINGLE. It is turning our schools into prisons. That is never a good idea.

Ms. PRESSLEY. Thank you. This is not an issue of the architecture of our schools. It is about the foundation of our country and whether we care about our people, our children more than guns. Every single life wrought by gun violence matters. The 87-year-old doing Bible study, the 27-year-old walking down the street, the seven-year-old learning to read, all had lives to live and dreams to achieve. Only in America do we consider arming teachers while failing to pay them a livable wage. Only in America do survivors have to go and start GoFundMe pages to afford mental health and trauma supports. Only in America do we expect survivors who have barely buried their loved ones to make the case for policymakers to save lives. I yield back.

Chairwoman MALONEY. The gentlelady yields back.

The gentlelady from Ohio, Ms. Brown, is now recognized via Zoom.

Ms. BROWN. Thank you, Chairwoman Maloney, for holding this hearing. I would also like to thank the witnesses for coming, and, in particular, the witnesses on the first panel whose stories were simply gut-wrenching.

In 2020, guns were the leading cause of death in children. Out of the 45,000 firearm-related deaths in 2020, more than 4,300 of these were children. Many more have been injured or traumatized by gun violence. Sitting here, it is hard not to feel angry that we

allow so many children to be killed by guns. Now, let me be abundantly clear. My job is not to take away guns. I, myself, am a licensed gun owner. My job is to keep our communities safe. Our national obsession with guns is killing thousands of kids each year. Every one of those kids deserve to grow up and live a full life. We cannot sit idly by and do nothing as guns are used to kill our children and fellow Americans.

So, my first question is for Mr. Gramaglia. How does a red flag law work before you begin?

Mr. GRAMAGLIA. A red flag law is designed that if there is some sort of a threat that is alleged, a threat to harm yourself or others, that is brought forward so law enforcement or another professional can bring that to a court. That is the due process of a judicial process where a judge will examine the evidence that was brought forward, will look to see what the circumstances are, and a judge will make a determination whether or not a weapon or weapons are to be seized. And that is for a determinant amount of time, to be reviewed after a set amount of time where then that individual who had their weapons taken can come back in again and make a claim to get their weapons back.

Ms. BROWN. Thank you so much. Mr. Suplina, why are we seeing an increase in child deaths due to guns?

Mr. SUPLINA. Well, the short answer is that we are not doing anything. We are seeing an increase in child deaths because we don't have the laws in place that we have been discussing this morning and this afternoon. We have not enacted child access prevention laws at the Federal level that could protect children both from unintentional access or rather unauthorized access and child suicide. The reasons go on and on. And children are dying in homicides in this country, they are dying by suicide, they are dying by unintentional deaths, and we have not addressed that. In the states that have, we see better outcomes, and I want to emphasize that because we gloss over it so much. In the states that are enacting these laws, even though their efficacy is lessened by the influx of firearms from other states, we are seeing lower mortality rates among children and the general population.

Ms. BROWN. Thank you. Mr. Jackson for you. We have heard your testimony today about kids who have been traumatized by the horrors carried out in Uvalde, in communities that look like yours and mine. Can you share with us the impacts of gun violence on child survivors as well as their friends and family members?

Mr. JACKSON. Yes. I mean, what we have to realize is that they have a lifetime of trauma that they have to live with. And we know that one of the biggest indicators of whether someone will become a future victim or even an offender of violence is had they been exposed to that trauma. And what is most terrifying for me is in both of these communities and communities all over the country, we are forgetting about victims and their trauma. We are not providing the services and support for them or their families, and there are people in Buffalo right now that have been abandoned by our government and just asked to deal with that trauma. So, a huge thing that we can do now is fight for resources, for community-led violence intervention and prevention strategies that include therapeutic and trauma care for those who have been directly impacted.

77

Ms. BROWN. Thank you so much. I think we have all heard far too many stories of gun violence. Again, I personally have been impacted by losing the lives of three young men who were part of my youth ministry that did not live to see the age of 21. This has to stop. Enough is enough. We have the tools to make a difference for families across this country if we can just come together and find the political will, the compassion, and the courage, and the capacity to just do it. With that, I yield back.

Chairwoman MALONEY. The gentlelady yields back.

The gentlewoman from Missouri, Ms. Bush, is now recognized.

Ms. BUSH. St. Louis and I thank you, Madam Chairwoman, for convening this hearing.

In St. Louis, we know the devastation and the trauma of daily gun violence in our community. It is the drumbeat of violence where 6 people were killed and 14 shot within one weekend and in one part of our community where the population is only a little over 300,000, and it is not considered an anomaly. It is the daily occurrence of trauma and heartbreak in a community reeling from a Nation who is unwilling to act but can. So, many people in our community have been directly harmed by gun violence, and everybody in our community has been traumatized in some way.

Since the massacre of 19 students and two teachers at Robb Elementary in Uvalde, Texas, we have heard a lot of stories, a lot of theories about how best to protect students and how best to protect teachers. At best, these suggestions are absurd distractions, and at worst, they will further harm the very communities in need of our help the most, communities like mine, communities like Buffalo and Uvalde, Black communities, Latino communities, AAPI communities, our schools, our churches, the list goes on. And we need to address the incidence of gun violence in this country, not with carceral interventionist solutions, but with a public health approach that is rooted in prevention.

Mr. Jackson, briefly, what specific strategies has your organization employed to address the gun violence crisis in communities of color, just briefly?

Mr. JACKSON. Really briefly, victim services and support for families, hospital-based violence intervention and prevention strategies, cognitive behavioral therapy programs like READI Chicago, Advance Peace, that work with those who are most at risk, creating safe passes for youth as they are coming home. And that is actually a short list of some of the evidence-based models that we know can save lives, and we are fighting for that. You know, cities all over the country are investing their resources. We know that community leaders all over the country, thousands of these organizations are fighting to save lives but yet we are stuck with scraps when it comes to Federal resources.

Ms. BUSH. Evidence-based models that save lives. We need to pass out the pamphlet on what you are doing. I am a survivor of gun violence. I have sat with parents who lost their children to gun violence. I have heard from students who sat next to me and talked to me about how they lost friends, and they lost classmates, and they don't cry, they don't even feel anything anymore, all due to gun violence. Our children want action, but the strategies that I get to hear too often from my fellow colleagues, and some on this

committee, will call for the hardening of schools and for placing armed staff and police officers in academic environments.

And it tears me down because I think about as a child when we had fire drills and tornado drills, and they taught us, you know, crouch down and cover your head. And I remember we would have these routine drills, and I really believed that a tornado was going to come because they made us do this. I believed that a fire drill was coming. It can happen because our school is making us do this, and now they have these shooter these active shooter drills. What are we doing? I think about my nephew. I think about my son's safety at school. It is always on my mind, is this unrelenting concern about not only their physical safety, but also the emotional toll that they endure through this run, hide, fight reality every single day.

So, President Pringle, how has the daily reality of militarized schools and active shooter drills affected our students in these times of extreme gun violence?

Ms. PRINGLE. We have seen evidence of increased trauma-related illnesses, physical illnesses, as well as our students reporting to us that they are afraid to come to school, that they don't want to go to a grocery store because the violence is in the communities, too. We have heard from our teachers that they are leaving our profession because they don't believe that they can protect our students, but they are not stopping. We see our students rising up, don't we? They are demanding that this country protect them and pass gun laws that are common sense where most Americans agree we should be passing. That is what our students are demanding, that is what our teachers are demanding, and that is what we will continue to fight for.

Ms. BUSH. Thank you. You know, 81 percent of those convicted on gun possession charges in my community in the Eastern District of Missouri are Black, and it tears me up when we talk about saving lives. How do we talk about saving lives but we arm people to be able to take lives, and we arm them easily, and we arm them from the standpoint of it is my right. What about life?

Mr. Jackson, in our efforts to save lives and prevent further harm, why is it important for lawmakers to consider the impact of gun control laws and how they affect Black and brown communities?

Chairwoman MALONEY. The gentlelady has time has expired. You may answer the question briefly, Mr. Jackson.

Mr. JACKSON. Because this is life or death for us. You know, this is now the No. 1 cause of death for Black men and the No. 2 cause of death for Black women and Latino men. And while this may be a political topic for Congress, this is life or death for our communities. You know, I have been nearly shot five times, despite going to church, like the member said it before, despite saying the Pledge of Allegiance every day in school.

Gun violence surrounds us every single day, and we are dropping like flies, and we don't need more carceral strategies. What we need are real investments in our communities, real investments and prevention strategies that we know work, and we need someone to stand up against the flood of firearms that are pouring into our communities. Guns don't grow on trees. We are not creating

79

these guns. They are being flooded into our communities and the gun industry is profiting off of our death every single day.

Chairwoman MALONEY. The gentlelady's time has expired.

The gentleman from Illinois, Mr. Davis, is now recognized.

Mr. DAVIS. Thank you. Thank you very much, Madam Chairman, and I also want to thank all of our witnesses who have been here with us for much of the day.

I think it is clear. There is no doubt that we have a gun violence crisis in our country. Matter of fact, there have been more mass shootings this year than there have been days in the year, because there is one almost every day and every time you pick up the paper or watch television. In addition, there is a steady drumbeat of gun violence daily. It was an average of 124 people losing their lives to gun violence every day. In 2020, more than 45,000 people were killed by gun violence, the highest number in our history. The lives lost by homicide, suicide, and other gun-related injuries occur hourly, and the crushing impact of these losses expands exponentially to their loved ones and their communities.

Given that gun violence is a public health problem, I am preparing to reintroduce my bill to create a dedicated funding stream for gun violence prevention. You know, an ounce of prevention, I was told, is worth much more than a pound of cure. No comparable developed nation near the number of gun deaths as we do. To reduce gun violence, we need stable revenue to research it and combat it.

When we talk of all the aspects of gun violence, I live in inner-city America with one of the largest populations of low income people that you find in a city in America. That is the city of Chicago. We call it the Windy City, and, of course, it is a city where local elected officials have been making every effort that they could to reduce gun violence. You cannot purchase legally a handgun in the city of Chicago, yet handguns are flowing into our city like water flows into a river, and that is because we know that no matter how hard we try, we can't do the job that we need to do unless there is Federal action—Federal. You can walk across the street into another area and purchase all the weapons that you want and manage to sneak them back into Chicago.

When we talk about the trauma of gun violence, mine does not come from reading the papers or watching it. My grandson when he was 15 years old, was killed in a little scrap with a group of kids, and they didn't even really dislike each other. They had a little group who would swap clothes. "Let me wear your gym shoes tomorrow and you wear my jacket." "Let me wear your hair piece." But they got into a little scrap and one of the young people had a gun, and, of course, another one told him, "shoot," and he shot. It was the most chilling telephone call I have ever gotten from a police commander who called in and said, I think I got some bad news. The trauma of that experience has wrecked his family. As a matter of fact, shortly after that, my son, his father, just kind of gave up, passed away. My granddaughter has been traumatized, and their whole family is disrupted.

And so if we are going to be real in terms of what we need, we need Federal gun legislation that limits the number of guns that exist in our country. There is no reason we can't do that. We can,

80

we should, and we must. And I thank you, Madam Chairman, and yield back the balance of my time.

Chairwoman MALONEY. Thank you.

The gentleman from California, Mr. DeSaulnier, is recognized for five minutes.

Mr. DESAULNIER. Thank you, Madam Chair, and thank you so much for this hearing. Thank you, the panelists, and, in particular, thank you to the first panelists. For all of those who have lost family members to gun violence, how this can continue to happen in this country is extraordinary. It is just so depressing, and we hear the same arguments every time this happens, unfortunately.

So now, we have some history. Coming from a state that coordinates efforts, we are going to have a difference, many of us are. A state California vote for years, we have worked at this on evidence-based research on policy that can save lives and stop these things from happening. So, let's just look at the numbers. "If you are in California, we can't stop these things from happening." Again, it is not that we have some kind of unique wisdom to this, but we have relied on investments and evidence-based research. And what that shows is kids are almost 60 percent, statistically, less likely to be victims of gun violence in California. Adults, all people in California, are 35 percent less likely, statistically, not less likely 35 percent, less likely to be victims of gun violence, 25 percent less likely to be involved in a mass murder.

"We couldn't do this." The problem in California is that accepting the fact that these things are going to happen, but we are trying to do is prevent them as best we can, rather than just accepting that it is a fait accompli, that somehow this is going to happen, for whatever their reasons are. And of course, we have our own suspicions about what motivates people to let this continue to happen. But one of our problems is 25 percent of the guns that are used in crime in California come from outside of California, so we need national standards. We will continue to do what we can do in jurisdictions that support evidence-based research that treats this as a public health epidemic that it is.

So, Mr. Suplina, to this point in the work that you do in my area, in the Bay Area, we have a long history and we are doing this again, and we call it is not here. We are just examining the evidence-based research that you and others at Gifford CDC does so well at national comparisons and as a state, but we are trying to bring it to the local level. And if we have things that were preempted about, we will go to our elected officials at the Federal, and state, level and the Court if we have to. And by the way, all these laws have been in place and they are more stringent than the ones we are considering, and they are constitutional. The Courts have decided they are constitutional.

So, in that context, Mr. Suplina, tell us a little bit about your experience in evidence—based research and the causality and the outcomes. There are thousands of lives that have been saved by these policies. What does your work inform you to that point?

Mr. SUPLINA. Well, Congressman, precisely that when you look at all 50 states based on their strength of gun laws and look at their rate of gun deaths, there is a direct correlation between strength of gun laws and lower rates of gun deaths. It is just, you

81

know, statistically correlated, and it is a fact. And California, which does have some of the best gun laws in the country, also has some of the lowest rates of gun violence. Not enough. There is always more to do, but I actually really appreciate the way you have framed it because we are talking about a Nation that does have hundreds of millions of firearms in it. We are going to continue to have incidents of firearm violence in a Nation that has that many guns, but we can also do sensible things, as California has been a leader on, to reduce firearms deaths, and it just bears out in the data. You can look at it. You cited some of it, and there is more than we can be doing. I believe the programs that Mr. Jackson has been referencing throughout the afternoon are a place where, you know, California has also led, but more can be done.

And I believe that the next level of our intervention here really has to be with the industry because in California, what has happened, the industry has innovated around your laws. They have created ghost guns, which are turning up in crime scenes at record rates in California more than any other place in the country. And they are, you know, designing around other laws. So, it is time to take a look at the industry. I think California may be ready to do that and doing so will save lives.

Mr. DESAULNIER. That is why we have to keep stay on it, but evidence-based research can save lives.

Thank you, Madam Chair. I yield back.

Chairwoman MALONEY. Thank you.

The gentlelady from the District of Columbia, Ms. Norton, is now recognized.

Ms. NORTON. Thank you, Madam Chair, for this valuable hearing. If you look at the statistics, gun violence turns out to be a woman's issue, and what do these statistics show? Nearly 1 million women who are alive today have been shot or shot at by an intimate partner, and an average of 70 women are shot and killed each month by an intimate partner. Mr. Jackson, in your experience, is domestic violence a major factor in gun violence?

Mr. JACKSON. Yes, it is a huge factor, and it is also a huge reason why we are fighting for people-centered strategies to research the root causes of such violence and incidents. Right now there is the Protect Black Women and Girls Act that were strong proponents to address the 100,000 Black women and girls who go missing or murdered every single year.

Ms. NORTON. Mr. Jackson, I know that you have advocated for both community violence intervention and supply side efforts to reduce the number of guns in circulation. How would reducing the supply of guns reduce domestic violence deaths in particular?

Mr. JACKSON. There have been multiple studies done which I can supply to the record that have shown the presence of a gun greatly increases the risk of violence against someone in the home. And when we think about gun violence and how it is terrorizing our community and it being the No. 2 cause of death for Black women, we need to do all we can to address this violence beyond simple policing strategy.

Ms. NORTON. Thank you. Commissioner Gramaglia, in your experience, do firearms in the home heighten the risk of injury or death in a domestic dispute?

82

Mr. GRAMAGLIA. Well, I will say that we don't typically, on an annual basis, have very many domestic homicides in our community. But when you have an illegal gun in the home, it certainly does increase the risk of harm to everybody in the house.

Ms. NORTON. Mr. Suplina, what effort did the coronavirus pandemic have on gun related domestic violence?

Mr. SUPLINA. Well, to step back for a second, the presence of a gun in the home increases the risk of homicide by two times, risk of suicide by three times, and the risk that a domestic violence incident will become fatal by five times, just to lay that out for you. During the COVID–19 and the response in the lockdowns, we have, you know, real reason to be concerned that domestic violence increased even while being underreported. I don't have statistics in front of me on how domestic gun violence increased during that time period, but we know that it is a, you know, tragic form of gun violence that we often really do not hear about. In fact, many mass shootings, both ones you have heard about and ones you haven't heard about, start with an act of domestic violence either earlier in time or directly in relation to the incident as we have recently seen.

Ms. NORTON. And, Mr. Suplina, currently Federal law prohibits spouses with a history of domestic abuse from possessing a gun, but the so-called boyfriend loophole allows abusive dating partners, like abusive boyfriends and girlfriends, to have access. Could you explain how this boyfriend loophole works and what we could do about it?

Mr. SUPLINA. Well, what we have to do about it is close it. There is really no reason why in 2022 we shouldn't give protection where there are incidents of domestic violence, that we shouldn't also remove firearms, where, you know, a couple is not in a married relationship. So, there are efforts, as you know, in the House to close that loophole, and doing so would be very effective at reducing domestic violence deaths.

Ms. NORTON. Thank you, Madam Chair. I yield back.

Chairwoman MALONEY. The gentlelady yields back.

I ask unanimous consent that Representative Sheila Jackson Lee be allowed to participate.

Without objection, so ordered.

The gentlelady from Texas, Ms. Jackson Lee, is now recognized.

Ms. JACKSON LEE. Madam Chair, I thank you, and the chairman, and all members for their generosity in yielding to me at this time. I wanted to be very sure to be in this committee meeting today. I have just come off the floor of the House. We are now debating the Protect Our Kids Act. I want to acknowledge Zeneta Everhart, Dr. Guerrero, Miah, Felix and Kimberly Rubio, and the previous witness, Ms. Hughes. To the witnesses that are here, I want to acknowledge you and as well, to acknowledge Mayor Adams for his presence here.

My time is short. And so, I will be asking very pointed questions. To Mr. Suplina, I hope I pronounced it correctly, you said 2021 was the deadliest year. We are now close to that in 2022. "Yes" or "no?"

Mr. SUPLINA. We are on pace, correct.

Ms. JACKSON LEE. The bill that I have introduced, the Kimberly Vaughan Safe Storage Act, among others that are in the Protect

83

Our Kids Act, which I will comment on specifically, deals with the requirement of point of sale for storage devices. In the instance of Kimberly Vaughan, the son stole a gun from an unlocked, unsafe area, which I think goes to suicides and other uses of homicide. Is a safe storage issue an important issue as it relates to bringing down gun violence?

Mr. SUPLINA. It is such an important issue, Congresswoman. It is important for safety in the home. It is important to keep, you know, young kids away from firearms. It is important to reduce youth suicide. It is important to reduce school shootings because guns often start in the home and are accessed when they are not safely secured. There is just no overstating the importance of child access protection laws and other secure storage laws, as well as all programs that really encourage responsible gun store.

Ms. JACKSON LEE. Thank you. Mr. Jackson, let me express my concern, but also your heroic recovery should be touted and recognized. You had very important statistics. The No. 1 killer of African-American men, premature death, is by guns, second for Latinos, and second for Black women. You also have already mentioned the cycle of violence. How much of a disparity and impact in our minority communities is this gun usage, and gun victimization, and gun death? I have two other persons I want to raise a question with, so bear with me as you make a very brief answer to that, and I thank you and salute your recovery.

Mr. JACKSON. No, thank you, and I will be very brief. But we have seen the largest increase in homicides since the start of the pandemic in the Black community, a 39-percent increase, as well as it already being 80 percent of homicides coming from Black and brown communities. And we are in a world now where a Black man is at a greater risk of being shot and killed than a police officer, and that shouldn't be a reality for anyone.

Ms. JACKSON LEE. So, protecting our kids, dealing with the prohibitive magazines, raising the age limit, getting rid of ghost guns, because I have seen some of the folk on the street with the ghost guns, stopping trafficking, which, you know, they want to tout a city like Chicago, gun violence, but all the states around them have no laws. Would all that be part of helping to bring down the carnage?

Mr. JACKSON. That will be a huge help, and we need that comprehensive strategy to be applied everywhere. You know, we saw with every other health crisis that we didn't just say, oh, let's work on this one community. How do we make our entire country safer? And that is what we expect to see here.

Ms. JACKSON LEE. Thank you. Commissioner, I believe in the Constitution, and in the Constitution is a Bill of Rights, and the Second Amendment is there. I, as a member of the Judiciary Committee, have no reason, no intent to take away the Second Amendment rights. You have guns. You hunt. You are a responsible gun owner. Speak to me, and I have got one other person, so I guess I am going to be in trouble, about the fact on the assault weapons ban. There are more weapons in that potential bill that are allowed, automatic weapons, than those who are not. So, can you speak to the fairness of an assault weapons ban and a potential seven-day waiting period?

84

Mr. GRAMAGLIA. An assault weapon ban, to me, is a no brainer. Those weapons are made for one thing, and that is to kill people, and it is to kill a lot of people at one time. It is, you know, seeing the damage caused by them and I just can't see any other purpose from it.

Ms. JACKSON LEE. Would a seven-day waiting period help as well on automatic weapons?

Mr. GRAMAGLIA. It is a start. If that weapon has not banned, it prevents someone from getting something right away.

Ms. JACKSON LEE. May I, to Ms. Pringle, indicate in the state of Texas, we have been waving that the solution has been "arm teachers." Can you give me a sense of arming the teachers, those precious teachers that was shot and died, and then, the ones that was shot and lived, can you——

Chairwoman MALONEY. The gentlelady's time has expired, but Ms. Pringle can answer briefly.

Ms. JACKSON LEE. I appreciate it. Thank you so very much.

Ms. PRINGLE. Putting the responsibility on teachers to carry guns to protect our students is not only irrational. It is unfair, and we know what we need in this country, and you just described it. It is that comprehensive, commonsense gun laws, all of them working in collaboration, not arming teachers, and putting that responsibility on them and causing more harm and damage to the people who have dedicated their lives to educating American students. That is not OK. We know what we need to do. We need to do it now.

Ms. JACKSON LEE. I thank the chairwoman and the ranking member. I yield back.

Chairwoman MALONEY. Thank you.

Ms. JACKSON LEE. I thank the witnesses.

Chairwoman MALONEY. Before we close, I want to thank all of our panelists for incredible and meaningful testimony. It is tremendously important for Congress's work. I want to thank each and every one of you for your time, your knowledge, your commitment. Before we close, I want to offer the ranking member an opportunity to offer any closing remarks he may have. Ranking member Comer, you are now recognized.

Mr. COMER. Thank you, Madam Chair, and, again, I thank the witnesses for being here. This was a meaningful conversation, discussion. That is what this committee is supposed to do, and I appreciate the opportunity, Madam Chair, and again, thank you for your time.

When we look at this issue, like any issue in Congress, we need to focus on where we can have compromise because obviously the two parties have very differing ideologies, not just on the Second Amendment, but just about every major issue in America. But there is consensus to protect our school children. We all want that. I have three kids in the public schools. My mom was a public school teacher. I think when you look at the areas where there is consensus to act now, do something now, they are to harden our schools, to invest in better infrastructure.

We had a school shooting in Marshall County, Kentucky a few years ago, and there was overwhelming support, bipartisan support to harden those schools. You have to go through two doors now in

85

just about every schools in the state—elementary, middle, and high school—to be buzzed in through those doors to go in. We need to invest in more school resource officers, and we need to better train those school resource officers. I think we saw that in Uvalde. The officer there obviously wasn't trained very well in that situation.

Another idea that I think is common sense where there is compromise is something my friend, Ro Khanna, mentioned with respect to social media companies. We need to have some type of alert with the social media companies. Anytime a user posts anything about school violence, somehow that needs to get to the hands of the authority. Somehow we need to have some type of communication between the school resource officers, law enforcement, whomever, and the social media companies. That is a responsibility of the social media companies, in my opinion, that they could do better on.

We need to stop the Defund the Police movement, and that has been an effort by some of our friends on the left. That has been an utter failure. Crime is on the increase in every year, all types of crime. We need to stop that. And last, we need to ensure that we have prosecutors who are tough on crime because that has been a problem in the name of COVID and everything else with so many criminals that have been let out early release. It is just not working. We are seeing that in the data, especially in the inner city. So, I think there are areas where we can come together and compromise, and I hope that we can work together in a bipartisan way to better protect our public school children.

Madam Chair, thank you, and I yield back.

Chairwoman MALONEY. Thank you. Today, we heard firsthand accounts of the devastation that gun violence epidemic inflicts on American communities and families. To our witnesses who shared their personal stories of pain and loss, thank you for your bravery. We also heard from a local government leader from a gun safety advocate, a community activist, from an educator, and from a law enforcement officer. They spoke with one voice calling on Congress to end this epidemic of gun violence.

Let me emphasize that our Nation's police, the men and women sworn to protect our communities, are pleading with Congress to pass meaningful gun safety laws. And I am proud to say that today the House of Representatives heard their call and is approving commonsense gun safety legislation supported by a strong majority of Americans. This is an important first step toward protecting our children, and I hope that the Senate will pass this legislation without delay. But the fight does not end here. The gun lobby still has a powerful hold over many of my Republican colleagues, and they are opposing simple steps to save lives, like banning assault weapons, simply because it might hurt the industry's bottom line. It is time to hold this industry accountable for the suffering and death that it has caused, including the death of Lexi Rubio, her teachers, and classmates.

Two weeks ago, I wrote to the Nation's largest gun makers, including those who sold the assault rifles used in the massacres in Buffalo and Texas. We wanted to get to the bottom of how much these companies are profiting from selling weapons of war and how they are marketing these weapons to civilians. Over the last few

86

days, the committee has received information from these companies that is troubling. It is clear they are reaping enormous profits from assault weapons that are used in mass shootings of innocent people. This hearing is not the end of our investigation. In the coming days, we will continue to gather information and issue findings. I also intend to hold a second hearing to hear directly from the gun industry so they can explain to the American people why they continue to sell the weapons of choice for mass murderers.

The fight to protect our children from gun violence is far from over, but based on the bravery and determination our witnesses displayed today, I am confident it is a fight we can and will win.

Again, I thank you all for your commitment, for your time, for your testimony today. I yield back.

Oops. Before I close, I want to thank, again, everyone and I commend all my colleagues.

And with that, without objection, all members will have five legislative days within which to submit extraneous materials and to submit additional written questions for the witnesses to the chair, which will be forwarded to the witnesses for their response. I ask our witnesses to please respond as promptly as you are able.

Chairwoman MALONEY. And with that, this meeting is adjourned, and we are going to the floor to vote for gun safety.

[Whereupon, at 4:10 p.m., the committee was adjourned.]

○