**EXHIBIT 17**

## EXPERT REPORT OF PROFESSOR SAUL CORNELL

### I.    Assignment

I have been asked to provide an expert opinion on the history of firearms regulation in the Anglo-American legal tradition. I have further been asked to opine on how the Founding-era generation understood the right to bear arms, as well as the understanding of the right to bear arms held at the time of the ratification of the Fourteenth Amendment to the United States Constitution. Finally, I have been asked to evaluate the local ordinance at issue in this case, particularly regarding its connection to the tradition of firearms regulation in American legal history.

### II.    Qualifications and Background

I am the Paul and Diane Guenther Chair in American History at Fordham University. The Guenther chair is one of three endowed chairs in the history department at Fordham and the only one in American history. In addition to teaching constitutional history at Fordham University to undergraduates and graduate students, I teach constitutional law at Fordham Law School. I have been a Senior Visiting research scholar on the faculty of Yale Law School, the University of Connecticut Law School, and Benjamin Cardozo Law School. I have given invited lectures, presented papers at faculty workshops, and participated in conferences on the topic of the Second Amendment and the history of gun regulation at Yale Law School, Harvard Law School, Stanford Law School, UCLA Law School, the University of Pennsylvania Law School, Columbia Law School, Duke Law School, Pembroke College Oxford, Robinson College, Cambridge, Leiden University, and McGill University.[1]

My writings on the Second Amendment and gun regulation have been widely cited by state and federal courts, including the majority opinion and dissenting opinion in *NYSRPA v. Bruen*.[2] My scholarship on this topic has appeared in leading law reviews and top peer reviewed legal history journals. I authored the chapter on the right to bear arms in *The Oxford Handbook of the U.S. Constitution* and co-authored the chapter in *The Cambridge History of Law in America* on the Founding era and the Marshall Court, the period that includes the adoption of the Constitution and

---

[1] For a full *curriculum vitae* listing relevant invited and scholarly presentations, *see* Exhibit 1.

[2] *N.Y. State Rifle & Pistol Ass'n v. Bruen*, 142 S. Ct. 2111, 2022 U.S. Lexis 3055 (2022). For a full list of court citations, *see* Exhibit 2.

VIRAMONTES 004185
CCSAO 09/15/2022

the Second Amendment.[3] Thus, my expertise not only includes the history of gun regulation and the right to keep and bear arms, but also extends to American legal and constitutional history broadly defined. I have provided expert witness testimony in *Rocky Mountain Gun Owners, Nonprofit Corp. v. Hickenlooper*, No. 14-cv-02850 (D. Colo.); *Chambers, v. City of Boulder*, No. 2018 CV 30581 (Colo. D. Ct. City of Boulder, filed June 14, 2018), *Zeleny v. Newsom*, No. 14-cv-02850 (N.D. Cal.), and *Miller v. Smith*, No. 2018 cv 3085 (C.D. Ill.); *Jones v. Bonta*, 34 F.4th 704 (9th Cir. 2022); *Baird v. Bonta*, No. 2:19-cv-00617 (E.D. Cal.); *Worth v. Harrington*, No. 21-cv-1348 (D. Minn.).

## III. Retention and Compensation

I am being compensated for services performed in the above-entitled case at an hourly rate of $750 for reviewing materials, participating in meetings, and preparing reports; $1,000 per hour for depositions and court appearances; and an additional $100 per hour for travel time. My compensation is not contingent on the results of my analysis or the substance of any testimony.

## IV. Basis for Opinion and Materials Considered

The opinion I provide in this report is based on my review of the amended complaint filed in this lawsuit; my review of the local ordinances at issue in this lawsuit; my education, expertise, and research in the field of legal history. Additionally, my conclusions draw on a detailed review and analysis of the primary sources, secondary sources, and other materials cited in the footnotes and text of this report and listed in Exhibit 3. The opinions contained herein are made pursuant to a reasonable degree of professional certainty.

## V. Summary of Opinion

In *Bruen*, the Supreme Court underscored that text, history, and tradition are the foundation of modern Second Amendment jurisprudence. Understanding text, history, and tradition require a sophisticated grasp of istorical context. One must canvass the relevant primary sources, secondary literature, and jurisprudence to arrive at an understanding of the scope of permissible regulation consistent with the Second Amendment.

---

[3] Saul Cornell, *The Right to Bear Arms*, *in* THE OXFORD HANDBOOK OF THE U.S. CONSTITUTION 739–759 (Mark Tushnet, Sanford Levinson & Mark Graber eds., 2015); Saul Cornell & Gerald Leonard, *Chapter 15: The Consolidation of the Early Federal System*, *in* 1 THE CAMBRIDGE HISTORY OF LAW IN AMERICA 518–544 (Christopher Tomlins & Michael Grossberg eds., 2008).

VIRAMONTES 004186
CCSAO 09/15/2022

It is impossible to understand the meaning and scope of Second Amendment protections without understanding the way it fits within the larger context of American law in the Founding era. The members of the First Congress who wrote the words of the Second Amendment and the American people who enacted the text into law were well schooled in English common law ideas. Not every feature of English common law survived the American Revolution, but there were important continuities between English law and the common law in America.[4] Each of the new states, either by statute or judicial decision, adopted multiple aspects of the common law that had been in effect in the English colonies for generations.[5] No concept was more important to the common law than the concept of the peace.[6] As one early American justice of the peace manual published after the adoption of the Second Amendment noted: "the term peace, denotes the condition of the body politic in which no person suffers, or has just cause to fear any injury."[7]

In *Bruen*, Justice Kavanaugh reiterated *Heller*'s invocation of Blackstone's observation that there was a "well established historical tradition of prohibiting the carrying of dangerous and unusual weapons."[8] The dominant understanding of the Second Amendment and its state constitutional analogues at the time of their adoption in the Founding period forged an indissoluble link between the right to keep and bear arms with the goal of preserving the peace.[9]

---

[4] William B. Stoebuck, Reception of English Common Law in the American Colonies, 10 Wm. & Mary L. Rev. 393 (1968); MD. CONST. of 1776, DECLARATION OF RIGHTS, art. III, § 1. William B. Stoebuck, Reception of English Common Law in the American Colonies, 10 Wm. & Mary L. Rev. 393 (1968); Lauren Benton & Kathryn Walker, *Law for the Empire: The Common Law in Colonial America and the Problem of Legal Diversity*, 89 CHI.-KENT L. REV. 937 (2014).

[5] 9 STATUTES AT LARGE OF PENNSYLVANIA 29-30 (Mitchell & Flanders eds. 1903). FRANCOIS XAVIER MARTIN, A COLLECTION OF STATUTES OF THE PARLIAMENT OF ENGLAND IN FORCE IN THE STATE OF NORTH-CAROLINA 60–61 (Newbern 1792). Commonwealth v. Leach, 1 Mass. 59 (1804).

[6] Laura F. Edwards, THE PEOPLE AND THEIR PEACE: LEGAL CULTURE AND THE TRANSFORMATION OF INEQUALITY IN THE POST-REVOLUTIONARY SOUTH (2009).

[7] JOSEPH BACKUS, THE JUSTICE OF THE PEACE 23 (1816).

[8] *District of Columbia v. Heller*, 554 U. S. 570, at 626−627 (2008), and n. 26. Blackstone and Hawkins, two of the most influential English legal writers consulted by the Founding generation described these types of limits in slightly different terms. The two different formulations related to weapons described as dangerous and unusual in one case and sometimes as dangerous or unusual in the other instance, see Saul Cornell, *The Right to Carry Firearms Outside of the Home: Separating Historical Myths from Historical Realities*, 39 FORDHAM URB. L.J. 1695134 (2012).; It is also possible that the phrase was an example of an archaic grammatical and rhetorical form hendiadys, see Samuel Bray, *'Necessary AND Proper' and 'Cruel AND Unusual': Hendiadys in the Constitution*, 102 VIRGINIA LAW REVIEW 687 (2016).

[9] On Founding era conceptions of liberty, *see* JOHN J. ZUBLY, THE LAW OF LIBERTY (1775). The modern terminology to describe this concept is "ordered liberty." *See Palko v. Connecticut*, 302 U.S, 319, 325 (1937). For a more recent elaboration of the concept, *see generally* JAMES E. FLEMING & LINDA C. MCCLAIN, ORDERED LIBERTY: RIGHTS, RESPONSIBILITIES, AND VIRTUES (2013). On Justice Cardozo and

VIRAMONTES 004187
CCSAO 09/15/2022

In the years following the adoption of the Second Amendment and its state analogues, gun regulation increased. Indeed, the individual states exercised their police power to address long standing issues and novel problems created by firearms in American society.

### **The Historical Inquiry Required by *Bruen*, *McDonald*, and *Heller***

The United States Supreme Court's decisions in *Heller and McDonald[10]*, and *Bruen*, have directed courts to look to text, history, and tradition for guideposts in evaluating the scope of permissible firearms regulation under the Second Amendment. Justice Thomas, the author of the majority opinion in *Buren*, has noted that judges must avoid approaching history, text, and tradition with an "ahistorical literalism."[11]  Legal texts must not be read in a decontextualized fashion detached from the web of historical meaning that made them comprehensible to Americans living in the past. Instead, understanding the public meaning of constitutional texts requires a solid grasp of the relevant historical contexts.[12]

Following the mandates set out in *Heller, McDonald* and more recently in *Bruen*, history provides essential guideposts in evaluating the scope of permissible regulation under the Second Amendment.[13]   Moreover, history neither imposes "a regulatory straightjacket nor a regulatory blank check."[14] The court acknowledged that "other cases implicating unprecedented societal concerns or dramatic technological changes may require a more nuanced approach."   *Bruen* differentiates between cases in which contested regulations are responses to long standing problems and situations in which modern regulations address novel problems with no clear historical analogues from the Founding era or the era of the Fourteenth Amendment.

In the years between *Heller* and *Bruen*, historical scholarship has expanded our understanding of the history of arms regulation in the Anglo-American legal tradition, but much

---

the ideal of ordered liberty, see *Palko v. Connecticut*, 302 U.S, 319, 325 (1937); John T. Noonan Jr., *Ordered Liberty: Cardozo and the Constitution*, 1 CARDOZO L. REV. 257 (1979); Jud Campbell, *Judicial Review, and the Enumeration of Rights*, 15 GEO. J.L. & PUB. POL'Y 569 (2017).

[10] *McDonald v. City of Chicago*, 557 U.S. 965 (2009).

[11] *Franchise Tax Board of California v. Hyatt*, 139 S. Ct. 1485, 1498 (2019) (Thomas, J.) (criticizing "ahistorical literalism").

[12] S*ee* Jonathan Gienapp, *Historicism and Holism: Failures of Originalist Translation*, 84 FORDHAM L. REV. 935 (2015).

[13]  *Supra* note 2 at 21

[14]  *Id*.

VIRAMONTES 004188
CCSAO 09/15/2022

more work needs to be done to fill out this picture.[15]  Indeed, such research is still ongoing:  new materials continue to emerge, and in the months since *Bruen* was decided additional evidence about the history of regulation has surfaced and new scholarship interpreting it has appeared in leading law reviews and other scholarly venues.[16]

Justice Kavanaugh  underscored a key holding of *Heller* in his  *Bruen* concurrence: "Like most rights, the right secured by the Second Amendment  is  not  unlimited.     From Blackstone through  the  19th-century cases,  commentators and courts  routinely explained that  the  right  was  not  a right to keep and carry any weapon whatsoever  in any manner whatsoever  and  for  whatever  purpose." Crucially, the court  further noted that "we do think that *Heller* and *McDonald* point toward at least two metrics: "how and why the regulations burden a law-abiding citizen's right to armed self-defense."[17]

One overarching principle regarding firearms regulation does emerge from this period and it reflects not only the common law assumptions familiar to the Founding generation, but it is hard wired into the Second Amendment itself. As Justice Scalia noted in *Heller*, and Justice Thomas reiterated in *Bruen*, the original Second Amendment was a result of a form of interest balancing undertaken by the people themselves in framing the federal constitution and the first ten amendments. Thus, from its outset the Second Amendment recognizes both the right to keep and bear arms and the right of the people to regulate arms to promote the goals of preserving a free state. An exclusive focus on rights and a disparagement of regulation is thus antithetical to the plain meaning of the text of the Second Amendment. Although rights and regulation are often cast as antithetical in the modern gun debate, the Founding generation saw the two goals as complimentary. Comparing the language of the Constitution's first two amendments and their different structures and word choice makes this point crystal clear. The First Amendment prohibits "abridging" the rights it protects. In standard American English in the Founding era, to "abridge" meant to "reduce." Thus, the First Amendment prohibits a diminishment of the rights it protects. The Second Amendment's language employs a very different term, requiring that the right to bear

---

[15] Eric M. Ruben & Darrell A. H. Miller, *Preface: The Second Generation of Second Amendment Law & Policy*, 80 LAW & CONTEMP. PROBS. 1 (2017).

[16]*Symposium — The 2nd Amendment at the Supreme Court: "700 Years Of History" and the Modern Effects of Guns in Public*  55 U.C. DAVIS L. REV. 2495 (2022).
NEW HISTORIES of GUN RIGHTS AND REGULATION: ESSAYS ON THE PLACE OF GUNS IN AMERICAN LAW AND SOCIETY (Joseph Blocher, Jacob D. Charles & Darrell A.H. Miller eds., forthcoming 2023).
[17]  *Supra* note 2.

VIRAMONTES 004189
CCSAO 09/15/2022

arms not be "infringed." In Founding era American English, the word "infringement" meant to "violate" or "destroy." Richard Burns, in his influential eighteenth-century legal dictionary, illustrated the concept of infringement in the context of violations of the common law. Liberty, according to Burns, was not identical to that "wild and savage liberty" of the state of nature. True liberty, by contrast, only existed when individuals created civil society and enacted laws and regulations that promoted *ordered* liberty.[18] Regulation was therefore not understood to be an "infringement" of the right to bear arms, but rather the necessary foundation for the proper exercise of that right as required by the concept of ordered liberty.[19] In short, when read with the Founding era's interpretive assumptions and legal definitions in mind, the text of the two Amendments was seen to set up very different frameworks for thinking about the rights they protect. Members of the Founding generation would have understood that legislature could regulate the *conduct* protected by the Second Amendment and comparable state arms bearing provisions as long such regulations did not destroy the underlying *right*. In fact, without robust regulation of arms, it would have been impossible to implement the Second Amendment and its state analogues.[20] In keeping with the clear public meaning of the Second Amendment's text and comparable state provisions, early American governments enacted laws to preserve the rights of law-abiding citizens to keep and bear arms and promote the equally vital goals of promoting public safety.

### From Muskets to Pistols: Change and
### Continuity in Early American Firearms Regulation

Guns have been regulated from the dawn of American history.[21] At the time *Heller* was decided there was little scholarship on the history of gun regulation and little quality scholarship on early American gun culture.[22] Fortunately, a burgeoning body of scholarship has illuminated

---

[20] H. RICHARD UVILLER & WILLIAM G. MERKEL, THE MILITIA AND THE RIGHT TO ARMS, OR, HOW THE SECOND AMENDMENT FELL SILENT 150 (2002).

[21] Saul Cornell and Nathan DeDino, *A Well Regulated Right: The Early American Origins of Gun Control*, 73 FORDHAM L. REV. 487 (2004).
[22] *Id.*

VIRAMONTES 004190
CCSAO 09/15/2022

both these topics, deepening scholarly understanding of the relevant contexts needed to implement *Bruen's* framework.[23]

The common law Americans inherited from England always acknowledged that the right of self-defense was not unlimited but existed within a well delineated jurisprudential framework. The entire body of the common law was designed to preserve the peace.[24] Statutory law, both in England and America functioned to further secure the peace and public safety. Given these indisputable facts, *Heller* correctly noted, the right to keep and bear arms was never understood to prevent government from enacting a broad range of regulations to promote the peace and maintain public safety. To deny such an authority would be to convert the Constitution into a suicide pact and not a charter of government The Second Amendment and its state analogues were understood to enhance the concept of ordered liberty, not undermine it.[25]

*Bruen's* methodology requires judges to distinguish between the relevant history necessary to understand early American constitutional texts and a series of myths about guns and regulation that were created by later generations to sell novels, movies, and guns themselves.[26] Unfortunately, many of these myths continue to cloud legal discussions of American gun policy and Second Amendment jurisprudence.[27]

Although it is hard for many modern Americans to grasp, there was no comparable societal ill to the modern gun violence problem for Americans to solve in the era of the Second Amendment. A combination of factors, including the nature of firearms technology and the realities of living life in small face to face and mostly homogenous rural communities that typified many parts of early America, militated against the development of such a problem. In contrast to modern America, homicide was not the problem that government gun policy needed to address at the time of the Second Amendment.[28]

---

[23] Eric M. Ruben & Darrell A. H. Miller, *Preface: The Second Generation of Second Amendment Law & Policy*, 80 Law and Contemporary Problems 1 (2017).

[24] Saul Cornell, *The Right to Keep and Carry Arms in Anglo-American Law: Preserving Liberty and Keeping the Peace*, 80 LAW & CONTEMP. PROBS. 11 (2017).

[25] *See generally* Saul Cornell, *The Long Arc Of Arms Regulation In Public: From Surety To Permitting*, 1328-1928, 55 U.C. DAVIS L. REV. 2547 (2022)

[26] Pamela Haag, GUNNING OF AMERICA : BUSINESS AND THE MAKING OF AMERICAN GUN CULTURE. (2016).

[27] RICHARD SLOTKIN, GUNFIGHTER NATION: THE MYTH OF THE FRONTIER IN TWENTIETH-CENTURY AMERICA (1993); JOAN BURBICK, GUN SHOW NATION: GUN CULTURE AND AMERICAN DEMOCRACY (2006).

[28] Randolph Roth, AMERICAN HOMICIDE 56, 315 (2009).

VIRAMONTES 004191
CCSAO 09/15/2022

The surviving data for New England is particularly rich and has allowed scholars to formulate a much better understanding of the dynamics of early American gun policy. Levels of gun violence among those of white European ancestry in the era of the Second Amendment were relatively low compared to modern America. These low levels of violence among persons of European ancestry contrasted with the high levels of violence involving the tribal populations of the region. The data presented in Figure 1 is based on the pioneering research of Ohio-State historian Randolph Roth. It captures one of the essential facts necessary to understand what fears motivated American gun policy in the era of the Second Amendment. The problem Americans faced at the time of the Second Amendment was not too many guns, but too many of the wrong type of guns. Americans were far better armed than their British ancestors, but the guns most Americans owned and desired were those most useful for life in an agrarian society: fowling pieces and light hunting muskets.[29] Killing pests and hunting birds were the main concern of farmers, and their choice of firearm reflected these basic facts of life. Nobody bayoneted turkeys, and a pair of polished dueling pistols were of limited utility for anyone outside of a small elite group of wealthy, powerful, and influential men.[30]

Limits in Founding era firearms technology also militated against the use of guns as effective tools of interpersonal violence in this period. Eighteenth-century muzzle loading weapons, especially muskets, took too long to load and were therefore seldom used to commit crimes. Nor was keeping guns loaded a viable option because the black powder used in these weapons was not only corrosive, but it attracted moisture like a sponge. Indeed, the iconic image of rifles and muskets hung over the mantle place in early American homes was not primarily a function of aesthetics or the potent symbolism of the hearth, as many today assume. As historian Roth notes: "black powder's hygroscopic, it absorbs water, it corrodes your barrel, you can't keep it loaded. Why do they always show the gun over the fireplace? Because that's the warmest, driest place in the house."[31] Similar problems also limited the utility of muzzle loading pistols as

---

[29] Kevin M. Sweeney, *Firearms Ownership and Militias in Seventeenth and Eighteenth Century England and America*, *in* A RIGHT TO BEAR ARMS?: THE CONTESTED ROLE OF HISTORY IN CONTEMPORARY DEBATES ON THE SECOND AMENDMENT (Jennifer Tucker et al. eds., 2019).

[30] *Id.*

[31] Randolph Roth, transcript interview, *Why is the United States the Most Homicidal in the Affluent World*, available at https://nij.ojp.gov/media/video/24061#transcript--0 (last visited 9/14/2022).

VIRAMONTES 004192
CCSAO 09/15/2022

practical tools for self-defense or criminal offenses. Indeed, at the time of the Second Amendment, over ninety percent of the weapons owned by Americans were long guns, not pistols.[32]



**Figure 2.3** Unrelated-adult homicide rates in New England by race, 1677–1797 (per 100,000 persons per year).

As Roth's data makes clear there was not a serious homicide problem looming over debates about the Second Amendment. Nor were guns the primary weapon of choice for those with evil intent during this period.[33] Government policy responded to these realities by requiring white citizens capable of bearing arms to acquire at their own expense a military quality musket and participate in mandatory training and other martial activities.[34] Gun policy in the Founding era reflected these realities, and accordingly one must approach any analogies drawn from this period's regulations with some caution when applying them to a modern heterogenous industrial society capable of producing a bewildering assortment of firearms whose lethality would have been almost unimaginable to the Founding generation.[35] Put another way, laws created for a society without much of a gun violence problem enacted at a time of relative gun scarcity have limited value in illuminating the challenges Americans face today.

---

[32] *Id.*

[33] *Id.*

[34] Saul Cornell, A WELL REGULATED MILITIA: THE FOUNDING FATHERS AND THE ORIGINS OF GUN CONTROL IN AMERICA (2006).

[35] Darrell A. H. Miller & Jennifer Tucker, *Common Use, Lineage, and Lethality*, 55 U.C. Davis L. Rev. 2495 (2022)

VIRAMONTES 004193
CCSAO 09/15/2022

The calculus of individual self-defense changed dramatically in the decades following the adoption of the Second Amendment.[36] The early decades of the nineteenth century witnessed a revolution in the production and marketing of guns.[37]  The same technological changes and economic forces that made wooden clocks and other consumer goods such as Currier and Ives prints common items in many homes transformed  American gun culture. [38]  These same changes also made handguns and a gruesome assortment of deadly knives, including the dreaded Bowie knife, more common. Economic transformation was accompanied by a host of profound social and economic changes that gave rise to America's first gun violence crisis.  As cheaper, more dependable, and easily concealable handguns proliferated in large numbers, Americans, particularly southerners, began sporting them with alarming regularity.[39] The change in behavior was most noticeable in the case of handguns.  The culmination of this gradual process of evolution in both firearms and ammunition technology was the development of Samuel Colt's pistols around the time of the Mexican War.[40]

The response of states to the emergence of new firearms and new perceptions of threats to the peace was a plethora of new gun laws. These new laws limited the sale of weapons and the use of weapons that threatened the peace. In sort, when faced with changes in technology, consumer behavior, and faced with novel threats to public safety, the individual states enacted laws to address these problems. In every instance apart from a few outlier cases in the Slave South, courts upheld such limits on the unfettered exercise a right to keep and bear arms. The primary limit identified by courts in evaluating such laws was the threshold question about abridgement: did the law negate the ability to act in self defense.[41] The people themselves acting through their legislatures retained the fundamental right to determine which dangerous weapons were exempted from the full protection of the constitutional right to keep and bear arms.

---

[36]  *Supra* note 28.

[37] Lindsay Schakenbach Regele, *Industrial Manifest Destiny: American Firearms Manufacturing and Antebellum Expansion* 93 BUSINESS HISTORY REVIEW  57 (2018).

[38]  Sean Wilentz, *Society, Politics, and the Market Revolution*, in THE NEW AMERICAN HISTORY, edited by Eric Foner (1990).

[39] *Supra* note 28.

[40]  William N. Hosley, COLT: THE MAKING OF AN AMERICAN LEGEND (1986).

[41]  On southern gun rights exceptionalism, see Eric M. Ruben & Saul Cornell, *Firearms Regionalism and Public Carry: Placing Southern Antebellum Case Law in Context*, 125 YALE L.J.F. 121, 128 (2015)

VIRAMONTES 004194
CCSAO 09/15/2022

One useful metric inherited from English common law was the concept of *in terrorem populi*.[42] In his influential treatise on criminal law, Joe Prentis Bishop summarized the strong continuities between English and American law regarding dangerous weapons. "The same thing has, moreover has been very properly held in the United States; and so here, whether we receive the English statute or not, we hold criminal by our common law the going or riding about armed, with unusual and dangerous weapons, to the terror of the people."[43] The key determinant of legality according to this view was the probability that a particular weapon would provoke a terror and undermine the peace: a determination that was inescapably tied to contextual judgments made by legislatures and courts about how a particular class of weapons impacted society. The long-standing prohibition on dangerous or unusual weapons in part reflects this ancient common law principle.

### The Police Power and Firearms Regulation

The 1776 Pennsylvania Constitution, the first revolutionary constitution to assert a right to bear arms, preceded the assertion of this right by affirming a more basic rights claim: "That the people of this State have the sole, exclusive and inherent right of governing and regulating the internal police of the same."[44] The phrase "internal police" had already become common, particularly in state laws establishing towns and defining the scope of their legislative authority.[45] By the early nineteenth century the term was a fixture in American law.[46] Thus, an 1832 American encyclopedia confidently asserted that police, "in the common acceptation of the word, in the U. States and England, is applied to the municipal rules, institutions and officers provided for

---

[42] John Bouvier 1 A LEGAL DICTIONARY 2ⁿᵈ ed., (1843) at 660.

[43] Joel Prentis Bishop, 2 COMMENTARIES ON CRIMINAL LAW 2ⁿᵈ ed. (1859) at 678; Mark Anthony Frassetto, *To the Terror of the People: Public Disorder Crimes and the Original Understanding of the Second Amendment*, 42 S. Ill. U. L.J. 61 (2018).

[44] PA. CONST. OF 1776, Ch. I, art iii.

[45] For other examples of constitutional language similar to Pennsylvania's provision, N.C. CONST. OF 1776, DECLARATION OF RIGHTS, art. II; VT. CONST. OF 1777, DECLARATION OF RIGHTS, art. IV. For other examples of this usage, *see* An Act Incorporating the residents residing within limits therein mentioned, *in* 2 NEW YORK LAWS 158 (1785) (establishing the town of Hudson, NY); An Act to incorporate the Town of Marietta, *in* LAWS PASSED IN THE TERRITORY NORTHWEST OF THE RIVER OHIO 29 (1791). For later examples, *see* 1 STATUTES OF THE STATE OF NEW JERSEY 561 (rev. ed. 1847); 1 SUPPLEMENTS TO THE REVISED STATUTES. LAWS OF THE COMMONWEALTH OF MASSACHUSETTS, PASSED SUBSEQUENTLY TO THE REVISED STATUTES: 1836 TO 1849, INCLUSIVE 413 (Theron Metcalf & Luther S. Cushing, eds. 1849).

[46] ERNST FREUND, THE POLICE POWER: PUBLIC POLICY AND CONSTITUTIONAL RIGHTS 2, n.2 (1904).

VIRAMONTES 004195
CCSAO 09/15/2022

maintaining order, cleanliness &c."[47] The Founding era's police right and the Marshall Court's doctrine of the police power would become fixtures in American law.

The power to regulate firearms and gunpowder has always been central to the police power and historically was shared by both states, local municipalities and the federal government on federal land and buildings.[48] The adoption of the Constitution and the Bill of Rights did not deprive states of their police powers. Indeed, if it had, the Constitution would not have been ratified and there would be no Second Amendment today. Ratification was only possible because Federalists offered their Anti-Federalist opponents strong assurances that nothing about the new government threatened the traditional scope of the individual state's police power authority.[49]

Federalists and Anti-Federalist bitterly disagreed over many legal issues, but this one point of accord was indisputable. Brutus, a leading Anti-Federalist, emphatically declared that "[I]t ought to be left to the state governments to provide for the protection and defence [sic]of the citizen against the hand of private violence, and the wrongs done or attempted by individuals to each other . . . ." Federalist Tench Coxe concurred, asserting that: "[t]he states will regulate and administer the criminal law, exclusively of Congress." States, he assured the American people during ratification, would continue to legislate on all matters related to the police power "such as unlicensed public houses, nuisances, and many other things of the like nature."[50]

At the Founding it was recognized that state police power authority was at its pinnacle in matters relating to guns or gun powder. Thus, Massachusetts enacted a law that prohibited storing a loaded weapon in a home, a firearms safety law that recognized that the unintended discharge of firearms posed a serious threat to life and limb.[51] New York City even granted broad power to the government to search for gun powder and transfer powder to the public magazine for safe storage:

---

[47] 10 ENCYCLOPÆDIA AMERICANA 214 new edition (Francis Lieber ed.).

[48] Harry N. Scheiber, *State Police Power*, in 4 ENCYCLOPEDIA OF THE AMERICAN CONSTITUTION 1744 (Leonard W. Levy et al. eds., 1986).

[49] Saul Cornell, THE OTHER FOUNDERS: ANTIFEDERALISM AND THE DISSENTING TRADITION IN AMERICA, 1788-1828 (1999).

[50] Brutus, ESSAYS OF BRUTUS VII, reprinted in 2 THE COMPLETE ANTIFEDERALIST 358, 400–05 (Herbert J. Storing ed., 1981). Tench Coxe, A Freeman, PA. GAZETTE, Jan. 23, 1788, reprinted in FRIENDS OF THE CONSTITUTION: WRITINGS OF THE "OTHER" FEDERALISTS 82 (Colleen A. Sheehan & Gary L. McDowell eds., 1998).

[51] Act of Mar. 1, 1783, ch. XIII, 1783 Mass. Acts 37, An Act in Addition to the Several Acts Already Made for the Prudent Storage of Gun Powder within the Town of Boston, § 2.

VIRAMONTES 004196
CCSAO 09/15/2022

it shall and may be lawful for the mayor or recorder, or any two Alderman of the said city, upon application made by any inhabitant or inhabitants of the said city, and upon his or their making oath of reasonable cause of suspicion (of the sufficiency of which the said mayor or recorder, or Aldermen, is and are to be the judge or judges) to issue his or their warrant or warrants, under his or their hand and seal, or hands and seals for searching for such gun powder, in the day time, in any building or place whatsoever.[52]

The power to regulate firearms and gunpowder was therefore at the very core of the police power and inheres in both states and local municipalities. A slow process of judicializing this concept of police, transforming the Founding era's idea of a "police right" into a judicially enforceable concept of the "police power" occurred beginning with the Marshall Court and continuing with the Taney Court.[53]

The application of the police power to firearms and ammunition was singled out as the *locus classicus* of state police power by Chief Justice John Marshall in his 1827 discussion of laws regulating gun powder in *Brown v. Maryland.*[54] Nor was Marshall unique in highlighting the centrality of this idea to American law.[55] The ubiquity of the police power framework for evaluating the constitutionality of legislation regarding firearms reflected the centrality of this approach to nearly every question of municipal legislation touching health or public safety..[56]

---

[52] An Act to Prevent the Storing of Gun Powder, within in Certain Parts of New York City, LAWS OF THE STATE OF NEW-YORK, COMPRISING THE CONSTITUTION, AND THE ACTS OF THE LEGISLATURE, SINCE THE REVOLUTION, FROM THE FIRST TO THE FIFTEENTH SESSION, INCLUSIVE 191-2 (Thomas Greenleaf, ed., 1792).

[53] Eras of Supreme Court history are typically defined by the tenure of the Chief Justice. The Marshall Court Period covered the years 1801-1835. For a brief overview, *see* https://supremecourthistory.org/history-of-the-court-history-of-the-courts/history-of-the-court-history-of-the-courts-the-marshall-court-1801-1835/. The Taney Court period covered the years 1836-1864, https://supremecourthistory.org/history-of-the-court-history-of-the-courts/history-of-the-courts-history-of-the-courts-the-taney-court-1836-1864/.

[54] 25 U.S. (12 Wheat.) 419, 442-43 (1827) ("The power to direct the removal of gunpowder is a branch of the police power").

[55] In the extensive notes he added as editor of the 12th edition of James Kent's classic *Commentaries an American Law*, Oliver Wendell Holmes, Jr., wrote that regulation of firearms was the *locus classicus* of the police power. *See* 2 JAMES KENT COMMENTARIES ON AMERICAN LAW (340) 464 n.2 (Oliver Wendell Holmes, Jr., ed. 12 ed. 1873).

[56]ERNST FREUND, THE POLICE POWER: PUBLIC POLICY AND CONSTITUTIONAL RIGHTS 2, n.2 (1904). WILLIAM J. NOVAK, THE PEOPLE'S WELFARE: LAW AND REGULATION IN NINETEENTH-CENTURY AMERICA (1996); Christopher Tomlins, *To Improve the State and Condition of Man: The Power to Police*

VIRAMONTES 004197
CCSAO 09/15/2022

Massachusetts Judge Lemuel Shaw, one of the most celebrated state jurists of the pre-Civil War era elaborated this point in his influential 1851 opinion in *Commonwealth v. Alger,* a decision that became a foundational text for lawyers, judges, and legislators looking for guidance on the meaning and scope of the police power. Shaw described the police power in the following manner:

> [T]he power vested in the legislature by the constitution, to make, ordain and establish all manner of wholesome and reasonable laws, statutes and ordinances, either with penalties or without, not repugnant to the constitution, as they shall judge to be for the good and welfare of the commonwealth, and of the subjects of the same. It is much easier to perceive and realize the existence and sources of this power, than to mark its boundaries, or prescribe limits to its exercise. There are many cases in which such a power is exercised by all well-ordered governments, and where its fitness is so obvious, that all well regulated minds will regard it as reasonable. Such are the laws to prohibit the use of warehouses for the storage of gunpowder.[57]

Indeed, the scope of government power to regulate, prohibit, and inspect gunpowder has been among the most far reaching of any exercise of the police power throughout American history.[58] A Maine law enacted in 1821 authorized town officials to enter any building in town to search for gun powder:

> Be it further enacted, That it shall, and may be lawful for any one or more of the selectmen of any town to enter any building, or other place, in such town, to search for gun powder, which they may have reason to suppose to be concealed or kept, contrary to the rules and regulations which shall be established in such town,

---

*and the History of American Governance*, 53 Buff. L. Rev. 1215 (2005); Markus Dirk Dubber, The Police Power: Patriarchy And The Foundations Of American Government (2005); Gary Gerstle, Liberty And Coercion: The Paradox Of American Government, From The Founding to the Present (2015).

[57] *Commonwealth v. Alger*, 61 Mass. (7 Cush.) 53 (1851). For another good discussion of how state jurisprudence treated the concept, *see Thorpe v. Rutland*, 27 Vt. 140, 149 (1855).

[58] Spitzer, Guns Across America *supra* note 6 at 39-64.

VIRAMONTES 004198
CCSAO 09/15/2022

according to the provisions of this Act, first having obtained a search warrant therefore according to law.[59]

No jurisdiction enumerated the full contours of the police power they possessed in a single text or in a single statute or ordinance. Rather, it was well understood that the exercise of this power would need to adapt to changing circumstances and new challenges as they emerged. This conception of law was familiar to most early American lawyers and judges who had been schooled in common law modes of thinking and analysis.[60] Throughout the long sweep of Anglo-American legal history, government applications of the police power were marked by flexibility, allowing local communities to adapt to changing circumstances and craft appropriate legislation to deal with the shifting challenges they faced.[61] This vision of the police power was articulated forcefully by the Supreme Court in the License Cases when Justice McClean wrote this about the scope of state police power:

> It is not susceptible of an exact limitation, but must be exercised under the changing exigencies of society. In the progress of population, of wealth, and of civilization, new and vicious indulgences spring up, which require restraints that can only be imposed by new legislative power. When this power shall be exerted, how far it shall be carried, and where it shall cease, must mainly depend upon the evil to be remedied.[62]

One of the most important early American gun-related cases discussed in *Heller*, *State v. Reid*, offers an excellent illustration of the way police power jurisprudence was used by antebellum judges to adjudicate claims about gun rights and the right of the people to regulate.[63]  The case was a classic example of antebellum police power jurisprudence: "The terms in which this provision is phrased," the court noted, "leave with the Legislature the authority to adopt such regulations of police, as may be dictated by the safety of the people and the advancement of public

---

[59] 1821 Me. Laws 98, An Act for the Prevention of Damage by Fire, and the Safe Keeping of Gun Powder, chap. 25, § 5.

[60] Kunal M. Parker, Common Law History, And Democracy In America, 190-1900: Legal Thought Before Modernism (2013).

[61] William J. Novak, *A State of Legislatures*, 40 Polity 340 (2008).

[62] *License Cases (Thurlow v. Massachusetts; Fletcher v. Rhode Island; Peirce v. New Hampshire),* 5 How. (46 U.S.) 504, 592 (1847).

[63] *See State* v. *Reid,* 1 Ala. 612, 612 (1840).

VIRAMONTES 004199
CCSAO 09/15/2022

morals."[64] The regulation of arms was in the court's view something at the very core of state police power.[65]

### Reconstruction and the Expansion of State Police Power to Regulate Firearms

Although Founding-era constitutions separated the right of the people to regulate their internal police from statements about the right to bear arms, Reconstruction-era Constitutions adopted a new formulation, fusing the two rights together as one. Constitution writers in the era of the American Revolution feared powerful standing armies and sought to entrench civilian control of the military, constitution writers in the era of the Fourteenth Amendment were motivated by a different fear: the proliferation of especially dangerous weapons. The language of the right to bear arms provisions in state constitutions enacted during Reconstruction and after began to recognize that the police power of the state could be used to regulate firearms.[66] Millions of Americans living in the newly organized western states and newly reconstructed states of the former confederacy adopted constitutional provisions that reflected this new formulation of the right to bear arms. For example, the 1868 Texas Constitution included new language that underscored the indissoluble connection that Anglo-American law had long recognized between the right to keep and bear arms and regulation of guns. "Every person shall have the right to keep and bear arms, in the lawful defence of himself or the government, under such regulations as the Legislature may prescribe."[67] Nor was Texas an outlier in this regard. Sixteen state constitutions adopted during this period employed similarly expansive language.[68] Thus, millions of Americans were living under constitutional regimes that acknowledged that the individual states' police power authority over firearms was at its apogee when regulating the use of guns in public.[69]

---

64 *Id.* at 616.

65 Apart from rare outlier decisions, such as Bliss v. Commonwealth, 12 Ky. (2 Litt.) 90, 92 (1822) courts employed a police power framework to adjudicate claims about the scope of state power to regulate arms. For a useful discussion of *Bliss* in terms of the police power, see ERNST FREUND, THE POLICE POWER: PUBLIC POLICY AND CONSTITUTIONAL RIGHTS 91 (1904).

66 Saul Cornell, *The Right to Regulate Arms in the Era of the Fourteenth Amendment: The Emergence of Good Cause Permit Schemes in Post-Civil War America*, 55 U.C. DAVIS L. REV. ONLINE 65 (2021).

67 TEX. CONST. OF 1868, Art. I, § 13; for similarly expansive constitutional provision enacted after the Civil War, *see* IDAHO CONST. OF 1889, art. I, § 11 ("The people have the right to bear arms for their security and defense; but the legislature shall regulate the exercise of this right by law."); UTAH CONST OF 1896, art. I, § 6 ("[T]he people have the right to bear arms for their security and defense, but the legislature may regulate the exercise of this right by law.").

68 *Supra* note 64.

69 *Id.*

VIRAMONTES 004200
CCSAO 09/15/2022

This new constitutional focus on regulation was entirely consistent with the Fourteenth Amendment's emphasis on the protection of rights and the need to regulate conduct that threatened the hard-won freedoms of recently free people of the South and Republicans hoping to further the goals of Reconstruction.[70] The author of Section One of the Fourteenth Amendment, John Bingham, reassured voters that the states would continue to bear the primary responsibility for "local administration and personal security."[71] As long as state and local laws were racially neutral and favored no person over any other, the people themselves, acting through their representatives, were free to enact reasonable measures necessary to promote public safety and further the common good.[72]

It would be difficult to understate the impact of this new paradigm for gun regulation on post-Civil War legislation. Across the nation legislatures took advantage of the new formulation of the right to bear arms included in state constitutions and enacted a staggering range of new laws to regulate arms. Indeed, the number of laws enacted skyrocketed, increasing by over four hundred percent from antebellum levels.[73] Not only did the number of laws increase, but the number of states passing such laws expanded.[74]

Henry Campbell Black, the author of *Black's Law Dictionary*, described the police power as "inalienable" and echoed the view of a long line of jurists who noted that the scope of the power was not easily defined and the determination of its limits was best left to courts on a case-by-case basis.[75] Indeed, even the most ardent critics of the police power, such as conservative legal scholar Christopher G. Tiedeman, acknowledged that "police power of the State extends to the protection

---

[70] ERIC FONER, THE SECOND FOUNDING: HOW THE CIVIL WAR AND RECONSTRUCTION REMADE THE CONSTITUTION (2019).

[71] John Bingham, *Speech*, CINCINNATI DAILY GAZETTE (Sept. 2, 1867) as quoted in Saul Cornell and Justin Florence, *The Right to Bear Arms in the Era of the Fourteenth Amendment: Gun Rights or Gun Regulation*, 50 SANTA CLARA L. REV. 1043. 1058 (2010).

[72] For a discussion of how the courts wrestled with the meaning of the Amendment, *see* WILLIAM E. NELSON, THE FOURTEENTH AMENDMENT: FROM POLITICAL PRINCIPLE TO JUDICIAL DOCTRINE (1998).

[73] *See* Robert F. Spitzer, *Gun Law History in the United States and Second Amendment Rights*, 80 L. & CONTEMP. PROBS. 55, 59-61 tbl. 1 (2017).

[74] *Id.*

[75] HENRY CAMPBELL BLACK, HANDBOOK OF CONSTITUTIONAL LAW, 334–344 (2d ed., 1897).

VIRAMONTES 004201
CCSAO 09/15/2022

of the lives, limbs, health, comfort and quiet of all persons, and the protection of all property within the State."[76]

Reconstruction (1863-1877) ushered in profound changes in American law, but it did not fundamentally alter the antebellum legal view that a states' police powers were rooted in the people's right to make laws to protect the peace and promote public safety. Nor did Reconstruction challenge the notion that these powers were at their zenith when dealing with guns and gun powder. In fact, the Republicans who wrote the Fourteenth Amendment were among the most ardent champions of an expansive view of state police power. As heirs to the antebellum Whig vision of a well regulated society, Reconstruction-era Republicans used government power aggressively to protect the rights of recently freed slaves and promote their vision of ordered liberty.[77]

In keeping with the larger goals of Reconstruction, this period witnessed an intensification of firearms regulation. Republicans sought to protect the rights of African Americans to bear arms but were equally insistent on enacting strong racially neutral regulations aimed at public safety. The violence of the Reconstruction period led to the enactment of a range of more robust firearms regulations. Reconstruction era Republicans were eager to protect the rights of newly freed persons, including the right to keep and bear arms.[78] Support for protecting the rights of freed persons did not mean that Republicans were opposed to racially neutral firearms regulations aimed at promoting public safety.

The laws enacted during Reconstruction underscore the fact that robust regulation of firearms during Reconstruction was not a novel application of the police power, but simply an example of the flexibility inherent in this accepted legal concept.

**Firearms and the Peace: Terror Enters the Modern Age**

---

[76] CHRISTOPHER G. TIEDEMAN, A TREATISE ON THE LIMITATIONS OF THE POLICE POWER IN THE UNITED STATES 4–5 (1886), *citing Thorpe v. Rutland R.R.*, 27 Vt. 140, 149-50 (1854).

[77] Robert J. Kaczorowski*, Congress's Power to Enforce Fourteenth Amendment Rights: Lessons from Federal Remedies the Framers Enacted*, 42 HARV. J. ON LEGIS. 187 (2005); Christopher Tomlins, *To Improve the State and Condition of Man: The Power to Police and the History of American Governance* 53 BUFFALO L. REV. 1215 (2005-2006).

[78] Mark Anthony Frassetto, *The Law and Politics of Firearms Regulation in Reconstruction Texas*, 4 TEX. A&M L. REV. 95, 113–17 (2016); Brennan G. Rivas, *An Unequal Right to Bear Arms: State Weapons Laws and White Supremacy in Texas, 1836-1900*, 121 SOUTHWESTERN QUARTERLY 284 (2020).

VIRAMONTES 004202
CCSAO 09/15/2022

With the dawn of a new century, changes in technology, consumer behavior, and society once again created a novel gun violence problem requiring state action.[79] Although breech loading rifles and repeating rifles emerged in the late nineteenth century these weapons did not achieve sufficient market penetration to impact gun violence. In fact, the marketing of these weapons focused on their utility in western and rural contexts, not the urban areas most plagued by crime.[80] By contrast the emergence of fully automatic and semi-automatic weapons in the early decades of the twentieth century followed a different trajectory. These weapons did exacerbate urban crime prompting multiple legislatures to aggressively regulate them and, in some instances, prohibit their sale and possession. Fears about gangster weapons echoed earlier fears about weapons of "bravado, and affray" associated with earlier periods of intensive firearms regulation.[81]

As was true for the first wave of state gun control laws, passed in response to the proliferation of handguns in the antebellum era, the new concern over "gangster weapons" did not emerge simultaneously with the development of new firearms technology. Semi-automatic and fully automatic weapons did immediately produce social problems requiring government action. The passage of new regulations governing firearms invariably has trailed technological developments in gun design, manufacture, and marketing. Legislation was only necessary once new weapons became popular enough to cause a problem that required government action. This well-established pattern repeated itself in the case of rapid-fire weapons, including semi-automatic and fully automatic guns. As these weapons proliferated and undermined public safety, new laws were crafted to mitigate their harms.[82]

Nothing better illustrates this process than popular concerns about "gun toting" and "gangster weapons," including the notorious "Tommy Gun," a machine gun that was popularly associated with the Saint Valentine's Day Massacre and criminals such as Machine Gun Kelly. Until the 1920s these weapons were not perceived to present a sufficient public safety concern to prompt regulation. Political scientist Robert Spitzer's overview of the history of firearms regulation underscores this point: "So, for example, fully automatic weapons, most famously the

---

[79] ERNST FREUND, THE POLICE POWER 246–47 (1904); Spitzer, *supra* note 16 at 60.
[80] Pamela Haag, THE GUNNING OF AMERICA: BUSINESS AND THE MAKING OF AMERICAN GUN CULTURE (2016).
[81] S*upra* note 41
[82] Robert J. Spitzer, *Gun Law History in the United States and Second Amendment Rights*, 80 LAW & CONTEMP. PROBS. 55 (2017).

VIRAMONTES 004203
CCSAO 09/15/2022

Tommy gun, became available for civilian purchase after World War I. But it was only when ownership spread in the civilian population in the mid-to-late 1920s, and the gun became a preferred weapon for gangsters, that states moved to restrict them. The lesson of gun regulation history here is that new technologies bred new laws when circumstances warranted."[83]

Laws targeting fully automatic and semi-automatic rapid-fire weapons were a classic example of the flexibility of the police power. Michigan's law is illustrative of these laws:

> It shall be unlawful within this state to manufacture, sell, offer for sale or possess any machine gun or firearm which can be fired more than sixteen (16) times without reloading or any muffler, silencer, or device for deadening or muffling the sound of a discharged firearm. [84]

In response to the rise of "gun toting" and "gangsterism" in the 1920s, a number of states passed new laws banning fully automatic machine guns and in some instances semi-automatic weapons.[85] It is important to note that the weapons singled out for prohibition were not simply those capable of fully automatic fire, but also included many semi-automatics as well.[86] By the early 1930s more than half the states had passed some type of prohibition on fully automatic or semi-automatic weapons.[87] A number of states embraced the view that fully automatic and semi-automatic weapons ought to be classified as "machine guns" for legal purposes. [88] Minnesota's 1933 law was among the most detailed drafted:

---

[83] Id. at 68

[84] Michigan Pub. Acts 1929, Act No. 206, Section 3, Comp. Laws 1929, § 16751:

[85] Adam Winkler: GUN FIGHT: THE BATTLE OVER THE RIGHT TO BEAR ARMS IN AMERICA (211) at 191. Deconde, GUN VIOLENCE IN AMERICA.

[86] Robert J. Spitzer, *Gun Law History in the United States and Second Amendment Rights*, 80 LAW & CONTEMP. PROBS. 55 (2017).

[87] Among the western and mountain states passing such laws: Act effective July 29, 1927, ch. 552, 1927 Cal. Stat. 938; Act of Mar. 9, 1931, ch. 178, 1931 N.D. Laws 305; Or. Laws 488, 489; 1933 S.D. Sess. Laws 245;Act of Mar. 6, 1933, ch. 64, 1933 Wash. Sess. Laws 335. There were also unprecedented efforts to coordinate such actions nationally, including the creation of model statutes for states to use for their own legislative efforts, see Patrick J. Charles, ARMED IN AMERICA: A HISTORY OF GUN RIGHTS FROM COLONIAL MILITIAS TO CONCEALED CARRY (2018). Charles, ARMED IN AMERICA at 193.

[88] *Report of Chairman of Section on Torts and Criminal Law*, 39 HANDBOOK OF THE NATIONAL CONFERENCE OF COMMISSIONERS ON UNIFORM STATE LAWS AND PROCEEDINGS OF THE ANNUAL CONFERENCE MEETING 346 (1920) at 350.

VIRAMONTES 004204
CCSAO 09/15/2022

Definitions. (a) Any firearm capable of loading or firing automatically, the magazine of which is capable of holding more than twelve cartridges, shall be a machine gun within the provisions of the Act. (b) Any firearm capable of automatically reloading after each shot is fired, whether firing singly by separate trigger pressure or firing continuously by continuous trigger pressure; which said firearm shall have been changed, altered or modified to increase the magazine from the original design as manufactured by the manufacturers thereof, or by the addition thereto of extra and/or longer grips or stocks to accommodate such extra capacity, or by the addition, modification and/or attachment thereto of any other device capable of increasing the magazine capacity thereof, shall be a machine gun within the provisions of this Act."[89]

Similarly, South Dakota defined machine guns as weapons "from which more than five shots or bullets may be rapidly, or automatically, or semi-automatically discharged from a magazine."[90]

### Assault Weapons Bans, the Police Power, and the  Latest Face of Terror

Another major inflection point in the debate over firearms regulation focused on "assault weapons," and was closely connected to the rise of mass shootings in the last decades of the twentieth century.[91] California led the way with its ban on assault weapons enacted after the Stockton School Massacre in 1989.[92] Proposals to ban  "assault weapons" are part of a larger national movement to deal with the carnage caused by high capacity, high velocity weapons.  The popularity of these weapons and accessories is a recent development in American gun culture.[93]

Defining what types of weapons ought to be included under the category of "assault weapons" has become one of the most deeply contentious issue in the fraught political debate over gun regulation. Gun rights advocates have insisted that the term  "assault weapon" is an invention

---

[89] 1933 Minn. Laws 231-33, An Act Making It Unlawful to Use, Own, Possess, Sell, Control or Transport a "Machine Gun", as Hereinafter Defined, and Providing a Penalty for the Violation Thereof, ch. 190, §§ 1-3.
[90] 1934 S.C. Acts 1288, An Act Regulating the use and Possession of Machine Guns: §§ 1 to 6.
[91] Allen Rostron, *Style, Substance, and the Right to Keep and Bear Assault Weapons*, 40 CAMPBELL L. REV. 301 (2018); Jaclyn Schildkraut et.al *Mass Shootings, Legislative Responses, and Public Policy: An Endless Cycle of Inaction* 68 EMORY L.J. 1043 (2020).
[92] Cal. Penal Code §§ 16350, 16790, 16890, 30500-31115.
[93]  Robert Spitzer, THE POLITICS OF GUN CONTROL (2012)14.

VIRAMONTES 004205
CCSAO 09/15/2022

of gun control activists and that the term is essentially meaningless.[94]   For those in the  gun rights community these  "modern sporting rifles" share functions and features with many other guns including some  hunting rifles.[95] Much of the current controversy over bans or restrictions on dangerous or unusual weapons revolves around the AR-15 and similar types of weapons.[96]  The debates heavy focus technological factors obscures the  fact that legislative efforts to ban these weapons fit squarely within the long Anglo-American tradition of limiting public access to weapons capable of provoking terror.

The  history of the AR- 15 clearly shows why legislatures have singled out this class of weapon. The development of the AR-15 was tied to the strategic requirements of the American military to find a replacement for heavier World War II era rifles. The military M-16 and the civilian AR-15 are closely related. In contrast to standard issue military weapons such as the M-16, the AR-15 and other similar civilian weapons are all semi-automatic, not selective fire weapons capable of firing in either fully automatic or semi-automatic modes.

When they were first introduced military-style AR-15 types of weapons were not especially popular.[97]   Gun makers eventually developed a more effective set of marketing strategies that linked these products to their origins in the military. [98]  When first marketed this connection was a liability because of lingering opposition to the Vietnam War slowed down early civilian interest in a weapon that was closely related to the M-16. [99]

---

[94] For a good illustration of the gun rights point of view, Stephen P. Halbrook, *New Yorkers Not So "Safe" Act: The Second Amendment in an Alice-In-Wonderland World Where Words Have No Meaning* 78 ALBANY L. REV. 789 (2015).

[95]  On modern marketing of firearms, see Pamela Haag, THE GUNNING OF AMERICA: BUSINESS AND THE MAKING OF AMERICAN GUN CULTURE (2016).

[96] James Jacobs, "Why Ban Assault Weapons?" 37 CARDOZO L. REV. 681 (2015) at 687. For a useful overview of the legal issues in regulating this class of weapons, see Vivian S. Chu *Federal Assault Weapons Ban: Legal Issues Congressional Research Service*, February 14, 2013.

[97] David M. Studdert et. al. *Testing the Immunity of the Firearm Industry to Tort Litigation* 177 JAMA INTERNAL MEDICINE 102  (2017) 102–5.

[98] Joseph Blocher,  *Has the Constitution Fostered a Pathological Rights Culture? The Right to Bear Arms: Gun Rights Talk*, 94 B.U.L. Rev. 813 (2014) and Joseph Blocher, *Hunting and The Second Amendment* 91 NOTRE DAME L. REV. 133 (2015).

[99] On the insurrectionary tradition, see David C. Williams, *Constitutional Tales of Violence: Populists, Outgroups, and the Multicultural Landscape of the Second Amendment Constitutional Tales of Violence: Populists, Outgroups, and the Multicultural Landscape of the Second Amendment* 74 TULANE L. REV. 387 (1999).

VIRAMONTES 004206
CCSAO 09/15/2022

There is no doubt that many of the pragmatic and cosmetic features of AR-15 type weapons now account for their popularity among some segments of the gun owning public. [100] The weapons are lighter, produce less recoil, and are easier to fire than an older generation of hunting rifles. The fact that these weapons are also highly customizable has increased their appeal. Commentators have analogized them to other consumer products, describing them as an adult and hyper-masculine version of a "Barbie Doll."[101] Opponents of robust regulation of assault weapons insist that the targeted weapons are neither especially dangerous nor unusual. Moreover, gun rights advocates insist that the category is an invention of gun control advocates and the prohibition targets cosmetic features. [102]

Dismissing marketing strategies tying these weapons to the military as simply cosmetic misses an important point about the history of firearms technology and government regulation. The history and tradition of arms regulation has always recognized that the ability to inspire *terrorem populi* is a legitimate justification for regulation. Adam Lanza, the perpetrator of the Newtown killings, used a Bushmaster AR-15-type weapon that was marketed with a slogan that traded on hyper-aggressive forms of toxic masculinity: "Consider Your Man Card Reissued."[103] There is little disputing the fact that despite protestations that these are merely sporting rifles the marketing campaigns used to sell these weapons evokes images of military assault capabilities.[104] The advertisement from two popular arms manufacturers are illustrative of these campaigns.[105]

---

[100] Rachel A. Callcut et. al., *Effect Of Mass Shootings on Gun Sales-A 20-Year Perspective* 87 J. TRAUMA ACUTE CARE SUR. 531 (2019).

[101] Robert J. Spitzer, *Why Assault Rifles are Selling*, CHICAGO TRIBUNE, June 16, 2015.

[102] Stephen P. Halbrook, *Reality Check: The Assault Weapon Fantasy and Second Amendment Jurisprudence* 14 GEORGETOWN J. OF L. & PUBLIC POLICY 47 (2016). For a good example of this type of flawed technological determinist approach, see David B. Kopel, *Rational Basis Analysis of "Assault Weapon" Prohibition*, 20 J. CONTEMP. L. 381 (1994). For a general discussion of the problems with technological determinism, see Merritt R. Smith, and Leo Marx, DOES TECHNOLOGY DRIVE HISTORY? THE DILEMMA OF TECHNOLOGICAL DETERMINISM (Cambridge, MA: MIT, 1994); Allan Dafoe , *On Technological Determinism: A Typology, Scope Conditions, and a Mechanism Science*, 40 TECHNOLOGY, & HUMAN VALUES 1047 (2015).

[103] Deconde, GUN VIOLENCE IN AMERICA; Cornell and DeDino, *A Well Regulated Right.*

[104] Mark Berman and Todd C. Frankel , "Companies made more than $1B selling powerful guns to civilians, report says House oversight committee accused gun manufacturers of "manipulative marketing campaigns" and profiting off violence,", WASHINGTON POST, July 27, 2022

[105] Carolyn Maloney, Supplemental Memorandum https://oversight.house.gov/sites/democrats.oversight.house.gov/files/2022.07.27%20Supplemental%20M EMO%20for%20the%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%20FC%20Gun%20Manufacturer%20Hearing.pdf

VIRAMONTES 004207
CCSAO 09/15/2022





*Bruen* brushes past these technology focused arguments. From the perspective of text, history, and tradition the key legal fact is that that these weapons are perceived by important segments of the public to weapons capable of provoking a terror. Even if one accepted that some of the specified features on these weapons were simply cosmetic, a point hotly contested by proponents of stronger regulation, this fact does not negate the undeniable fact that these weapons are capable of producing terror.[106] Firearms manufacturers created a type of weapon and marketed

---

[106] Allen Rostron, *Style, Substance, and the Right to Keep and Bear Assault Weapons*, 40 CAMPBELL L. REV. 301 (2018). There has been considerable debate over the category of assault weapons for over thirty years, see Franklin E. Zimring, *The Problem of Assault Firearms* 35 CRIME & DELINQUENCY 538 (1989). Mass shootings have been rendered more deadly by the proliferation of assault weapons, see John Donahue, https://law.stanford.edu/2019/10/15/the-assault-weapon-ban-saved-lives/. For the most recent assessment of the impact of assault weapons on the American gun violence problem, see Christopher S. Koper *et. al., Criminal Use of Assault Weapons and High-Capacity Semiautomatic Firearms: an Updated Examination of Local and National Sources* 95 J. URBAN HEALTH 313 (2018).

VIRAMONTES 004208
CCSAO 09/15/2022

it to distinct demographics, stressing characteristics and cultural associations that tied them to war and then used these associations to effectively market them. The fact that a successful marketing strategy earned gun companies over a billion dollars is a fact that contradicts the claims of gun rights advocates these weapons are no different than other guns available to consumers. If that were true than gun companies would have abandoned these marketing strategies long ago and replaced them with something more effective. It would be illogical and run counter to the most basic principles of Anglo-American law to argue that people themselves are powerless to regulate these weapons to mitigate the threats they pose to peace and public safety. The appeal of these weapons and their contribution to gun violence are two sides of the same coin.[107] From a constitutional perspective the holding in *Bruen* makes issues about technology less relevant to evaluating the ability of these weapons to provoke terror.[108]

### *Bruen's* Framework and Modern Assault Weapons Bans

The power to regulate and in some cases prohibit dangerous or unusual weapons has always been central to the police power authority of states and localities. At different moments in American history communities have deemed categories of weapons to be especially dangerous and have regulated them, and when it appeared necessary enacted bans on some types of weapons. Such determinations were not made based on technological features in isolation but reflected the ancient common law tradition of singling out weapons capable of producing a terror. Such weapons undermined the peace and the constitutional imperative embedded in the text of the Second Amendment to protect the security of a free state. Defining exactly which category of weapons have fallen outside of the scope of constitutional protection has shifted over time as society has addressed new developments in firearms technology, evolving societal norms, and

---

[107] Polly Mosendz, *Why Gunmakers Would Rather Sell AR-15s Than Handguns*, June 20, 2018, BLOOMBERG, https://www.bloomberg.com/news/articles/2018-06-20/why-gunmakers-would-rather-sell-ar-15s-than-handguns.Donohue, *The Swerve*. Christopher S. Koper, *Assessing The Potential to Reduce Deaths And Injuries From Mass Shootings Through Restrictions on Assault Weapon and Other High-Capacity Semiautomatic 19 Firearms* CRIMINOLOGY AND PUBLIC POLICY 147( 2020); Mark Gius, *The Impact of State and Federal Assault Weapons Bans on Public Mass Shootings* 22 APPLIED ECONOMICS LETTERS 281 (2014).
[108] David Hemenway, and Eliot Nelson, *The Scope of the Problem: Gun Violence in the USA* 6 CURRENT TRAUMA REPORTS 29 (2020).

VIRAMONTES 004209
CCSAO 09/15/2022

other changes. In short, social, and economic transformation were always accompanied by legal transformation. Put another way, as times change, the law changes with them.[109]

Political scientist Robert Spitzer's overview of the history of firearms regulation underscores a point about American law: "The lesson of gun regulation history here is that new technologies bred new laws when circumstances warranted."[110] Given this history, the language of the Illinois Constitution of 1970 linking the right to keep and bear arms and the police power is apposite: "Subject only to the police power, the right of the individual citizen to keep and bear arms shall not be infringed."[111] States and localities, including Illinois and its towns and cities, have regulated gunpowder and arms, since the earliest days of the American Republic. The statutes at issue in this case are analogous to a long-established tradition of firearms regulation in America, beginning in the colonial period and stretching across time to the present. This venerable tradition of using police power authority to craft specific laws to meet shifting challenges has continued to the present day. Illinois and its various localities were no exception to this tradition. Cities and towns in Illinois did, and have continued to, craft a wide range of regulations responsive to local needs as they arose.[112] The adaptability of state and local police power provided the flexibility governments needed to deal with the problems created by changes in firearms technology and gun culture.

Pursuant to 28 USC §1746. I declare under penalty of perjury that the foregoing is true and correct.

---

[109] Robert J. Spitzer, *Gun Law History in the United States and Second Amendment Rights*, 80 LAW & CONTEMP. PROBS. 55 (2017).

[110] *Id.*

[111] ILL. CONST. art. I, § 22 (1970).

[112] GARY GERSTLE, LIBERTY AND COERCION: THE PARADOX OF AMERICAN GOVERNMENT FROM THE FOUNDING TO THE PRESENT (2017).

VIRAMONTES 004210
CCSAO 09/15/2022

Pursuant to 28 USC §1746. I declare under penalty of perjury that the foregoing is true and correct.

Executed on September 15, 2022, in Redding, CT.

*Saul Cornell*

_____

VIRAMONTES 004211
CCSAO 09/15/2022

# Saul Cornell

Paul and Diane Guenther Chair in American History
Department of History
Fordham University

441 East Fordham Road ✳ Bronx, NY 10458 ✳ 203 826-6608 (c) ✳ scornell1@fordham.edu

| Education | | | |
|---|---|---|---|
| 1989 | University of Pennsylvania | Ph.D. | Dissertation: "The Political Thought and Culture of the Anti-Federalists" |
| 1985 | University of Pennsylvania | MA | History |
| 1982 | Amherst College | BA | History - Magna Cum Laude |
| 1980-81 | University of Sussex, Brighton, England | | |

| Teaching Experience | | |
|---|---|---|
| 2009-2020 | Guenther Chair in American History | Fordham University |
| 2011-2022 | Adjunct Professor of Law | Fordham Law School |
| 2005-2008 | Professor of History | The Ohio State University |
| 1997-2005 | Associate Professor, History | The Ohio State University |
| 1995 | Thomas Jefferson Chair | University of Leiden, The Netherlands |
| 1991-1997 | Assistant Professor, History | The Ohio State University |
| 1989-1991 | Assistant Professor, History | College of William and Mary |

## Fellowships and Grants

- 2019-2020 The Gilder Lehrman Center for the Study of Slavery, Resistance, and Abolition, Yale University
- 2018-2019 Senior Research Scholar in Residence, Floersheimer Center for Constitutional Democracy, Cardozo Law School
- 2014 Senior Research Scholar in Residence, University of Connecticut Law School
- 2011 Senior Research Scholar in Residence, Yale Law School
- 2003-2008 Joyce Foundation, Second Amendment Center Grant, $575,000
- 2003-2004 NEH Fellowship
- 2002-2005 Department of Education, Teaching American History Grant, Historyworks, $2,000,000
- 2002 Gilder-Lehrman Fellowship
- 2001-2002 Joyce Foundation Planning Grant, $40,000
- 2001 American Council of Learned Societies (ACLS)
- 1999-2000 Betha Grant, Batelle Memorial Endowment, Ohio Teaching Institute, $100,000
- 1998 Thomas Jefferson Memorial Foundation, Research Fellowship
- 1995 Thomas Jefferson Chair in American Studies, Fulbright Lecturing Award
- 1994 Ohio State University Seed Grant
- 1993 Ohio State University Special Research Assignment
- 1992 Ohio State University Grant-In-Aid
- 1989-1991 NEH Post-Doctoral Fellow, Institute of Early American History and Culture

Cornell Exhibit A
VIRAMONTES 004212
CCSAO 09/15/2022

| Prizes and Awards |
|---|

- 2006 Langum Prize in Legal History 2006
- 2006 History News Network, Book of the Month
- 2006 History News Network, Top Young Historian
- 2001 Society of the Cincinnati, History Book Prize, a Triennial Award for the Best Book on the American Revolutionary Era
- 2000 Choice Outstanding Academic Book

| Publications, Presentations and Media Appearances |
|---|

### Books:

The Partisan Republic:  Democracy, Exclusion, and the Fall of the Founders Constitution
*New Histories of American Law*, series eds., Michael Grossberg and Christopher Tomlins (Cambridge University Press, 2019)  [With Gerald Leonard]

The Second Amendment On Trial:  Critical Essays on District of Columbia v. Heller
(University of Massachusetts Press,  2013) [with Nathan Kozuskanich]

Visions of America: A History of the United States [co-authored with  Jennifer Keene and Ed O'Donnell] (First edition, 2009),( second edition 2013) (third edition, 2016)

"A Well Regulated Militia": The Founding Fathers and the Origins of Gun Control (Oxford University Press, 2006) (paperback edition  2008)

Whose Right to Bear Arms Did the Second Amendment Protect?  (Bedford/St. Martins Press, 2000) (Paperback 2000)

The Other Founders:  Anti-Federalism and the Dissenting Tradition in America, 1788-1828  (Institute of Early American History and Culture, University of North Carolina Press, 1999)  (paperback edition 2001)

Editor, Retrieving the American Past:  Documents and Essays on American History, (Pearson, 1994-2008)

### Interviews, Editorials, Essays, Podcasts:

"Cherry-picked history and ideology-driven outcomes: Bruen's originalist distortions," SCOTUSblog (Jun. 27, 2022, 5:05 PM), https://www.scotusblog.com/2022/06/cherry-picked-history-and-ideology-driven-outcomes-bruens-originalist-distortions/

"Clarence Thomas' Latest Guns Decision Is Ahistorical and Anti-Originalist"
SLATE June 24, 2022

"The Right Found a New Way to Not Talk About a School Shooting," SLATE May 25, 2022

VIRAMONTES 004213
CCSAO 09/15/2022

"The Horror in New York Shows the Madness of the Supreme Court's Looming Gun Decision," *Slate* May 19, 2022

"Guns, Guns Everywhere: Last week's subway Shooting was Horrifying. If the Supreme Court Creates a National Right to Carry, the Future will be Worse," New York Daily News Apr 17, 2022

"The Supreme Court's Latest Gun Case Made a Mockery of Originalism" *Slate* November 10, 2021

"'Originalism' Only Gives the Conservative Justices One Option On a Key Gun Case," *Washington Post,* November 3, 2021

"Neither British Nor Early American History Support the Nearly Unfettered Right to Carry Arms," *Slate* November 02, 2021

"Will the Supreme Court Create Universal Concealed Carry Based on Fantasy Originalism?" *Slate* November 1, 2021

"Biden was Wrong About Cannons, but Right About the Second Amendment," *Slate* June 29, 2021

"Barrett and Gorsuch Have to Choose Between Originalism and Expanding Gun Rights," *Slate* April 29, 2021 Slate

"What Today's Second Amendment Gun Activists Forget: The Right Not to Bear Arms," *Washington Post*, January 18,  2021

"Could America's Founders Have Imagined This?" *The New Republic*, December 20, 2019

"Don't Embrace Originalism to Defend Trump's Impeachment" *The New Republic*, December 5, 2019

"The Second-Amendment Case for Gun Control" *The New Republic*, August 4, 2019

"The Lessons of a School Shooting—in 1853" *Politico*, March 24, 2018.

"Originalism and the Second Amendment in *District of Columbia v. Heller*," *University of Chicago Law Review*, Podcast, Briefly 1.9, Wed, 04/11/2018

"Sandy Hook and the Original Meaning of the Second Amendment," *Time* December, 2017

"The State of the Second Amendment," National Constitution Center, Podcast October, 2017

"Gun Anarchy and the Unfree State: The Real History of the Second Amendment," *The Baffler On-line* October 2017

"Five Types of Gun Laws the Founding Fathers Loved*" Salon* October 22, 2017

"Half Cocked," *Book Forum* April 2016

"Let's Make an Honest Man of Ted Cruz. Here's how we Resolve his "Birther" Dilemma with Integrity" *Salon* January 23, 2016

"Guns Have Always Been Regulated,"  *The Atlantic Online* December 17, 2015

"The Slave-State Origins of Modern Gun Rights" *The Atlantic Online*  30, 2015 [with Eric Ruben]

PBS, "Need to  Know: 'Debating the Second Amendment: Roundtable'" April 26, 2013

"All Guns are not Created Equal"  Jan 28, 2013 *Chronicle of Higher Education* [with Kevin Sweeney]

VIRAMONTES 004214
CCSAO 09/15/2022

"What the 'Right to Bear Arms' Really Means" *Salon* January 15, 2011 "Elena Kagan and the Case for an Elitist Supreme Court," *Christian Science Monitor* May 20, 2010

"Gun Points," *Slate*, March 8, 2010  (With Justin Florence, and Matt Shors)

"What's Happening to Gun Control,"   To the Point*, NPR. March 11, 2010

"Getting History Right," *National Law Journal*, March 1, 2010

"History and the Second Amendment," *The Kojo Nnamdi Show* , WAMU (NPR) March 17, 2008

"The Court and the Second Amendment,"  *On Point* with Tom Ashbrook, WBUR (NPR)  March 17, 2008

"Aim for Sensible Improvements to Gun Regulations," *Detroit Free Press,* April 29, 2007

"A Well Regulated Militia," *The Diane Rehm Show*,  WAMU (NPR)  Broadcast on Book TV  ( 2006)

"Taking a Bite out of the Second Amendment," *History News Network*, January 30, 2005

"Gun Control," Odyssey, Chicago NPR September 8, 2004

"Loaded Questions," *Washington Post Book World*  February 2, 2003

"The Right to Bear Arms," Interview *The Newshour,* PBS  May 8, 2002

"Real and Imagined," *New York Times*, June 24, 1999

## Scholarly Articles, Book Chapters, and  Essays:

"History and Tradition or Fantasy and Fiction: Which Version of the Past  Will the Supreme Court Choose in NYSRPA  v. Bruen?," 49 *Hastings Constitutional  Law Quarterly* (2022): 145-177.

"The Long Arc of Arms Regulation in Public: From Surety to Permitting,1328–1928," 55  University  of California, Davis Law Review  (2022): 2545-2602

"'Infants' and Arms Bearing in the Era of the Second Amendment:  Making Sense of the Historical Record," 40 Yale Law & Policy Review Inter Alia 1 (2021)

"The Right to Regulate Arms in the Era of the Fourteenth Amendment: The Emergence of Good Cause Permit Schemes in Post-Civil War America" *55*  University of California, Davis Law Review Online (2021): 65-90.

 "President Madison's Living Constitution: Fixation, Liquidation, and Constitutional Politics in the Jeffersonian Era"*,* 89 Fordham Law Review  (2021): 1761-1781.

"History, Text, Tradition, and the Future of Second Amendment Jurisprudence: Limits on Armed Travel Under Anglo-American Law, 1688–1868," 83 Law and Contemporary Problems (2020): 73-95

"Reading the Constitution, 1787–91: History, Originalism, and Constitutional Meaning." Law and History Review 37 (2019): 821–45

VIRAMONTES 004215
CCSAO 09/15/2022

"Constitutional Mythology and the  Future of Second Amendment Jurisprudence after *Heller*," in Firearms and Freedom: The Second Amendment in the Twenty-First Century Controversies in American Constitutional Law Series (Routledge, 2017): 8-24

"The Right to Keep and Carry Arms in Anglo-American Law, Preserving Liberty and

Keeping the Peace,"  80 Law and Contemporary Problems (2017): 11-54

"Half Cocked':  The Persistence of Anachronism and Presentism in the Academic Debate over the Second Amendment,"  107 Northwestern Journal of Criminal Law  107 (2017): 203-218

"The 1790 Naturalization Act and the Original Meaning of the Natural Born Citizen Clause: A Short Primer on Historical Method and the Limits of Originalism," Wisconsin Law Review Forward  92 (2016)

"Constitutional Meaning and Semantic Instability: Federalists and Anti-Federalists on the Nature of Constitutional  Language," in special issue on "The Future of Legal History,"  American Journal of Legal History 56 (2016): 21-29

"Firearm Regionalism and Public Carry: Placing Southern Antebellum Case Law in Context," Yale Law Journal  Forum  125(2015-16):121-135 [with Eric Ruben]

"Originalism As Thin Description: An Interdisciplinary Critique" Fordham Law Review *Res Gestae*  84 (2015):  1-10

"The Right to Bear Arms," The Oxford Handbook of the US Constitution,  eds., Mark Tushnet, Sanford Levinson, and Mark Graber (2015): 739-759

"Conflict, Consensus & Constitutional Meaning: The Enduring Legacy of Charles Beard" Constitutional Commentary 29 (2014): 383-409

"Meaning and Understanding in  the History of Constitutional  Ideas: the Intellectual History Alternative to Originalism"  Fordham Law Review 82  (2013): 721-755

"The Right to Carry Firearms Outside of the Home: Separating Historical Myths from Historical Realities"  Fordham Urban Law Journal 39 (2012): 1695-1726

"Evidence, Explanation, and the Ghost of Charles Beard" William & Mary  Quarterly 69 (2012): 393-4

"Idiocy, Illiteracy, and the Forgotten Voices of Popular Constitutionalism: Ratification and the Ideology of Originalism" William & Mary Quarterly 69 (2012): 365-368

"The People's Constitution v. The Lawyer's Constitution: Popular Constitutionalism and the Original Debate Over Originalism," Yale Journal of Law and the Humanities 23 (2011): 295-337

"St. George Tucker's Lecture Notes, The Second Amendment, and Originalist Methodology: A Critical Comment," Northwestern University Law Review 103 (2009): 406-416

"Heller, New Originalism, and Law Office History: 'Meet the New Boss, Same as the Old Boss'" UCLA Law Journal  56  (2009): 1095 -1125

"Originalism on Trial: The Use and Abuse of History in District of Columbia v. Heller" Ohio-State Law Journal 69 (2008): 625-640

"Consolidation of the Early Federal System," Chapter 10 of the Cambridge History of  A merican Law (Cambridge University Press, 2008) [With Gerry Leonard]

VIRAMONTES 004216
CCSAO 09/15/2022

"The Ironic Second Amendment" <u>Albany Government Law Review</u> 2 (2008): 292-311.

"The Original Meaning of Original Understanding: A Neo-Blackstonian Critique," <u>Maryland Law Review</u> (2008): 101-115

"Mobs, Militias, and Magistrates: Popular Constitutionalism During the Whiskey Rebellion," <u>Chicago-Kent Law Review</u> (2007): 883-903

"The Second Amendment and Early American Gun Regulation: a Closer Look at the Evidence," <u>Law and History Review</u> (2007): 197-204

"St. George Tucker and the Second Amendment: Original Understandings and Modern Misunderstandings," <u>William and Mary Law Review</u> 47 (2006): 1123-55

"The Early American Origins of the Modern Gun Control Debate: The Right to Bear Arms, Firearms Regulation, the Lessons of History," <u>Stanford Law and Policy Review</u> (2006): 571-596

"Well Regulated: The Early American Origins of Gun Control," <u>Fordham Law Review</u> 73 (2004): 487-528 [With Nathan DeDino]

"Beyond the Myth of Consensus: The Struggle to Define the Right to Bear Arms in the Early Republic," in <u>Beyond the Founders: New Essays on the Political History of the Early Republic</u> (UNC Press, 2005)

"A New Paradigm for the Second Amendment," <u>Law and History Review</u> 22 (2004): 161-7

"Gun Laws and Policies: A Dialogue," Focus on Law Studies: Teaching about Law in the Liberal Arts (American Bar Association, 2003)

"The Militia Movement," <u>Oxford Companion to American Law</u> (Oxford University Press, 2002)

"Don't Know Much About History: The Current Crisis in Second Amendment Scholarship," <u>Northern Kentucky Law Review</u> (2003)

"A Right to Bear Quills or Kill Bears? A Critical Commentary on the Linkage between the 1st and 2nd Amendment in Recent Constitutional Theory," in <u>The Limits of Freedom in A Democratic Society</u> (Kent State University Press, 2001)

"The Irony of Progressive Historiography: The Revival of Anti-Federalism in Contemporary Constitutional History," in <u>American Law Ways and Folkways</u> (Odense University Press, Denmark 2001)

"Commonplace or Anachronism: The Standard Model, The Second Amendment, and the Problem of History in Contemporary Constitutional Theory," <u>Constitutional Commentary</u> (1999): 221-246

"Mere Parchment Barriers? Anti-Federalists, the Bill of Rights, and the Question of Rights Consciousness," in <u>Government Proscribed: The Bill of Rights</u> (University of Virginia Press, 1998): 175-208

"Moving Beyond the Great Story: Post-Modern Prospects, Post-Modern Problems, A Forum on Robert Berkhofer, Jr. <u>Beyond the Great Story" American Quarterly</u> (1998): 349-357

"The Anti-Federalists," in <u>The Blackwell Companion to American Thought</u>, eds., James Kloppenberg (London, 1995)

"The Bill of Rights," in <u>The Blackwell Companion to American Thought</u>, eds., James Kloppenberg (London, 1995)

VIRAMONTES 004217
CCSAO 09/15/2022

"Splitting the Difference: Textualism, Contexualism, and Post-Modern History," <u>American Studies</u> (1995): 57-80

"Canon Wars II: The Return of the Founders," <u>Reviews in American History</u> 22 (1994): 413-417

"Moving Beyond the Canon of Traditional Constitutional History: Anti-Federalists, the Bill of Rights and the Promise of Post-Modern Historiography," <u>Law and History Review</u> (1994): 1-28

"Early American History in a Post-Modern Age," <u>William and Mary Quarterly</u> 50 (1993): 329-341

"Liberal Republicans, Republican Liberals?: The Political Thought of the Founders Reconsidered," <u>Reviews in American History</u> 21 (1993): 26-30

"Politics of the Middling Sort: The Bourgeois Radicalism of Abraham Yates, Melancton Smith, and the New York Anti-Federalists," in <u>New York in the Age of the Constitution</u> (New York Historical Society, 1992): 151-175

"Aristocracy Assailed: Back-Country Opposition to the Constitution and the Problem of Anti-Federalist Ideology," <u>Journal of American History</u> (1990): 1148-1172

"The Changing Historical Fortunes of the Anti-Federalists," <u>Northwestern University Law Review</u> (1989): 39-73

"Reflections on the `Late Remarkable Revolution in Government,' Aedanus Burke and Samuel Bryan's Unpublished History of the Ratification of the Federal Constitution," <u>The Pennsylvania Magazine of History and Biography</u> (1988): 103-130

## **Invited Lectures:**

"Race, Regulation, and Guns: The Battleground in the Debate Over the Second Amendment," Haber/Edelman Lecture: University of Vermont, Fall 2021

"Second Amendment Myths and Realities," University of Tampa, Honors College Symposium, November 30, 2018.

"The Common Law and Gun Regulation: Neglected Aspects of the Second Amendment Debate," Guns in Law, Amherst College, Law Justice and Society (2016)

"The New Movement to End Gun Violence." UCLA Hammer Museum (2016)

"No Person May Go Armed": A Forgotten Chapter in the History of Gun Regulation" The Elizabeth Battelle Clark Legal History Series, Boston University College of Law, 2016

Legacy Speaker Series: "Guns in the United States," University of Connecticut (2016) "How does the Second Amendment Apply to Today?"

American Constitution Society/ Federalist Society Debate, Tulane Law School, New Orleans (2016)

"The Second Amendment and The Future of Gun Regulation: Forgotten Lessons From U.S. History," Constitution Day Lecture, Goucher College, (2015)

Keynote Lecture: "The Second Amendment and American Cultural Anxieties: From Standing Armies to the Zombie Apocalypse" Firearms and Freedom: The Relevance of the Second Amendment in the Twenty First Century, Eccles Center, British Library (Spring 2015)

VIRAMONTES 004218
CCSAO 09/15/2022

"Narratives of Fear and Narratives of Freedom:  A Short Cultural History of the Second Amendment," Comparing Civil Gun Cultures: Do Emotions Make a Difference? Max Plank Institute, Berlin (2014)

"History and Mythology in the Second Amendment Debate," Kollman Memorial Lecture, Cornell College, Iowa (Spring, 2013)

"Will the Real Founding Fathers Please Stand Up or Why are so few Historians Originalists" Constitution Day Lecture, Lehman College, Fall 2011

"Lawyers, Guns, and Historians: The Second Amendment Goes to Court," SHEAR/HSP Public Lecture, Philadelphia, July, 2008

The Robert H. and Alma J. Wade Endowment Lecture, Kentucky Wesleyan University, "The Early American Origins of Gun Control" (2006)

"Jefferson, Mason, and Beccaria:  Three Visions of the Right to Bear Arms in the Founding Era," Bill of Rights Lecture, Gunston Hall Plantation, Fairfax, VA   (2003)

"A New Paradigm for the Second Amendment," Finlay Memorial Lecture, George Mason University, (2001)

"Academic Gunsmoke:  The Use and Abuse of History in the Second Amendment Debate," Cadenhead Memorial Lecture, University of Tulsa, (2000)

"Why the Losers Won: The Rediscovery of Anti-Federalism in the Reagan Years," Thomas Jefferson Inaugural Lecture, University of Leiden, Netherlands, (1995)

## **Presentations:**

"From Ideology to Empiricism: Second Amendment Scholarship After Heller, " Hastings Constitutional Law Quarterly Symposium, Heller at Ten, January 18, 2019

"Firearms and the Common Law Tradition,"  Aspen Institute, Washington, DC (2016)

"The Original Debate over Original Meaning Revisited, " British Group in EarlyAmerican History, Annual Meeting,  Cambridge, England (2016)

"Second Amendment Historicism and Philosophy"  The Second Generation of Second Amendment Scholarship" Brennan Center, NYU 2016

"The Reception of the Statute of Northampton in Early America:  Regionalism and the Evolution of Common Law Constitutionalism" OIEAHC and the USC/Huntington Library Early Modern Studies Institute May 29–30, 2015

"The Right to Travel Armed in Early America: From English Restrictions to Southern Rights," British Group in Early American History, Annual Conference Edinburgh, Scotland (2014)

"Progressives, Originalists, and Pragmatists:   The New Constitutional Historicism and the Enduring Legacy of Charles Beard," Charles Beard, Economic Interpretation and History, Rothmere Center, Oxford University (2012)

CUNY Early American Seminar, "The People's Constitution v. the Lawyer's Constitution," 2011

Roundtable : "The Work of J.R. Pole," SHEAR ,  Philadelphia, Pennsylvania 2011

VIRAMONTES 004219
CCSAO 09/15/2022

"The Right to Bear Arms in the Era of the Fourteenth Amendment: Gun Rights or Gun Regulation?" Bearing Arms, Policy, Policing, and Incorporation After Heller, Santa Clara Law School (2010)

"Re-envisioning Early American History," American Historical Association Annual Meeting, San Diego (2010)

"The Ironic Second Amendment" Firearms, the Militia, and Safe Cities: Merging History, Constitutional Law and Public Policy, Albany Law School ( 2007)

"*District of Columbia* v. *Heller* and the Problem of Originalism," University of Pennsylvania Constitutional Law Workshop, Philadelphia ( 2007)

"Progressives and the Gun Control Debate," American Constitution Society, Harvard Law School, (2006)

"The Problem of Popular Constitutionalism in Early American Constitutional Theory," American Association of Law Schools, Annual Conference (2006)

"Popular Constitutionalism and the Whiskey Rebellion," Symposium on Larry Kramer's The People Themselves, Chicago-Kent Law School (2005)

Roundtable Discussion on the Second Amendment and Gun Regulation, NRA/ GMU Student's For the Second Amendment Symposium (2005)

"The Early American Origins of the Modern Gun Control Debate: The Right to Bear Arms, Firearms Regulation, and the Lessons of History," Gun Control: Old Problems, New Problems, Joint Conference Sponsored by the John Glenn Institute and Stanford Law School (2005)

"Original Rules for Originalists?" University of Minnesota Law School (2005)

"The Fourteenth Amendment and the Origins of the Modern Gun Debate," UCLA, Legal History Workshop (2004)

"Beyond Consensus, Beyond Embarrassment: The Use and Abuse of History in the Second Amendment Debate," American Society of Legal History, Austin, TX (2004)

"Armed in the Holy Cause of Liberty: Guns and the American Constitution," NYU Legal History Colloquium (2004)

"Digital Searches and Early American History," SHEAR Brown University (2004)

"Well Regulated: The Early American Origins of Gun Control," The Second Amendment and the Future of Gun Regulation," Joint Conference Sponsored by the John Glenn Institute and Fordham Law School, New York (2004)

"Minuteman, Mobs, and Murder: Forgotten Contexts of the Second Amendment," Department of History, University of California Berkeley (2003)

"History vs. Originalism in the Second Amendment Debate," Federalist Society/ American Constitution Society, George Washington University Law School, Washington D.C. (2003)

"Self-defense, Public Defense, and the Politics of Honor in the Early Republic," Lake Champlain Early American Seminar, Montreal (2003)

"The Ironic Second Amendment" "Gun Control: Controversy, Social Values, and Policy," University of Delaware Legal Studies Conference, Newark, Delaware (2003)

VIRAMONTES 004220
CCSAO 09/15/2022

"Individuals, Militias, and the Right to Bear Arms:  The Antebellum Debate Over Guns," Institute for Legal Studies, University of Wisconsin School of Law (2004)

"Guns in the British Atlantic World: New Research, New Directions" Society for the Historians of the Early American Republic, Ohio State University (2003)

"Neither Individual nor Collective:  A New Paradigm for the Second Amendment," American Bar Foundation, Chicago (2003)

"The Changing Meaning of the Armed Citizen in American History," "Americanism Conference," Georgetown University  (2003)

"A New Paradigm for the Second Amendment?"  Supreme Court Historical Society, Washington, D.C. (2002)

"Constitutional History as Cultural History: The Case of the Second Amendment" European American Studies Association, Bordeaux,  France (2002)

"Don't Know Much About History: The Current Crises in Second Amendment Scholarship," Salmon P. Chase College of Law, Symposium, "The Second Amendment Today," (2002)

"History, Public Policy, and the Cyber-Age: Gun Control Policy after the Emerson Decision," Sanford Institute of Public Policy, Duke University (2002)

"Constitutional History After the New Cultural History: The Curious Case of the Second Amendment," Society of the Historians of the Early American Republic, Baltimore (2001)

Roundtable Discussion, "The State of Second Amendment Scholarship," American Historical Association (2001)

"Armed in the Holy Cause of Liberty: Critical Reflections on the Second Amendment Debate," Vanderbilt University Law School (2001)

"Neither Individual nor Collective:  A New Paradigm for the Second Amendment,"  Boston University Law School, (2000)

"The Current State of Second Amendment Scholarship," National Press Club Washington, D.C. American Bar Association,  (2000)

"Taking the Hype out of Hyper-Text, Or What Should Textbook Companies Being Doing for us on the Web," OAH  St. Louis, Missouri (1999)

"The Ironies of Progressive Historiography: The Revival of Anti-Federalism in Contemporary Constitutional Theory," European American Studies Association, Lisbon, Portugal (1998)

"Deconstructing the Canon of American Constitutional History" American Society of Legal History, Seattle, Washington (1998)

"Beyond Meta-narrative: The Promise of Hypertext," American Studies Association, Seattle, Washington (1998)

"Text, Context, Hypertext," American Historical Association, Washington D.C. (1998)

"Jefferson and Enlightenment," International Center for Jefferson Studies, Charlottesville, VA, (1998)

"Copley's Watson and the Shark: Interpreting Visual Texts with Multi-media Technology," American Studies Association, Washington, D.C. (1997)

VIRAMONTES 004221
CCSAO 09/15/2022

"Multi-Media and Post-Modernism," H-Net Conference, Technology and the Future of History, East Lansing, Michigan (1997)

Comment on Jack Rakove's Original Meanings, Society of the Historians of the Early Republic, State College, PA (1997)

"Teaching with Multi-Media Technology," Indiana University, spring 1997 "Constitutional History from the Bottom Up: The Second Amendment as a Test Case," McGill University, Montreal, Canada (1996)

"Just Because You Are Paranoid, Does Not Mean the Federalists Are Not Out to Get You: Freedom of the Press in Pennsylvania," University of Pennsylvania (1995)

"Multi-Media and Post-Modernism: The Future of American Studies?" Lecture, Erasmus University, Rotterdam, Netherlands (1995)

"Post-Modern American History? Ratification as a Test Case," St. Cross College, Oxford University, Oxford, England (1994)

"The Other Founders," NYU Legal History Seminar," NYU Law School (1994)

"Reading the Rhetoric of Ratification," paper presented at "Possible Pasts: Critical Encounters in Early America," Philadelphia Center for Early American Studies, Philadelphia, PA (1994)

"American Historiography and Post-Modernism," Organization of American Historians, Atlanta, GA (1994)

"The Anti-Federalist Origins of Jeffersonianism," Columbia Seminar on Early American History (1994)

"American History in a Post-Modern Age?" American Historical Association, San Francisco, CA (1994)

"Post-Modern Constitutional History?" Indiana University School of Law, Bloomington, IN (1993)

Participant, Institute of Early American History and Culture, planning conference, "New Approaches to Early American History," Williamsburg, VA (1992)

"Mere Parchment Barriers? Federalists, Anti-Federalists and the Problem of Rights Consciousness," American Studies Association, Baltimore, MD (1991)

"James Madison and the Bill of Rights: a comment on papers by Jack Rakove, Ralph Ketcham and Max Mintz," Organization of American Historians and Center for the Study of the Presidency Conference, "America's Bill of Rights at 200 Years," Richmond, VA, (1991)

Symposium participant, "Algernon Sidney and John Locke: Brothers in Liberty?" Liberty Fund Conference, Houston, TX (1991)

"Mere Parchment Barriers? Antifederalists, the Bill of Rights and the Question of Rights Consciousness," Capitol Historical Society, Washington, D.C. (1991)

"Anti-Federalism and the American Political Tradition," Institute of Early American History and Culture Symposium, Williamsburg, VA (1989)

## Other Professional Activities

Editorial Board, Constitutional Study, University of Wisconsin Press (2014-present)
Advisory Council, Society of Historians of the Early American Republic (SHEAR) (2007-2009)

VIRAMONTES 004222
CCSAO 09/15/2022

Program Committee, Annual Conference, Society of the Historians of the Early American Republic, Philadelphia, PA 2008

Editorial Board, American Quarterly (2004-2007)

Director, Second Amendment Research Center, John Glenn Institute for Public Service and Public Policy, 2002- 2007

Fellow, Center for Law, Policy, and Social Science,  Moritz College of Law, Ohio State University 2001-2004

Local Arrangements Committee, Annual Conference, Society of the Historians of the Early American Republic, Columbus, OH 2003

Project Gutenberg Prize Committee, American Historical Association, 2004,  2002

Program Committee, Annual Conference, Society of the Historians of the Early American Republic, 2001

Co-Founder Ohio Early American Studies Seminar

NEH Fellowship Evaluator, New Media Projects, Television Projects

Multi-media Consultant and Evaluator, National Endowment for the Humanities, Special, Projects, Division of Public Programs, Grants Review Committee (1999)

### Book Reviews:

Journal of American History
William and Mary Quarterly
American Studies Journal of the Early Republic
Pennsylvania Magazine of History and Biography
American Quarterly
American Journal of Legal History
Law and History Review

### Journal and Book Referee:

Journal of American History
William and Mary Quarterly
Diplomatic History
Pennsylvania Magazine of History and Biography
Law and History Review
Harvard Law Review
Stanford Law Review
Yale Law Journal
University Press of Virginia
University of North Carolina Press
Stanford University Press
University of Massachusetts Press
Oxford University Press
Cambridge University Press
University of Michigan Press
Harvard University Press

VIRAMONTES 004223
CCSAO 09/15/2022

Expert Witness Reports

Saul Cornell

*Rocky Mountain Gun Owners, Nonprofit Corp. v. Hickenlooper*, 14-cv-02850 (D. Colo.); *Chambers, et al., v. City of Boulder*, 2018 CV 30581 (Colo. D. Ct. City of Boulder, filed June 14, 2018), *Zeleny v. Newsom*, 14-cv-02850 (N.D. Cal.), and *Miller, et al v. Smith, et al.*, 2018 cv 3085 (C.D. Ill.); *Jones v. Bonta United States* Court of Appeals, --- F.4th ---- , 2022 WL 1485187 (9th Cir., May 11, 2022); Baird v. Bonta, No. 2:19-cv-00617 (E.D. Cal.);*Worth v. Harrington,* 21-cv-1348 (D. Minn.).

**Saul Cornell**
**Court Citations**

**Supreme Court**

*N.Y. State Rifle & Pistol Ass'n v. Bruen*, 597 U.S. __, 50 2022 U.S. Lexis 3055 (2022)

*N.Y. State Rifle & Pistol Ass'n v. Bruen*, 597 U.S. __, 26, 28, 45, 47 2022 U.S. Lexis 3055 (2022) (Breyer, J. dissenting)

McDonald v. City of Chicago, Ill., 561 U.S. 742, 900, 901 n.44  (2010) (Stevens, J., dissenting).

McDonald v. City of Chicago, Ill., 561 U.S. 742, 914, 933 (2010) (Breyer, J., dissenting).

D.C. v. Heller, 554 U.S. 570, 666 n.32, 671, 685 (2008) (Stevens, J., dissenting).

**Federal Courts**

Jones v. Bonta, 34 F.4th 704 (9th Cir. 2022)

Duncan v. Bonta, 19 F.4th  (2021).

Hirschfeld v. Bureau of Alcohol, Firearms, Tobacco & Explosives, 5 F.4th 407 (4th Cir.), as amended (July 15, 2021), vacated as moot, 14 F.4th 322 (4th Cir. 2021), cert. denied sub nom. Marshall v. Bureau of Alcohol, Tobacco, Firearms & Explosives, 142 S. Ct. 1447 (2022).

Nat'l Rifle Ass'n of Am., Inc. v. Swearingen, 545 F. Supp. 3d 1247 (N.D. Fla. 2021).

Young v. Hawaii, 992 F.3d 765, 785-86 (9th Cir. 2021) (en banc).

Kanter v. Barr, 919 F.3d 437, 446 n.6, 457, 462, 464 (7th Cir. 2019) (Barrett, J., dissenting).

Medina v. Whitaker, 913 F.3d 152, 159 (D.C. Cir.), cert. denied sub nom. Medina v. Barr, 140 S. Ct. 645 (2019).

Young v. Hawaii, 896 F.3d 1044, 1066 (9th Cir. 2018), reh'g en banc granted, 915 F.3d 681 (9th Cir. 2019).

Young v. Hawaii, 896 F.3d 1044, 1077 (9th Cir. 2018) (Clifton, J., dissenting), reh'g en banc granted, 915 F.3d 681 (9th Cir. 2019).

Teixeira v. Cty. of Alameda, 873 F.3d 670, 684–85 (9th Cir. 2017).

Kolbe v. Hogan, 813 F.3d 160, 175 (4th Cir. 2016), on reh'g en banc, 849 F.3d 114 (4th Cir. 2017).

Binderup v. Attorney Gen. United States of Am., 836 F.3d 336, 348 (3d Cir. 2016).

Binderup v. Attorney Gen. United States of Am., 836 F.3d 336, 370–71, 371 n.17, 372 n.19 (3d Cir. 2016) (Hardiman, J., concurring).

Cornell Exhibit C

1

Binderup v. Attorney Gen. United States of Am., 836 F.3d 336, 389 n.85, 405 n.187 (3d Cir. 2016) (Fuentes, J., concurring).

Peruta v. Cty. of San Diego, 824 F.3d 919, 935 (9th Cir. 2016).

Peruta v. Cty. of San Diego, 742 F.3d 1144, 1185, 1188 (9th Cir. 2014) (Thomas, J., dissenting).

Nat'l Rifle Ass'n, Inc. v. Bureau of Alcohol, Tobacco, Firearms, & Explosives, 714 F.3d 334, 342 n.19, 343 n.23 (5th Cir. 2013) (Jones, J., dissenting).

Kachalsky v. Cty. of Westchester, 701 F.3d 81, 95 & n.21 (2d Cir. 2012).

Moore v. Madigan, 702 F.3d 933, 935 (7th Cir. 2012).

Nat'l Rifle Ass'n of Am., Inc. v. Bureau of Alcohol, Tobacco, Firearms, & Explosives, 700 F.3d 185, 200, 202–03 (5th Cir. 2012).

United States v. Carpio-Leon, 701 F.3d 974, 980 (4th Cir. 2012).

United States v. Greeno, 679 F.3d 510, 519 (6th Cir. 2012).

United States v. Yancey, 621 F.3d 681, 684 (7th Cir. 2010).

United States v. Rene E., 583 F.3d 8, 12, 15–16 (1st Cir. 2009).

Miller v. Sessions, 356 F. Supp. 3d 472, 481 (E.D. Pa. 2019).

Grace v. D.C., 187 F. Supp. 3d 124, 138 n.11 (D.D.C. 2016).

Powell v. Tompkins, 926 F. Supp. 2d 367, 386 (D. Mass. 2013), aff'd, 783 F.3d 332 (1st Cir. 2015).

United States v. Tooley, 717 F. Supp. 2d 580, 589–591 (S.D.W. Va. 2010), aff'd, 468 F. App'x 357 (4th Cir. 2012).

United States v. Boffil-Rivera, No. 08-20437-CR, 2008 WL 8853354, 6 (S.D. Fla. Aug. 12, 2008), report and recommendation adopted sub nom. United States v. Gonzales-Rodriguez, No. 08-20437-CR, 2008 WL 11409410 (S.D. Fla. Sept. 22, 2008), aff'd sub nom. United States v. Boffil-Rivera, 607 F.3d 736 (11th Cir. 2010).

**State Courts**

State v. Christen, 2021 WI 39, 396 Wis. 2d 705, 958 N.W.2d 746, cert. denied, 142 S. Ct. 1131, 212 L. Ed. 2d 20 (2022).

Norman v. State, 215 So. 3d 18, 30 & nn.11–12 (Fla. 2017).

Posey v. Com., 185 S.W.3d 170, 179–180 (Ky. 2006).

Posey v. Com., 185 S.W.3d 170, 185 n.3 (Ky. 2006) (Scott, J., concurring).

State v. Craig, 826 N.W.2d 789, 796 (Minn. 2013).

VIRAMONTES 004226
CCSAO 09/15/2022

People v. Handsome, 846 N.Y.S.2d 852, 858 (N.Y. Crim. Ct. 2007).

Zaatari v. City of Austin, No. 03-17-00812-CV, 2019 WL 6336186, 22 (Tex. App. Nov. 27, 2019) (Kelly, J., dissenting).

State v. Roundtree, 2021 WI 1, 395 Wis. 2d 94, 952 N.W.2d 765

State v. Christen, 2021 WI 39, 958 N.W.2d 746

VIRAMONTES 004227
CCSAO 09/15/2022