**EXHIBIT 19**



Monique H. Worrell
# State Attorney
Ninth Judicial Circuit
Orange and Osceola County, Florida

Re: PULSE

If the requested records contain any of the following confidential and/or exempt information, it has been redacted or withheld pursuant to applicable law.

\_\_\_\_\_ Active Criminal Investigative/Intelligence Information and/or Substance of Confessions, if applicable - F.S. 119.071(2)(c)l / F.S. 119.011(3)(d) / F.S. 119.071(2)(e)

\_\_\_\_\_ Attorney work product – F.S. 119.071(1)(d)

\_\_\_\_\_ Autopsy photographs, audio recordings, and video recordings – F.S. 406.135(2)

\_\_\_\_\_ Bank account, debit and credit card numbers - F.S. 119.071(5)(b), 119.0714(l)(j), (2)(e) and 3(b)

\_\_\_\_\_ Body Camera Recordings – F.S. 119.071(2)(l)

\_\_\_\_\_ CPT reports F.S. 39.202(6) and/or DCF reports - F.S. 39.202(1) and 415.107(11) and/or reporter information – F.S. 39.202(5)

\_\_\_\_\_ Department of Motor Vehicle Information - F.S. 119.0712(2)(b), F.S. 322.142(4) and/or SSN F.S. 119.071(5)(a)

\_\_\_\_\_ FCIC/NCIC records 943.053(2) - F.S. Section 943.053(3)

\_\_\_\_\_ Fingerprint records - F.S. 119.071(5)(g)        \_\_\_\_\_ Pre-Sentence Investigation – F.S. 945.10

\_\_\_\_\_ Form 52 (Clinical Record) - F.S.394.46l5(1) and/or medical information F.S. 119.07(1) and/or EMS Records F.S. 401.30(4) or Forensic behavioral health evaluations F.S. 916.1065

\_\_\_\_\_ Identifying information of confidential informants - F.S. 119.017(2)(f) & undercover personnel - F.S. 119.071(4)(c) and Law Enforcement techniques and/or procedures - F.S. 119.071(2)(d)

\_\_\_\_\_ Victim Confidentiality Request is on file - F.S. 119.071(2)(j)1

\_\_\_\_\_ Identifying Information of victims of Sexual Offenses and/or Child Abuse - F.S. 119.071(2)(h)

\_\_\_\_\_ Juvenile Information obtained under Chapter 985 –F.S. 985.04(1)(a)

**X** Surveillance/Security camera footage – F.S. 281.301; F.S. 119.071(3)(a)

\_\_\_\_\_ Eyewitnesses to murder – F.S. 119.071(2)(m)1

\_\_\_\_\_ Telecommunications records – F.S. 119.071(5)(d)

\_\_\_\_\_ Items sealed by Order of the Court

**X** Other:  F.S. 119.071(2)(o)

CONFIDENTIAL-SUBJECT TO PROTECTIVE ORDER - Viramontes03365

# Florida Department of Law Enforcement

## *Ninth Judicial Circuit*



## Use of Force Investigation

### Case #: OR-27-0258

## Case Agent: Alphonso Williams

500 West Robinson Street
Orlando, Florida 32801
Office: (407) 245-0801
Fax: (407) 245-0824
AlphonsoWilliams@fdle.state.fl.us

CONFIDENTIAL-SUBJECT TO PROTECTIVE ORDER - Viramontes03366

# Florida Department of Law Enforcement

*Ninth Judicial Circuit of Florida*

**OR-27-0258**

Table of Contents

**I.**  **Investigative Summary**

**II.**  **Biographical Profile**

**III.**  **Investigative Reports / Related Items**



# Florida Department of Law Enforcement
## Case Number: OR-27-0258

### Ninth Judicial Circuit of Florida



**Investigative Summary**

**Use of Force Investigation**

**Orlando Police Department**
**Orange County Sheriff's Office**

**Incident Date:** June 12, 2016

**Case Agent:**
Special Agent Alphonso Williams

| | |
|---|---|
| Subject: | Omar Mir Seddique Mateen<br>White/Male<br>DOB: 11/16/86 |
| Involved Officer: | Orlando Police Department Officers<br>Officer Adam Gruler<br>Lieutenant Scott Smith<br>Sergeant Jeffrey Backhaus<br>Officer Timothy Stanley<br>Officer Kevin Easterling<br>Officer Andre Bishop<br>Sergeant James Parker<br>Detective Raul Rivas<br>Lieutenant Jonathan Bigelow<br>Officer Ricardo Duenas<br>Officer Michael Napolitano<br><br>Orange County Sheriff's Office Deputies<br>Sergeant Fred Westerberg<br>Deputy Gerald Cavis<br>Deputy Matthew Futch |
| Incident Location: | Pulse Nightclub<br>1912 Orange Avenue<br>Orlando, FL |

CONFIDENTIAL-SUBJECT TO PROTECTIVE ORDER - Viramontes03368

| Summary of Events |
| --- |

## FDLE's Initial Response to 1912 S. Orange Avenue (IR #1)

On June 12, 2016, the Orlando Police Department (OPD) and the Orange County Sheriff's Office (OCSO) requested the Florida Department of Law Enforcement (FDLE) conduct an investigation into the use of force by OPD Detective Adam Gruler, Lieutenant Scott Smith, Sergeant Jeffrey Backhaus, Officer Timothy Stanley, Officer Kevin Easterling, Officer Andrew Bishop, Sergeant James Parker, Detective Raul Rivas, Lieutenant Jonathan Bigelow, Officer Ricardo Duenas, Officer Michael Napolitano, along with OCSO Sergeant Fred Westerberg, Deputy Gerald Cavis, and Deputy Matthew Futch.  This use of force occurred at the Pulse nightclub located at 1912 South Orange Avenue, Orlando, Florida, which resulted in the death of Omar Mir Seddique Mateen.

This investigation revealed that on June 12, 2016, at approximately 0202 hours, Omar Mir Seddique Mateen (hereinafter "Mateen") entered the Pulse nightclub and starting shooting at the patrons inside. OPD Detective Adam Gruler was working at the Pulse nightclub in an off-duty capacity, when he heard the gunshots being fired from inside. Numerous law enforcement officers responded to the nightclub to assist. Within minutes, Detective Gruler fired his handgun at Mateen from two different positions.  A team consisting of Lt. Scott Smith, Sgt. Jeffrey Backhaus, Officer Elio Florin, Officer Ben Chisari, Officer Michael Napolitano, and Belle Isle Officer Brandon Cornwell formed an entry team and entered the nightclub through a broken window. While inside, they moved toward the gunshots and took positions near the bathrooms located on the west side of the building. From this position, Lt. Smith and Sgt. Backhaus observed Mateen emerge from the south bathroom and subsequently fired their rifles at him.

While holding this position, the Orlando Police Department received information from Mateen that he had placed explosive devices on vehicles outside the Pulse nightclub and that he had also placed explosive devices on the victims/hostages located inside the Pulse nightclub.

Members of the Orlando Police Department held this position until members of the OPD SWAT team and the Orange County SO Explosive Ordinance Disposal (EOD) unit started making holes in the west wall of the Pulse nightclub.  During this process, Mateen emerged from one of the holes and started firing a rifle and a handgun at the law enforcement officers positioned outside the nightclub.

OPD Lt. Scott Smith, Lt. Jonathan Bigelow, Sgt. James Parker, Officer Tim Stanley, Officer Kevin Easterling, Officer Andrew Bishop, Officer Ricardo Duenas, Officer Michael Napolitano, Detective Raul Rivas along with OCSO Sgt. Fred Westerberg, Deputy Gerald Cavis, and Deputy Matthew Futch returned fire at Mateen causing his death. During the exchange of gunfire, OPD Officer Michael Napolitano was shot and injured by Mateen.

## Radio Traffic / CAD Report (IR #2)

On July 19, 2016, FDLE Special Agent (SA) Lisa Gundrum received a compact disc (CD) from OPD Detective Calder Haas labeled "Pulse Shooting Orlando Police 2016-242039, Radio Transmissions Time Stamped," which contained the radio transmissions of the incident that occurred on June 12, 2016.

SA Gundrum reviewed the radio transmission recordings on the CD in a folder labeled "Radio Traffic." The "Radio Traffic" folder contained three files labeled "16-242039 initial 43 for Pulse, Emergency East, and Patrol East." SA Gundrum also reviewed the computer aided dispatch (CAD) report of the incident.

Radio Transmissions
File "16-242039 initial 43 for Pulse"
Duration: 10 minutes and 48 seconds, no time/date stamp

The recording captured the first radio transmissions of Detective Gruler saying "Shots fired" and the initial entry of officers on scene at Pulse nightclub.

CONFIDENTIAL-SUBJECT TO PROTECTIVE ORDER - Viramontes03369

File "Emergency East"
Duration: 3 hours and 40 minutes, time/date stamped

The recording captured the radio transmissions approximately ten minutes after Detective Gruler yelled, "Shots fired," and ended with a radio transmission request for assistance to transport the injured to Orlando Regional Medical Center.

File "Patrol East"
Duration: 3 hours and 55 minutes, time/date stamped

The recording captured the radio transmissions of "16-242039 initial 43 for Pulse" and radio transmissions of "Emergency East." The following is a summary, but not inclusive of the entire recording.

**Radio Traffic:**

| Time/Date Stamp | Description |
|---|---|
| 02:02 | (Detective Adam Gruler) Shots fired, shots fired, shots fired |
| 02:02 | (Dispatcher) Sig 43 on patrol east Detective Gruler unknown location with shots fired |
| 02:02 | (Detective Gruler) Shots fired 1912 Orange Avenue, shots fired, multiple down |
| 02:02 | (Detective Gruler) Shots still being fired |
| 02:03 | (Detective Gruler) Shots fired, shots still being fired |
| 02:03 | (Detective Gruler) All right I need, I think he, shots fired, shots fired still, give me a perimeter, give me perimeter |
| 02:03 | (Lieutenant Dan Brady) Location? |
| 02:03 | (Dispatcher) Pulse 1912 South Orange |
| 02:04 | (Detective Gruler) Ok, we got multiple down, I only got one officer here with me, I saw the subject inside continued to shoot |
| 02:04 | (Detective Gruler) I need people here now guys |
| 02:04 | (Officer James Hyland) Oscar 561, I am almost 10-97 |
| 02:04 | (Lieutenant Scott Smith) Hey stay off the radio, you already called 43 Gruler, people are coming to you, if he is still shooting and there are people in there, you need to go contact them |
| 02:05 | (Detective Gruler) Right there, right there, stop, stop he is in this patio |
| 02:05 | (Officer Hyland) All right he is still firing, he is still firing, we need more people here now, multiple shots |
| 02:05 | (Detective Gruler) He's got an assault rifle, he's got an assault rifle |
| 02:05 | (Detective Gruler) South door, south door watch the south door |
| 02:06 | (Officer Hyland) I got the south doors over here, I have got one down, still got an active shooter in here |
| 02:06 | (Lieutenant Roger Brennan) Get a team and engage |
| 02:06 | (Detective Gruler) All right we have setup a team, the first team go up to that door watch that south door |
| 02:06 | (Detective Gruler) All shots have stopped |
| 02:07 | (Dispatcher) Are you 10-4 to move it to Emergency East? |
| 02:07 | (Officer Hyland) No headquarters we have an active shooter |
| 02:07 | (Lieutenant Smith) If shots have stopped, just hold it and we huh, we will get a team together here is anyone else still inside? |
| 02:07 | (Officer Hyland) We don't know right now, just hold traffic we got a team going in |
| 02:08 | (Detective Gruler) All right we have multiple down, no shots are going on right now, bring the shield up |
| 02:08 | (Detective Gruler) He is in the back, he is in the back |
| 02:08 | (Detective Gruler) All right, I need people west of the building, west of the building |
| 02:08 | (Dispatcher) 10-4 team to headquarters, I'm landline can hear shots fired in the background |
| 02:09 | (Lieutenant Smith) Trying to key up but only rapid gunfire heard in the background |
| 02:09 | (Lieutenant Smith) I don't want anybody to the west. Our outgoing fire if he is on the patio will be going to the west |
| 02:10 | (Officer Tyler Olson) Westside of building is clear |
| 02:10 | (Officer Olson) We hold the west over hear so that we are not in the crossfire |
| 02:10 | (Officer Doug Cote) Hey we are coming in from the patio, we have 4 officers in here |
| 02:10 | (Officer Felix Santiago) We have multiple causalities inside |
| 02:11 | (Lieutenant Smith) Do you still have the door open from the outside to that car |
| 02:11 | (Detective Gruler) We got the door we got eyes |

3

CONFIDENTIAL-SUBJECT TO PROTECTIVE ORDER - Viramontes03370

| | |
|---|---|
| 02:11 | (Lieutenant Smith) I need to know if you have anybody that moves left or right across, I think he is going to be in the corner to the west end of the building |
| 02:11 | (Detective Gruler) 10-4 there are doors on the north side of the building that can go out. |
| 02:11 | (Officer Santiago) The last two sessions of shots were heard from the inside from the west side, from the west south |
| 02:11 | (Officer Brandon Tabaczyznski) OK, we need people to pull people to safety right out here |
| 02:11 | (Detective Gruler) All right, still shooting from that west side |
| 02:12 | (Sergeant Wellon) Where is our team out to get something together to try to make entry |
| 02:12 | (Detective Gruler) We got it, just hold traffic, no talking |
| 02:12 | (Detective Gruler) All right, there is a bathroom to your left, straight ahead of you to your left in the corner is a dressing room |
| 02:13 | (Officer Cote) All right coming in the bar watch your crossfire |
| 02:13 | (Detective Gruler) All right watch behind you, watch behind you, I just saw some movement |
| 02:14 | (Officer Cote) I saw something in the back door guys |
| 02:14 | (Detective Gruler) All right, there are dressing rooms right there by that curtain. Where you at? There are dressing rooms to your left. |
| 02:14 | (Lieutenant Smith) Robertson where you at? |
| 02:14 | (Officer Robertson) I just made my way into the eastside |
| 02:14 | (Lieutenant Smith) Shots fired if you can come in from the southwest, get in here |
| 02:15 | (Officer Robertson) Brandon are you outside? |
| 02:15 | (Officer Donohue) We got a lot more cops going to the front, is there a reason Scott you want them in there? |
| 02:15 | (Lieutenant Smith) Negative, we need to set up teams and start getting these injured out, we have a lot down in here, he is trapped in the bathroom |
| 02:15 | (Officer Tabaczyznski) Scott, we have another, another crew at the (unintelligible) I am in? |
| 02:16 | (Officer Joseph Imburgio) Hold all those people |
| 02:16 | (Sergeant Toruno) Get any units over here at Einstein's we are going to secure them over here, we are going to put all the people in Einstein's parking lot |
| 02:16 | (Lieutenant Smith) Brandon let me know when you have a team |
| 02:16 | (Lieutenant Smith) Roger |
| 02:16 | (Lieutenant Smith) Do you see Brandon? |
| 02:16 | (Officer Tabaczyznski) Scott do you need another team inside? |
| 02:17 | (Lieutenant Smith) Roger, what I need from you is a triage team, get together 4 to 5 people, the people cannot walk in here, we need to start pulling them out right now, I also need someone to get on the phone with HRC? [unintelligible] immediately |
| 02:17 | (Sergeant Wellon) They are say[ing], there are two shooters. |
| 02:17 | (Officer James Falbo) Shots fired inside |
| 02:17 | (Detective Gruler) That is us, don't talk. |
| 02:18 | (Officer Cage) Does anybody have a red laser on their gun? |
| 02:18 | (Sergeant Wellon) 10-14, they are saying two shooters guys, two shooters |
| 02:18 | (Officer Mastrangelo) 10-4 be advised [unintelligible] at least 25 injured in here |
| 02:18 | (Dispatcher) I copy. 24 injured |
| 02:18 | (Officer Mastrangelo) A total about 25 injured inside Pulse |
| 02:18 | (Dispatcher) 10-4. We are still landline with the office. They have someone in there as well. |
| 02:19 | (Lieutenant Smith) Hey, looks like a white male, it was really quick, I couldn't tell if he is in the bathroom to the left, probably southeast, southeast of that corner (unintelligible) I don't know if there is a window there or not |
| 02:19 | (Officer Robertson) Lieutenant Smith where are you? |
| 02:19 | (Officer Solis) 10-14 Witnesses were saying there are two suspects, one black male and one white male |
| 02:19 | (Officer Corbitt) Someone opening a door on the east side |
| 02:20 | (Dispatcher) Alpha 34 do you want HCNT or just SWAT? |
| 02:20 | (Dispatcher) We are landline with someone inside the restroom with the shooter |
| 02:20 | (Lieutenant Smith) Find out where they are, white or black male |
| 02:21 | (Detective Gruler) Ok that guy that just came out, we need to talk to him, and get as much information as we can right now who is in there, what he looks like, what he is wearing |
| 02:21 | (Dispatcher) Caller is advising they are downstairs bathroom, cannot advise if male or female because shooter is right there |
| 02:21 | (Dispatcher) Caller cannot advise anything else because she is whispering |
| 02:21 | (Lieutenant Smith) All right keep her on there, keep her talking anything you can get, white or black male, or whether if he is still armed |

CONFIDENTIAL-SUBJECT TO PROTECTIVE ORDER - Viramontes03371

| | |
|---|---|
| 02:22 | (Officer Funke) A witness is saying the suspect has a bald head, dark skinned, white T-shirt, dark pants |
| 02:22 | (Lieutenant Smith) All right |
| | (Lieutenant Smith) I need to know where that is coming from, is that coming from the guy that was just wounded or guy coming out of the bathroom. |
| 02:22 | (Officer Funke) This is a guy outside, a guy that specifically saw him |
| 02:22 | (Lieutenant Smith) Who is with the male shaved side? Gonna top off or whatever bullshit he's got in there, he is wounded and he came out of that bathroom, we need to talk to him and get as much information out of him as possible |
| 02:22 | (Dispatcher) Caller is advising he is reloading in the bathroom |
| 02:22 | (Lieutenant Smith) Get as much information from that guy in the bathroom as possible |
| 02:22 | (Dispatcher) All we have is that she is a female in the downstairs bathroom and she cannot say anything because he is right there |
| 02:22 | (Lieutenant Smith) Can she tell you how many other people are in the bathroom with her |
| 02:23 | (Dispatcher) She says there is a lot in the bathroom |
| 02:23 | (Dispatcher) Including the shooter |
| 02:23 - 02:34 | [Radio transmissions consisted of a triage team being established for the victims directed to Einstein's, information was obtained from a male that exited the bathroom and Dispatch continued to be landline with a caller in the bathroom and a caller in the office. There was also communication with a caller in the upstairs office.] |
| 02:34 | (Officer Hyland) Just be advised, we got some long gun shell casings here |
| 02:34- 02:40 | [Radio transmissions during the time frame consisted of evacuating the victims from the upstairs office and communication with victims in a dressing room by the stage.] |
| 02:40 | (Dispatcher) Just 10-14 team we are possibly landline with the shooter |
| 02:40 | (Dispatcher) [unintelligible] Patrol we are possibly landline with the shooter |
| 02:40 | (Lieutenant Smith) 10-4 Do let me know what he saying [unintelligible] is CNT near the command post or the Comm Center and get there and get on the line with him |
| 02:40 | (Dispatcher) He is on the phone with him now |
| 02:42 | (Dispatcher) Caller said [unintelligible] shooter at 1900 hours and said he pledged the Islamic State |
| 02:47 | (Dispatcher) I have information on the phone number for the shooter |
| 02:47 | (Dispatcher) It comes back to a Omar Mateen |
| 02:47 | (Dispatcher) An address in Fort Pierce |
| 02:51 | (Officer Crosby) We are on the phone with someone who alleges to be the shooter and there are explosive devices in the vehicle in the parking lot fyi |
| 02:52 | (Dispatcher) Just 10-14, per the text message from the caller were are getting from a person with the shooter in the bathroom, he is possibly wearing a bomb |
| 02:53 | (Dispatcher) Guys we are getting a report that somebody in one of the bathroom may have an explosive device attached to him, just so you guys know in the building you may not want to stay there |
| 02:53- 04:03 | [Radio Transmissions during this time frame consisted of a request for any agency with a bomb dog, K9 bomb dogs arriving and clearing multiples areas around the nightclub, additional organization and deployment positions of SWAT in the nightclub and communication with victims in the dressing room.] |
| 04:03 | (Officer Clough) Copy that, Command Center did you copy that? The van that is underneath the awning that we have visible ammunition in the vehicle, the Airport dog did hit on that van |
| 04:10 | (Dispatcher) Headquarters just 10-14 we are receiving text messages that there is a male in the downstairs restroom with a bomb strapped on him and loading a gun, we still have people in the dressing room and in the restroom |
| 04:29 | (Officer Rush) All right, I am with someone who is texting with someone in the bathroom. The suspect advises he is going to attach four vests to four people in 15 minutes [remainder unintelligible stepped on by automation date & time] |
| 04:58 | (Dispatcher) Headquarters to Chase, on the channel? (Chase) on the channel go ahead, (Dispatcher) 10-4 they are advising if you can pull back because they are going to set off a charge |
| 05:07 | (Dispatcher) Headquarters to units on the perimeter, stand down for SWAT, stand down for SWAT |
| 05:11 | (Dispatcher) Headquarters per the units on SWAT, there are injured people bringing them out |
| 05:14 | (Dispatcher) Shots fired north bathroom, shots fired north bathroom |

On July 19, 2016, FDLE Special Agent (SA) Alphonso Williams received a compact disc (CD) from OPD Detective Calder Haas of the 911 calls for the incident that occurred on June 12, 2016. OCSO Sergeant Michael Ruggiero also provided SA Williams with an additional CD of the 911 calls received by the Orange County SO.

CONFIDENTIAL-SUBJECT TO PROTECTIVE ORDER - Viramontes03372

A review of the 911 calls shows that Mateen called 911 twice. A synopsis of those recordings reflects the following:

**911 Calls**

**Call One**
Duration: 50 Seconds
File Title: "Part 1 Susp"
Time: No timestamp
Orlando Police Dispatcher (OD) and Omar Mateen (OM)

OD:   Emergency 911, this is being recorded.
OM:   *In the name of God the Merciful, the beneficent [Arabic]*
OD:   What?
OM:   Praise be to God, and prayers as well as peace be upon the prophet of God [*Arabic*].
      I wanna let you know, I'm in Orlando and I did the shootings.
OD:   What's your name?
OM:   My name is I pledge of allegiance to Abu Bakr Al-Baghdadi, of the Islamic State.
OD:   Ok, What's your name?
OM:   I pledge my allegiance to Abu Bakr Al-Baghdadi, may God protect him [*Arabic*],
      on behalf of the Islamic State.
OD:   Alright. Where are you at?
OM:   In Orlando.
OD:   Where in Orlando?

Call disconnects.

**Call Two**
Duration: 11 Seconds
File Title: "Unk Poss Susp 023028hrs"
Time: 0230 hours

The second call from Mateen was received at 0230 hours. Mateen was heard saying something in Arabic and then disconnected.

The OPD Crisis Negotiation Team (CNT) responded and OPD Sergeant Andrew Brennan spoke with Mateen. Three separate CNT recordings were provided and reviewed by SA Nicole Miller. The following is a synopsis of those recordings:

**CNT Call One**
Duration: 9 Minutes 21 seconds
File Title: "CNT 1"
Time: 0248 hours

Description: Sergeant Brennan spoke with Mateen through a cellphone. When asked who OPD was speaking with, Mateen described himself as "The person who pledged his allegiance to the Islamic State." Mateen advised that America needed to stop bombing Syria and Iraq and that a lot of innocent people are being killed. Mateen additionally stated "What am I to do here? When my people are getting killed over there?" The following is a synopsis and transcription of the conversation between Sergeant Brennan (AB) and Mateen (OM). The time documented is the elapsed time:

Elapsed Time:
02:09: AB:   Well, I'm trying to, to figure out how to keep you safe and how to get this resolved peacefully because I'm not a politician, I'm not a government. All I can do is help individuals, and I wanna start with helping you.

6

02:23 OM:     By the way there's, there's some vehicles outside that have some bombs, just to let you know. Your people are gonna get it and I'm gonna ignite it if they try to do anything stupid.

02:34 AB:     Okay, I under, I understand that and I'll pass that along, can you tell me what vehicles cause I don't want to see anybody get hurt.

02:41 OM:     No, but I'll tell you this, it can take out a whole city block almost.

02:47 AB:     I, I understand that; tell me in the club do you have any injured people with you? That you brought with you?

02:57: OM:     I'm not; I'm not letting you know nothing.

02:59 AB:     Well I'm trying to offer you help.

03:02 OM:     Well you need to know that they need to stop bombing Syria and Iraq. US is collaborating with Russia and they're killing innocent women and children okay?

03:13 AB:     I hear what you're saying.

03:15 OM:     My homeboy Tamerlan Tsarnaev did his thing on the Boston Marathon, my homeboy [unintelligible] did his thing okay, so now it's my turn, okay.

**Mateen is then asked his name and identifies himself as the "Islamic Soldier." Mateen stated that he can be referred to as the "Soldier of God" and advised that he spent all day praying.**

04:18 AB:     I understand that, okay what I'm trying to do is make sure that you and no one else suffers any further injury, okay? I can help make peace.

04:28 OM:     I have a vest.

04:29 AB:     Okay, you have a vest, I understand that, [unintelligible] and so what kind of vest are you talking about? Is it, is it a bullet resistant vest? Is it a bomb vest?

04:43 OM:     It's what they used in France.

04:45 AB:     It's what they used in France, okay.

04:48 OM:     I gotta go.

04:49 AB:     Well, well I'd like you to stay on the phone with me please, okay? Are you there? Please stay on the phone with me so I can help pass along your concerns.

*Background noise, "Go ahead with bomb dogs."*

05:06 OM:     You can, you can bring the bomb dogs they're not going to smell shit.

05:09 AB:     Well I understand that.

05:11 OM:     That stuff, you can't smell it. Bring your little American bomb dogs, their fucking outdated anyways.

05:15 AB:     Well tell me, tell me you're wearing what I presume from what you're saying you're wearing a bomb vest?

05:22 OM:     No.

05:24 AB:     Well you said you're wearing a vest.

05:25 OM:     No, I'm not.

05:26 AB:     So, well what are you wearing?

05:27 OM:     Yeah, it's like you know to go out to a wedding.

**Sgt. Brennan asks numerous questions and makes statements to Mateen. Mateen does not respond and the call ends.**

**CNT Call Two**
Duration: 16 Minutes 6 seconds
File Title: "CNT 2"
Time: No timestamp

Description: After Mateen stopped talking with OPD, OPD disconnected and called Mateen back. Mateen answered but does not say anything. OPD disconnected and called back another four times before Mateen answered the phone. On the fifth attempt, Mateen answered the phone and advised that the airstrike that killed Abu Waheed a few weeks ago is what "triggered it." Mateen then advised that more attacks would happen in the days to follow, but did not provide any details.

CONFIDENTIAL-SUBJECT TO PROTECTIVE ORDER - Viramontes03374

| | | |
|---|---|---|
| 08:09 AB: | Well, I'm trying to help you. You don't want people to get injured, I presume that means if you brought somebody with you, you don't want them hurt is that correct? |
| 08:19 OM: | None of your business homeboy. |
| 08:22 AB: | Okay. Omar, can I get you to come outside and talk to my people there at the scene so we can peacefully resolve this? |
| 08:31 OM: | No. |
| 08:34 AB: | K, cause I'm not there but I have people there that would love to talk to you. Can you put down your weapon and come outside and talk to them please? |
| 08:44 OM: | You want to know what kind of weapon I have too? |
| 08:47 AB: | If you want to tell me. |
| 08:49 OM: | Or you want to know how many weapons I have? |
| 08:51 AB: | I can take that too, I'm, I'm all ears Omar. I have no agenda other than helping you pass along this message. |
| 08:59 OM: | So what year, what year did you graduate from the police academy? |
| 09:03 AB: | I'm sorry. |
| 09:05 OM: | What year did you graduate from the police academy? |
| 09:08 AB: | Sir, this is about you okay? I'm here to help you. I'm here to pass along your information, okay? You don't want to know ancient history about me. Tell me how I can help you. You asked me do I want to know about weapons? Sure, tell me about your weapons. Omar, I'm trying to help you. I can't do that if you won't give me something to pass along to, to the people that are in power which is I presume what you want to happen out of all of this. I don't want to see you or any of your associates get hurt and I don't want to see anybody else get hurt in the United States or anywhere else around the world. |

Mateen then disconnects. Three more attempts were made to communicate with Mateen via cellphone and on the third attempt, Mateen answered but did not say anything. He then hung up the phone.

**CNT Call Three**
Duration: 3 minutes 1 second
File Title: "CNT 3"
Time: No timestamp

Description: On the second attempt, contact was made with Mateen who advised that he was annoyed with all the phone calls he was receiving and didn't appreciate the way he was being spoken to. Mateen advised again that the "air strikes need to stop" and then disconnected at 0325 hours.

---

**Officer Interviews**

---

**Interview of Detective Adam Gruler (IR #3)**

On June 17, 2016, at 0939 hours, FDLE Special Agents Alphonso Williams and Craig Beers along with Federal Bureau of Investigation (FBI) Special Agent Kevin Ferrington conducted a sworn, digital audio recorded interview with Orlando PD Detective Adam Gruler in the presence of his attorney, Jason Bankowitz. The interview was conducted at the FDLE Orlando Regional Operations Center (OROC) located at 500 W. Robinson Street, Orlando, Florida. In summary, Detective Gruler stated the following:

Detective Gruler acknowledged that he understood that the interview was voluntary and being conducted as part of a criminal investigation into the use of force incident, and stated he did not review any video or audio recordings relating to this incident prior to this interview.

Detective Gruler arrived at his off-duty detail at the Pulse nightclub at approximately 2340 hours and parked his OPD unmarked vehicle on the sidewalk south of the nightclub and parallel to Esther Street. Detective Gruler was wearing his OPD white motors shirt consisting of his name and OPD badge inscribed on it along with his duty vest and full gun belt.

8

At approximately 0100 hours, Detective Gruler left the nightclub for approximately twenty minutes in his vehicle to look for an underage juvenile who ran from him earlier during his shift. Detective Gruler returned back to the nightclub and parked his vehicle in the same location after he was unable to locate the juvenile.

Just prior to 0200 hours, Detective Gruler was standing in front of his vehicle when he heard gunshots coming from the interior of the building. Detective Gruler took cover behind a vehicle that was parked on the south side of the building. Detective Gruler then called out, "Shots fired," over the radio and requested additional officers to respond as he drew his handgun.

Detective Gruler observed several patrons running out of the nightclub who were bleeding. Detective Gruler yelled and instructed the patrons to run away from the nightclub. As the gunshots continued, Detective Gruler identified the sound of the weapon being fired inside as a long gun.

Detective Gruler observed two males exit the double doors on the south side of the nightclub and drop to the ground. Detective Gruler then observed a portion of Mateen's shoulder/elbow along with the barrel of a long gun emerge from the same doors and fire rounds at these two males on the ground. Detective Gruler then fired approximately two to six rounds at Mateen. Detective Gruler's rounds struck the right side door and caused Mateen to retreat back inside. Detective Gruler was approximately seventy-five feet from Mateen when he fired his weapon. Detective Gruler then moved to the west and took a position behind a vehicle that was parked near the dumpster and VIP parking area.

From that position, Detective Gruler observed Mateen casually walking through the west bar area and toward the north end of the nightclub. Mateen was "shooting rounds into bodies" as he stepped over them. Detective Gruler described Mateen as being a light-skinned black or Hispanic male and approximately 6'1" in height. Detective Gruler then moved to the east side of the building where he again observed Mateen walking across the main dance floor and continuing to fire rounds into the victims that were lying on the ground. Detective Gruler stood in the middle of the parking lot near the Pulse sign, looked through the patio gate that led into the nightclub and identified Mateen as the only person standing. From this position, Detective Gruler fired approximately two rounds at Mateen as he passed his field of view. Detective Gruler described the constant volleys of gunshots from Mateen as repeated "bangs" followed by pauses. Detective Gruler "knew he [Mateen] was reloading; that the pauses were enough time for a reload."

As Detective Gruler and a contact team were about to make entry into the patio area, they did not hear any shooting for an extended period of time. Detective Gruler and the contact team regrouped to determine if Mateen was still an "active shooter," or if he was down from Detective Gruler's rounds. Shortly thereafter, the shooting started again when the contact team advanced on the main door of the nightclub. Detective Gruler stood near OPD Lieutenant Scott Smith as they moved toward the main door.

Detective Gruler was informed that Mateen was contained in a bathroom near the west bar. Detective Gruler counted over twenty bodies that were scattered across the main dance floor. Detective Gruler assisted with securing a portion of the nightclub and extracting wounded victims from the nightclub. Detective Gruler was familiar with the layout of the nightclub and provided this information to Lt. Smith and OPD Communications Center.

Detective Gruler was later relieved from the scene. Detective Gruler was scared throughout this incident, and did not witness any other law enforcement officers fire their weapons.

When asked why he used deadly force, Detective Gruler made the following statements:

"I feared that the gun was going to continue out the door and engage me."

"I engaged again fearing for…the lives of….anybody contained in the building."

"I feared for the….safety and lives of these two people that were down that were being shot and the safety and lives of the people I knew that were still in the club."

9

"Firing at him [Mateen] for… fear, loss of additional life."

**Interview of Lt. Scott Smith (IR #4)**

On June 17, 2016, at 1054 hours, FDLE Special Agents Alphonso Williams and Craig Beers along with Federal Bureau of Investigation (FBI) Special Agent Kevin Ferrington conducted a sworn, digital audio recorded interview with Orlando PD Lieutenant Scott Smith in the presence of his attorney, Jason Bankowitz. The interview was conducted at the FDLE Orlando Regional Operations Center (OROC) located at 500 W. Robinson Street, Orlando, Florida. In summary, Lt. Smith stated the following:

Lt. Smith acknowledged that he understood that the interview was voluntary and being conducted as part of a criminal investigation into the use of force incident, and stated he did not review any video or audio recordings relating to this incident prior to this interview.

Lt. Smith was at the office and heard a call for help come over the radio in reference to shots fired. Lt. Smith responded to the Pulse nightclub and parked in the area of West Esther Street and South Orange Avenue.  Lt. Smith exited his unmarked patrol vehicle, heard gunshots as he retrieved his rifle, and then moved toward the nightclub on foot. Lt. Smith heard the shots coming from the main entrance door and the double doors located on the south side of the building. Lt. Smith then looked through the open double doors in an attempt to identify Mateen, but he was unable to see him.

Lt. Smith told someone to break the large glass window on the south side. Lt. Smith then "muzzle punched" and raked away the existing glass from that window. Lt. Smith and several other officers entered the building through this window, where he observed an empty .223 magazine lying on the floor. The shooting paused, so Lt. Smith looked into the hallway/main dance floor area where he observed bodies lying everywhere. Lt. Smith heard shooting again so they moved toward the gunshots and the west bar area. Lt. Smith heard a gunshot while entering the bar area followed by some screaming and two additional shots.

While waiting there, Lt. Smith observed Mateen "crouched" and peeking around the door frame. Lt. Smith then yelled verbal commands, "Orlando Police! Let me see your hands! Step out!" Lt. Smith stated, "He [Mateen] just kind of stares at me" and "looks down the hallway to kinda [sic] kinda see who's standing next to me." Lt. Smith believed that Mateen was assessing him. Mateen refused to comply with any commands and retreated back into the bathroom. As Mateen ducked back into the bathroom, Lt. Smith fired three rounds and Sergeant Backhaus fired one round at Mateen. Lt. Smith believed Mateen was a "barricaded suspect" because no noise was coming from the bathroom. Lt. Smith requested a SWAT call out over the radio and left the other officers at the bar to assess the rest of the scene. Lt. Smith told officers to triage the victims and save who they could.

Lt. Smith heard victims were calling 911 from the bathrooms and that Mateen called 911 and pledged his allegiance to ISIS. Mateen also mentioned something about explosive vests. Lt. Smith knew they were dealing with a hostage situation at that time. Additional members of the OPD SWAT team responded to the nightclub and Lt. Smith switched roles. Lt. Smith put on his SWAT gear and briefed with the team. The officers that were positioned inside the club were switched out with members of the SWAT team.

The SWAT team set up in the field on the west side of the club. The Orange County SO EOD personnel placed an explosive charge on the west wall in an attempt to breach the south bathroom wall. The breach was unsuccessful and the SWAT team then used the BearCat to breach the wall with the ram. The first hole was in the hallway between two bathrooms. Two additional holes were made south of the initial hole in which several victims were removed from the south bathroom through these holes.

While removing victims, Lt. Smith heard approximately three to four gunshots coming from the north bathroom. SWAT members inside the BearCat then made holes in the north bathroom wall. Lt. Smith and Lieutenant Jonathan Bigelow each deployed a distraction device into the hallway to suppress the active shooting. While Lt. Smith stood on the south of the hallway hole, he observed Mateen exit the north bathroom while firing a rifle and a handgun and attempting to exit the hole. Lt. Smith fired an unknown number of rounds at Mateen.

10

Mateen fell back when Lt. Smith yelled, "Cease fire!" and then reloaded a new magazine into his weapon. Lt. Smith also heard Officer Napolitano say he [Napolitano] was shot in the helmet.

A couple of SWAT members approached the breach hole where they observed a battery pack attached to Mateen. Lieutenant Bigelow and other SWAT members were worried that Mateen might have enough life to set off an explosive device and harm other innocent victims. Lt. Smith then approached Mateen and fired one round at Mateen's head. SWAT members removed more victims from both bathrooms and then OCSO EOD took over the scene.

When asked why he used deadly force, Lt. Smith made the following statement:

"I thought I was going to die or one of the other twelve or thirteen guys that were standing out there with us, he was going to kill one of us."

### Interview of Sergeant Jeffrey Backhaus (IR #5)

On June 17, 2016, at 1212 hours, FDLE Special Agents Alphonso Williams and Craig Beers along with Federal Bureau of Investigation (FBI) Special Agent Kevin Ferrington conducted a sworn, digital audio recorded interview with Orlando PD Sergeant Jeffrey Backhaus in the presence of his attorney, Jason Bankowitz. The interview was conducted at the FDLE Orlando Regional Operations Center (OROC) located at 500 W. Robinson Street, Orlando, Florida. In summary, Sgt. Backhaus stated the following:

Sgt. Backhaus acknowledged that he understood that the interview was voluntary and being conducted as part of a criminal investigation into the use of force incident, and stated he did not review any video or audio recordings relating to this incident prior to this interview.

Sergeant Backhaus responded to the Pulse nightclub after he heard Detective Adam Gruler call out a "Signal 43" [Emergency Assistance]. Sergeant Backhaus arrived and parked his patrol vehicle at Orange Avenue and Kaley Street. Sergeant Backhaus retrieved his rifle and spare magazines and walked to the front of the nightclub. Sgt. Backhaus continued to hear gunshots and moved to the south side of the building near the double doors and a large window. Sergeant Backhaus positioned himself behind Lieutenant Scott Smith, Officer Michael Napolitano, Officer Elio Florin and Officer Ben Chisari as they broke the window and entered the nightclub.

Once inside, Sergeant Backhaus and Officer Napolitano went to the right of the building, while Lt. Smith, Officer Florin and Officer Chisari went to the left side of the building. As Sergeant Backhaus walked along the main dance floor, he observed blood on the floor along with injured victims and people hiding. Sergeant Backhaus then directed additional officers to assist with removing victims from the building.

Sergeant Backhaus joined Lt. Smith, Officer Napolitano, Officer Chisari and Officer Florin behind the west bar that faced a hallway where they believed Mateen was hiding. There were two restrooms on opposite ends of the hallway and Sergeant Backhaus last heard gunshots coming from that area. While the cover team covered that area, Sergeant Backhaus noticed that the door to the restroom on the right [north] was closed, while the door to the south side restroom was partially open. Sergeant Backhaus covered the north restroom while Lt. Smith covered the south restroom.

Shortly thereafter, Sergeant Backhaus observed a small portion of a "light skinned" person [Mateen] look around the corner of the south restroom toward the officers. As Lt. Smith ordered Mateen to "show his hands," Mateen refused to comply and continued to "slowly slice the pie" toward the officers. Lt. Smith and Sergeant Backhaus then fired rounds at Mateen as he retreated back into the restroom.

Sergeant Backhaus believed that Mateen was the suspect because he was the only person standing up while everyone else was on the ground. As time progressed, Sergeant Backhaus and the contact team changed their positions, but continued to cover the hallway when they received information about possible explosive devices within the building.

CONFIDENTIAL-SUBJECT TO PROTECTIVE ORDER - Viramontes03378

Sergeant Backhaus was relieved from his position so he could go and change into his SWAT gear. Sergeant Backhaus was then positioned on the south side of the building near the BearCat. Sergeant Backhaus joined the rotation where they covered the interior hallway of the nightclub from the outside of the building. Sergeant Backhaus held that position until he started assisting Officer Timothy Stanley with identifying the layout of the nightclub.

Once the larger BearCat was brought to the scene, Sergeant Backhaus assembled the "Ram" as it was moved to the west side of the building. Sergeant Backhaus then assembled the gas delivery system on the BearCat as well. At some point, the SWAT team received information that Mateen was going to send out four people with suicide vests within fifteen minutes.

After the explosive breach was attempted, the BearCat was used to make additional holes in the wall. Sergeant Backhaus and OPD Agent Jonathan Cute were positioned in the gun port area of the BearCat. Sergeant Backhaus exited the BearCat and assisted in removing victims/hostages from the south restroom through the holes in the wall. As Sergeant Backhaus stood near the center hole, he heard gunshots coming from the north restroom. The SWAT team then deployed two distraction devices into the hole as they prepared to enter. Mateen then appeared at the center hole and started firing rounds at the SWAT team. Sergeant Backhaus, who was positioned at the rear of the stack, moved to his left and fired multiple rounds at the area of the muzzle flash until Lt. Smith yelled cease fire. Once Mateen was on the ground, Sergeant Backhaus assisted with removing additional victims from the north restroom.

When asked why he used deadly force, Sergeant Backhaus made the following statement:

"I feared that was the bad guy [Mateen] who was coming out, and he was going to start shooting more people, shooting at us. I was trying to…defend myself, my teammates and other people that were in…the building."

## Interview of Officer Timothy Stanley (IR #6)

On June 17, 2016, at 1416 hours, FDLE Special Agents Alphonso Williams and Craig Beers along with Federal Bureau of Investigation (FBI) Special Agent Kevin Ferrington conducted a sworn, digital audio recorded interview with Orlando PD Officer Tim Stanley in the presence of his attorney, Jason Bankowitz. The interview was conducted at the FDLE Orlando Regional Operations Center (OROC) located at 500 W. Robinson Street, Orlando, Florida. In summary, Officer Stanley stated the following:

Officer Stanley acknowledged that he understood that the interview was voluntary and being conducted as part of a criminal investigation into the use of force incident, and stated he did not review any video or audio recordings relating to this incident prior to this interview.

Officer Stanley responded to the Pulse nightclub and met with Lieutenant Scott Smith near the north side of the building. Officer Stanley then entered the nightclub to assess the severity of the scene and to confirm that the SWAT members inside the nightclub were all right. Officer Stanley was tasked with checking the exterior of the building for possible entry points and to determine if the BearCat could breach the walls. Officer Stanley also tasked other SWAT members to assemble the "Ram" on the BearCat. Officer Stanley, Officer Ricardo Duenas, Officer Kevin Easterling, and other SWAT members opened a door on the northwest corner of the building and removed four live victims. Officer Stanley and other SWAT members also removed approximately eight more live victims from a room on the northwest corner of the building after removing an air conditioning unit from the wall.

The OCSO EOD personnel attempted an explosive breach on the west wall, but the breach failed and the BearCat was then used penetrate the remaining portions of the hole. Lt. Smith noticed that this hole was in a hallway between two bathrooms. SWAT members then created two additional holes with the BearCat south of the initial hole made with the explosive device. These two holes were in the south bathroom and while Officer Stanley was removing live victims/hostages from the bathroom, other SWAT members stood in a manner to form a wall. They were covering the north bathroom door when Officer Stanley heard approximately three gunshots coming from the north bathroom.

12

Officer Stanley yelled "DD!" and SWAT members deployed distraction devices. Officer Stanley observed a "big shadow [Mateen] emerge." Officer Stanley did then "see him [Mateen] walking out the door" from the north bathroom door with a rifle and fire approximately three rounds as he exited the bathroom. Officer Stanley drew his handgun and fired approximately three to four rounds at Mateen until he fell. Lt. Smith then yelled, "Cease Fire!" then Officer Napolitano approached Officer Stanley and said he thought he was struck in the head. Officer Stanley instructed Officer Napolitano to go and get checked out. Officer Stanley then heard another gunshot, but did not observe it. Officer Stanley and other SWAT members entered the north bathroom and removed live victims from the building.

During the incident, Officer Stanley also received information that Mateen had a bomb in his vehicle along with explosive vests.

When asked why he used deadly force, Officer Stanley made the following statement:

"He [Mateen] was trying to kill myself and everybody else."

### Interview of Officer Kevin Easterling (IR #7)

On June 17, 2016, at 1341 hours, FDLE Special Agents Alphonso Williams and Craig Beers along with Federal Bureau of Investigation (FBI) Special Agent Kevin Ferrington conducted a sworn, digital audio recorded interview with Orlando PD Officer Kevin Easterling in the presence of his attorney, Jason Bankowitz. The interview was conducted at the FDLE Orlando Regional Operations Center (OROC) located at 500 W. Robinson Street, Orlando, Florida. In summary, Officer Easterling stated the following:

Officer Easterling acknowledged that he understood that the interview was voluntary and being conducted as part of a criminal investigation into the use of force incident. Officer Easterling stated that he watched some videos of this incident via social media.

Officer Easterling received a SWAT callout regarding an active shooter at the Pulse nightclub. Officer Easterling also received a phone call from his father (a police officer) who informed him that Mateen had shot a lot of people inside the nightclub.

Officer Easterling arrived and was positioned along the northwest corner of the building with OPD Agent Jonathan Cute and additional officers. Officer Easterling provided cover for Agent Cute and OPD Officer Tim Stanley while they removed victims/hostages from the interior of the nightclub.

Shortly thereafter, Officer Easterling assisted Officer Stanley with rescuing victims/hostages through a window. Officer Easterling then positioned himself behind a patrol vehicle while he covered the building. Officer Easterling received information that Mateen said he had made peace with "Allah" and that he was going to place four bomb vests on four hostages and send them out.

After the explosive charge attempt on the west side of the building, the BearCat was then used to breach the remaining portion of the hole. The first hole was created in the center hallway on the west side of the building. The BearCat was used to make additional holes in the wall along the west side of the building. The SWAT team was able to remove additional victims from these holes.

While positioned behind the BearCat, Officer Easterling heard approximately five small caliber gunshots coming from the area of the north restroom. Officer Easterling believed that Mateen was executing victims inside the restroom. The SWAT team then used the BearCat to create a hole in the north restroom. Mateen then appeared in the center hole and started "firing his AR-15" at the SWAT team. Officer Easterling then fired his rifle at Mateen. Officer Easterling was aiming slightly to the left of the muzzle flash coming from Mateen's rifle.

After Mateen went to the ground, Lt. Smith yelled, "Cease fire." Lt. Jonathan Bigelow was concerned that Mateen might set off a bomb and suggested that a SWAT operator should ensure that Mateen was dead. Lt.

13

Smith then approached Mateen and fired one additional round into Mateen's head. Officer Easterling assisted with extracting additional victims from the restroom prior to turning the scene over to the OCSO EOD.

Officer Easterling indicated throughout this incident, he was afraid and scared. When asked why he used deadly force, Officer Easterling made the following statements:

"I was afraid for me. I was afraid for…. my fellow SWAT, my fellow SWAT, SWAT officers."

"I didn't know the place would blow up." and "He [Mateen] came out shooting first."

## Interview of Detective Raul Rivas (IR #8)

On June 17, 2016, at 1314 hours, FDLE Special Agents Alphonso Williams and Craig Beers along with Federal Bureau of Investigation (FBI) Special Agent Kevin Ferrington conducted a sworn, digital audio recorded interview with Orlando PD Detective Raul Rivas in the presence of his attorney, Jason Bankowitz. The interview was conducted at the FDLE Orlando Regional Operations Center (OROC) located at 500 W. Robinson Street, Orlando, Florida. In summary, Detective Rivas stated the following:

Detective Rivas acknowledged that he understood that the interview was voluntary and being conducted as part of a criminal investigation into the use of force incident.

Detective Rivas responded to the Pulse nightclub and met with other SWAT members. Detective Rivas took a position near the BearCat that was parked on the south side of nightclub facing the double doors. Detective Rivas was told that Mateen was down a hallway to the left [west]. Detective Rivas left his position and entered the nightclub with OPD Officer Andrew Bishop to assess the severity of the incident. Detective Rivas then repositioned himself near the BearCat and other SWAT members.

Detective Rivas heard over the radio about an explosive breach and then heard an explosion. Detective Rivas heard that the breach failed and that the SWAT members on the west side of the building requested additional SWAT members to assist. Detective Rivas and Sergeant James Parker went to the west side of the building to assist. Detective Rivas observed two holes on the west wall and positioned himself south of the large hole. Detective Rivas was able to see inside the large hole and observed a closed door to the north. Detective Rivas then heard approximately five gunshots coming from the north bathroom.

As SWAT members deployed two distraction devices, the BearCat was then used to create holes in the north bathroom wall. Detective Rivas then observed Mateen exit the north bathroom door and also observed a "muzzle flash." Detective Rivas fired approximately seven to ten rounds at the muzzle flash and then inserted a new magazine into his weapon. Detective Rivas and Sergeant Parker approached the hole to check the status of Mateen, where they observed a battery pack lying between Mateen's legs. Mateen was lying on his back with his head facing north and his feet facing south. Detective Rivas also assisted with making additional holes on the north bathroom wall and removing live victims.

During the incident, Detective Rivas received information that Mateen called 911 and pledged his allegiance to ISIS, and that he was going to arm victims with explosive vests.

When asked why he used deadly force, Detective Rivas made the following statement:

"When he [Mateen] came out he was firing at us, and I thought he was going to hit one of us, kill one of us, and I was going to stop him."

## Interview of Lt. Jonathan Bigelow (IR #9)

On June 17, 2016, at 1449 hours, FDLE Special Agents Alphonso Williams and Craig Beers along with Federal Bureau of Investigation (FBI) Special Agent Kevin Ferrington conducted a sworn, digital audio recorded interview with Orlando PD Lieutenant Jonathan Bigelow in the presence of his attorney, Jason Bankowitz. The

14

interview was conducted at the FDLE Orlando Regional Operations Center (OROC) located at 500 W. Robinson Street, Orlando, Florida. In summary, Lieutenant Bigelow stated the following:

Lt. Bigelow acknowledged that he understood the interview was voluntary and being conducted as part of a criminal investigation into the use of force incident, and stated he did not review any video or audio recordings relating to this incident prior to this interview.

Lt. Bigelow received a SWAT callout regarding an active shooter at the Pulse nightclub. Lt. Bigelow arrived on scene where he was briefed by Lt. Scott Smith and informed that Mateen was in a bathroom inside the nightclub. Lt. Bigelow then entered the building through the receptionist area and assessed the scene. Lt. Bigelow observed SWAT members and law enforcement officers scattered throughout the building along with dead bodies on the floor. Lt. Bigelow also observed two magazines lying on the floor of the nightclub.

Lt. Bigelow acted as a facilitator and assisted in removing injured victims from the building. Lt. Bigelow heard when the OPD Communications Center advised that Mateen said he was going to strap four bomb vests on four people and send them out to four corners of the building. The SWAT team then adjusted their position based on Mateen's threat.

Shortly thereafter, Lt. Bigelow moved to the west side of the building, inspected the wall, and determined the location for the explosive breach. After the explosive charge partially breached the west side of the wall, the BearCat was then used to create additional holes in the wall.

While Lt. Bigelow assisted with removing victims from the south restroom, he heard approximately five gunshots coming from the area of the north restroom. As the BearCat was being used to breach the north restroom, Lt. Bigelow and Lt. Smith discharged two distraction devices into the building.

Lt. Bigelow stood near the west wall when he observed a muzzle flash and gunshots followed by additional gunshots. Lt. Bigelow felt the concrete from the wall hit him when he ducked his head, came back up, and fired four rounds from his rifle at Mateen. Lt. Bigelow stopped firing and reloaded an additional magazine. Lt. Bigelow approached the hole when he observed Mateen lying on the ground with a Glock handgun lying on his chest. The Glock handgun was locked back and pointing southeast.

As the SWAT team removed people from the building, a SWAT member observed Mateen moving, and a battery pack or remote near his hand. Lt. Bigelow was concerned that Mateen might set off a bomb and suggested that a SWAT operator should ensure that Mateen was dead. Lt. Smith then approached Mateen and fired one additional round to Mateen's head.

Lt. Bigelow assisted with retrieving additional victims from the building before EOD personnel cleared the area. Throughout this incident, Lt. Bigelow acted as a facilitator for the SWAT team.

When asked why he used deadly force, Lt. Bigelow made the following statement:

Mateen posed harm to "my fellow officers" which led Lt. Bigelow to believe that Mateen's actions placed his fellow officers in "graved [sic] danger of death or great bodily harm."

Lt. Bigelow believed if he did not fire his weapon at Mateen, somebody else was "going to get hurt or die."

## Interview of Officer Ricardo Duenas (IR #10)

On June 17, 2016, at 1539 hours, FDLE Special Agents Alphonso Williams and Craig Beers along with Federal Bureau of Investigation (FBI) Special Agent Kevin Ferrington conducted a sworn, digital audio recorded interview with Orlando PD Officer Ricardo Duenas in the presence of his attorney, Jason Bankowitz. The interview was conducted at the FDLE Orlando Regional Operations Center (OROC) located at 500 W. Robinson Street, Orlando, Florida. In summary, Officer Duenas stated the following:

CONFIDENTIAL-SUBJECT TO PROTECTIVE ORDER - Viramontes03382

Officer Duenas acknowledged that he understood the interview was voluntary and being conducted as part of a criminal investigation into the use of force incident, and stated he did not review any video or audio recordings relating to this incident prior to this interview.

Officer Duenas responded to the Pulse nightclub and met with his fellow SWAT members. Officer Duenas took a position of cover on the west side of the building with other officers. Officer Duenas left his position and assisted other SWAT members with removing live victims from various locations. Officer Duenas then repositioned himself on the west side of the building. During the incident, Officer Duenas received information that Mateen had explosives. The OCSO EOD personnel arrived and deployed an explosive breach on the west wall. The breach failed, so SWAT members used the BearCat to breach the remaining portion of the center hole. The BearCat was then used to create additional holes south of the center hole where the SWAT members removed several live victims from the building.

Officer Duenas heard approximately three gunshots coming from the interior of the building. Officer Duenas stood south of the center hole near Officer Michael Napolitano, then took cover behind a dumpster that was approximately fifteen yards from the wall where he had a clear view of the center hole. Officer Duenas heard "more gunfire and I see a muzzle flash" coming from the center hole. "I saw the muzzle flash coming from the hole getting bigger." Officer Duenas believed that Mateen was "gaining ground" on the SWAT members. Officer Duenas then fired approximately eleven rounds at the muzzle flash.

After learning that Officer Michael Napolitano was shot, Officer Duenas escorted him to medical treatment. Officer Duenas then assisted with extracting live victims from the west wall.

When asked why he used deadly force, Officer Duenas made the following statement:

"He [Mateen] was going to shoot someone and he's going to pop out of that hole" and he was worried other SWAT members were in danger.

**Interview of Officer Andrew Bishop (IR #11)**

On June 17, 2016, at 1605 hours, FDLE Special Agents Alphonso Williams and Craig Beers along with Federal Bureau of Investigation (FBI) Special Agent Kevin Ferrington conducted a sworn, digital audio recorded interview with Orlando PD Officer Andrew Bishop in the presence of his attorney, Jason Bankowitz. The interview was conducted at the FDLE Orlando Regional Operations Center (OROC) located at 500 W. Robinson Street, Orlando, Florida. In summary, Officer Bishop stated the following:

Officer Bishop acknowledged that he understood that the interview was voluntary and being conducted as part of a criminal investigation into the use of force incident, and stated he did not review any video or audio recordings relating to this incident prior to this interview other than what was broadcasted over the media.

At approximately 0200 hours, Officer Bishop received a SWAT callout regarding an active shooter at the Pulse nightclub. Officer Bishop arrived on scene and made contact with Lieutenant Scott Smith at the front double doors of the nightclub. Officer Bishop then took a position of cover near the double doors on the south end of the building. Officer Bishop observed SWAT members and police officers inside the building and around his location. At some point, Officer Bishop was relieved from his position and was escorted into the nightclub by Lt. Smith where Officer Bishop observed bodies scattered throughout the dance floor and lobby area along with M4 magazines.

Officer Bishop received information that Mateen had a bomb inside his vehicle that was parked north of the nightclub. Officer Bishop also received information that Mateen said he was going to place four [bomb] vests on four individuals and send them out to different sections of the nightclub. Officer Bishop then took a position of cover along the southwest corner of the nightclub near the BearCat.

Officer Bishop heard the explosion when EOD attempted to breach the west side wall. Officer Bishop observed several victims running from the west side of the building as the SWAT team breached the wall.

16

CONFIDENTIAL-SUBJECT TO PROTECTIVE ORDER - Viramontes03383

Shortly thereafter, Officer Bishop heard approximately five gunshots coming from the interior of the north restroom. Officer Bishop believed that Mateen was shooting victims. As Officer Bishop approached the west end of the building, he observed a "shadow what appeared to be umm a handgun…directly in front of me." Officer Bishop was approximately twenty to thirty feet from the wall when he observed a "muzzle flash" and believed that Mateen was "shooting" at the SWAT team. Officer Bishop then fired his rifle in the direction of the muzzle flash until Lt. Smith yelled, "Cease fire!" Officer Bishop then reloaded and inserted a new magazine into his rifle.

After EOD mentioned that Mateen had a device near his legs, Officer Bishop observed Officer Stanley and Sergeant Parker enter the holes in the building and rescue victims. The SWAT team retreated from the building after rescuing all live victims.

When asked why he used deadly force, Officer Bishop made the following statements:

"I was in fear of the officers, who were standing and still trying rescue victims, were being shot at."

"I was in fear that he was going to shoot more innocent victims."

"I was in fear that eventually, he was going to shoot me….. in the… exchange of gunfire."

### Interview of Officer Michael Napolitano (IR #12)

On June 17, 2016, at 1648 hours, FDLE Special Agents Alphonso Williams and Craig Beers along with Federal Bureau of Investigation (FBI) Special Agent Kevin Ferrington conducted a sworn, digital audio recorded interview with Orlando PD Officer Michael Napolitano in the presence of his attorney, Jason Bankowitz. The interview was conducted at the FDLE Orlando Regional Operations Center (OROC) located at 500 W. Robinson Street, Orlando, Florida. In summary, Officer Napolitano stated the following:

Officer Napolitano acknowledged that he understood that the interview was voluntary and being conducted as part of a criminal investigation into the use of force incident, and stated he did review portions of the incident from the OCSO Chase helicopter prior to this interview.

Officer Napolitano responded to the Pulse nightclub after hearing an officer call out shots fired over the radio. Officer Napolitano exited his marked patrol vehicle, retrieved his rifle, and walked toward the nightclub on foot. Officer Napolitano heard gunshots as he approached the building. Officer Napolitano met with Lieutenant Scott Smith, Officer Elio "Manny" Florin, Officer Ben Chisari, Sergeant Jeffrey Backhaus, and other officers on the south side of the building. Officer Napolitano threw his closed "ASP" baton through the window as they attempted to make entry into the nightclub.

Officer Napolitano, Lieutenant Smith, Officer Florin, Officer Chisari, Sergeant Backhaus, and other officers entered the club. Officer Napolitano went to the right toward the main dance floor with another officer. Officer Napolitano then observed bodies scattered over the floor as he moved toward the area of the west bar. Officer Napolitano was near the west bar when he heard Lieutenant Smith yell commands and observed him fire rounds at Mateen. Officer Napolitano took a position of cover behind the bar with Lieutenant Smith, Officer Chisari, and Sergeant Backhaus. Officer Napolitano then took a position in the doorway to the north and covered a hallway that led to the bathrooms.

Officer Napolitano switched roles as members of the SWAT team responded to the nightclub. Officer Napolitano was relieved by another officer so he could change into his SWAT gear. Officer Napolitano took a position covering the double doors located on the south side of the building when Officer Timothy Stanley approached Officer Napolitano and requested assistance on the west side of the building. Officer Napolitano then met with Officer Kevin Easterling, Officer Ricardo Duenas, and Officer Jonathan Cute on the west side of the building and waited for the BearCat.

Orange County Sheriff's Office (OCSO) EOD personnel also arrived on scene and deployed an explosive breach on the west wall. SWAT members used the BearCat to breach the remaining portions of the wall. While

17

removing victims from the building, Officer Napolitano heard approximately three gunshots coming from the north bathroom. SWAT members deployed a distraction device, and then used the BearCat to create a hole in the north bathroom wall.

Officer Napolitano observed SWAT members form a line south of the large hole, and joined this line on the west side. Officer Napolitano observed a "figure" in the north bathroom doorway and then "I just felt this impact like on my head and umm I fell back." Officer Napolitano knew that he was "shot in the head." Officer Napolitano rolled to his right side and fired an unknown number of rounds toward the "figure." Officer Napolitano heard someone yell, "Cease fire!" when he stood up, moved back, and reloaded a new magazine into his weapon. Officer Napolitano told Officer Stanley he was shot in the head and was then transported to the hospital.

During the incident, Officer Napolitano received information that Mateen was possibly in possession of explosive devices, and that he was going to strap bomb vests to four victims and send them out.

When asked why he used deadly force, Officer Napolitano made the following statements:

"He [Mateen] was a threat, he had a gun, he was going to kill more people, kill us, and I figured the best way to stop him was kill him."

### Interview of Sergeant James Parker (IR #13)

On June 29, 2016, at 1407 hours, FDLE Special Agents Alphonso Williams and Craig Beers along with Federal Bureau of Investigation (FBI) Special Agent Torrance Slaughter conducted a sworn, digital audio recorded interview with Orlando PD Sergeant James Parker in the presence of his attorney, Jason Bankowitz. The interview was conducted at the FDLE Orlando Regional Operations Center (OROC) located at 500 W. Robinson Street, Orlando, Florida. In summary, Sergeant Parker stated the following:

Sergeant Parker acknowledged that he understood that the interview was voluntary and being conducted as part of a criminal investigation into the use of force incident, and stated he did not review any video of the incident prior to this interview.

Sergeant Parker received a SWAT callout regarding an active shooter at the Pulse nightclub. Sergeant Parker arrived on scene and made contact with Lieutenant Scott Smith on the south side of the nightclub. Lt. Smith briefed Sergeant Parker and informed him that he believed Mateen was inside the north bathroom of the nightclub. Lt. Smith escorted Sergeant Parker along with other SWAT members into the nightclub. Sergeant Parker and the SWAT members were strategically placed inside the nightclub. Sergeant Parker observed dead bodies scattered on the dance floor. Sergeant Parker received information that Mateen was equipped with explosives on his person and inside his vehicle.

Sergeant Parker went from the interior to the exterior of the nightclub checking on SWAT members. As the west wall was being breached, Sergeant Parker assisted with removing victims from the holes in the building.

Shortly thereafter, Sergeant Parker looked through the breached hole where he observed a "body walking" followed by approximately six gunshots. Sergeant Parker believed that Mateen was shooting victims inside the bathroom. As the SWAT team created a hole in the west wall that led into the north bathroom, Sergeant Parker observed, "a handgun come out of this [center] hole just pointing straight out." Sergeant Parker "grabbed his rifle and just started shooting back into the umm hole." Once Mateen went to the ground, Sergeant Parker approached Mateen and observed a handgun off to his side and a battery pack on his leg.

As the EOD personnel instructed everyone to clear the area, the SWAT team created another hole in the wall. Sergeant Parker then crawled into the hole and removed several victims from the bathroom.

When asked why he used deadly force, Sergeant Parker made the following statements:

CONFIDENTIAL-SUBJECT TO PROTECTIVE ORDER - Viramontes03385

"I thought for sure this guy [Mateen] had explosives, I thought he was intent to blow the rest of these people up, us and anybody else, and make a big bang."

"I thought I was going to die along with a lot of my umm coworkers."

**Interview of Sergeant Fred Westerberg (IR #14)**

On June 21, 2016, at 1338 hours, FDLE Special Agents Alphonso Williams and Craig Beers along with Federal Bureau of Investigation (FBI) Special Agent Kevin Ferrington conducted a sworn, digital audio recorded interview with Orange County SO Sergeant Fred Westerberg who is assigned to the OCSO Explosive Ordnance Disposal (EOD) squad. The interview was conducted at the FDLE Orlando Regional Operations Center located at 500 W. Robinson Street, Orlando, Florida. In summary, Sergeant Westerberg stated the following:

Sergeant Westerberg acknowledged that he understood that the interview was voluntary and being conducted as part of a criminal investigation into the use of force incident, and stated he did not review any video of the incident prior to this interview.

At approximately 0319 hours, Sergeant Westerberg received a callout to respond to the Pulse nightclub regarding an active shooter. Sergeant Westerberg arrived on scene and set up a staging area for the EOD personnel. Sergeant Westerberg received information that OPD wanted to perform an explosive breach on the west wall of the nightclub. Sergeant Westerberg instructed his personnel to build the explosive charge. Sergeant Westerberg also received information that Mateen was wearing an explosive vest.

OPD SWAT team leaders instructed Sergeant Westerberg on the exact area of the wall they wanted breached. The EOD personnel placed the explosive charge on the west wall. Sergeant Westerberg then fired the charge which broke through portions of the wall. A BearCat was then used to breach the remaining portions of the wall. Sergeant Westerberg and the SWAT team were able to remove victims from this hole.

At some point, Sergeant Westerberg heard gunshots coming from the left [north] bathroom when he was approximately twenty yards from the breached point in the wall. Lieutenant Scott Smith tossed a "flash bang" into the hole. As a second flash bang was thrown into the hole, Sergeant Westerberg observed Mateen emerge from the center hole when he heard and observed "two distinctive muzzle flashes (rifle and a handgun)" directed right at him. Officer Napolitano was approximately three feet in front and to the right of Sergeant Westerberg. Sergeant Westerberg observed Officer Napolitano's head snap back as he hit the ground. Sergeant Westerberg then dropped to his knee and fired approximately twenty rounds at the muzzle flash.

After Mateen fell to the ground, Sergeant Westerberg approached Mateen and observed a power device lying between his legs. There were two wires from the battery pack that went up and underneath Mateen's legs. While Sergeant Westerberg assessed Mateen for explosive devices, Lieutenant Scott Smith called movement and fired one additional round at Mateen.

Sergeant Westerberg and the SWAT team were able to extract additional victims from the north restroom. The EOD personnel and the FBI cleared the area in an attempt to locate bomb devices inside the nightclub.

Sergeant Westerberg later discovered that Mateen did not have any explosives on his person or in the nightclub, and the battery pack was from the emergency lighting that fell down during the breach.

When asked why he used deadly force, Sergeant Westerberg made the following statements:

"I was being shot at."

"He [Mateen] was shooting at me, I was returning fire."

"I was in the open, I had no hard cover."

19

CONFIDENTIAL-SUBJECT TO PROTECTIVE ORDER - Viramontes03386

**Interview of Deputy Gerald Cavis (IR #15)**

On June 21, 2016, at 1422 hours, FDLE Special Agents Alphonso Williams and Craig Beers along with Federal Bureau of Investigation (FBI) Special Agent Kevin Ferrington conducted a sworn, digital audio recorded interview with Orange County SO Deputy Gerald Cavis, who is assigned to the OCSO Explosive Ordnance Disposal (EOD) squad, in the presence of his attorney, Jason Bankowitz. The interview was conducted at the FDLE Orlando Regional Operations Center located at 500 W. Robinson Street, Orlando, Florida. In summary, Deputy Cavis stated the following:

Deputy Cavis acknowledged that he understood that the interview was voluntary and being conducted as part of a criminal investigation into the use of force incident, and stated he did not review any video of the incident prior to this interview.

At approximately 0320 hours, Deputy Cavis received a callout to respond to the Pulse nightclub regarding an active shooter. Deputy Cavis arrived on scene and staged at the intersection of Lucerne Terrace and Kaley Street. Deputy Cavis was briefed about the incident and received information that Mateen was wearing a suicide vest and was in possession of explosive devices.

Shortly thereafter, Deputy Cavis and his fellow EOD personnel [Sergeant Westerberg and Deputy Matthew Futch] built an explosive charge to penetrate the west wall of the nightclub. The EOD personnel then met up with the SWAT team where they were instructed to place the explosive charge on the area of the wall that separated the two restrooms. Deputy Cavis was informed that there were several victims inside the south and north restrooms of the nightclub along with Mateen.

When the charge was detonated, it penetrated portions of the targeted area. The SWAT team then connected the ram to the BearCat and breached the remaining portion of the wall. Deputy Cavis and the SWAT team were able to extract several victims from the building through the hole. The BearCat was used to make additional holes into the wall to remove victims.

At some point, Deputy Cavis heard gunshots coming from the north restroom. "The suspect [Mateen] umm presents himself in that hole [center] and comes out shooting at us [law enforcement]" with a rifle. Deputy Cavis, who was near the wall, fired approximately ten rounds at the muzzle flash from his rifle.

Once the shooting ceased, Deputy Cavis and Sergeant Westerberg approached Mateen and observed a battery pack connected to wires lying near Mateen. Deputy Cavis believed Mateen was equipped with an explosive device and instructed the SWAT team to clear the area. Deputy Cavis then briefly assessed Mateen's person for additional devices with negative results.

Deputy Cavis remained with Mateen while the SWAT team made additional holes in the wall and removed victims from the building. Once all the live victims were removed from the building, all personnel cleared the area. Shortly thereafter, EOD personnel, OPD SWAT, and the FBI entered the building and checked each deceased victim for explosives.

Deputy Cavis later discovered that the emergency lighting sign fell from the restroom and broke inside a sink during the incident. Deputy Cavis then realized that the battery pack and wires near Mateen were similar to the broken emergency lighting sign.

During this incident, Deputy Cavis allowed Deputy Futch to use his assigned Glock 21 pistol because Deputy Futch did not have his weapon at the time of the shooting.

When asked why he used deadly force, Deputy Cavis made the following statements:

"I was in fear for my life and the life of my team members, so we had to respond accordingly."

"It was apparent at the point, that he [Mateen] was trying to kill us."

CONFIDENTIAL-SUBJECT TO PROTECTIVE ORDER - Viramontes03387

**Interview of Deputy Matthew Futch (IR #16)**

On June 22, 2016, at 1309 hours, FDLE Special Agent Alphonso Williams, and Federal Bureau of Investigation (FBI) SA Kevin Ferrington conducted a sworn, digital audio recorded interview with Orange County SO Deputy Matthew Futch who is assigned to the OCSO Explosive Ordnance Disposal (EOD) squad. The interview was conducted at the FDLE Orlando Regional Operations Center located at 500 W. Robinson Street, Orlando, Florida. In summary, Deputy Futch stated the following:

Deputy Futch acknowledged that he understood that the interview was voluntary and being conducted as part of a criminal investigation into the use of force incident, and stated he did not review any video of the incident prior to this interview.

Deputy Futch arrived on scene and parked the Orange County SO "Breacher" van at Lucerne Terrace and Kaley Street. Deputy Futch was instructed to build an explosive charge for the west wall of the nightclub. Deputy Futch received information that Mateen had killed approximately twenty people and he was armed with an assault rifle. Deputy Futch also heard information that Mateen was wearing an explosive vest, placed four explosive vests on four victims, and had explosives inside his van which was parked in the parking lot of the nightclub.

Shortly thereafter, Deputy Futch, Deputy Gerald Cavis and Sergeant Fred Westerberg met with the OPD SWAT team on the southwest corner of the nightclub. The SWAT team instructed Deputy Futch and his team to place the explosive charge on the west wall between the two restrooms. After the charge was fired, the BearCat was used to breach the remaining portion of the hole. Deputy Futch then retrieved Deputy Cavis' pistol [Glock 21] and provided cover on the hole in the wall. As the BearCat made additional holes in the wall, the SWAT team was able to remove victims from the south restroom.

At some point, Deputy Futch heard approximately ten gunshots coming from the north restroom. One of the OPD SWAT members tossed two "flash bangs" into the initial breach point. Deputy Futch then retreated near the dumpster. As the BearCat penetrated the wall near the north restroom, Deputy Futch observed most of Mateen's body and muzzle flashes appear from the initial hole. Deputy Futch also observed Mateen aiming a gun southwest toward law enforcement. Deputy Futch was approximately fifteen to twenty yards away when he returned fire.

After the gunshots ceased, Deputy Futch approached the wall along with other law enforcement personnel where he observed wires and a power source on Mateen's body. Deputy Futch stood near Lieutenant Scott Smith when Lt. Smith fired an additional round at Mateen. Once all victims were removed from the north restroom, everyone cleared the area and staged near the northwest corner.

After clearing the building, Deputy Futch stated that they did not locate any bomb devices on Mateen or in the nightclub.

When asked why he used deadly force, Deputy Futch made the following statements:

"I believe he was going to kill umm an officer or deputy."

"He did not appear…to be shooting at me, umm he appeared to be shooting at the other deputies and officers.... directly to the south of the entry point."

---

**Law Enforcement Witness Interviews**

---

**Interview of Officer Ben Chisari (IR #17)**

On June 21, 2016, at 1001 hours, FDLE Special Agents Alphonso Williams and Craig Beers conducted a sworn, digital audio recorded interview with Orlando PD Officer Ben Chisari at the FDLE Orlando Regional

CONFIDENTIAL-SUBJECT TO PROTECTIVE ORDER - Viramontes03388

Operations Center located at 500 W. Robinson Street, Orlando, Florida. In summary, Officer Chisari stated the following:

At approximately 0200 hours, Officer Chisari responded to the Pulse nightclub after hearing shots fired over the radio. Officer Chisari arrived on scene and parked his vehicle east of the nightclub. Officer Chisari heard gunshots coming from the nightclub as he retrieved his rifle from his vehicle. Officer Chisari continued to hear gunshots as he walked to the south side of the nightclub. Officer Chisari heard Mateen reload his rifle a few times as he stood in front of the nightclub.

Officer Chisari joined a team that consisted of Lt. Smith, Sergeant Backhaus, Officer Napolitano and Officer Manny [Elio] Florin. Officer Napolitano smashed out the window on the south side of the nightclub so they could see inside. Officer Chisari could not remember if the team entered the building through the window or a door but when they cleared portions of the building, they heard gunshots coming from a restroom on the west side. Officer Chisari and Officer Florin covered the north dressing room and stage area while the other members of the team positioned themselves behind a bar on the west side of the building.

Lt. Smith and Sgt. Backhaus fired rounds at Mateen who was positioned near the two restrooms. Officer Chisari saw Lt. Smith fire his weapon, but could not see Sergeant Backhaus fire. Officer Chisari then moved behind the bar and assisted with covering the hallway where the two restrooms were located.

Shortly thereafter, Officer Chisari moved north toward the stage as he continued to watch the doors on that side. After an hour had elapsed, Officer Chisari received information that Mateen was in possession of a bomb and that he was going to blow the nightclub up within fifteen minutes. Officer Chisari and his fellow coworkers moved past the main dance floor onto the back patio area. Officer Chisari observed several bodies scattered throughout the main dance floor. There was another team that covered the bar and bathroom area where Mateen was hiding.

Officer Chisari remained on the patio area throughout this incident.

**Interview of Officer Elio Florin (IR #18)**

On June 21, 2016, at 1022 hours, FDLE Special Agents Alphonso Williams and Craig Beers conducted a sworn, digital audio recorded interview with Orlando PD Officer Elio Florin at the FDLE Orlando Regional Operations Center located at 500 W. Robinson Street, Orlando, Florida. In summary, Officer Florin stated the following:

Officer Florin arrived at the Pulse nightclub and met Lieutenant Scott Smith on the south side of the building near the main door. Officer Florin heard multiple gunshots coming from the nightclub. Officer Florin, Lt. Smith and additional officers entered the nightclub through a broken window or the main door. Officer Florin continued to hear gunshots coming from the west side restroom as he entered the building.

The gunshots stopped as Officer Florin moved through the nightclub. Officer Florin remembered being on the west side of the building behind a bar with Lt. Smith, Sergeant Backhaus, Officer Ben Chisari and Officer Napolitano. While in this position, Lt. Smith directed Officer Florin to clear a hallway near the bar when Officer Florin heard gunshots. Officer Florin turned toward the bar where he observed his fellow officers pointing their weapons in the direction of the hallway. Officer Florin then walked behind the bar and stood next to Lt. Smith.

Shortly thereafter, Officer Florin assisted with moving two victims from behind the bar and turning them over to another police officer. Officer Florin then went back to his position and stood next to Officer Chisari and covered a door. During the incident, Officer Florin received information that Mateen pledged allegiance to the Islamic State.

At some point, Officer Florin moved to another position prior to being relieved by a SWAT team member. Upon being relieved from his position, Officer Florin exited the nightclub and assisted with helping and escorting injured victims away from the nightclub.

CONFIDENTIAL-SUBJECT TO PROTECTIVE ORDER - Viramontes03389

**Interview of Officer Jonathan Cute (IR #19)**

On June 21, 2016, at 1022 hours, FDLE Special Agent Mark Mynheir conducted a sworn, digital audio recorded interview with Orlando PD Officer Jonathan Cute at Boone High School, 1000 East Kaley Street, Orlando, FL. In summary, Officer Cute stated the following:

In the early morning hours of June 12, 2016, Officer Cute received a text message of a SWAT callout involving an active shooter at the Pulse nightclub and responded to the scene. The SWAT team did not have time for a formal briefing because the scene was still dynamic, so he, Lieutenant Jonathan Bigelow, and approximately three other SWAT team members loaded into one of the armored personnel carriers (BearCat) and drove to the west side of the nightclub.

The SWAT team set up a perimeter and established a hold on the northwest corner of the building. The west side of the building was concrete block, with exits on the north side. These officers positioned themselves where they could also cover the doors on the north side. Mateen's vehicle was located approximately twenty-five yards to their east, and the bomb dogs "hit" on it. Officer Cute and the other SWAT team members could not give up their position, so they remained at their position while the bomb unit examined the vehicle.

The officers on scene were advised over the radio that there were officers inside the nightclub. They believed that Mateen was in one of the bathrooms and that Mateen was also on the terrorist watch-list, which heightened Officer Cute's concern. Mateen had at least one rifle, and had killed approximately twenty people. They were also told that Mateen had made peace with Allah, had four bomb vests, and he was going to strap them to four hostages.

Officer Cute was further advised over the radio that four victims were trapped in a dressing room on the north side of the building near the door. These victims/hostages called the OPD dispatchers and stated that they could hear the officers outside. Officer Cute and Officer Tim Stanley opened the north door, and Officer Cute called out, "Orlando Police." The victims/hostages responded and exited the dressing room. Officer Cute and Officer Stanley cleared the dressing room and exited the building and returned to their position on the northwest corner because of a potential crossfire with other officers positioned inside the club. They were advised over the radio that Mateen was going to send out the four people with the bomb vests in fifteen minutes and have them detonate. The SWAT team was also made aware that additional victims were hiding throughout the nightclub.

A window air-conditioning unit was embedded into the concrete block on the northwest corner of the building. Officer Cute and other officers pushed the air conditioner in and were able to get eight more people out of the building through that hole. They tried to gather information from these victims/hostages and then turned them over to patrol officers to be removed from the area.

The Orange County Sheriff's Office (OCSO) Explosive Ordnance Disposal unit assisted OPD's SWAT team by placing a rectangular shape charge on the west wall of the nightclub in an attempt to blow a hole through to the second restroom where additional victims/hostages were hiding. They detonated the charge, but it did not blow the wall completely in; it only weakened the area. They used the BearCat to push the wall in and create a hole large enough to enter/exit. The officers rescued approximately twelve people with various injuries from the restroom and some of these victims/hostages needed to be carried out. Several more holes were punched in the west wall.

Officer Cute along with Lieutenant Scott Smith, Detective Raul Rivas, Officer Andrew Bishop, Officer Kevin Easterling, Sergeant James Parker, and Lieutenant John Bigelow were able to see the door to the bathroom where Mateen was holding the hostages. The holes in the wall were too small for an officer with all their gear on to crawl through, but they could cover the door with their weapons. They rolled flashbangs into the hallway to contain Mateen in the bathroom.

Officer Cute used the BearCat for cover as he kept his firearm trained on the bathroom door through one of the holes in the wall. When the BearCat started backing out, he no longer had a good view of the bathroom door.

23

Lieutenant Bigelow moved around the BearCat to the other side to get a better line of sight when they heard what sounded like slow and deliberate gunshots coming from inside of the bathroom.

Officer Cute did not want Lieutenant Bigelow to be on that side without backup, so he attempted to run behind the BearCat to get to the other side. As Officer Cute was behind the BearCat, the driver started backing up, and Officer Cute was nearly struck by the vehicle. As he came around the BearCat, Officer Cute heard more gunshots that were louder and clearer, as if the person had cleared the doorway and was shooting at them. He heard his fellow SWAT team members fire their weapons and could see Lieutenant Bigelow firing his rifle into the building.

The firing stopped, and Officer Cute moved forward to a hole in the wall where he saw Mateen lying on his back with the pistol next to him. Mateen had what appeared to be a battery with wires coming out of it and affixed to his right side.

One of the EOD officers said, "He [Mateen] has a device. He has a device." Lieutenant Smith then fired a single round into Mateen's head. The officers were concerned that there could still be a second suspect inside, and the EOD officers wanted the rest of the officers to back out of the area because of the possibility of explosives in the building and on Mateen.

Officer Cute could hear people screaming for help from the bathroom. The officers used a hammer to make the hole larger and called for the people to come out of the bathroom. Some people came out, but then several OPD officers went into the building through the hole and pulled additional victims out.

## Interview of Officer Robert Woodyard (IR #23)

On June 21, 2016, at 1022 hours, FDLE Special Agent Mark Pellham conducted a sworn, digital audio recorded interview with Orlando PD Officer Robert Woodyard at 595 N. Primrose Rd., Orlando, FL. In summary, Officer Woodyard stated the following:

Officer Woodyard is a member of the OPD Special Weapons and Tactics Team (SWAT) and was notified at approximately 0200 hours to respond to Orange Avenue and Harding Street, near Pulse nightclub. Officer Woodyard met with other members of the SWAT team near the location and was briefed on the active shooter situation. Additional information was that Mateen had stopped shooting but was still inside the Pulse nightclub with multiple hostages.

During the operation, Officer Woodyard operated the armored personnel carrier (BearCat) and rammed the building approximately six times while attempting to breach a hole in the building. Approximately ten SWAT members aided in the operation and removed several individuals from the building. While outside, the SWAT team was removing individuals from the building when they heard gunfire coming from inside. Officer Woodyard utilized the BearCat and created an additional hole in the building where the gunfire was heard. Once the breach was completed, Officer Woodyard saw what he believed to be an individual moving toward the SWAT team located outside. After the individual moved toward the breach location, Officer Woodyard heard an unknown SWAT member indicate on the radio "contact." Officer Woodyard explained that "contact" indicates that a threat is being observed. Officer Woodyard then saw the SWAT members fire toward the breach location.

## Interview of Officer Brandon Cornwell (IR #20)

On June 12, 2016, at 0800 hours FDLE Special Agent Lisa Gundrum conducted a voluntary, sworn, recorded interview of Belle Isle Police Department (BIPD) Officer Brandon Cornwell. The interview was conducted at the Orlando Police Department, 100 South Hughey Avenue, Orlando, Florida. Also present during the interview was Federal Bureau of Investigation Special Agent Kate Holloway. In summary, Officer Cornwell stated the following:

CONFIDENTIAL-SUBJECT TO PROTECTIVE ORDER - Viramontes03391

On June 12, 2016, Officer Cornwell was working in his official capacity as a police officer when he heard a "signal 43" call over the radio for OPD in regard to shots fired inside a nightclub. Being approximately a minute and a half away, Officer Cornwell responded to the incident location.

Upon arriving, Officer Cornwell parked next to the Dunkin Donuts on North Orange Avenue, exited his vehicle, removed his long gun and ran on foot to the direction of gunfire. As Officer Cornwell approached the nightclub, he observed four to six officers on scene and heard gunshots from inside the nightclub.

Officer Cornwell took a position on the northwest side of the building with an OPD officer. From Officer Cornwell's location, he could see through the glass window into the nightclub. Officer Cornwell heard more gunshots, but did not see anyone with a gun. Officer Cornwell and the other officers on scene entered the building through an open door on the south side of the nightclub. As he started to enter the nightclub, there was rapid fire, and someone said something to the effect of, "he is reloading, take a position." Officer Cornwell ran and took cover by a vehicle. Officer Cornwell observed an officer break a glass window, and Officer Cornwell along with approximately six officers entered the nightclub through this broken window. Officer Cornwell and the officers walked to the bar area of the nightclub where the group separated. Officer Cornwell along with another officer went to the back of the nightclub and cleared what Officer Cornwell believed to be a male's bathroom. Officer Cornwell heard screaming from a hallway area that contained two doors and took a position at the left side of the bar which allowed him to cover the door on the right side of the hall. Three additional officers, OPD Lieutenant Smith, OPD K9 Officer Florin, and Sergeant Backhaus took positions behind the bar and covered the door on the left side of the hall. Officer Cornwell indicated movement and "shadows" could be seen through the "bubble" like glass windows of the bathroom doors.

Two to four minutes later, Officer Cornwell believed an OPD Lieutenant yelled, "Show me your hands, show me your hands," while looking down the hallway. Officer Cornwell was not able to see the person, or which direction the person came from, but the officers fired rounds at this person who retreated back into the room. While positioned at the end of the bar, Officer Cornwell indicated there were two people behind the bar; one was shot and the other person requested help. One of the three officers positioned behind the bar dragged the male outside the nightclub.

Shortly thereafter, a white male in a white T-shirt, covered in blood exited with his hands up from the door that the officers just fired toward. According to Officer Cornwell, it was apparent the male had been shot. The male was directed to low crawl with his hands up toward the door, and Officer Cornwell scanned the male for weapons. After reaching the door, the male was taken by two officers.

Not long afterward, the OPD Lieutenant received information that Mateen had "C-4," (an explosive) and for everyone to get out of the nightclub. Officer Cornwell then maintained a position at the back door. Officer Cornwell did not go back into the building, but held security at the back door and at the broken window in addition to assisting with the search of people exiting the nightclub and the transportation of injured people.

Officer Cornwell activated his AXON body camera during the incident. A copy of the recorded incident from Officer Cornwell's body camera was obtained and reviewed by SA Gundrum. The entire recording is divided into seven segments, however, the following segment shows when Officer Cornwell entered the nightclub with the OPD officers:

**Surveillance Video**
Segment 1: AXON_ Body_2_Video_2016-06-12_0206
Duration: 30 minutes

Description: The recording captured Officer Cornwell arriving on scene and shortly thereafter entering the nightclub with other officers on scene. The recording captured Officer Cornwell's position and other officers' positions in the nightclub. At one point, Officer Cornwell returned to the outside of the nightclub and remained at the broken front window outside the nightclub. The recording captured communication between officers inside the nightclub, radio traffic, and communication between officers outside the nightclub. The recording also captured the audio from the shots being fired by Lt. Smith and Sgt. Backhaus while behind the west bar.

CONFIDENTIAL-SUBJECT TO PROTECTIVE ORDER - Viramontes03392

**Civilian Witness Interviews**

During this investigation, several victims were interviewed by law enforcement, but only the following individuals witnessed the use of force incident by law enforcement personnel.

### Interview of Jonathan Watts (IR #24)

On June 13, 2016, at 1320 hours, FDLE Special Agent Alphonso Williams conducted a sworn, digital audio recorded interview with Jonathan Watts at the intersection of Grant Street and Orange Avenue, Orlando, FL in his agency issued vehicle. Watts is the manager of "One-Way Valet" and was working at the Pulse nightclub during the incident. In summary, Watts stated the following:

Watts started his shift at the Pulse nightclub at 2100 hours. Watts did not observe anything out of the ordinary until approximately 0130 hours. While Watts was parking a vehicle along Kaley Street, he observed a van parking underneath a canopy at the rear of Pulse nightclub. Watts never saw the driver of the van and because it was late, Watts did not instruct the driver of the van that the area was off limits.

Shortly thereafter, Watts stood at the podium near the front of the nightclub talking with Orlando PD Officer Adam [Gruler] who was sitting inside his unmarked vehicle. Just prior to 0200 hours, Watts and Detective Gruler heard multiple volleys of gunshots coming from the nightclub. Detective Gruler then exited his vehicle, radioed "Shots fired," drew his handgun and pointed it at the front door of the nightclub. Watts did not see Detective Gruler fire his weapon.

Watts remained behind Detective Gruler's vehicle until he realized that the gunshots were not going to stop, which is when he ran and hid behind the Dunkin Donuts' wall. After two minutes elapsed, Watts observed a person running from the double doors of the nightclub and collapse to the ground. Watts and a coworker ran south on Orange Avenue and away from the nightclub. Watts continued to hear gunshots as he hid behind a building. Watts stated that the gunshots would stop for a moment and then continue. Watts also observed several police officers throughout the area assisting injured gunshot victims.

### Interview of Johnathan Amaya (IR #21)

On June 12, 2016, at 0744 hours, FDLE Special Agent Alphonso Williams conducted a sworn, digital audio recorded interview with Johnathan Amaya at the Orlando PD located at 100 S. Hughey Avenue, Orlando, FL. Amaya has been employed by the Pulse nightclub for two months. In summary, Amaya stated the following:

Amaya arrived at the Pulse nightclub to start his shift at approximately 2317 hours. Amaya's duties consisted of walking around the nightclub and picking up debris and dishes. Prior to the shooting incident, there was nothing unusual about the environment within the nightclub from any other Saturday night.

At approximately 0200 hours, while Amaya was on the patio, he heard gunshots and assumed it was a mix from the "DJ." Amaya then observed patrons from inside the nightclub screaming and running. Amaya immediately hit the ground, then got up and ran behind the patio bar with one of his coworkers as he continued to hear gunshots. Amaya then ran out of the nightclub through the rear exit.

Amaya ran to the parking lot of the Dunkin Donuts and hid behind a parked vehicle. From that location, Amaya observed a police officer [Gruler] standing behind a patrol vehicle and firing his weapon in the direction of the Pulse nightclub. Amaya believed the police officer fired approximately two rounds. Amaya then observed a group of police officers shoot out the front window of the nightclub in an attempt to enter the building. Amaya continued to hear gunshots coming from the interior of the nightclub.

CONFIDENTIAL-SUBJECT TO PROTECTIVE ORDER - Viramontes03393

## Interview of Christi Wallace-Clarke (IR #22)

On June 12, 2016, at 0801 hours, FDLE Special Agent Alphonso Williams conducted a sworn, digital audio recorded interview with Christi Wallace-Clarke at the Orlando PD located at 100 S. Hughey Avenue, Orlando. In summary, Wallace-Clarke stated the following:

Wallace-Clarke arrived at the Pulse nightclub at 2245 hours. Everyone inside the nightclub was having fun and listening to music. Wallace-Clarke purchased drinks at the bar and was dancing with her friends. At approximately 0200 hours, Wallace-Clarke was out on the porch when she heard several gunshots. Wallace-Clarke did not know what was going on until she observed several patrons running and exiting the nightclub through a gate. Wallace-Clarke joined the crowd and followed them out of the nightclub.

While in the parking lot, Wallace-Clarke observed a police officer [Gruler] fire his weapon from behind a vehicle. Wallace-Clark observed the muzzle flash but did not know who the police officer was shooting at. The police officer was yelling, but Wallace-Clarke could not determine what was being said.

Wallace-Clarke then ran and hid behind a parked vehicle along with the three other patrons from the nightclub where she continued to hear gunshots. While moving to a different location, Wallace-Clarke assisted with helping an injured female who had been shot in the forearm. Wallace-Clarke observed several additional injured victims from the nightclub.

Wallace-Clark recorded portions of the scene after she fled the nightclub from her cellular phone. The video footage was turned over to the Federal Bureau of Investigation (FBI).

## Interview of Rebeca Hernandez (IR #30)

On June 12, 2016, at 0745 hours, FDLE Special Agent Steve Brenton conducted a sworn, digital audio recorded interview with Rebeca Hernandez at the Orlando PD located at 100 S. Hughey Avenue, Orlando. In summary, Hernandez stated the following:

Hernandez was on vacation with friends at the Pulse nightclub. Hernandez was on the patio area of the nightclub when she observed club patrons exiting the door from the patio area, then exiting the patio area into the parking lot on the south side of the nightclub. Hernandez then ran behind the patrons and hid behind a vehicle that was parked adjacent to West Esther Street. As Hernandez heard several gunshots from the area of the nightclub, she entered the vehicle she was hiding behind and discovered that the vehicle was an undercover police vehicle.

Hernandez then panicked and attempted to call her friends that were with her at the nightclub. Hernandez looked through the window of the vehicle and observed a police officer [Gruler] fire approximately seven rounds toward the front door of the nightclub. Hernandez estimated that this police officer was approximately 15 to 20 feet away from her when he fired his weapon. The police officer was halfway between the front door of the club and the vehicle Hernandez was hiding in. Hernandez did not see who the police officer was firing at. Hernandez described the shooting as constant shooting, but could not distinguish where the shots were coming from or who was shooting.

Hernandez eventually exited the vehicle and observed police officers dragging injured victims out of the nightclub.

Hernandez recorded video from her cellphone after she exited the unmarked police vehicle. SA Brenton took custody of Hernandez' cellphone and gave it to the Orlando PD forensic team who later turned the phone over to the FBI.

CONFIDENTIAL-SUBJECT TO PROTECTIVE ORDER - Viramontes03394

## Interview of Solana Luna (IR #31)

On June 12, 2016, at 0803 hours, FDLE Special Agent Steve Brenton conducted a sworn, digital audio recorded interview with Solana Luna at the Orlando PD located at 100 S. Hughey Avenue, Orlando. In summary, Luna stated the following:

Luna and her friends were on vacation and visited the Pulse nightclub. Luna was with her friend, Rebeca Hernandez, on the patio area of the nightclub when she heard a "pop," and assumed it was a sound effect by the disc jockey. Luna realized something was wrong when she observed club patrons running and exiting out the patio door. Luna then ran behind the patrons toward the parking lot on the south side of the building. Luna then observed an Orlando PD police officer yelling and instructing people to get out of the nightclub. The police officer was armed with a handgun and had it pointed in the direction of the nightclub.

The OPD officer stood near a blue vehicle that was parked in a parking space facing West Esther Street on the south side of the nightclub. Luna described the police officer as a heavy-set white male, tall with light brown hair and big ears.

Luna ran from the nightclub toward West Esther Street. As Luna passed the OPD officer, she heard several gunshots and assumed that the shots were being fired by the OPD officer. Luna never saw the police officer fire his weapon. Luna never saw Mateen inside the club and was not aware of any other person(s) firing a weapon.

## Video/Sequence of Events (IR #26)

FDLE Special Agent Alphonso Williams obtained and reviewed video footage from OPD Officer Ann Mislang's vehicle dash camera, Pulse nightclub interior surveillance camera, OPD Mobile Command Unit, OCSO Chase helicopter and the Seminole County Sheriff's Office (SCSO) Alert helicopter as it relates to the use of force incident. In summary, the aforementioned videos reflect the following:

### Edgewood Officer Michael Myles Body Worn Camera:
AXON Flex Video 2016-06-12-0207
Length: 19 minutes 3 seconds

Description: The video was retrieved from Edgewood Officer Michael Myles' body camera. The video shows Officer Myles exiting his patrol vehicle at the nightclub. While Officer Myles is standing behind a vehicle and facing the south side of the nightclub, Officer Michael Napolitano is observed throwing an object [baton] through a window.

 

28

CONFIDENTIAL-SUBJECT TO PROTECTIVE ORDER - Viramontes03395

*Elapsed Time:*

    A. 01:42 seconds: Officer Napolitano throws his baton through a window on the south side of the nightclub

**Surveillance video**
OPD marked vehicle's dash camera #8959
Length: 12 minutes 23 seconds

Description: Video was retrieved from a stationary dash camera from Officer Ann Mislang's assigned patrol vehicle [#8959]. The video depicts patrons running from Pulse nightclub while several gunshots could be heard in the background. Detective Gruler was also observed firing approximately three rounds from his handgun in the direction of the nightclub.



*Elapsed Time:*

    A. 00:23 seconds: Detective Gruler and an unknown police officer run in the roadway toward the front hood of a marked patrol vehicle

    B. 00:48 seconds: Detective Gruler fired one round in the direction of the nightclub, walks out of the view of the camera and two additional muzzle flashes can be seen and heard from his position.

**Surveillance video**
Interior Camera of Pulse Nightclub from Camera #4 (no audio)
Length: 18 minutes 47 seconds

Interior Camera of Pulse Nightclub from Camera #5 (no audio)
Length: 19 minutes

The time stamp on the video is not accurate and is approximately one hour and thirteen minutes behind the actual time. For example, the stamp says 00:57, but the actual time is 02:11 hours.

Description: Video was retrieved from camera #4 and #5 of the Pulse nightclub and provided to FDLE by the Federal Bureau of Investigation (FBI). The footage is an overhead view of the west side bar. The video depicts OPD and Belle Isle police officers behind a bar and pointing their weapons west of their position. The footage shows debris falling off the counter as Lieutenant Scott Smith and Sergeant Jeffrey Backhaus fire their weapons.

CONFIDENTIAL-SUBJECT TO PROTECTIVE ORDER - Viramontes03396



*Elapsed Time:*

A. 04:56 [2:15 a.m. ***approximate actual time,*** 01:02:20 ***timestamp***] Lt. Smith and Sgt. Backhaus stood behind a bar and fired their rifles to the west toward the south bathroom.

## Surveillance video
OPD Mobile Command Unit
Length: 2 hours 30 seconds

Description: The video footage was retrieved from a stationary camera from the top of the OPD Mobile Command Unit. The video is an overhead view and the view of the incident is partially obstructed by trees. The footage shows an explosion to the west side wall of the nightclub, a SWAT armored vehicle [BearCat] penetrating and breaching the west side wall while SWAT members extracted several victims from the building. The video also shows when the BearCat quickly penetrated the northwest wall, SWAT members were observed firing several rounds in the direction of the building.



30

CONFIDENTIAL-SUBJECT TO PROTECTIVE ORDER - Viramontes03397

*Elapsed Time:*

A. 01:32:01: (5:01 a.m. **approximate actual time**) An explosion to the west side wall is observed.

B. 01:38:03-01:44:45: (5:07 a.m. to 5:13 a.m. ***approximate actual time***) The BearCat breaches the west side wall/south restroom while SWAT members are escorting several victims from the building.

C. 01:44:46 -01:45:21: (5:13 a.m. to 5:14 a.m. ***approximate actual time***) The BearCat moves to the north restroom, two distraction devices are deployed. The BearCat repeatedly breaches the northwest wall and SWAT members can be seen firing several rounds in the direction of the wall.

**Surveillance video**
OCSO Chase Helicopter
Length: 50 minutes 49 seconds

Description: The video shows the Chase helicopter flying above the Pulse nightclub while police officers are escorting victims from the building. The footage also shows several SWAT members firing their weapons on the west side of the nightclub.

*Elapsed Time:*

08:44 Several SWAT members fired rounds in the direction of the west side of the nightclub.

**Surveillance video**
SCSO Alert Helicopter
Length: 16 minutes 39 seconds

Description: The video shows SWAT members along the west side of the nightclub area prior to the use of force incident. This video does not capture the use of force incident.

**Firearms (IR #33)**

SA Alphonso Williams obtained all firearms that were used by Orlando PD and Orange County SO during this use of force incident. On June 15, 2016, these weapons were forwarded to FDLE Firearm's Section where test fires were generated. These test fires were turned over to the FBI on June 17, 2016. Test fires analyses were conducted on the following weapons:

| FDLE Item# | Agency Exhibit# | Description |
|---|---|---|
| 1 | AW1 | One 45 Auto caliber Glock model 21 pistol, serial number KVR160 (Deputy Cavis' handgun, utilized by Deputy Futch) |
| 2 | AW2 | One 45 Auto caliber Heckler & Koch model UMP semiautomatic pistol, serial number 163-002969 (Deputy Cavis' rifle) |
| 3 | AW3 | One 45 Auto caliber Heckler & Koch model UMP semiautomatic pistol, serial number 163-003328, and one sight (Sergeant Westerberg's rifle) |
| 9 | DG1 | One 5.56 NATO caliber SIG Sauer model SIGM400 semiautomatic rifle, serial number 20J008379, one magazine, and twenty-six 223 Remington caliber cartridges (Sergeant Parker's rifle) |
| 10 | DG2 | One 357 SIG caliber SIG Sauer model P226 semiautomatic pistol, serial number U730227, one magazine, and six 357 SIG caliber cartridges (Officer Stanley's handgun) |
| 11 | DG3 | One 5.56 NATO caliber SIG Sauer model SIGM400 semiautomatic rifle, serial number 20J008378, one magazine, and twenty-eight 223 Remington caliber cartridges (Sergeant Backhaus' rifle) |
| 12 | DG4 | One 9mm Luger caliber SIG Sauer model P226 semiautomatic pistol, serial number UU625951, one magazine, fifteen 9mm Luger caliber cartridges, and one sealed manila envelope listed as containing "(1) 9mm round from chamber" (Detective Gruler's handgun) |

CONFIDENTIAL-SUBJECT TO PROTECTIVE ORDER - Viramontes03398

| 13 | DG5 | One 357 SIG caliber SIG Sauer model P226 semiautomatic pistol, serial number UU706099, one magazine, and twelve 357 SIG caliber cartridges (Officer Duenas' handgun) |
| 14 | DG6 | One 5.56 NATO caliber SIG Sauer model SIGM400 semiautomatic rifle, serial number 20J008377, one magazine, and twenty-eight 223 Remington caliber cartridges (Lt. Bigelow's rifle) |
| 15 | DG7 | One 5.56 NATO caliber SIG Sauer model SIGM400 semiautomatic rifle, serial number 20J008384, one magazine, and twenty-five 223 Remington caliber cartridges (Detective Rivas' rifle) |
| 16 | DG8 | One 5.56 NATO caliber SIG Sauer model SIGM400 semiautomatic rifle, serial number 20J009054, one magazine, and twenty-five 223 Remington caliber cartridges (Officer Easterling's rifle) |
| 17 | DG9 | One 45 Auto caliber Heckler & Koch model UMP submachine gun, serial number 163-001773, one magazine, and twenty-four 45 Auto caliber cartridges (Officer Napolitano's rifle) |
| 18 | DG10 | One 5.56 NATO caliber SIG Sauer model SIGM400 semiautomatic rifle, serial number 20J008383, one magazine, and twenty-eight 223 Remington caliber cartridges (Officer Bishop's rifle) |
| 19 | DG11 | One 5.56 NATO caliber Knight's Armament model SR-16 Stoner Rifle semi/full automatic rifle, serial number KA80004, one magazine, and twenty-eight 223 Remington caliber cartridges (Lt. Smith's rifle) |

**Note:** *The entire crime scene was processed by the FBI. All evidence from the Pulse nightclub and the Medical Examiner's Office were recovered and collected by the FBI.*

## Medical Examiner's Report (IR #34)

The following is a summary of the Medical Examiner's report on Omar Mir Seddique Mateen, prepared by the District Nine (9) Associate Medical Examiner, Joshua D. Stephany, dated August 5, 2016.

**Date of Death:**        June 12, 2016
**County:**        Orange
**Date and Time of Autopsy:** June 13, 2016 at 1500 hours
**Cause of Death:**        Multiple gunshots wounds
**Manner of Death:**        Homicide

I. Penetrating gunshot wound of the head and neck:
A.    Entrance wound on the superior right scalp
B.    Stippling, soot, and muzzle imprint are absent
C.    Multifocal subgaleal hemorrhage
D.    Linear and comminuted fractures of the base of the skull and calvaria
E.    Lacerations of the right cerebral hemisphere
F.    Cortical contusions of the cerebral hemispheres
G.    Lacerations of the right cerebellum
H.    Oval defect in the right occipital bone
I.    Lacerations and hemorrhage of the musculature of the posterior right neck
J.    Deformed projectile recovered from the musculature of the right neck
K.    Direction of the path of the wound is front to back and downward

II. Perforating gunshot wound of the right chest:
A.    Entrance wound on the right chest
B.    Stippling, soot, and muzzle imprint are absent
C.    Lacerations and hemorrhage of the musculature of the right chest
D.    Fractures of the proximal right clavicle
E.    Exit wound on the inferior right neck
F.    Fragments of projectile recovered along the path of the wound
G.    Direction of the path of the wound is right to left and upward

III. Perforating gunshot wound of the right chest:

CONFIDENTIAL-SUBJECT TO PROTECTIVE ORDER - Viramontes03399

A.      Entrance wound on the lateral right chest
B.      Stippling, soot, and muzzle imprint are absent
C.      Lacerations and hemorrhage of the musculature of the lateral right chest
D.      Exit wound on the lateral right back
E.      Direction of the path of the wound is front to back, slightly right to left, and downward

IV. Penetrating gunshot wound of the abdomen:
A.      Entrance wound on the right abdomen
B.      Stippling, soot, and muzzle imprint are absent
C.      Lacerations and hemorrhage of the subcutaneous soft tissue and musculature of the abdomen
D.      Projectile fragment recovered from the subcutaneous soft tissue of the right abdomen
E.      Direction of the path of the wound is right to left and slightly upward

V. Penetrating gunshot wound of the right lower extremity:
A.      Entrance wound on the posterior right calf
B.      Stippling, soot, and muzzle imprint are absent
C.      Lacerations and hemorrhage of the musculature of the right lower extremity
D.      Fractures of the right tibia and fibula
E.      Fragmentation of projectile within the soft tissue and musculature of the right lower extremity by x-ray
F.      No fragments recovered from the path of the wound
G.      Direction of the path of the wound is back to front, right to left, and upward

VI. Perforating gunshot wound of the right foot:
A.      Entrance wound on the bottom of the right foot
B.      Stippling, soot, and muzzle imprint are absent
C.      Lacerations and hemorrhage of the musculature and soft tissue of the right foot
D.      Fractures of the bones of the right foot
E.      Exit wound on the lateral right foot
F.      Direction of the path of the wound is left to right, front to back, and upward

VII. Perforating gunshot wound of the right foot:
A.      Entrance wound on the bottom of the right foot
B.      Stippling, soot, and muzzle imprint are absent
C.      Lacerations and hemorrhage of the musculature and soft tissue of the right foot
D.      Fractures of the bones of the right foot
E.      Exit wound on the superior aspects of the right foot
F.      Direction of the path of the wound is back to front and upward

VIII. Perforating gunshot wound of the 2nd digit of the right foot:
A.      Entrance wound on the distal inferior aspects of the 2nd digit if the right foot
B.      Stippling, soot, and muzzle imprint are absent
C.      Fractures of the phalanges of the 2nd digit of the right foot
D.      Exit wound on the superior distal aspect of the 2nd digit of the right foot
E.      Direction of the path of the wound is upward

IX. Pseudo-stippling of the right face, right ear, and right neck

X. Blunt force injuries of the torso:
A.      Abrasion and contusion of the lateral right chest

Toxicology: Negative

CONFIDENTIAL-SUBJECT TO PROTECTIVE ORDER - Viramontes03400

## Witnesses

### Law Enforcement Witnesses

| Florida Department of Law Enforcement – Orlando Regional Operations Center<br>500 West Robinson Street, Orlando, Florida 32801 – (407) 245-0801 | |
| --- | --- |
| ➢ SAS Daniel Warren<br>➢ SA Steven Brenton<br>➢ SA David Hubbard<br>➢ SA Mark Mynheir<br>➢ SA Nicole Miller<br>➢ SA Danielle Gill | ➢ SA Bill Lee<br>➢ SA Alphonso Williams (Case Agent)<br>➢ SA Craig Beers<br>➢ SA Mark Pellham<br>➢ SA Lisa Gundrum |

| Orlando Police Department<br>100 S. Hughey Ave, Orlando, Florida 32801 – (407) 246-2401 | |
| --- | --- |
| ➢ Lt. Jonathan Bigelow<br>➢ Lt. Scott Smith<br>➢ Sergeant Jeffrey Backhaus<br>➢ Sergeant James Parker<br>➢ Detective Adam Gruler<br>➢ Detective Raul Rivas<br>➢ Officer Kevin Easterling<br>➢ Officer Robert Woodyard | ➢ Officer Ben Chisari<br>➢ Officer Andrew Bishop<br>➢ Officer Timothy Stanley<br>➢ Officer Ricardo Duenas<br>➢ Officer Michael Napolitano<br>➢ Officer Jonathan Cute<br>➢ Officer Elio Florin |

| Orange County Sheriff's Office<br>2500 W. Colonial Dr, Orlando, Florida 32804 – (407) 254-7000 | |
| --- | --- |
| ➢ Sergeant Fred Westerberg<br>➢ Deputy Gerald Cavis | ➢ Deputy Matthew Futch |

| Belle Isle Police Department<br>1600 Nela Ave., Belle Isle, FL 32809– (407) 851-7730 | |
| --- | --- |
| ➢ Officer Brandon Cornwell | |

### Civilian Witnesses

| WITNESSES | | |
| --- | --- | --- |
| Johnathan Amaya | | |
| Christi Wallace-Clarke | | |
| Solana Luna | | |
| Rebeca Hernandez | | |

## Conclusion

FDLE has completed a comprehensive investigation into the use of deadly force by OPD Officers and OCSO Deputies. This presentation of facts is based on law enforcement witnesses, civilian witnesses, and physical evidence. FDLE submits this investigative summary to the Office of the State Attorney for their review and disposition.

CONFIDENTIAL-SUBJECT TO PROTECTIVE ORDER - Viramontes03401

## Notarizations

I swear that the foregoing is a true and accurate summary of facts either personally known to me, or derived from statements provided to me or to other law enforcement officers during the course of this investigation.

SWORN to and SUBSCRIBED BEFORE ME          This _22nd_ day of **August**, 2016

Alphonso Williams, Special Agent
Florida Department of Law Enforcement
Orlando Regional Operations Center
500 West Robinson Street
Orlando, Florida 32801

(Notary Public or LEO)

EMMA RODRIGUEZ
MY COMMISSION EXPIRES
October 6, 2018
#FF 160405
Bonded thru
Troy Fain - Insurance
NOTARY PUBLIC, STATE OF FLORIDA

35

CONFIDENTIAL-SUBJECT TO PROTECTIVE ORDER - Viramontes03402