**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF ILLINOIS**

| | | |
|---|---|---|
| CUTBERTO VIRAMONTES, et al. | : | |
| | : | |
| Plaintiffs, | : | |
| | : | Case No. 1:21-cv-04595 |
| vs. | : | |
| | : | Chief Judge Rebecca R. Pallmeyer |
| THE COUNTY OF COOK, et al. | : | |
| | : | |
| Defendants. | : | |

**PLAINTIFFS' RESPONSE IN OPPOSITION TO DEFENDANTS' MOTION FOR**
**SUMMARY JUDGMENT**

David G. Sigale (Atty. ID# 6238103)
LAW FIRM OF DAVID G. SIGALE, P.C.
430 West Roosevelt Road
Wheaton, IL 60187
(630) 452-4547
dsigale@sigalelaw.com

David H. Thompson*
Peter A. Patterson*
William V. Bergstrom*
COOPER & KIRK, PLLC
1523 New Hampshire Ave., N.W.
Washington, D.C. 20036
(202) 220-9600
(202) 220-9601 (fax)
dthompson@cooperkirk.com
ppatterson@cooperkirk.com
wbergstrom@cooperkirk.com
      *Admitted p*ro hac vice*

*Attorneys for Plaintiffs*

# TABLE OF CONTENTS

**Page**

TABLE OF AUTHORITIES ................................................................................. ii

INTRODUCTION ............................................................................................... 1

BACKGROUND .................................................................................................. 2

ARGUMENT ...................................................................................................... 3

  I.  The Banned Firearms Are "Arms" Within the Meaning of the Second Amendment. ........ 4

    A.  *Heller* Establishes That All Rifles Are "Arms." ....................................... 4

    B.  The Banned Rifles Cannot Be Excluded From the Amendment's Scope On the Asserted Ground That They Are "Like" M-16s. ................................... 5

  II.  Cook County's Ban is Unconstitutional Because the Banned Firearms Are In Common Use and Therefore Necessarily Not "Dangerous and Unusual" Weapons. ....................... 10

    A.  Firearms "In Common Use" Cannot Be Dangerous And Unusual. ...................... 11

    B.  The Banned Firearms Are "In Common Use." ....................................... 13

    C.  The County's Additional Considerations For What Makes A Firearm "Dangerous And Unusual" Must Be Rejected. ..................................... 20

  III.  No Historic Firearms Regulations Justify Cook County's Ban. ........................... 29

    A.  The Ban Is Not Supported By the Tradition of Regulating "Dangerous and Unusual" Weapons. ............................................................. 30

    B.  So-Called "Public Concern Justifications" Are Not Adequate Analogues for the Ban. ....................................................................... 33

  IV.  Seventh Circuit Caselaw On This Issue Was Abrogated by *Bruen*. ....................... 35

CONCLUSION ................................................................................................. 37

**TABLE OF AUTHORITIES**

**Cases**                                                                                                                        **Page**

*Andrews v. State*, 50 Tenn. 165 (Tenn. 1871)..................................................................32

*Ass'n of N.J. Rifle and Pistol Clubs, Inc. v. Att'y Gen. N.J.*, 910 F.3d 106 (3d Cir. 2018) ..........14

*Aymette v. State*, 21 Tenn. 154 (Tenn. 1840) .................................................................32

*Boland v. Bonta*, No. 8:22-cv-1421, 2023 WL 2588565 (C.D. Cal. Mar. 20, 2023)....................31

*Caetano v. Massachusetts*, 577 U.S. 411 (2016) ...................................................... *passim*

*Cox. v. Louisiana*, 379 U.S. 536 (1965)..........................................................................28

*District of Columbia v. Heller*, 554 U.S. 570 (2008) *passim*

*Duncan v. Becerra*, 970 F.3d 1133 (9th Cir. 2020) .......................................................14

*Duncan v. Becerra*, 19 F.4th 1087 (9th Cir. 2021) .......................................................14

*English v. State*, 35 Tex. 473 (Tex. 1871) .................................................................34, 36

*Ezell v. City of Chicago*, 651 F.3d 684 (7th Cir. 2011) ....................................................15

*Fife v. State*, 31 Ark. 455 (Ark. 1876) ..........................................................................32

*Friedman v. City of Highland Park*, 136 S. Ct. 447 (2015).............................................19

*Friedman v. City of Highland Park*, 784 F.3d 406 (7th Cir. 2015) .........................7, 35, 36

*Fyock v. Sunnyvale*, 779 F.3d 991 (9th Cir. 2015) ........................................................21

*Heller v. District of Columbia*, 670 F.3d 1244 (D.C. Cir. 2011)...............................14, 17

*Hill v. State*, 53 Ga. 472 (Ga. 1874)...............................................................................34

*Kennedy v. Bremerton School District*, 142 S. Ct. 2407 (2022)......................................28

*Kolbe v. Hogan*, 849 F.3d 114 (4th Cir. 2017) (en banc) ..................................................7

*Nat'l Ass'n for Gun Rights, Inc. v. San Jose*,
  No. 5:22-cv-501, 2022 WL 3083715 (N.D. Cal. Aug. 3, 2022)...............................31

*New York State Rifle & Pistol Association, Inc. v. Bruen*, 142 S. Ct. 2111 (2022).............. *passim*

*New York State Rifle and Pistol Ass'n, Inc. v. Cuomo*, 804 F.3d 242 (2d Cir. 2015)....................14

*People v. Murillo*, 587 N.E.2d 1199 (Ill. App. Ct. 1992) ..................................................25

*People v. Webb*, 131 N.E. 3d 93 (Ill. 2019) .....................................................................17

*People v. White*, 409 N.E.2d 73 (Ill. App. Ct. 1980) .......................................................25

*Ramirez v. Commonwealth*, 94 N.E.3d 809 (Mass. 2018)........................................16, 17

*Silveira v. Lockyer*, 328 F.3d 567 (9th Cir. 2003) .........................................................20

*Staples v. United States*, 511 U.S. 600 (1994)..........................................................8, 17

*Stenberg v. Carhart*, 530 U.S. 914 (2000).....................................................................13

*Thomas for Brown v. Sullivan*, 785 F. Supp. 788 (C.D. Ill. 1992) ................................................37

*United States v. Henry*, 688 F.3d 637 (9th Cir. 2012) ...................................................22

*United States v. Marzzarella*, 614 F.3d 85 (3d Cir. 2010)......................................21, 22

*Watson v. City of Memphis*, 373 U.S. 526 (1963)........................................................28

*Wilson v. Cook County*, 937 F.3d 1028 (7th Cir. 2019)........................................35, 36

*Worman v. Healey*, 922 F.3d 26 (1st Cir. 2019) ..........................................................7

## Constitutions and Statutes

U.S. CONST., amend. II ....................................................................................................4

Code of Ordinances of Cook Cnty., Ill.,

    § 54-211 .............................................................................................................2,4

    § 54-212 .........................................................................................................2, 4, 27

Code of Ordinances of Cook Cnty., Ill., § 54-212(a)(1)................................................27

720 Ill. Comp. Stat. 5/24-1.9(b) & (c) .........................................................................3

## Other Authorities

Frank H. Easterbrook, *Abstraction and Authority*, 59 U. CHI. L. REV. 349 (1992) ......................12

Mark W. Smith, *Attention Originalists: The Second Amendment was adopted in 1791, not 1868*, HARV. J. L. & PUB. POL'Y PER CURIAM (Dec. 7, 2022), https://bit.ly/42BmRX3 ...34

Michael J. Klarman, *Rethinking the Civil Rights and Civil Liberties Revolutions*, 82 VA. L. REV. 1 (1996)......................................................................................12

## INTRODUCTION

In *New York State Rifle & Pistol Association, Inc. v. Bruen*, 142 S. Ct. 2111 (2022), the Supreme Court explained that the Second Amendment "elevates above all other interests the right of law-abiding, responsible citizens to use arms for self-defense" and that it is not the balance struck by modern-day legislatures but rather that reflected in "the traditions of the American people . . . that demands our unqualified deference." *Id.* at 2131 (quotation omitted). And *Bruen* clarified what should have been understood from *District of Columbia v. Heller*, 554 U.S. 570 (2008): that whether a statute violates the Second Amendment is a question that must be resolved based on the text and history of the Second Amendment, with no room for "interest balancing" in the analysis. This case should be a straightforward application of the text-and-history standard. The firearms in question are "arms" within the meaning of the text of the Amendment, and because they are in common use for lawful purposes—meaning they are not "dangerous and unusual weapons"—there is no historical tradition that sanctions banning them.

The County, however, does whatever it can to muddle that clear analysis, first by making several (incorrect) historical arguments in its discussion of the text, and then making more "interest-balancing" style arguments in its putatively historical discussion. Much of the County's argument can be dismissed out of hand as incompatible with the framework *Bruen* has prescribed to govern these cases. And to the extent the County's argument does fit within that framework, it merely underscores that there is *no historical tradition* of banning firearms that are in common use for lawful purposes. Because there can be no serious debate that the so-called "assault weapons" targeted by the County are in common use, the Court must deny the County's motion for summary judgment.

**BACKGROUND**

Cook County makes it illegal to "manufacture, sell, offer or display for sale, give, lend, transfer ownership of, acquire, carry or possess" common semiautomatic rifles, which it has tendentiously labeled "assault weapons." *See* Code of Ordinances of Cook Cnty., Ill. §§ 54-211, 54-212(a) (Dec. 15, 2020), https://bit.ly/2Lcts75 (hereinafter "C.C. Ord."). Cook County identifies a long list of semiautomatic rifles as "assault weapons" by name, including all versions of the very popular AR-15, C.C. Ord. § 54-211, *Assault weapon* ¶ (7), and it also identifies them by feature, *id.* ¶ (1). A rifle that is not specifically named is considered an "assault weapon" if it can accept an ammunition magazine containing more than ten rounds of ammunition and has any of the following features:

(A) Only a pistol grip without a stock attached;
(B) Any feature capable of functioning as a protruding grip that can be held by the non-trigger hand;
(C) A folding, telescoping, or thumbhole stock;
(D) A shroud attached to the barrel, or that partially or completely encircles the barrel, allowing the bearer to hold the firearm with the non-trigger hand without being burned, but excluding a slide that encloses the barrel ; or
(E) A muzzle brake or muzzle compensator.

*Id.*

Plaintiffs Cutberto Viramontes and Christopher Khaya are law-abiding residents of Cook County who wish to own AR-15 style semiautomatic rifles for lawful purposes. Pls's Resps. and Objs. To Defs.' Rule 56.1 Statement of Material Facts ¶¶ 12–16 ("RSOMF"). They are members of the Associational Plaintiffs, Firearms Policy Coalition, Inc. and Second Amendment Foundation. Pls.' Rule 56.1 Statement of Additional Material Facts ¶¶ 4, 9. The Associational Plaintiffs are all nonprofit organizations dedicated to promoting the right to keep and bear arms who bring this suit on behalf their members in Cook County who are hurt by the County's Ban, including the Individual Plaintiffs. *Id.* ¶¶ 1–3, 5–8, 10.

Plaintiffs initiated this lawsuit on August 27, 2021, *see* Compl. Doc. 1. The County answered. *See* Cnty. Defs.' Answer to Pls.' Compl., Doc. 17 (Nov. 15, 2021). Plaintiffs moved for judgment on the pleadings, acknowledging that their suit was, at the time, foreclosed by binding Seventh Circuit precedent, *see* Pls.' Br. in Supp. of Judgment on the Pleadings, Doc. 21 (Dec. 3, 2021), and the Court denied that motion, *see* Notification of Docket Entry, Doc. 23 (Dec. 8, 2021). While the parties were engaged in discovery, the Supreme Court decided *Bruen*, abrogating the cases that had formerly bound this Court and foreclosed Plaintiffs' claims. On January 10, 2023, Illinois enacted a law which made it unlawful to "manufacture, deliver, sell, import, [] purchase" or "possess" any so-called "assault weapon," 720 Ill. Comp. Stat. 5/24-1.9(b) & (c). Almost immediately the law was challenged in court. Plaintiffs moved to stay this case while the litigation over the State Ban played out, *see* Pls.' Mot to Stay, Doc. 69 (Jan. 31, 2023), and the Court denied that motion. *See* Order, Doc. 88 (Mar. 8, 2023).

The County has moved for summary judgment, *see* Defs.' Mem. of Law in Supp. of Their Mot for Summ. J., Doc. 82 (Mar. 3, 2023) ("County Br."), and Plaintiffs now oppose that motion.

## ARGUMENT

Under *Bruen*, and "in keeping with *Heller*," courts must analyze all Second Amendment challenges the same way: "When the Second Amendment's plain text covers an individual's conduct, the Constitution presumptively protects that conduct." 142 S. Ct. at 2129–30. In other words, if the challenged law prevents Plaintiffs from undertaking some activity covered by the *text* of the Amendment, the law is *presumptively unconstitutional*. The law must be enjoined unless the government carries its burden to "justify its regulation by demonstrating that it is consistent with the Nation's historic tradition of firearm regulation." *Id.* at 2130. "Only then may a court conclude that the individual's conduct falls outside the Second Amendment's unqualified command." *Id.*

3

(quotation marks omitted). Here, the plain text covers owning the banned firearms, and the County has not carried its burden to show a historical exception to the clear meaning of the text because *Bruen* and *Heller* have already established there is no tradition of banning commonly possessed arms.

**I.     The Banned Firearms Are "Arms" Within the Meaning of the Second Amendment.**

The textual analysis in this case is straightforward. *Heller* and *Bruen* together resolve almost every relevant question about the text of the Amendment, and certainly every relevant question in this case. Nevertheless, presumably because *Bruen* was so very clear that the County bears the burden of justifying its regulation if the text of the Amendment covers Plaintiffs' desired conduct, *see Bruen*, 142 S. Ct. at 2126, 2127, 2130, 2133, 2135, 2138, 2149 n.25, 2150, & 2160, the County attempts to put *everything* at the first step of the analysis, cluttering up its putatively textual argument with all sorts of non-textual claims that the Court should simply disregard as irrelevant.

**A.  *Heller* Establishes That All Rifles Are "Arms."**

The Second Amendment says: "A well regulated Militia, being necessary to the security of a free State, the right of the people to keep and bear Arms shall not be infringed." U.S. CONST., amend. II. The Cook County Ban prohibits Plaintiffs from "manufactur[ing], sell[ing], offer[ing] of display[ing] for sale, giv[ing], lend[ing], transfer[ing] ownership of, acquir[ing], carry[ing], or possess[ing]," certain makes and models of firearms, C.C. Ord. §§ 54-211, 54-212(a), including the very popular AR-15 rifle, *see id.* § 54-211, *Assault weapon*, ¶ (7), as well as any unlisted rifle that possesses certain features, id. § 54-211, *Assault weapon* ¶ (1).

There can be no doubt under *Bruen* and *Heller* that these firearms are "Arms." The Supreme Court explained in *Heller* that "[t]he 18th-century meaning is no different from the meaning today. . . . '[A]rms' [means] 'any thing that a man wears for his defence, or takes into his

hands, or useth in wrath to cast at or strike another.' " 554 U.S. at 581. Thus, the Amendment presumptively protects the right to possess "all instruments that constitute bearable arms, even those that were not in existence at the time of the founding." *Id.* at 582; *accord Caetano v. Massachusetts*, 577 U.S. 411, 411 (2016); *see also Bruen*, 142 S. Ct. at 2132. That includes, *prima facie*, the AR-15s that Plaintiffs wish to possess and the other firearms the County has banned.

The County makes only one argument against this conclusion that plausibly qualifies as "textual," but it is based on a misreading of *Bruen*. The County claims that "Arms" covers only those items that "facilitate armed self-defense" and that this definition excludes the banned firearms because "there is nothing 'defensive' whatsoever" about them. County Br. 11–12. There is no such thing as a purely "defensive" firearm, and as discussed in detail below, the banned rifles are overwhelmingly chosen by Americans for self-defense purposes for which they are well suited. But even accepting for a moment the nonsensical distinction between a weapon intended to be used offensively and one that is purely defensive, *Heller* explained that "arms" in the Amendment covers would cover both, when it noted that historically the term denoted both "[w]eapons of offence, or armour of defence." 554 U.S. at 581 (quoting Samuel Johnson, 1 DICTIONARY OF THE ENGLISH LANGUAGE 106 (4th ed.) (reprinted 1978) (brackets in original)); *see also Heller*, 554 U.S. at 584 (explaining that the "natural meaning of 'bear arms' . . . implies that the carrying of the weapon is for the purpose of offensive *or* defensive action") (emphasis added) (quotation marks omitted).

## B. The Banned Rifles Cannot Be Excluded From the Amendment's Scope On the Asserted Ground That They Are "Like" M-16s.

The County claims that the banned firearms are not arms because they "share performance characteristics with weapons developed for military offensives." County Br. 13. As just discussed, the Second Amendment protects "arms," a term that as a matter of plain text includes military

weapons, so even if this were an accurate description of the banned firearms it would not alter the textual analysis. *See Heller*, 554 U.S. at 583 (" 'Keep arms' was simply a common way of referring to possessing arms, for militiamen *and everyone else*." (emphasis in original)). In trying to prove otherwise, the County cites *Heller* itself, which it claims noted a " 'historical tradition of prohibiting the carrying dangerous and unusual weapons' such as 'weapons that are most useful in military service—M-16 rifles and the like.' " County Br. 15 (quoting *Heller*, 554 U.S. at 627). The County misreads this portion of *Heller*. It is apparent, even from the small part of this discussion that the County quotes, that this section of *Heller* was engaged not in constitutional exegesis and delimiting another bound on the word "arms," but analyzing the *historical* limitations of the right. And in the paragraph immediately preceding this statement, the Court had *already supplied* the historical dividing line between protected and unprotected arms: firearms that are "in common use" are protected, while "dangerous and unusual weapons" are not. *Id.* This is a historical test, and one that the firearms banned by the County easily satisfy, as Plaintiffs discuss below, but the first point here is that the Court was not adding a limitation to its textual interpretation of the word "arms."

Rather, the Court was anticipating the objection that application of this *historical* "common use" line—which would possibly permit the government to ban private ownership of firearms like fully automatic machine guns and other "sophisticated arms that are highly unusual in society at large" even though they are used by the military—is out of step with the stated purpose of the Amendment to preserve the militia. 554 U.S. at 267. The Supreme Court explained that such an objection was baseless because, even if the passage of time "limited the degree of fit between the prefatory clause and the protected right," the right to possess the types of firearms that are in common use for lawful purposes remained fundamentally unchanged. *Id.* And so it should be clear

6

that *Heller*'s illustrative reference to "M-16 rifles" and other "weapons that are most useful in military service" was, therefore, not intended to exempt from Second Amendment protection any firearm that could be sufficiently likened to a weapon used by the military, but to illustrate that certain "dangerous and unusual" firearms not in common use (like those capable of automatic fire, including the M-16) could be banned consistent with Second Amendment.

To buttress its alternative reading, the County cites *Kolbe v. Hogan*, 849 F.3d 114 (4th Cir. 2017) (en banc), *abrogated by Bruen*, 142 S. Ct. at 2126–27, but in addition to being based on the same fundamental misreading that the County offers here, *Kolbe* was an outlier even before *Bruen*. While other federal courts of appeals upheld bans similar to Cook County's before *Bruen*, none of them adopted the idiosyncratic "most-useful-in-the-military" test adopted by *Kolbe* and pressed by the County here. Rather, they either upheld the laws under the intermediate scrutiny framework that *Bruen* expressly rejected, *see, e.g., Worman v. Healey*, 922 F.3d 26, 39–40 (1st Cir. 2019), *abrogated by Bruen*, 142 S. Ct. 2111 (2022), or, in the case of the Seventh Circuit, adopted a different idiosyncratic test that is fundamentally incompatible with *Bruen*. *Friedman v. City of Highland Park*, 784 F.3d 406, 411 (7th Cir. 2015), *abrogated by Bruen*, 142 S. Ct. 2111 (2022). For the reasons just explained, *Kolbe*'s test cannot be squared with *Bruen*. Again, *Bruen* clarified that *every* Second Amendment case must proceed first by analyzing the text of the Amendment and then by examining our nation's history of firearm regulation, which, in challenges to a ban on a type of firearm, requires determining whether the arm is "dangerous and unusual." *Bruen*, 142 S. Ct. at 2127–28. *Kolbe*, however, explicitly *refused* to perform a "dangerous and unusual" analysis, in the very portion of the opinion that the County cites for support, *see Kolbe*, 849 F.3d at 136 n.10; County Br. 15–16 . This Court should not rely on *Kolbe*.

7

The County's argument based on *Heller*'s reference to M-16s is wrong for the related reason that the banned rifles are not like military firearms. The County claims that the AR-15, the most popular of the banned firearms, is a semi-automatic version of the military M-16 rifle (which is a "select fire" rifle, capable of either semi-automatic or fully automatic fire), and it claims disingenuously that "there is not a meaningful difference between the military-grade M-16 and the civilian AR-15," because the two firearms take similar ammunition, which they fire with the same effective range, maximum range, and muzzle velocity. County Br. 14. But to say there is no difference on these four points is very different from saying there is no "meaningful" difference between these firearms. One extremely significant difference—the difference which *Heller* was pointing toward—is that the M-16 is capable of automatic fire, meaning that the firearm will discharge more than one round for a single trigger pull, while the AR-15 is capable only of semiautomatic fire, meaning that each trigger pull fires one bullet. *See* RSOMF ¶ 9. Accordingly, the U.S. Supreme Court *nearly thirty years ago* held that an AR-15 was among the firearms that "traditionally have been widely accepted as lawful possessions" *precisely because* it was a semiautomatic firearm and therefore not a "machinegun[ ]" capable of automatic fire. *Staples v. United States*, 511 U.S. 600, 611–12 (1994). Similarly, Christopher Koper, a criminologist at George Mason University, has explained that the banned firearms "do not operate differently than other comparable semiautomatics," including those that the County *does not* ban. RSOMF ¶ 4 (quoting Christopher S. Koper, *Assessing the Potential to Reduce Deaths and Injuries from Mass Shootings Through Restrictions on Assault Weapons and Other High-Capacity Semiautomatic Firearms*, 19 CRIM. & PUB. POL'Y 147, 149 (2020)). AR-15s are not "like" automatic military weapons.

The County next tries to conflate the AR-15 and the M-16 when it claims that AR-15s can be, and "often" are, easily "convert[ed into] a . . . fully automatic weapon." *See* RSOMF ¶ 10. In support of this claim, the County notes that over a 5-year period from 2017-2021, the ATF "recovered 5,454 machine gun conversion parts," RSOMF ¶ 11, but even if *every one* of those parts was successfully used to modify a rifle classed as an "assault weapon" by the County, that would still amount to unlawful conversion of a minuscule fraction of all the AR-15 or similar styled rifles that Americans have owned. RSOMF ¶ 20 (noting that 24.6 million Americans have owned AR-15 or similar style rifles). And in reality, most conversion devices which are illegally misused are not misused on rifles, but on handguns, since handguns are far more popular with criminals, and any type of semiautomatic weapon can be "converted" in the way the County describes. *See* RSOMF ¶ 332 (reporting that 643 of the 706 semiautomatic firearms modified to operate in fully automatic fashion between 2018 and mid-2022 were Glock handguns). The existence of conversion devices does not make AR-15s into firearms that "may be banned" "like M-16s." *Heller*, 554 U.S. at 627.

Finally, the County turns to the marketing of the rifles, claiming that AR-15s and similar firearms have been marketed as having a connection to military firearms. *See* County Br. 16–17. But if the AR-15's actual features do not make it "like M-16s," then select examples of advertising certainly do not either. And again, the ultimate point here is that, as bindingly interpreted by *Heller* and reaffirmed by *Bruen*, *even military firearms* fall within the amendment's plain text, and as a matter of history arms that are in common use cannot be banned. The County nominally makes a textual argument here, but it fails to offer a satisfactory connection between advertising and *any* part of the *Bruen* analysis. The Court can and should simply disregard this sort of "evidence" as irrelevant.

The County makes several other arguments in its "textual analysis" but because those arguments either directly relate to the historical "common use" test, or the County asserts that they do, they are discussed below.

## II. Cook County's Ban Is Unconstitutional Because the Banned Firearms Are In Common Use and Therefore Necessarily Not "Dangerous and Unusual" Weapons.

Because the banned firearms are "arms" within the meaning of the Second Amendment's plain text, the Ordinance is "presumptively unconstitutional" and must be justified by the County, which bears the burden of proving its Ban is "consistent with this Nation's historical tradition of firearm regulation." *Bruen*, 142 S. Ct. at 2126. In other contexts, applying this test will involve research into this Nation's history of firearm regulation, but that exercise is unnecessary here because both *Bruen* and *Heller* have already established the contours of the relevant historical tradition: bearable arms cannot be banned unless doing so would fit into the "historical tradition of prohibiting the carrying of 'dangerous and unusual weapons.' " *Id.* at 2128 (quoting *Heller*, 554 U.S. at 627). And a law by definition *will not* fit into that tradition if it bans 'possession and use of weapons that are 'in common use.' " *Id.* at 2128 (quoting *Heller*, 554 U.S. at 627); *see also Heller*, 554 U.S. at 625 ("We therefore read *Miller* to say only that the Second Amendment does not protect those weapons not typically possessed by law-abiding citizens for lawful purposes, such as short-barreled shotguns.").

As explained above, this is *not* a textual question; the text of the Amendment reaches all arms, dangerous, unusual, or otherwise. It is also not an exception to the method laid out in great detail by *Bruen*. Instead, it is a concrete application of that historical analysis, based on Supreme Court precedent which *Bruen* reaffirmed and which controls this case. In *Heller*, the Supreme Court's discussion of "dangerous and unusual" firearms came in its analysis of the history of recognized limitations on the Second Amendment right, and the Supreme Court specifically noted

that it was an exception to the Second Amendment's broad language that was "fairly supported by . . . historical tradition." 554 U.S. at 627. *Bruen* quoted this same language from *Heller* to explain that what the *Heller* court was doing was "rel[ying] on the historical understanding of the Amendment to demark the limits on the exercise of that right." 142 S. Ct. at 2128; *see also* TRO, *Rocky Mountain Gun Owners v. Town of Superior, Colo.*, 1:22-cv-01685-RM-NRN, Doc. 18 at 10 (July 22, 2022) (granting, post-*Bruen*, a temporary restraining order against enforcement of a similar ban on certain semiautomatic rifles and noting "the Court is unaware of historical precedent that would permit a governmental entity to entirely ban a type of weapon that is commonly used by law-abiding citizens for lawful purposes"). The County is therefore entirely wrong to suggest, throughout its brief, that "dangerous and unusual" is a factor for consideration as part of the analysis of the Amendment's text and therefore the burden falls on Plaintiffs to prove the banned firearms *are not* dangerous and unusual. *See* County Br. 25. *Bruen* and *Heller* were clear—this is a historical question—and so the County bears the burden of fitting its law into a historical paradigm. *See, e.g.*, *Bruen*, 142 S. Ct. at 2126. The County has failed to carry that burden.

### A. Firearms "In Common Use" Cannot Be Dangerous And Unusual

Whether a firearm is "dangerous and unusual" is a conjunctive question. "A weapon may not be banned unless it is *both* dangerous *and* unusual." *Caetano*, 577 U.S. at 417 (Alito, J., concurring) (emphasis in original). Because a firearm that is in common use for lawful purposes necessarily is not unusual, such a firearm *does not* fall within this category and *cannot be banned*. *Bruen*, 142 S. Ct. at 2143. And in assessing common use, the Supreme Court has made clear that the Second Amendment focuses on the practices of the American people *nationwide*, not just, say, in Cook County or even Illinois. *See id.* at 2131 ("It is this balance—struck by the traditions of the American people—that demands our unqualified deference."); *Heller*, 554 U.S. at 628 (handguns are "overwhelmingly chosen by American society" for self-defense); *Caetano*, 577 U.S. at 420

(Alito, J., concurring) ("[S]tun guns are widely owned and accepted as a legitimate means of self-defense across the country."). Therefore, the Amendment protects those who live in states or localities with a less robust practice of protecting the right to keep and bear firearms just as much as it protects those who live in jurisdictions that have hewed more closely to America's traditions. In this way, the Amendment is similar to other constitutional guarantees that serve to hold state and local governments to minimum standards that are applicable nationwide, for "constitutional adjudication frequently involves the justices' seizing upon a dominant national consensus and imposing it on resisting local outliers." Michael J. Klarman, *Rethinking the Civil Rights and Civil Liberties Revolutions*, 82 VA. L. REV. 1, 16 (1996). More pithily, the Supreme Court "obliterates outliers." Frank H. Easterbrook, *Abstraction and Authority*, 59 U. CHI. L. REV. 349, 370 (1992).

Furthermore, the "common use" test makes clear that courts and legislatures do not have the authority to second-guess the choices made by law-abiding citizens by questioning whether they really "need" the arms that ordinary citizens have chosen to possess. While *Heller* noted several "reasons that a citizen may prefer a handgun for home defense," the Court held that "[w]*hatever the reason*, handguns are the most popular weapon chosen by Americans for self-defense in the home, and a complete prohibition of their use is invalid." 554 U.S. at 629 (emphasis added). And in *Bruen* the Court reaffirmed that "the traditions of the American people"—which includes their choice of preferred firearms—"demand[ ] [the courts'] unqualified deference." 142 S. Ct. at 2131. Thus, unless the government can show that a certain type of firearm is "not typically possessed by law-abiding citizens for lawful purposes," *Heller*, 554 U.S. at 625, that is the end of the matter. Firearms owned by law-abiding citizens for lawful purposes cannot be banned.

Finally, the Second Amendment inquiry focuses on the choices made by *contemporary* law-abiding citizens. *Heller* rejected as "bordering on the frivolous" "the argument . . . that only

those arms in existence in the 18th century are protected." *Id.* at 582. And in *Caetano*, the Supreme Court reiterated this point, holding that "Arms" protected by the Second Amendment need not have been "in existence at the time of the Founding." 577 U.S. 411–12 (quoting *Heller*, 554 U.S. at 582). The *Caetano* Court flatly denied that a particular type of firearm's being "a thoroughly modern invention" is relevant to determining whether the Second Amendment protects it. *Id.* And *Bruen* cements the point. Responding to laws that allegedly restricted the carrying of handguns during the colonial period, the Court reasoned that "even if these colonial laws prohibited the carrying of handguns because they were considered 'dangerous and unusual weapons' in the 1690s, they provide no justification for laws restricting the public carry of weapons that are unquestionably in common use today." *Bruen*, 142 S. Ct. at 2143.

This case reduces to the following, straightforward inquiry: are the arms banned by Cook County "in common use" according to the lawful choices of contemporary Americans? They unquestionably are.

**B.  The Banned Firearms Are "In Common Use."**

The firearms that Cook County targets with its Ban are among the most popular firearms in the country, owned by millions of Americans who overwhelmingly use them for lawful purposes. The term "assault weapons" is a misnomer. "Prior to 1989, the term 'assault weapon' did not exist in the lexicon of firearms. It is a political term, developed by anti-gun publicists." *Stenberg v. Carhart*, 530 U.S. 914, 1001 n.16 (2000). But while "assault weapons" is not a recognized category of firearms, "semiautomatic rifles" is, and it is semiautomatic rifles that Plaintiffs wish to acquire and that Cook County bans as "assault weapons."

Even if Plaintiffs accept the County's framing and the banned firearms, a subset of semiautomatic rifles, are considered as their own category, they still easily satisfy the common use test. The dispositive point under *Heller* and *Bruen* is that millions of law-abiding citizens choose

13

to possess firearms in that category. "Commonality is determined largely by statistics." *Duncan v. Becerra*, 970 F.3d 1133, 1147 (9th Cir. 2020), *rev'd* 19 F.4th 1087 (9th Cir. 2021) (en banc), *granted, vacated, and remanded in light of Bruen*, 142 S. Ct. 2895 (2022); *see also Ass'n of N.J. Rifle & Pistol Clubs*, *Inc. v. Att'y Gen. N.J.* ("*ANJRPC*"), 910 F.3d 106, 116 (3d Cir. 2018), *abrogated by Bruen* (finding an "arm" is commonly owned because "[t]he record shows that millions . . . are owned"); *New York State Rifle & Pistol Ass'n, Inc. v. Cuomo*, 804 F.3d 242, 255 (2d Cir. 2015), *abrogated by Bruen* ("Even accepting the most conservative estimates cited by the parties and by amici, the assault weapons . . . at issue are 'in common use' as that term was used in *Heller*."); *Heller v. District of Columbia* ("*Heller II*"), 670 F.3d 1244, 1261 (D.C. Cir. 2011) ("We think it clear enough in the record that semi-automatic rifles . . . are indeed in 'common use.' "). This is demonstrated by the AR-15 and other modern semiautomatic rifles, which epitomize the firearms that Illinois bans.

The AR-15 is America's "most popular semi-automatic rifle," *Heller II*, 670 F.3d at 1287 (Kavanaugh, J., dissenting), and in recent years it has been "the best-selling rifle type in the United States," RSOMF ¶ 94. Today, the number of AR-rifles and other similar rifles in circulation in the United States exceeds **twenty-four million**. RSOMF ¶¶ 20. The banned firearms are therefore much more common than either professional or doctoral degrees. RSOMF ¶ 94. And in recent years they have been the second-most common type of firearm sold, at approximately 20% of all firearm sales, behind only semiautomatic handguns. *Id*.

AR-style rifles are commonly and overwhelmingly possessed by law-abiding citizens for lawful purposes. In a 2021 survey of 16,708 gun owners, recreational target shooting was the most common reason (cited by 66% of owners) for possessing an AR-style firearm, followed closely by home defense (61.9% of owners) and hunting (50.5% of owners). RSOMF ¶ 20. And just last

14

month a Washington Post-Ipsos poll confirmed the accuracy of these numbers, finding that among the one-in-five gun owners who own an AR-15 or similarly styled rifle, target shooting was a "major reason" for ownership for 60% of respondents and a minor reason for 30%, with protection of self, family, and property rating as *even more* important, with 65% reporting it as a major reason and 26% reporting it as a minor reason for owning an AR-15. *See* RSOMF ¶ 20. A third recent survey of over 2,000 owners of such firearms reached the same result, showing again that home-defense and recreational target shooting are the two most important reason for owning these firearms. *See* RSOMF ¶ 20 (discussing an NSSF survey). These purposes are plainly lawful and related, as "maintain[ing] proficiency in firearm use [is] an important corollary to . . . self-defense," *Ezell v. City of Chicago*, 651 F.3d 684, 708 (7th Cir. 2011). Another survey found that more than 20 million adults participated in target or sport shooting with firearms like those the County has banned. RSOMF ¶ 20. Overall, there is no reasonable dispute that the banned rifles are in common use. And that should be no surprise.

> AR-style rifles are popular with civilians and law enforcement around the world because they're accurate, light, portable, and modular. . . . [The AR-style rifle is] also easy to shoot and has little recoil, making it popular with women. The AR-15 is so user-friendly that a group called 'Disabled Americans for Firearms Rights' . . . says the AR-15 makes it possible for people who can't handle a bolt-action or other rifle type to shoot and protect themselves.

*Id.*.

The fact that "assault" rifles are used extremely rarely in crime underscores that AR-15s and other banned rifles are commonly possessed by law-abiding citizens for lawful purposes. Evidence indicates that "well under 1% [of firearms used in crime] are 'assault rifles.' " RSOMF ¶ 213. This is true locally as well as nationally. Locally, the vast majority of firearms used in crime are handguns, and seizures of *any* assault rifles are few and far between. *See* RSOMF ¶¶ 213, 331. Nationally, from 2015 through 2020, only 2.2% of murders were committed with *any*

15

type of rifle. RSOMF ¶ 213. Murder by "hands, fists, feet, etc." was almost twice as common, at 4,008, over the same time period—and murder by handgun, at over 40,000, was over *20 times* as common. *Id*. Even if a different modern semiautomatic rifle had been involved in each rifle-related murder from 2015 to 2020, an infinitesimal percentage of the approximately 20 million modern sporting rifles in circulation in the United States during that time period—around .01 percent— would have been used for that unlawful purpose. More broadly, as of 2016, only .8 percent of state and federal prisoners reported using *any* kind of rifle during the offense for which they were serving time. *Id*.

Finally, the Supreme Court's decision in *Caetano* further supports that the arms banned by the County must be considered to be in common use for lawful purposes. That case concerned Massachusetts's ban on the possession of stun guns, which the Commonwealth's highest court had upheld on the basis that such weapons are not protected by the Second Amendment. 577 U.S. at 411. With a brief *per curiam* opinion, the Supreme Court vacated that decision. *Id.* at 411–12. Though the Court remanded the case back to the state court without deciding whether stun guns are constitutionally protected, *see id.*, Justice Alito filed a concurring opinion concluding that those arms "are widely owned and accepted as a legitimate means of self-defense across the country," based on evidence that "hundreds of thousands of Tasers and stun guns have been sold to private citizens." *Id.* at 420 (Alito, J., concurring) (cleaned up) (citation omitted). Of course, that is far fewer than the millions of AR-15s and other similar semiautomatic rifles that the County bans which are sold to private citizens nationwide.

The Massachusetts Supreme Judicial Court got the message. In a subsequent case, that Court, relying on *Caetano*, held that because "stun guns are 'arms' within the protection of the Second Amendment," the state's law barring "civilians from possessing or carrying stun guns,

even in their home, is inconsistent with the Second Amendment and is therefore unconstitutional." *Ramirez v. Commonwealth*, 94 N.E.3d 809, 815 (Mass. 2018). The Illinois Supreme Court followed suit with a similar ruling in 2019, relying on *Caetano* and *Ramirez* to conclude that "[a]ny attempt by the state to rebut the *prima facie* presumption of Second Amendment protection afforded stun guns and tasers on the grounds that the weapons are uncommon or not typically possessed by law-abiding citizens for lawful purposes would be futile." *People v. Webb*, 131 N.E. 3d 93, 96 (Ill. 2019). This reasoning is sound, and it necessarily entails the invalidity of the County's ban, which restricts arms that are many times more common than stun guns.

There is a venerable tradition in this country of lawful private ownership of semiautomatic firearms. The Supreme Court has held as much, concluding in *Staples* that semiautomatics, unlike machine guns, "traditionally have been widely accepted as lawful possessions." 511 U.S.at 612. Semiautomatic rifles have been commercially available for over a century. *See Heller II*, 670 F.3d at 1287 (Kavanaugh, J., dissenting). Yet apart from the now-expired ten-year federal "assault weapons" ban, the Federal Government has not banned them. And currently the vast majority of States do not ban semiautomatic rifles deemed "assault weapons." RSOMF ¶ 317.

The County offers a different formulation of "common use." The County defines "common" as "widespread" or "prevalent," which is generally in line with the Supreme Court precedent discussed above. County Br. 28–29. The problems begin when the County begins to "unpack" the word "use," which it says cannot extend to "mere commonness of *ownership*." *Id.* at 28. Instead, the County would require a demonstration that the banned firearms have frequent incidents of lawful "use," with particular emphasis placed on assessing how frequently a firearm is "used" for self-defense. *Id.* at 29. The County argues that the firearms are seldom "used," under its definition of the term, because rifles classed as "assault weapons" by the County make up

17

"approximately 4% of all firearms in circulation in American society" and "that small number likely overrepresents the number of *people* who own Assault Weapons, which are not distributed evenly among the population or even among gun owners." *Id.* at 30. And "use" of firearms is rare, according to the County, since "victims of violent crimes do not use *any* firearms to defend themselves 99.2% of the time. *Id.*

As discussed above, the firearms banned by the County are indisputably "common" under any definition of the term, but most importantly, under the threshold in *Caetano*. And the County's narrow interpretation of "use" cannot be squared with the Amendment or with Supreme Court precedent. The Second Amendment protects the rights of Americans to "keep and bear Arms." By its plain terms, it contemplates ways of "using" firearms other than just shooting them. In construing the word "bear," *Heller* explained the term meant "being *armed and ready* for offensive or defensive action in a case of conflict with another person." 554 U.S. at 584 (quoting *Muscarello v. United States*, 524 U.S. 125, 143 (1998) (Ginsburg, J., dissenting)) (emphasis added). Similarly, in *Bruen* the Court explained that ,"[a]lthough individuals often 'keep' firearms in their home, *at the ready for self-defense*, most do not 'bear' (*i.e.*, carry) them in the home beyond moments of actual confrontation. To confine the right to 'bear' arms to the home would nullify half of the Second Amendment's operative protections." 142 S. Ct. at 2134–35 (emphasis added). Therefore, when a large number of law-abiding citizens *possess* a type of arm *for a lawful purpose*, even if that lawful purpose is simply to have the arm available in case it is needed, then that firearm is "in common use" within the meaning of the Second Amendment and cannot be banned.

This comports with the way the Supreme Court has applied the common use test. In *Caetano*, Justice Alito did not ask how often stun guns were actually discharged to prevent an attack. Instead, he explained that the "relevant statistic is that hundreds of thousands of Tasers and

18

stun guns have been sold to private citizens, who it appears may lawfully possess them in 45 states." 577 U.S. at 420 (Alito, J., concurring) (cleaned up). And when analyzing a similar "assault weapons" ban to this one, Justice Thomas said "the ban is thus highly suspect because it broadly prohibits common semiautomatic firearms used for lawful purposes. Roughly five million Americans own AR-style semiautomatic rifles." *Friedman v. City of Highland Park*, 136 S. Ct. 447, 449 (2015) (Thomas, J., dissenting from the denial of certiorari). In both cases the touchstone for "common use" was ownership.

Finally, even accepting for the sake of argument the County's restrictive definition of "use," which would hang the issue of whether a firearm is protected on how frequently it is "used" during the course of a reported violent crime, the County claims that just 0.8% of violent crimes involve the use of a firearm for self-defense. *See* County Br. 30. If that were the test, and the County were right about the statistics, then *no* firearms would be protected. And that cannot be the case. In fact, the evidence shows that firearms generally, and rifles specifically, are frequently used for self-defense. For example, Professor English found that 31.1% of gun owners—approximately 25.3 million Americans—report having used a firearm in self-defense, with approximately 1.67 million defensive gun uses every year. RSOMF ¶ 27; *see also* RSOMF ¶ 20. And while the majority of these incidents involved the use of a handgun, approximately 13% of reported defensive uses were with rifles. RSOMF ¶ 27. Extrapolating out from this data, Americans use rifles to defend themselves over 100,000 times annually—a million times a decade. It is reasonable to conclude that the best-selling rifles in the country—those banned by Cook County—make up the bulk of those uses.

Finally, the County is wrong to suggest that the Second Amendment right exists only to the extent that it can be demonstrated it is regularly needed. "The Second Amendment is a

doomsday provision, one designed for those exceptionally rare circumstances where all other rights have failed—where the government refuses to stand for reelection and silence those who protest; where courts have lost the courage to oppose, or can find no one to enforce their decrees. However improbable these contingencies may seem today, facing them unprepared is a mistake a free people get to make only once." *Silveira v. Lockyer*, 328 F.3d 567, 568–70 (9th Cir. 2003) (Kozinski, J., dissenting from denial of rehearing en banc); *see also* RSOMF ¶¶ 28, 30.

### C. The County's Additional Considerations For What Makes A Firearm "Dangerous And Unusual" Must Be Rejected.

The County suggests that this Court should consider a litany of additional factors in deciding whether the banned firearms are "dangerous and unusual," including "whether the weapons have features that make them particularly deadly or harmful compared to other firearms, whether the weapons have an unusually apt application to illegal activity, and whether the weapons pose a unique threat." County Br. 26. In so doing, the County seeks to analyze whether the banned firearms are "dangerous" in isolation, and to skip over the question of whether they are "unusual." But the dangerous and unusual test is conjunctive—a firearm must be *both* to be banned—and as just explained, there is no plausible argument that these firearms are "unusual." *See Heller*, 554 U.S. at 627 (appealing to tradition of regulating "dangerous *and* unusual weapons") (emphasis added); *Caetano*, 577 U.S. at 417 (Alito, J., concurring) ("As the *per curiam* opinion recognizes, this is a conjunctive test: A weapon may not be banned unless it is *both* dangerous *and* unusual."). There is a logical problem with the County's suggested analysis—it fails to define what group the banned firearms should be compared *against*. An AR-15 is undeniably particularly dangerous if compared against a stun gun, but it is certainly *not* if the comparison is a standard hunting rifle. The only sensible comparison, in light of *Bruen* and *Heller*, is firearms that are in common use for lawful purposes today. *Heller*, 554 U.S. at 624. After all, following *Heller* it is clear that handguns

*are not* dangerous and unusual, and yet under the metrics highlighted by the County (and discussed in detail below), the claim that a handgun is "dangerous and unusual" is stronger than the claim that an AR-15 is. For example, there is no question that a handgun, by virtue of being readily concealable, has a much better claim to "unusually apt application to illegal activity" than a so-called "assault weapon," and the facts bear this out. Handguns are overwhelmingly the weapon of choice for criminals, in Cook County and elsewhere. *See* RSOMF ¶¶ 213; 331 (the top 20 firearms seized by the Chicago police in 2014 were *all* handguns, and just three so-called "assault weapons" were seized that entire year).

The cases upon which the County relies to isolate them were all abrogated by *Bruen* (though the County again fails to acknowledge that fact), and what is more, they each recognized that "dangerousness" cannot be separated from the question of whether something is "unusual" and discussed *both* elements of the test. For instance, the County cites *Fyock v. Sunnyvale*, 779 F.3d 991 (9th Cir. 2015), for the proposition that the Court should ask "whether a weapon has 'uniquely dangerous propensities,' " County Br. at 28 (quoting *Fyock*, 779 F.3d at 997), but in *Fyock* what the Court actually said was that to determine if a firearm is dangerous and unusual "we consider whether the weapon has uniquely dangerous propensities *and* whether the weapon is commonly possessed by law-abiding citizens for lawful purposes." 779 F.3d at 997 (emphasis added). The County also fails to note that *Fyock* ultimately concluded that the district court had not erred in finding that the magazines that were at issue in that case were "in common use" and so protected by the Second Amendment (subject to the interest balancing analysis that is no longer good law after *Bruen*). *Id.* at 998. In *United States v. Marzzarella*, 614 F.3d 85 (3d Cir. 2010), the Third Circuit specifically did not find the firearms at issue (handguns with obliterated serial numbers) to be dangerous on the grounds the County proposes; it found the greatest support for

excluding them from Second Amendment protection in the fact that they are not "typically possessed by law-abiding citizens for lawful purposes" since a law-abiding citizen has no reason to "prefer an unmarked firearm" which functions identically to one that is properly marked. *Id.* at 95 (quoting *Heller*, 554 U.S. at 625). And in *United States v. Henry*, 688 F.3d 637 (9th Cir. 2012), the Ninth Circuit found machine guns to be "dangerous and unusual" both because, "[s]hort of bombs, missiles, and biochemical agents, [the court could] conceive of few weapons that are more dangerous than machine guns" *and* because "[o]utside of a few government-related uses, machine guns largely exist on the black market." *Id.* at 640.

In other words, the County's claim that "dangerous and unusual" should be reduced to merely "dangerous" conflicts with *Bruen* and *Heller*, provides the Court with no logically workable standard, and is not even supported by the abrogated precedents from which the County purports to derive its reading.

Finally, even if "dangerousness" could be considered alone, the County's arguments that the firearms in question are "dangerous" are precisely the types of arguments the Supreme Court rejected when it rejected the pre-*Bruen* "interest balancing" approach taken by courts of appeals in Second Amendment cases. And the Court in *Bruen* expressly warned against allowing interest-balancing to be smuggled back into the analysis through the guise of analogical reasoning. *See* 142 S. Ct. at 2133 n.7. Under *Bruen*, the County's attempt to resurrect an interest-balancing inquiry is out of bounds. But to the extent the Court considers the County's arguments, they fail on their own terms. .

*First*, the County makes psychological claims about the banned firearms, asserting both that merely being in the presence of one of the banned firearms "can make an individual more violent," County Br. 31, and that mass shootings committed with so-called assault weapons are

22

uniquely likely to cause "psychological damage to victims, bystanders, and society as a whole." *Id.* at 34. But despite the claims that the banned firearms promote mass shootings by making an individual violent, to the extent there is hard evidence in this area, it contradicts the County's position. The so-called "weapons effect," which posits that the presence of weapons make individuals more inclined to aggression, has been the subject of many studies attempting to elicit a connection between proximity to weapons and aggressive actions, but the studies have been inconclusive. *See* RSOMF ¶ 123. And as for the psychological effects of mass-shootings, no one disputes that these types of attacks inflict both physical damage on their direct victims and psychological harm on the community as a whole, but the County fails to connect mass shootings—which as discussed more fully below are, like other crimes, primarily carried out with handguns—to the banned rifles in this case.

*Second*, the County claims that the banned firearms cause wounds that "are consistently more serious than those caused by non-Assault Weapons and that victims of Assault Weapons are at greater risk for immediate and long-term complications from both damage caused by the velocity of the bullets and the number of wounds involved." County Br. 32. In the same vein, the County argues that the performance capabilities of the banned firearms "render[] them unsuitable for use in self-defense situations." County Br. 20. As to both points, the County is simply wrong. "AW-type firearms do not operate differently than other comparable semiautomatics, nor do they fire more lethal ammunition." RSOMF ¶ 4 (quoting Christopher S. Koper, *Assessing the Potential to Reduce Deaths and Injuries from Mass Shootings Through Restrictions on Assault Weapons and Other High-Capacity Semiautomatic Firearms*, 19 CRIM'Y & PUB. POL'Y 147, 149 (2020)). A widely respected forensic pathologist and former member of the Justice Department's National Commission on Forensic Science has called the claim that the banned firearms cause more severe

wounds than other comparable semiautomatics "[o]ne of the common fallacies about assault rifles." RSOMF ¶ 4 (quoting Dr. Vincent J.M. DiMaio, *Gunshot Wounds: Practical Aspects of Firearms, Ballistics, and Forensic Techniques* at 170-71 (3rd ed. 2015)). Dr. DiMaio explained that, "[i]n fact, the wounds are less severe, even when compared to such venerable hunting rifles as the Winchester M-94 (introduced in 1894) and its cartridge the .30-30 (introduced in 1895)." *Id.*

The County's arguments about the effects of the ammunition of the banned firearms is undermined by the fact that the County's ban *does not regulate ammunition*. The County points to alleged facts such as the "higher energy release" of 5.56mm/.223 caliber ammunition, the way the ammunition "yaw[s]" on impact, resulting in the creation of a large "temporary cavity" when these cartridges hit human tissue, and that wounds to the extremities from rifle shots are more serious than those caused by handguns. County Br. 32–33. But while these are all alleged features of the type of ammunition frequently (but not always) used in AR-15s, *see, e.g.*, RSOMF ¶ 66 (noting that some, but not all 5.56mm/.223 caliber rounds "yaw"), the ammunition itself is not regulated by the County, so an individual could legally buy a Cook County compliant rifle, with none of the banned features, that nonetheless fired the ammunition which the County views as having such horrific effects. But more to the point, the County greatly overstates the wounding power of the 5.56mm/.223 caliber cartridge. According to Navy Combat Surgeon and president of the International Wound Ballistics Association, Martin L. Fackler, "widespread misinformation persists" regarding the wounding power of rifles like the AR-15, and "[t]he damage caused by the military rifle bullet [5.56mm] cannot be differentiated from that caused by a handgun bullet even by the most expert." RSOMF ¶ 71 (quoting Martin L. Fackler, MD, *Gunshot Wound Review*, Annals of Emergency Medicine 202(Aug. 1996)). And far from breaking bones from sheer "energy

24

release," Dr. Fackler noted that in his career he had personally seen just two incidences of such an injury, both from close-range shotgun blasts, and he had never seen a verified report of such an injury in any medical literature. RSOMF ¶ 73.

The County is also wrong to claim that the banned firearms are not useful for self-defense. The County casts this argument in terms of what is required for a self-defense showing under Illinois law. This is a red herring, since if Illinois self-defense law prohibits the use of a protected arm in every circumstance, then that law would independently violate the Second Amendment, as an infringement on the pre-existing right to armed self-defense. *See Heller*, 554 U.S. at 592. In any event, the County's argument misconstrues Illinois self-defense law which merely prohibits the use of excessive force in self-defense. *See, e.g.*, *People v. Murillo*, 587 N.E.2d 1199, 1205 (Ill. App. Ct. 1992). The County has cited no case suggesting that use of certain types of firearms is *per se* excessive force, and the cases demonstrate that is not how the analysis is handled. "If a person is confronted with such means or force as to induce a reasonable belief that he is in danger of loss of life or of suffering great bodily harm, that is all the law requires to justify a killing as self-defense." *People v. White*, 409 N.E.2d 73, 75 (Ill. App. Ct. 1980). In other words, the line is between whether lethal force is justified or not. If lethal force is justified, then courts do not inquire into questions like how powerful the weapon used in self-defense was.

Furthermore, there is ample evidence that the banned firearms are excellent for self-defense. The specific features of firearms targeted by the County's Ban are, perversely, the very features that make these firearms so good for self-defense. "Pistol grips," "adjustable stocks," and "barrel shrouds" all make it easier to fire the banned rifles comfortably and accurately and assist with controlling recoil. *See* RSOMF ¶ 20. It should not be surprising then, that study after study has found that self-defense is a major reason why so many Americans choose to buy them. *See*

25

RSOMF ¶ 20. And that really is the crucial point. As explained previously, the County simply has no authority, under the Second Amendment, to substitute its judgment for "the traditions of the American people"—including their choice of preferred firearms—which under *Bruen,* "demand[] [the courts'] unqualified deference." 142 S. Ct. at 2131. For the same reason, *Heller* did not demand a showing that handguns were actually good for self-defense, merely that the American people favored them, "whatever the reason." 554 U.S. at 629.

*Third*, the County argues that the banned firearms cause unique problems for law enforcement. County Br. 35–37. Specifically, the County claims that the banned firearms have been more frequently used in crime in recent years, especially by gangs, are the "weapon of choice for mass shootings in public spaces," and have required the police to expend time and resources on to plan for threats they pose. *Id.* at 35. Additionally, the County claims that the banned firearms are particularly dangerous to police because they can pierce body armor, and leave the police "outgunned." *Id.* at 36. As a result, the County argues that "law enforcement increasingly requires tactics such as charging structures with armored vehicles, use of explosives, robots, and drones with explosives" to counter the threat of the banned firearms.

Taking these claims in reverse order, the County here is taking to extremes the tendency, noted above, to greatly overstate the power of the banned firearms. The County's claim that crimes committed with assault weapons "increasingly" require extreme responses like bombing, or ramming a building with an armored vehicle, is unsupported. To the extent it has any basis in fact, it relies entirely on isolated instances of particularly egregious crimes and does not demonstrate an "increasing" normal response to crime committed with firearms. *See* RSOMF ¶¶ 199–200. As to the concerns about being outgunned, although it may not be the normal practice for police to carry banned rifles, it should be noted that law enforcement use of these firearms is on the rise,

and that Cook County itself exempts law enforcement officers and government employees from the restriction. *See* C.C. Ord. § 54-212(a)(1); RSOMF ¶ 26. And as discussed above, these firearms are not especially powerful rifles, and in fact they are significantly weaker than many common hunting firearms, so concerns about the armor-piercing abilities of these rounds are rather general concerns about all rifles. RSOMF ¶¶ 4, 221.

This leaves the County's claims about the use of these firearms in crime. It is simply not true that the banned firearms are the "weapons of choice" of mass shooters. Handguns are by far the most commonly used firearms in mass shootings, whereas semiautomatic rifles are used in just between 10 and 36 percent of such (very rare) crimes. *See* RSOMF ¶ 103. With respect to other forms of criminal use of firearms, the County's concerns are even more baseless. There is no evidence that gang members (or other criminals) increasingly seek to acquire and use the banned firearms. In 2014, of the top twenty models of firearms seized by Chicago Police, *all 20* were handguns, and only three "assault weapons associated with criminal incidents" were recovered that entire year. RSOMF ¶ 213. And this has not changed in recent years. Rifles made up just 4.5% of the recovered crime guns traced by the ATF in Chicago from 2017–2021, and over the same period 9mm pistols were the most often traced. RSOMF ¶ 331. Handguns are especially attractive to gang members because they are more easily concealable, and illegally modified handguns (which make up the bulk of illegally modified firearms recovered) have become a status symbol among gangs. RSOMF ¶¶ 332–333. If the County is concerned with crime, it has picked the wrong target.

*Fourth*, the County argues that the banned firearms have a "chilling effect" on the exercise of First Amendment rights. County Br. 37. Here, the County claims that studies have shown that individuals, when asked whether they would attend a protest, are less likely to attend when they

27

think people may be armed. This claim is not specific to the banned firearms, and even if it were it is extremely unclear how the County believes this claim is connected to the "dangerousness" inquiry under *Bruen* and *Heller*. It is plain enough that the County is really, with all of these arguments, trying to impress upon the Court all the good reasons it believes it has for banning the rifles that are the subject of this lawsuit. In a pre-*Bruen* world, all of this would have been presented and argued much more straightforwardly in terms of the importance of the governmental interests at issue in this case, and the relative burden imposed on the rights of Plaintiffs. But *Bruen* did away with interest balancing, and specifically warned against efforts by litigants to sneak the old analysis back in under the guise of the new. *See Bruen*, 142 S. Ct. at 2133 n.7. Even under the old analysis, the County's evidence of a harm that is related in any way to the banned rifles is extremely weak. *See* RSOMF ¶¶ 207–212. What is more, the reaction of bystanders to a valid exercise of Second Amendment rights cannot diminish those rights—we do not subject constitutional rights in this country to a heckler's veto. *See, e.g.*, *Kennedy v. Bremerton School District*, 142 S. Ct. 2407, 2427 (2022); *Watson v. City of Memphis*, 373 U.S. 526, 535 (1963) ("[C]onstitutional rights may not be denied simply because of hostility to their assertion or exercise."); *cf. Cox. v. Louisiana*, 379 U.S. 536, 550 (1965) (rejecting claim that protests constituted a "breach of the peace" because of fear by others that "violence was about to erupt" based on the reactions of bystanders to the protester's peaceful exercise of their First Amendment rights). But more importantly, this Court must follow *Bruen* and should disregard these arguments entirely.

### III.   No Historic Firearms Regulations Justify Cook County's Ban.

As explained above, the only historical tradition of firearm regulation that can justify a ban on a type of firearms is the tradition of regulating "dangerous and unusual weapons," which the Supreme Court has repeatedly recognized. And furthermore, that historic limitation on the right

28

only permits bans on firearms that are not in common use for lawful purposes, so it cannot justify Cook County's Ban. The Court can end its analysis here.

Nevertheless, the County has put forward other proposed analogues which merely serve to underscore that there is no historical support for its position. Before analyzing the County's proposed analogues, a note on the *Bruen* methodology is in order. The County argues that it should be given greater leeway than is usual in identifying historical analogues, because "a more nuanced approach" is called for in "cases implicating unprecedented societal concerns or dramatic technological changes." *Bruen*, 142 S. Ct. at 2132; *see also* County Br. 39. But, even in such cases, the Supreme Court has required Courts to "reason by analogy," a process which requires—even where a technological change has taken place—finding regulations that "impose a comparable burden on the right of armed self-defense and [for which] that burden is comparably justified." *Bruen*, 142 S. Ct. at 2132. In any event, this case involves no "dramatic technological change" that needs to be accounted for in the historical analysis. The County claims that the banned firearms are capable of much faster and more accurate fire than were the guns owned by most Americans at the Founding, *see* County Br. 38–40, and that the Founders did not have a gun violence problem like we do today, *id.* at 37. The first point is directly addressed by *Bruen* and *Heller*, which explain "one way in which the Second Amendment's historically fixed meaning applies to new circumstances: Its reference to 'arms' . . . covers modern instruments that facilitate armed self-defense." *Bruen*, 142 S. Ct. at 2132; *see also Heller*, 554 U.S. at 582. Indeed, that is a chief feature of the "dangerous and unusual" test—it grows and changes as technology changes—permitting courts a straightforward method to apply the Second Amendment's text to modern firearms by protecting those that are in common use *today*. If the Supreme Court accepted the County's arguments on this point, then it would have treated the handguns at issue in *Heller* as

constitutionally suspect "dramatic technological changes," since most handguns sold today also "do not require manual reloading," County Br. 39–40, can be "kept loaded" without danger from "corrosive" gunpowder that "attract[s] moisture," *id.* at 38, often feature "detachable and/or extended magazine[s]," *id.* at 39, and permit "the shooter to fire more shots, faster and farther than their predecessors," *id*. The County does not explain why these features did not impact the analysis in *Heller* but should control this case.

As for the claim that gun violence was not a problem at the Founding, that may have been true in some parts of the country, but it was hardly the case everywhere, and for the first century of our country's history, periods of staggering violence can be found. RSOMF ¶ 238. And again, this claim was also relevant—more relevant, in fact—in *Heller*, given that the firearms at issue here are seldom used in crime because criminals overwhelmingly favor handguns. *See* RSOMF ¶ 331–333.

### A. The Ban Is Not Supported By The Tradition of Regulating "Dangerous and Unusual" Weapons.

At risk of sounding like a broken record, the firearms banned by the County are not "dangerous and unusual" weapons that can be banned consistent with the Second Amendment. The County, however, argues this point at *every* stage of its analysis, and here, in its focus on history, it offers yet another suggestion for how the test should work (and yet again, its suggestion is inconsistent with *Bruen* and *Heller*). First, the County looks to the Statute of Northampton of 1328, and other laws against "affray," which it claims form the basis for the prohibition on dangerous and unusual weapons. *See* County Br. 42–44. But laws against "affray," which prohibited "going armed to the terror of the people," *Bruen*, 142 S. Ct. at 2145 (quotation marks omitted), are irrelevant. As *Bruen* explained, the affray laws had an intent element. They did not prohibit the keeping, or even carrying, of any firearms themselves, but rather they targeted the

carrying of firearms for the purpose of terrorizing the people. *Id.* at 2145–46. In other words, under the affray laws, an individual could own a weapon, and an individual could carry a weapon. The only thing he could not do was go armed in public for the purpose of terrorizing his fellow citizens. *Id.* And *Heller* has already explained, in its discussion of cases discussing affray laws, that these laws are fully accounted for by the "dangerous and unusual"/"common use" analysis that has been the focus of much of this brief. *See Heller*, 554 U.S. at 627 (citing, *inter alia*, *State v. Langford*, 10 N.C. 381 (1824)). And the burden on the right imposed by the County Ban, which does not permit *ownership* of arms in common use, is much greater than under the laws against affray.

Next, the County argues that laws regarding the storage of gunpowder provide historical support for its ban on semiautomatic rifles because "gunpowder gave an average citizen the ability to kill many people quickly, as assault weapons do today." County Br. 44 But the gunpowder regulations cited are nothing like the County's Ban. They were essentially public safety regulations which limited the amount and dictated the method of keeping gunpowder with the purpose of preventing accidental explosions and fires. *See Boland v. Bonta*, --- F. Supp.3d ----, 2023 WL 2588565, at *8 (C.D. Cal. Mar. 20, 2023) ("The main goal of the gunpowder storage laws was to prevent fire."); *see also Nat'l Ass'n for Gun Rights, Inc. v. San Jose*, --- F. Supp.3d ----, 2022 WL 3083715, at *10 (N.D. Cal. Aug. 3, 2022) ("Gunpowder storage laws . . . were often specific to gunpowder and not easily translatable to firearm regulations."). In addition to having a different purpose, the gunpowder laws did not burden the right in the same way, since they did not preclude ownership of any sort of firearm.

The County also claims that weapons that "were more likely than others to be used for unlawful purposes" could be regulated under the "dangerous and unusual" umbrella. County Br. 45. But the cases and laws the County cites to support this claim do not demonstrate any tradition

of banning a firearm, or any other weapon, that was among the most commonly possessed for self-defense, so they do not represent a comparable burden on the right of armed self-defense. *See Bruen*, 142 S. Ct. at 2133. In fact, the opposite is true. The County cites *Fife v. State*, 31 Ark. 455, 461 (1876) for the proposition that the Second Amendment did not protect arms that were normally "used in private quarrels and brawls," County Br. at 45 (quoting *id.*), but immediately after the County stops quoting the opinion, the Arkansas Supreme Court goes on to clarify that arms *cannot* be banned under its reasoning if they are "such as is in ordinary use, and effective as a weapon of war, and useful and necessary for the 'common defense.' " *Fife*, 31 Ark. At 461; *see also Bruen*, 142 S. Ct. at 2155 (citing *Fife*). *Fife* provides no support for the County's Ban. The same is true of *Andrews v. State*, 50 Tenn. 165 (1871), in which the Tennessee Supreme Court carved out (on state constitutional grounds) an exception for revolvers from a statewide ban on several weapons, noting that "[t]he right to keep arms involves, necessarily, the right to use such arms for all ordinary purposes." *Id.* at 178–79; *see also Heller*, 554 U.S. at 688 (discussing the same). And the County's final case on this point, *Aymette v. State*, 21 Tenn. 154 (1840), provides no support either. That case dealt with a law that regulated the method of carriage, and in upholding a ban on concealed carriage, the Tennessee Supreme Court embraced an "odd reading of the right" which was "not the one [*Heller*] adopt[ed]." *Heller*, 554 U.S. at 613. *Aymette* is irrelevant here, but even if it were not, it is not a reliable guide to the meaning of the Second Amendment.

The County's examples of historical laws banning certain types of weapons similarly abide by the "in common use" principle that should guide this Court's analysis. The County points to "fully automatic weapons like the Tommy gun," which have been widely regulated since the early 1930s as an example of a firearm that was banned because of its use in crime. *See* County Br. 47. To the extent that bans on fully automatic machine guns are consistent with the Second

Amendment it is because those firearms were (and remain) dangerous *and unusual*; they are not in common use. *See Heller*, 554 U.S. at 627. By contrast, the banned firearms at issue here *are* in "common use today." The County attempts to get around this objection by trying to equate the two, arguing that "the current legality of semiautomatic rifles creates a loophole for would-be machine gun owners: they can buy a semiautomatic rifle and convert it to a fully automatic weapon." County Br. 47. Accepting this counterfactual for the sake of argument, that would still not make the laws regulating machine guns proper analogues for the County's Ban, it would just permit laws regulating the conversion of a semiautomatic rifle into an illegal machine gun. In fact, those laws already exist. And as explained above, not unique to the banned firearms. The experience of the Chicago Police demonstrates that the vast majority of such conversions are done on semiautomatic handguns which the County does not ban. RSOMF ¶ 332. The County cannot make bans on machine guns relevant to its ban on common semiautomatic rifles.

**B. So-Called "Public Concern Justifications" Are Not Adequate Analogues for the Ban.**

The County next claims that "the founding generation would have understood that the government has primary responsibility for protecting its citizenry . . . and would not have expected the Second Amendment to allow rule by those willing and able to arm themselves the most heavily." County Br. 50. It support for this sweeping statement (which does not describe the situation here, where Plaintiffs are law-abiding citizens who simply want to own the most popular rifle in the country; they are not attempting to "rule" by "arm[ing] themselves the most heavily") are the gunpowder laws which were discussed and rejected above, and three court cases from between 1840 and 1874. As an initial matter, these court cases come much too late to show, as the County asserts, what "the founding generation would have understood" about *anything*. *Id.*; *see* Mark W. Smith, *Attention Originalists: The Second Amendment was adopted in 1791, not 1868,*

HARV. J. L. & PUB. POL'Y PER CURIAM (Dec. 7, 2022), https://bit.ly/42BmRX3. And in any event, the cases do not support the principle the County claims to derive from them. One case, *Aymette*, was discussed and rejected as a guide to the proper interpretation of the Amendment by *Heller*, as explained above. Another, *English v. State*, 35 Tex. 473 (1871), would have permitted such significant restrictions on the right that it weighed against the Supreme Court's decision in *Bruen*, where the Supreme Court dismissed it as an "outlier[]" that "provide[s] little insight into how postbellum courts viewed the right to carry protected arms in public." *Bruen*, 142 S. Ct. at 2153.

The County therefore has on this point just one case that has *not* been explicitly rejected by the Supreme Court for misunderstanding the nature of the Second Amendment right, and *Hill v. State*, 53 Ga. 472 (1874) is easily distinguishable from the County's Ban. In *Hill*, the Plaintiff was charged with violating a statute prohibiting carriage of a pistol at a court of justice. *Id.* at 473. The Georgia Supreme Court determined that the law was consistent with the Georgia constitution's right-to-bear-arms provision (though it explicitly did not consider the federal constitution). *Id.* at 474. Similar "sensitive places" laws were discussed in *Bruen*, where the Supreme Court found they may be useful analogues for modern laws "prohibiting the carry of firearms in *new* and analogous sensitive places," but that they were irrelevant to general laws governing carriage since, if they were applied beyond their narrow context, they "would in effect exempt cities from the Second Amendment." 142 S. Ct. at 2133–34. That is even more true in this case, where it is mere ownership, not carriage, of the banned firearms that is in issue. The authority of legislatures to prohibit firearms inside courthouses has nothing to do with the County's claim to the right to ban law-abiding citizens from owning some of the most popular firearms in the country.

Fundamentally, the County's misinterpretation of the Second Amendment and misunderstanding of our Country's history throughout its brief is based on one overarching error.

The County insists on focusing on the small fraction of criminals who misuse the banned firearms, and they analyze history exclusively with an eye toward exercise of government power directed against that misuse. But *Heller* and *Bruen* both focused on the lawful use of firearms, for constitutionally permissible purposes like self-defense, by ordinary, law-abiding citizens, when analyzing the scope of the Second Amendment. *See, e.g., Heller*, 554 U.S. at 629 ("[T]he American people have considered the handgun to be the quintessential self-defense weapon."); *Bruen*, 142 S. Ct. at 2150 ("None of these historical limitations on the right to bear arms approach New York's proper-cause requirement because none operated to prevent law-abiding citizens with ordinary self-defense needs from carrying arms in public for that purpose."). This Court is bound to follow *Heller* and *Bruen*'s approach, and that necessarily entails rejecting the County's framing of the analysis as about anything other than the common and lawful use of the banned firearms.

## IV. Seventh Circuit Caselaw On This Issue Was Abrogated by *Bruen*.

After 50 pages of briefing, the County reveals that it thinks that no new analysis is really necessary in this case, because Plaintiffs' claims are foreclosed by the Seventh Circuit's decisions—both before *Bruen*—in *Wilson v. Cook County*, 937 F.3d 1028 (7th Cir. 2019), and *Friedman v. City of Highland Park*, 784 F.3d 406 (7th Cir. 2015). *See* County Br. 46–48. It is true that Plaintiffs acknowledged, when they filed this lawsuit, that *Wilson* and *Friedman* foreclosed their claims. In fact, they moved for judgment on the pleadings on their own case on that basis. *See* Compl. at ¶ 5; Pls.' Mot. for Judgment on the Pleadings at 1. But contrary to the County's claim that "*Bruen* casts no doubt on the results" of those cases, County Br. 47, *Bruen* entirely abrogated those decisions, and they are no longer controlling.

In *Friedman*, the Seventh Circuit upheld a municipal ban on so-called "assault weapons" and "large capacity magazines." 784 F.3d at 419. In doing so, the Court did not apply the text-and-history framework that *Bruen* has clarified is *the framework* to apply, nor did it assess whether the

banned firearms were in common use for lawful purposes, which *Bruen* has demonstrated is *the historical test* for such laws. Instead, the court thought "it better to ask whether a regulation bans weapons that were common at the time of ratification or those that have 'some reasonable relationship to the preservation or efficiency of a well regulated militia,' and whether law-abiding citizens retain adequate means of self-defense." *Id.* at 410 (citations omitted). And in *Wilson*, which involved the County's Ban, the Seventh Circuit declined to revisit *Friedman* and found it controlling. 937 F.3d at 1029. Not only is the test under *Friedman* not the test under *Bruen*, these cases are essentially irrelevant to the analysis this Court must do. Whether a type of firearm existed in the 1790s has no bearing on whether it is constitutionally protected. *Bruen* clarified that weapons that are protected are those "in common use *today*." 142 S. Ct. at 2143 (emphasis added). The same is true for whether the banned arms have "some reasonable relationship to the preservation or efficiency of a well regulated militia." *Friedman*, 784 F.3d at 410 (quoting *Heller*, 554 U.S. at 622). In *Bruen*, the Supreme Court analyzed a late-19th-century case, *English*, in which the Texas Supreme Court had concluded that the Second Amendment and the state's analogue only protected such arms "as are useful and proper to an armed militia." 35 Tex. at 474. As just discussed, the *Bruen* Court dismissed this rationale as an "outlier[]," 142 S. Ct. at 2153, and instead reiterated that the Second Amendment right to keep and bear arms "does not depend on service in the militia," *id.* at 2127.

Even though *Friedman*'s rationale has been entirely undermined by Supreme Court precedent, and in fact the Supreme Court expressly held that circuit courts had almost all entirely misapplied *Heller*, the County urges this Court to consider itself bound because lower courts are bound by existing precedent "even when that precedent rests on reasoning that has been subsequently called into doubt." County Br. 54 (citing *Rodriguez de Quijas v.*

36

*Shearson/AmericanExpress, Inc.*, 490 U.S. 477, 484 (1989)). The County is wrong. It is true that courts must follow Supreme Court precedent unless and until the Supreme Court itself declares that precedent overruled, but district courts do not need to follow circuit court decisions that are contrary to newer Supreme Court precedent. *See, e.g., Thomas for Brown v. Sullivan*, 785 F. Supp. 788, 791 (C.D. Ill. 1992) (declining to apply Seventh Circuit precedent in light of an intervening Supreme Court decision). It would be a mistake to do so here.

## CONCLUSION

For the foregoing reasons, the Court should deny the County's motion for summary judgment.

Dated: April 24, 2023

Respectfully Submitted,

/s/ David H. Thompson

David G. Sigale (Atty. ID# 6238103)
LAW FIRM OF DAVID G. SIGALE, P.C.
430 West Roosevelt Road
Wheaton, IL 60187
(630) 452-4547
dsigale@sigalelaw.com

David H. Thompson*
Peter A. Patterson*
William V. Bergstrom*
COOPER & KIRK, PLLC
1523 New Hampshire Ave., N.W.
Washington, D.C. 20036
(202) 220-9600
(202) 220-9601 (fax)
dthompson@cooperkirk.com
ppatterson@cooperkirk.com
wbergstrom@cooperkirk.com
    *Admitted p*ro hac vice*

*Attorneys for Plaintiffs*