**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS**

| | | |
|---|---|---|
| CUTBERTO VIRAMONTES, et al. | : | |
| | : | |
| Plaintiffs, | : | |
| | : | Case No. 1:21-cv-04595 |
| v. | : | |
| | : | Chief Judge Rebecca R. Pallmeyer |
| THE COUNTY OF COOK, et al. | : | |
| | : | |
| Defendants. | : | |

**PLAINTIFFS' RESPONSES AND OBJECTIONS TO DEFENDANTS' RULE 56.1
STATEMENT OF MATERIAL FACTS**

Pursuant to Local Rule 56.1(e), Plaintiffs Cutberto Viramontes, Christopher Khaya, Firearms Policy Coalition, Inc., and Second Amendment Foundation submit the following responses and objections to Defendants' statement of material facts (ECF No. 81). By responding, Plaintiffs do not concede the materiality or relevance of any fact.

1.     On May 24, 2022, Roy Guerrero, M.D., a Uvalde area pediatrician, reported to his office for a routine day. *The Urgent Need to Address the Gun Violence Epidemic: Hearing Before the H. Comm. on Oversight and Reform*, 117TH CONG. 8-10 (2022) (statement of Dr. Roy Guerrero, Pediatrician, Uvalde, Tex.), attached hereto as Exhibit 1.

**Response:** Plaintiffs presently lack knowledge and, on that basis, decline to dispute at this time.

2.      By 12:30 p.m., Dr. Guerrero found himself racing to the hospital only to find the parents of his patients sobbing and shouting their childrens' respective names, desperately begging for news of their survival. *Id.*

**Response**: Plaintiffs presently lack knowledge and, on that basis, decline to dispute at this time.

3.     Dr. Guerrero made his way to the surgical area, searching for information about one of his patients. *Id.*

**Response:** Plaintiffs presently lack knowledge and, on that basis, decline to dispute at this time.

4.      What he found "was something no prayer will ever relieve: two children whose bodies had been pulverized by bullets fired at them, decapitated, whose flesh had been ripped apart, that the only clue as to their identities was blood-spattered cartoon cloths still clinging to them []." *Id.*

**Response:** Plaintiffs lack knowledge to admit or dispute this fact and, on that basis, decline to dispute at this time, to the extent it reflects Dr. Guerrero's impressions of what he saw. While this statement speaks for itself, it is necessary for context to understand that "AW-type firearms do not operate differently than other comparable semiautomatics, nor do they fire more lethal ammunition." Christopher S. Koper, *Assessing the Potential to Reduce Deaths and Injuries from Mass Shootings Through Restrictions on Assault Weapons and Other High-Capacity Semiautomatic Firearms*, 19 CRIM'Y & PUB. POL'Y 147, 149 (2020), attached as Exhibit 1. Indeed, according to a renowned forensic pathologist, former medical examiner, and former member of the Justice Department's National Commission on Forensic Science, "[o]ne of the common fallacies about assault rifles is that the wounds produced by them are more severe than those due to regular military rifle and hunting rifles. In fact, the wounds are less severe, even when compared to such venerable hunting rifles as the Winchester M-94 (introduced in 1894) and its cartridge the .30-30 (introduced in 1895)." Vincent J.M. DiMaio, GUNSHOT WOUNDS: PRACTICAL ASPECTS OF FIREARMS, BALLISTICS, AND FORENSIC TECHNIQUES (2d ed. 1999), attached as Exhibit 2. Furthermore, the bullets typically fired by an AR-style rifle are far smaller than those used since before the Founding: "Muskets, which were being transitioned from matchlocks to flintlocks, were typically .75 caliber. That was a powerful, deadly weapon that could create a three-quarters-of-an-inch wound. By comparison, today's AR-15 rifle typically fires a .223 caliber bullet, which is less than a quarter of an inch in diameter. In other words, the

2

seventeenth-century musket fired a bullet three times larger in diameter than the bullet usually fired by the AR-15." Stephen P. Halbrook, AMERICA'S RIFLE: THE CASE FOR THE AR-15 104 (Google Books ed. 2022), attached as Exhibit 3.

5.  As he waited with his fellow Uvalde doctors, nurses and first responders for children that could be saved, "they never arrived. All that remained was the bodies of 17 more children and the two teachers who cared for them." *Id.*

**Response:** Plaintiffs presently lack knowledge and, on that basis, decline to dispute at this time.

6.  On that fateful day, children and educators were attacked in an elementary school, murdered in an act of domestic terror by an assailant carrying an AR-15 rifle, a weapon regulated by the Cook County Blair Holt Assault Weapon Ordinance ("the Ordinance"), attached hereto as Exhibit 2; *Expert Report of Louis Klarevas* ("Klarevas") at Table 4, attached hereto as Exhibit 3; *Declaration of Professor John J. Donohue* ("Donohue") at ¶61, attached hereto as Exhibit 4.

**Response:** Plaintiffs admit that the Uvalde shooter used an AR-15 rifle, which is a firearm banned by Cook County. Plaintiffs dispute Defendants' characterizations of the shooting to the extent inconsistent with the official investigative report of the shooting issued by the Texas House of Representatives. *See Interim Report 2022: Investigative Committee on the Robb Elementary Shooting*, Tex. H.R., 88th Leg. (July 17, 2022), attached as Exhibit 4.

7.  More people have died or been injured in mass school shootings in the United States from 2000 to 2018 than in the entire twentieth century. Exhibit 4 Donohue at ¶ 48.

**Response:** Dispute. The study referenced by Defendants defines a "mass shooting" as a shooting during which "four or more people are killed (excluding the shooter)." Not only is there "no standard definition of what constitutes a mass shooting," with "different data sources—such as media outlets, academic researchers, and law enforcement agencies—frequently us[ing] different definitions when

discussing and analyzing mass shootings," the soundness of Defendants' statistical observation dispositively turns on what they choose to define as a "mass shooting." Rosanna Smart & Terry L. Schell, *Mass Shootings in the United States*, RAND CORP. (Apr. 15, 2021), https://bit.ly/3L9kzH4, attached as Exhibit 5.

8.      The assault weapons, in conjunction with high-capacity magazines, as defined under the Ordinance are capable of inflicting significant carnage upon civilians in a short period of time. *Expert Report of James E. Yurgealitis* ("Yurgealitis") at p.31, 32, attached hereto as Exhibit 5.

**Response:** Dispute. "Assault weapons," as defined by the Ordinance, "do not function differently than other comparable semiautomatics, nor do they fire more lethal ammunition." *See* Koper, *supra* Resp. to Statement 4, at 149. Of course, all firearms are capable of causing injury or death, but to the extent the County claims the prohibited firearms are more damaging or lethal than other semiautomatic firearms that are not prohibited, the County is wrong. Indeed, according to a renowned forensic pathologist, former medical examiner, and former member of the Justice Department's National Commission on Forensic Science, "[o]ne of the common fallacies about assault rifles is that the wounds produced by them are more severe than those due to regular military rifle and hunting rifles. In fact, the wounds are less severe, even when compared to such venerable hunting rifles as the Winchester M-94 (introduced in 1894) and its cartridge the .30-30 (introduced in 1895)." *See* DiMaio, *supra* Resp. to Statement 4. Furthermore, the bullets fired by an AR-style rifle are far smaller than those used since before the Founding: "Muskets, which were being transitioned from matchlocks to flintlocks, were typically .75 caliber. That was a powerful, deadly weapon that could create a three-quarters-of-an-inch wound. By comparison, today's AR-15 rifle typically fires a .223 caliber bullet, which is less than a quarter of an inch in diameter. In other words, the seventeenth-century musket fired a bullet three times larger in diameter than the

bullet usually fired by the AR-15." *See* Halbrook, *supra* Resp. to Statement 4, at 104. All semiautomatic firearms have exactly the same inherent rate of fire because the number of bullets that exit the muzzle in a unit of time depends entirely on how fast its operator physically pulls the trigger: "Once one pulls the trigger and fires a round, another round loads itself and may be fired by another pull of the trigger." *See* Halbrook, *supra* Resp. to Statement 4, at 206. Consequently, the semiautomatic rifles banned by the City for being "assault weapons" can shoot no faster than any other semiautomatic firearm. Additionally, Defendants' reference to "high-capacity" magazines is of no consequence as their restrictions on those magazines are not challenged here.

9.     The assault weapons prohibited by the Ordinance are identical to military firearms except for the ability to fire on a fully automatic mode. Exhibit 5 Yurgealitis at p.21.

**Response:** Dispute. Some of the banned firearms are similar in some respects to firearms also used by the military. In particular, the AR-15, the most popular rifle in the country, is a semi-automatic version of the M16, a military rifle with select-fire capability (meaning it can fire in semiautomatic mode like an AR-15, where one round is discharged each time the trigger is pulled, or in automatic mode, where one pull of the trigger discharges more than one bullet), *see* NSSF Fast Facts, Background Information On So-Called "Assault Weapons," NSSF (May 2022), attached as Exhibit 6, but the firearms are not "identical" in any meaningful sense. This is because the M16, as an automatic weapon, has a much higher rate of fire than an AR-15, *see Rifle Marksmanship: M16-/M4-Series Weapons*, DEP'T OF THE ARMY 2-1 tbl. 2-1 (2008), https://bit.ly/3pvS3SW, attached as Exhibit 7. Indeed, having thoroughly reviewed industry and military manuals, former Army officer and infantryman Dennis Chapman concludes, "Semiautomatic rifles such as the AR-15 cannot even approximate—much less replicate—the effective rates of fire of machineguns or selective-fire weapons, and they cannot even remotely approach the extreme capabilities that some poorly informed commentators attribute to them." Dennis P. Chapman, THE AR-15 CONTROVERSY:

Semiautomatic Rifles and the Second Amendment 34 (2nd ed. 2022), attached as Exhibit 82. And "[n]o aspect of the semiautomatic AR-15's capabilities or features render it any more a military arm or "weapon of war"—or any "deadlier"—than any other semiautomatic rifle." *Id.* at 100. The Supreme Court has itself observed that, unlike machineguns, semiautomatic rifles like AR-15s "traditionally have been widely accepted as lawful possessions." *Staples v. United States*, 511 U.S. 600, 611–12 (1994). As the Court noted at the very outset of its opinion, the only categorical distinction between a machinegun and a semiautomatic firearm is that the former "fires repeatedly with a single pull of the trigger," while the latter "fires only one shot with each pull of the trigger." *Staples*, 511 U.S., at 602 n.1. This distinction is supported by the very history of firearms development: "At the end of the 19th Century and the beginning of the 20th, a new technology emerged that would set out a clear line of demarcation between firearms adapted solely to military applications and those useful in other shooting applications—technology that would, for the first time, set apart "weapons of war" from other firearms. That technology was automatic fire: the ability to fire more than one round, whether in a continuous stream or in a burst, with each pull of the trigger." Chapman, *supra* at 110-111. Contrary to Defendants' characterization, the automatic-semiautomatic distinction is central to the nature and function of a firearm—not a peripheral point to be shrugged off.

10. The ability to convert a civilian AR-15 style gun into a fully automatic weapon is an additional factor that makes the weapons unusual. Exhibit 4 Donohue at ¶100.

**Response:** Dispute. As just explained, the AR-15 is not capable of automatic fire. The law at issue here does not ban firearms converted to be able to fire automatically, but firearms that are *only* capable of semiautomatic fire. Machinegun conversion devices like auto sears can be used on semiautomatic firearms generally and not just on the firearms the County bans as "assault weapons". Alain Stephens & Keegan Hamilton, *The Return of the Machine Gun*, The Trace (Mar. 24, 2022),

attached as Exhibit 9. If, as the County contends, the "ability to convert a civilian…gun into a fully automatic weapon…makes the weapon unusual," all semiautomatic firearms are unusual. That conclusion is clearly foreclosed by, inter alia, *District of Columbia v. Heller*, 554 U.S. 570 (2008).

11.     During the period of 2012 to 2017, the Bureau of Alcohol, Tobacco, and Firearms recovered 814 machine gun conversion parts. During the period of 2017-2021, the Bureau recovered 5,454 machine gun conversion parts, a 570% jump. *National Firearms Commerce and Trafficking Assessment*, Vol. 2, p. 4, attached hereto as Exhibit 6.

**Response:** Dispute. Defendants mischaracterize the report as evidence of proliferation in the availability or use of machine gun conversion parts. It appears to be the result of merely a change in definition. The ATF's final rule reinterpreting the statutory term "machinegun" to include bump-stock devices went into effect on March 26, 2019, for the first time including those devices among the "machine gun conversion parts" it reports as recovered. *See* Bump-Stock-Type Devices, 83 Fed. Reg. 66,514, 66,522 (Dec. 26, 2018), attached as Exhibit 10. That means that for at least part of 2017-2021, the definition of "machine gun conversion parts" covered at least 520,000 more devices than the same term did from 2012 to 2017. Greg Stohr, *Bump-Stock Ban Left Intact as Supreme Court Rejects Challenges*, BLOOMBERG LAW (Oct. 3, 2022), https://bit.ly/43W35Gq, attached as Exhibit 11. Defendants' attempted comparison of the two five-year periods fails because the spike in recovered machine gun conversion parts can be explained by the ATF's radical expansion of the kind and number of devices covered by the term.

12.     Plaintiff Cutberto Viramontes seeks to own a Smith and Wesson Military & Police AR-15 style semiautomatic rifle, which is banned by the Ordinance. *Complaint* at ¶ 40, attached hereto as Exhibit 7.

**Response:** Admit.

13.     Viramontes intends to possess a semiautomatic rifle for lawful purposes,

particularly self-defense. Exhibit 7 Complaint at ¶ 40; *Deposition of Cutberto Viramontes* 6:20-22; 55:10-14, attached hereto as Exhibit 8.

**Response:** Admit.

14.       Viramontes lives in a two-unit apartment building. Exhibit 8 Viramontes Dep. 8:7-12.

**Response:** Admit.

15.       Plaintiff Christopher Khaya seeks to own an Israel Military Industries Galil AR-15 style semiautomatic rifle, which is banned by the Ordinance. Exhibit 7 Complaint at ¶ 42.

**Response:** Admit.

16.       Khaya intends to possess a semiautomatic rifle for lawful purposes, particularly self-defense. Exhibit 7 Complaint at ¶ 42; *Deposition of Christopher Khaya* 7:17-22, attached hereto as Exhibit 9.

**Response:** Admit.

17.       Khaya resides in an apartment in a building containing three other apartments. Exhibit 9 Khaya Dep., 7:23-8:3.

**Response:** Admit.

18.       Khaya currently owns a .22 caliber semi-automatic Rossi rifle and a Smith and Wesson handgun. *Id.* 34:12-35:9; 48:17-49:20.

**Response:** Admit.

19.       The organizational Plaintiffs maintain that their members seek to obtain or use semiautomatic rifles in Cook County that are banned by the Ordinance. Exhibit 7 Complaint at ¶ 43.

**Response:** Admit.

20.       Assault weapons, whether rifles or handguns, are a poor choice for home defense

or personal protection. Exhibit 5 Yurgealitis at 28.

**Response:** Dispute. The common firearms that the County tendentiously labels "assault weapons," especially those with the features specifically prohibited by Cook County, are, in fact, well-suited for self-defense. For instance, a pistol grip and other features "capable of functioning as a protruding grip that can be held by the non-trigger hand" help to stabilize a firearm and permits its operator to maintain accuracy. David B. Kopel, *Rational Basis Analysis of "Assault Weapon" Prohibition*, 20 J. CONTEMP. L. 381, 392–93 (1994), attached as Exhibit 8. A muzzle brake or compensator reduces recoil by redirecting energy and so permits the operator to aim the firearm more effectively. *Id.* "Recoil can be painful, and muzzle movement interferes with accuracy. A telescoping stock…'allows the user to adjust the length of the stock,' which, 'like finding the right size shoe, simply allows the shooter to rest the weapon on his or her shoulder properly and comfortably.'" *See* Halbrook, *supra* Resp. to Statement 4, at 383 (quoting *New York State Rifle & Pistol Ass'n v. Cuomo*, 990 F. Supp. 2d 349, 368 (2013)). Similarly, a flash suppressor "reduces noise and potentially increases accuracy," while "there is no law enforcement concern for pistol grips or thumbhole stocks, which simply assist a shooter in absorbing recoil." *Id.* at 399 (quoting *Murphy v. Guerrero*, No. 1:14-CV-00026, 2016 WL 5508998, *19 (D. N. Mariana Islands, Sept. 28, 2016). "Such features…do not render the AR-15 more deadly by making it fire faster . . . or impact with far more power. They mostly serve the same ergonomic functions as similar features on non-banned firearms, making the AR-15 easier and safer to use." E. Gregory Wallace, *"Assault Weapon" Lethality*, 88 TENN. L. REV. 1, 13–14 (2020), attached as Exhibit 12.

As Wallace explains in detail, "When a rifle fires, recoil from the bullet and propellant gases exiting the muzzle of the barrel moves the rifle back along the centerline of the barrel. With many hunting rifles and shotguns, the centerline of the barrel is higher than the shooter's shoulder because the buttstock of the rifle is angled lower than the barrel. Recoil thus causes the barrel of the rifle to

move back and up." E. Gregory Wallace, *"Assault Weapon" Myths*, 43 S. Ill. U. L. J. 193, 228–29 (2018), attached as Exhibit 13. To mitigate the inaccuracy due to recoil, "M16 rifles were designed to reduce muzzle rise by moving the buttstock in line with the barrel so that the rifle's recoil will push straight back against the shooter's shoulder." *Id.* at 229. This straight-line alignment, which the semiautomatic AR-15 also has, "requires a pistol grip separate from the buttstock because it is too awkward to pull the trigger while gripping the raised buttstock when firing the rifle from the shoulder, whether standing, kneeling, or prone." *Ibid.* A pistol grip "thus allows for accurate firing from the shoulder, which is how the rifle was designed to shoot." *Ibid.* Indeed, this is how the Department of Defense's Defense Advanced Research Projects Agency (DARPA) explained the purpose of pistol grips for AR-15s: "a plastic stock with a rubber butt, assembled in line with the bore" that "in conjunction with its high line of sight and separate hand grip, is designed to minimize rotation about the shoulder during firing." U.S. Dep't of Def.: Advanced Rsch. Projects Agency, Report of Task No. 13A: Test of Armalite Rifle, AR-15 (U) (Aug. 20, 1962), attached as Exhibit 14. The pistol grip is positioned "in such a manner as to provide a more natural, comfortable, and effective grasp of the rifle. It is this purpose, and no other, for which the modern pistol grip is intended." *See* Chapman, *supra* Resp. to Statement 9 at 38.

Indeed, "the M4 rifle, which is equivalent to a .223 caliber rifle [like the AR-15], is relatively light in both force and velocity compared to many other shoulder-fired weapons used for hunting and recreation." Joseph W. Galvin et al., *Rate and time to return to shooting following arthroscopic and open shoulder surgery*, 6 JSES Int'l 968 (2022), attached as Exhibit 99. So much so, in fact, that "[w]hen compared to many hunting rifles, the M4 often produces 3 to 4 times less recoil energy and typically about half of the recoil velocity." *Ibid.*

Generally known as "handguards," a barrel shroud "is the metal or plastic enclosure that covers typically all but a few inches of the barrel" and, on an AR-15, "has multiple functions: (1) it

provides the shooter with a forward grip on the rifle using the non-trigger hand; (2) it protects the shooter's hand from a hot barrel; (3) it protects the barrel and gas tube or piston from damage; (4) it helps ventilate and cool the barrel; and (5) it provides a base for attaching accessories to the rifle such as sights, slings, flashlights, forward vertical grips, and bipods. None of these functions make the AR-15 exceptionally lethal, especially when compared to non-banned rifles." *See* Wallace, *supra* Resp. to Statement 20, at 231. Indeed, the County's ordinance by its own terms describes the banned barrel shroud as "allowing the bearer to hold the firearm with the non-trigger hand without being burned," raising the curious question of whether the County would prefer more burned hands during the operation of firearms. Code of Ordinances of Cook Cnty., Ill. § 54-211, (Dec. 15, 2020), https://bit.ly/2Lcts75. Rifles also "have been equipped with "barrel shroud" handguards for more than 100 years," with bolt-actions being "the first rifles so equipped." *See* Chapman, *supra* Resp. to Statement 9 at 65. Because burned hands pose "a critically important safety concern" for the millions of Americans who own these rifles, these handguards "exist to protect shooters from injury by contact with hot rifle barrels during ordinary, routine shooting activities." *Id.* at 66-67.

The County also isolates folding, telescoping, or thumbhole stocks as a banned feature. Broadly termed "adjustable stocks," these accessories are ergonomic improvements over earlier fixed-stock rifle configurations" that are "designed to allow adjustments in the rifle's length of pull, making the firearm more comfortable to shoot in both military and civilian applications." *See* Wallace, *supra* Resp. to Statement 20, at 232. "A telescoping stock makes a rifle easier to shoulder properly for different users, or for one user when shooting from different positions or wearing different thicknesses of clothing." *Id.* In fact, the military's fully automatic M16 "has a fixed stock," while the civilian semiautomatic AR-15 has "telescoping rather than folding stocks." *Id*. A thumbhole stock is simply a hole in the stock through which the user can place his or her thumb to allow a more secure grip on the firearm. Adjustable stocks serve a perfectly sensible function, one in fact rooted in American

tradition: "Most people cannot afford to have a rifle custom-stocked to fit their precise size and shape and certainly cannot afford to have custom stocks made for each member of their family. Collapsible or adjustable stocks provide a standard, off-the-shelf solution that allows each shooter to adjust the rifle to their own body and thus optimize their shooting experience; adjustable buttstocks enable multiple members of a family to practice shooting with the same rifle, optimizing the shooting experience for each. In this respect, adjustable buttstocks reflect the American shooting tradition, wherein hunting, target shooting, and arms for self-defense have always been the province of ordinary working people of modest means as opposed to the European tradition wherein the shooting sports were the domain of the wealthy and privileged classes who could afford to indulge in fine handcrafted and extremely expensive custom sporting arms." *See* Chapman, *supra* Resp. to Statement 9 at 83-84. The bottom line is that none of the "assault" features identified by the County are nearly as nefarious as it suggests. Rather, they improve the functions of a rifle, render its operation simpler and more accurate, and so render the rifles they accessorize favored firearms for defense of self and home.

It is not surprising, then, that millions of Americans have chosen the banned firearms for exactly these purposes. *See* William English, *2021 National Firearms Survey: Updated Analysis Including Types of Firearms Owned* at 33–34, GEO. UNIV. (May 13, 2022) (finding that 24.6 million Americans, or 30.2% of gun owners, had owned or did own an AR-15 or similar style rifle, and that the most common reasons for owning them were target shooting (66% of owners), home defense (61.9% of owners) and hunting (50.5% of owners)), attached as Exhibit 15; *see Poll of current gun owners* at 1, WASH. POST-IPSOS (Mar. 27, 2023) (finding 20% of gun owners currently own an AR-15 or similar style rifle, 60% of respondents citing target shooting as a "major reason" for owning them and 30% citing that as a "minor reason," and protection of self, family, and property rating as even *more* important, with 65% as a major reason and 26% reporting it as a minor reason), attached as Exhibit 16. A recent survey of over 2,000 owners of such firearms reached the same result,

showing again that home-defense and recreational target shooting are the two most important reason for owning these firearms. *See* Modern Sporting Rifle: Comprehensive Consumer Report at 5, NAT'L SHOOTING SPORTS FOUND., INC. (July 14, 2022), attached as Exhibit 17; *see also* Sport Shooting Participation in the U.S. in 2020 at *iii*, NAT'L SHOOTING SPORTS FOUND., INC. (2021), https://bit.ly/3sPuEQl, attached as Exhibit 104 (noting that in 2020, 20 million American participated in sport or target shooting with firearms like those banned by the County). "AR-style rifles are popular with civilians and law enforcement around the world because they're accurate, light, portable, and modular. . . . [The AR-style rifle is] also easy to shoot and has little recoil, making it popular with women. The AR-15 is so user-friendly that a group called 'Disabled Americans for Firearms Rights' . . . says the AR-15 makes it possible for people who can't handle a bolt-action or other rifle type to shoot and protect themselves." Frank Miniter, THE FUTURE OF THE GUN 46-47 (Google Books ed. 2014), attached as Exhibit 105. This popularity among a diverse demographic of Americans is, in part, because an AR-15 "firing .223 or 5.56 mm ammunition produces *zero* felt recoil—that is, nearly all the recoil produced by firing is absorbed by the buffer assembly, transmitting almost none to the shooter's shoulder." Chapman, *supra* Resp. to Statement 9 at 127.

But not only are semiautomatic rifles useful in self-defense generally, they are particularly useful when one is confronted by multiple assailants. Indeed, 51.2 percent of all self-defense incidents annually involve two or more attackers, while 20.4 percent of such incidents involve three or more attackers. *See* English, *supra* Resp. to Statement 20, at 15. In 2019, a Houston homeowner repelled five armed home invaders with his semiautomatic AK-47. Stefania Okolie*, 5 Shot and 3 Killed After Homeowner Opens Fire on Suspects in East Houston*, ABC13 (Jan. 20, 2019), attached as Exhibit 18. An eight-months-pregnant mother in Florida used an AR-15 to defend herself and her family when two masked men forcibly entered her home, pistol-whipped her husband, and grabbed her daughter. She fatally shot one of the attackers, while the other ran away. Joe Tacopino, *Pregnant*

*Florida mom uses AR-15 to kill home intruder*, N.Y. POST (Nov. 4, 2019), attached as Exhibit 19. When the owner of a Santa Monica liquor store, and his friends, stood in front of his store armed with AR-15s, the looters who had plundered and razed neighboring stores simply passed them by without incident. *Santa Monica Owner Protects His Store With Guns Amid Looting*, CBS L.A. (June 1, 2020), attached as Exhibit 20. A homeowner in Florida used his AR-15 to fight off four home invaders in Summerfield, Fla. Two died from their injuries, two were arrested near the house, and the homeowner was injured. Austin Miller, *MCSO: 2 of 4 intruders dead, homeowner injured in home invasion*, OCALA STAR BANNER (July 10, 2019), attached as Exhibit 21. When firearms instructor Dave Thomas ran into his apartment hallway with his AR-15 because he heard women screaming, he found blood in the hallway and a man stabbing another. The stabber ran away when Thomas threatened to shoot him. Hannah Leone, *Gun instructor uses AR-15 to stop attacker in Oswego: "He was half a breath away from getting his head blown off,"* CHI. TRIB. (Mar, 1, 2018), attached as Exhibit 22. The 19-year-old son of a homeowner in Oklahoma shot and killed two of three home invaders who had entered the house through the back door with the goal of burglarizing it. *Homeowner's son shoots, kills three would-be burglars*, FOX NEWS (Mar. 27, 2017), attached as Exhibit 23. In Texas, the teenage son of a police officer's son was babysitting his 12-year-old sister when two burglars who had ransacked neighboring homes broke into their house through a back window. The boy repelled them with his father's rifle, hitting one of them and sending them both scurrying to the local hospital. *Investigators: 15-year-old son of deputy shoots burglary suspect*, KHOU11 (June 29, 2010), attached as Exhibit 24. The rifles used in all these instances of self- or home-defense are banned by the County on account of their cosmetic features.

21.      Assault rifles were not designed for, and are not particularly suitable for, home defense in short range close quarter situations. *Id.* at 29.

**Response:** Dispute. *See* Resp. to Statement 20.

22.     Assault weapons and large capacity magazines facilitate excessive discharge of
ammunition with a resultant risk to uninvolved individuals. *Id.* at 28.

**Response:** Dispute. So-called assault weapons function in precisely the same way as any other
semiautomatic firearms. So-called large capacity magazines permit individuals to have a firearm
equipped with sufficient ammunition to effectively defend themselves in many situations without
reloading, which can be a fatal pause in self-defense situations. Indeed, "from the perspective of a
victim trying to defend her home and family, the time required to re-load a pistol after the tenth
shot might be called a 'lethal pause,' as it typically takes a victim much longer to re-load (if they
can do it at all) than a perpetrator planning an attack. In other words, the re-loading 'pause' the
State seeks in hopes of stopping a mass shooter, also tends to create an even more dangerous time
for every victim who must try to defend herself with a small-capacity magazine. The need to re-
load and the lengthy pause that comes with banning all but small-capacity magazines is especially
unforgiving for victims who are disabled, or who have arthritis, or who are trying to hold a phone
in their off-hand while attempting to call for police help. The good that a re-loading pause might
do in the extremely rare mass shooting incident is vastly outweighed by the harm visited on
manifold law-abiding, citizen-victims who must also pause while under attack." *Duncan v.
Becerra*, 366 F. Supp. 3d 1131, 1178–79 (S.D. Cal. 2019); *see also* Gary Kleck, *Large-Capacity
Magazines and the Casualty Counts in Mass Shootings: The Plausibility of Linkages*, 17 J. RES. &
POL'Y 28, 42–44 (2016), attached as Exhibit 25. In any event, Defendants' reference to "large
capacity" magazines is of no consequence as their restrictions on those magazines are not
challenged here.

23.     In a home defense capacity, AK and AR type rifles present a problem of
overpenetration of common household materials. *Id.* at 30.

**Response:** Dispute. Overpenetration is largely a result of the ballistic qualities of the rounds an

individual uses with their firearms, and it can be just as significant of a problem with other types of firearms. Many civilians, for precisely this reason, load their AR- or AK-type firearms with deforming ammunition that greatly reduces the risks of overpenetration. Indeed, "one of the advantages of an AR rifle compared to a handgun is that the AR bullet is much smaller than typical defensive handgun rounds. Hence, the bullet loses velocity sooner than does a bigger bullet when it strikes the target. Therefore, the AR bullet is less likely to over-penetrate—that is, to exit the criminal's body and thereby endanger other people." David Kopel, *How powerful are AR rifles?,* REASON MAG. (Feb. 27, 2023) (internal emphasis omitted), attached as Exhibit 26; *see also The Pros and Cons of the Home Defense AR-15*, GUNCRAFT TRAINING ACAD. (Apr. 30, 2018), attached as Exhibit 27. But the County's own ordinance does not evince any real concern for overpenetration. Not only has the County left off its list of banned firearms guns like shotguns or hunting rifles that shoot more penetrative rounds, it has banned features that make rifles more accurate, thereby reducing the risk of overpenetration on missed shots, *see* Resp. to Statement 20, and it has also banned the very style of rifles that fire smaller and less penetrative rounds. *See supra* Wallace *"Lethality"* Resp. to Statement 20, at 8; *see also id.* at 68. Indeed, a round from an AR-15 "normally penetrates less through walls than common handgun and shotgun rounds, reducing the risk to public safety from bullet overpenetration." *Id*. at 57. The degree of penetration, after all, "would depend on the caliber" of the round, and the County draws no distinctions as to caliber. *See* Halbrook, *supra* Resp. to Statement 4, at 398. It would seem that the County does not in fact care about overpenetration at all.

24.     The residents of Cook County are concentrated at a population density of 5,583 people                        per                        square                        mile. https://www.census.gov/quickfacts/fact/table/chicagocityillinois,US/PST045221.

**Response:** The cited source speaks for itself and, on that basis, Plaintiffs admit.

25.     The population density within the City of Chicago is 12,059.8 people per square mile. https://www.census.gov/quickfacts/fact/table/chicagocityillinois,US/PST045221

**Response:** The cited source speaks for itself and, on that basis, Plaintiffs admit.

26.     The purpose and best use of assault weapons is to kill with extreme speed and efficiency, not self-defense or hunting. *Declaration of Chief Larry Snelling* ("Snelling") at ¶ 18, attached hereto as Exhibit 10.

**Response:** Dispute. Plaintiffs object that this is not a "fact" requiring a response, but an opinion. To the extent warranting response, *see* Resp. to Statement 20. As for the "purpose" of a firearm, that is not an intrinsic feature of a firearm but is entirely dependent on the user. After all, "[p]olice nationwide are issued, or purchase their own, AR-15-style rifles," and jurisdictions "that ban "assault weapons" for civilians exempt law enforcement officers and even retired officers." *See* Halbrook, *supra* Resp. to Statement 4, at 38. The County's own ban exempts law enforcement officers and government employees at all levels from its ambit. Code of Ordinances of Cook Cnty., Ill. §§ 54-212(a)(1). Indeed, "[i]n today's patrol vehicles it seems you're more likely to find a semi-automatic rifle chambered in .223. It's probably an AR-15 variant with a barrel that measures somewhere between 16" to 20"." Lt. Frank Borelli, *The Patrol Rifle Necessity*, OFFICER.COM (Apr. 18, 2019), attached as Exhibit 28. Chicago's own police department, after all, has listed the "AR-15/M-4 type, semiautomatic carbine chambered in 5.56 mm" as an "approved carbine" for department issue. Chicago Police Department, *Police Carbine Operator Program*, U04-02-05 (Feb. 2, 2015), attached as Exhibit 29. But police officers issued, and permitted to possess, AR-style rifles plainly do not wish "to kill with extreme speed and efficiency." Rather, "police use such rifles…because they are considered well suited for self-defense, including in an urban environment." *See* Halbrook, *supra* Resp. to Statement 4, at 38.

27.     Firearms other than assault weapons are more suitable for personal defense than are

17

assault weapons. *Expert Report and Declaration by Phil Andrew* ("Andrew") at p.8, ¶¶24.25, attached hereto as Exhibit 11; Exhibit 5 Yurgealitis at p.28–29.

**Response:** Dispute. Plaintiffs object that this is not a "fact" requiring a response, but an opinion. To the extent warranting response, *see* Resp. to Statement 20. Additionally, the evidence shows that the banned firearms are used much more frequently in self-defense than the County believes. Professor English found that 31.1% of gun owners—approximately 25.3 million Americans—report having used a firearm in self-defense, with approximately 1.67 million defensive gun uses every year. *See* English, *supra* Resp. to Statement 20, at 9. Thirteen percent of these defensive gun uses were with rifles. *Id*. at 10–11.

28.     Home defense and/or retail robbery situations are rarely, if ever, lengthy shootouts with extensive exchanges of gunfire. Exhibit 5 Yurgealitis at p.28.

**Response:** Dispute. "Rarely" is far too subjective an adverb to factually describe the occurrence of self-defense events, particularly those involving life and death. As detailed in Resp. to Statement 20, shootouts with assailants occur, and a majority of defensive firearm uses occur against multiple assailants. *See* English, *supra* Resp. to Statement 20, at 15. The benefits of AR-style firearms, also detailed in Resp. to Statement 20, are particularly pronounced in those contexts. In fact, "lengthy shootouts with extensive exchanges of gunfire" are often avoided precisely *because* of the unique defensive advantages AR-style firearms offer a means to speedily and effectively end violent encounters, as the features and incidents recounted in Resp. to Statement 20 demonstrate. But it is an independent analytical error to presume, as the County does, that firearms and the Second Amendment are meant only for those situations it considers normal, frequent, or routine. Rather, in many ways, "[t]he Second Amendment is a doomsday provision, one designed for those exceptionally rare circumstances where all other rights have failed-where the government refuses to stand for reelection and silences those who protest; where

18

courts have lost the courage to oppose, or can find no one to enforce their decrees. However improbable these contingencies may seem today, facing them unprepared is a mistake a free people get to make only once..." *Silveira v. Lockyer*, 328 F.3d 567, 568–70 (9th Cir. 2003) (Kozinski, J., dissenting from denial of rehearing en banc).

29.     Most confrontations involve gunfire at close range, and most law enforcement agencies emphasize a 3–10-yard line of fire during their firearm training qualifications. Exhibit 11 Andrew at p.8.

**Response:** Plaintiffs presently lack knowledge of law enforcement agencies' line-of-fire training emphases and, on that basis, decline to dispute at this time.

30.     Although there are over 300 million firearms in the United States, victims of violent crimes do not defend themselves with a firearm in 99.2% of attacks. Exhibit 4 Donohue at ¶ 115.

**Response:** Dispute. About "25.3 million adult Americans have used a gun in self-defense." English, *supra* Resp. to Statement 20, at 12 The vast majority of these cases (81.9%) do not involve a fired shot. *Id.* at 9. For 31.8% of gun owners, "the mere presence of a gun has deterred criminal conduct." *Id.* at 16. Indeed, "this suggests that approximately 25.9 million gun owners have been involved in an incident in which the presence of a firearm deterred crime on some 44.9 million occasions. This translates to a rate of approximately 1.5 million incidents per year for which the presence of a firearm deterred crime." *Id.* at 16. According to a large-scale survey of defensive gun uses, only 59.5% of respondents involved in defensive gun uses also reported personal ownership of a gun. Gary Kleck & Marc Gertz, *Armed resistance to crime: The prevalence and nature of self-defense with a gun*, 86 J. CRIM. L. & CRIMINOLOGY 150, 187 (1995), attached as Exhibit 30. This means even those who do not own firearms benefit from defensive uses of firearms by those who do. Furthermore, even if true, the County's proffered statistic compels no material inference. Victims of violent crime may not

have defended themselves with a firearm simply because they did not have access to one at the time they were victimized. They might have been targeted because they were known or suspected to be unarmed. They might have survived, or suffered less at their attackers' hands, had they had the benefit of armed self-defense. How many victims do not, or do not have a chance to, avail themselves of an advantage in defending their lives and homes has no impact on the rights of those who do wish to avail themselves of it.

31.     The firearms industry and pro-firearms groups hold the position that brandishing a firearm and not using it is enough to stop a perpetrator in the vast majority of violent criminal acts. *Id.* at ¶¶ 116–118.

**Response:** Admit that brandishing or displaying a firearm is often enough to defend oneself from a violent criminal attack. Dispute that displaying and deterring with a firearm is not "use" of a firearm. *See also* Resp. to Statement 30.

32.     Legally armed civilians and private security have had limited impact in stopping assault weapon attacks. Exhibit 11 Andrew at p.9.

**Response:** Dispute. In 2017, former NRA instructor, civilian Stephen Willeford used his semiautomatic rifle to confront and disable the shooter who attacked the First Baptist Church in Sutherland Springs, Tex. *See* Saeed Ahmed, Doug Criss, and Emanuella Grinberg, *"Hero" exchanged fire with gunman, then helped chase him down*, CNN (Nov. 7, 2017), attached as Exhibit 31. In 2007, a security guard engaged and shot a gunman armed with a rifle who killed four people at a Colorado church, ending the assault as the gunman killed himself. *Despite Shots From Security Guard, 24-Year-Old Murray Killed Himself*, ABC NEWS (Feb. 26, 2009), attached as Exhibit 32. In any event, this statistic suffers from the same infirmity as that in Statement 30: it compels no material inference. The "impact" that legally armed citizens have in stopping attacks depends, inter alia, on whether there are armed citizens at the location of a shooting, whether they

are able to access their firearms in time, locate the shooter, safely get within firing range of the

shooter, and engage the shooter. Whether the constellation of factors involved in disabling a

shooter align in a particular case is immaterial to the rights of those who wish to avail themselves

of the advantage of armed self-defense and so enlarge their own, and others', chances of survival.

33.     Other weapons, such as a pump action shotgun or an eight-shot revolver, have

stopping power, low probability of over penetration, and ease of use. Exhibit 5 Yurgealitis

at p.28.

**Response:** Dispute. Defendants' statement evinces a misunderstanding of the force at which

shotgun pellets strike in close range and the short range at which they are most effective.

"Shotguns are low-velocity weapons, but at close range, their pellets or slugs have considerable

wounding potential." *See supra* Wallace *"Lethality"* Resp. to Statement 20, at 51. At a range of

under ten feet, "the shotgun produices the most devastating injuries of all small arms." Panagiotis

K. Stefanopoulos et al., *Wound Ballistics of Firearm-Related Injuries—Part 1: Missile*

*Characteristics and Mechanisms of Soft Tissue Wounding*, 43 INT'L J. ORAL & MAXILLOFACIAL

SURGERY 1445, 1454 tbl.2 (2014), attached as Exhibit 33. "The kinetic energy of typical twelve-

gauge 00 buckshot fired at 1,200 fps is about 1,700 ft/lbs at the muzzle. Wounding is severe due

to the pellets acting as a single large projectile, their rapid deceleration and transfer of all their

energy to tissue, and the creation of multiple wound tracks due to the so-called "billiard ball

effect" scattering the pellets inside the tissue." *See supra* Wallace *"Lethality"* Resp. to Statement

20, at 51. While "[s]hotgun pellets do not produce a temporary cavity like expanding, yawing, or

fragmenting handgun and rifle bullets," *id.*, "[t]hese wounding effects . . . are of lesser extent

compared to the distinctively massive injuries produced by shotgun blasts," *see supra*

Stefanopoulos et al., *Wound Ballistics*, at 1454. "Shotgun slugs deform and cause temporary

cavitation," *see supra* Wallace *"Lethality"* Resp. to Statement 20, at 51, "produc[ing] massive

internal injuries within a range of [one hundred] meters, comparable in severity to those encountered from hunting rifle bullets." *see supra* Stefanopoulos et al., *Wound Ballistics*, at 1453. "The kinetic energy of a typical twelve-gauge shotgun slug is around 2,600 ft/lbs, which approximates the energy of larger caliber rifle bullets." *See supra* Wallace *"Lethality"* Resp. to Statement 20, at 51. The stronger recoil of shotguns also renders them more unwieldy for self- and home- defense than semiautomatic rifles: "the typical shotgun has more recoil than most handguns and rifles." Brandon Mattox, *How to Reduce Shotgun Recoil*, SILENCER CENT. (Jan. 17, 2023), https://bit.ly/40x6TLE, attached as Exhibit 36. Defendants' evangelization of the benefits of revolvers does not square with the retirement of the outdated firearm among police departments. Indeed, the revolver "is being phased out" by the largest police department in the United States as "the [New York] Police Department and most other law enforcement agencies to switch to semiautomatic weapons." Ashley Southall, *New York Police Department Is Retiring the Revolver*, THE NEW YORK TIMES (May 31, 2018), https://nyti.ms/3KQ0K7m, attached as Exhibit 34. But this switch from revolvers to semiautomatic firearms is neither novel nor sudden—police departments have been "replacing the time-honored .38-caliber revolver with a 9-millimeter semiautomatic pistol as a standard weapon" since at least 1989. Amy Hill Hearth, *Police Turning to 9-mm. Guns to Fight Crime*, THE NEW YORK TIMES (Mar. 12, 1989), attached as Exhibit 35.

34.     A shotgun disperses shot in a conical pattern, expanding in an ever-larger pattern as it travels, as opposed to a round from an AR-15, which travels like a laser beam. *Deposition of James Yurgealitis* ("Yurgealitis Dep."), 92:1-7, attached hereto as Exhibit 12.

**Response:** Dispute. A round from an AR-15, like all rifle and handgun rounds, travels in a generally straight line, accounting for effects from gravity and from wind. It does not "travel[] like a laser beam." This sort of hyperbolic language is both inaccurate and indicative of the County's

experts' attempts to describe ordinary functioning of ordinary firearms in overblown and frightening language.

35.     A shotgun's conical shot pattern has more utility in a home defense scenario, for example, in a darkened house where the homeowner may be feeling the effects of adrenaline. Exhibit 12 Yurgealitis 92:1-17.

**Response:** Dispute. While a shotgun may have some advantages in some cases, the way shotgun shot spreads can also be a disadvantage where precise shooting, or shooting over longer distances, is required. *See also* Resp. to Statement 33. Shotguns also have overpenetration problems at short distances due to the incredible amounts of kinetic energy they have at short distances. *See id.*

## Witnesses

36.     Phil Andrew is a public safety and crisis management specialist, a licensed attorney, and a detective. Exhibit 11 Andrew at ¶¶ 3-4, 6-7.

**Response:** Plaintiffs lack knowledge to admit or dispute this fact and, on that basis, decline to dispute at this time.

37.     Andrew was a Special Agent of the Federal Bureau of Investigation for 21 years. *Id.* at ¶¶ 3-4, 6-7, 9-10, 12-15.F

**Response:** Plaintiffs lack knowledge to admit or dispute this fact and, on that basis, decline to dispute at this time.

38.     Dr. Christopher Colwell is the Chief of Emergency Medicine at Zuckerberg San Francisco General Hospital and Trauma Center. *Declaration of Christopher B. Colwell, M.D.* ("Colwell") at p.1, attached hereto as Exhibit 13.

**Response:** Plaintiffs lack knowledge to admit or dispute this fact and, on that basis, decline to dispute at this time.

39.     Dr. Colwell has over 30 years of experience treating gunshot wounds, including treating the victims of the shootings at Columbine High School in Colorado, a movie theater in Aurora, Colorado, and the UPS facility in San Francisco. Colwell at 3. [N]ot one of the injuries from assault weapons that he has managed has come in the setting of self-defense. *Id.* at p.3.

**Response:** Plaintiffs lack knowledge to admit or dispute this fact and, on that basis, decline to dispute at this time.

40.     John Donohue is the C. Wendell and Edith M. Carlsmith Professor of Law at Stanford Law School and was formerly a tenured chaired professor at both Yale Law School and Northwestern Law School. Professor Donohue teaches courses evaluating the nature of gun regulation in the United States and its impact on crime. Exhibit 4 Donohue at ¶¶ 3-5.

**Response:** Plaintiffs lack knowledge to admit or dispute this fact and, on that basis, decline to dispute at this time.

41.     Dr. Stephen Hargarten is an emergency medicine specialist and a faculty member at the Comprehensive Injury Center at the Medical College of Wisconsin. He has practiced emergency medicine for over 35 years and conducted research on wound ballistics that involved shooting different styles of firearms at a gelatin standardized muscle tissue simulator. *Report of Stephen W. Hargarten, MD, MPH* ("Hargarten") at ¶ 1, ¶ 8-12, and Viramontes 03545, attached hereto as Exhibit 14.

**Response:** Plaintiffs lack knowledge to admit or dispute this fact and, on that basis, decline to dispute at this time.

42.     James Yurgealitis is a consultant and technical advisor in the field of firearms

forensics. Exhibit 5 Yurgealitis at Viramontes 04176-4177.

**Response:** Plaintiffs lack knowledge to admit or dispute this fact and, on that basis,

decline to dispute at this time.

43.     Yurgealitis is a former Special Agent of the Bureau of Alcohol, Tobacco, and

Firearms where he served as the Program Manager for Forensic Services at the ATF

National Laboratory Center, as well as a Special Agent of the Federal Bureau of

Investigation, the U.S. Secretary of State, and the U.S. Department of State. *Id.* at

Viramontes 04176-4177.

**Response:** Plaintiffs lack knowledge to admit or dispute this fact and, on that basis,

decline to dispute at this time.

44.     Louis Klarevas is a security policy analyst and research professor at Teachers

College, Columbia University.  Exhibit 3 Klarevas at ¶¶ 1-4.

**Response:** Plaintiffs lack knowledge to admit or dispute this fact and, on that basis,

decline to dispute at this time.

45.     Klarevas is a founding member of the Columbia University Scientific Union for the

Reduction of Gun Violence (SURGE) as well as a member of the Regional Gun Violence

Research Consortium at the State University of New York's Nelson A. Rockefeller

Institute of Government. *Id.* at ¶¶ 1-4.

**Response:** Plaintiffs lack knowledge to admit or dispute this fact and, on that basis,

decline to dispute at this time.

46.     Klarevas has served on the faculties of the George Washington University, the City

University of New York, New York University, and the University of Massachusetts. He

is a former Defense Analysis Research Fellow at the London School of Economics and

Political Science and a United States Senior Fulbright Scholar in Security Studies at the University of Macedonia. *Id.* at ¶¶ 1-4.

**Response:** Plaintiffs lack knowledge to admit or dispute this fact and, on that basis, decline to dispute at this time.

47.     Dr. Martin Schreiber is a Colonel in the U.S. Army Reserve and the Chief of the Division of Trauma, Critical Care, & Acute Care Surgery, a Professor of Surgery, and the trauma medical director at Oregon Health & Science University. *Declaration of Martin A. Schreiber, MD FACS FCCM COL, MC, USAR* ("Schreiber") at Viramontes 003958, 03964, attached hereto as Exhibit 15.

**Response:** Plaintiffs lack knowledge to admit or dispute this fact and, on that basis, decline to dispute at this time.

48.     Dr. Schreiber has served in Afghanistan twice and in Iraq once caring for combat injuries. *Id.*

**Response:** Plaintiffs lack knowledge to admit or dispute this fact and, on that basis, decline to dispute at this time.

49.     Dr. Jillian Peterson is an associate professor of criminology and criminal justice and the Director of the Forensic Psychology program at Hamline University. *Expert Report of Jillian K. Peterson, PhD for Cook County State's Attorney's Office* ("Peterson") at Viramontes 03908, attached hereto as Exhibit 16.

**Response:** Plaintiffs lack knowledge to admit or dispute this fact and, on that basis, decline to dispute at this time.

50.     Dr. Peterson is the Co-founder and co-president of The Violence Project Research Center, which is best known for its public database of mass shooters in the U.S. *Id.*

**Response:** Plaintiffs lack knowledge to admit or dispute this fact and, on that basis, decline to dispute at this time.

51.     Saul Cornell is the Paul and Diane Guenther Chair in American History at Fordham University, where he teaches constitutional history to undergraduates, graduates, and law students of the Fordham Law School. *Expert Report of Professor Saul Cornel* ("Cornell") at Viramontes 004185, attached hereto as Exhibit 17.

**Response:** Plaintiffs lack knowledge to admit or dispute this fact and, on that basis, decline to dispute at this time.

52.     Professor Cornell has been a senior visiting research scholar at Yale Law School, the University of Connecticut Law School, and Benjamin Cardozo Law School. He has been widely published on the topic of the Second Amendment and gun regulation. *Id.*

**Response:** Plaintiffs lack knowledge to admit or dispute this fact and, on that basis, decline to dispute at this time.

53.     Dr. Diana Palmer is a licensed mental health provider, clinical supervisor, and part-time lecturer in the Doctor of Law and Policy program at Northeastern University. She holds a doctorate degree in Law and Policy. *Expert Report and Declaration by Dr. Diana Palmer* ("Palmer") at ¶¶ 1,2 , attached hereto as Exhibit 18.

**Response:** Plaintiffs lack knowledge to admit or dispute this fact and, on that basis, decline to dispute at this time.

54.     Chief Larry Snelling is the Chief of the Chicago Police Department's Bureau of Counterterrorism. He has been a member of the Chicago Police Department since 1992. He is responsible for over twenty units, including the Intelligence Section, Special Weapons and Tactics (SWAT), Firearms Investigation Team, Canine Unit, Public

Transportation Unit, Airport Operations, Marine Operations Unit, Mounted Unit, Gang Investigations Unit, and Bomb Squad of CPD. Exhibit 10 Snelling at ¶¶ 1-3, 6.

**Response:** Plaintiffs lack knowledge to admit or dispute this fact and, on that basis, decline to dispute at this time.

## Medical Implications of Injuries Caused by Assault Weapons

55.     Injuries caused by assault weapons and events in which assault weapons are used are consistently more serious than those caused by non-assault weapons. Exhibit 13 Colwell at p.1.

**Response:** Dispute. *See* Resp. to Statement 4.

56.     Gunshot wounds from assault weapons, such as AR-15s and AK-47s, increase the likelihood for morbidity as well as difficulty in triaging and managing injuries. *Id.* at p.2.

**Response:** Dispute. *See* Resps. to Statements 4 and 8.

57.     Conversely, handgun injuries produce less harm to the human body and are generally survivable unless the bullet penetrates a critical organ or major blood vessel. Exhibit 15 Schreiber at p.2.

**Response:** Dispute. The amount of harm inflicted by a firearm of any type is primarily dependent upon *where* an individual is injured by a bullet or bullets, not what sort of firearm fired the bullet. *See* Deposition Transcript of James Yurgealitis at 42:24–42:6. According to Navy Combat Surgeon, and president of the International Wound Ballistics Association Colonel Martin L. Fackler, "widespread misinformation persists" regarding the wounding power of rifles like the AR-15, and "[t]he damage caused by the military rifle bullet [5.56mm] cannot be differentiated from that caused by a handgun bullet even by the most expert." Martin L. Fackler, *Gunshot Wound Review*, ANNALS OF EMERGENCY MED. 202 (Aug. 1996), attached as Exhibit 37. And this 5.56 mm cartridge is the very one the AR-15 is designed to accept—in fact, as a key feature: "Notwithstanding its distinctive

appearance and unique aluminum, fiberglass, and plastic construction, the AR-15's most groundbreaking feature was, arguably, its ammunition–the intermediate .223 Remington and 5.56mm NATO rounds." Dennis P. Chapman, *Firearms Chimera: The Counter Productive Campaign to Ban the AR-15 Rifle*, 8 BELMONT L. REV. 191, 203 (2020), attached as Exhibit 38. In short, "AW-type firearms do not operate differently than other comparable semiautomatics, nor do they fire more lethal ammunition." *See* Koper, *supra* Resp. to Statement 4, at 149; *see also* Resps. to Statements 4 and 8.

58. Victims of assault weapons are at greater risk for immediate and long-term complications from both damage caused by the velocity of the bullets and the number of wounds involved. Exhibit 13 Colwell at p.2,3.

**Response:** Dispute. Defendants' failure to indicate a comparator renders the statement incomplete and impossible to answer. *See also* Resps. to Statements 4, 8, and 57.

59. The killing capacity of a weapon is primarily determined by the kinetic energy imparted by the bullet, its effective range, and the rate at which the weapon fires projectiles. Exhibit 15 Schreiber at p.2.

**Response:** Dispute. Defendants identify three discrete factors as "primarily" determining the "killing capacity" of a firearm, and these undefined terms leave this statement vague and ambiguous. Furthermore, it should be noted that the features of firearms that make them targets of Cook County's ban do not impact any of the features which "primarily" determine the firearms "killing capacity." Finally, there are many other factors which determine the "killing capacity" of a firearm in particular circumstances: "How bullets injure and kill has less to do with velocity and kinetic energy than with the location of impact, the bullet's physical characteristics (mass, shape, and construction), and the type of tissues disrupted along the bullet's path." *See supra* Wallace *"Lethality"* Resp. to Statement 20, at 45 (summarizing research from Martin L. Fackler, *Civilian*

*Gunshot Wounds and Ballistics: Dispelling the Myths*, 16 EMERGENCY MED. CLINICS 17, 19 (1998) and Martin L. Fackler, *Gunshot Wound Review*, 28 ANNALS EMERGENCY MED. 194, 202 (1996). *See also* Resps. to Statements 4, 8, and 57.

60.     The muzzle velocity of an AR-15 is approximately 3,200 feet per second compared to approximately 1,200 feet per second for a 9mm Baretta. The kinetic energy of an AR-15 is 1,303 foot pounds, compared to 400 foot pounds for a 9mm Baretta. *Id.* at 2; Exhibit 5 Yurgealitis at p.16. The effective range of an A-R15 is approximately 400–500 yards compared to up to 50 yards for a typical handgun. Schreiber at 3.

**Response:** Admit that the specifications of the AR-15 listed here are accurate, but Plaintiffs dispute that comparison to a 9mm handgun is material or even relevant. Cook County has singled out certain semiautomatic rifles as illegal. The question is not whether they are more powerful than handguns, but whether they are more powerful than rifles which are not banned by the County. In fact, other centerfire rifles which are not banned are equal to or more powerful than the AR-15 in these respects. *See* Jacob Sullum, *Neither 'Capacity' Nor 'Power' Distinguishes 'Assault Weapons' From Other Firearms*, REASON (Oct. 31, 2018), attached as Exhibit 39.

61. The energy release with a bullet from AR 15 style rifles (5.56 NATO bullets) is over three times greater than from bullets from a Thompson Machine gun rifle (.45 ACP bullet). Defs.' Ex. 14, Hargarten Rep. at ¶¶ 11, 12.

**Response:** Dispute. It is unclear what Defendants mean by "energy release" and whether they mean the energy released at the time the projectile leaves the muzzle or at the time of the projectile's impact. At any rate, "the AR-15's smaller .223/5.56 bullets strike with only one-fourth to one-half of the energy of most other centerfire rifle bullets despite having higher velocities." *See supra* Wallace, *"Lethality"* Resp. to Statement 20, at 53.

62.     When a projectile fired by an AR-15 penetrates the human body, it creates not only

a permanent cavity the size of the bullet, but also a temporary cavity radiating radially from

the permanent cavity path caused by the dispersion of kinetic energy. *Id.* at ¶ 10; Exhibit

15 Schreiber at p.2.

**Response:** Admit. All bullets create both permanent and temporary cavities when they strike a

target. Jeremy J. Hollerman et al., *Gunshot wounds: Bullets, Ballistics, and Mechanisms of Injury*,

155 AM. J. OF ROENTGENOLOGY 685, 686 (Oct. 1990), attached as Exhibit 40.

63.     The temporary cavity can be up to 11–12.5 times larger than the diameter of the

ammunition. Exhibit 5 Yurgealitis at p.17.

**Response:** Admit. Large temporary cavities can result from large handgun bullets and center-fire

rifle bullets generally, not just bullets fired from the banned firearms. *See* Hollerman, et al., *supra*

Resp. to Statement 62, at 687.

64.     The temporary cavity of the 5.56 NATO bullet is over three times the size of the .45

caliber bullet's temporary cavity from the Thompson Machine gun. Exhibit 14 Hargarten

at ¶¶ 11, 12.

**Response:** Admit. As discussed above, rifle ammunition produces larger temporary cavities than

typical handgun bullets, like a .45 ACP. *See* Hollerman et al., *supra* Resp. to Statement 62, at 687.

65.     An AR-15's kinetic energy release and resulting permanent and temporary cavities

are more destructive than a bullet fired by a Thompson machine gun, with direct

implications for injury and death. *Id.*at ¶ 13.

**Response:** Admit in part, dispute in part. The most lethal feature of bullets fired from a machine

gun is not their individual ballistic qualities but the fact that they are fired from a gun capable of

automatic fire. Simply describing individual wounds and comparing them for lethality creates a

false impression of how the firearms that shot them compare.

66.     The "yaw" of assault rifle ammunition (the deviation of the bullet's axis in relation

to its trajectory) also contributes to the creation of both temporary and permanent large wound cavities in the human body. Exhibit 5 Yurgealitis at p.16.

**Response:** Dispute. Not all ammunition "yaws," and while yawing is a feature of some, primarily military, 5.56mm full-metal jacket rounds, the more common .223 caliber rounds used by civilians typically do not yaw (though the bullets, in many other ways, perform similarly). *See* Kopel, *supra*, Resp. to Statement 23, at II.B. At any rate, the yawing of a bullet depends far less on the firearm than on other factors. And there is no categorical difference between the yawing of a bullet fired from an "assault weapon" and one fired from any other semiautomatic firearm. "The yaw of a bullet is defined as the deviation of the long axis of the bullet from its line of flight. When a bullet is fired down a rifled barrel, the rifling imparts a gyroscopic spin to the bullet. The purpose of the spin is to stabilize the bullet's flight through the air. Thus, as the bullet leaves the barrel, it is spinning on its long axis, which in turn corresponds to the line of flight. As soon as the bullet leaves the barrel, however, it begins to wobble or yaw. The amount or degree of yaw of a bullet depends on the physical characteristics of the bullet (its length, diameter, cross-sectional density), the rate of twist of the barrel, and the density of the air." *See* DiMaio, *supra* Resp. to Statement 4.

67.     5.56 bullets will yaw upon contacting tissue. Conversely, handgun bullets travelling at a lower velocity do not typically yaw upon contact with tissue and do not create as large of a wound cavity nor commensurate destruction of tissue. *Id.* at 16; Exhibit 12 Yurgealitis Dep. 67:12–24.)

**Response:** Admit in part, dispute in part. Yawing is a feature of some 5.56mm rounds, but as discussed above, many civilian rounds do not have that effect. "In fact, many AR users choose ammunition that is designed *not* to yaw but instead to deform." *See* Kopel, *supra*, Resp. to Statement 23.

68.     The yaw effect of assault rifle ammunition can also cause the bullet to fragment upon

striking human bone, which contributes to additional tissue damage not immediately adjacent to the cavity itself.  Exhibit 5 Yurgealitis at p.16.

**Response:** Admit in part, dispute in part. *See* Resp. to Statement 66.

69.     The fragmentation of assault rifle ammunition can amplify the effects of the temporary cavity, increasing the severity of the wound. *Id.*at p.17.

**Response:** Dispute to the extent meant to imply this is a unique feature of assault rifle ammunition.

70.      Organs such as the liver and spleen are more severely lacerated because of the development of temporary cavitation. Exhibit 14 Hargarten at ¶ 14; Exhibit 15 Schreiber at p.2.

**Response:** Admit.

71.      Patients with assault rifle injuries frequently have multiple organs injured as well as major blood vessels. They often require massive blood transfusions due to tremendous blood loss and require a series of operations, instead of just one as is common with handguns. Exhibit 15 Schreiber at p.2.

**Response:** Dispute. Whether multiple organs are injured, and the amount of blood lost, are all dependent upon *where* an individual is injured by a bullet or bullets, not what sort of firearm fired the bullet. *See* Deposition Transcript of James Yurgealitis at 42:24–42:6, Defs.' Ex. 12. According to Navy Combat Surgeon, Colonel Martin L. Fackler and president of the International Wound Ballistics Association, "widespread misinformation persists" regarding the wounding power of rifles like the AR-15, and "[t]he damage caused by the military rifle bullet [5.56mm] cannot be differentiated from that caused by a handgun bullet even by the most expert." Fackler, *supra* Resp. to Statement 57. In short, "AW-type firearms do not operate differently than other comparable semiautomatics, nor do they fire more lethal ammunition." *See* Koper, *supra* Resp. to Statement 4, at 149.

72.    When patients with assault rifle injuries survive, they require prolonged hospitalizations and follow-up and suffer much greater disability for the rest of their shortened lives. *Id.*

**Response:** Dispute. As explained in Resp. to Statement 71, the extent of an individual's injuries are dependent upon many factors, but the cosmetic features of the firearm that fired the bullet is not one of them. Many wounds from AR-15 style rifles are no more severe than wounds from a handgun and have been successfully treated the same way. *See* Fackler, *supra* at 195, 202; Koper, *supra* at 149.

73.    Bullets from AR 15 style rifles are also more likely to fracture bones due to their higher energy release. Exhibit 14 Hargarten at ¶ 14.

**Response:** Dispute. As Hargarten himself explains, "energy release" causes the creation of a temporary cavity. Defs.' Ex. 14, Hargarten Rep. at ¶ 14. "Fractures from cavitation are rare in the human being: I have seen but two (both from short-range shotgun blasts) and have not seen a verified report of any in the literature." Fackler, *supra* at 199; Koper, *supra* at 149.

74.    Assault rifle blasts to the extremities frequently result in amputations, Exhibit 15 Schreiber at p.2, even where an injury to the same body part caused by a handgun would be treatable. Exhibit 13 Colwell at p.3.

**Response:** Dispute. Injuries to extremities from firearms like an AR-15 are frequently no more severe than a handgun wound to an extremity. Reports of such wounds in Vietnam during the Vietnam War noted that they generally "showed small entry and exit wounds and a clean soft-tissue track with little or no devitalization of tissue. Such wounds usually healed if left alone." Fackler, *supra* at 195. Furthermore, "[d]elegates to the Tri-Service War Surgery conferences of 1970 and 1971 reported no unusual problems associated with 'high-velocity' bullet wounds in Vietnam. There were *no reports* of rifle bullet wounds causing traumatic amputation of an

extremity." *Id.* (emphasis added); *see also* Koper, *supra* Resp. to Statement 4, at 149.

75. Children who are shot by an AR-15 style bullet have extremely high mortality rates, partially due to having a smaller torso and lower blood reserve than teenagers or adults. Exhibit 14 Hargarten at ¶ 15.

**Response:** Dispute. *See* Resp. to Statement 4, 8, 57, 71.

76. The effective range of an AR-15 is approximately 400–500 yards, compared to 50 yards for a typical handgun. Exhibit 15 Schreiber at p.3.

**Response:** Admit.

77. Assault weapons, especially when equipped with large capacity magazines, can also fire more shots faster, often causing more victims per event and more injuries per victim. Exhibit 13 Colwell at p.3.

**Response:** Dispute. This statement of fact is incomplete, as it provides no comparison for what an "assault weapon" supposedly shoots "faster" than. A semiautomatic rifle shoots at the same rate as a semiautomatic handgun and at a significantly lower rate than an automatic firearm. *See Rifle Marksmanship: M16-/M4-Series Weapons*, DEP'T OF THE ARMY at tbl. 2-1 (2008), https://bit.ly/3pvS3SW, attached as Exhibit 7 (noting that an M16 has an effective rate of fire 150-200 rounds per minute in automatic mode but just 45-65 rounds per minute in semiautomatic mode).

78. The fact that there are multiple victims when assault weapons are involved adds to the complexity of managing cases as triage of multiple potentially serious injuries is often involved which can lead to delays in transport and treatment while resources are being used for multiple real or potential victims. *Id.*

**Response:** Dispute. The firearms banned by Cook County are involved in a very small portion of firearm homicides. *See* John Gramlich, *What the data says about gun deaths in the U.S.*, PEW RSCH. CTR. (Feb. 3, 2022), https://pewrsr.ch/3MxkLve, attached as Exhibit 41. Mass shootings are an

exceptionally rare form of gun crime, making up a minuscule percentage of all homicides. *See* Christopher S. Koper, *America's Experience with the Federal Assault Weapons Ban, 1994-2004*, *in* Reducing Gun Violence in America: Informing Policy with Evidence and Analysis 166 (Daniel W. Webster & Jon S. Vernick eds., 2013), attached as Exhibit 42; D'Vera Cohn et al., *Gun Homicide Rate Down 49% Since 1993 Peak; Public Unaware*, Pew Rsch. Ctr. (May 7, 2013), https://pewrsr.ch/3qwE94l, attached as Exhibit 43. And even so, mass shootings involving multiple victims are most often carried out with handguns, not so-called "assault weapons." James Alan Fox & Monica DeLateur, *Mass Shootings in America: Moving Beyond Newtown*, 18 Homicide Studies 125, 136 (2013) (noting that the "overwhelming majority of mass murderers use firearms that would not be restricted by an assault weapons ban" and "semiautomatic handguns are far more prevalent"); *accord* Daniel W. Webster et al., *Evidence Concerning the Regulation of Firearms Design, Sale, and Carrying on Fatal Mass Shootings in the United States*, 19 Crim'y & Pub. Pol'y 171, 188 (2020).

79. Injuries caused by assault weapons are more likely to require implementation of disaster plans which focus resources on doing the greatest good for the greater number of victims, potentially limiting resources for other patients who may also need assistance. Id. at p.2.

**Response:** Dispute. *See* Resps. to Statements 4, 8, 57, 71, 78.

80. These complex and difficult triage decisions are rarely, if ever, necessary when non-assault weapons are involved. *Id.* at p.3.

**Response:** Dispute. *See* Resp. to Statement 79.

81. The injuries produced by assault type weapons frequently exceed the capabilities of civilian trauma systems and trauma surgeons. Exhibit 15 Schreiber at p.3.

**Response:** Dispute. *See* Resp. to Statement 79.

82. When first introduced, military-style AR-15 types of weapons were not especially

popular. Exhibit 17 Cornell at p.22.

**Response:** Plaintiffs object that the initial popularity of the AR-15 is irrelevant, as the Supreme Court has made clear that what matters for the "common use" analysis is whether a firearm is in "common use *today*." *See Bruen*, 142 S. Ct. at 2143 (emphasis added).

83.      The patent on the AR-15 expired in the late 1970s, which led to competition in the marketplace. Exhibit 5 Yurgealitis at p.14,15.

**Response:** Admit.

84.      In the 1980s, gun manufacturers began branding military-style firearms with the label "assault" weapons to make them more marketable to civilians. *Id.* at 18–19; Exhibit 3 Klarevas at ¶ 14; Exhibit 4 Donohue at ¶ 90.

**Response:** Plaintiffs object that the marketing of the banned firearms is irrelevant to any part of the analysis under *Bruen*, and this fact is not in any way "material" to this case. Subject to that objection, Plaintiffs dispute. While "assault rifle" has a technical meaning (different from the meaning used by the County here), "assault weapon" does not. "Prior to 1989, the term 'assault weapon' did not exist in the lexicon of firearms. It is a political term, developed by anti-gun publicists to expand the category of 'assault rifles' so as to allow an attack on as many additional firearms as possible on the basis of undefined 'evil' appearance." *Stenberg v. Carhart*, 530 U.S. 914, 1001 n.16 (2000) (Thomas, J., dissenting) (citation omitted).

85.      After the 1994 federal ban expired in 2004, legislation provided broad immunity to gun manufacturers, which allowed for a torrent of consumer advertising designed to highlight the battlefield appeal of modern assault weapons. Exhibit 4 Donohue at ¶ 84.

**Response:** Plaintiffs object that the marketing of the banned firearms is irrelevant to any part of the analysis under *Bruen*, and this fact is not in any way "material" to this case. Plaintiffs admit that in 2004 Congress passed the Protection of Lawful Commerce in Arms Act to protect the firearms

industry from spurious lawsuits intending to hold manufacturers liable for criminal misuse of their products. Plaintiffs dispute the rest of Statement 85.

86.  Gunmakers developed a set of marketing strategies linking these products to their origins in the military. Exhibit 17 Cornell at p.22.

**Response:** Plaintiffs object that the marketing of the banned firearms is irrelevant to any part of the analysis under *Bruen*, and this fact is not in any way "material" to this case. Plaintiffs presently lack knowledge regarding the "marketing strategies" of firearms manufacturers and, on that basis, decline to dispute at this time.

87.  Marketing campaigns used to sell assault weapons have utilized images of military assault capabilities. *Id.* at 23.

**Response:** Plaintiffs object that the marketing of the banned firearms is irrelevant to any part of the analysis under *Bruen*, and this fact is not in any way "material" to this case. The examples of firearms advertisements cited by Professor Cornell speak for themselves.

88.  The gun industry marketed assault weapons with depictions of combat and phrases like, "The closest you can get without having to enlist," and "Forces of opposition, bow down." Exhibit 4 Donohue at ¶¶ 85, 87.

**Response:** Plaintiffs object that the marketing of the banned firearms is irrelevant to any part of the analysis under *Bruen*, and this fact is not in any way "material" to this case. The examples of firearms advertisements cited by Professor Donohue speak for themselves.

89.  Adam Lanza, the perpetrator of the Newtown killings, used a Bushmaster AR-15 type weapon marketed with the slogan "Consider Your Man Card Reissued." *Id.* at ¶ 91; Exhibit 17 Cornell at p.23.

**Response:** Plaintiffs object that the marketing of the banned firearms is irrelevant to any part of the analysis under *Bruen*, and this fact is not in any way "material" to this case. Plaintiffs admit that

Lanza used a Bushmaster AR-15. Plaintiffs dispute that there is any evidence Lanza saw the type of marketing Professor Donohue cites. The examples of firearms advertisements cited by Professor Donohue speak for themselves.

90.    The overall configuration of "copycat" AR rifles remains identical to the original production design adopted in the 1960s. Exhibit 5 Yurgealitis at p.15, 17, 18.

**Response:** Admit.

91.    Shooters using assault weapons do not need a high level of firearm proficiency, professional training, or practice to inflict mass death and injury at close and longer ranges because they are able to fire rapidly with high-capacity magazines and remain accurate at ranges well beyond 100 yards with little skill development. Exhibit 10 Snelling at ¶ 12; Exhibit 11 Andrew at p.6.

**Response:** Plaintiffs admit that firearms deemed "assault weapons" by Cook County are safe and accurate to use, even for non-experts. *See* Resp. to Statement 20. But, rather than making them more dangerous, this fact makes them a good choice for individuals who are not firearms experts who desire to protect themselves and their homes. Plaintiffs dispute that anyone with "little skill development" can fire rapidly and accurately at ranges "well beyond 100 yards" because "little" and "well beyond" are subjective terms used in service of an opinion that cannot be responded to on a factual basis.

92.    Seventy percent of adults in the United States do not own any firearms at all. Exhibit 4 Donohue at ¶ 25.

**Response:** Dispute. This understates firearm ownership. As of 2020, 32% of American adults reported owning a firearm personally, and 44% reported living in a house with a firearm. *See* Lydia Saad, *What Percentage of Americans Own Guns?*, Gallup (Nov. 13, 2020), https://bit.ly/3MXF23N, attached as Exhibit 46. *See* English, *supra* Resp. to Statement 20, at 8.

93.     The rise in popularity of assault weapons and their accessories is a recent development in American gun culture. Exhibit 17 Cornell at p.21.

**Response:** Plaintiffs object that how recently AR-15s became popular is irrelevant, because what matters under *Bruen* is whether a firearm is in "common use today." 142 S. Ct. at 2143. Subject to that objection, Plaintiffs dispute. AR-15s and similar rifles have been commercially available since the 1960s and have been popular since at least the 1980s. *See* Jon Schuppe, *America's rifle: Why so many people love the AR-15*, NBC NEWS (Dec. 27, 2017), https://nbcnews.to/43ScOxy, attached as Exhibit 47.

94.     As of December 2019, assault rifles made up approximately 4% of all firearms in circulation in American society. Exhibit 3 Klarevas at ¶ 27.

**Response:** Admit with respect to total stock of firearms, but this is misleading. AR-15s and other similar rifles are exceptionally popular and sell at a much higher rate than their share of the total stock indicates. In recent years, the AR-15 has been "the best-selling rifle type in the United States," Nicholas J. Johnson, *Supply Restrictions at the Margins of Heller and the Abortion Analogue*, 60 HASTINGS L.J. 1285, 1296 (2009), attached as Exhibit 48. Modern sport rifles are the second most common type of firearm sold, behind only semiautomatic handguns. Sales of modern sport rifles account for approximately 20% of nationwide firearm sales. *See 2021 Firearms Retailer Survey Report*, NAT'L SHOOTING SPORTS FOUND., INC., at 9, https://bit.ly/3gWhI8E, attached as Exhibit 49. Today, the number of AR-rifles and other similar rifles in circulation in the United States exceeds twenty-four million. *Commonly Owned: NSSF Announces Over 24 Million MSRS in Circulation*, NSSF (July 20, 2022), https://bit.ly/3QBXiyv, attached as Exhibit 50. *See also* English, *supra* Resp. to Statement 20, at 1. By comparison, there are just 4.56 million noninstitutionalized civilians with doctoral degrees, and 3.15 with professional degrees, in the United States. *See Educational Attainment in the United States: 2019*,

U.S. Census Bureau tbl. 1 (Mar. 30, 2020), https://bit.ly/3qBy077, attached as Exhibit 51.

95.    The average civilian assault-rifle owner owns three or more assault rifles, and 27% of owners have bought four or more. Exhibit 4 Donohue at ¶ 86.

**Response:** Dispute. A recent large-scale survey of American gun owners indicates that approximately 24.6 million Americans have owned an AR-15 or similar modern semiautomatic rifle, with the "median owner" identified as owning a single rifle. *See* English, *supra* Resp. to Statement 20, at 2, 33.

96.    The U.S. accounts for 5% of the world's population but has had one-third of the public shootings that have occurred worldwide since the late 1960s. *Id.* at ¶ 67.

**Response:** Dispute. There is no accepted definition of "public shooting" and this fact is insufficiently specific to respond to adequately.

97.    Of all firearm homicides in the U.S. in 1993, 17.9% were committed with long guns. That percentage doubled to 35.6% by 2018. *Id.* at ¶ 36.

**Response:** Dispute. In 2018, according to the FBI, there were 10,265 homicides committed in the United States with firearms, but just 297 were committed with rifles (2.9%) and just 235 were committed with shotguns (2.3%). *Expanded Homicide Data Table 8: Murder Victims by Weapon, 2014–2018*, *Crime in the United States*, FBI, U.S. DEP'T OF JUST. (2018),https://bit.ly/2p0bw4D, attached as Exhibit 52. By contrast, 6,603 were committed with handguns (64%). The only way to get to the percentages reached by Professor Donohue is to lump together every non-handgun category together and *assume* they are all rifles, despite the fact that the largest single non-handgun category is "firearms, type not stated," which accounts for 2,963 (29%) and there is *no reason* to assume that the unidentified firearms differ in general breakdown from the identified firearms such that they would even slightly increase the share of crime committed with long guns, let alone *entirely consist* of long guns. Professor Donohue's assertion is also contrary to a widely cited 2004 study which found that so-called "assault weapons" "are used in a small

41

fraction of gun crimes." Christopher Koper et al., *An Updated Assessment of the Federal Assault Weapons Ban: Impacts on Gun Markets and Gun Violence, 1994–2003* (2004), U.S. DEP'T OF JUST., at 2, https://bit.ly/3hZiy5v, attached as Exhibit 53. And furthermore, although Professor Donohue denigrates relying on FBI statistics for understanding homicide trends and suggests instead that CDC data would be a better choice, *his own numbers* here are based on the FBI data (just misinterpreted). *See* Grace Kena & Jennifer L. Truman, *Trends and Patterns in Firearm Violence*, 1993–2018, BUREAU OF JUST. STAT. SPECIAL REP. at Tbl. 4 (Apr. 2022), https://bit.ly/3ojUJYS (noting source of data is FBI Supplementary Homicide Reports), attached as Exhibit 54; *see also* Donohue Report, Defs.' Ex. 4 at n.13. This makes sense, since the Bureau of Justice Statistics has elsewhere explained that FBI "data are better suited for understanding the circumstances surrounding homicide incidents," as we are interested in doing here. *The Nation's Two Measures of Homicide*, BUREAU OF JUST. STAT. PROGRAM REP. at 4 (July 2014), https://bit.ly/41mlLO8, attached as Exhibit 55.

Finally, Plaintiffs note that the 2021 FBI data demonstrates that rifles, and long guns in general, still form a minuscule portion of homicides. There were 510 homicides committed with rifles of any type that year, the same number as were committed with "personal weapons" like hands and feet, and far fewer than the 5,363 committed with handguns. *U.S. Homicide Offense characteristics: Type of Weapon Involved by Offense*, FBI CRIME DATA EXPLORER (2023), https://bit.ly/40NHSMC, attached as Exhibit 56.

98.     Since January 1, 1980, 1,195 people have died in the United States in mass public shootings, defined as shootings resulting in four or more casualties where the act occurred largely in a public setting and did not involve an underlying criminal objective. Exhibit 3 Klarevas at ¶ 23.

**Response:** Dispute. It "is difficult to make accurate generalizations about mass shootings. These challenges occur, in part, because (1) there are many different definitions for mass shootings, each

of which may be useful for a somewhat different purpose; (2) we have incomplete data sources that do not track these events in a consistent manner over time, likely include a biased sample of incidents, and lack the full range of individual and incident characteristics researchers are interested in; and (3) there are statistical limitations inherent in trying to draw inferences form rare and idiosyncratic events." *See* Smart & Schell, *supra* Resp. to Statement 7. As a result, there is little agreement even among researchers regarding "how often mass shooting events occur, how the rate has changed over time, and incident characteristics." *Id.* And the differences in views are massive. "Depending on which data source is referenced, there were somewhere between six and 503 mass shootings and between 60 and 628 mass shooting fatalities in 2019." *Id. See also* Resp. to Statement 7.

99.     Since January 1, 1980, 1,126 people have died in the United States in mass shootings that involved 6 or more fatalities regardless of motive or location, known as high fatality mass shootings. *Id.*

**Response:** Dispute. *See* Resps. to Statements 7 and 98.

100.     746 of those deaths occurred after the expiration of the federal ban in 2004. (*Id.*, Ex. B.)

**Response:** Dispute. *See* Resps. to Statements 7 and 98.

101.     There were an average of 2.7 events public mass shootings per year in the 1980s, rising to an average of 4.5 events per year from 2010 to 2013. Exhibit 4 Donohue at ¶ 41.

**Response:** Dispute. *See* Resps. to Statements 7 and 98. This also overstates the actual rise in "mass public shooting" incidents, which data from multiple studies suggests has only slightly increased over the past four decades. *See* Smart & Schell, *supra* Resp. to Statement 7.

102.     The eight deadliest acts of criminal violence in the United States since September 11, 2001 have been mass shootings. Exhibit 3 Klarevas at ¶ 24. Seven of those mass

43

shootings involved assault weapons. *Id.* at ¶ 28.

**Response:** Dispute. *See* Resps. to Statements 7 and 98. Plaintiffs also note that this is missing important context which overstates its significance. Mass shootings, despite their prevalence in the media, are a very rare form of crime. In 2018, for instance, "mass public shootings . . . represent[ed] fewer than one of every 200 homicides." *See* Smart & Schell, *supra* Resp. to Statement 7.

 103. 2010 to 2019 was the worst decade on record in terms of frequency and lethality of mass shootings in the United States. *Id.* at ¶ 25.

**Response:** Dispute. *See* Resps. to Statements 7 and 98.

 104. Assault weapons are disproportionately used in mass shootings relative to their use in other gun homicides. Exhibit 16 Peterson at p.8.

**Response:** Dispute. *See* Resps. to Statements 7 and 98. A Congressional Research report concluded that "offenders used firearms that could be characterized as 'assault weapons' in . . . 9.78% [of mass shootings]." William J. Krouse & Daniel Richardson, CONG. RSCH SERV., R44126, MASS MURDER WITH FIREARMS: INCIDENTS AND VICTIMS, 1999-2013 29 (2015), attached as Exhibit 100. In addition, handguns are the firearm most commonly involved in active shootings and mass shootings; semiautomatic rifles or 'assault-style' weapons are used in an estimated 10 to 36 percent of active shootings and mass shootings." *See* Smart & Schell, *supra* Resp. to Statement 7.

 105. Over half of high-fatality mass shootings and mass public shootings in the last five years involved assault weapons. Exhibit 3 Klarevas at ¶ 26.

**Response:** Dispute. *See* Resps. to Statements 7, 98, and 104. Plaintiffs also note that the problem with making statistical generalizations of already rare events is exacerbated when an artificially truncated timeframe, like "the last five years," is used.

 106. Over 70% of deaths in high-fatality mass shootings and mass public shootings in the last five years were from incidents involving assault weapons. *Id.*

44

**Response:** Dispute. *See* Resps. to Statements 7, 98, 104, and 105. It appears that Professor Klarevas included within his "last five years" the Las Vegas shooting which occurred in October 2017. *See* Klarevas Report, Defs.' Ex. 3 at 10 n.16.

107.     In 2019, 75% of high-fatality mass shootings and 57% of all mass public shootings were committed with assault rifles, far outpacing the relative prevalence of assault rifles in American society. *Id.* at ¶ 27. Extended magazines were used in a fifth of all mass shootings with more than 4 fatalities from 1999 to 2022. Exhibit 16 Peterson at p.11.

**Response:** Dispute. *See* Resps. to Statements 7, 98, 104, and 105. Additionally, the objection that the problem with making statistical generalizations of already rare events is exacerbated when an artificially short timeframe, like a single year, is used. Plaintiffs note that, when not cherry-picking a single year for alarmist analysis, and relying on longer time frames, so-called assault weapons are used in mass shootings at a far lower rate than Professor Klarevas suggests.

108.     Since 1980, high fatality mass shootings without an assault weapon had an average death toll of 8.0 fatalities per shooting. High fatality mass shootings with an assault weapon had an average death toll of 13.5 fatalities per shooting. Exhibit 3 Klarevas at ¶ 29.

**Response:** Dispute. *See* Resps. to Statements 7 and 98. Professor Klarevas's work has found an unusually marked effect on the presence or absence of so-called "assault weapons" at mass shootings. The RAND Corporation noted that a 2019 paper by Klarevas showed "improbably large" effect sizes which it concluded were "likely biased" because of the limited number of incidents considered by Klarevas and his coauthors. *See Effects of Assault Weapon and High-Capacity Magazine Bans on Mass Shootings*, RAND CORP. (Jan. 10, 2023), https://bit.ly/3mR58uT, attached as Exhibit 57.

109.     Since 1980, mass public shootings without an assault weapon had an average death toll of 6.0 fatalities per shooting. Mass public shootings with an assault weapon had an

average death toll of 10.6 fatalities per shooting. *Id.*

**Response:** Dispute. *See* Resps. to Statements 7, 98, and 108.

110. Since 2012, high fatality mass shootings without an assault weapon had an average death toll of 7.8 fatalities per shooting. High fatality mass shootings with an assault weapon had an average death toll of 18.1 fatalities per shooting. *Id.*

**Response:** Dispute. *See* Resps. to Statements 7, 98, and 108.

111. Since 2012, mass public shootings without an assault weapon had an average death toll of 6.2 fatalities per shooting. Mass public shootings with an assault weapon had an average death toll of 13.9 fatalities per shooting. *Id.*

**Response:** Dispute. *See* Resps. to Statements 7, 98, and 108

112. Mass shootings presently pose the deadliest threat of individual acts of violence in America in the post-September 11 era, and the problem is growing. *Id.*at ¶ 43.

**Response:** Dispute. *See* Resps. to Statements 7, 98, and 108. It is unclear how mass shootings are "the deadliest threat," but the fact is they are an exceptionally rare form of gun crime, making up a minuscule percentage of all homicides. *See* Koper, *supra* Resp. to Statement 78, at 166; *see also* Cohn et al., *supra* Resp. to Statement 78, at 4.

113. Mass shootings involving assault weapons, on average, have resulted in a substantially larger loss of life than similar incidents that did not involve assault weapons. *Id.*at ¶ 43.

**Response:** Dispute. *See* Resps. to Statements 7, 98, and 108. Plaintiffs also note that "substantially larger" is a subjective term that cannot be understood or answered on a factual basis.

114. Restrictions on assault weapons have the potential to significantly reduce the frequency and lethality of mass shootings. *Id.* at ¶ 43; *see also* Exhibit 4 Donohue at ¶ 67.

**Response:** Dispute. *See "Effects of Assault Weapon Bans," supra* Resp. to Statement 108

(finding uncertain effects from assault weapon bans on mass shootings). This is because these firearms "do not operate differently than other comparable semiautomatics." *See* Koper, *supra* Resp. to Statement 4, at 149; *see also* Benjamin M. Blau et al., *Guns, laws and public shootings in the United States*, APPLIED ECONOMICS, Vol. 48, Issue 49, 4732 (2016), attached as Exhibit 58; Webster, et al., *Evidence concerning the regulation of firearms design, sale, and carrying on fatal mass shootings in the United States*, CRIMINOLOGY & PUB. POL'Y, Vol. 19, Issue 1 (2020) (finding "no evidence that . . . assault weapons bans . . . were associated with the incidence of fatal mass shootings"). Plaintiffs also note that "significantly reduce" is a subjective term that cannot be understood or answered on a factual basis.

115.     Between January 1, 1990 and June 30, 2022, states that prohibited assault weapons experienced 44-percent and 14-percent decreases, respectively, in high-fatality mass shooting and mass public shooting incidence rates.  Exhibit 3 Klarevas at ¶ 37.

**Response:** Dispute. *See* Resps. to Statements 7, 98, and 108.

116.     Between January 1, 1990 and June 30, 2022, states with assault weapons bans experienced 57 percent fewer high-fatality mass shootings involving the use of an assault weapons and 32 percent fewer mass public shootings involving the use of assault weapons. *Id.* at ¶ 38.

**Response:** Dispute. *See* Resps. to Statements 7, 98, and 108.

117.     In the ten years the federal assault weapons ban was in effect, gun massacres resulting in 6 or more deaths fell significantly compared to the ten years prior. In the ten years after the ban expired, gun massacres skyrocketed to levels higher than before the ban was in place. Exhibit 4 Donohue at ¶¶ 74–76, citing Klarevas.

**Response:** Dispute. *See* Resps. to Statements 7, 98, and 108.

118.     There is not the slightest evidence that the federal assault weapons ban

compromised the safety of law-abiding citizens. Exhibit 4 Donohue at ¶ 104.

**Response:** Dispute. *See* English, *supra* Resp. to Statement 20, at 12, 15(finding that 31% of firearm owners have used firearms in self-defense and that 13% of such uses involved a rifle). When individuals are deprived of their right to possess such firearms, they cannot use them successfully for self-defense.

119.    Deaths per gun massacre increased 90% in the ten years after the federal ban was allowed to expire. *Id.* at ¶ 80.

**Response:** Dispute. *See* Resps. to Statement 7, 98, and 108. The implication of this statement that the federal ban had been suppressing mass shootings is incorrect. No such link has been shown. *See* Resp. to Statement 114.

120.    There have been 15 gun massacres with 6 or more deaths since 2014, killing 272 people, and each one involved assault weapons and/or high capacity magazines that would have been prohibited under the federal ban had it still been in effect. *Id.* at ¶ 81.

**Response:** Dispute, subject to the objection above that it is very difficult to make generalizations about mass shooting violence, Professor Donohue does not distinguish between "assault weapons" and "high capacity magazines" but this case does not challenge the magazine size restrictions put in place by the County. Without distinguishing these features, Professor Donohue's numbers cannot say anything informative about so-called "assault weapons" alone.

121.    In the five-year period from 2014-2019, the number of fatalities in gun massacres involving 6 or more deaths topped the amount that occurred in the ten years after the ban expired (2004-2013). *Id.* at ¶ 78.

**Response:** Dispute. *See* Resps. to Statements 114.

122.    Mass shooters who use assault rifles are likely influenced by two psychological phenomena: the weapons effect and social proof. Exhibit 16 Peterson at p.12–13.

48

**Response:** Dispute. *See* Resps. to Statement 7, 98, and 108.

123. The weapons effect is a concept that states that the mere presence of weapons increases aggressive thoughts and aggression. *Id.*

**Response:** Dispute that the weapons effect is a valid psychological phenomenon. "The most recent meta-analysis of the weapons effect (Benjamin, et al. 2018) suggests that although the mere presence of weapons appeared to reliably increase accessibility of aggressive cognition and hostile threat appraisals, the available literature suggested that the influence of the mere presence of weapons on aggressive behavioral outcomes was at best inconclusive." Arlin J. Benjamin, Jr., *Weapons Effect* at 2, in THE INT'L ENCYCLOPEDIA OF MEDIA PSYCH. (2020), https://bit.ly/3AeVu8q, attached as Exhibit 59. There have been a few more recent studies that appear to show a "weapons effect" increasing aggressive behaviors, but the studies are hardly conclusive, with both limited sample and effect sizes. *Id.* at 2–3.

124. Social proof is a concept stating that people tend to mimic those who came before when they do not know what to do. In the context of mass shootings, this means many mass shooters conform to expectations of what mass shooters do, and one mass shooting creates social proof for the next mass shooting, until eventually there is a generalized knowledge about mass shootings. *Id.* at 13.

**Response:** Dispute. *See* Resps. to Statement 7, 98, and 108. Additionally, if anything this tends against any finding that the type of firearm used plays a causal role in the lethality of mass shootings.

125. In 2018, the FBI announced that the active shooter problem in the United States was growing. Exhibit 4 Donohue at ¶ 45.

**Response:** Plaintiffs lack knowledge to admit or dispute this fact and, on that basis, decline to dispute at this time.

126.    According to the FBI's data, the number of active shooter incidents has doubled from 2017 to 2021, from 30 to 61. *Id.* at ¶ 46.

**Response:** The data speaks for itself. To the extent this mischaracterizes the data, dispute.

127.    The number of mass shootings is higher following the termination of the federal assault weapons ban in 2004. *Id.* at ¶ 47.

**Response:** Dispute. *See* Resps. to Statement 7, 98, and 108. Defendants' statement is also vague and impossible to answer factually in the absence of a comparator.

128.    After the federal ban lapsed in 2004, the gun market was flooded with increasingly more powerful weaponry that allowed mass killers to kill even more quickly with predictable results. *Id.* at ¶ 77.

**Response:** Dispute. *See* Resps. to Statements 8, 9, 20, and 22. The firearms banned by the County as "assault weapons" are not "more powerful" than, and function no differently from, any other comparable semiautomatic firearms.

129.    The decade after the ban lapsed saw a 266 percent increase in mass shooting incidents and a 347 percent increase in fatalities, even as overall violent crime continued downward. *Id.* at ¶ 77.)

**Response:** Dispute. *See* Resps. to Statement 7, 98, and 108.

## Cook County's Ordinance

130.    In November 2006, the Cook County Board of Commissioners enacted, and in July 2013 they revised, the Blair Holt Assault Weapons Ban ("the Ordinance"). Exhibit 7 Complaint at ¶ 18; Exhibit 2 Ordinance.

**Response:** Admit.

131.    The Ordinance defines "assault weapon" and "large-capacity magazine" and makes it illegal to "manufacture, sell, offer or display for sale, give, lend, transfer ownership of,

acquire, carry or possess" either item in Cook County. Exhibit 2 Ordinance; Exhibit 7
Complaint at ¶ 19.

**Response:** Dispute that this is not a "fact" but rather a statement of the law. The terms of the Ordinance speak for themselves.

132.     Under section 24-211(1)(A)–(E) of the Ordinance, an assault weapon includes a "semiautomatic rifle that has the capacity to accept a large capacity magazine detachable or otherwise" as well as at least one of the following: only a pistol grip without a stock attached; any feature capable of functioning as a protruding grip that can be held by the non-trigger hand; a folding, telescoping, or thumbhole stock; a shroud attached to the barrel, or that partially or completely encircles the barrel, allowing the bearer to hold the firearm with the non-trigger hand without being burned, but excluding a slide that encloses the barrel; or a muzzle break or muzzle compensator.  Exhibit 2 Ordinance at § 24-211(1)(A)–(E); Exhibit 5 Yurgealitis at p.22.

**Response:** Dispute that this is not a "fact" but rather a statement of the law. The terms of the Ordinance speak for themselves.

133.     Under section 24-211(2), an assault weapon includes a "semiautomatic pistol or any semi-automatic rifle that has a fixed magazine, that has the capacity to accept more than ten rounds of ammunition." Exhibit 2 Ordinance at § 24-211(2); Exhibit 5 Yurgealitis at p.24.

**Response:** Dispute that this is not a "fact" but rather a statement of the law. The terms of the Ordinance speak for themselves.

134.     Under section 24-211(3), an assault weapon has the capacity to accept a detachable magazine as well as at least one of the following: any feature capable of functioning as a protruding grip that can be held by the non-trigger hand; a folding, telescoping, or

thumbhole stock; a shroud attached to the barrel, or that partially or completely encircles the barrel, allowing the bearer to hold the firearm with the non-trigger hand without being burned, but excluding a slide that encompasses the barrel; a muzzle brake or muzzle compensator; or the capacity to accept a detachable magazine at some location outside of the pistol grip. Exhibit 2 Ordinance at § 24-211(3); Exhibit 5 Yurgealitis at p.24–25.

**Response:** Dispute that this is not a "fact" but rather a statement of the law. The terms of the Ordinance speak for themselves.

135. Under section 24-211(4), an assault weapon includes a semiautomatic shotgun with one more of the following: only a pistol grip without a stock attached; any feature capable of functioning as a protruding grip that can be held by the non-trigger hand; a folding, telescoping, or thumbhole stock; an ability to accept a detachable magazine. Exhibit 2 Ordinance at § 24-211(4); Exhibit 5 Yurgealitis at p.25.

**Response:** Dispute that this is not a "fact" but rather a statement of the law. The terms of the Ordinance speak for themselves.

136. Under section 24-211(5), an assault weapon includes any shotgun with a revolving cylinder. Exhibit 2 Ordinance at § 24-211(5).

**Response:** Dispute that this is not a "fact" but rather a statement of the law. The terms of the Ordinance speak for themselves.

137. A semiautomatic rifle or shotgun which includes only a pistol grip increases the ability of the operator to conceal the firearm, to maneuver the firearm in confined space, and to fire from positions other than the shoulder. Exhibit 5 Yurgealitis at p.22,26.

**Response:** Dispute. *See* Resp. to Statement 20.

138. Semiautomatic rifles with a pistol grip and without a shoulder stock are used in the military. Exhibit 12 Yurgealitis Dep., 27:10-28:9.

**Response:** Plaintiffs admit that there are examples of firearms with this configuration that have been used by the military, but Plaintiffs further note that much more common military firearms, like the M16 for instance, do not have this configuration. Nor do most commonly owned AR-15 rifles. In fact, the ordinary meaning of "rifle" specifically requires the firearm in question to be equipped with a shoulder stock because a rifle is designed to be fired from the shoulder. *See, e.g.*, 18 U.S.C. § 921(a)(7).

139.     A protruding foregrip allows the operator to better control recoil and muzzle climb, thus increasing the hit probability of successive shots. Exhibit 5 Yurgealitis at p.22,26.

**Response:** Admit. *See* Resp. to Statement 20.

140.     Rifles with protruding foregrips or forward grips are military-style firearms as opposed to sporting style firearms. Exhibit 12 Yurgealitis Dep., 28:21-29:13.

**Response:** Dispute. Professor Yurgealitis admitted he "could not say . . . absolutely" that protruding or forward grips were not used for sporting purposes, Defs.' Ex. 12 at 29:12–13. In fact, they are common features of semiautomatic rifles: "Vertical foregrips are pretty common and they are essentially a bar mounted to the bottom of the handguard of an AR." Sean Curtis, *8 Best AR-15 Foregrips: Vertical & Angled*, PEWPEW TACTICAL (Dec. 22, 2022), attached as Exhibit 60.

141.     A folding and/or telescoping stock facilitates easier or more comfortable firing from positions other than the shoulder and allows the operator to more easily conceal or maneuver the rifle in a confined space. Exhibit 5 Yurgealitis at p.23,26.

**Response:** Dispute. Folding and telescoping stocks increase the likelihood of successful home defense by permitting safe storage of defense instruments in accessible spaces and making the rifle maneuverable in confined spaces. *See* Kopel, *supra* Resp. to Statement 20, at 398–99. Although the smaller size makes the firearm more concealable, handguns are still "far more concealable than rifles in any configuration." *Id*. Even with an adjustable stock, these rifles are intended to be shot from the

shoulder. *See* Resp. to Statement 20.

142.     Folding, telescoping, and thumbhole stocks are not common features on sporting rifles. Exhibit 12 Yurgealitis Dep., 29:14-18.

**Response:** Dispute. "[T]he civilian AR-15 has telescoping rather than folding stocks. Adjustable stocks are ubiquitous on civilian rifles." *See supra* Wallace, *"Myths"* Resp. to Statement 20, at 232.

143.     A shroud or handguard that encircles the barrel protects the gas tube/ piston mechanism from inadvertent damage, protects the operator from injury due to a hot barrel or other component, and provides additional grip space for the operator to steady the rifle. Exhibit 5 Yurgealitis at p.23,26.

**Response:** Admit. *See* Resp. to Statement 20.

144.     Barrell shrouds or handguards are more common on military firearms than sporting rifles. Exhibit 12 Yurgealitis Dep., 29:19-30:10.

**Response:** Dispute. *See* Resp. to Statement 20.

145.     A muzzle brake can allow the operator to regain control of the rifle more rapidly after firing by venting escaping gases upward at the end of the barrel. Exhibit 5 Yurgealitis at p.23,26.

**Response:** Admit. *See* Resp. to Statement 20.

146.     Muzzle brakes and muzzle compensators are not common features on sporting rifles. Exhibit 12 Yurgealitis Dep., 31:2-6.

**Response:** Dispute. *See* Resp. to Statement 20.

147.     A secondary added grip increases stability in controlling a pistol. Exhibit 5 Yurgealitis at p.24.

**Response:** Admit. *See* Resp. to Statement 20.

148.     A folding, telescoping, or thumbhole stock increases stability in controlling the

pistol. *Id.*

**Response:** Admit.

149.    Modern firearms with a detachable magazine forward of the pistol grip provide a second grip point, increasing stability and allow more controlled rapid fire. *Id.* at p.25.

**Response:** Admit in part, dispute to the extent that the statement is too vague to permit a response, because "rapid fire" is undefined.

150.    Increased controllability can result in more effective shot placement by the operator and require less time to acquire successive targets. *Id.* at p.24.

**Response:** Admit.

151.    Most traditional hunting rifles or sporting rifles do not have the ability to accept or use detachable magazines with varying capacities. Exhibit 12 Yurgealitis Dep., 34:19-24.

**Response:** Dispute. "Since the beginning of the twentieth century, semiautomatic firearms with detachable magazines have been commonly possessed." *See* Halbrook, *supra* Resp. to Statement 4, at 16. Furthermore, it is unclear what Defendants mean by "traditional".

152.    The Ordinance also lists specific examples of banned assault weapons. Exhibit 2 Ordinance at § 54-211(7)(a); Exhibit 7 Complaint at ¶ 26.

**Response:** Plaintiffs object that this is not a "fact" but rather a statement of the law. The terms of the Ordinance speak for themselves.

153.    Any person who legally possessed an "assault weapon" or "large-capacity magazine" prior to enactment of the Ordinance must remove it from county limits, modify it to render it permanently inoperable, or surrender it to the Sheriff. Exhibit 2 Ordinance at § 54-212(c); Complaint at ¶ 21.

**Response:** Plaintiffs object that this is not a "fact" but rather a statement of the law. The terms of the Ordinance speak for themselves.

154.     Violation of the County Ordinance is a misdemeanor, carrying a fine ranging from $5,000 to $10,000 and a term of imprisonment of up to six months. Exhibit 2 Ordinance at § 54-214(a); Complaint at ¶ 23.

**Response:** Plaintiffs object that this is not a "fact" but rather a statement of the law. The terms of the Ordinance speak for themselves.

155.     Controlling for population, the states that have prohibited assault weapons experienced 57% fewer high fatality mass shooting incidents involving assault weapons and 32% fewer mass public shooting incidents involving assault weapons than states without assault weapons bans for the period of January 1, 1990 through June 30, 2022. Exhibit 3 Klarevas at ¶ 38.

**Response:** Dispute. In a meta-analysis of six studies, including one by Professor Klarevas, the RAND Corporation found that "assault weapon" bans have uncertain effects on mass shootings and evidence of any relationship is inconclusive. *See "Effects of Assault," supra* Resp. to Statement 108. Speaking of Professor Klarevas's study specifically, the analysis concluded that the effect sizes demonstrated by Professor Klarevas "were improbably large," an error that suggested the outcome of the study was "likely biased because of the sparsity" of the data analyzed. *Id.; see also* Resp. to Statement 98.

156.     The states that have prohibited assault weapons experienced 68% fewer fatalities resulting from high fatality mass shooting incidents involving assault weapons and 57% fewer fatalities resulting from mass public shooting incidents involving assault weapons than states without assault weapons bans for the period of January 1, 1990 through June 30, 2022. *Id.*

**Response:** Dispute. *See* Resps. to Statements 7, 98, 108, and 155.

157.     Controlling for population, and including shootings that did not involve assault

weapons, the states that have prohibited assault weapons experienced 44% fewer high fatality mass shooting incidents with firearms of all kinds and 14% fewer mass public shooting incidents with firearms of all kinds than states without assault weapons bans for the period of January 1, 1990 through June 30, 2022. *Id.* at ¶ 37.

**Response:** Dispute. *See* Resps. to Statements 7, 98, 108, and 155.

158.    By population, the states that have prohibited assault weapons experienced 54% fewer fatalities resulting from high fatality mass shootings involving firearms of all kinds and 37% fewer fatalities resulting from mass public shootings involving firearms of all kinds than states without assault weapons bans for the period of January 1, 1990 through June 30, 2022. *Id.* at ¶ 37.

**Response:** Dispute. *See* Resps. to Statements 7, 98, 108, and 155.

159.    Cook County has experienced less frequent and less lethal high-fatality mass shootings and mass public shootings than the rest of the United States since implementing the assault weapons ban in 1993. *Id.* at ¶ 40.

**Response:** Dispute. Mass public shootings are extremely rare events, most places in the United States have experienced *none* since 1993. It is misleading to compare the rate of mass shootings within Cook County (a very small sample) against the rate across the entire country as a whole (an all-inclusive sample). *See also* Resps. to Statements 7, 98, and 108.

160.    Cook County has not seen a high-fatality mass shooting or mass public shooting involving an assault weapon since the ban. *Id.* at ¶ 40.

**Response:** Subject to the objection above that it is very difficult to make generalizations about mass shooting violence, Plaintiffs admit. Though Cook County *has* experienced mass shootings since the Ban, as Professor Klarevas admits.

161.    The high-fatality mass shootings and mass public shootings perpetrated without an

assault weapon that have occurred in Cook County since the ban have an average death toll of 6.0 per incident and 5.5 per incident, respectively. *Id.* at ¶ 40.

**Response:** Dispute. *See* Resps. to Statements 7, 98, and 108.

162.     The average death toll of high fatality mass shootings and mass public shootings in the entire United States is 10.1 and 7.4, respectively. *Id.* at ¶ 40.

**Response:** Dispute. *See* Resps. to Statements 7, 98, and 108.

163.     If the federal assault weapons ban had remained in place after 2004 and the country had moved toward a more complete ban, many of the gun tragedies of recent years would have been far less deadly and damaging to countless individuals who have been maimed and injured throughout the United States. Exhibit 4 Donohue at ¶ 114.

**Response:** Dispute. This is not a fact at all, but rather unfounded conjecture. As explained above, "assault weapons" bans have no demonstrated effect on mass shootings. *See* Resp. to Statement 154; *see also* Resp. to Statement 7, 98, and 108.This is hardly surprising, given that "AW-type firearms do not operate differently than other comparable semiautomatics, nor do they fire more lethal ammunition." *See* Koper, *supra* Resp. to Statement 4, at 149.

164.     The FBI's analysis of active shooters over age 18 found that 65% had no adult convictions prior to the active shooting event. *Id.* at ¶ 50.

**Response:** Admit.

165.     One in five assault weapons owners do not lock up their assault rifles, and more than 30% do not secure their ammunition. *Id.*at ¶ 86.

**Response:** The results of the survey speak for themselves. Dispute to the extent this mischaracterizes the survey.

166.     Teenage gunmen who are not eligible to possess assault weapons may take weapons from relatives who legally possess them and use them to commit mass shootings, as was

the case in at least 20 of the 32 school shootings with at least three victims dead or injured that have occurred since 1990. *Id.* at ¶ 50; *see also Id.* at ¶106.

**Response:** Defendants' sources speak for themselves. Dispute to the extent Defendants misconstrue the sources.

167.     Approximately 400,000 guns fall into the possession of criminals each year when they are lost by or stolen from law-abiding citizens. *Id.* at ¶ 108.

**Response:** Dispute. This overstates it. From 2005-2010, according to the Bureau of Justice Statistics, there were an average of 172,040 firearms stolen each year. U.S. Bureau of Justice Statistics, *Firearms Stolen During Household Burglaries and Other Property Crimes, 2005–2010*, U.S. DEP'T OF JUST. (Nov. 2012), https://bit.ly/2D9ujOd, attached as Exhibit 61.

168.     Many of the most horrific and notorious mass shootings were perpetrated by law-abiding citizens armed with assault weapons: Stephen Paddock (Las Vegas, 59 killed); Omar Mateen (Pulse Nightclub, 49 killed); Adam Lanza (Sandy Hook Elementary, 26 killed); James Holmes (movie theater, 12 killed); Buffalo, New York supermarket (10 killed); Uvalde, Texas elementary school (21 killed). *Id.* at ¶ 109.

**Response:** Dispute. Mass murderers obviously are not law-abiding citizens.

### Impact on the Community

169.     Survivors of mass shootings report a broad range of emotions, such as anger, sadness, fear, frustration, helplessness, and an eroded sense of safety and trust, as well as symptoms of depression, anxiety, cognitive issues, and post-traumatic stress disorder. Exhibit 16 Peterson at p.14; *see also* Exhibit 4 Donohue at ¶ 48.

**Response:** Plaintiffs object that this fact is not specific to the types of firearms banned by Cook County. Plaintiffs further object that it is very difficult to make generalizations about mass shooting

violence. *See* Resps. to Statements 7 and 98.  Furthermore, mass shootings are also statistically rare. In the most recent years for which data are available (2015–2019), the FBI reports that 71,704 murders were committed, 52,125 with a firearm. *Expanded Homicide Data Table 8: Murder Victims by Weapon, 2015–2019*, *Crime in the United States*, FBI, U.S. DEP'T OF JUST. (2019), https://bit.ly/31WmQ1V, attached as Exhibit 101. The FBI reported 125 active shooter incidents during the same 5-year period. Lacey Wallace, *Mass Shootings are Rare—Firearm Suicides Are Much More Common, and Kill More Americans,* PBS (Mar. 30, 2021), https://to.pbs.org/3LlU8z9, attached as Exhibit 63. According to one source, mass shootings account for 0.2% of total firearm deaths. *Facts and Figures: The Human Toll*, U.C. DAVIS HEALTH, https://bit.ly/43SBQww, attached as Exhibit 64. And even in these events, rifles are not the weapon of choice for perpetrators. *See* Resp. to Statement 104. Subject to these objections, Plaintiffs admit.

170.     The National Center for Post-Traumatic Stress Disorder states that 28% of people who witness a mass shooting develop PTSD and another third will develop acute stress disorder. Exhibit 16 Peterson at p.14.

**Response:** Subject to the objections above, *see* Resp. to Statement 169, Plaintiffs state that they presently lack knowledge and, on that basis, decline to dispute at this time.

171.     Some studies have found that as many as 95% of mass shooting survivors develop PTSD in the aftermath. *Id.*

**Response:** *See* Resp. to Statement 170.

172.     In communities where a mass shooting occurs, at least 5 to 10% of people who were not primary victims develop PTSD. *Id.*

**Response:** Subject to the objection above, *see* Resp. to Statement 169, Plaintiffs dispute. This assertion mischaracterizes the source, which analyzed "disaster victims" in general, not communities impacted by mass shootings specifically. Dr. Peterson's report cites, a U.S. Department of Veterans

Affairs article, to a study by Yuval Neria et al., *Post-traumatic stress disorder following disasters: a systematic review*, 38 PSYCH. MED. 467 (Apr. 2008), https://bit.ly/3GTJOLR, attached as Exhibit 65, which analyzed few "mass shootings" in its study of man-made disasters. Instead, the authors focused primarily on the Oklahoma City Bombing and the 2001 attack on the World Trade Center.

173.    Because mass shootings are seemingly random and unpredictable, these events cause helplessness, making them more traumatic than nearly all other causes of injury and death in the healthy populations that are exposed. *Id.*

**Response:** Dispute. The "seemingly random" and "unpredictable" natures of mass shootings are not unique features to these types of tragedies and are not a basis on which to distinguish "all other causes of injury and death in the healthy populations that are exposed."

174.    Nearly half of all adults in the United States fear becoming a victim of a mass shooting. *Id.* at p.15.

**Response:** Dispute. Plaintiffs admit that Peterson cites a few studies indicating a large portion of adults in the United States fear becoming a victim of a mass shooting, but Plaintiffs dispute that fear is reasonable. *See* Resp. to Statement 169. As of 2015, only 41% of Americans were not at all afraid of flying in an airplane, with a majority of adults either "bothered slightly" or "afraid," despite air travel's well-understood safety record. *See* Kathy Frankovic, *Most Americans now worried about flying*, YOUGOVAMERICA (Apr. 1, 2015), https://bit.ly/3KVyccy, attached as Exhibit 66. Mass shootings are tragic, traumatic, and shocking events. . . . However, they represent a very small fraction of the homicides in the United States." *See* Smart & Schell, *supra* Resp. to Statement 7. In fact, from 1976 through 2018, an average of just 26 people were killed per year in public mass shooting incidents (defined as "incidents that occur in the absence of other criminal activity (e.g., robberies, drug deals, and gang 'turf' wars') in which a gun was used to kill four or more victims in a public location within a 24-hour period"). Grant Duwe, *Patterns and Prevalence of Mass*

*Violence*, 2019 J. CRIM. & PUB. POL'Y 1, 12 (2019), https://bit.ly/3ovd19A, attached as Exhibit 67. That is slightly lower than the number of individuals (27) killed each year by lightning strikes and significantly lower than the number injured by lightning strikes (243). *How Dangerous is Lightning?*, NAT'L WEATHER SERV., https://bit.ly/3wN3iNU, attached as Exhibit 68.

175.     Approximately 80% of U.S. adults report feeling stressed about mass shootings. *Id.* at p.15.

**Response:** *See* Resp. to Statement 174.

176.     As of 2018, three out of four youth in America reported mass shootings being a primary source of stress. *Id.* at p.15.

**Response:** *See* Resp. to Statement 174.

177.     Around 20% of youth report the potential of a school shooting causes them daily stress. *Id.* at p.15.

**Response:** *See* Resp. to Statement 174.

178.     Following the 1984 San Ysidro McDonald's shooting in which 21 people were killed by a gunman with a semi-automatic Uzi, 12.6% of female members of the broader community who were not directly involved in the shooting showed symptoms of PTSD. *Id.* at p.15.

**Response:** Admit.

179.     Public mass shootings are particularly high-visibility events that are quite shocking to the public and unsettling to the sense of public safety. Exhibit 4 Donohue at ¶ 61.

**Response:** This is a statement of opinion to which no response is required or possible. *See* Resps. to Statements 173 and 174.

180.     It is abundantly clear that the horrors of mass shootings such as the killing of 20 students and 6 teachers at Sandy Hook Elementary, 19 elementary students and 2 teachers

in Uvalde, Texas, and 10 people who died in a hate crime in Buffalo, New York, have inflicted psychological distress far beyond the contours of those small communities and indeed caused suffering throughout the entire country. *Id.*

**Response:** This is a statement of opinion to which no response is required or possible. *See* Resps. to Statements 173 and 174.

181.    Studies consistently show that mass shootings can lead to increased levels of post-traumatic stress disorder, anxiety, and depression. *Id.* at ¶ 62.

**Response:** Subject to the objections above that it is very difficult to make generalizations about mass shooting violence and that mass shootings are rare events that are most commonly perpetrated with handguns, Plaintiffs admit. *See also* Resp. to Statement 169.

182.    The 2008 shooting at Northern Illinois University that left five people dead and 17 wounded led to a dramatic increase in PTSD symptoms among the university's students. *Id.* at ¶ 62.

**Response:** Admit.

183.    In Norway, stress reactions were increased among the general population after a shooting in 2011 left 67 people dead and 32 wounded. *Id.* at ¶ 63.

**Response:** Admit.

184.    Children and people who have experienced previous trauma or psychological disorders are more susceptible to mental health problems or PTSD after a mass shooting. *Id.* at ¶ 65.

**Response:** Subject to the objections above that it is very difficult to make generalizations about mass shooting violence and that mass shootings are rare events that are most commonly perpetrated with handguns, Plaintiffs admit. *See also* Resp. to Statement 169.

185.    One study found that local exposure to fatal school shootings increased youth

antidepressant use by 21.4% in the following two years. *Id.* at ¶ 66.

**Response:** Subject to the objections above that it is very difficult to make generalizations about mass shooting violence and that mass shootings are rare events that are most commonly perpetrated with handguns, Plaintiffs admit. *See* Resp. to Statement 169.

186. Rifle caliber assault weapons prohibited under the Ordinance pose a significant risk to law enforcement officers. Exhibit 5 Yurgealitis at p.32.

**Response:** Dispute. The firearms banned by the Ordinance are not identified by caliber, and the Ordinance bans firearms that are not "rifle caliber" if they have banned features. Furthermore, rifle-caliber firearms are used extremely rarely in crime, as discussed above. *See* Resp. to Statement 97. Finally, "rifle caliber assault weapons" pose no greater threat to law enforcement than other rifle-caliber firearms because they operate the same way as any other semiautomatic firearm. *See also* Resp. to Statement 162.

187. Firearms based on the AR-15 design are the weapon of choice in 85% of mass shootings resulting in four or more victims. Exhibit 11 Andrew at p.4.

**Response:** Dispute. As discussed above, handguns are much more commonly used in mass shootings than "firearms based on the AR-15 design." *See* Smart & Schell, *supra* Resp. to Statement 7; *see also* Resp. to Statement 98. The figure on which Mr. Andrew relies is higher than the figure found by *any* of the studies analyzed by Smart & Schell. And in fact, the study from which it was derived, DiMaggio et al., *Changes in U.S. mass shooting deaths associated with the 1994 federal assault weapons ban: Analysis of open-source Data*, J. OF TRAUMA & ACUTE CARE SURGERY 86, no. 1 (2019): 11–19, attached as Exhibit 69, inspired a letter to the editor from another of the County's experts, Professor Klarevas. Professor Klarevas wrote that, of the "three key findings" presented by DiMaggio and his coauthors—(1) that 77% of mass shootings between 1981 and 2017 involved "assault weapons" which were responsible for 86% of the fatalities, (2)

64

"assault weapons" accounted for all mass-shooting fatalities in 15 of the years surveyed, and (3) a statistical analysis of the period when the federal "assault weapons" ban was in effect "seven preventable deaths were attributable to assault weapons alone"—"the first two findings are incorrect, calling into question the third finding and any broader conclusion that can be drawn from the study regarding the impact of the AWB." Louis Klarevas, *Letter to the editor re: DiMaggio, C., Et al. "Changes in U.S. mass shooting deaths associated with the 1994-2004 federal assault weapons ban: Analysis of open-source data*, J. OF TRAUMA & ACUTE CARE SURGERY 86, no. 5 (2019): 926–28, attached as Exhibit 70. Professor Klarevas went on to note that "after reviewing the study's data set, I believe that the authors misidentified the involvement of assault weapons in roughly half the incidents" and that "when the erroneous cases are recalibrated, the number of incidents involving assault weapons drops 62% . . . and the number of fatalities resulting from such shootings drops 46%" bringing the study into rough consistency with the others to look at the issue. *Id.* Professor Klarevas closed by noting that "[w]ith such a large number of misclassifications, the study's overarching conclusions about the effect of the AWB is called into question." *Id;* FBI, *supra Expanded Homicide Data Table 8*, Resp. to Statement 169.

In response to Professor Klarevas's letter, DiMaggio acknowledged that his methodology had counted all semiautomatic firearms as "assault weapons." Charles DiMaggio, *Author's response: "Changes in U.S. mass shooting deaths associated with the 1994-2004 federal assault weapons ban. Analysis of open-source data*, J. OF TRAUMA & ACUTE CARE SURGERY 87, no. 4: 1003–04, attached as Exhibit 102.

188.    Domestic terrorists, extremists, and private militias with hate-related ideologies are attracted to and encouraged to acquire assault weapons based on the assault weapons' unique characteristics. *Id.*

**Response:**  Dispute. Beyond objecting to the subjectivity of the term "hate-related ideologies,"

Plaintiffs note that the features of "assault weapons" are neither nefarious nor unique to the banned firearms. An "assault weapon" fires no faster, and is no more dangerous, than any other semiautomatic firearm. *See* Resps. to Statements 20 and 22.

189. Perpetrators of targeted violence arm themselves with assault weapons because they require limited professional training, they are effective at a distance, and because they are marketed as military-police style weapons. *Id.*; *see also* Exhibit 4 Donohue at ¶ 69.

**Response:** Dispute. *See* Resps. to Statements 20, 22, 187, and 188.

190. Perpetrators seek to look cool, intimidate and embrace the appeal of the military or police wannabe due to intentional marketing tie-in by manufacturers. Exhibit 11 Andrew at p.4; *see also* Exhibit 4 Donohue at ¶ 69.

**Response:** Dispute. *See* Resps. to Statements 20, 22, 187, and 188.

191. An assailant with an assault rifle is able to kill and injure twice the number of people compared to an assailant with a non-assault rifle or handgun. Exhibit 11 Andrew at 4. "[F]rom a public safety perspective, once an attack begins with an assault weapon, it is already worst-case scenario." Exhibit 11 Andrew at 3. "Death and severe injury is not avoidable." Exhibit 11 Andrew at p.3.

**Response:** Dispute. "Assault weapons" function no differently from any other semiautomatic firearm. *See* Resps. to Statements 4, 8, 20, and 22. Furthermore, the actions of criminals do not affect the rights of those who wish to avail themselves of the advantages common semiautomatic rifles offer for defense of self and home.

192. An assault weapon transforms terrorists, criminals, deranged people, or disconnected teens with poor coping skills and an intent to kill into killing machines. Exhibit 11 Andrew at p.6.

**Response:** Dispute. "Assault weapons" function no differently from any other semiautomatic

firearm. *See* Resps. to Statements 4, 8, 20, and 22.

193.    Mass shooters frequently express the view that assault weapons will make others realize they are powerful. Exhibit 4 Donohue at ¶ 69.

**Response:** Dispute. Although there are some examples of this, it is far from "frequent." Furthermore, the actions of criminals do not affect the rights of those who wish to avail themselves of the advantages common semiautomatic rifles offer for defense of self and home.

194.    The shooter who perpetrated a mass shooting at a high school in Parkland, Florida left a recording on his Instagram including the statement, "With the power of the A.R. you will know who I am." *Id.* at ¶ 94.

**Response:** Admit. The actions of criminals do not affect the rights of those who wish to avail themselves of the advantages common semiautomatic rifles offer for defense of self and home.

195.    The ability to kill or injure more people with an assault rifle has coincided with a sharp increase in mass shootings and related casualties, representing a significantly increased public safety threat and a decreased ability to effectively stop and respond to attacks with assault weapons without significant casualties and injuries. Exhibit 11 Andrew at p.4.

**Response:** Dispute. As discussed above, the AR-15 has been commercially available for decades and popular for at least the last 40 years. The "sharp increase in mass shootings and related casualties" which Mr. Andrew purports to find (based on a *Newsweek* article), occurs long after the availability and popularity of the AR-15 was already well-established. *See also* Resps. to Statements 4, 8, 20, and 114. Furthermore, the actions of criminals do not affect the rights of those who wish to avail themselves of the advantages common semiautomatic rifles offer for defense of self and home.

196.    The general public and particularly large public venue events, schools, and

workplaces are at greater risk today due to the limits of reasonable and practical law enforcement and crisis planning efforts to mitigate the threat of an individual or group using assault weapons to attack. Exhibit 11 Andrew at p.5.

**Response:** Dispute. It is unclear from Mr. Andrew's report what this statement means, particularly to what "limits" he is referring. More than that, as discussed above, the general public is at *extremely little* risk from mass public shootings compared to other sorts of crime, since they are an exceptionally rare form of firearm crime. *See also* Resps. to Statement 78. Furthermore, the actions of criminals do not affect the rights of those who wish to avail themselves of the advantages common semiautomatic rifles offer for defense of self and home.

197. The widely endorsed "run, hide, and fight" active shooter response has limitations based on the crisis environment, the mindset of situational leaders, the age and capacity of those participating, and the attackers' participation, surprise, and position, and still results in death and injury even with training and practice. Exhibit 11 Andrew at p.6.

**Response:** Dispute. Whatever the limitations of responses to active-shooter situations, they are not unique to situations involving the use of "assault weapons." *See* Resps. to Statements 4, 8, 20, and 22. Furthermore, the actions of criminals do not affect the rights of those who wish to avail themselves of the advantages common semiautomatic rifles offer for defense of self and home.

198. "Law enforcement response, armed security, and concerned citizen response have proven to be slow for the few minutes that Assault Weapon attacks transpire and have low effectiveness in preventing death and injury in confrontations involving assault weapons… Attacks with assault weapons result in death and injury even with on-duty and off-duty law enforcement, armed security, and lawfully armed citizens present or in immediate vicinity or response." Exhibit 11 Andrew at p.7. Law enforcement response to assault weapon-involved attacks requires highly aggressive officer responses, including specialized

weapons, the surging of personnel, increased perimeters, and the mindset to undertake the force of violent action. Exhibit 11 Andrew at 7.

**Response:** Dispute. Whatever the limitations of responses to active-shooter situations, they are not unique to situations involving the use of "assault weapons." *See* Resps. to Statements 4, 8, 20, and 22. Furthermore, neither the actions of criminals nor the response of law enforcement affects the rights of those who wish to avail themselves of the advantages common semiautomatic rifles offer for defense of self and home.

199.     These incidents increasingly require tactics such as charging structures with armored vehicles, use of explosives, robots, and drones with explosives. Exhibit 11 Andrew at 6.

**Response:** Dispute. Whatever the limitations of responses to active-shooter situations, they are not unique to situations involving the use of "assault weapons." *See* Resps. to Statements 4, 8, 20, and 22. Furthermore, neither the actions of criminals nor the response of law enforcement affects the rights of those who wish to avail themselves of the advantages common semiautomatic rifles offer for defense of self and home. Mr. Andrew's statement also does not suggest mass shootings "increasingly" require these extreme measures, but merely cites to a New York Times article regarding a single incident in which a SWAT truck was driven into a building under circumstances that are extremely unclear from the article. *See* Andrew Rep., Defs.' Ex. 11 at 7 & n.22. He cites no examples of the use of explosives, robots, or drones with explosives, in response to an "assault weapon" being used in crime of any kind.

200.     In the 2016 mass shooting at Pulse Nightclub, law enforcement used an armed personnel carrier (BearCat) to breach the wall after learning the shooter had an assault rifle. *Florida Department of Law Enforcement, Ninth Judicial Circuit, Use of Force Investigation Case #: OR-27-0258*, ("Orlando Report") attached hereto as Exhibit 19, p.13,

24.

**Response:** Dispute. Whatever the limitations of responses to active-shooter situations, they are not unique to situations involving the use of "assault weapons." *See* Resps. to Statements 4, 8, 20, and 22. Furthermore, neither the actions of criminals nor the response of law enforcement affects the rights of those who wish to avail themselves of the advantages common semiautomatic rifles offer for defense of self and home.

201.     The "good guy with a gun" actually requires significant training and expertise to confront an attacker safely and still rarely has the opportunity to respond under the surprise circumstances. Exhibit 11 Andrew at p.7, 8.

**Response:** Dispute. Mr. Andrew's report is contradictory on this point. He asserts that a bad guy with a gun "can easily kill a large number of people with little or no training and preparation" and yet the same firearm will be useless in the hands of a "good guy with a gun" who must have "significant training and expertise to confront an attacker safely." Defs.' Ex. 11, Andrew at ¶ 21. As an example of the inability of a "good guy with a gun," Mr. Andrew chooses the 2017 Las Vegas shooting in which the shooter was located a great distance from the concert he attacked at which "200 law enforcement officers where [sic] present." *Id.* In any event, this statistic suffers from the same infirmity as those in Statements 30 and 32: it compels no material inference. The impact that legally armed citizens have in stopping attacks depends, inter alia, on whether there are armed citizens at the location of a shooting, whether they are able to access their firearms in time, locate the shooter, safely get within firing range of the shooter, and engage the shooter. Whether the constellation of factors involved in disabling a shooter align in a particular case is immaterial to the rights of those who wish to avail themselves of the advantage of armed self-defense and so enlarge their own, and others', chances of survival. Finally, the Ordinance draws no lines on the basis of training—the firearms tendentiously labeled "assault weapons" are banned

no matter how well-trained one who wishes to possess it may be.

202.  A well-placed attacker with an assault weapon is devastatingly effective and decreases the opportunity for effective law enforcement response, as demonstrated in the 2017 Las Vegas concert attack. *Id.* at p.8.

**Response:** Dispute. "Assault weapons" function no differently from, and are no more effective than, any other semiautomatic firearm. *See* Resps. to Statements 4, 8, 20, and 22. Even if firearms had any transformative power, "assault weapons" would have no more of it than any other semiautomatic firearm. Furthermore, neither the actions of criminals nor the response of law enforcement affects the rights of those who wish to avail themselves of the advantages common semiautomatic rifles offer for defense of self and home.

203.  Approximately one in five police officers killed in the line of duty were killed with an assault weapon, despite the relative rarity of use of assault weapons in crime in general. Exhibit 4 Donohue at ¶ 132.

**Response:** Dispute. Both the claim about the number of police officers killed using so-called assault weapons and the comparison of that number to the general criminal use of assault weapons are flawed. First, Defendant's own expert admits that the percentage of police murders that involve assault weapons may be substantially lower—closer to 13 percent, or one in ten police officers killed in the line of duty. Donohue at ¶ 132. The one in ten ratio is more accurate than the one in five ratio because the higher calculation is based on much older data (1998–2001 vs. 2009–2013), and because there is no indication that the higher calculation excluded instances where an officer was killed with his own service weapon. *Officer Down: Assault Weapons and the War on Law Enforcement,* VIOLENCE POL'Y CTR. (May 2003), https://bit.ly/3UVEPA6, attached as Exhibit 72. The study cited for the lower calculation explicitly excluded these killings from the data. Donohue at ¶ 132. This exclusion is highly relevant because such tragedies are in no way impacted by bans

71

on *private* ownership of assault weapons. Second, Defendant inappropriately implies that assault weapons are disproportionately chosen by criminals who seek to kill police officers. For the proposition that the portion of police killings committed with "assault weapons" is higher than the portion of other gun crimes committed with "assault weapons," Defendants cite to Professor Donohue, whose source for this claim makes no mention of the rate of general criminal use of assault weapons. *Id*.

204.     Law enforcement officers are aware of the higher rate of deaths and injuries of officers due to assault weapons, aware that assault weapons are being used to target law enforcement officers, and aware of the fact that not all body armor provides adequate protection in a shoot-out. Exhibit 11 Andrew at p.8.

**Response:** Dispute. This statement is too general and unsupported by Mr. Andrew or his sources. For instance, to prove that "assault weapons are being used to target law enforcement officers" Mr. Andrew cites to a single Dallas shooting in which one of the firearms used was a so-called "assault weapon." This citation to a lone instance demonstrates that it is impossible to respond to this statement because there is no reference to the degree to which assault weapons are being used to target law enforcement officers. To the extent that the assumption that assault weapons are being used to target law enforcement officers relies on sources referenced in Statement 203, *see* Resp. to Statement 203. Additionally, the statement does not provide enough detail about "the fact that [law enforcement officers are aware] not all body armor provides adequate protection in a shoot-out," a claim for which Mr. Andrew has no source except his own experience. The statement does not indicate that this concern relates to a specific class of firearms, and it is thus irrelevant to the case.

205.     This contributes to stress and hinders recruitment, retention, and performance. *Id.*; *see also* Exhibit 4 Donohue at ¶132.

**Response:** Dispute. This statement is too general to adequately respond to, and it is not supported.

Mr. Andrew provides no citations for any of the claims in the statement. Professor Donohue provides a citation for the proposition that private ownership of assault weapons impacts law enforcement *training*, but he does not demonstrate a link between increased training and poor performance, recruitment, and/or retention. Professor Donohue's references to delayed police responses at two mass shootings are far from dispositive and are directly contradicted by the highly reactive actions taken by law enforcement in the recent Nashville school shooting. Teddy Grant & Alexandra Faul, *Nashville Police Officers Speak about Response to Mass Shooting: 'Training is What Kicked in,'* ABC NEWS (Apr. 4, 2023), https://abcn.ws/41xbVZK, attached as Exhibit 73. The unsubstantiated assertions in this statement are also at odds with the fact that the vast majority of police officers in the United States oppose bans on assault weapons. Rich Morin et al., *Police Views, Public Views*, PEW RSCH. CTR. (Jan. 17, 2017), https://pewrsr.ch/3oxMBUO, attached as Exhibit 74.

206.     Individuals who believe firearms will be present at a protest are less likely to attend, carry a sign, or vocalize their views at the protest than individuals who do not believe firearms will be present. Exhibit 18 Palmer at p.11. This is true for both gun owners and non-gun owners. *Id*.

**Response:** The survey cited speaks for itself, but Plaintiffs dispute to the extent this mischaracterizes the survey. Plaintiffs also object that this is irrelevant, as it does not distinguish between so-called "assault weapons" and any other arm.

207.     Individuals who did not believe firearms would be present at a protest tended to say that their reasons for attending a protest included wanting to be heard, to influence others, support a cause, participate in a civic duty, and effect change. *Id.* at p.12.

**Response:** Dispute. *See* Resp. to Statement 206.

208.     Individuals who did believe firearms would be present at a protest tended to not believe

73

they would be able to make a difference or not to believe that making a difference was worth the risk they perceived was posed by the firearms. *Id.* at p.12–13.

**Response:** Dispute. *See* Resp. to Statement 206.

209.    People who were less likely to attend, carry a sign, or vocalize their views at a protest if they believed firearms may be present perceived that firearms at a protest would be used to intimidate or threaten them if the people with the firearms did not agree with their point of view. *Id.* at p.8,9.

**Response:** Dispute. *See* Resp. to Statement 206.

210.    Even individuals who believe they are responsible gun owners do not trust other people with guns in a protest environment. *Id.* at p.10.

**Response:** Dispute. *See* Resp. to Statement 206.

211.    Research also shows that instructors on campus reported a chilling effect on speech when students were armed not necessarily due to any overt action on the student's part, but as a result of instructors' perceptions of the aggressive potential of the student due to campus carry. *Id.* at 9.

**Response:** Dispute. *See* Resp. to Statement 206.

212.    Both students who own guns and those who do not report feeling that the presence of legal guns on campus would negatively affect classroom debate and decrease feelings of safety. *Id.* at p.10.

**Response:** Dispute. *See* Resp. to Statement 206.

213.    The Chicago Police Department regularly recovers assault weapons and has recovered assault weapons that have been converted to fully automatic fire. Exhibit 10 Snelling at ¶ 12.

**Response:** Dispute, as there is no definition of "regularly." Evidence indicates that "well under 1%

[of crime guns] are 'assault rifles.' " GARY KLECK, TARGETING GUNS: FIREARMS AND THEIR CONTROL 112 (1997), attached as Exhibit 75; *see also* Resp. to Statement 97. Of the top 20 firearms seized by Chicago Police in 2014, *all 20* were handguns. *See* Sarah Kollmorgen, *Chicago Criminals' Favorite Gunmakers: A Visual Ranking*, THE TRACE (Jan. 6, 2016), https://bit.ly/41tIDv7, attached as Exhibit 76. That same year, "Chicago police recovered only three assault weapons associated with criminal incidents." *Id.* Nationally, from 2016 through 2021, only 2.5% of murders were committed with *any* type of rifle. *See Expanded Homicide Offense Characteristics: Murder Victims by Weapon (2016-2021), FBI Crime Data Explorer*, U.S. DEP'T OF JUST. (2021), attached as Exhibit 103; *supra* FBI, *Expanded Homicide Data Table 8*, Resp. to Statement 169 (90,594 total murders; 2,028 with rifles). Murder by "hands, fists, feet, etc." was almost twice as common, at 4,008, over the same time period—and murder by handgun, at over 40,000, was over *20 times* as common. *Id*. As of 2016, only 0.8 percent of state and federal prisoners reported using *any* kind of rifle during the offense for which they were serving time. Mariel Alper & Lauren Glaze, *Source and Use of Firearms Involved in Crimes: Survey of Prison Inmates, 2016*, U.S. DEP'T OF JUST., OFF. OF JUST. PROGS., BUREAU OF JUST. STATS. 5 tbl. 3 (Jan. 2019), https://bit.ly/31VjRa9, attached as Exhibit 77. Furthermore, neither the actions of criminals nor the response of law enforcement affects the rights of those who wish to avail themselves of the advantages common semiautomatic rifles offer for defense of self and home. *See also* Resp. to Statement 10.

214.     Because assault weapons allow a shooter to hit within a larger area and at a higher velocity, many victims of assault weapons are not the intended targets but innocent bystanders, including bystanders shot through cars or walls. This has occurred in Chicago. *Id.* at ¶ 14– 15.

**Response:** Dispute. "Assault weapons" function no differently from any other semiautomatic

firearm. *See* Resps. to Statements 4, 8, 20, and 22. Furthermore, neither the actions of criminals nor the response of law enforcement affects the rights of those who wish to avail themselves of the advantages common semiautomatic rifles offer for defense of self and home.

215.     Gangs in Chicago are eager to procure assault weapons to intimidate other gangs or respond in kind to shootings involving assault weapons because they are more powerful and accurate. *Id.* at ¶ 17.

**Response:** Dispute. *See* Resps. to Statements 97 and 213. "The weapons of choice for gangs today are 9mm semiautomatic handguns, followed by .40 caliber and .45 caliber semiautomatics," says Thomas Ahern, an ATF senior agent based in Chicago. It makes sense then that those calibers account for about half of the crime guns recovered by police." Kollmorgen, *supra* Resp. to Statement 212. "Assault weapons" also function no differently from any other semiautomatic firearm. *See* Resps. to Statements 4, 8, 20, and 22. Furthermore, neither the actions of criminals nor the response of law enforcement affects the rights of those who wish to avail themselves of the advantages common semiautomatic rifles offer for defense of self and home.

216.     Gangs in Chicago see it as a sign of weakness not to possess assault weapons and seek to avoid that appearance. *Id.* at ¶ 17.

**Response:** Dispute. *See* Resp. to Statement 215.

217.     There is no rational reason for members of the public in Chicago to own assault weapons, even for self-defense. *Id.* at ¶ 18.

**Response:** Dispute. *See* Resps. to Statements 20 and 22.

218.     Prior to 2008, the Chicago Police Department did not assign assault rifles to police officers. Due to the prevalence of assault weapons on the street rising in recent years, CPD now maintains a small number of assault rifles. *Id.* at ¶ 19.

**Response:** Dispute to the extent that the County is referring to "assault rifles" in the sense of

battlefield rifles capable of selective fire. Indeed, far from undermining Plaintiff's claim in this case, this demonstrates that so-called "assault weapons" have important defensive uses. *See* Resps. to Statements 20, 22, and 26.

219.    Most CPD officers do not carry assault weapons as part of their job duties and are not trained with them. *Id.* at ¶ 20.

**Response:** Admit. Plaintiffs dispute that this is relevant; the share of a city's police force that uses semiautomatic rifles does not impact the rights of those who wish to avail themselves of the benefits that such firearms offer in defense of self and home.

220.    The first officer responding to an active shooter incident involving an assault weapon in Chicago will likely have weaker firepower than the assailant. *Id.* at ¶ 20.

**Response:** Dispute. "Assault weapons" are not unique in their "firepower." *See* Resps. to Statements 4, 8, 20, and 22. Furthermore, neither the actions of criminals nor the response of law enforcement affects the rights of those who wish to avail themselves of the advantages common semiautomatic rifles offer for defense of self and home.

221.    Standard police equipment has minimal effect on ammunition fired from assault weapons, and ammunition from assault weapons can travel through most bullet proof vests and standard protective equipment used by law enforcement. *Id.* at ¶ 13-14, 21.

**Response:** Dispute. "Assault weapons" function no differently from any other semiautomatic firearm. *See* Resps. to Statements 4, 8, 20, and 22. And "virtually *all* rifle ammunition will pierce soft body armor, which is why federal law defines 'armor piercing ammunition' as a projectile for use in *a handgun* with certain metallic properties." *See* Halbrook, *supra* Resp. to Statement 4, at 393 (quoting 18 U.S.C. § 921(a)(17)(B)) (emphasis in original). Indeed, an "AR-15 rifle is no better at piercing soft body armor than any other rifle of the same caliber." *Ibid*. Furthermore, the actions of criminals do not affect the rights of those who wish to avail themselves of the

advantages common semiautomatic rifles offer for defense of self and home.

222.　　　Situations involving an assailant with an assault weapon require officers to wear the highest level of protective equipment, such as the highest level of bullet-proof vests with added trauma plates. *Id.* at ¶ 22.

**Response:** Dispute. *See* Resp. to Statement 221.

223.　　　The highest level of protective equipment can be prohibitively expensive and, for CPD officers, would have to be purchased out-of-pocket. *Id.* at ¶ 23.

**Response:** Dispute. Because "assault weapons" operate and fire no differently from any other semiautomatic firearm, they cause no greater incurrence of costs than other semiautomatic firearms. *See* Response to Statement 221. Furthermore, Plaintiffs dispute Defendants' characterization of the Chicago Police Department's cost-distribution policy as specific to "[t]he highest level of protective equipment." In fact, this is the departmental norm: "Chicago police officers are responsible for replacing their own vests…in addition to other equipment and uniform expenses." *Get Behind the Vest: The Bullet Proof Vest*, CHICAGO POLICE MEM'L FOUND., https://bit.ly/3UYurHP, attached as Exhibit 78.

224.　　　An officer outfitted with equipment that stops a shot fired from an assault weapon can still suffer significant trauma because of the high velocity with which he was hit. *Id.* at ¶ 22.

**Response:** Admit. This is not unique to so-called "assault weapons." *See* Resp. to Statement 221.

225.　　　Hits from assault weapons to parts of the body that are not covered by a vest will have a much higher likelihood of causing death or serious injury as compared to hits from other firearms. *Id.* at ¶ 22.

**Response:** Dispute. *See* Resps. to Statements 20 and 221.

226.　　　Due to the weight of the highest level of body armor and the fact that such body armor

limits the wearer's mobility, it is not practical to require all officers to wear this equipment, if it were available, except after it has been confirmed that a shooter possesses an assault weapon. *Id.* at ¶ 23.

Response: Dispute. *See* Resps. to Statements 20 and 221.

227.    CPD has adjusted its large event and domestic terrorism preparations to address assault weapons and mass shootings. *Id.* at ¶ 24.

**Response:** Dispute. "Assault weapons" function no differently from, and require no more addressing than, other semiautomatic firearms. *See* Resps. to Statements 4, 8, 20, and 22. As for the problems with "mass shootings" as a factual term, *see* Resps. to Statements 7 and 98. Beyond this, the actions of the Chicago Police Department speak for themselves.

228.    The rise in mass shootings and the increased prevalence of assault weapons has led to CPD to dedicate increasingly large amounts of resources and time to securing events and the general safety of the public. *Id.* at ¶ 25.

**Response:** Dispute. "Assault weapons" function no differently from, and require no greater dedication of resources to secure against than, other semiautomatic firearms. *See* Resps. to Statements 4, 8, 20, and 22. As for the problems with "mass shootings" as a factual term, *see* Resps. to Statements 7 and 98. Beyond this, the actions of the Chicago Police Department speak for themselves.

229.    In preparation for 2022's Lollapalooza music festival, CPD asked residents near Grant Park to stay off their rooftops and instituted other safety precautions designed to address concerns from assault weapons from both within and without the perimeter. *Id.* at ¶ 26.

**Response:** Dispute. "Assault weapons" function no differently from, and require no more heightened precautions to secure against than, other semiautomatic firearms. *See* Resps. to

Statements 4, 8, 20, and 22. Beyond this, the actions of the Chicago Police Department speak for themselves.

230.     A threat to Lollapalooza was reported in 2022, which caused CPD to have to decide whether to evacuate everyone to outside the secure perimeter, where the potential shooter could be waiting for the crowd with an assault weapon. *Id.* at ¶ 27.

**Response:** Dispute. "Assault weapons" function no differently from, and require no more heightened precautions to secure against than, other semiautomatic firearms. *See* Resps. to Statements 4, 8, 20, and 22. Beyond this, the actions of the Chicago Police Department speak for themselves.

231.     No matter how prepared or well-equipped CPD is, it is virtually impossible to guarantee a mass shooting with an assault weapon will be stopped. *Id.* at ¶ 28.

**Response:** Dispute. "Assault weapons" function no differently from, and require no greater dedication of resources to secure against than, other semiautomatic firearms. *See* Resps. to Statements 4, 8, 20, and 22. As for the problems with "mass shootings" as a factual term, *see* Resps. to Statements 7 and 98. But, even as a general matter, it is "virtually impossible to guarantee" that any harm will not occur. That pertains not only to harms from all firearms but to all harms, everywhere. And it is all the more reason to permit law-abiding citizens to defend themselves.

## History of Firearms Regulations in the United States 1700-1900

232.     The dominant understanding of the Second Amendment and its state constitutional analogues at the time of their adoption in the Founding period forged an indissoluble link between the right to keep and bear arms with the goal of preserving the peace. Exhibit 17 Cornell at p.3.

**Response:** Dispute. This statement relates to the analysis of history as it informs the meaning of

the text of the Second Amendment. The analysis of history is not a factual inquiry but a *legal* one. *See Bruen*, 142 S. Ct. at 2130 n.6 ("The job of judges is not to resolve historical questions in the abstract; it is to resolve *legal* questions presented in particular cases or controversies. That 'legal inquiry is a refined subset' of a broader 'historical inquiry' and it relies on 'various evidentiary principles and default rules' to resolve uncertainties." (quoting W. Baude & S. Sachs, *Originalism and the Law of the Past*, 37 L. & Hist. Rev. 809, 810–11 (2019))). *Bruen* itself dealt with historical claims not as findings of fact but as part of its legal analysis. Finally, the State's expert, Professor Cornell, is not a reliable source on the history of firearm regulation in this country. He has derided *Bruen* as "bonkers" for applying "fiction, fantasy, and mythology" as an interpretive model. Saul Cornell, *Cherry-picked history and ideology-driven outcomes:* Bruen*'s originalist distortions*, SCOTUSBlog (June 27, 2022), https://bit.ly/3Jp4EDa, attached to Exhibit 79. While Plaintiffs will respond to the substance of the statements in this section where appropriate, when the issue relates to the *legal* analysis prescribed by *Bruen*, Plaintiffs will engage with their substance in their legal briefing.

233.    At the time of the drafting of the Second Amendment, regulation was not understood to be an "infringement" on the right to bear arms, but rather the necessary foundation for the proper exercise of that right as required by the concept of ordered liberty. *Id.* at p.6.

**Response:** Dispute. *See* Resp. to Statement 232.

234.    The common law Americans inherited from England acknowledged that the right to self-defense was not unlimited and was designed to preserve the peace. *Id.* at 7.

**Response:** Dispute. *See* Resp. to Statement 232.

235.    The long-standing prohibition on dangerous and unusual weapons reflects the principle of *in terrorem populi,* which was a concept inherited from English common law. *Id.* at p.11.

**Response:** Dispute. *See* Resp. to Statement 232.

236.    According to the concept of *in terrorem populi*, the key determinant of legality was whether a particular weapon would provoke a terror and undermine the peace. *Id.* at p.11.

**Response:** Dispute. *See* Resp. to Statement 232.

237.    Statutory law in England and the United States functioned to secure the peace and public safety. *Id.* at p.7.

**Response:** Dispute. *See* Resp. to Statement 232.

238.    There was no serious homicide problem or other societal ill comparable to the modern gun violence problem for Americans to solve in the era of the Second Amendment. *Id.* at 7.

**Response:** Dispute. *See* Resp. to Statement 232. *See also* Randolph Roth, AMERICAN HOMICIDE 162, 171, 185 (2012) (giving examples of high rates of homicide in the latter half of the 1700s), attached as Exhibit 80.

239.    Levels of gun violence among those of white European ancestry in the era of the Second Amendment were relatively low compared to modern America. *Id.* at 8.

**Response:** Dispute. *See* Resp. to Statement 232.

240.    At the time of the Second Amendment, the guns most Americans owned were those most useful for life in an agrarian society such as fowling pieces and light hunting muskets. *Id.* at 8.

**Response:** Dispute. *See* Resps. to Statements 4 and 232.

241.    Eighteenth-century muzzle loading weapons were not effective tools of interpersonal violence and were seldom used to commit crimes because they took time to load and could not be stored loaded. *Id.* at p.8.

**Response:** Dispute. *See* Resp. to Statement 4 and 232.

242.    Keeping guns loaded in the eighteenth century was not a viable option. *Id.* at p.8.

**Response:** Admit.

243.     The black powder used in eighteenth-century weapons was corrosive and attracted moisture. *Id.* at p.8.

**Response:** Admit.

244.     Average citizens could theoretically stockpile gunpowder in their homes or places of business. Stephen Porter, *Accidental Explosions: Gunpowder in Tudor & Stuart London*, HISTORY EXTRA (Sept. 22, 2016), https://bit.ly/3AiZt3C.

**Response:** Plaintiffs lack knowledge to admit or dispute this fact and, on that basis, decline to dispute at this time.

245.     In London, a gunpowder explosion at Tower Hill in 1552 killed seven, an explosion at Crooked Lane in 1560 killed eleven, another at Fetter Lane in 1583 killed three, another at Tower Street in 1650 killed 67 and destroyed fifteen houses, and in 1715 over a hundred houses on Thames Street were destroyed in a fire caused by a gunpowder explosion that leveled a house. *Accidental Explosions: Gunpowder in Tudor & Stuart London*, HISTORY EXTRA (Sept. 22, 2016), https://bit.ly/3AiZt3C.

**Response:** Admit.

246.     In the famed Gunpowder Plot of 1605, Guy Fawkes and his coconspirators amassed 36 barrels of gunpowder to level the House of Lords. *See generally,* Alan Haynes, *The Gunpowder Plot* (History Press 1994).

**Response:** Admit.

247.     In England, the explosion at Crooked Lane led to an outright ban on gunpowder storage in houses, though that ban was later modified to allow storage of two pounds of powder. *See* Stephen Porter, *supra* Resp. to Statement 243.

**Response:** Admit.

248.     At the time of the Founding, the States regulated the possession and storage of gunpowder as part of the exercise of their police power. Exhibit 17 Cornell at p.12-14.

**Response:** Dispute. *See* Resp. to Statement 232.

249.     At the time of the Second Amendment, over ninety percent of weapons owned by Americans were long guns. *Id.* at p.9.

**Response:** Admit.

250.     The production and marketing of guns increased and was greatly advanced technologically in the nineteenth century. *Id.* at p.10.

**Response:** Plaintiffs object that this asserted fact is too vague to allow a response and, on that basis, dispute.

251.     As cheaper, more dependable, and easily concealable handguns proliferated in large numbers in the nineteenth century, Americans began sporting them. *Id.* at p.10.

**Response:** Dispute. *See* Resp. to Statement 250.

252.     As a result of the new technology and increased availability of guns, new laws were passed in the mid-1800s to limit the sale of weapons and the use of weapons that threatened the peace. *Id.* at p.10.

**Response:** Dispute. *See* Resp. to Statement 232.

253.     Most courts upheld limits on the right to keep and bear arms. *Id.* at p.10.

**Response:** Dispute. *See* Resp. to Statement 232.

254.     The primary limit identified by courts in evaluating gun laws was whether the law negated the ability to act in self-defense. *Id.* at p.10.

**Response:** Dispute. *See* Resp. to Statement 232.

255.     The history and tradition of arms regulation has always recognized that the ability to inspire terrorem populi is a legitimate justification for regulation. *Id.* at p.23.

**Response:** Dispute. *See* Resp. to Statement 232.

256.     The power to regulate firearms and gunpowder has always been central to the police power. *Id.* at p.12–14.

**Response:** Dispute. *See* Resp. to Statement 232.

257.     Throughout Anglo-American legal history, government applications of the police power were marked by flexibility. *Id.* at p.15.

**Response:** Dispute. *See* Resp. to Statement 232.

258.     Throughout Anglo-American legal history, communities were able to adapt to changing circumstances and craft appropriate legislation to deal with shifting challenges. *Id.* at p.15.

**Response:** Dispute *See* Resp. to Statement 232.

259.     As compared to the Revolution-era drafters, who feared standing armies and sought to entrench civilian control of the military, the Constitution writers in the era of the Fourteenth Amendment were motivated by the proliferation of especially dangerous weapons. *Id.* at p.16.

**Response:** Dispute. *See* Resp. to Statement 232.

260.     The language of the right-to-bear-arms provisions in Reconstruction-era state constitutions began to reflect that the police power of the state could be used to regulate firearms. *Id.* at p.16.

**Response:** Dispute. *See* Resp. to Statement 232.

261.     The 1868 Texas Constitution included language that underscored the connection Anglo-American law had recognized between the right to keep and bear arms and the regulation of guns. *Id.* at p.16.

**Response:** Dispute. *See* Resp. to Statement 232. The language of the 1868 Texas Constitution speaks for itself.

262.     Sixteen state constitutions adopted during this period employed language acknowledging states' police power authority over firearms. *Id.* at p.16.

**Response:** Dispute. *See* Resp. to Statement 232. The language of these state constitutions speak for themselves.

263.     Driven in part by the violence of the Reconstruction period, post-Civil War legislatures also enacted a range of new laws to regulate arms. Exhibit 17 Cornell at p.17, 18.

**Response:** Dispute. *See* Resp. to Statement 232.

264.     The number of laws enacted regulating firearms increased by over four hundred percent from antebellum levels. *Id.* at p.17.

**Response:** Dispute. *See* Resp. to Statement 232.

265.     The Reconstruction period witnessed an intensification of firearms regulation. *Id.* at p.18.

**Response:** Dispute. *See* Resp. to Statement 232.

266.     Republicans in this time sought to protect the rights of African Americans to bear arms but were also insistent on enacting regulations aimed at public safety following the violence of the Reconstruction period. *Id.* at p.18.

**Response:** Dispute. *See* Resp. to Statement 232.

## The Advent of Semi-Automatic Weapons

267.     The first assault weapon or assault rifle was a German Sturmgewehr Model 1944 used by the German military in World War II.  Exhibit 5 Yurgealitis at p.11.

**Response:** Dispute. This is misleading to the extent it suggests "assault weapons" and "assault rifles" are the same things. Assault rifles are "short, compact, selective-fire weapons that fire a cartridge intermediate in power between submachine gun and rifle cartridges. In other words, assault rifles are battlefield rifles which can fire automatically." *See* Kopel, *supra* Resp. to

86

Statement 20, at 386 (quotation marks omitted). As defined by Cook County, "assault weapons" are not capable of automatic fire.

268.   A semiautomatic firearm utilizes the energy generated by firing a cartridge to power the firearm's cycle of fire and reload the next cartridge to be fired without any action by the user. This is in contrast to pump action, bolt action, or lever action weapons, all of which require the user to manually reload (by pumping a forearm piece or pulling a bolt or lever, e.g.) the next cartridge after firing. *Id.* at p.8–10.

**Response:** Admit.

269.   The assault weapons prohibited by the Ordinance were developed for use in war or are direct descendants of weapons developed for use in war. *Id.* at p.11–15, 19, 29.)

**Response:** Dispute. It is true that the AR-15 specifically is a semiautomatic version of the M16, but even that does not establish that the banned firearms "were developed for use in war." As Dennis Chapman has noted specifically regarding the AR-15, "None of its features are exclusively military in character, and those of its features that were most groundbreaking at the time of its development [the materials it uses and the ammunition it fires] owed their existence, not to the dictates of military procurement officers, but to the innovation of civilian firearms enthusiasts and engineers. The AR-15 is not a 'weapon of war.' What it is, rather, is a highly versatile general-purpose rifle well suited to most civilian shooting applications." Chapman, *supra* Resp. to Statement 9 at 95.

270.   Weapons designed for military use are designed to be maximally effective, i.e., to deliver reliable lethality or the ability to incapacitate a chosen target. *Id.* at p.21.)

**Response:** Dispute. Certain military firearms have applications that are not related to the ability to "deliver reliable lethality" or "incapacitate a chosen target." For instance, while the military generally discourages the use of fully automatic fire (because it is *ineffective* at delivering reliable

lethality), it is nevertheless useful in battlefield situations which call for "suppressing fire" intended to keep an enemy pinned down. *See* Chapman, THE AR-15 CONTROVERSY, *supra* Resp. to Statement 9 at 112-115.

271.     The assault weapons adopted by the U.S. military used 5.56mm/.223 caliber ammunition. *Id.* at p15.

**Response:** Dispute that the firearms used by the U.S. military are "assault weapons." *See* Resp. to Statement 267. Admit that the M-16 uses 5.56mm ammunition.

272.     The 5.56mm/.223 caliber ammunition is smaller and lighter than the ammunition used in rifles prior to the advent of assault weapons. *Id.* at p.15.

**Response:** Admit that the 5.56mm round is a smaller and lighter round that what was used in military rifles before the adoption of the M-16, dispute that it was lighter than all previous rifle ammunition. The .223 caliber round is based on a pre-existing rifle round of similar size—the .222 Remington. *See* Richard A. Mann, *The .223 Family Tree*, GUNDIGEST (June 3, 2022), https://bit.ly/43HXvYp, attached as Exhibit 83.

273.     The 5.56mm/.223 caliber ammunition allowed a soldier to carry more ammunition and allowed the firearms to accommodate larger capacity magazines. *Id.* at p.15,16.

**Response:** Admit.

274.     Despite being smaller, the 5.56mm/.223 caliber ammunition traveled with the same muzzle velocity as the larger ammunition—approximately 3,200 feet per second. *Id.* at p.16.

**Response:** Admit. Because energy is a function of both mass and velocity, the smaller rounds have lower energy than larger rounds with the same muzzle velocity. *See* Kopel, *supra* Resp. to Statement 23, at II.B.

275.     Typically, the 5.56mm/.223 caliber ammunition used in assault weapons will rotate on its axis ("yaw") when it hits human tissue. *Id.* at p.16.

**Response:** Dispute. *See* Resp. to Statement 66.

276. Handgun bullets travel at a lower velocity and do not typically experience yaw. *Id.* at p.16.

**Response:** Dispute. How bullets travel is dependent upon a number of variables, and this is too general a statement to adequately respond to.

277. When the military tested the 5.56mm/.223 caliber cartridge, they found that it had the capability to create a horrendous wound channel in a human target given the smaller size of the bullet. Exhibit 12 Yurgealitis Dep., 65:15-19.

**Response:** Dispute. Although there were initial reports, during field tests of M16s during the Vietnam War, of incredible wounding power of the 5.56mm round, the Army's Wound Ballistic Laboratory repeatedly tested the ammunition to try and duplicate the reported results and they were unable to do so. *See* Kopel, *supra* Resp. to Statement 23 at II.C. In the subsequent decades of military use, the much more common complaint has been that the cartridge is underpowered for military use. *See* Anthony F. Milavic, *It's the Cartridge, Stupid—Not the Rifle*, Proceedings, Vol. 128 (Aug. 2002), https://bit.ly/41lJdLj, attached as Exhibit 84; *see also* Resp. to Statement 4, 8, 57, 71, and 84

278. An M855A1 5.56mm/.223 caliber cartridge, which is used by the U.S. Army and readily available to the public, is capable of penetrating a concrete block at 20–40 yards and 3/8-inch-thick steel plate at 300 yards. Exhibit 5 Yurgealitis at p.30,31.

**Response:** Admit.

279. In 2017, a shooter at the Sutherland Springs Baptist Church killed 26 people by standing outside the church and shooting an AR-15 254 times through the walls of the building. Exhibit 4 Donohue at ¶ 60.

**Response:** Dispute. The Sutherland Springs Baptist Church shooter did fire his rifle at the outside

89

of the church, but that did not result in the deaths of the 26 victims. Professor Donohue cites no report that supports this claim (indeed, Professor Donohue himself does not make this claim but rather says that the shooter fired on the church from outside "on his way to killing 26 men, women, and children"). Defs.' Ex. 4, Donohue Decl. ¶ 60. Other reports make clear that the shooter entered the church before murdering victims inside. *See, e.g.*, Terence Cullen, *Survivors of Texas massacre recall moment gunman entered church*, DAILY NEWS (Nov. 7, 2017), https://bit.ly/40uXT9L, attached as Exhibit 85.

280.    Many of the features and accessories specifically banned by the Ordinance allow a shooter to more easily conceal and/ or stabilize a semi-automatic rifle. Exhibit 5 Yurgealitis at p.22–26.

**Response:** Dispute. *See* Resps. to Statements 20 and 22.

281.    The ability to fire an increased quantity of cartridges without reloading, which is afforded by a high-capacity magazine, increases the lethality and effectiveness of assault rifles. *Id.* at p.26.

**Response:** Dispute. *See* Resp. to Statement 22.

282.    Assault rifles were not designed for traditional hunting, nor was 5.56mm/.223 caliber ammunition. *Id.* at p.27.

**Response:** Admit to the extent this is referring to "assault rifles" meaning battlefield rifles capable of selective fire, but dispute to the extent it refers to so-called "assault weapons." *See* Resp. to Statement 268. As for the ammunition, as noted above, it was based on a varmint hunting cartridge, the .222 Remington. *See id.* at 270.

## Regulations on Firearms in the Late 19th Century and After

283.    At the beginning of the 20th century, changes in technology, consumer behavior, and society in the early decades of the 1900s created a novel gun-violence problem. Exhibit 17

Cornell at p.19.

**Response:** Dispute. Gun violence was not a novel problem. *See* Resp. to Statement 238; *see also id*. at 232.

284.     The emergence of fully automatic and semi-automatic weapons in the early decades of the twentieth century exacerbated urban crime. *Id.*

**Response:** Dispute. This statement is much too broad to permit an adequate response, but the rise in crime in the early 20th century was multicausal, with perhaps the most important contribution coming from the rise of organized crime as a result of prohibition. *See The FBI and the American Gangster, 1924-1938*, FBI, https://bit.ly/2UEWP1r, attached as Exhibit 86; *see also* Resp. to Statement 232.

285.     As rapid-fire weapons, including semi-automatic and fully automatic weapons proliferated and undermined public safety, new laws were crafted to mitigate their harms. *Id.*

**Response:** Dispute. Professor Cornell cites on this point a law from Michigan in 1927, which did not outlaw semiautomatics generally but instead targeted magazine capacity, prohibiting ownership of firearms capable of firing more than sixteen times without reloading. *See* 1929 Mich. Pub. Acts, Act No. 206 § 3, Comp. Laws 1929, 16751. This law, like the handful of other state laws that similarly restricted certain semiautomatic firearms, was not long lived. It was repealed in 1959 Mich. Pub. Acts 249, 250. *See* Resp. to Statement 232.

286.     Historically, legislation has only been deemed necessary once new weapons become popular enough to cause a problem that requires government action. *Id.*

**Response:** Dispute. As just noted, some states did target semiautomatic firearms with certain capacity, but those restrictions were almost all repealed. *See* Resp. to Statement 285; *see also* Resp. to Statement 232.

287.    Restrictions on weaponry have historically followed growing criminal abuse and social harm, rather than at the time these weapons are first introduced. Exhibit 4 Donohue at ¶ 32; Exhibit 17 Cornell at p.19.

**Response:** Dispute. *See* Resp. to Statement 286.

288.    Although fully automatic weapons like the Tommy gun became available for civilian purchase after World War I, they were not immediately perceived to present a sufficient public safety concern to prompt regulation. Exhibit 17 Cornell at p.19,20.

**Response:** Dispute. *See* Resp. to Statement 232.

289.    In the 1920s and 1930s weapons like the "Tommy gun" became a preferred weapon for gangsters. Exhibit 4 Donohue at ¶ 33.

**Response:** Admit. *See* Resp. to Statement 232.

290.    The first group of state restrictions on weapons deemed inappropriate for civilian use were adopted in the 1920s and 1930s. *Id.*

**Response:** Dispute. *See* Resp. to Statement 232.

291.    It was not until the mid-to-late 1920s, when fully automatic weapons became the preferred weapons for gangsters, that states moved to restrict them. Exhibit 17 Cornell at 20.

**Response:** Dispute. *See* Resp. to Statement 232.

292.    As states restricted fully automatic weapons in response to "gangsterism" in the 1920s, many semi-automatic weapons were also restricted. *Id.*

**Response:** Dispute. *See* Resp. to Statement 232 and 285.

293.    In the 1920s, multiple states passed new laws banning fully automatic machine guns. *Id.*

**Response:** Dispute. *See* Resp. to Statement 285; *see also* Resp. to Statement 232.

294.    By the early 1930s, more than half the states had passed some type of prohibition on fully automatic or semi-automatic weapons. *Id.*

**Response:** Dispute. This is seriously misleading, because it does not distinguish between laws that targeted both fully automatic and certain semiautomatic weapons, and those that targeted only fully automatic weapons. The rifles banned by the County are semiautomatic. *See* Resp. to Statement 232.

295.     Multiple states embraced the view that fully automatic and semi-automatic weapons should be classified as "machine guns" for legal purposes. *Id.*

**Response:** Dispute. *See* Resps. to Statements 285 and 294.

296.     A 1933 Minnesota law's definition of machine gun included "any firearm capable of automatically reloading after each shot is fired, whether firing singly by separate trigger pressure or firing continuously by continuous trigger pressure; which said firearm shall have been changed, altered, or modified to increase the magazine from the original design as manufactured by the manufacturers thereof, or by the addition thereto of extra and/or longer grips or stocks to accommodate such extra capacity, or by the addition, modification, and/or attachment thereto of any other device capable of increasing the magazine capacity thereof[.]" *Id.* at p.20,21.

**Response:** The law speaks for itself, and in fact shows that it was not a blanket restriction on semiautomatic firearms but was a restriction on magazine capacity. *See* Resp. to Statement 232.

297.     A 1934 South Dakota law defined machine guns as weapons "from which more than five shots or bullets may be rapidly, or automatically, or semi-automatically discharged from a magazine." *Id.* at p.21.

**Response:** Dispute. This quote misleadingly omits a crucial part of the statute, which targeted machine guns from which "more than five shots or bullets may be fired rapidly or automatically, or semiautomatically discharged from a magazine, *by a single function of the firing device*." 1933 S.D. Sess. Laws 245–47. As the full quote makes clear, this law targeted automatic firearms, as

we use that term today. It should also be noted that Professor Cornell's report on this particular point is very confused. The quotation above is actually from a 1933 South Dakota Law, but the citation he offers points to a 1934 South *Carolina* law regulating machine gun possession (which does not have the reference to "semi-automatically" that appears in the South Dakota law). *See* 1934 S.C. Acts 1288. *See* Resp. to Statement 232.

## The Rise of Assault Weapons in the United States

298.     In 1957, the Army invited Armalite's chief gun designer, Eugene Stoner, to produce a lightweight, high-velocity rifle that could operate in both semi- and fully-automatic modes with firepower capable of penetrating a steel helmet or standard body armor at 500 yards. Exhibit 4 Donohue at ¶¶ 96, 132.

**Response:** Plaintiffs presently lack knowledge and, on that basis, decline to dispute at this time.

299.     Stoner devised the AR-15 to meet these specifications. *Id.* at ¶ 96.

**Response:** Plaintiffs presently lack knowledge and, on that basis, decline to dispute at this time.

300.     One of its designers stated that the AR-15 assault rifle was originally engineered to generate "maximum wound effect." *Id.* at ¶ 101.

**Response:** Dispute. Rolling Stone provides no citation for the "maximum wound effect" quote in its article, and there is no evidence that Eugene Stoner, the designer of the ArmaLite AR-15 rifle, ever said that his design was engineered to generate "maximum wound effect." *See* Tim Dickinson, *All-American Killer: How the AR-15 Became Mass Shooters' Weapon of Choice*, Rolling Stone (Feb. 22, 2018), https://bit.ly/3H3VFXY, attached as Exhibit 87; *see also* Resps. to Statements 4, 8, 57, 71, and 87.

301.     A confidential ARPA report in July 1962 noted that the AR-15 was subject to comprehensive field evaluation under combat conditions in Vietnam and that the "lethality of the AR-15 and its reliability record were particularly impressive." *Id.* at ¶ 97.

**Response:** Dispute. *See* Resp. to Statement 277.

302. In December 1963 the Army adopted the AR-15 and rebranded it the M-16. *Id.* at

  ¶ 99; *see also* Exhibit 5 Yurgealitis at p.13,14.

**Response:** Admit, though this is misleading, since the AR-15 at the time was a military assault rifle

with selective fire capability, unlike the semiautomatic rifles banned by Cook County. By the time

the Army had adopted the M-16, the original design had already been sold to a new company, Colt,

and the semiautomatic, civilian design has since been adapted by many other manufacturers with

variations on the original design, meaning the firearms covered by the Cook County ban are

significantly different from the design adopted by the Army in 1963. *See* Greg Myre, A Brief History

Of The AR-15, NPR (Feb. 28, 2018), https://n.pr/2Ja5Ryr, attached as Exhibit 88.

303. Colt, a firearms manufacturer, proposed the sale of its assault rifles on the civilian market

  in 1963. Exhibit 5 Yurgealitis at p.17.

**Response:** Admit, though this is misleading, since Colt proposed the sale of a *semiautomatic*

*version* of the rifles in question in 1963. Completely distinct from the automatic M-16 sold to the

Army in 1963, the semiautomatic AR-15 was sold to law enforcement and to the general public.

*See* Myre, *supra* Resp. to Statement 302.

304. The civilian version of the assault rifles did not include the capability to fire fully automatic

  but maintained the same appearance, physical features, and semiautomatic rate of fire.

  Exhibit 4 Donohue at ¶ 100; Exhibit 5 Yurgealitis at p.17–18.

**Response:** Dispute to the extent the term "physical features" includes the internal components

necessary to permit automatic fire, which were included in the military M-16 rifle but not in the

civilian AR-15. Unlike the military M-16, the civilian AR-15 does not include "both semiautomatic

(i.e. autoloading) and fully automatic fire-control options" and so lacks the physical components,

like fire selectors, of the military M-16. *See M16 rifle*, Encyclopedia Britannica (May 25,

95

2022), https://bit.ly/40tupc7, attached as Exhibit 89.

305.    In the 1980s, sharp increases in crime occurred as more powerful weaponry started to proliferate and led to a second round of restrictions limiting magazine capacity and banning assault weapons. Exhibit 4 Donohue at ¶ 33.

**Response:** Dispute. "[D]ata from the Uniform Crime Reports (UCR) suggests only a mild increase in crime over this period, while the National Crime Survey (NCS) actually depicts lower levels of criminal activity," according to the National Bureau of Economic Research. Scott Boggess & John Bound, *Did Criminal Activity Increase During the 1980s? Comparisons Across Data Sources*, NAT'L BUREAU OF ECON. RES. (Aug. 1993), https://bit.ly/43NiDwl, attached as Exhibit 90. Additionally, increases in drug-related activity contributed significantly to arrests and incarcerations during the 1980s. Again, the NBER states, "During the latter part of the 1980s a dramatic increase in the number of arrests and incarcerations for drug law violations also played an important role," meaning changes in crime rates, if at all significant, must be attributed to drug activity and myriad other factors than changes in weaponry. *See id.* Moreover, the passage of the landmark Firearm Owners' Protection Act and other federal firearms legislation in the 1980's points to the loosening of firearms restrictions, rather than an increase in restrictions, during this period. *See* David Welna, *The Decades-Old Gun Ban That's Still On The Books*, NPR (Jan. 16, 2013), https://n.pr/41LAQbG, attached as Exhibit 91.

306.    The rise of mass shootings in the last decades of the twentieth century impacted firearms regulation. Exhibit 17 Cornell at p.21.

**Response:** Dispute. *See* Resp. to Statement 232.

307.    Defining "assault weapons" has been contentious issue in political debate over gun regulation. *Id.*

**Response:** Admit. *See* Resp. to Statement 84.

96

308.     Some in the gun rights community argue that "modern sporting rifles" share features with other guns including hunting rifles. *Id.* at p.22.

**Response:** Admit.

309.     Because of the propensity of the 5.56mm/.223 caliber round to create significant damage upon impacting living tissue, it is not generally considered nor favored as a hunting cartridge. Exhibit 5 Yurgealitis at p.17.

**Response:** Dispute. The 5.56mm/.223 caliber round is a "varmint" round, used for small game hunting and target shooting (as well as self-defense) but generally not favored for larger animal hunting because it is *insufficiently* damaging upon impact. *See* Resps. to Statements 4, 8, 57, and 71.

310.     The development of the AR-15 was tied to the strategic requirements of the American military to find a replacement for heavier World War II era rifles. Exhibit 17 Cornell at p.22.

**Response:** Admit, thought this omits important context. While the AR-15 was developed for use in the military, its only exclusively military attribute was selective fire capability. *See* Resp. to Statement 269.

311.     As social, economic, and technological changes have occurred, government has responded with evolving gun regulation. Exhibit 17 Cornell at p.26.

**Response:** Dispute. *See* Resp. to Statement 232.

312.     California banned assault weapons after the Stockton School Massacre in 1989, in which a gunman killed 5 children and injured 32 others in less than 3 minutes with an AK- 47-type assault rifle. *Id.* at p.21; Exhibit 3 Klarevas at ¶ 31.

**Response:**  Dispute that this is not a "fact" but rather a statement of the law. California's laws speak for themselves.

313.    New Jersey (1990), Hawaii (1992), Connecticut (1993), and Maryland (1994) passed assault weapons restrictions or bans soon after the Stockton Massacre. Exhibit 3 Klarevas at ¶ 31.

**Response:** Dispute that this is not a "fact" but rather a statement of the law. The States' laws speak for themselves.

314.    In September 1994, the United States Congress enacted a nationwide ban on assault weapons, which prohibited the manufacture, importation, possession, and transfer of assault weapons not legally owned prior to the date the law took effect. *Id.* at ¶ 33.

**Response:** Dispute that this is not a "fact" but rather a statement of the law. Federal law speaks for itself.

315.    The federal assault weapons ban included a 10-year sunset provision. Cognizant that the federal ban may be allowed to expire, Massachusetts and New York enacted their own state assault weapons bans prior to its expiration. *Id.* at ¶ 34.

**Response:** Dispute that this is not a "fact" but rather a statement of the law. Federal law speaks for itself.

316.    The District of Columbia enacted an assault weapons ban after the federal ban expired. *Id.* at ¶ 34.

**Response:** Dispute that this is not a "fact" but rather a statement of the law. The District of Columbia's ordinances speak for themselves.

317.    Currently eight state-level jurisdictions within the U.S. ban assault weapons: California, New Jersey, Hawaii (assault pistols only), Connecticut, Maryland, Massachusetts, New York, and the District of Columbia. *Id.* at ¶ 35.

**Response:** Dispute that this is not a "fact" but rather a statement of the law. The States' laws speak for themselves.

318.     California, New Jersey, and Hawaii's bans have been in place for over 30 years. *Id.* at ¶ 35.

**Response**: Dispute that this is not a "fact" but rather a statement of the law. The States' laws speak for themselves.

319.     Over a quarter of the U.S. population is subject to an assault weapons ban. *Id.* at ¶ 35.

**Response:** Admit.

320.     18 U.S.C. 924(c) provides an additional ten-year sentence for the use of a semi- automatic assault weapon during a crime of violence or drug trafficking offense. 18 U.S.C. 924(c).

**Response:** Dispute that this is not a "fact" but rather a statement of the law. The statute speaks for itself.

321.     Much of the current controversy over bans or restrictions on dangerous or unusual weapons revolves around the AR-15 and similar types of weapons. Exhibit 17 Cornell at p.22.

**Response:** Dispute. *See* Resp. to Statement 232. Plaintiffs note that whether a type of arm is "dangerous *and* unusual" (the County misstates the test in this factual assertion) is a legal inquiry, which the Supreme Court has addressed in detail and which does not permit the banning of any firearm that is "in common use today" for lawful purposes, which AR-15s "and similar types" undeniably are. *See Bruen*, 142 S. Ct. at 2143.

322.     The debate over restrictions on dangerous and unusual weapons focuses heavily on technological factors, which obscures the fact that legislative efforts to ban those weapons fit squarely within the long Anglo-American tradition of limiting public access to weapons capable of provoking terror. *Id.*

**Response:** Dispute. *See* Resps. to Statements 232 and 321.

323.     The statutes at issue in this case are analogous to a long-established tradition of firearms

99

regulation in America, beginning in the colonial period and stretching across time to the present. *Id.* at 26.

**Response:** Dispute. *See* Resps. to Statements 232 and 321.

324.  The maximum range of an M16 is 3,000 meters, and the effective range is 550 meters. Exhibit 5 Yurgealitis at p. 30. https://www.tecom.marines.mil/portals/120/docs/student%20materials/fmst%20manual/m16.doc.

**Response:** Admit.

325.  The civilian AR-15 in 5.56mm ammunition retains the same performance characteristics in terms of muzzle velocity, range, etc.) as the military M16. Exhibit 5 Yurgealitis at p.29.

**Response:** Dispute. While the specific characteristics listed are the same, the civilian AR-15 is materially different from the M-16 because of its inability to fire in automatic mode.

326.  The M-16 performing in semi-automatic mode fires at a rate of 45-65 rounds per minute. *Id.* at p.30.

**Response:** Admit. All semiautomatic firearms have the same inherent rate of fire because the number of bullets that exit the muzzle in a unit of time depends entirely on how fast its operator physically pulls the trigger: "Once one pulls the trigger and fires a round, another round loads itself and may be fired by another pull of the trigger." *See* Halbrook, *supra* Resp. to Statement 4, at 206. Consequently, the semiautomatic rifles banned by the City can shoot no faster than any other semiautomatic firearm. *See* Resps. to Statements 8 and 20.

327.  The M-16 performing in automatic mode fires at a rate of 150-200 rounds per minute. *Id.* at p.30.

**Response:** Admit that this is the "effective rate of fire" of an M-16 performing in automatic mode. However, it should be noted that an M-16 in automatic mode can actually fire much more

rapidly. If one just holds the trigger down, it is capable of firing 700-950 rounds per minute. *See M16 Rifle*, *supra* Resp. to Statement 304.

### The Challenge of Policing in Public Spaces

328.  There are more than 1,000 sworn staff under Chief Snelling's supervision, and he serves as the Incident Commander for all major events in Chicago, including protests, festivals, concerts, etc. Exhibit 10 Snelling at ¶ 6.

**Response:** Plaintiffs presently lack knowledge and, on that basis, decline to dispute at this time.

329.  Chief Snelling also ensures that the CPD assists the FBI and other law enforcement agencies in defending against international and domestic terrorism. *Id.* at ¶ 8.

**Response:** Plaintiffs presently lack knowledge and, on that basis, decline to dispute at this time.

330.  As a member of the CPD, Chief Snelling possesses decades of experience with firearms, including assault weapons. *Id.* at ¶ 10. He has been present on crime scenes involving individuals shot or murdered by assault weapons and regularly receives and reviews reports of shootings in Chicago involving assault weapons. *Id.*

**Response:** Plaintiffs presently lack knowledge and, on that basis, decline to dispute at this time.

331.  Chicago has experienced a significant increase in the number of shootings involving assault weapons in the last ten years, and CPD recovers assault weapons regularly. *Id.* at ¶ 11.

**Response:** Dispute, this claim leaves out important context. Assault weapons like the AR-15 are a minute portion of crime guns recovered in Chicago. *See* Resp. to Statement 213. For example, from 2013-2016, more than 90% of crime guns recovered were handguns. Rifles, by contrast, made up just 4.8% of recovered firearms. *Gun Trace Report 2017* at 9, CHI. POLICE DEP'T, https://bit.ly/2Jl3iM2, attached as Exhibit 92; *see also* Dep. Trans. of Sgt. Chris Imhof, 22:21–24, attached as Exhibit 93 (stating the majority of recovered firearms are handguns). Moreover, rifles made up only 4.5% of all recovered crime guns traced by the ATF in Chicago from 2017–2021,

and the ATF concluded that handguns were the most frequently traced type of crime gun in Chicago, making up over 80% of recovered crime guns. In the words of the Chicago Sun-Times, "The ATF report shows 9mm pistols — manufactured by Glock, Taurus and Smith & Wesson — were the firearms most often traced in Chicago." *See* Frank Main, *Shorter 'time-to-crime' for guns used in crimes in Chicago than in NY, LA, a sign of illegal trafficking, Justice Department says*, CHI. SUN-TIMES (Feb. 4, 2023), https://bit.ly/3N5wl7N, attached as Exhibit 95; *see also National Firearms Commerce and Trafficking Assessment (NFCTA): Crime Guns - Volume Two*, ATF (Feb. 2, 2023), https://bit.ly/3Lj3c7S, attached as Exhibit 94. Of the top 20 firearms seized by Chicago Police in 2014, *all 20* were handguns. *See* Sarah Kollmorgen, *supra* Resp. to Statement 213. That same year, "Chicago police recovered only three assault weapons associated with criminal incidents." *Id.*

332.     Gangs in particular seem to be in a race to procure assault weapons to intimidate other gangs or respond in kind to shootings involving assault weapons. *Id.* at ¶ 17.

**Response:** Dispute, *see* Resps. to Statements 215 and 331. Additionally, in its report on crime guns in Chicago, *The Trace* noted that "[t]he weapons of choice for gangs today are 9mm semiautomatic handguns, followed by .40 caliber and .45 caliber semiautomatics, says Thomas Ahern, an ATF senior agent based in Chicago. It makes sense then that those calibers account for about half of the crime guns recovered by police." Kollmorgen, *supra* Resp. to Statement 213. In fact, gangs are more focused on procuring handguns, which they illegally modify with "switches" that permit fully automatic fire. James Barlow, a firearms enforcement officer with the ATF, told NPR that "Chicago has one of the worst switch problems in the country," creating a correlation "between the rise in citywide mass shootings and the proliferation of switches." *See* Frank Main et al., *In Chicago, handguns turned into high-capacity machine guns fuel deadly violence*, NPR (Oct. 28, 2022), https://n.pr/3H6Jeuy, attached as Exhibit 96. But the "switch" problem is almost

entirely a *handgun* problem. "At least 643 of the 706 modified weapons recovered by the Chicago police between 2018 and last month were Glock handguns," *Ibid.* Recent gang violence, then, owes more to the race to procure handguns outfitted with illegal modifications than to any procurement of the firearms targeted by this law. *Ibid.*

333.     Gangs prefer assault weapons because they are more powerful and accurate, thus increasing the likelihood of fatalities. *Id.* at ¶ 17.

**Response:** Dispute, *see* Resps. to Statements 215, 331, and 332. Additionally, Phillip Cook, a Duke University economist specializing in gun violence, observes that handguns with illegal modifications are "especially attractive to gang members" over rifles because of the handguns' effectiveness and concealability. *See* Frank Main et al, *supra* Resp. to Statement 331. "I think Chicago has, of course, a lot of gang violence, sadly, so the gangs are well-informed about options when it comes to firepower," Cook noted, adding that handguns, unlike rifles, have become status symbols among the Chicago gang communities due to their ubiquity. *Ibid.*

334.     There has also been an increase over the last several years of social media posts, meant to intimidate others and/or glamorize gang violence, depicting individuals brandishing assault weapons. *Id.* at ¶ 17.

**Response:** Dispute. *See* Resps. to Statements 213, 215, 331, 332, and 333. Handguns are by far the most prevalent type of weapon in social media posts involving firearms. In one study analyzing Twitter posts involving firearms, researchers found that "semi-automatic handguns were the most common type of firearm representing 91.7% of all guns depicted," while posts featuring rifles made up only 3.6% of the pool. *See* Desmond U. Patton et al., *Guns on social media: complex interpretations of gun images posted by Chicago youth*, Palgrave Commc'ns at 5 (Oct. 15, 2019), https://go.nature.com/40v17tJ, attached as Exhibit 97.

335.     Assault rifles are the weapon of choice for mass shootings in public spaces, because they

allow a person to kill or injure as many people as possible in a short time, much more than with a handgun or non-semi-automatic rifle. *Id.* at ¶ 24.

**Response:** Dispute. As explained above, mass shootings, like other crimes, are most often committed with handguns, not "assault weapons." *See* Resps. to Statements 98 and 104. Additionally, "Six out of every 10 mass public shootings are carried out by handguns alone, while only one in 10 is committed with a rifle alone. *The Current Gun Debate: Mass Shootings*, THE HERITAGE FOUND. (Mar. 12, 2018), *https://*herit.ag/3mYGqZx, attached as Exhibit 98. Numerous mass public shooters have used handguns to kill or injure dozens of people. *See id.*

336.     Most officers do not carry assault weapons as part of their job duties, nor are they trained with them, so an officer first responding to an active shooter incident involving an assault weapon will have weaker firepower than the assailant. *Id.* at ¶ 20.

**Response:** Dispute. As discussed above, so-called "assault weapons" are not more powerful than other semiautomatic rifles and do not fire more dangerous ammunition. *See* Resps. to Statements 20, 22.

337.     CPD has thus adjusted its large event and domestic terrorism preparations to address assault weapons and mass shootings. *Id.* at ¶ 24.

**Response:** Plaintiffs presently lack knowledge and, on that basis, decline to dispute at this time.

338.     The rise in mass shootings and the increased prevalence of assault weapons has required CPD to dedicate increasingly large amounts of resources and time to securing public events and the general safety of the public. *Id.* at ¶ 25.

**Response:** Admit that CPD has dedicated increasingly large amounts of resources and time to securing public events and the general safety of the public, but dispute that change was necessitated by "increased prevalence" of so-called "assault weapons" which remain a small minority of the firearms used in crime. *See also* Resp. to Statement 330.

104

339.    No matter how prepared or well-equipped CPD is, it is virtually impossible to guarantee a

mass shooting with an assault weapon will be stopped. *Id.* at ¶ 28.

**Response:** *See* Resp. to Statement 231.


Dated: April 24, 2023                                    Respectfully Submitted,

                                                         /s/ David H. Thompson
David G. Sigale (Atty. ID# 6238103)                      David H. Thompson*
LAW FIRM OF DAVID G. SIGALE, P.C.                        Peter A. Patterson*
430 West Roosevelt Road                                  William V. Bergstrom*
Wheaton, IL 60187                                        COOPER & KIRK, PLLC
(630) 452-4547                                           1523 New Hampshire Ave., N.W.
dsigale@sigalelaw.com                                    Washington, D.C. 20036
                                                         (202) 220-9600
                                                         (202) 220-9601 (fax)
                                                         dthompson@cooperkirk.com
                                                         ppatterson@cooperkirk.com
                                                         wbergstrom@cooperkirk.com
                                                             *Admitted p*ro hac vice*

                                                         *Attorneys for Plaintiffs*