EXHIBIT 71

An official website of the United States government. Here's how you know

Home • Crime in the U.S. • 2019 • Crime in the U.S. 2019 • Tables • Expanded Homicide Data Table 8



U.S. DEPARTMENT OF JUSTICE • FEDERAL BUREAU OF INVESTIGATION • CRIMINAL JUSTICE INFORMATION SERVICES DIVISION

Criminal Justice Information Services Division | Feedback | Contact Us | Data Quality Guidelines | UCR Home

**Home** | **Offenses Known to Law Enforcement** | **Violent Crime** | **Property Crime** | **Clearances** | **Persons Arrested** | **Police Employee Data**

Expanded Homicide Data Table 8

**Murder Victims**
by Weapon, 2015–2019

Download Excel

| Weapons | 2015 | 2016 | 2017 | 2018 | 2019 |
|---|---|---|---|---|---|
| **Total** | **13,847** | **15,355** | **15,206** | **14,446** | **13,927** |
| Total firearms: | 9,143 | 10,398 | 11,014 | 10,445 | 10,258 |
|     Handguns | 6,194 | 6,778 | 7,052 | 6,683 | 6,368 |
|     Rifles | 215 | 300 | 389 | 305 | 364 |
|     Shotguns | 248 | 247 | 263 | 237 | 200 |
|     Other guns | 152 | 172 | 178 | 164 | 45 |
|     Firearms, type not stated | 2,334 | 2,901 | 3,132 | 3,056 | 3,281 |
| Knives or cutting instruments | 1,533 | 1,562 | 1,608 | 1,542 | 1,476 |
| Blunt objects (clubs, hammers, etc.) | 438 | 466 | 474 | 455 | 397 |
| Personal weapons (hands, fists, feet, etc.)[1] | 651 | 668 | 715 | 712 | 600 |
| Poison | 8 | 12 | 15 | 6 | 16 |
| Explosives | 1 | 1 | 0 | 4 | 3 |
| Fire | 63 | 78 | 93 | 76 | 81 |
| Narcotics | 70 | 119 | 112 | 102 | 93 |
| Drowning | 12 | 9 | 8 | 9 | 7 |
| Strangulation | 96 | 97 | 90 | 75 | 64 |
| Asphyxiation | 105 | 93 | 112 | 92 | 92 |
| Other weapons or weapons not stated | 1,727 | 1,852 | 965 | 928 | 840 |

- [1] Pushed is included in personal weapons.
- NOTE: The Uniform Crime Reporting Technical Refresh enables updating of prior years' crime data; therefore, data presented in this table may not match previously published data.

**Most Wanted**

Ten Most Wanted
Fugitives
Terrorism
Kidnappings / Missing Persons
Seeking Information
Bank Robbers
ECAP
ViCAP

**About**

Mission & Priorities
Leadership & Structure
Partnerships
Community Outreach
FAQs

**News**

Stories
Videos
Press Release
Speeches
Testimony
Podcasts and Radio
Photos
Español
Apps

**Resources**

Law Enforcement
Businesses
Victim Assistance
Reports & Publications

**What We Investigate**

Terrorism
Counterintelligence
Cyber Crime
Public Corruption
Civil Rights
Organized Crime
White-Collar Crime
Violent Crime
WMD

**Contact Us**

Field Offices
FBI Headquarters
Overseas Offices

**Services**

CJIS
CIRG
Laboratory Services
Training Academy
Operational Technology
Information Management

**FBI Jobs**

Submit a Tip
Crime Statistics
History
FOIPA
Scams & Safety
FBI Kids
FBI Tour

**Additional Resources**

Accessibility
eRulemaking
Freedom of Information / Privacy Act
Legal Notices
Legal Policies & Disclaimers
Privacy Policy
USA.gov
White House
No FEAR Act
Equal Opportunity



FEDERAL BUREAU OF INVESTIGATION



**FBI.gov Contact Center**

Email updates

# EXHIBIT 72

# Man wanted in officer's slaying dies in gunbattle

By RICH McKAY
SENTINEL STAFF WRITER

BEVILLE'S CORNER — A man wanted in the killing of a New Jersey police officer last week was slain during a gunfight Easter morning after a chase b... ... Hernand...

and abdomen, also wounding her partner before fleeing.

Hernando deputies called for backup as they began to pursue Marti and he sped off and shot at them, Bergen County, N.J., prosecutor John L. Molinelli said.

... drove northeast on State ... crossing from Hernando in ...

ment, Caruthers said. The chase covered about 20 miles, Hernando sheriff's officials said.

When the car stopped about 9:50 a.m., Marti got out with an AK-47 assault rifle and again shot at the deputies, officials said. He was shot several times by deputies, Caruthers said.

Marti was airlifted to a Lakeland hospital where he was pronounced...

**Violence Policy Center**

# "Officer Down"

## Assault Weapons and the War on Law Enforcement

# Rifle attack called officer's nightmare

B6 The Roanoke Times, Sunday, June 17, 2001

*Suspect brandished 9 mm 'Uzi-style' weapon, authorities say*

## Slain officer wanted shift with most action

ACTION FROM 1-A

In his application, Cudnik said he wanted to be a police officer because it was "one of the most mentally and physically challenging and emotionally rewarding vocations that I can aspire to."

... wanted to work when all the action was happening."

His personnel file showed no commendations. The only reprimand occurred in February 1995 when he was suspended for 60 days for leaving the scene of a three-car accident while off-duty, then failing to report his involvement in it.

Cudnick grew up in the Garfield Heights area and graduated from Parma Senior High School in 1967. He was the divorced father of three sons: Hilary Jr., 23, a Cleveland firefighter; Michael, 21, a student at the University of Dayton; and Daniel, 20, with the Coast Guard.

Even though he worked the grueling 8 p.m. to 4 a.m. shift in one of the city's toughest neighborhoods, Cudnik was a frequent presence at the bar, which opened at 6 a.m. to serve bacon and eggs to the no-nonsense working man's crowd at the nearby LTV Steel Co. mill.

"He was always here," said

**The Violence Policy Center (VPC)** is a national non-profit educational organization that conducts research and public education on firearms violence and provides information and analysis to policymakers, journalists, grassroots advocates, and the general public. The Center examines the role of firearms in America, analyzes trends and patterns in firearms violence, and works to develop policies to reduce gun-related death and injury.

This report was authored by VPC Legislative Director Kristen Rand and VPC Policy Analyst Marty Langley. It was edited by VPC Publications Coordinator Aimée Stenzel and VPC Executive Director Josh Sugarmann.

This study was funded in part with the support of The David Bohnett Foundation, The California Wellness Foundation, The George Gund Foundation, The Joyce Foundation, The John D. and Catherine T. MacArthur Foundation, and The Streisand Foundation. Past studies released by the VPC include:

- *Firearms Production in America 2002 Edition—A Listing of Firearm Manufacturers in America with Production Histories Broken Out by Firearm Type and Caliber* (March 2003)
- *"Just Like Bird Hunting"—The Threat to Civil Aviation from 50 Caliber Sniper Rifles* (January 2003)
- *When Men Murder Women: An Analysis of 2000 Homicide Data* (October 2002)
- *No Deal: The Drop in Federally Licensed Firearms Dealers in America* (September 2002)
- *Sitting Ducks—The Threat to the Chemical and Refinery Industry from 50 Caliber Sniper Rifles* (August 2002)
- *License to Kill IV: More Guns, More Crime* (June 2002)
- *American Roulette: The Untold Story of Murder-Suicide in the United States* (April 2002)
- *The U.S. Gun Industry and Others Unknown—Evidence Debunking the Gun Industry's Claim that Osama bin Laden Got His 50 Caliber Sniper Rifles from the U.S. Afghan-Aid Program* (February 2002)
- *"A .22 for Christmas"—How the Gun Industry Designs and Markets Firearms for Children and Youth* (December 2001)
- *Kids in the Line of Fire: Children, Handguns, and Homicide* (November 2001)
- *Unintended Consequences: Pro-Handgun Experts Prove That Handguns Are a Dangerous Choice For Self-Defense* (November 2001)
- *Voting from the Rooftops: How the Gun Industry Armed Osama bin Laden, Other Foreign and Domestic Terrorists, and Common Criminals with 50 Caliber Sniper Rifles* (October 2001)
- *Shot Full of Holes: Deconstructing John Ashcroft's Second Amendment* (July 2001)
- *Hispanics and Firearms Violence* (May 2001)
- *Where'd They Get Their Guns?—An Analysis of the Firearms Used in High-Profile Shootings, 1963 to 2001* (April 2001)
- *A Deadly Myth: Women, Handguns, and Self-Defense* (January 2001)
- *Handgun Licensing and Registration: What it Can and Cannot Do* (September 2000)
- *Pocket Rockets: The Gun Industry's Sale of Increased Killing Power* (July 2000)
- *Gunland USA: A State-by-State Ranking of Gun Shows, Gun Retailers, Machine Guns, and Gun Manufacturers* (June 2000)
- *Guns For Felons: How the NRA Works to Rearm Criminals* (March 2000)
- *One Shot, One Kill: Civilian Sales of Military Sniper Rifles* (May 1999)
- *Cease Fire: A Comprehensive Strategy to Reduce Firearms Violence* (Revised, October 1997)

Violence Policy Center
1140 19th Street, NW
Suite 600
Washington, DC 20036

202-822-8200 phone
202-822-8205 fax
www.vpc.org web

©May 2003
Violence Policy Center

# Introduction

In 1994, Congress passed, and President Clinton signed, a ban on the production of certain semiautomatic assault weapons as well as high-capacity ammunition magazines that hold more than 10 rounds.  The law banned specific assault weapons by name and also classified as assault weapons semiautomatic firearms that could accept a detachable ammunition magazine and had two additional assault weapon design characteristics.  The law is scheduled to end on September 13, 2004.

This study reveals the gun industry's efforts to evade the 1994 ban and documents the significant threat assault weapons still pose to law enforcement.  These facts make clear the need to not only renew, but also *strengthen*, the ban before it expires next year.  Legislation will soon be introduced in the U.S. Congress to accomplish this goal.  Without action this Congress, the 1994 law will expire in 2004.

Both President Bush and Attorney General Ashcroft have expressed support for the assault weapons ban.  President Bush's support for the ban has been longstanding. In October 2000, Bush campaign spokesperson Ray Sullivan told *Salon* magazine that he would expect then-candidate Bush to reauthorize the ban.[1]  That position was reiterated by Attorney General John Ashcroft during his confirmation hearings on January 17, 2001, when he stated, "It is my understanding that the president-elect of the United States has indicated his clear support for extending the assault weapon ban, and I would be pleased to move forward that position, and to support that as a policy of this president, and as a policy of the Justice Department."[2]  Most recently, in April of this year, White House spokesperson Scott McClellan told Knight Ridder news service, "The President supports the current law, and he supports reauthorization of the current law."[3]

This study contains three sections.  *Section One:  Assault Weapons, the Gun Industry, and Law Enforcement* reveals how the firearms industry has evaded the current ban, and how assault weapons continue to pose a stark threat to America's law enforcement personnel.  *Section Two:  Law Enforcement Officers Killed in the Line of Duty by Assault Weapons, 1998 Through 2001* is a chart listing the known incidents of police officers killed by assault weapons, including year, state, manufacturer, model of assault weapon, and caliber.  *Section Three:  Selected Incidents of Law Enforcement Officers Killed in the Line of Duty by Assault Weapons, 1998 Through*

---

[1]      Jake Tapper, "Gore Shoots Blanks on Guns," *Salon*, October 24, 2000.

[2]      "Day 2, Morning Session of a Hearing of the Senate Judiciary Committee," *Federal News Service*, January 17, 2001.

[3]      Shannon McCaffrey, "In Surprise Move, Bush Backs Renewing Ban on Assault Weapons," *Knight Ridder/Tribune News Services*, April 12, 2003.

*2001* offers expanded narratives for 15 of the law enforcement shootings that occurred during this period. Each narrative also includes a representative illustration of the model of assault weapon used in the shooting (each weapon shown is representative of the brand or model of assault weapon and may not be identical to the specific weapon used in the shooting detailed in the narrative).

## Section One: Assault Weapons, the Gun Industry, and Law Enforcement

### Assault Weapons: A Clear Threat to Law Enforcement

A primary stimulus for the 1994 law was the severe threat that assault weapons pose to law enforcement officers. Police and other law enforcement personnel were some of the first victims of the assault weapon trend that emerged in the 1980s. For example, in October 1984, a San Jose, California, police officer was gunned down with an UZI carbine. In a high-profile shootout in April 1986, two agents from the Federal Bureau of Investigation (FBI) were killed by robbery suspects wielding a Ruger Mini-14 assault rifle. Five other agents were wounded in the gun battle. As high-capacity assault weapons became more commonplace, police routinely complained that they were being outgunned by suspects. As a result, major law enforcement organizations supported passage of the 1994 federal assault weapons ban.

In 1995, the first full year in which the ban was implemented, police continued to be victims of assault weapons. Approximately one in 10 of the 74 law enforcement officers killed in the line of duty in 1995 was slain with a banned assault weapon.[4]

### The Gun Industry Evades the Law

Immediately after the 1994 law was enacted, the gun industry moved quickly to make slight, cosmetic design changes in their "post-ban" guns to evade the law, a tactic the industry dubbed "sporterization." Of the nine assault weapon brand/types listed by manufacturer in the law,[5] six of the brand/types have been re-marketed in new,

---

[4] *Cop Killers: Assault Weapon Attacks on America's Police*, Violence Policy Center, September 1995.

[5] The law states, "The term `semiautomatic assault weapon' means—(A) any of the firearms, or copies or duplicates of the firearms in any caliber, known as—(i) Norinco, Mitchell, and Poly Technologies Avtomat Kalashnikovs (all models); (ii) Action Arms Israeli Military Industries UZI and Galil; (iii) Beretta Ar70 (SC-70); (iv) Colt AR-15; (v) Fabrique National FN/FAL, FN/LAR, and

"sporterized" configurations.[6]  In fact, gunmakers openly boast of their ability to circumvent the assault weapons ban.  Their success is described in an August 2001 *Gun World* magazine article about the new Vepr II assault rifle, a "sporterized" version of the AK-47:

> In spite of assault rifle bans, bans on high capacity magazines, the rantings of the anti-gun media and the rifle's innate political incorrectness, the Kalashnikov [AK-47], in various forms and guises, has flourished.  Today there are probably more models, accessories and parts to choose from than ever before.

Equally blunt was an article in the May 2003 issue of *Gun World* reviewing the LE Tactical Carbine, a post-ban, "sporterized" AR-15 clone:

> Strange as it seems, despite the hit U.S. citizens took with the passage of the onerous crime bill of 1994 [which contained the federal assault weapons ban], ARs are far from dead.  Stunned momentarily, they sprang back with a vengeance and seem better than ever.  Purveyors abound producing post-ban ARs for civilians and pre-ban models for government and law enforcement agencies, and new companies are joining the fray.[7]

Just such a post-ban AR, the Bushmaster XM15 M4 A3 assault rifle, was used by the Washington, DC-area snipers to kill 10 and injure three in October 2002.  The Bushmaster is the poster child for the industry's success at evading the ban. The snipers' Bushmaster is even marketed as a "Post-Ban Carbine."  [Please see page four for catalog copy.]

The industry's efforts have been aided by the fact that not all assault weapons are covered by the 1994 ban.  For example, assault weapons with more conventional designs, such as the Ruger Mini-14, were not covered by the 1994 law—although gun experts define them as assault weapons.  Furthermore, any gun that was legally possessed as of the date the 1994 law took effect may still be legally possessed and

---

FNC; (vi) SWD —10, M-11/9, and M-12; (vii) Steyr AUG; (viii) INTRATEC TEC-9, TEC-DC9 and TEC-22; and (ix) revolving cylinder shotguns, such as (or similar to) the Street Sweeper and Striker 12…."

[6]     Assault weapons that have not been reintroduced are the Beretta AR70, Street Sweeper and Striker 12 assault shotguns (the latter two guns were re-classified by the Bureau of Alcohol, Tobacco, Firearms and Explosives (ATF) as subject to the strict regulations of the National Firearms Act of 1934), and Steyr AUG, although Steyr has begun marketing a new assault weapon—the Vector—that, like the AUG, is of a bullpup design.

[7]     "Rock River's LE Tactical Carbine," *Gun World* (May 2003), p. 50.



## 4 Bushmaster Rifles & Carbines   Internet: www.bushmaster.com

# Bushmaster XM15 M4 Type 16" Post-Ban Carbine...

**M4 Profile Barrel • Mini Y Comp Muzzle Brake • Fixed length BATF Approved Tele-style Stock**

A new model from Bushmaster in 2001, this XM15 E2S M4 Type Post-Ban Carbine features a lightweight 14.5" Barrel machined in the distinctive M4 profile with a permanently attached Mini Y Comp muzzle brake. This configuration yields a total barrel length of 16" to comply with Post-Ban regulations. A BATF approved fixed tele-style buttstock is added to complete the military look of this new carbine. The 14.5" barrel is chrome lined in both bore and chamber for maximum longevity and ease of maintenance. The barrel's button rifling, in a 1 x 9" right hand twist, will stabilize a wide range of currently available ammunition with bullet weights up to 69 grains. The M16A2 dual aperture, rear sight system offers both windage and elevation adjustments - elevation is calibrated from 300 to 800 meters. The two different apertures give either a short range, quick target acquisition sight picture or a smaller "peep" aperture for long distance accuracy. The tele-stock style buttstock is pinned and fixed in an "open" position and has been BATF approved for use on Post-Ban manufactured carbines.

As with all other Bushmasters, the forged 7075T6 aircraft quality aluminum receivers are finished in a non-reflective mil. spec. hard anodize for durability, and include all M16A2 design improvements such as cartridge case deflector, last round bolt hold-open and raised ridges for magazine release button protection. A mil. spec. manganese phosphate coating insures complete protection against corrosion or rust on barrel and other exposed steel parts. The M4-16" Carbine is shipped in a lockable, hard plastic case - complete with 10 round magazine, carrying sling, and Operator's Safety and Instruction Manual.

**BATF Approved, Fixed Position, Tele-Style Buttstock**

**M4 Profile Chrome Lined Barrel & Mini Y Comp Muzzle Brake** (permanently pinned and welded in place)

### SPECIFICATIONS:
**XM15 M4 Type 16" Post-Ban Carbine**

| | |
|---|---|
| Caliber | .223 Rem. (5.56 mm) |
| Mag. Capacity | Shipped with 10 round (accepts all M16 type) |
| Overall Length | 34.875 inches (88.6 cm) |
| Barrel Length | 16" total w. Mini Y Comp (40.6 cm) |
| Rifling | R.H. twist; 1 turn in 9" |
| Weight w/o magazine | 6.59 Lbs. (2.99 kg) |
| Mode of Operation | Gas Operated - Semi Automatic |

**Bushmaster XM15 E2S M4 Type 16" Post-Ban Carbine**
(Model Number PCWA2X 14M4MY)
**Call your FFL Dealer for Price.**
Shipped with 10 Round Magazine, Sling and Operator's Manual in Bushmaster's lockable rifle case.

This new carbine is also available in an "A3" type model including the Bushmaster Flat-top Upper Receiver and Removable A3 Carry Handle to offer you the ultimate in sight and scope mounting versatility.
**Call your FFL dealer for pricing on...**
**Model # PCWA3X 14M4MY**

**Bushmaster Value!...**
All complete Bushmaster Rifles and Carbines are shipped in this foam lined, hard plastic, lockable case.
**A $14.95 Value!**

**ORDERS 24 hrs.**
**1 800 998 7928**

*The Bushmaster XM15 used by the Washington, DC-area snipers to kill 10 and wound three in October 2002 is the poster child for the gun industry's cynical efforts to circumvent the federal assault weapons ban. Maine-based Bushmaster even advertises the gun—based on the banned Colt AR-15 assault rifle—as a "Post-Ban Carbine."*

4

transferred without restriction.  With respect to high-capacity ammunition magazines, manufacturers stockpiled thousands, or perhaps hundreds of thousands, of magazines before the ban took effect.  Those magazines—some of which can hold up to 75 rounds of ammunition—are still widely available.

### *Still a Threat to Police—One in Five Law Enforcement Officers Slain in the Line of Duty is Killed With an Assault Weapon*

The gun industry's evasion of the 1994 ban on assault weapons and high-capacity ammunition magazines continues to put law enforcement officers at extreme risk.  Using data obtained from the Federal Bureau of Investigation, the Violence Policy Center has determined that *at least 41 of the 211 law enforcement officers slain in the line of duty between January 1, 1998, and December 31, 2001, were killed with assault weapons*.[8]  *Using these figures, one in five law enforcement officers slain in the line of duty was killed with an assault weapon*.

While no comprehensive information is yet available for the years 2002 and 2003, it is clear that law enforcement personnel continue to be killed by assault weapons.  For example, on February 20, 2003, in Alexandria, Louisiana, two police officers were killed in an ambush with an AK-47-type assault rifle.  Anthony Molette, age 25, had a long criminal history, including a charge of attempted first-degree murder.  The day before the murders, Molette opened fire on an officer in his patrol car.  The officer was not hurt, but 18 to 20 rounds were fired into the vehicle.  Molette bragged to his friends about the shooting, prompting Alexandria police to search for him.  When officers arrived at Molette's residence to serve a warrant, Molette opened fire, fatally wounding Officers Charles Ezernack, age 26, and Jeremy "Jay" Carruth, age 29.  Molette was shot and killed as he charged two other police officers.[9]

The fact that from 1998 through 2001 one in five law enforcement officers slain in the line of duty was killed with an assault weapon indicates that the ban in its current form is inadequate to protect police and the public from the hazards presented by assault weapons.

---

[8]     The Federal Bureau of Investigation data does not identify the firearm used in some instances, in those cases the type of firearm is listed as "unknown."  Therefore, the number of law enforcement officers killed with assault weapons may actually be higher.  (This figure does not include the 72 law enforcement deaths that resulted from the events of September 11, 2001.  The foreword of the FBI's *Law Enforcement Officers Killed and Assaulted, 2001* states, "Because a catastrophe such as the September 11 attacks falls far outside the normal course of police experience, the FBI has not included those fatalities in the 2001 rate, trend, or disposition tables for to do so would skew the data and render analyses meaningless.")  The year 2001 is the most recent year for which complete information is available from the FBI.

[9]     "Police Killings Baffling," *State-Times/Morning Advocate*, February 22, 2003.

According to the Urban Institute's 1997 study of the effects of the 1994 ban,[10] "the relatively high use of assault weapons in murders of police suggests that police gun murders should be more sensitive to the effects of the ban than gun murders of civilians."  The stark reality that murders of law enforcement personnel committed with assault weapons have not abated demonstrates the need to not only renew, but significantly strengthen, the current ban.

---

[10]     Roth and Koper, *Impact Evaluation of the Public Safety and Recreational Firearms Use Protection Act of 1994 Final Report*, Urban Institute, March 13, 1997.

## Section Two:  Law Enforcement Officers Killed in the Line of Duty by Assault Weapons, 1998 Through 2001

| Year | State | Manufacturer | Model | Caliber |
|---|---|---|---|---|
| 1998 | Alaska | Colt | AR-15 | 7.62mm |
| | Georgia | Iver Johnson | M1 Carbine | .30 |
| | Oregon | Norinco | SKS[11] | 7.62mm |
| | New York | Unknown | MAC-11 | 9mm |
| | California | Armalite | M151A | .223 |
| | Mississippi | Colt | AR-15 | .223 |
| | Mississippi | Colt | AR-15 | .223 |
| | Michigan | DPMS, Inc. | AR-15 | .223 |
| | Florida | Unknown | SKS | 7.62mm |
| | Colorado | Unknown | SKS | 7.62mm |
| | Texas | Unknown | AR-15 | .223 |
| | Texas | Unknown | AR-15 | .223 |
| | Missouri | Unknown | MAK 90 | 7.62mm |
| | California | Ruger | Mini-14 | .223 |
| | Indiana | Norinco | SKS | 7.62mm |
| 1999 | California | Ferunion/Hungarian Arms | SA85 | 7.62mm |
| | Indiana | Norinco | SKS | 7.62mm |

---

[11]    The SKS is not banned by name under the 1994 federal assault weapons ban.  Only SKS rifles that were modified to be defined as an assault weapon under Section (B) of the law were affected by the ban.  Section (B) defines a "semiautomatic assault weapon" as "a semiautomatic rifle that has an ability to accept a detachable ammunition magazine and has at least 2 of—(i) a folding or telescoping stock; (ii) a pistol grip that protrudes conspicuously beneath the action of the weapon; (iii) a bayonet mount; (iv) a flash suppressor or threaded barrel designed to accommodate a flash suppressor; and (v) a grenade launcher…."  Legislation to be introduced this Congress would explicitly ban any SKS able to accept a detachable ammunition magazine.  Unless otherwise stated, the exact configuration of SKS weapons used in police shootings cited in this study cannot be determined.

| Year | State | Manufacturer | Model | Caliber |
|------|-------|--------------|-------|---------|
| | New Jersey | Intratec | TEC-9 | 9mm |
| | Arizona | Unknown | AK-47 | 7.62mm |
| | California | Norinco | MAK 90 | 7.62mm |
| | Oklahoma | Colt | AR-15 H-BAR | .223 |
| | Texas | Norinco | MAK 90 Sporter | 7.62mm |
| | Texas | Norinco | MAK 90 | 7.62mm |
| | Texas | Norinco | MAK 90 | 7.62mm |
| | Texas | Norinco | MAK 90 | 7.62mm |
| 2000 | North Carolina | Maadi | ARM | 7.62mm |
| | Georgia | Ruger | AR-15[12] | .223 |
| | California | Colt | CAR-15 | .223 |
| | Texas | Ruger | Mini-14 | .223 |
| | Georgia | Intratec | TEC-9 | 9mm |
| | Maryland | Unknown | M1 Carbine | .30 |
| 2001 | California | Unknown | AR-15 | .223 |
| | Florida | SWD, Inc. | M-11 | 9mm |
| | Indiana | Unknown | AK-47 | 7.62mm |
| | Kentucky | Underwood | M1 Carbine | .30 |
| | Kentucky | Underwood | M1 Carbine | .30 |
| | Michigan | Unknown | SKS | 7.62mm |
| | Tennessee | Maadi | MAK 90 | 7.62mm |
| | Texas | Unknown | M-11 | 9mm |
| | Texas | Norinco | SKS | 7.62mm |
| | Utah | Norinco | SKS | 7.62mm |

---

[12]     Inconsistency between manufacturer and weapon type from FBI data.

# Section Three:  Selected Incidents of Law Enforcement Officers Killed in the Line of Duty by Assault Weapons,[13] 1998 Through 2001

---

[13]     Each weapon shown is representative of the brand or model of assault weapon and is not a picture of the specific weapon used in the shooting described in the narrative.

**Date:** January 27, 1998

**Location:** Portland, Oregon

**Assault Weapon:** Norinco SKS 7.62mm rifle

On January 27, 1998, one police officer was killed and two were wounded with a Norinco SKS 7.62mm rifle. The officers, working on a drug investigation in Portland, entered the home of Steven Douglas Dons and were met with gunfire. Colleen Waibel, a six-year veteran, was hit with multiple gunshots, becoming the first female officer killed in the line of duty in Portland. Kim Keist, a 15-year veteran, was wounded in the chest and arm despite wearing a bullet-proof vest. A third officer was treated for a gunshot wound to the hand. A neighbor reported that Dons was known to have a large arsenal of weapons and that police had been called to the house weeks before on a complaint of weapons being fired. Dons committed suicide while awaiting trial.

Lauren Dodge, "Three Portland Officers Ambushed at House; One Dead, Two Wounded," *Associated Press*, January 28, 1998; "Victim, Husband Have Mixed Feelings Over Apparent Suicide of Suspect," *The Columbian*, February 26, 1998.



11

**Date:**                              April 25, 1998

**Location:**                          Millbrae, California

**Assault Weapon:**                    Armalite M151A .223 rifle

On April 25, 1998, one police officer was killed with an Armalite M151A .223 rifle.  Officer David Chetcuti responded to another officer's call for help in a traffic stop on the Millbrae Avenue off-ramp of U.S. 101.  Officer Seann Graham had pulled over Marvin Patrick Sullivan for not having a current registration sticker for his vehicle.  Sullivan, who was heavily armed and had bombs strapped to his body, opened fire, wounding Officer Chetcuti.  Chetcuti returned fire hitting the suspect once in the side before being killed by two shots to the head from close range.  Several of the bullets penetrated Chetcuti's bullet-proof vest, and more than 40 bullet casings were recovered at the scene.  Officer Graham escaped harm by diving into a drainage ditch.  Sullivan was arrested after leading several police cars in a chase across the San Mateo Bridge.  Sullivan has been repeatedly declared incompetent to stand trial, and sent to a California state mental hospital.

Tyche Hendricks and Jim Herron Zamora, "Cop Killing:  No Fremont Tie," *San Francisco Examiner*, April 27, 1998; "Judge: Man isn't competent; Defendant Sent Back to Hospital in Millbrae Cop Slaying Case," *San Jose Mercury News*, July 23, 2002.



**Date:**                               May 29, 1998

**Location:**                        Cortez, Colorado

**Assault Weapon:**         SKS 7.62mm rifle

On May 29, 1998, one police officer was killed and two were wounded with an SKS 7.62mm rifle. Officer Dale Claxton stopped a truck that had been reported stolen the day before. As Officer Claxton was checking the stolen truck's license plate, a passenger in the truck fired approximately 40 rounds through the front of Claxton's police cruiser. Montezuma County Sheriff's Deputy Jason Bishop responded to the radio call of an officer being shot, and was wounded as his cruiser was hit with approximately 40 more rounds from the SKS. Minutes later, Deputy Todd Martin was wounded in the left arm and right leg. The three suspects, described by authorities as "anti-government, end-of-the-world-fearing survivalists," escaped into Colorado. Two of the suspects were later found dead, while the third, Jason Wayne McVean, is still at large.

Greg Burton, "Posse Scours Badlands for 3 Cop Killers," *Salt Lake Tribune*, May 31, 1998; Julie Cart, "Answers Vanished Along With Four Corners Outlaw," *Los Angeles Times*, November 24, 1999.



**Date:**               July 7, 1998

**Location:**            San Benito, Texas

**Assault Weapon:**      AR-15 .223 rifle

On July 7, 1998, two U.S. Border Patrol agents were killed with an AR-15 .223 rifle. Ernie Moore, reportedly enraged over a broken love affair, shot and wounded Dan Morin, who had been dating Moore's former girlfriend, and killed Morin's mother and sister. Two hours later, a shootout ensued between Moore and police officers resulting in the death of two Border Patrol agents before Moore was fatally wounded. In addition to a cocaine habit, Moore had a history of emotional problems and displayed Nazi posters and photos of Adolf Hitler in his bedroom.

James Pinkerton, "Two Border Patrol Agents Are Slain During Rampage," *Houston Chronicle*, July 8, 1998; "Assault Rifle Costs Border Town $35M," *National Law Journal*, March 4, 2002.



**Date:** November 29, 1998

**Location:** Los Angeles, California

**Assault Weapon:** Ruger Mini-14 .223 rifle

On November 29, 1998, Los Angeles Police Department training officer Brian Brown was killed with a Ruger Mini-14 .223 rifle. Brown and his partner witnessed a drive-by shooting in Culver City and attempted to stop the suspects. The gunmen fired multiple rounds from the Mini-14, killing Officer Brown. Police shot and killed one of the suspects near the scene while the other managed to commandeer a taxi, leading police on a five-mile chase before also being fatally wounded.

Anthony Breznican, "Three Dead, Including Police Officer, During Violent Arrest for Drive-By Shooting," *Los Angeles Times*, December 1, 1998.



| | |
|---|---|
| **Date:** | January 10, 1999 |
| **Location:** | Oakland, California |
| **Assault Weapon:** | MAK-90 or SA85 7.62mm rifle |

On January 10, 1999, Officer James Williams was killed with a MAK-90 or SA85 7.62mm rifle. Officer Williams was among a group of officers who were searching for a rifle that had been discarded by the occupants of a vehicle that was involved in a chase with police. While they were searching for the rifle, a gunman opened fire from a nearby overpass, killing Officer Williams. Chad Rhodes was arrested and charged with special-circumstances murder, attempted murder, three counts of firing an assault weapon, and possessing an assault weapon. Rhodes pleaded guilty to second-degree murder and was sentenced to life in prison without parole.

Henry K. Lee, "Arrest in Oakland Sniper Slaying," *San Francisco Chronicle*, January 12, 1999; Henry K. Lee, "Sniper Suspect Enters Plea of Not Guilty," *San Francisco Chronicle*, February 6, 1999; "Man Pleads Guilty in Killing of Oakland Cop," *San Francisco Chronicle*, April 9, 2003.



**Date:** April 8, 1999

**Location:** Orange, New Jersey

**Assault Weapon:** TEC-9 9mm pistol

On April 8, 1999, Officer Joyce Carnegie was killed with a TEC-9 9mm pistol. Condell Woodson pleaded guilty to felony murder in the death of Officer Carnegie. Woodson claimed that his gun accidentally went off, shooting Carnegie in the head and abdomen as she was attempting to arrest Woodson for armed robbery. Woodson also pleaded guilty to robbery and weapons offenses. Carnegie was the second policewoman killed in the line of duty in New Jersey history.

Amy Westfeldt, "Man Pleads Guilty to Policewoman's Murder," *Associated Press*, May 13, 1999.



**Date:**               June 12, 1999

**Location:**           Orange County, California

**Assault Weapon:**     MAK-90 or SA85 7.62mm rifle

On June 12, 1999, Sheriff's Deputy Brad Riches was killed with a MAK-90 or SA85 7.62mm rifle.  Deputy Riches was sitting in his patrol car outside a 7-Eleven when his police cruiser was riddled with assault weapon fire.  The 7-Eleven clerk said that a customer told him he was carrying an AK-47-style assault rifle to shoot a police officer.  Maurice Steksal was convicted on November 19, 2002 of the first-degree murder of Deputy Riches.

Jack Leonard, "Thousands Pay Last Respects to Slain Deputy," *Los Angeles Times*, June 17, 1999; Greg Hardesty, "Laborer Guilty of Deputy's Murder," *Orange County Register*, November 20, 2002.



**Date:**                                January 27, 2000

**Location:**                          Lexington, North Carolina

**Assault Weapon:**               Maadi 7.62mm rifle

On January 27, 2000, Sheriff's Deputy Todd Cook was killed with a Maadi 7.62mm rifle. Deputy Cook was serving a warrant at the home of Christopher Lee Cooper who had been accused of trespassing and was also wanted by Lexington police for questioning about a statutory rape. Deputy Cook was shot at least five times from behind. After the shooting, Cooper led police on a car chase that ended when he crashed through a roadblock. Officers found Cooper dead in the car from a self-inflicted gunshot wound.

"Piedmont Community Mourns Loss of Slain Deputy," *Associated Press*, January 29, 2000.



19

**Date:**                               August 3, 2000

**Location:**                         San Marcos, Texas

**Assault Weapon:**            Ruger Mini-14 .223 rifle

On August 3, 2000, State Trooper Randall Vetter was killed with a Ruger Mini-14 .223 rifle. Trooper Vetter stopped 72-year-old Melvin Hale for not wearing his seat belt. Hale got out of his car and aimed his rifle at Vetter because he believed the traffic stop violated his constitutional rights. Vetter raised his pistol and ordered him to put down his gun. Hale fired at least twice, hitting Vetter in the head as he sat in his patrol car. Six months earlier, another San Marcos trooper had written a letter warning Hays County law enforcement officers to exercise caution around Hale. The trooper said Hale had threatened him with a rifle when he stopped at Hale's ranch to ask about deer hunting on the 125-acre property. Hale pleaded guilty to the shooting and was sentenced to life in prison.

Jason Spencer, "A Somber Salute for a Fallen Officer," *Austin American-Statesman*, August 9, 2000; "Trooper's Shooter Gets Life Sentence; 74-year-old Accepted Surprise Plea Agreement as Jury Selection Began," *Austin American-Statesman*, January 24, 2002.



**Date:**                          March 29, 2001

**Location:**                      San Antonio, Texas

**Assault Weapon:**                M-11 assault pistol

On March 29, 2001, San Antonio Police Officer Hector Garza, age 48, was shot and killed while responding to a domestic disturbance report. Jessica Garcia, age 21, had called police to ask for an officer's protection while she moved out of her home. When Garcia's husband, Frank, learned of her plans, he drove home and killed both Jessica and Officer Garza—a 25-year police veteran—by shooting them both in the head with an M-11 assault pistol. Frank Garcia, 28, was arrested at the scene and charged with two counts of capital murder and three counts of attempted murder. Garcia was convicted of the murders in February 2002.

Bill Hendricks, "Cop's Slaying Stuns City," *San Antonio Express-News*, March 30, 2001; "Garcia Gets Death Penalty; Cop Killer Sentenced," *San Antonio Express-News*, February 12, 2002.



21

| | |
|---|---|
| **Date:** | April 4, 2001 |
| **Location:** | Detroit, Michigan |
| **Assault Weapon:** | SKS assault rifle |

On April 4, 2001, Detroit Police Officer Neil Wells, age 41, was fatally shot during a drug raid at an abandoned apartment house. While on patrol, Wells and his partner received a complaint of drug sales at the building. When the officers arrived, the gunman was waiting in ambush behind a door. Wells was shot twice at close range with an SKS assault rifle. Lamont Smith, age 21, was charged with murder and felony firearm violations. Smith was convicted of second degree murder and sentenced to 60 to 90 years in prison.

Norman Sinclair, "Gun Owner Sought in Cop's Killing," *The Detroit News*, April 8, 2001; "Man Given 60-90 Years in Cop Killing," *Detroit Free Press*, January 16, 2002.



**Date:**                            September 6, 2001

**Location:**                        Hamilton County, Tennessee

**Assault Weapon:**                  MAK 90 assault rifle

On September 6, 2001, Hamilton County Sheriff's Deputy Donald Bond, age 35, was shot and killed when he stopped at a fruit and vegetable stand to check on a suspicious vehicle. When Deputy Bond did not respond to a 2:18 AM call from his dispatcher, an alert was sent out to locate him. A fellow deputy found Bond dead beside his patrol car, shot multiple times with an MAK 90 assault rifle. Later that morning, acting on a tip, a SWAT team evacuated the suspect's street and waited for a chance to make an arrest. After observing Marlon Duane Kiser, age 31, throw out a front panel of body armor and Deputy Bond's service weapon, police arrested Kiser and charged him with first-degree murder. Kiser is awaiting trial in the case.

Mike O'Neal and Gary Tanner, "Suspect Held in Deputy's Death," *Chattanooga Times Free Press*, September 7, 2001; "Law Enforcement Officers Killed and Assaulted, 2001," Federal Bureau of Investigation; "Courts News Digest," *Chattanooga Times Free Press*, February 18, 2003.



**Date:** September 17, 2001

**Location:** Indianapolis, Indiana

**Assault Weapon:** AK-47 assault rifle

On September 17, 2001, Marion County Sheriff's Deputy Jason Baker, age 24, was killed during a car chase and gun battle. On his way to a report of a domestic dispute, Deputy Baker tried to make a traffic stop. The driver refused to stop and a chase ensued. Allen Dumperth, a convicted felon, and Michael Shannon, both age 20, fired at Baker from their fleeing car. When Baker's fellow officers found him, he was dead from a gunshot wound to the head. The front and rear windows of his patrol car were shot out. After crashing his car, Dumperth was shot and killed by members of the police SWAT team. Shannon later pleaded guilty in court to shooting Deputy Baker.

Vic Ryckaert, "Role in Deputy Death Brings 40 Years; 21-Year-Old Bought the Assault Rifles Used by 2 Men Accused in Slaying of Jason Baker," *Indianapolis Star*, April 11, 2002.



**Date:**                                November 13, 2001

**Location:**                        Nicholasville, Kentucky

**Assault Weapon:**            M1 Carbine

Jessamine County Sheriff's Deputies Billy Ray Walls, age 28, and Chuck Morgan, age 51, were shot and killed, and another deputy was wounded, when they tried to serve a warrant for misdemeanor terroristic-threatening to Phillip Walker, age 75, on his drydocked houseboat. Walker had threatened to kill a family member with a gun. While in the houseboat with the deputies, Walker fired 11 shots from a 30-caliber M1 Carbine, killing Deputy Walls and fatally injuring Deputy Morgan. Walker was killed in the gun battle.

Greg Kocher, "Man Who Killed Deputy Fired 11 Times Police Say," *Lexington Herald Leader*, November 15, 2001.



M1 Cal. .30 Carbine

M1A1 Cal. .30 Carbine with folding metal stock

25

## About the Violence Policy Center

The Violence Policy Center (VPC) is a national nonprofit educational organization working to reduce death and injury from firearms. As America's premier think tank on gun policy, the VPC studies current firearms issues and provides information to policymakers, journalists, public health professionals, and grassroots activists.

The virtually unrestricted distribution of firearms is more than a crime problem, it is a national health crisis. Unlike every other consumer product, firearms are exempt from federal health and safety laws. Guns—especially handguns and assault weapons—are inherently dangerous products, and the failure to regulate them like all other products costs thousands of lives and billions of dollars every year. By conducting research on key issues in firearms policy, the VPC counters the gun lobby's distortions and brings hard facts to the debate over firearms death and injury.

 **Violence Policy Center**      www.vpc.org

# EXHIBIT 73

VIDEO     LIVE     SHOWS     CLIMATE                    LOG IN     | Stream on hulu

# Nashville police officers speak about response to mass shooting: 'Training is what kicked in'

"All of us stepped over a victim," an officer said at a news conference.

By **Teddy Grant** and **Alexandra Faul**

April 4, 2023, 7:00 PM

   

Hero officers speak publicly for 1st time after taking down Nashville shooter
Jeff Mathes, Michael Colazzo and Rex Engelbert's actions have been co...                        Read More

The Metro Nashville Police Department officers who ended the mass shooting at a private Christian school in Tennessee that left six people dead cited their police training on how they responded to the scene.

Detective Sgt. Jeff Mathes, Detective Michael Collazo and officer Rex Engelbert started a press conference Tuesday by offering condolences to the families. They all described how it was luck that they were all in the area last week to respond to the call for an active shooter.

The officers thanked the community for the outpouring of support received following the March 27 shooting at The Covenant School that left three children and three adults dead.



Children from The Covenant School, a private Christian school in Nashville, Tenn., hold hands as they are taken to a reunification site at the Woodmont Baptis... Show more⌄

Jonathan Mattise/AP

---

MORE: Nashville school shooting suspect owned 7 legal guns, police say

---

According to Nashville police, after the shooter, identified by police as 28-year-old Audrey Hale, opened fire at the school, responding officers shot and killed the suspect about 14 minutes after the initial 911 call was received.

Commander Dayton Wheeler, who also responded to the shooting, described the day as something he would never forget, saying that his "stomach dropped" when he realized the emergency calls that he received about a shooting were at a school.

Detective Sgt. Mathes and three of the detectives from his unit were among the first to enter the school on the morning of the shooting.

Mathes was in his office when he received a call about an active shooter. He and his team raced out the door, donned their ballistic protection, grabbed his shotgun and went into the building.

He described how his training kicked in, recounting how he had to block out the sadness of stepping over a victim to neutralize the threat.

"All of us stepped over a victim. I, to this day, don't know how I did that morally, but training is what kicked in," Mathes said.

According to the Mathes, he entered the school with "purpose" because he knew how serious the situation was based on the number of calls about a shooting.

"We just heard the sounds and from my training experiences, I knew those sounds to be rifles," Mathes said.



A police officer walks by an entrance to The Covenant School after a shooting, March 27, 2023, in Nashville, Tenn.

John Amis/AP

Officer Engelbert said he had to go to the Metro Police Academy for business, which put him in the Midtown section of the city at the time of the shooting.

"I really had no business being where I was. I think you can call it fate or God or whatever you want, but I can't count on both my hands the irregularities that put me in that position when a call for service came out for a deadly aggression at a school," Engelbert said.

Detective Collazo, who works for Mathes, said he was completing administrative tasks when the call of the active shooter came in.

Upon arrival, Collazo encountered two employees of the school who led him toward where the shooter entered the building. He found custodian 62-year-old Mike Hill, one of the victims of the shooting, on the ground not moving.

---

MORE: Nashville shooting timeline: How the massacre unfolded at the Covenant School

---

Police released body camera footage from Collazo, a nine-year veteran, and Engelbert, a four-year veteran, on March 28, which showed them firing at the suspect.

Police have identified the slain children as 9-year-old students Evelyn Dieckhaus, William Kinney and Hallie Scruggs. In addition to Hill, the two other adult victims were 60-year-old head of school Katherine Koonce and 61-year-old substitute teacher Cynthia Peak.

*ABC News' Morgan Winsor and Emily Shapiro contributed to this report.*

## Related Topics

Nashville School Shooting



This Year's Kia Lineup Is Turning Heads -- And Finally On Sale!
Best Kia Deals | Search Ads

Tori Roloff Confirms Sad Family News
Pens and Patron

All Americans Are Replacing Ac's with This Tiny Cooler
Top Gadget World

K-pop star Moon Bin found dead at home

Man allegedly guns down parents and their 2 friends days after his release from prison

Thefts prompt 17 states to urge recall of Kia, Hyundai cars

The Volkswagen Bus Is Back With A Vengance
The New VW Bus

They're Not Scrubs. They're FIGS.
FIGS

Shop Now

Prince William and Prince Harry's "forgotten" stepsister
Royal Sister

Promoted Links by Taboola

ABC News Network | Privacy Policy | Your US State Privacy Rights | Children's Online Privacy Policy | Interest-Based Ads | About Nielsen Measurement
Terms of Use | Do Not Sell or Share My Personal Information | Contact Us

Copyright © 2023 ABC News Internet Ventures. All rights reserved.

EXHIBIT 74

NUMBERS, FACTS AND TRENDS SHAPING YOUR WORLD    NEWSLETTERS | PRESS | DONATE | MY ACCOUNT | CONTACTED BY US?

Read our research on: Congress | Economy | Gender

## Pew Research Center

Search pewresearch.org...

RESEARCH TOPICS ▾    ALL PUBLICATIONS    METHODS    SHORT READS    TOOLS & RESOURCES    EXPERTS    ABOUT

Home › Research Topics › Other Topics › Occupational Groups › Police

REPORT  |  JANUARY 11, 2017



BEHIND THE BADGE

# 6. Police views, public views

BY **RICH MORIN**, **KIM PARKER**, **RENEE STEPLER** AND **ANDREW MERCER**

Police and the public hold sharply different views about key aspects of policing as well as on some major policy issues facing the country. For example, most police say more officers are needed to adequately patrol their communities, while the majority of the public doesn't think more officers are necessary. A majority of officers oppose a ban on assault-style weapons, while a majority of the public favors a ban on these weapons. More than eight-in-ten police say people don't understand the risks and rewards of police work well, while an equally large majority of the public says they do.

At the same time, there are areas of broad agreement between officers and the public. Majorities of the police and public favor the use of body cameras by officers to record interactions with the public. Large majorities of police and the public also support easing some legal restrictions on marijuana, though the public is more likely than officers to support the legalization of marijuana for both personal and medical use (49% vs. 32%).

**Police, public differ on perceptions of deadly black-police encounters**

*% saying the deaths of blacks during encounters with police in recent years are ...*

Isolated incidents    Signs of a broader problem

These contrasting views and striking similarities emerge from two surveys, one of 7,917 sworn police officers conducted online May 19-Aug. 14, 2016, and the other a nationally representative survey of 4,538 adults conducted Aug. 16-Sept. 12, 2016, by mail and online. The surveys included a number of identically worded questions, which allowed for direct comparisons of how officers and the public see the role of the police in their communities and how they view recent deaths of blacks during encounters with police, as well as to capture their views on some major policy issues, including gun control, the use of body cameras by officers and assessments of racial progress.

Some of the sharpest differences between the police and the public emerge over views on deaths of blacks during encounters with police in recent years and the protests that many of those incidents ignited. For example, 67% of the police but only 39% of the public describe these deadly encounters as isolated incidents rather than signs of a broader problem between blacks and police. When this overall finding is analyzed by race, an equally striking result snaps into focus: About seven-in-ten white officers (72%) but fewer than half of all black officers see these encounters as isolated incidents. By contrast, majorities of black officers (57%) as well as the public overall (60%) say the incidents are signs of a broader problem between police and the black community.

When the subject shifts to overall views on racial progress, large differences again emerge between the public and the police and also between blacks and whites within each group. For example, when police and the public are asked if the country has made the changes needed to give blacks equal rights with whites, fully eight-in-ten police officers – including 92% of white officers but only 29% of black officers – say the necessary changes have been made. By contrast, about half (48%) of the public, including 57% of whites but only 12% of blacks, says the country has made the changes needed for blacks to have equal rights with whites.



**Protectors or enforcers? Majority of officers, half of public say police are both**

*% of officers and the public saying they see themselves/see their local police more as ...*

Note: No answer category not shown.
Source: Survey of law enforcement officers conducted May 19-Aug. 14, 2016; survey of U.S. adults conducted Aug. 16-Sept. 12, 2016.
"Behind the Badge"

**PEW RESEARCH CENTER**

The remainder of this chapter examines these and other related findings in greater detail. The first sections compare and contrast police and public views on the role of police in the community and how each group views the risks and rewards of police work. The next sections describe how each group views recent deadly encounters between police and blacks and also examines police and public attitudes toward the protests that followed many of these incidents. The final section examines police and public attitudes on some current issues relevant to law enforcement, including gun policy, legalization of marijuana and racial equality.

## How the public sees the police, how police see themselves

Protectors, enforcers or both – what do Americans see when they look at their local police? And do their perceptions of the police align with what officers say is their primary role?

Overall, about six-in-ten (62%) officers say their primary role is to serve as both protectors and enforcers; among the public, about half (53%) view their local police this way.



At the same time, three-in-ten officers (31%) say their primary role is to serve as protectors, about twice the share of the public (16%) who see their local police in that way.

An even larger disparity between police-public views emerges over the enforcement role of police. Only 8% of officers say they mainly see themselves as enforcers – the long arm of the law – yet fully three times the share of the public (29%) see their local police that way.

This disparity over how the public views police and how officers see their role is partially explained by race. Blacks are significantly more likely than whites to see their local police as mainly enforcers (39% vs. 26%) and less likely to see officers as both protectors and enforcers (43% vs. 57%).



**Among blacks, police and public have different views of role of police**

*% saying they see themselves/see their local police more as ...*

Legend: ■ Protectors ■ Enforcers ■ Both equally

*Among whites*

| | Protectors | Enforcers | Both equally |
|---|---|---|---|
| Officers | 32 | 9 | 59 |
| Public | 17 | 26 | 57 |

*Among blacks*

| | Protectors | Enforcers | Both equally |
|---|---|---|---|
| Officers | 27 | 4 | 69 |
| Public | 14 | 39 | 43 |

*Among Hispanics*

| | Protectors | Enforcers | Both equally |
|---|---|---|---|
| Officers | 28 | 7 | 65 |
| Public | 14 | 33 | 46 |

Note: No answer category not shown. Whites and blacks include only non-Hispanics. Hispanics are of any race.
Source: Survey of law enforcement officers conducted May 19-Aug. 14, 2016; survey of U.S. adults conducted Aug. 16-Sept. 12, 2016. "Behind the Badge"

**PEW RESEARCH CENTER**

Overall, 46% of Hispanic adults see police in their community as both enforcers and protectors, while 33% view them as enforcers and 14% as protectors. Among Hispanic officers, about two-thirds (65%) see their role to be both protectors and enforcers, while 7% say they are enforcers and 28% consider themselves to be protectors.

## Contrasting views on size of police force

When it comes to manpower, police are unequivocal: More than eight-in-ten officers (86%) say their department does not have enough police to adequately patrol their community. By contrast, a majority of the public (57%) wants no change in the size of the local police force. About a third of the public (34%) want more officers in their local area, and 8% favor fewer officers.



**Americans who see local police as enforcers less likely to want a greater police presence**

*% saying they would like to see a ____ police force in their local area, among the public who view local police more as protectors/enforcers/both equally*



Among the public, these differences are linked, in part, to how they see their local police. Among those who view the local police as mainly being enforcers, a quarter say they want more officers and 19% would favor a smaller police department. The remaining 54% favor no change.



**Do Americans understand the challenges police face? Public says yes, police say no**

*% of public saying they understand the risks and challenges that police face on the job ...*



At the same time, roughly a third (36%) of those who see the police as both protectors and enforcers would prefer to see more officers. Only 4% favor a smaller force, while 59% prefer the current level of policing. Similarly, about a third of those who view their police as protectors (30%) favor a larger police presence, 11% would like a smaller force and 59% prefer no change. (The views of police on whether there are enough officers in their

communities are far more unequivocal: About eight-in-ten or more in each group says their department falls short of having the number of officers their community needs.)

## Police work: Great risks, great frustrations

The overwhelming majority of Americans say they understand the risks and challenges that police face. And an equally lopsided share of police disagrees.

Fully eight-in-ten Americans (83%) say they understand the risks and challenges of police work – including 38% who believe they understand the risks very well. By contrast, fully 86% of the police say the public does not fully comprehend the trials that officers face – including 40% who say Americans don't understand well at all the risks and challenges of police work.

Another survey finding provides a striking example of an apparent disconnect between what the public thinks police work is like and the reality of law enforcement.

Perhaps influenced by popular television police dramas that routinely feature vividly choreographed shootouts, more than eight-in-ten Americans (83%) believe that typical police officers fire their service weapon while on duty at least once in their career – and about three-in-ten (31%) believe police discharge their weapon at least a few times a year.

In fact, only about a quarter of all officers (27%) say they have ever fired their service weapon.[14]

### Police work more dangerous, more frustrating



Officers more worried about their personal safety on the job

*% saying they ___ have serious concerns about their physical safety when they are at work*

| | Nearly always/ Often | Sometimes | Hardly ever/ Never |
|---|---|---|---|
| Officers | 42 | 42 | 16 |
| All employed | 14 | 19 | 67 |

Note: No answer category not shown.
Source: Survey of law enforcement officers conducted May 19-Aug. 14, 2016; survey of U.S. adults conducted Aug. 16-Sept. 12, 2016. "Behind the Badge"
PEW RESEARCH CENTER

But how do police view the risks and rewards of their work, and how do those views differ from Americans in other occupations? To partially answer those questions, the surveys asked officers and employed Americans how often they worried about their physical safety

while at work, how often their job made them feel frustrated and how often it made them feel fulfilled.

Average police officers are three times as likely as workers overall to say they nearly always or often have serious concerns about their physical safety while on the job (42% vs. 14%). Employed Americans, meanwhile, are about four times as likely as officers on average to say they hardly ever or never seriously worry about their physical well-being at work (67% vs. 16%).



**Police work: More frustrating, less fulfilling than most other jobs**

*% saying their work nearly always or often makes them feel ...*

Officers ■ All employed

Frustrated
Officers: 51
All employed: 29

Fulfilled
Officers: 42
All employed: 52

Source: Survey of law enforcement officers conducted May 19-Aug. 14, 2016; survey of U.S. adults conducted Aug. 16-Sept. 12, 2016, "Behind the Badge"

PEW RESEARCH CENTER

Officers also are more likely on average than employed Americans overall to say their jobs frequently make them feel frustrated and somewhat less likely to feel fulfilled by their work. Half (51%) of officers say their job nearly always or often frustrates them, compared with 29% of all workers. A larger share of white officers report feeling frustrated by their job than do white workers overall (54% vs. 28%).

At the same time, about four-in-ten officers (42%) say their work frequently makes them feel fulfilled, compared with half of employed adults (52%) who feel that way. There was no significant difference between white and black officers.

## Officers, public agree that police work is more difficult now

**Officers say policing is harder now, public views it as more dangerous**

*% of officers saying high-profile incidents involving police and blacks have made their job ...*

■ Harder   ■ Easier*   ■ No difference

| 86 | 12 |

*Less than 0.5%

*% of public saying policing is ___ compared with five years ago*

■ More dangerous   ■ Less dangerous   ■ About the same

| 70 | 6 | 24 |

Note: No answer category not shown.
Source: Survey of law enforcement officers conducted May 19-Aug. 14, 2016; survey of U.S. adults conducted Aug. 16-Sept. 12, 2016. "Behind the Badge"

PEW RESEARCH CENTER

The public and officers agree that recent deaths of blacks during incidents with police and the protests they have sparked have added to the challenges of police work. More than eight-in-ten officers (86%) say their job is harder now as a result of the protests. At the same time, seven-in-ten Americans believe police work has become more dangerous in the past five years.

On both measures, solid majorities of whites and blacks agree police work is harder now, though whites are more likely than blacks to say policing has become more challenging. About nine-in-ten white officers (89%) and 81% of black police say their job has gotten harder. Similarly, roughly three-quarters of whites (74%) in the general population and 60% of blacks say policing has become more hazardous in recent years.

## Public, police see deadly police-black encounters differently



**Majority of police say fatal police-black encounters are isolated incidents; majority of the public says the encounters point to a bigger problem**

*% saying the deaths of blacks during encounters with police in recent years are ...*

|  | Isolated incidents | Signs of a broader problem |
|---|---|---|
| Officers | 67 | 31 |
| Public | 39 | 60 |

Note: No answer category not shown.
Source: Survey of law enforcement officers conducted May 19-Aug. 14, 2016; survey of U.S. adults conducted Aug. 16-Sept. 12, 2016. "Behind the Badge"
**PEW RESEARCH CENTER**

Police and the public describe the recent fatal incidents involving blacks and the police in very different ways.

Roughly two-thirds of the police (67%) say these deadly encounters are isolated incidents, while about three-in-ten (31%) say they are signs of serious problems between law enforcement and the black community. But when the public is asked to consider these incidents, the result is virtually reversed: Six-in-ten say these encounters are signs of a broader problem, while 39% describe them as isolated incidents.



**Large racial differences on perceptions of deadly black-police encounters among police, the public**

*% saying the deaths of blacks during encounters with police in recent years are ...*

■ Isolated incidents ■ Signs of a broader problem

Among whites

| | Isolated incidents | Signs of a broader problem |
|---|---|---|
| Officers | 72 | 27 |
| Public | 44 | 54 |

Among blacks

| | Isolated incidents | Signs of a broader problem |
|---|---|---|
| Officers | 43 | 57 |
| Public | 18 | 79 |

Note: No answer category not shown. Whites and blacks include only non-Hispanics.
Source: Survey of law enforcement officers conducted May 19-Aug. 14, 2016; survey of U.S. adults conducted Aug. 16-Sept. 12, 2016. "Behind the Badge"
**PEW RESEARCH CENTER**

These differences grow sharper when race is added to the analysis. Black and white officers see these incidents very differently, as do whites and blacks in the general public.

For example, about seven-in-ten white police officers (72%) and 44% of whites overall say fatal black-police encounters are isolated incidents. By contrast, only about four-in-ten black officers (43%) and 18% of blacks overall share this view.



**Most officers, public agree anti-police bias is a motive for protests**

*% saying protests over deaths of blacks who died during encounters with the police are motivated ___ by long-standing bias against the police*

■ A great deal  ■ Some  ■ Not much  ■ Not at all

| | A great deal | Some | Not much | Not at all |
|---|---|---|---|---|
| Officers | 68 | 24 | 4 | 2 |
| Public | 41 | 38 | 12 | 7 |

Note: No answer category not shown.
Source: Survey of law enforcement officers conducted May 19-Aug. 14, 2016; survey of U.S. adults conducted Aug. 16-Sept. 12, 2016. "Behind the Badge"

**PEW RESEARCH CENTER**

At the same time, black officers are about twice as likely as blacks nationally to describe these encounters as isolated incidents (43% vs. 18%). And while a narrow majority of black officers (57%) say the incidents are signs of a broader problem, a much larger majority of blacks overall (79%) express this view. In fact, roughly similar shares of black police and whites overall – 57% and 54%, respectively – see these incidents as pointing to larger issues between blacks and law enforcement.

## Anti-police bias is seen as a motive for protests by most officers and public

Large majorities of the police and the public agree that long-standing anti-police bias was at least some of the principle behind the protests that have followed many of the recent fatal incidents involving blacks and the police.





## Many blacks and whites say anti-police bias is a protest motive

*% saying protests over deaths of blacks who died during encounters with the police are motivated ___ by long-standing bias against the police*

■ A great deal  ■ Some  ■ Not much  ■ Not at all

**Among whites**

NET 95%

| Officers | 72 | 23 | 3 | 2 |

NET 85%

| Public | 47 | 38 | 10 | 5 |

**Among blacks**

NET 91%

| Officers | 59 | 32 | 6 | 3 |

NET 56%

| Public | 25 | 32 | 21 | 20 |

Note: No answer category not shown. NETs calculated before rounding. Whites and blacks include only non-Hispanics.
Source: Survey of law enforcement officers conducted May 19-Aug. 14, 2016; survey of U.S. adults conducted Aug. 16-Sept. 12, 2016. "Behind the Badge"

**PEW RESEARCH CENTER**

About nine-in-ten officers (92%) say the protests were motivated by bias toward the police, including 68% who say this was a great deal of the reason behind the demonstrations. A smaller but still substantial 79% majority of the public agrees that prejudice against the police provided at least some of the impetus for the protests, including 41% who see this as a major motivation.

A familiar pattern emerges when race is factored into the analysis. Black and white officers differ somewhat about the motives of the protesters, and the views of each group differ with those of all blacks and whites.

Fully nine-in-ten white officers (95%) and 85% of whites nationally say the protests are motivated at least somewhat by anti-police bias. Underlying this modest difference is the much larger share of white officers who feel that long-standing animosity toward police is a great deal of the protesters' motivation (72% of white officers vs. 47% for all whites).

## Police, public disagree about accountability as a protest motive

*% saying protests over deaths of blacks who died during encounters with the police are motivated ____ by the genuine desire to hold police accountable*

|  | Not much/Not at all | A great deal/Some |
|---|---|---|
| Officers | 64 | 35 |
| Public | 34 | 65 |

Note: No answer category not shown.
Source: Survey of law enforcement officers conducted May 19-Aug. 14, 2016; survey of U.S. adults conducted Aug. 16-Sept. 12, 2016. "Behind the Badge"

**PEW RESEARCH CENTER**

Among blacks, the disparity between police and the public is even greater than it is among whites. About nine-in-ten black officers (91%) say anti-police feelings are a reason for the protests. By contrast, 56% of blacks overall share this view.

Again, the belief that anti-police bias is a major reason behind the demonstrations is more strongly held by black officers. Black officers are more than twice as likely as blacks generally to say bias was a great deal of the reason for the demonstrations (59% of black officers vs. 25% of all blacks).

## White officers more skeptical that accountability motivated protests



**White officers less likely than other groups to say accountability a motive**

*% saying protests over deaths of blacks who died during encounters with the police are motivated ___ by a genuine desire to hold officers accountable*

■ A great deal ■ Some □ Not much ■ Not at all

Among whites

NET 27%

Officers: 5 | 22 | 40 | 32

NET 63%

Public: 27 | 35 | 25 | 12

Among blacks — NET 69%

Officers: 34 | 35 | 21 | 10

NET 79%

Public: 55 | 24 | 11 | 7

Note: No answer category not shown. NETs calculated before rounding. Whites and blacks include only non-Hispanics.
Source: Survey of law enforcement officers conducted May 19-Aug. 14, 2016; survey of U.S. adults conducted Aug. 16-Sept. 12, 2016. "Behind the Badge"

PEW RESEARCH CENTER

The police and the public also disagree about how important a motivation the desire to hold police accountable was to protesters. The difference is dramatic: Only about a third of all officers (35%) say the desire to make officers answerable was at least some of the motivation for the demonstrations, while 65% of the public says accountability was a factor.

A different pattern emerges when blacks and whites are asked the degree to which they believe the protests are genuine attempts to force police accountability. White officers stand apart; they are far less likely than whites generally, black officers or blacks to see holding officers answerable for their actions as a major goal of the protests.

About a quarter (27%) of white officers say accountability motivated the protests; by contrast, more than twice the share of whites overall (63%) say this. In fact, a quarter of whites overall (27%) say the desire for police accountability was a great deal of the reason for the protests – identical to the share of police who say accountability was either a great deal (5%) or some (22%) of the motivation, combined.

Blacks, both officers and in the public, see the desire for accountability as a driving factor behind the protests. About seven-in-ten black police officers (69%) say concerns about police accountability played at least some role in the protests, a view shared by 79% of all blacks. Moreover, blacks nationally are significantly more likely than black officers to say this was a great deal of the motivation for demonstrators (55% vs. 34%).

## Broad support for body cameras

One consequence of recent fatal encounters between police and blacks has been the growing call for police to wear video cameras to record interactions between officers and the public. While some law enforcement organizations, including the police unions in Miami and Boston, have attempted to slow down efforts to make officers wear "body cams," the surveys find that a clear majority of officers and a larger share of the public support their use.



**Majority of police and a larger share of the public favor body cameras**

*% saying they ___ the use of body cameras by police*

|  | Oppose | Favor |
|---|---|---|
| Officers | 33 | 66 |
| Public | 6 | 93 |

Note: No answer category not shown.
Source: Survey of law enforcement officers conducted May 19-Aug. 14, 2016; survey of U.S. adults conducted Aug. 16-Sept. 12, 2016. "Behind the Badge"

**PEW RESEARCH CENTER**

Two-thirds of the police (66%) and an even larger share of the public (93%) favor the use of body cameras by police to record interactions between officers and the public. However, the surveys also find that police see relatively fewer benefits than the public does from the use of body cams by officers.

About six-in-ten Americans (59%) but only a third of police say body cams would make members of the public more likely to cooperate with officers. By contrast, a majority of police (56%) says body cams would make no difference, a view shared by about a third (35%) of the public. Only 5% of the public and 10% of the police say members of the public would be less likely to obey officers who are wearing body cameras.



**Public sees more benefits than police from use of body cameras**

*% saying body cameras on officers would make ...*

Police are somewhat more convinced about the positive effects of body cameras on police behavior than on the public's behavior. Half of officers and two-thirds of the public (66%) say a police officer would be more likely to act appropriately when wearing a body cam. At the same time, 44% of officers and 27% of the public doubt that wearing body cams would have an impact on police behavior, while small shares of officers and the public say officers would be less likely to act appropriately (5% and 6%, respectively).

## Broad support from police, public for some gun law reforms



**Police more supportive of gun rights than public**

*% saying it is more important to ...*

Police officers are considerably more likely than the general public to say it is more important to protect the rights of Americans to own guns than it is to control gun

ownership (74% of officers vs. 53% of the public). At the same time, there is widespread agreement between police and the public on several key gun law reforms. For example, more than nine-in-ten officers and almost the same share of the public favor laws that would prevent the mentally ill from purchasing guns (95% and 87%, respectively). And about the same proportions of the police and the public favor background checks for people who buy weapons at a gun show or from a private individual (88% and 86%, respectively).



**Police, public agree on a range of new gun control measures, disagree on assault weapons ban**

*% saying they favor …*

■ Officers  ■ Public

Laws to prevent mentally ill from purchasing guns
Officers: 95
Public: 87

Making private gun sales and sales at gun shows subject to background checks
Officers: 88
Public: 86

Creating a federal database to track all gun sales
Officers: 61
Public: 71

A ban on assault-style weapons
Officers: 32
Public: 64

Note: Officers were shown all four questions on one screen. Half the sample of the public was asked about laws regarding the mentally ill and background checks and the other half was asked about laws on assault weapons and a federal database.
Source: Survey of law enforcement officers conducted May 19-Aug. 14, 2016; survey of U.S. adults conducted Aug. 16-Sept. 12, 2016. "Behind the Badge"

**PEW RESEARCH CENTER**

A majority of police and a larger share of the public also support the creation of a federal database to track gun sales (61% and 71%, respectively).

However, the consensus on guns vanishes when the focus turns to assault-style weapons. About two-thirds of Americans (64%) but only about a third of police (32%) favor outlawing assault weapons.

The gender gap among police on this issue is among the largest of any question in this survey: A majority of female officers (57%) favor a ban on assault weapons, compared with about a quarter of their male colleagues (27%). This disparity mirrors the overall gender gap in the country as a whole: 74% of women and 54% of men favor making these weapons illegal.

## A majority of police, public support easing some restrictions on marijuana

As more jurisdictions move to decriminalize or legalize the private use of marijuana by adults, large majorities of the police and the public favor easing restrictions on the drug. However, a larger share of the public than police favor legalization of marijuana for personal and medical use (49% vs. 32%).

Overall, about seven-in-ten officers support allowing medical use of marijuana (37%) or favor the legalization of the drug for both personal and medical use (32%). The public is more favorably inclined than police toward relaxing marijuana laws; more than eight-in-ten Americans support either legalizing marijuana (49%) or allowing only medical use of the drug (35%).



The surveys found little support among the public for outlawing marijuana use under any circumstances (15%). However, police are twice as likely as all adults to favor an outright ban on the drug (30%).

As with younger adults generally, officers younger than 35 are more likely than those ages 50 to 60 to favor permitting personal and medical use of marijuana (37% vs. 27%). Among the public, a majority of adults (63%) under the age of 45 favor legalization.

## Police say no more changes needed to achieve racial equality; public divided



**Younger police and younger adults more likely to favor legalization of marijuana**

*% saying marijuana should be legal for medical and personal use by adults*

Note: Less than 2% of the police sample was older than 60 so the analysis was restricted to those in the police and general public samples who were 60 or younger.
Source: Survey of law enforcement officers conducted May 19-Aug. 14, 2016; survey of U.S. adults conducted Aug. 16-Sept. 12, 2016. "Behind the Badge"

PEW RESEARCH CENTER

The wide disparities in the views of blacks and whites in American society over whether more changes are needed to achieve racial equality loom even larger in the country's police departments.

Overall, the surveys find that police are significantly more likely than the public to say the country has made the changes necessary to give blacks equal rights with whites (80% vs. 48%). By contrast, half of the public believes the country still needs to make changes to achieve racial equality, a view shared by only 16% of police.

Underlying these overall results are sharp disagreements between blacks and whites on this issue – a racial divide that is wider within America's police departments than it is in the country as a whole.



**Police more likely than public to say that no more changes are needed to give blacks equal rights with whites**

*% saying that ...*

Note: No answer category not shown.
Source: Survey of law enforcement officers conducted May 19-Aug. 14, 2016; survey of U.S. adults conducted Aug. 16-Sept. 12, 2016. "Behind the Badge"

PEW RESEARCH CENTER

Fully nine-in-ten white police officers (92%) say the country has made the needed changes to achieve racial equality. Nationally, a modest 57% majority of whites say this, a difference of 35 percentage points.



**Police, public divided by race over whether attaining equality requires more changes**

*% saying that ...*

|  | Our country has made the changes needed to give blacks equal rights with whites | Our country needs to continue making changes to give blacks equal rights with whites |
|---|---|---|
| White officers | 92% | 6% |
| Black officers | 29 | 69 |
| All whites | 57 | 41 |
| All blacks | 12 | 84 |

Note: No answer category not shown.
Source: Survey of law enforcement officers conducted May 19-Aug. 14, 2016; survey of U.S. adults conducted Aug. 16-Sept. 12, 2016.
"Behind the Badge"
PEW RESEARCH CENTER

The differences between black officers and blacks overall is significantly smaller. About three-in-ten black officers (29%) say the necessary changes have been made, a view shared by only 12% of blacks nationally and a 17 percentage point difference. By contrast, large majorities of black officers and blacks overall believe more changes are needed (69% and 84%, respectively).

14. The survey questions specifically asked the public and officers not to include in their count or estimate instances where officers fired their service weapon "on a gun range or while training." ↵

## Social Trends Monthly Newsletter

Sign up to to receive a monthly digest of the Center's latest research on the attitudes and behaviors of Americans in key realms of daily life



| Enter email address... |

Sign Up

REPORT MATERIALS

📄 Complete Report PDF

📱 Survey of the public topline


Video: How police view their jobs

BLE OF CONTENTS

ehind the Badge

Police culture

Inside America's police departments

Police and the community

Police, fatal encounters and ensuing protests

Reimagining the police through training and reforms

**Police views, public views**

How the public sees the police, how police see themselves

Police work: Great risks, great frustrations

Officers, public agree that police work is more difficult now

Public, police see deadly police-black encounters differently

Anti-police bias is seen as a motive for protests by most officers and public

White officers more skeptical that accountability motivated protests

Broad support for body cameras

Broad support from police, public for some gun law reforms

A majority of police, public support easing some restrictions on marijuana

Police say no more changes needed to achieve racial equality; public divided

:knowledgments

ethodology

RELATED

SHORT READ | FEB 3, 2023

Before release of video showing Tyre Nichols' beating, public views of police conduct had improved modestly

---

SHORT READ | JAN 20, 2023

For Black History Month, a look at what Black Americans say is needed to overcome racial inequality

---

REPORT | AUG 30, 2022

Black Americans Have a Clear Vision for Reducing Racism but Little Hope It Will Happen

---

SHORT READ | JUL 14, 2022

How Black Americans view the use of face recognition technology by police

---

REPORT | MAR 17, 2022

AI and Human Enhancement: Americans' Openness Is Tempered by a Range of Concerns

TOPICS

Race & Ethnicity

Criminal Justice

Police

Religion & Social Values

Police

MOST POPULAR

1 Americans confident in Zelenskyy, but have limited familiarity with some other world leaders

---

2 What the data says about Americans' views of climate change

3   Podcasts as a Source of News and Information

4   In a Growing Share of U.S. Marriages, Husbands and Wives Earn About the Same

5   Key facts as India surpasses China as the world's most populous country

---

Pew Research Center

1615 L St. NW, Suite 800
Washington, DC 20036
USA
(+1) 202-419-4300 | Main
(+1) 202-857-8562 | Fax
(+1) 202-419-4372 | Media
Inquiries

**RESEARCH TOPICS**

Politics & Policy

International Affairs

Immigration & Migration

Race & Ethnicity

Religion

Generations & Age

Gender & LGBTQ

Family & Relationships

Economy & Work

Science

Internet & Technology

News Habits & Media

Methodological Research

Full topic list

**FOLLOW US**

✉ Email Newsletters

 Facebook

 Twitter

t Tumblr

▶ YouTube

 RSS

**ABOUT PEW RESEARCH CENTER** Pew Research Center is a nonpartisan fact tank that informs the public about the issues, attitudes and trends shaping the world. It conducts public opinion polling, demographic research, media content analysis and other empirical social science research. Pew Research Center does not take policy positions. It is a subsidiary of The Pew Charitable Trusts.

Copyright 2023 Pew Research Center    About    Terms & Conditions    Privacy Policy    Reprints, Permissions & Use Policy

Feedback    Careers

# EXHIBIT 75



Case: 1.21-cv-04595 Document #: 98-8 Filed: 04/24/23 Page 66 of 158 PageID #:3016

## ABOUT THE AUTHOR

Gary Kleck is Professor in the School of Criminology and Criminal Justice at Florida State University. His research centers on violence and crime control with special focus on gun control and crime deterrence. Dr. Kleck is the author of *Point Blank: Guns and Violence in America* (Aldine de Gruyter, 1991) and a contributor to the major sociology journals.

Copyright © 1997 by Walter de Gruyter, Inc., New York
All rights reserved. No part of this publication may be reproduced or transmitted in any form or by any means, electronic or mechanical, including photocopying, recording, or any information storage or retrieval system, without prior permission in writing from the publisher.

ALDINE DE GRUYTER
A division of Walter de Gruyter, Inc.
200 Saw Mill River Road
Hawthorne, New York 10532

This publication is printed on acid free paper ∞

**Library of Congress Cataloging-in-Publication Data**

Kleck, Gary, 1951–
    Targeting guns : firearms and their control / Gary Kleck.
      p.    cm. — (Social institutions and social change)
    Includes bibliographical references (p.   ) and index.
    ISBN 0-202-30569-4 (pbk. : alk. paper)
    1. Gun control—United States.  I. Title.  II. Series.
HV7436.K54   1997
363.3'3'0973—dc21
                                  97-35884
                                      CIP

Manufactured in the United States of America
10 9 8 7 6 5 4 3 2

*To my wife Diane and my children Matthew and Tessa*
*To my parents, William and Joyce Kleck*



their semiautomatic capability, which provides a somewhat higher rate of fire than other guns (and allegedly makes it easy to convert the guns to a fully automatic capability), and their ability to accept large-capacity magazines. However, if a law restricted all guns with such attributes, millions of voters would be affected. About 300,000–400,000 semiautomatic center-fire rifles and about 400,000–800,000 semiautomatic pistols were sold each year in the United States in the 1970s and 1980s (U.S. Bureau of the Census 1991; Thurman 1994), and by the peak year of 1994, over two million semiautomatic pistols were produced or imported into the United States, less exports (Thurman 1996). A December 1989 national survey indicated that 27% of U.S. gun owners reported ownership of at least one semiautomatic gun (Quinley 1990:3), which would imply that about 13% of all U.S. households own such guns. Most of these semiautomatic firearms can accept large-capacity magazines.

As a way out of this dilemma, lawmakers have thrown up their hands and declined to identify the dangerous attributes of AWs. Instead, laws passed in California, New Jersey, and Connecticut and at the federal level included long lists of specific makes and models of banned guns that have little in common beyond (almost always) a semiautomatic loading mechanism and (usually) an arguably "military" appearance. Typical of such efforts was the Connecticut AW law, which listed no fewer than sixtyseven different models or series of guns. The list lumped together handguns, rifles, and shotguns, both those usually sold with large magazines and those with small ones, large caliber and small caliber, foreign-made and domestic. Although the guns on the list were almost all semiautomatic, so were a much larger number of guns left off the list, such as the very popular Colt Model 1911A1 .45-caliber pistol and the Beretta Model 92 9-mm pistol (Connecticut 1993). Other laws passed in California and New Jersey and at the federal level defined the restricted weapon category using similarly heterogeneous, but limited lists of specific gun models (Cox Newspapers 1989; U.S. Congressional Research Service 1992).

The difficulties with this political compromise are obvious. If semiautomatic fire and the ability to accept large magazines are not important in crime, then there is little reason to focus regulations on AWs. On the other hand, if these *are* important crime-aggravating attributes, then it makes little crime control sense (though ample political sense) to systematically exclude from restriction the most widely owned models that have these attributes, since this severely limits the impact of regulation by allowing an ample supply of legally available semiautomatic models to be substituted for the handful of banned models.

**The Prevalence of AWs as Crime Weapons**

It was commonplace for news sources in the late 1980s and 1990s to refer to either "assault weapons" or "assault rifles" as the "favored" weapon of criminals, or, more narrowly, of drug dealers and youth gangs (e.g., *New York Times*, 21 February 1989; *Newsweek*, 14 October 1985, p. 48). This claim was not true, either for criminals in general or for less specific types of criminals. This claim was largely based on guns that police agencies asked BATF to trace. In 1989–1990, 8.2% of BATF-traced guns were classified as "assault weapons" (reported in U.S. Congressional Research Service 1992:10). Unfortunately, the guns traced by BATF are not representative of guns used in crime, nor does BATF claim they are. Crime guns are rarely traced, and the few that are traced are not selected in a way that would ensure they are representative of all crime guns. In 1994, only 1.8% of homicides, robberies, and aggravated assaults known to the police and committed with a gun resulted in a BATF gun trace (computed from data in U.S. BATF 1995:43; U.S. FBI 1995:18, 29, 32, 58). As the Congressional Research Service noted, "the firearms selected for tracing do not constitute a random sample and cannot be considered representative of the larger universe of all firearms used by criminals, or of any subset of that universe" (U.S. Congressional Research Service 1992: 65).

Table 4.1 summarizes the available evidence on the share of crime guns that are AWs. These studies are mostly analyses of guns recovered by police from criminals, and typically cover *all* of the guns recovered in a given period, rather than some small, unrepresentative subset. The findings indicated that less than 2% of crime guns are "assault weapons" (the median was about 1.8%) and well under 1% are "assault rifles." Only two estimates, of forty-seven total, were over 4.3%. The estimate based on guns traced by BATF was double that of the next highest one, and over four times the typical figure obtained in studies of complete populations of guns recovered by police, indicating that trace data grossly overstate AW involvement in crime. Since about 14% of violent crimes are committed with guns (U.S. Bureau of Justice Statistics 1994a:83), this means that only about 1 in 400 (1.8% x 14% = 0.25%) violent crimes are committed with AWs.

One can artificially increase the share of crime guns that are "AWs" simply by expanding the definition of an AW. A New York bill proposed by then-governor Mario Cuomo defined AW as any center-fire semiautomatic rifle or shotgun capable of holding six or more rounds in its magazine, or any semiautomatic pistol capable of holding ten or more rounds (New York State 1994). This definition would probably encompass most of the new handguns sold in the United States since 1987 and a large share of rifles and shotguns. It would not, however, correspond to the meaning of the term in either common usage or in

any existing state or federal statutory definitions. Use of this expansive definition allowed the authors of a New York State report to claim that 16% of New York City gun homicides in 1993 involved "assault weapons" (Zawitz 1995:4), a claim uncritically repeated in a U.S. Justice Department report (Zawitz 1995:6).

In the face of such consistently negative evidence, even a spokesman for Handgun Control, which advocated tighter restrictions on AWs, conceded in 1989 that assault weapons "play a small role in overall violent crime," while emphasizing that they could become a problem in the future (Philip McGuire, quoted in the *New York Times*, 7 April 1989, p. A15).

This spokesman's use of the term "overall violent crime" may have been intended to hint that "ARs" or AWs might be commonly used by special criminal subgroups such as drug dealers and gang members. For example, a spokesman for the U.S. Drug Enforcement Administration asserted that "you can count on coming across them on every single narcotics raid" (*Los Angeles Herald Examiner*, 23 January 1989, p. A-1). The available evidence contradicts the claim that "assault weapons" are favored by drug dealers. Records of a Chicago-area narcotics unit indicated that only 6 of 375 guns seized in drug raids, or 1.6%, were AWs (Mericle 1989). Likewise, only 2.9% of a statewide California sample of guns recovered from drug dealers were AWs (Table 4.1, note g).

In Los Angeles, beginning in 1989, police and newspapers reported an epidemic of so-called "drive-by" shootings allegedly involving youth gang members using "assault weapons" to fight over control of drug trafficking. However, when queried about the guns seized from gang members, the head of the city's largest police gang detail admitted that (as of 1985) the unit had not confiscated *any* AWs: "We've seized only shotguns and handguns, but I have heard about the purchase of Uzis and military assault rifles" (*Crime Control Digest*, 13 May 1985, p. 2). A later study of "drive-by shootings" of juveniles in Los Angeles indicated that AW use was documented in only 1 of 583 incidents (Hutson et al. 1994). Presumably AW use was even less common among gang members in cities lacking the vocal concern over gang use of AWs and "ARs" that characterized Los Angeles. Thus, AWs are virtually never used by drug dealers or juvenile gang members, just as is true of criminals in general.

The 1994 federal ban on the possession, manufacture, and sale of "assault weapons" (Title XI, Subtitle A of the Violent Crime Control and Law Enforcement Act of 1994) covered only about nineteen specific named models or series of guns, though among the more than seventy models included in the California, New Jersey, and Connecticut AW bans, the federal ban covered most of the models that were relatively more frequently used in crime (for the models, see *Congressional Record*, 21 August 1994, Senate, p. 8826; for their relative

prevalence among traced guns, see U.S. Congressional Research Service 1992:10). The ban did not prohibit possession of AWs legally owned at the time of the law's effective date, so owners of existing guns could continue to own and transfer all they possessed as of September 1994.

How large a share of crime guns were covered by the ban? The two most extensive samples of all guns recovered by police are statewide samples from Connecticut, covering 1988-1993, and Pennsylvania, covering 1989-1994. Of the 24,252 crime guns in these samples, 337, or 1.39%, were models covered by the federal AW ban (author's computations based on data in Laroche 1993; Pennsylvania State Police 1994; see Table 4.1, notes j, B).

At the time this bill was passed, there were at least 387 distinct models of semiautomatic firearms being legally sold as newly manufactured guns (Warner 1993:282-310, 337-41, 371-75, 389-93, 417-20), most of them capable of accepting large-capacity magazines, in addition to hundreds of no-longer-manufactured models still circulating in the used-gun market. Thus, there was an enormous supply of semiautomatic guns capable of accepting large-capacity magazines that could serve as easily acquired substitutes for the nineteen banned models. It is hard to imagine how the federal AW ban could even hypothetically prevent a death or injury by banning further sales and manufacture of just nineteen models of semiautomatic guns that accounted for less than 1.4% of guns used by criminals and that possessed no violence-relevant attributes to distinguish them from over 380 semiautomatic models not banned.

The most likely effect of the federal AW ban—or, more properly, the public debate and related publicity preceding passage of the ban—was a huge short-term increase in the number of AWs and other semiautomatic guns in the civilian stock. From 1986, when media attention to these guns began to grow, through 1989, when the first state AW ban was passed in California, to 1994 when the federal ban was passed, a previously ailing U.S. gun industry got a new lease on life due to sales of semiautomatic guns that either were to be banned or that gun buyers thought *might* be banned. After steady declines from 5.6 million guns produced in 1980 to a trough of 3.0 million in 1986, U.S. gun production reached one temporary peak of 4.4 million in 1989, and then another peak while the federal ban was being debated, with a total of 5.0 million guns produced in 1993 and 5.2 million in 1994 (Thurman 1996). The biggest production increases were in the category of semiautomatic pistols, which increased 228% from 1986 to 1993. The 1993 handgun production of 2.7 million was the highest in the recorded history of the U.S. firearms industry. The gun industry's trade magazine, *Shooting Industry,* described the 1993 experience as a "buying frenzy" and attributed it to the "threat of gun bans" (Thurman 1994; for further evidence

of production increases, see Roth and Koper 1997:66-67).

Of course, the AW ban was intended to produce a long-term reduction in the stock of AWs, but it is doubtful whether this will ever be achieved. The law expires after ten years, in September 2004 and thus will not be in effect for the "long term" unless it is reenacted. Further, even if the law is renewed, if prospective gun buyers simply buy mechanically equivalent unbanned semiautomatic guns instead of the few banned models, there will be no long-term reduction in availability of semiautomatic guns. In this case, the only lasting effects of the ban will be whatever consequences follow from the "excess" millions of semiautomatic guns that were added to the civilian stock in 1986-1994 in anticipation of AW bans.

It has been claimed that criminals "prefer" AWs in some sense, one source asserting that the fraction of traced guns that were AWs exceeded a rough guess from BATF that only 2% of all U.S. guns were AWs (Cox Newspapers 1989:4; for a source treating this claim as factual, see Roth and Koper 1997:17). Producing a meaningful estimate of this sort would require having gun ownership data by model. BATF does not gather gun data by model. Indeed, its data do not even distinguish semiautomatic rifles and shotguns from other types of rifles and shotguns, or, among imported handguns, semiautomatic pistols from other types of handguns. Consequently, their data cannot supply meaningful estimates of the number of AWs or "ARs" in the hands of the American public. Note, however, that if the BATF guess were even slightly too high, and the actual figure were just 1.8%, this would be identical to the median share of crime guns classified as AWs (Table 4.1), contradicting the claim that AWs are especially likely to be used in crime.

There are data on domestic production of semiautomatic pistols as a general category, though not the subset defined as AWs. Since 85% of the handguns added to the private U.S. stock in 1984-1993 were domestically manufactured (U.S. BATF 1994:14-15), the domestic production data provide a good picture of the handguns recently added to the national gun supply. Zimring (1976) showed that the majority of guns used by criminals are relatively recently manufactured guns, so these would be the appropriate set of guns to use in the comparison.

Do criminals "prefer" semiautomatic pistols in the sense that their share of crime guns is greater than their share of the general stock of handguns recently manufactured in the United States? Among all handguns produced in the United States in the preceding ten years, less exports, 68.6% were semiautomatic pistols U.S. BATF 1994:14. Among handguns traced by BATF in 1994, 66.8% were semiautomatic pistols (U.S. BATF 1995a). Thus, semiautomatic pistols were actually slightly *less* common among traced guns than they were among handguns being distributed to the general population.

As noted, however, trace requests are misleading for judging the types of guns generally used by criminals. Unfortunately, no other national source covers all guns seized by police or a representative sample of all seized guns. However, one can examine a large local police sample of all seized guns and compare it with guns recently added to the general U.S. gun stock. In a sample of guns seized in the first three months of 1989 in the Los Angeles Police Department, 49.8% of the handguns were semiautomatic pistols (Los Angeles Police Department 1989). Among the 7,438,603 handguns produced by U.S. manufacturers from 1984 to 1988, less exports, 3,993,517 were semiautomatic pistols (U.S. BATF 1994:15). > Thus, 53.7% of the domestically produced handguns bought by the general, largely noncriminal public were semiautomatic pistols, while 49.8% of those seized from criminals fell into this category. Los Angeles criminals in 1989 did not "prefer" semiautomatic weapons in the sense of going out of their way to obtain them in numbers disproportionate to their share of the recently sold handgun stock. Rather, criminals were just using the same kinds of handguns as recent noncriminal gun buyers had been obtaining.

Further, while 31% of the handguns used in juvenile "drive-by" shooting incidents in Los Angeles in 1991 were semiautomatic pistols (Hutson et al. 1994:326), 62% of the handguns produced by U.S. manufacturers in the preceding five years were semiautomatic pistols. Thus, even if young gang members in Los Angeles were only half as likely to use semiautomatic pistols as one would expect based on recent handgun production, and in this sense used to actually "disprefer" the semiautomatic pistols. If the higher rate of fire and larger magazines of these weapons were important to criminals, they were no more important, and perhaps even less so, to them than to semiautomatic gun buyers.

A survey of a representative national sample of state prison inmates provided information on the guns that criminals owned in the month before the arrest that led to their imprisonment, as well as the guns they actually used in their crimes. Of those who owned a handgun of any kind in the preceding month, 71% were armed with a handgun when they committed the crime that got them sent to prison. However, of those who possessed a "military-type" gun, only 16.7% were armed with such a gun when they committed their crimes (computed from U.S. Bureau of Justice Statistics 1993b:18-19, 33). Thus, compared to their availability, AWs were underrepresented among these felons' crime guns. These results held consistent with respect to "assault rifles" by surveys of inmates in Virginia prisons in 1992-1993, which revealed that although 20% of the offenders had

previously possessed "assault rifles," *none* had carried or fired one at their latest crime (Virginia 1994:63). Thus, criminals not only did not "prefer" military-style guns, they were strongly disinclined to carry them during commission of their crimes, even when they owned one. In sum, under any meaningful interpretation of "preference," criminals do not prefer assault weapons.

"Assault rifles" are clearly much larger than the handguns criminals really do favor, and even "assault weapon" handguns such as Uzis are generally larger than other handguns. Since criminals say they favor more concealable handguns (Wright and Rossi 1986:163), this may largely explain why so few criminals use assault weapons.

### "Assault Weapon" Trends

There is nothing new about either semiautomatic firearms in general or "assault rifles" or "assault weapons" in particular. Semiautomatic firearms were produced in large numbers beginning in the late nineteenth century, and true assault rifles were introduced into military use during World War II (Ezell 1983:17, 514-15). Semiautomatic "assault rifles" became more popular among civilians during the 1980s—gun catalogs indicate a substantial increase in the number of models of "paramilitary" rifles shown between 1973 and 1988 [compare Koumjian (1973) with Warner (1988)]. However, this was less significant regarding violence than it appears, because it reflects little more than a demand for guns with military-style cosmetic details, rather than a violence-relevant shift to mechanically different gun types. Mechanically, "assault rifles" are semiautomatic center-fire rifles. Trends in sales of semiautomatic center-fire rifles were basically flat in the period from 1982 to 1987, and were substantially lower in the 1980s than in the 1970s (PB:95). The major trend in recent years has not been a shift to mechanically different types of rifles, but rather a shift in consumer preferences regarding rifles' appearance, along with a substantial shift away from domestic sources to foreign sources of semiautomatic rifles. In light of this latter trend, President George Bush's move in 1989 to ban imports of foreign "assault rifles" made more sense as trade protectionism than as gun control.

In contrast, among handguns, there was a dramatic move away from revolvers and toward semiautomatic pistols beginning in the late 1970s. In 1978, just 25% of handguns produced by U.S. manufacturers were semiautomatic pistols, compared to 80% in 1993 (Thurman 1994). This trend was characteristic of the general flow of guns into the general population's stock of guns, implying increases in the average magazine capacity of handguns.

A similar trend toward semiautomatic pistols probably occurred among criminals, though the trend was apparently no stronger among criminals than

among noncriminals, and little of it involved the gun models defined as AWs. We know little about crime gun trends before 1985, but scattered data paint a fairly consistent picture of trends in the 1985-1990 period. BATF data on gun traces indicated an increase in the AW share from 1986 to 1988, followed by a decline from 1988 to 1990, back down to its 1986 level (U.S. Congressional Research Service 1992:8). Similarly, the AW share of killings of police officers increased from 1986 to 1988, then declined in the following two years (ibid.:11). Baltimore experienced increased police recoveries of AWs from 1986 to 1988, a decline in 1989 (ibid.:16) and then a return to the 1988 level in 1990 (Baltimore Police Department 1991). Oakland police confiscations of AWs increased from 1985 to 1988, then declined from 1988 to 1990 (U.S. Congressional Research Service 1992:20). Low-quality data from surveys of Florida police departments indicated that AW use in crime for increased in the period 1986 to 1989 (ibid.:15), and that Miami police recoveries of AWs increased from 1986 to 1988, then declined in 1989 and leveled off in 1990 (ibid.:19). On the other hand, a study of bullets removed from gunshot victims at a Newark hospital indicated no shift toward ammunition commonly used in "assault rifles" from 1981 to 1989 (*Newark Star-Ledger*, 16 May 1990, p. 15). Likewise, an informal survey of all seven firearms examiners in Dade County (Miami), Florida, yielded the unanimous opinion that AW use in shootings had been slowly and steadily declining since 1981 (Florida 1990:156-57). The general picture is that AW use in crime, always low, increased from 1985 to about 1988 in at least some locations, and then declined thereafter.

### Trends in Number and Lethality of Gunshot Wounds

What were the consequences of the 1980s trend toward larger-capacity semiautomatic guns? In Washington, D.C., the number of wounds inflicted per GSW victim increased from 1985 to 1990 (Webster, Champion, Gainer, and Sykes 1992:696). There is no direct evidence that this increase was due to the increasing popularity of semiautomatic guns during the same period, and at least some of the increase in wounds per victim was attributable to the changing nature of violence in this city: there was an enormous increase in the share of violence that was committed by criminals involved in the crack cocaine trade. As Webster and his colleagues noted, drug enforcers are likely to be "more deliberate in their efforts to kill their victims by shooting them multiple times" (p. 698). Regardless of the reasons for the increase in wounds per patient, it did not result in any consistent increase in the in-hospital GSW fatality rate in Washington during the period studied. The rate was about 18% in 1983, 26% in 1984, 21% in 1985,18% in 1986,14% in 1987, 23% in 1988, 21% in 1989, and 24% in 1990

# EXHIBIT 76



# The only newsroom dedicated to covering gun violence.

Your tax-deductible donation will directly support nonprofit journalism on gun violence and its effects on our communities.

**Donate Now** →

 Investigating gun violence in America.

 Donate 

 **Chicago**

# Chicago Criminals' Favorite Gunmakers: A Visual Ranking

Police data reveals that drug money is helping the city's gang members buy more firepower, while decades-old 'Saturday Night Specials' continue to claim victims.

**By Sarah Kollmorgen** ● Jan 6, 2016



**B**y early December of last year, the Chicago Police Department had confiscated 6,521 illegal guns in 2015. That total meant the department was seizing about 19 guns a day  or about one gun every 74 minutes. For the city's police department, the remarkable haul wasn't unusual. In 2014, it recovered 6,429. In 2013, it seized 6,815.







Indeed, officers in Chicago recover more guns than their counterparts in New York and Los Angeles  two cities with larger populations  combined. In 2012, Los Angeles police seized 122 illegal guns for every 100,000 residents, while New York cops confiscated 39. In Chicago, the rate was 277.

Despite having some of the toughest gun regulations of any city in the country, Chicago continues to record thousands of shootings per year. As President Obama has pointed out, that isn't a failing of the city's gun laws. The problem is that most of the guns used in crimes in Chicago come from neighboring states with lax gun laws. A study released last year by the city found that almost 60 percent of firearms recovered at Chicago crime scenes were first bought in states that do not require background checks for Internet or gun show sales, like neighboring Indiana and Wisconsin. Of the remaining crime guns, nearly half were purchased at three gun shops just outside the city.

Research by the Chicago police and the Bureau of Alcohol, Tobacco, Firearms, and Explosives paints a detailed picture of how crime guns flow into the city. But less has been known about what kinds of firearms, specifically, are favored by the city's criminals. In an effort to learn more, The Trace filed an information request with the CPD's Research and Development Division, asking for the make, model, and caliber of all the crime guns collected in Chicago in 2014.

The CPD data includes guns used in violent crimes and murders, as well as guns confiscated during traffic stops. For our analysis, we excluded the 17 firearms collected by airport law enforcement, since those might not have involved illegal possession. The total also eliminates guns associated with a suicide or firearms turned into police through gun buybacks or other means. Guns turned in by the public accounted for more than 2,000 of the firearms recovered in 2014. In all, the CPD inventoried 4,505 guns in 2014 that were associated with criminal incidents or events in which an officer determined that a crime had taken place.

Narrowing the focus to groupings of guns by manufacturer and caliber produces the following popularity index of Chicago crime guns:



(illustration: Joel Arbaje for The Trace)

From that hierarchy, a few patterns emerge. The city's criminals, for instance, prefer semiautomatic pistols to revolvers and generally seek out cheap junk guns. What's also notable is the type of gun that doesn't appear among the top models seized. In 2014, Chicago police recovered only three assault weapons associated with criminal incidents. "Often there's a misimpression about the importance of assault guns and assault weapons, and it's important to point out how rare that is," says Phillip Cook, an economist at Duke University who studies underground

gun markets. "The guns being used in Chicago for crime and murder are by and large very ordinary pistols."

## Smith & Wesson: Chicago's top crime gun manufacturer

In 2000, Smith & Wesson struck a "historic" deal with the Clinton Administration, agreeing to a stringent set of safety and distribution standards. For instance, the company would sell its products only to dealers who took steps to restrict the sale of guns to criminals. The agreement reportedly helped settle several civil suits brought against Smith & Wesson by state and federal agencies.

But the deal put the company in dire straits. An apoplectic National Rifle Association called for a boycott, and the company's sales declined by up to 60% before the end of 2000 compared to 1999. Its British owner was forced to sell the company, but it quickly regained its footing, thank in part to the Bush Administration — which declined to enforce the Clinton-era deal and awarded Smith & Wesson several federal contracts.

Nearly two decades after its rocky safety initiative, Smith & Wesson is Chicago's leading producer of crime guns. The company holds four spots among the 20 guns most frequently recovered by police — more than any other brand — and is the most popular manufacturer overall, with 624 total guns seized in 2014. It's worth pointing out that Smith & Wesson is the country's largest firearm manufacturer, which may account for the prevalence of its products among the city's crime guns.

Meanwhile, the company has again come under government scrutiny. Last month, New York City's public advocate filed a letter saying the Securities and Exchange Commission should investigate whether Smith & Wesson misrepresented or omitted information about how often its firearms are used in crimes. (Smith & Wesson could not be reached for comment.)

## 9MM handguns are the new crime gun of choice

Between 80 to 85 percent of the city's homicides are committed with a gun. Of those murders, a "preponderance" are carried out by gang members, according to

a 2015 report co-authored by Duke's Phillip Cook.



Friends comfort each other at a Chicago memorial service for a gun violence victim in 2014. (Getty Images/Scott Olson)

The weapons of choice for gangs today are 9MM semiautomatic handguns, followed by .40 caliber and .45 caliber semiautomatics, says Thomas Ahern, an ATF senior agent based in Chicago. It makes sense then that those calibers account for about half of the crime guns recovered by police.

Until the 1980s, .38-caliber revolvers were the most popular crime guns, according to Cook. These revolvers were more reliable and cheaper than semiautomatic pistols of the era. But that changed as manufacturers began producing semiautomatics that were just as efficient and affordable as revolvers. What makes semiautomatics particularly appealing to gang members is that they generally have a higher capacity than revolvers, meaning they can fire more shots before it's necessary to reload.

## Drug money is allowing gang members to buy better guns

Glock is one of the most name-dropped brands in Jay-Z's lyrics, and the Austrian firearm manufacturer has received prominent shout outs from Wu Tang Clan and 50 Cent, among other hip hop artists. If you assume the references to be instances of art following illegal commerce, you might imagine that Glocks are practically littering inner-city streets. But that's not the case. Given their high cost — the retail price for a Glock .45 or 9MM runs between $515 to $595 at one Chicago-area dealer — Glocks have typically remained out of reach for most gang members and the straw purchasers who often supply them.

"A lot of gang members and criminals are settling for what they can get their hands on and afford," says Duke's Phillip Cook. But just because gang members can't afford a Glock, that doesn't mean they don't want one. "Glock would probably be the weapon of choice for most of the gangs," says the ATF's Thomas Ahern. "They view Glocks as top of the line."

In recent years, Ahern says he has seen a shift in the quality of guns used by Chicago gangs. Gangs usually purchase cheap guns and dispose of them once they've been used in a crime, so they can avoid getting caught with the weapon down the line. But Ahern has noticed that an influx of cash from the narcotics trade has allowed some gang members to purchase higher quality guns like Glocks, which they generally hold onto.

## Hi-Points are dangerously cheap

Hi-Point Firearms, based in Mansfield, Ohio, produces low-cost semiautomatic handguns and carbines. The three Hi-Point models among Chicago's top crime guns are also among the cheapest by retail value, with prices ranging from $162 to $285. The company's focus on the affordability of its products has drawn the gunmaker unwanted attention. In 2005, Beemiller Inc., Hi Point's parent company, and MKS Supply, the company's sole distributor, were sued for negligence. The suit alleges that Beemiller and MKS intentionally supplied handguns to irresponsible dealers, because they stood to profit from sales to criminals.

The case, *Williams v. Beemiller*, was brought by the Brady Center to Prevent Gun Violence on behalf of Daniel Williams, a 17-year-old who was mistaken for a gang

member in New York and shot playing basketball. The Brady Center alleges the 9mm Hi- Point used to shoot Williams was purchased at a gun show along with 86 other guns in a single sale to an obvious straw purchaser. The defendants each moved to dismiss the suit under the Protection of the Lawful Commerce in Arms Act, which shields gun manufacturers and dealers from negligence suits, but after a judge tossed the case out, an appeals court reinstated the lawsuit. Hi-Point attorney Scott Allan disagreed with the ruling, telling the Associated Press that Hi-Point did not violate any statute. The case remains in New York court.



Chicago police display some of the thousands of firearms the department seized in 2014. (AP Photo/M. Spencer Green)

## A popular South American gunmaker has cracked the U.S. criminal market

In the 1990s, Bersa became the official firearms supplier for Argentina's armed forces and federal police. Since then, the manufacturer, which focuses on producing accurate handguns at reasonable prices, has grown increasingly popular in Central and South America. The company's presence among Chicago's

top crime guns would seem to indicate that these guns are beginning to draw more attention in the U.S.

## The "Saturday Night Special" is still kicking

In the 1980s, a group of gun manufacturers set up shop outside Los Angeles, California. These companies, which included Raven Arms and Lorcin Engineering, were collectively dubbed the "Ring of Fire," as they became notorious for producing simple, cheap handguns commonly known as "Saturday Night Specials." Even though these junk guns had a tendency to misfire or malfunction, production by Ring of Fire companies grew exponentially, and by 1990, they churned out one-third of all handguns in the U.S. A trace report by the ATF in the 1990s found that Saturday Night Specials like the ones produced by Raven and Lorcin were 3.4 times more likely to be used in crimes than other guns.

Though both companies have been out of business for decades, the appearance of the Lorcin .380 and Raven .25 among Chicago's most seized guns speaks to the enduring appeal of the Saturday Night Special. Harold Pollack, co-director of the University of Chicago Crime Lab, says that many black market gun customers are looking for a weapon that even the least skilled person can operate. These firearms fit the bill.

Older guns are also easier to buy for cheap on the black market, adding to their attraction, especially for younger gang members. Cook's research has shown that crime guns purchased by gang members tend to be an average of 12.6 years old.

Guns are durable goods, and once a lax law or untoward seller allows a gun to enter the black market, it will often stay in circulation for decades. "A gun manufactured in 1984 will kill you just as dead as a new one," says Pollack.

*[Top photo: AP Photo/M. Spencer Green]*

---

**Sarah Kollmorgen** 

EXHIBIT 77

**U.S. Department of Justice**
Office of Justice Programs
*Bureau of Justice Statistics*

## SPECIAL REPORT

JANUARY 2019 NCJ 251776

# Source and Use of Firearms Involved in Crimes: Survey of Prison Inmates, 2016

Mariel Alper, Ph.D., and Lauren Glaze, *BJS Statisticians*

Based on the 2016 Survey of Prison Inmates (SPI), about 1 in 5 (21%) of all state and federal prisoners reported that they had possessed or carried a firearm when they committed the offense for which they were serving time in prison (**figure 1**). More than 1 in 8 (13%) of all prisoners had used a firearm by showing, pointing, or discharging it during the offense for which they were imprisoned. Fewer than 1 in 50 (less than 2%) of all prisoners had obtained a firearm from a retail source and possessed, carried, or used it during the offense for which they were imprisoned.

An estimated 287,400 prisoners had possessed a firearm during their offense. Among these, more than half (56%) had either stolen it (6%), found it at the scene of the crime (7%), or obtained it off the street or from the underground market (43%). Most of the remainder (25%) had obtained it from a family member or friend, or as a gift. Seven percent had purchased it under their own name from a licensed firearm dealer.



**FIGURE 1**
**Percent of all state and federal prisoners who had possessed or used a firearm during their offense, 2016**

Note: See appendix table 1 for standard errors.
[a]Includes prisoners who carried or possessed a firearm during the offense.
[b]Includes prisoners who showed, pointed, or discharged a firearm during the offense.
Source: Bureau of Justice Statistics, Survey of Prison Inmates, 2016.

## HIGHLIGHTS

- About 21% of state and 20% of federal prisoners said they possessed a gun during their offense, while 79% of state and 80% of federal prisoners did not.

- About 29% of state and 36% of federal prisoners serving time for a violent offense possessed a gun during the offense.

- About 1.3% of prisoners obtained a gun from a retail source and used it during their offense.

- Handguns were the most common type of firearm possessed by state and federal prisoners (18% each); 11% of all prisoners used a handgun.

- Among prisoners who possessed a gun during their offense, 90% did not obtain it from a retail source.

- Among prisoners who possessed a firearm during their offense, 0.8% obtained it at a gun show.

- About 1 in 5 state and federal prisoners who possessed a firearm during their offense obtained it with the intent to use it during the crime.

- Among state prisoners who possessed a gun during their offense, 27% killed someone with it, another 12% injured someone, 7% fired the gun but did not injure anyone, and 54% did not fire it.

- State prisoners with no military service were more likely to possess a gun during their offense (21%) than prisoners who had served in the military (16%).



Statistics in this report are based on self-reported data collected through face-to-face interviews with a national sample of state and federal prisoners in the 2016 SPI. (See *Methodology*.)

The 2016 SPI data collection was conducted from January through October 2016. The SPI was formerly known as the Survey of Inmates in State and Federal Correctional Facilities (SISFCF). The Bureau of Justice Statistics (BJS) has periodically conducted the survey since the 1970s, with the most recent iteration fielded in 2004. The survey collects information from prisoners on a variety of topics, including firearm possession during the crime for which a prisoner was serving time and how the firearm was used during the crime. It also collects information on the method, source, and process that prisoners used to obtain the firearm. (See appendix 1, *Questions related to firearms in the Survey of Prison Inmates, 2016*.)

---

## Terms and definitions

■ **Firearm** – a weapon that uses gunpowder to shoot a bullet. Primary types are handguns, rifles, and shotguns:[1]

  ○ *Handgun* – a firearm which has a short stock and is designed to be held and fired by the use of a single hand.

  ○ *Rifle* – a firearm intended to be fired from the shoulder and designed to use the energy of an explosive to fire only a single projectile through a rifled bore for each single pull of the trigger.

  ○ *Shotgun* – a firearm intended to be fired from the shoulder and designed to use the energy of an explosive to fire through a smooth bore either a number of ball shot or a single projectile for each pull of the trigger.

■ **Firearm possession** – carrying or possessing at least one firearm when the offense for which prisoners were serving a sentence was committed.

■ **Firearm use** – showing a firearm to or pointing a firearm at anyone or discharging a firearm during the offense for which a prisoner was serving time.

■ **Source of the firearm** – from where and how prisoners reported obtaining the firearm they possessed during the crime for which they were imprisoned—

  ○ *Purchased or traded from a retail source* – includes a gun shop or store, pawn shop, flea market, or gun show.

    – **Gun shop or store** – a business establishment that sells firearms in an open shopping format.

    – **Pawn shop** – a business that offers secured loans to customers, with personal property used as collateral. This personal property is sold to the public if the loan is not repaid.

    – **Flea market** – a market that rents space to individuals to sell or barter merchandise.

    – **Gun show** – a temporary market where licensed dealers and unlicensed sellers can rent tables or booths to sell firearms.

  ○ *Obtained from an individual* – includes purchasing, trading, renting, or borrowing from a family or friend. Also includes when the firearm was gifted to or purchased for the person.

  ○ *Off the street or underground market* – illegal sources of firearms that include markets for stolen goods, middlemen for stolen goods, criminals or criminal enterprises, or individuals or groups involved in sales of illegal drugs.

  ○ *Theft* – includes stealing the firearm during a burglary or from a retail source, family member, friend, or another source.

  ○ *Other sources* – includes a firearm that a prisoner obtained or found at the location of the crime, including one that belonged to a victim or that someone else brought to the location of the crime. This category also includes sources for which there were few responses, such as for guns bought online, and other sources that did not fit into one of the existing categories. This also includes instances where there was not enough information to categorize the source, such as when a firearm was purchased from an unknown source or obtained from another person by an unknown method.

---

[1] The definitions of types of firearms in this section were taken from 18 U.S.C. § 921 (2009). They have been edited for length.

## Controlling-offense characteristics

About 29% of state and 36% of federal prisoners serving a sentence for a violent offense in 2016 possessed a firearm during the crime (table 1). About a quarter of state (23%) and federal (25%) prisoners serving time for a violent offense used a firearm during the crime. "Firearm use" is defined in this report as showing, pointing, or discharging a firearm during the offense for which a prisoner was serving a sentence.

Among prisoners serving time for homicide, more than 2 in 5 (44%) state prisoners and more than 1 in 3 (36%) federal prisoners had possessed a firearm during the crime. About 37% of state and 28% of federal prisoners serving time for homicide used a firearm during the homicide.

Among those serving time for robbery, more than 2 in 5 state prisoners (43%) and federal prisoners (46%) possessed a firearm during the offense, and nearly a third of state (31%) and federal (32%) prisoners used a firearm during the robbery. Firearm possession was less common among state prisoners serving a sentence for rape or sexual assault (2%). Less than 1% of state prisoners serving time for rape or sexual assault used a firearm in the commission of their crime.

## TABLE 1
**Firearm possession and use among state and federal prisoners during the offense for which they were serving time, by type of controlling offense, 2016**

| Controlling offense[a] | Estimated number of state prisoners[b] | Percent of state prisoners who— | | Estimated number of federal prisoners[b] | Percent of federal prisoners who— | |
|---|---|---|---|---|---|---|
| | | Possessed a firearm[b] | Used a firearm[c] | | Possessed a firearm[b] | Used a firearm[c] |
| Total | 1,211,200 | 20.9% | 13.9% | 170,400 | 20.0% | 5.0% |
| Violent* | 667,300 | 29.1% | 23.0% | 20,900 | 36.2% | 25.3% |
| Homicide[d] | 191,400 | 43.6 | 37.2 | 3,800 | 35.9 | 28.4 |
| Rape/sexual assault | 144,800 | 2.0 | 0.8 | 2,400 | : | : |
| Robbery | 149,600 | 43.3 | 31.5 | 10,700 | 46.3 | 32.1 |
| Assault | 149,400 | 25.0 | 20.6 | 2,900 | 29.0 | 18.1 |
| Other violent[e] | 32,200 | 17.0 | 12.6 | 1,200 | 34.1 | : |
| Property | 186,100 | 4.9% † | 2.0% † | 12,000 | 2.6% † | : |
| Burglary | 88,100 | 6.7 | 3.2 | 300 | : | : |
| Other property[f] | 98,000 | 3.3 | 1.0 | 11,800 | 2.4 | : |
| Drug | 180,800 | 8.4% † | 0.8% † | 80,500 | 12.3% † | 0.6% † |
| Trafficking[g] | 130,500 | 9.4 | 0.9 | 72,300 | 12.9 | 0.7 |
| Possession | 45,900 | 6.1 | : | 3,500 | : | : |
| Other/unspecified drug | 4,300 | : | : | 4,700 | : | : |
| Public order | 158,300 | 21.5% † | 5.6% † | 52,900 | 30.2% | 5.3% † |
| Weapons[h] | 43,800 | 67.2 | 15.7 | 22,200 | 66.9 | 11.3 |
| Other public order[i] | 114,400 | 4.0 | 1.7 | 30,700 | 3.6 | : |
| Other | 3,900 | : | : | 1,800 | : | : |
| Unknown | 14,900 | 4.3% † | : | 2,200 | : | : |

Note: See appendix table 2 for standard errors.
*Comparison group.
†Difference with comparison group is significant at the 95% confidence level across main categories, and no testing was done on subcategories (e.g., homicide).
: Not calculated. Too few cases to provide a reliable estimate, or coefficient of variation is greater than 50%.
[a]See *Methodology* for information on how controlling offense was measured.
[b]Excludes 3.0% of state prisoners and 1.7% of federal prisoners who were missing responses on firearm possession. Includes prisoners who were missing responses on firearm use.
[c]Excludes 3.0% of state prisoners and 1.7% of federal prisoners who were missing responses on firearm possession, and an additional 0.6% of state prisoners and 0.7% of federal prisoners who were missing responses on firearm use.
[d]Includes murder and both negligent and non-negligent manslaughter.
[e]Includes kidnapping, blackmail, extortion, hit-and-run driving with bodily injury, child abuse, and criminal endangerment.
[f]Includes larceny, theft, motor vehicle theft, arson, fraud, stolen property, destruction of property, vandalism, hit-and-run driving with no bodily injury, criminal tampering, trespassing, entering without breaking, and possession of burglary tools.
[g]Includes possession with intent to distribute.
[h]Includes being armed while commiting a crime; possession of ammunition, concealed weapons, firearms and explosive devices; selling or trafficking weapons; and other weapons offenses. Among federal prisoners, weapons offense include violations of federal firearms and explosives.
[i]Includes commercialized vice, immigration crimes, DUI, violations of probation/parole, and other public-order offenses.
Source: Bureau of Justice Statistics, Survey of Prison Inmates, 2016.

State and federal prisoners serving time for a violent offense were much more likely to have possessed a firearm during the offense (29% state, 36% federal) than prisoners serving time for a property (5% state, 3% federal) or drug (8% state, 12% federal) offense. Among prisoners serving time for a public-order offense, about 1 in 5 (21%) state prisoners and nearly 1 in 3 (30%) federal prisoners reported that they possessed a firearm during the crime, and about 1 in 20 reported they had used it. About two-thirds of state and federal prisoners sentenced for a weapons offense said they possessed a firearm during the crime.[2]

_____

[2]In addition to prisoners serving a sentence in state or federal prison in 2016 who possessed a firearm during the offense, weapons offenses include prisoners who were convicted of trafficking firearms but did not possess them at the time of the offense and prisoners who were convicted of a weapons offense that did not involve a firearm.

### Extent of firearm use among prisoners during the crime

State and federal prisoners in 2016 who had possessed a firearm during their offense were about equally likely to report that they had obtained the firearm with the intent to use it during the offense (19% state, 20% federal) **(table 2)**. However, state prisoners (68%) who possessed a firearm were more than 2.5 times as likely as federal prisoners (26%) who possessed a firearm to have used it during the crime.

Nearly half of state prisoners (46%) serving a sentence for a crime during which they possessed a firearm discharged the firearm when they committed the crime, compared to 12% of federal prisoners. Among state prisoners who possessed a firearm during their offense, 27% killed a victim with the firearm and another 12% injured or shot a victim but did not kill him or her. Federal prisoners who possessed a firearm when they committed their offense were much less likely to have killed (4%) or injured (2%) a victim with the firearm than state prisoners.

## TABLE 2
**Among state and federal prisoners who possessed a firearm during the offense for which they were serving time, extent of firearm use, 2016**

| Firearm use | State prisoners* | Federal prisoners | State prisoners | | Federal prisoners | |
| --- | --- | --- | --- | --- | --- | --- |
| | | | Violent offense* | Non-violent offense[a] | Violent offense* | Non-violent offense[a] |
| Total | 100% | 100% | 100% | 100% | 100% | 100% |
| Obtained firearm because planned to use in controlling offense[b] | | | | | | |
| Yes | 19.3% | 19.7% | 17.7% | 24.6% † | 26.4% | 18.0% |
| No | 80.7 | 80.3 | 82.3 | 75.4 † | 73.6 | 82.1 |
| Used firearm[c] | 68.0% | 25.9% † | 81.0% | 24.8% † | 72.5% | 12.9% † |
| Discharged | 46.5% | 11.9% † | 55.9% | 15.4% † | 27.3% | 7.5% † |
| Killed victim | 27.1 | 4.1 † | 35.0 | : | 16.5 | : |
| Injured/shot victim but did not kill victim | 12.4 | 2.2 † | 14.5 | 5.3 † | : | : |
| Discharged firearm but did not shoot anyone | 7.0 | 5.6 | 6.4 | 9.0 | 5.7 | 5.4 |
| Did not discharge[d] | 21.5% | 14.0% † | 25.2% | 9.4% † | 45.3% | 5.4% † |
| Did not use firearm | 32.0% | 74.1% † | 19.0% | 75.2% † | 27.5% | 87.1% † |
| Estimated number of prisoners who possessed a firearm (with valid data)[e] | 245,400 | 32,900 | 187,800 | 57,000 | 7,200 | 25,600 |

Note: Percentages are based on data reported on firearm possession, use, and controlling offense. Excludes 3.1% of state prisoners and 3.5% of federal prisoners who possessed a firearm during the offense and were missing responses on firearm use and 0.3% of state prisoners and 0.7% of federal prisoners who possessed a firearm and were missing a controlling offense. The sum of violent offense and non-violent offense does not equal the total number of state and federal prisoners who possessed a firearm in this table due to an estimated 600 state and 100 federal prisoners whose offense type was unknown. See appendix table 3 for standard errors.
*Comparison group.
†Difference with comparison group is significant at the 95% confidence level.
: Not calculated. Too few cases to provide a reliable estimate, or coefficient of variation is greater than 50%.
[a]Includes property, drug, public order, and other non-violent offenses.
[b]Percentages are based on the 246,200 state and 32,600 federal prisoners who reported they carried or possessed a firearm and whether they obtained a firearm to use during the offense.
[c]Includes prisoners who showed a firearm to anyone, pointed a firearm at anyone, or discharged the firearm during the offense.
[d]Includes prisoners who showed or pointed a firearm at anyone during the offense but did not discharge it.
[e]Includes prisoners who reported they carried or possessed a firearm. Excludes prisoners who were missing responses on firearm possession or use. For violent offense and non-violent offense, also excludes prisoners who were missing a controlling offense.
Source: Bureau of Justice Statistics, Survey of Prison Inmates, 2016.

Among prisoners who possessed a firearm during a violent offense, a large majority of both state (81%) and federal (73%) prisoners used the firearm during the offense, far more than the percentages for non-violent offenders (25% state, 13% federal). More than half (56%) of state prisoners serving time for a violent offense who possessed a firearm during the crime discharged it, compared to fewer than a sixth (15%) of non-violent offenders in state prison who possessed a firearm. Violent offenders (27%) in federal prison who possessed a firearm during the crime were about 3.5 times as likely to discharge it as non-violent offenders (8%). Among state prisoners who had possessed a firearm during their offense, however, non-violent offenders (25%) were more likely than violent offenders (18%) to have planned to use the firearm during the offense.

## Type of firearm possessed by prisoners during offense

Handguns were by far the most common type of firearm possessed or used by prisoners during the crime for which they were sentenced. About 18% of all state and federal prisoners in 2016 reported that they had possessed a handgun during the crime for which they were serving a sentence (table 3). Two percent or fewer possessed a rifle or a shotgun. Twelve percent of state (79%) and 5% of federal prisoners used a handgun during their offense. Most state (79%) and federal (80%) prisoners did not possess any type of firearm during the crime for which they were imprisoned.

## TABLE 3

**Firearm possession and use among state and federal prisoners during the offense for which they were serving time, by type of firearm, 2016**

| Type of firearm | Percent of prisoners who possessed a firearm | | | Percent of prisoners who used a firearm[a] | | |
|---|---|---|---|---|---|---|
| | All prisoners | State* | Federal | All prisoners | State* | Federal |
| **Total** | 100% | 100% | 100% | 100% | 100% | 100% |
| Firearm[b] | 20.8% | 20.9% | 20.0% | 12.8% | 13.9% | 5.0% † |
|   Handgun | 18.4 | 18.4 | 18.3 | 11.2 | 12.2 | 4.6 |
|   Rifle | 1.5 | 1.4 | 2.0 † | 0.8 | 0.8 | 0.4 † |
|   Shotgun | 1.6 | 1.6 | 1.7 | 1.1 | 1.2 | 0.4 † |
| No firearm | 79.2% | 79.1% | 80.0% | 87.2% | 86.1% | 95.0% |
| Estimated number of prisoners (with valid data)[c] | 1,378,200 | 1,208,100 | 170,100 | 1,378,200 | 1,208,100 | 170,100 |

Note: Details on type of firearm may not sum to totals because prisoners could report more than one type of firearm. Percentages exclude missing data. Excludes 3.0% of state prisoners and 1.7% of federal prisoners who were missing responses on firearm possession during the offense and an additional 0.3% of state prisoners and 0.2% of federal prisoners who were missing responses on type of firearm. See appendix table 4 for standard errors.
*Comparison group.
†Difference with comparison group is significant at the 95% confidence level.
[a]Percentages exclude 0.6% of state prisoners and 0.7% of federal prisoners who were missing responses on firearm use.
[b]Includes prisoners who reported a type of firearm that did not fit into one of the existing categories and those who did not provide enough information to categorize the type of firearm. About 0.1% of state prisoners and 0.2% of federal prisoners reported another type of firearm or did not report enough information to specify the type of firearm.
[c]Excludes prisoners who were missing responses on firearm possession or type of firearm. Counts are weighted to totals from the 2015 National Prisoner Statistics Program; see *Methodology: Survey of Prison Inmates, 2016* (NCJ 252210, BJS web, July 2019).
Source: Bureau of Justice Statistics, Survey of Prison Inmates, 2016.

## Demographic characteristics

Male prisoners were more likely than female prisoners to have possessed a firearm during their crime. About a fifth of male state and federal prisoners serving a sentence in 2016 possessed a firearm during the crime (table 4). Males in state prisons in 2016 were about 2.5 times as likely (22%) as females in state prisons (9%) to have possessed a firearm during the crime for which they were imprisoned. In federal prisons, males (21%) were about three times as likely as females (7%) to have possessed a firearm during their crime. Almost

3 in 10 (29%) black prisoners serving a sentence in state prison in 2016 possessed a firearm during their crime. White (12%) and Hispanic (21%) state prisoners were less likely to have possessed a firearm during their crime. Similarly, white (17%) and Hispanic (13%) federal prisoners serving a sentence in 2016 were less likely to have possessed a firearm during the crime than black (29%) federal prisoners. State prisoners who served in the military were less likely to have possessed a firearm during their crime (16%) than state prisoners who had not served in the military (21%).

## TABLE 4
**Firearm possession among state and federal prisoners during the offense for which they were serving time, by demographic characteristics, 2016**

| Demographic characteristic | State | | Federal | |
|---|---|---|---|---|
| | Number of prisoners | Percent of prisoners who possessed a firearm during the offense | Number of prisoners | Percent of prisoners who possessed a firearm during the offense |
| **Sex** | | | | |
| Male* | 1,124,200 | 21.8% | 159,800 | 20.9% |
| Female | 87,000 | 9.5 † | 10,600 | 6.6 † |
| **Race/Hispanic origin[a]** | | | | |
| White | 383,300 | 12.4% † | 35,400 | 16.6% † |
| Black* | 401,500 | 29.4 | 53,800 | 29.2 |
| Hispanic | 247,200 | 21.5 † | 62,600 | 12.6 † |
| American Indian/Alaska Native | 17,200 | 14.8 † | 2,800 | 23.8 |
| Asian/Native Hawaiian/Other Pacific Islander | 10,700 | 22.8 | 2,600 | : |
| Two or more races | 133,100 | 19.1 † | 10,900 | 29.3 |
| **Age at time of survey** | | | | |
| 18–24* | 123,800 | 31.7% | 8,200 | 30.1% |
| 25–34 | 389,100 | 24.4 † | 47,700 | 27.4 |
| 35–44 | 318,800 | 19.3 † | 58,800 | 19.0 † |
| 45–54 | 224,800 | 14.6 † | 36,700 | 14.1 † |
| 55 or older | 154,800 | 16.0 † | 19,000 | 12.2 † |
| **Marital status** | | | | |
| Married* | 168,500 | 16.7% | 36,800 | 14.4% |
| Widowed/widowered | 34,300 | 18.3 | 3,100 | 21.7 |
| Separated | 58,300 | 12.7 † | 9,600 | 12.8 |
| Divorced | 233,300 | 14.5 | 30,900 | 15.2 |
| Never married | 715,900 | 24.8 † | 90,000 | 24.6 † |
| **Education[b]** | | | | |
| Less than high school* | 750,500 | 23.1% | 94,900 | 22.7% |
| High school graduate | 273,700 | 19.6 † | 36,500 | 19.4 |
| Some college | 133,900 | 14.7 † | 23,100 | 18.8 |
| College degree or more | 43,600 | 11.0 † | 12,700 | 6.3 † |
| **Citizenship** | | | | |
| U.S. citizen* | 1,156,800 | 21.0% | 127,500 | 24.2% |
| Non-U.S. citizen | 53,100 | 18.5 | 42,400 | 7.2 † |
| **Military service** | | | | |
| Yes* | 95,200 | 15.6% | 9,200 | 15.9% |
| No | 1,115,900 | 21.4 † | 161,200 | 20.3 |

Note: Percentages and counts exclude missing data. Excludes 3.0% of state prisoners and 1.7% of federal prisoners who were missing responses on firearm possession during the offense. Details for counts may not sum to totals due to missing data. See appendix table 5 for standard errors.
*Comparison group.
†Difference with comparison group is significant at the 95% confidence level.
: Not calculated. Too few cases to provide a reliable estimate, or coefficient of variation is greater than 50%.
[a]Excludes persons of Hispanic/Latino origin, unless specified.
[b]Based on highest year of education completed.
Source: Bureau of Justice Statistics, Survey of Prison Inmates, 2016.

In general, the likelihood of state and federal prisoners having possessed a firearm during their crime decreased with age. Firearm possession among state prisoners ages 18 to 24 (32%) in 2016 was more common than among older prisoners. Federal prisoners ages 18 to 24 (30%) were more likely to possess a firearm than those age 35 or older (16%, not shown in table).

The difference in firearm possession between U.S. citizens (21%) and non-citizens (18%) in state prisons in 2016 was not statistically significant. Among federal prisoners serving a sentence in 2016, firearm possession was more than three times as high among U.S. citizens (24%) as non-citizens (7%).

## Method, source, and process used to obtain the firearm

Among prisoners who possessed a firearm when they committed the offense for which they were imprisoned and who reported the source from which they obtained it, the most common source (43%) was off-the-street or the underground market (table 5). Another 7% of state and 5% of federal prisoners stole the firearm, and 7% of state and 8% of federal prisoners reported that they obtained the firearm at the location of the crime.

## TABLE 5

**Among state and federal prisoners who had possessed a firearm during the offense for which they were serving time, sources and methods used to obtain a firearm, 2016**

| Source and method to obtain firearm | All prisoners | State | Federal |
|---|---|---|---|
| Purchased/traded at retail source | 10.1% | 9.7% | 13.7% |
| Gun shop/store | 7.5 | 7.2 | 9.6 |
| Pawn shop | 1.6 | 1.5 | 2.2 |
| Flea market | 0.4 | : | : |
| Gun show | 0.8 | 0.8 | 1.4 |
| Obtained from individual | 25.3% | 26.0% | 20.5% |
| Purchased/traded from family/friend | 8.0 | 7.9 | 9.1 |
| Rented/borrowed from family/friend | 6.5 | 7.0 | 3.0 |
| Gift/purchased for prisoner | 10.8 | 11.2 | 8.4 |
| Off the street/underground market[a] | 43.2% | 43.2% | 42.9% |
| Theft[b] | 6.4% | 6.6% | 4.7% |
| From burglary | 1.5 | 1.5 | : |
| From retail source | 0.2 | : | : |
| From family/friend | 1.6 | 1.8 | : |
| Unspecified theft[c] | 3.1 | 3.3 | 1.8 |
| Other source | 17.4% | 17.1% | 20.1% |
| Found at location of crime/victim | 6.9 | 6.7 | 7.9 |
| Brought by someone else | 4.6 | 4.7 | 3.6 |
| Other[d] | 5.9 | 5.6 | 8.5 |
| Multiple sources[e] | 2.5% | 2.6% | 2.0% |
| Estimated number of prisoners who possessed a firearm, excluding prisoners who did not report source[f] | 256,400 | 227,100 | 29,300 |

Note: Prisoners were asked to report all sources and methods of obtaining any firearm they possessed during the offense, so details may not sum to totals. Each source is included in this table when multiple sources were reported. See *Methodology*. Percentages exclude missing data. Excludes 10.3% of state prisoners and 14.1% of federal prisoners who possessed a firearm during the offense and were missing responses on either source or method of obtaining the firearm. These prisoners were excluded either because they did not provide a valid response or they did not receive the questions due to providing an open-ended response to the previous question about type of weapon. See appendix table 6 for standard errors.
: Not calculated. Too few cases to provide a reliable estimate, or coefficient of variation is greater than 50%.
[a]Illegal sources of firearms that include markets for stolen goods, middlemen for stolen goods, criminals or criminal enterprises, or individuals or groups involved in sales of illegal drugs.
[b]Excludes theft from victim.
[c]Includes theft where the source could not be identified and theft other than from a burglary, retail location, family, or friend.
[d]Includes if no source specified in the table was reported. Includes sources that did not fit into one of the existing categories, sources for which there were few responses such as bought online, or if there was not enough information to categorize the source. Examples of other sources include bought from an unknown source or obtained from a friend by an unknown method.
[e]Includes prisoners who reported multiple sources or methods that fit into more than one of the categories. Each reported source is included in the categories above.
[f]Includes prisoners who reported they carried or possessed a firearm and prisoners who reported a source or method.
Source: Bureau of Justice Statistics, Survey of Prison Inmates, 2016.

Among prisoners who possessed a firearm during the offense for which they were imprisoned, 7% of state and 10% of federal prisoners serving a sentence in 2016 bought or traded for the firearm from a gun shop or gun store. About 1% bought or traded for the firearm at a gun show. About a quarter (26%) of state prisoners and about a fifth (21%) of federal prisoners obtained a firearm that they possessed during their offense from an individual in a non-retail setting, such as a friend or family member.

Prisoners who reported that they had purchased or traded a firearm at a retail source were asked if they had obtained the firearm from a licensed dealer or private seller. Among prisoners who had possessed a firearm during the offense for which they were serving time, 8% of state and 11% of federal prisoners had purchased it from or traded with a licensed firearm dealer at a retail source (table 6).

Prisoners who reported that they had purchased a firearm from a licensed firearm dealer at a retail source were further asked whether they bought the firearm under their own name and whether they knew a background check was conducted. Among those who had possessed a firearm during the offense for which they were imprisoned, 7% of state and 8% of federal prisoners had purchased it under their own name from a licensed firearm dealer at a retail source, while approximately 1% of state and 2% of federal prisoners had purchased a firearm from a licensed dealer at a retail source but did not purchase it under their own name (not shown in table).

Among all prisoners who purchased or traded a firearm from a licensed firearm dealer at a retail source (8.2%), the majority reported that a background check was conducted (6.7%).

## TABLE 6

**Among state and federal prisoners who had possessed a firearm during the offense for which they were serving time, processes used to obtain a firearm, 2016**

| Process to obtain firearm | All prisoners | State | Federal |
|---|---|---|---|
| Total | 100% | 100% | 100% |
| Not purchased or traded at retail source | 89.9% | 90.3% | 86.3% |
| Purchased or traded at retail source[a] | 10.1% | 9.7% | 13.7% |
| Licensed firearm dealer at retail source | 8.2 | 7.9 | 10.9 |
| Purchased under own name[b] | 6.9 | 6.8 | 8.4 |
| Background check was reportedly conducted[c] | 6.7 | 6.3 | 9.4 |
| Private seller at retail source[d] | 1.2 | 1.1 | 2.3 |
| Unknown[e] | 0.7 | 0.8 | : |
| Estimated number of prisoners who possessed a firearm (with valid data)[f] | 256,400 | 227,100 | 29,300 |

Note: Percentages exclude missing data. Excludes 10.3% of state prisoners and 14.1% of federal prisoners who possessed a firearm during the offense and were missing responses on source or method of obtaining the firearm. See appendix table 7 for standard errors.
: Not calculated. Too few cases to provide a reliable estimate, or coefficient of variation is greater than 50%.
[a]Includes prisoners who purchased or traded from a retail source, including a retail store, pawn shop, flea market, or gun show.
[b]Includes prisoners who purchased from a retail source, including a retail store, pawn shop, flea market, or gun show. Excludes prisoners who traded for a firearm from a retail source.
[c]Includes prisoners who purchased from a retail source, including a retail store, pawn shop, flea market, or gun show. Excludes prisoners who traded for a firearm from a retail source and prisoners who reported that a background check was not conducted or who were unaware as to whether one was conducted.
[d]Excludes private sellers other than at a retail source.
[e]Includes prisoners who purchased or traded a firearm from a retail source and were missing responses on whether a firearm was purchased or traded from a licensed firearm dealer or a private seller at a retail source.
[f]Includes prisoners who reported they carried or possessed a firearm and prisoners who reported a source or method.
Source: Bureau of Justice Statistics, Survey of Prison Inmates, 2016.

### Use and source of firearms among all state and federal prisoners

About 1% of all state and federal prisoners used a firearm during the offense that they obtained from a retail source (table 7). About 2% of prisoners possessed a firearm that they obtained from a retail source, including a retail store, pawn shop, flea market, or gun show.

Thirteen percent of all state and federal prisoners used a firearm during the offense for which they were serving time in 2016.

**TABLE 7**
**Firearm possession and use among all state and federal prisoners during the offense for which they were serving time, by type of controlling offense and source, 2016**

| Controlling offense[a] | Percent of state and federal prisoners who— | | Percent of state and federal prisoners who— | |
|---|---|---|---|---|
| | Possessed a firearm[b] | Possessed a firearm that they obtained from a retail source[c] | Used a firearm[d] | Used a firearm that they obtained from a retail source[e] |
| Total | 20.8% | 1.9% | 12.8% | 1.3% |
| Violent* | 29.3% | 2.8% | 23.1% | 2.3% |
| Homicide[f] | 43.5 | 5.9 | 37.0 | 5.2 |
| Robbery | 43.5 | 1.8 | 31.5 | 1.3 |
| Property | 4.8% † | 0.5% † | 1.9% † | : |
| Drug | 9.6% † | 1.0% † | 0.8% † | 0.1% † |
| Public order | 23.6% † | 1.7% † | 5.5% † | 0.6% † |

Note: Percentages exclude missing data. Excludes 2.8% of prisoners who were missing responses on firearm possession during the offense and 1.2% of prisoners who had a valid response to firearm possession but were missing a controlling offense. Retail source includes purchasing or trading the firearm from a retail store, pawn shop, flea market, or gun show. Use includes prisoners who showed a firearm to anyone, pointed a firearm at anyone, or discharged a firearm during the controlling offense. See appendix table 8 for standard errors.
*Comparison group.
† Difference with comparison group is significant at the 95% confidence level across main categories, and no testing was done on subcategories (e.g., homicide).
: Not calculated. Too few cases to provide a reliable estimate, or coefficient of variation is greater than 50%.
[a]See *Methodology* for more information on how controlling offense was measured.
[b]Includes state and federal prisoners who reported a valid response to firearm possession.
[c]Includes state and federal prisoners who reported a valid response to firearm possession and source.
[d]Includes state and federal prisoners who reported a valid response to firearm possession and use.
[e]Includes state and federal prisoners who reported a valid response to firearm possession, source, and use.
[f]Includes murder and both non-negligent and negligent manslaughter.
Source: Bureau of Justice Statistics, Survey of Prison Inmates, 2016.

# Methodology

## Survey of Prison Inmates

The findings in this report are primarily based on data collected through the 2016 Survey of Prison Inmates (SPI). The SPI is a periodic, cross-sectional survey of the state and sentenced federal prison populations. Its primary objective is to produce national statistics of the state and sentenced federal prison populations across a variety of domains, including—but not limited to—demographic characteristics, current offense and sentence, incident characteristics, firearm possession and sources, criminal history, socioeconomic characteristics, family background, drug and alcohol use and treatment, mental and physical health and treatment, and facility programs and rule violations. RTI International served as BJS's data collection agent for the 2016 SPI under a cooperative agreement (award no. 2011-MU-MU-K070). From January through October 2016, data were collected through face-to-face interviews with prisoners using computer-assisted personal interviewing (CAPI).

Prior iterations of the SPI were known as the Survey of Inmates in State and Federal Correctional Facilities (SISFCF), which was renamed with the 2016 implementation. The first survey of state prisoners was fielded in 1974 and thereafter in 1979, 1986, 1991, 1997, and 2004. The first survey of federal prisoners was fielded in 1991, along with the survey of state prisoners, and since then both surveys have been conducted at the same time using the same questionnaire and administration.

The target population for the 2016 SPI was prisoners ages 18 and older who were held in a state prison or had a sentence to federal prison in the United States during 2016. Similar to prior iterations, the 2016 survey was a stratified two-stage sample design in which prisons were selected in the first stage and prisoners within sampled facilities were selected in the second stage. The SPI sample was selected from a universe of 2,001 unique prisons (1,808 state and 193 federal) that were either enumerated in the 2012 Census of State and Federal Adult Correctional Facilities or had opened between the completion of the census and July 2014 when the SPI sample of prisons was selected. A total of 364 prisons (306 state and 58 federal) participated in the 2016 survey out of the 385 selected (324 state and 61 federal) for interviewing. The first-stage response rate (i.e., the response rate among selected prisons) was 98.4% (98.1% among

state prisons and 100% among federal prisons).[3] A total of 24,848 prisoners participated (20,064 state and 4,784 federal) in the 2016 SPI based on a sample of 37,058 prisoners (30,348 state and 6,710 federal). The second-stage response rate (i.e., the response rate among selected prisoners) was 70.0% (69.3% among state prisoners and 72.8% among federal prisoners).[4]

Responses from interviewed prisoners in the 2016 SPI were weighted to provide national estimates. Each interviewed prisoner was assigned an initial weight corresponding to the inverse of the probability of selection within each sampled prison. A series of adjustment factors were applied to the initial weight to minimize potential bias due to non-response and to provide national estimates.

For more information on the 2016 SPI methodology, see *Methodology: Survey of Prison Inmates, 2016* (NCJ 252210, BJS web, July 2019).

## Standard errors and tests of significance

When national estimates are derived from a sample, as with the SPI, caution must be used when comparing one estimate to another or when comparing estimates between years. Although one estimate may be larger than another, estimates based on a sample rather than a complete enumeration of the population have some degree of sampling error. The sampling error of an estimate depends on several factors, including the size of the estimate, the number of completed interviews, and the intracluster correlation of the outcome within prisons. When the sampling error around an estimate is taken into account, estimates that appear different may not be statistically different. One measure of the sampling error associated with an estimate is the standard error. The standard error may vary from one estimate to the next. Standard errors in this report were estimated using Taylor Series Linearization to account for the complex design of the SPI in producing the variance estimates.

---

[3] A total of 15 prisons (12 state and 3 federal) that were sampled were deemed ineligible for the 2016 SPI. For more information, see *Methodology: Survey of Prison Inmates, 2016* (NCJ 252210, BJS web, July 2019).
[4] There were 10,661 sampled prisoners who were eligible for the survey but did not participate. Another 1,549 sampled prisoners were deemed ineligible for the survey. For more information, see *Methodology: Survey of Prison Inmates, 2016* (NCJ 252210, BJS web, July 2019).

Readers may use the estimates and standard errors of the estimates provided in this report to generate a 95% confidence interval around the estimates as a measure of the margin of error. Typically, multiplying the standard error by 1.96 and then adding or subtracting the result from the estimate produces the confidence interval. This interval expresses the range of values with which the true population parameter is expected to fall 95% of the time if the same method is used to select different samples.

For small samples and estimates close to 0%, the use of the standard error to construct the 95% confidence interval may not be reliable. Therefore, caution should be used when interpreting the estimates. Caution should also be used if constructing a 95% confidence interval, which would include zero in these cases, because the estimate may not be distinguishable from zero.

The standard errors have been used to compare estimates of firearm possession during the offense, firearm use during the crime, and type of firearm possessed. They have also been used to compare firearm possession among selected groups of prisoners that have been defined by demographic characteristics and controlling offense. To facilitate the analysis, rather than provide the detailed estimates for every standard error, differences in the estimates for subgroups in the relevant tables in this report have been tested and noted for significance at the 95% level of confidence. Readers should reference the tables for testing on specific findings. Unless otherwise noted, findings described in this report as higher, lower, or different passed a test at the 0.05 level of statistical significance (95% confidence level).

### Measurement of firearm possession and source

The 2016 SPI was restricted to prisoners age 18 or older at the time of the survey. Firearms analyses in this report were restricted to state and federal prisoners who were sentenced or state prisoners who were convicted but were awaiting sentencing. This report excludes prisoners who were awaiting trial (i.e., unconvicted) or a revocation hearing or who were held for other reasons. Unconvicted prisoners, such as those awaiting trial or being held for other reasons like safekeeping or a civil commitment, were excluded from this report because they were not asked questions about firearm possession to protect against self-incrimination. (See appendix 1, *Questions related to firearms in the Survey of Prison Inmates, 2016*.) Of

the estimated 1,421,700 state and federal prisoners in 2016, an estimated 287,400 were armed with a firearm, 1,094,200 were not armed with a firearm, 23,800 did not know or refused to answer the question, and 16,300 were not asked the question because they were not convicted or they stopped the interview before responding to the question.[5]

To determine whether prisoners possessed a firearm at the time of the offense for which they were serving time in prison, respondents were first asked whether they had carried, possessed, or used a weapon when the controlling offense occurred. Respondents could report that they carried, possessed, or used a firearm or another weapon such as a toy or BB gun, knife, other sharp object, or blunt object. Weapons other than firearms, including toy and BB guns, were excluded from this report. Multiple weapons and firearms could be reported by respondents.

Of the respondents who were asked about possessing a firearm during the offense for which they were imprisoned, about 3.0% of state and 1.7% of federal prisoners in 2016 were missing responses on firearm possession. These prisoners were excluded from the analyses in this report. All prisoners who reported they carried, possessed, or used a firearm during the offense were asked whether they had obtained the firearm because they were planning to carry, possess, or use it during the offense. They were also asked whether they showed, pointed, or fired the firearm during the offense. Respondents who reported that they fired the firearm were also asked whether they shot anyone and, if so, whether anyone they shot had died. Of the respondents who possessed a firearm during the offense, about 3.1% of state and 3.5% of federal prisoners in 2016 were missing responses on how they used the firearm. These prisoners were excluded from the analyses in figure 1, tables 1 through 3, and table 7.

To measure the type of firearm possessed by prisoners, respondents were asked whether they had carried, possessed, or used a handgun, rifle, shotgun, or some other type of firearm during the offense for which they were imprisoned. About 0.3% of state prisoners and 0.2% of federal prisoners in 2016 were missing responses on the type of firearm that they possessed. These prisoners, along with prisoners who were missing a response on firearm possession, were excluded from the analyses in table 3.

---

[5]The SPI sample was weighted to the state and federal prison populations that were eligible to be sampled in the survey. See *Methodology: Survey of Prison Inmates, 2016* (NCJ 252210, BJS web, July 2019).

To measure the source and method of obtaining the firearm possessed by prisoners during their crime, two separate questions were asked in the survey. The first question asked how the prisoners obtained the firearm, and multiple responses could be reported in the 2016 SPI. Possible responses included stole it, rented it, borrowed it from or were holding it for somebody, traded something for it, bought it, someone bought it for them, someone gave it as a gift, found it or it was at the location where the offense occurred, it was brought by someone else, or other. If respondents specified an "other" method of obtaining the firearm, then the field interviewers entered the respondents' answers into a text field. These responses originally reported as "other" were coded to one of the existing response categories if possible.

The second question asked where prisoners obtained the firearm, and multiple responses could be reported in the 2016 SPI. Respondents received this question if they reported that they stole, rented, borrowed from or were holding for somebody, traded something for, or bought the firearm. Possible responses included gun shop or gun store; pawn shop; flea market; gun show; from a victim, family member, or friend; from a fence (a middleman for stolen goods) or underground market; off the street or from a drug dealer; in a burglary; online or the internet; or other. Fewer than 1% of state and federal prisoners reported obtaining a firearm online. These responses were included in table 5 in the "other" category due to the small number of sample cases. If respondents specified an "other" source of obtaining a firearm, then the field interviewers entered the respondents' answers into a text field. Responses originally reported as "other" were coded to one of the existing response categories if possible.

The responses from these two questions were used to create the source and method categories in figure 1 and tables 5 through 7. Approximately 10.3% of state and 14.1% of federal prisoners in 2016 who possessed a firearm during the offense for which they were serving a sentence were missing responses on source or method of obtaining the firearm. These prisoners were excluded from figure 1 and tables 5 through 7.

Prisoners who reported purchasing or trading a firearm from a retail source (gun shop or gun store, pawn shop, flea market, or gun show) were asked if they purchased or traded it from a licensed firearm dealer or a private seller. Prisoners who reported they purchased a firearm from a retail source were further asked whether they bought the firearm under their own name and whether the seller did a firearm purchase background check before selling them the firearm. About 1% of the respondents who possessed a firearm during the offense purchased or traded it from a retail source and were missing responses on whether they bought the firearm from a licensed dealer or private seller. About 1% of respondents who possessed a firearm during the offense purchased it from a retail source and were missing responses on whether the firearm was purchased under their own name or whether a background check was conducted.

## Measurement of controlling offense

The way controlling offense was measured through the 2016 SPI, and reflected in this report, varies by sentence status and the number of offenses of prisoners:

- For sentenced prisoners and those awaiting sentencing with one offense, that offense is the controlling offense.

- For sentenced prisoners with multiple offenses and sentences, the controlling offense is the one with the longest sentence.

- For sentenced prisoners with multiple offenses and one sentence and those awaiting sentencing with multiple offenses, the controlling offense is the most serious offense. For this report, violent offenses are considered most serious, followed by property, drug, public-order, and all other offenses.

For prisoners who were convicted but awaiting sentencing, the controlling offense is the most serious offense.

## Appendix 1. Questions related to firearms in the Survey of Prison Inmates, 2016

This appendix includes the questions from the 2016 SPI that were used to measure the firearms' constructs in this report. Text that appears in capital letters in the questions was not read out loud to respondents. That text reflects programming instructions for the CAPI instrument, instructions to field interviewers who conducted the interviews, or response options that were not read out loud to respondents but were coded by the field interviewers during the interviews.

**Questions**

**CJ39.** (ASK IF RESPONDENT REPORTED BEING SENTENCED IN CJ1 OR CJ3 OR IF RESPONDENT REPORTED HE/SHE WAS AWAITING SENTENCING IN CJH2A.) Did you carry, possess, or use a weapon when the (INSERT CONTROLLING OFFENSE) occurred?

- YES
- NO (SKIP TO NEXT SECTION)

**CJH1.** How many weapons did you carry, possess, or use when the (INSERT CONTROLLING OFFENSE) occurred?

- ONE
- TWO OR MORE

**CJH2.** What (INSERT "kind of weapon was it?" OR "kinds of weapons were they?") CHECK ALL THAT APPLY.

- FIREARM
- TOY OR BB GUN (INCLUDE FAKE OR REPLICA GUNS)
- KNIFE
- OTHER SHARP OBJECT (SCISSORS, ICE PICK, AX, ETC.)
- BLUNT OBJECT (ROCK, CLUB, BLACKJACK, ETC.)
- ANOTHER WEAPON
    - What kinds of weapons were they?
        - INTERVIEWER: RECORD RESPONSE VERBATIM.

**CJH3.** (ASK IF RESPONDENT REPORTED "FIREARM" IN CJH2.) How many firearms did you carry, possess, or use when the (INSERT CONTROLLING OFFENSE) occurred?

- ENTER NUMBER OF FIREARMS

**CJH4.** (ASK IF RESPONDENT REPORTED "FIREARM" IN CJH2.) What (INSERT "type of firearm was it?" OR "types of firearms were they?") CHECK ALL THAT APPLY.

- A HANDGUN
- A RIFLE
- A SHOTGUN
- SOME OTHER TYPE OF FIREARM
    - What type of firearm?
        - INTERVIEWER: RECORD RESPONSE VERBATIM.

**CJH5.** (ASK IF RESPONDENT REPORTED "FIREARM" IN CJH2.) How did you obtain the (INSERT "firearm" OR "firearms") that you carried, possessed, or used during the (INSERT CONTROLLING OFFENSE)? Any others? CHECK ALL THAT APPLY.

- STOLE IT (GO TO CJH6)
- RENTED IT (GO TO CJH6)
- BORROWED FROM OR WAS HOLDING FOR SOMEBODY (GO TO CJH6)
- TRADED SOMETHING FOR IT (GO TO CJH6)
- BOUGHT IT (GO TO CJH6)
- SOMEONE BOUGHT IT FOR ME (GO TO CJH7)
- SOMEONE GAVE IT TO ME AS A GIFT (GO TO CJH9)
- FOUND IT/WAS AT LOCATION WHERE OFFENSE OCCURRED (GO TO CJH9)
- WAS BROUGHT BY SOMEONE ELSE (GO TO CJH9)
- OTHER
    - How did you obtain the firearm that you carried, possessed, or used during the offense?
        - INTERVIEWER: RECORD RESPONSE VERBATIM.

**CJH6.** (ASK IF RESPONDENT REPORTED "FIREARM" IN CJH2 AND REPORTED IN CJH5 HE/SHE "STOLE IT", "RENTED IT", "BORROWED FROM OR WAS HOLDING FOR SOMEBODY", "TRADED SOMETHING FOR IT", OR "BOUGHT IT".) Where did you obtain the (INSERT TYPE OF FIREARM REPORTED IN CJH4)? CHECK ALL THAT APPLY.

- GUN SHOP OR GUN STORE (GO TO CJH6A)
- PAWN SHOP (GO TO CJH6A)
- FLEA MARKET (GO TO CJH6A)
- GUN SHOW (GO TO CJH6A)
- FROM THE VICTIM(S) (GO TO CJH9)
- FROM A FAMILY MEMBER (GO TO CJH9)
- FROM A FRIEND (GO TO CJH9)
- FROM A FENCE/BLACK MARKET SOURCE (GO TO CJH9)
- OFF THE STREET/FROM A DRUG DEALER (GO TO CJH9)
- IN A BURGLARY (GO TO CJH9)
- ONLINE/THE INTERNET (GO TO CJH9)
- OTHER
    - Where did you obtain the (INSERT TYPE OF FIREARM REPORTED IN CJH4)?
        - INTERVIEWER: RECORD RESPONSE VERBATIM.

*Continued on next page*

## Appendix 1. Questions related to firearms in the Survey of Prison Inmates, 2016 (continued)

**CJH6a.** (ASK IF RESPONDENT REPORTED IN CJH6 THAT THE FIREARM WAS FROM A "GUN SHOP OR GUN STORE", "PAWN SHOP", "FLEA MARKET", OR "GUN SHOW".) When you obtained the (INSERT TYPE OF FIREARM REPORTED IN CJH4) was it from a licensed firearm dealer or a private seller?

- LICENSED FIREARM DEALER
- PRIVATE SELLER

**CJH6b.** (ASK IF RESPONDENT REPORTED IN CJH5 THAT HE/SHE "BOUGHT IT" AND IN CJH6 REPORTED THAT THE FIREARM WAS FROM A "GUN SHOP OR GUN STORE", "PAWN SHOP", "FLEA MARKET", OR "GUN SHOW".) Did you buy the (INSERT TYPE OF FIREARM REPORTED IN CJH4) under your own name?

- YES
- NO
- NO PAPERWORK WAS REQUIRED

**CJH6c.** (ASK IF RESPONDENT REPORTED IN CJH5 THAT HE/SHE "BOUGHT IT" AND REPORTED IN CJH6 THAT THE FIREARM WAS FROM A "GUN SHOP OR GUN STORE", "PAWN SHOP", "FLEA MARKET", OR "GUN SHOW".) Did the seller do a firearm purchase background check before selling you the gun?

- YES
- NO

**CJH6d.** (ASK IF RESPONDENT REPORTED IN CJH5 THAT HE/SHE "BOUGHT IT" AND IN CJH6 REPORTED THAT THE FIREARM WAS FROM A "GUN SHOP OR GUN STORE", "PAWN SHOP", "FLEA MARKET", OR "GUN SHOW".) Did you buy the (INSERT TYPE OF FIREARM REPORTED IN CJH4) directly or did someone else buy it for you?

- INMATE BOUGHT
- SOMEONE ELSE BOUGHT

**CJH7.** (ASK IF RESPONDENT REPORTED "SOMEONE ELSE BOUGHT IT FOR ME" IN CJH5.) Where did that person obtain the (INSERT TYPE OF FIREARM REPORTED IN CJH4)?

- GUN SHOP OR GUN STORE
- PAWN SHOP
- FLEA MARKET
- GUN SHOW
- FROM THE VICTIM(S)
- FROM A FAMILY MEMBER
- FROM A FRIEND
- FROM A FENCE/BLACK MARKET SOURCE

- OFF THE STREET/FROM A DRUG DEALER
- IN A BURGLARY
- ONLINE/THE INTERNET
- OTHER
  - Where did that person obtain the (INSERT TYPE OF FIREARM REPORTED IN CJH4)?
    - INTERVIEWER: RECORD RESPONSE VERBATIM.

**CJH8.** (ASK IF RESPONDENT REPORTED "SOMEONE ELSE BOUGHT IT FOR ME" IN CJH5.) Why did someone else obtain the (INSERT TYPE OF FIREARM REPORTED IN CJH4) for you? CHECK ALL THAT APPLY.

- COULD NOT TRAVEL TO WHERE THE SELLER WAS
- NOT ALLOWED BECAUSE TOO YOUNG
- NOT ALLOWED BECAUSE OF CRIMINAL RECORD
- THEY COULD GET IT MORE QUICKLY OR EASILY
- DID NOT WANT TO BE LINKED TO FIREARM PURCHASE
- OTHER
  - Why did someone else obtain the (INSERT TYPE OF FIREARM REPORTED IN CJH4) for you?
    - INTERVIEWER: RECORD RESPONSE VERBATIM.

**CJH9.** Did you get the (INSERT TYPE OF FIREARM REPORTED IN CJH4) because you were **planning** to carry, possess, or use it during the (INSERT CONTROLLING OFFENSE)?

- YES
- NO

**CJH10.** Did you show or point (INSERT "the firearm" OR "any of the firearms") at anyone during the (INSERT CONTROLLING OFFENSE)?

- YES
- NO

**CJH11.** Did you fire (INSERT "the firearm" OR "any of the firearms") during the (INSERT CONTROLLING OFFENSE)?

- YES
- NO (SKIP TO NEXT SECTION)

**CJH12.** Did you shoot anyone?

- YES
- NO (SKIP TO NEXT SECTION)

**CJH13.** Did anyone you shot die?

- YES
- NO

## APPENDIX TABLE 1
**Standard errors for figure 1: Percent of all state and federal inmates who had possessed or used a firearm during their offense, 2016**

| Characteristic | Possessed | Used |
|---|---|---|
| Any gun | 0.64% | 0.51% |
| Handgun | 0.59 | 0.46 |
| Gun they obtained from retail source | 0.13 | 0.12 |

Source: Bureau of Justice Statistics, Survey of Prison Inmates, 2016.

## APPENDIX TABLE 2
**Standard errors for table 1: Firearm possession and use among state and federal prisoners during the offense for which they were serving time, by type of controlling offense, 2016**

| Controlling offense | Estimated number of state prisoners | Percent of state prisoners who— | | Estimated number of federal prisoners | Percent of federal prisoners who— | |
|---|---|---|---|---|---|---|
| | | Possessed a firearm | Used a firearm | | Possessed a firearm | Used a firearm |
| Total | 31,100 | 0.69% | 0.57% | 8,300 | 1.76% | 0.71% |
| Violent | 22,400 | 0.90% | 0.73% | 2,700 | 2.87% | 2.83% |
| Homicide | 10,900 | 1.16 | 1.12 | 700 | 6.53 | 4.75 |
| Rape/sexual assault | 9,900 | 0.36 | 0.22 | 600 | : | : |
| Robbery | 6,700 | 1.32 | 1.28 | 1,600 | 3.73 | 3.80 |
| Assault | 5,900 | 1.34 | 1.24 | 700 | 5.15 | 4.52 |
| Other violent | 2,100 | 2.03 | 1.73 | 300 | 8.42 | : |
| Property | 7,800 | 0.53% | 0.32% | 2,000 | 0.83% | : |
| Burglary | 3,900 | 0.80 | 0.54 | 100 | : | : |
| Other property | 5,800 | 0.58 | 0.33 | 2,000 | 0.81 | : |
| Drug | 11,400 | 0.68% | 0.20% | 5,400 | 0.87% | 0.21% |
| Trafficking | 9,700 | 0.83 | 0.24 | 5,000 | 0.88 | 0.21 |
| Possession | 3,400 | 1.06 | : | 600 | : | : |
| Other/unspecified drug | 700 | : | : | 600 | : | : |
| Public order | 8,400 | 1.35% | 0.58% | 3,600 | 3.55% | 0.88% |
| Weapons | 3,000 | 2.02 | 1.70 | 2,700 | 2.02 | 1.60 |
| Other public order | 7,200 | 0.70 | 0.42 | 3,800 | 0.89 | : |
| Other | 600 | : | : | 300 | : | : |
| Unknown | 1,400 | 1.61% | : | 400 | : | : |

: Not calculated. Too few cases to provide a reliable estimate, or coefficient of variation is greater than 50%.
Source: Bureau of Justice Statistics, Survey of Prison Inmates, 2016.

**APPENDIX TABLE 3**

**Standard errors for table 2: Among state and federal prisoners who possessed a firearm during the offense for which they were serving time, extent of firearm use, 2016**

| Firearm use | State prisoners | Federal prisoners | State prisoners | | Federal prisoners | |
|---|---|---|---|---|---|---|
| | | | Violent offense | Non-violent offense | Violent offense | Non-violent offense |
| Obtained firearm because planned to use in controlling offense | | | | | | |
| Yes | 0.81% | 1.57% | 0.81% | 2.00% | 4.01% | 1.88% |
| No | 0.81 | 1.57 | 0.81 | 2.00 | 4.01 | 1.88 |
| Used firearm | 1.11% | 1.92% | 0.85% | 1.83% | 3.86% | 1.57% |
| Discharged | 1.34% | 1.17% | 1.36% | 1.47% | 3.58% | 1.14% |
| Killed victim | 1.28 | 0.75 | 1.40 | : | 2.49 | : |
| Injured/shot victim but did not kill victim | 0.73 | 0.55 | 0.86 | 0.89 | : | : |
| Discharged firearm but did not shoot anyone | 0.47 | 0.98 | 0.51 | 1.17 | 2.16 | 1.02 |
| Did not discharge | 0.97% | 1.60% | 1.21% | 1.24% | 4.99% | 0.87% |
| Did not use firearm | 1.11% | 1.92% | 0.85% | 1.83% | 3.86% | 1.57% |
| Estimated number of prisoners who possessed a firearm (with valid data) | 10,100 | 3,100 | 9,200 | 3,400 | 1,200 | 2,200 |

: Not calculated. Too few cases to provide a reliable estimate or coefficient of variation is greater than 50%.
Source: Bureau of Justice Statistics, Survey of Prison Inmates, 2016.

**APPENDIX TABLE 4**

**Standard errors for table 3: Firearm possession and use among state and federal prisoners during the offense for which they were serving time, by type of firearm, 2016**

| Type of firearm | Percent of prisoners who possessed a firearm | | | Percent of prisoners who used a firearm | | |
|---|---|---|---|---|---|---|
| | All prisoners | State | Federal | All prisoners | State | Federal |
| Firearm | 0.64 | 0.69% | 1.76% | 0.51 | 0.57% | 0.71% |
| Handgun | 0.59 | 0.64 | 1.63 | 0.46 | 0.51 | 0.67 |
| Rifle | 0.10 | 0.10 | 0.28 | 0.07 | 0.08 | 0.13 |
| Shotgun | 0.11 | 0.12 | 0.22 | 0.09 | 0.10 | 0.09 |
| No firearm | 0.64 | 0.69 | 1.76 | 0.51 | 0.57 | 0.71 |
| Estimated number of prisoners (with valid data) | 32,100 | 31,000 | 8,300 | 32,100 | 31,000 | 8,300 |

Source: Bureau of Justice Statistics, Survey of Prison Inmates, 2016.

**APPENDIX TABLE 5**

**Standard errors for table 4: Firearm possession among state and federal prisoners during the offense for which they were serving time, by demographic characteristics, 2016**

| | State | | Federal | |
|---|---|---|---|---|
| Demographic characteristic | Number of prisoners | Percent of prisoners who possessed a firearm during the offense | Number of prisoners | Percent of prisoners who possessed a firearm during the offense |
| **Sex** | | | | |
| Male | 30,700 | 0.74% | 8,200 | 1.88% |
| Female | 5,200 | 0.96 | 1,300 | 1.00 |
| **Race/Hispanic origin** | | | | |
| White | 16,500 | 0.64% | 3,900 | 2.28% |
| Black | 16,200 | 0.91 | 5,600 | 2.02 |
| Hispanic | 12,400 | 1.26 | 8,000 | 1.70 |
| American Indian/Alaska Native | 2,500 | 2.94 | 800 | 5.18 |
| Asian/Native Hawaiian/Other Pacific Islander | 1,600 | 4.69 | 600 | : |
| Two or more races | 5,000 | 1.19 | 1,200 | 3.50 |
| **Age at time of survey** | | | | |
| 18–24 | 8,200 | 1.71% | 1,000 | 5.69% |
| 25–34 | 13,700 | 1.00 | 3,200 | 2.57 |
| 35–44 | 9,500 | 0.94 | 3,400 | 1.68 |
| 45–54 | 9,100 | 0.76 | 2,400 | 1.68 |
| 55 or older | 7,700 | 1.02 | 2,200 | 2.02 |
| **Marital status** | | | | |
| Married | 6,300 | 1.06% | 3,100 | 1.77% |
| Widowed/widowered | 2,000 | 2.10 | 400 | 5.93 |
| Separated | 2,700 | 1.34 | 1,200 | 3.11 |
| Divorced | 10,600 | 0.97 | 2,200 | 1.58 |
| Never married | 20,100 | 0.81 | 5,800 | 2.10 |
| **Education** | | | | |
| Less than high school | 21,500 | 0.83% | 6,000 | 2.18% |
| High school graduate | 8,500 | 0.88 | 2,100 | 1.69 |
| Some college | 5,000 | 0.96 | 2,000 | 2.08 |
| College degree or more | 2,500 | 1.43 | 2,000 | 1.83 |
| **Citizenship** | | | | |
| U.S. citizen | 30,000 | 0.69% | 10,700 | 1.87% |
| Non-U.S. citizen | 3,700 | 2.04 | 9,500 | 1.09 |
| **Military service** | | | | |
| Yes | 4,800 | 1.07% | 1,200 | 2.98% |
| No | 28,700 | 0.72 | 8,200 | 1.80 |

: Not calculated. Too few cases to provide a reliable estimate, or coefficient of variation is greater than 50%.
Source: Bureau of Justice Statistics, Survey of Prison Inmates, 2016.

## APPENDIX TABLE 6

**Standard errors for table 5: Among state and federal prisoners who had possessed a firearm during the offense for which they were serving time, sources and methods used to obtain a firearm, 2016**

| Source and method to obtain firearm | All prisoners | State | Federal |
|---|---|---|---|
| Purchased/traded at retail source | 0.66% | 0.70% | 2.07% |
|   Gun shop/store | 0.54 | 0.56 | 1.87 |
|   Pawn shop | 0.27 | 0.29 | 0.62 |
|   Flea market | 0.13 | : | : |
|   Gun show | 0.16 | 0.17 | 0.44 |
| Obtained from individual | 0.87% | 0.94% | 2.02% |
|   Purchased/traded from family/friend | 0.59 | 0.65 | 1.27 |
|   Rented/borrowed from family/friend | 0.47 | 0.52 | 0.54 |
|   Gift/purchased for prisoner | 0.69 | 0.75 | 1.40 |
| Off the street/underground market | 1.07% | 1.13% | 3.26% |
| Theft | 0.48% | 0.53% | 0.79% |
|   From burglary | 0.22 | 0.24 | : |
|   From retail source | 0.07 | : | : |
|   From family/friend | 0.26 | 0.29 | : |
|   Unspecified theft | 0.31 | 0.34 | 0.53 |
| Other source | 0.78% | 0.85% | 1.80% |
|   Found at location of crime/victim | 0.50 | 0.53 | 1.31 |
|   Brought by someone else | 0.45 | 0.49 | 0.87 |
|   Other | 0.51 | 0.55 | 1.40 |
| Multiple sources | 0.27% | 0.29% | 0.50% |
| Estimated number of prisoners who possessed a firearm, excluding prisoners who did not report source | 9,900 | 9,500 | 2,800 |

: Not calculated. Too few cases to provide a reliable estimate, or coefficient of variation is greater than 50%.
Source: Bureau of Justice Statistics, Survey of Prison Inmates, 2016.

## APPENDIX TABLE 7

**Standard errors for table 6: Among state and federal prisoners who had possessed a firearm during the offense for which they were serving time, processes used to obtain a firearm, 2016**

| Process to obtain firearm | All prisoners | State | Federal |
|---|---|---|---|
| Not purchased or traded at retail source | 0.66% | 0.70% | 2.07% |
| Purchased or traded at retail source | 0.66% | 0.70% | 2.07% |
|   Licensed firearm dealer at retail source | 0.60 | 0.63 | 2.08 |
|     Purchased under own name | 0.54 | 0.57 | 1.89 |
|     Background check was reportedly conducted | 0.54 | 0.56 | 1.93 |
|   Private seller at retail source | 0.19 | 0.20 | 0.63 |
|   Unknown | 0.21 | 0.24 | : |
| Estimated number of prisoners who possessed a firearm (with valid data) | 9,900 | 9,500 | 2,800 |

: Not calculated. Too few cases to provide a reliable estimate, or coefficient of variation is greater than 50%.
Source: Bureau of Justice Statistics, Survey of Prison Inmates, 2016.

**APPENDIX TABLE 8**

**Standard errors for table 7: Firearm possession and use among all state and federal prisoners during the offense for which they were serving time, by type of controlling offense and source, 2016**

| Controlling offense | Percent of state and federal prisoners who— | | Percent of state and federal prisoners who— | |
|---|---|---|---|---|
| | Possessed a firearm | Possessed a firearm that they obtained from a retail source | Used a firearm | Used a firearm that they obtained from a retail source |
| Total | 0.64% | 0.13% | 0.51% | 0.12% |
| Violent | 0.88% | 0.23% | 0.72% | 0.21% |
| Homicide | 1.14 | 0.63 | 1.10 | 0.62 |
| Robbery | 1.25 | 0.29 | 1.22 | 0.25 |
| Property | 0.50% | 0.15% | 0.30% | : |
| Drug | 0.52% | 0.17% | 0.15% | 0.04% |
| Public order | 1.35% | 0.27% | 0.48% | 0.17% |

: Not calculated. Too few cases to provide a reliable estimate, or coefficient of variation is greater than 50%.
Source: Bureau of Justice Statistics, Survey of Prison Inmates, 2016.



The Bureau of Justice Statistics of the U.S. Department of Justice is the principal federal agency responsible for measuring crime, criminal victimization, criminal offenders, victims of crime, correlates of crime, and the operation of criminal and civil justice systems at the federal, state, tribal, and local levels. BJS collects, analyzes, and disseminates reliable statistics on crime and justice systems in the United States, supports improvements to state and local criminal justice information systems, and participates with national and international organizations to develop and recommend national standards for justice statistics. Jeffrey H. Anderson is the director.

This report was written by Mariel Alper and Lauren Glaze of BJS. Mariel Alper conducted statistical analyses. Marcus Berzofsky and John Bunker of RTI International provided statistical review. Danielle Kaeble, Laura Maruschak, Todd Minton, and Stephanie Mueller verified the report. Lauren Glaze was the BJS project manager for the 2016 Survey of Prison Inmates.

Eric Hendrixson and Jill Thomas edited the report. Tina Dorsey and Morgan Young produced the report.

January 2019, NCJ 251776





NCJ251776

**Office of Justice Programs**
**Building Solutions • Supporting Communities • Advancing Justice**
**www.ojp.gov**

# EXHIBIT 78



SHOP     CONTRIBUTE



PROTECTING OUR HEROES AND THEIR K9 PARTNERS

CONTRIBUTE TO THE MISSION



GET BEHIND THE VEST

# The Bullet Proof Vest

**A vest isn't bulletproof forever.** It wears out. It breaks down. It needs to be replaced every 5 years. And just one bullet permanently damages a vest, making it unusable. Chicago police officers are responsible for replacing their own vests. At $500 or more per vest, in addition to other equipment and uniform expenses, the costs can quickly add up. That's why we need your help. Your donation ensures that every officer out there protecting you is protected.

The Chicago Police Memorial Foundation has extended the Get Behind the Vest Program to supply vests to Chicago Police K9 Officers. We are now protecting the K9's who protect our Officers!



# VEST INFORMATION

The Chicago Police Memorial Foundation has partnered with the below listed Uniform Stores to provide a custom made standard four-pocket vest cover made of high-quality cordura nylon material following the Chicago Police Department Uniform and Property Standards, (U06-01-10) to each Officer participating in the Get Behind the Vest Program.

Each officer will be given an embossed CPMF certificate that must be presented to the uniform store participating in the program to receive the vest cover.

The standard vest covers will include the embroidery package featuring the Officer's name, star, velcro unit designator, large "POLICE" patch on the back of the cover, and CPMF's Embroidery Bar Patch. The patch must be worn centered on the shirt left pocket flap ½ inch below the finished edge on the approved standard black overshirt vest carrier per the Chicago Police Department Uniform and Property Standards, (U06-04-10).

The price of the standard vest cover, which will be paid by CPMF, is $140.50. If an Officer chooses additional features on a vest, or the 'MOLLE' vest cover, the Officer will pay the additional charges above $140.50.

If you have questions, please reach out to Joe Salemme at j.salemme@cpdmemorial.org

## Suggested Vest Cover Vendors:

| Uniform Store | Address | Phone |
|---|---|---|
| AJ Uniform | 2758 W. 111th St, Chicago 60655 | 773-239-2548 |
| Chicago Uniform Co | 550 W. Roosevelt Rd, Chicago 60606 | 312-913-1006 |
| The Cop Shop Chicago | 3616 S. Halsted, Chicago 60638 | 773-475-6056 |
| Eagle Uniform | 4732 W. 137th St, Crestwood, IL 60 | 708-371-0050 |
| Fitore Uniforms | 527 N. Ashland, Chicago 60622 | 312-291-9942 |
| JG Uniforms | 5949 W. Irving Park Rd, Chicago 60 | 773-545-4644 |
| Tri Taylor Uniforms | 2322 W. Roosevelt Rd, Chicago 60 | 312-666-3351 |
| VCG Uniform | 5050 W. Irving Park, Chicago 60634 | 773-545-3676 |







## FEATURED DONORS

Michael & Patrick
Brady






Site Design by:



  

Copyright © 2023 Chicago Police Memorial Foundation, All Rights Reserved

Privacy Policy | Donor Privacy Policy | Non Discrimination Policy | Whistleblower Policy

EXHIBIT 79

**SYMPOSIUM**

# Cherry-picked history and ideology-driven outcomes: Bruen's originalist distortions

 By **Saul Cornell**
on Jun 27, 2022 at 5:05 pm

f in 🐦 ✉ 🖨 Share



*This article is part of a symposium on the court's decision in New York State Rifle & Pistol Association v. Bruen.*

*Saul Cornell is the Paul and Diane Guenther chair in American history at Fordham University and adjunct professor of law at Fordham Law School.*

The majority opinion in *New York State Rifle & Pistol Association v. Bruen* invokes the authority of history but presents a version of the past that is little more than an ideological fantasy, much of **it invented by gun-rights advocates** and their libertarian allies in the legal academy with the express purpose of bolstering litigation such as *Bruen*. Rather than applying a history, text, and tradition approach, it would be more accurate to characterize Justice Clarence Thomas' decision as an illustration of the current Supreme Court's new interpretive model: **"Fiction, Fantasy, and Mythology."** Indeed, the distortion of the historical record, misreading of evidence, and dismissal of facts that don't fit the gun-rights narrative favored by Thomas are genuinely breathtaking in scope. Thomas has taken **law-office history** to a new low, even for the Supreme Court, a body whose special brand of **"law chambers history"** has prompted multiple critiques and been a source of amusement for generations of scholars and court watchers.

It is particularly noteworthy that Justice Stephen Breyer called out his colleagues for engaging in the most rank form of law-office history in his dissent. Although it has become common, almost routine, for scholars to catalog the embarrassing quality of the current Supreme Court's uses of history, it is unusual to see a sitting justice level this charge against others on the court in a published opinion. It is hard to dispute Breyer's negative characterization of his colleagues' tendentious, error-filled, and highly selective culling of evidence to vindicate their gun-rights agenda. **Bruen does mark a new low for the court.** Indeed, it seems appropriate that Thomas saw fit to quote ~~Dred Scott~~, the court's worst decision in history, approvingly. Thomas not only treats the case as good legal authority but suggests the author of the most reviled opinion in American law captured the meaning of the Second Amendment better than any other judicial pronouncement in American history.

To describe the Thomas version of the past as a caricature understates the case. In the Bizzaro constitutional universe inhabited by Thomas, Shakespeare's England was filled with pistol-packin' peasants, a notion that most English historians would find bonkers. The characterization of early American firearms regulation is equally flawed, and Thomas rests his dismissal of antebellum enforcement of gun laws on an as yet unpublished and **error-filled account by one of his former clerks** — even as he dismisses the many counter-examples provided by New York as a slender reed upon which to rest their case.

Perhaps the most egregious distortion of the historical record occurs in the majority's false claims about regulation during Reconstruction. Evidence of robust regulation of guns in public featured prominently in the briefs filed in the case, but the majority either dismisses contrary evidence as unrepresentative or simply ignores evidence it finds inconvenient. Here is what Thomas says about Texas, a state whose robust gun laws, he reluctantly concedes, undeniably support New York's approach to public safety. "We acknowledge," Thomas wrote, "that the Texas cases support New York's proper-cause requirement, which one can analogize to Texas'

**FEATURED POSTS**



**STATISTICAL SNAPSHOT**



**ARCHIVES**

Select Mont ⌄

'reasonable grounds' standard. But the Texas statute, and the rationales set forth in *English* and *Duke*, are outliers."

The originalist methodology applied by Thomas has one set of rules that apply to interpreting legal texts that support gun rights, and another more demanding set of standards that apply to those that undermine them. **The Thomas version of originalism** might be summarized as follows: No amount of evidence is enough to support gun control, but no iota of evidence is too little to legitimate gun-rights claims. If one of the goals of originalism was to limit judicial discretion (a value few originalists continue to espouse now that they have a supermajority on the court), then the Thomas rule does the opposite. It provides a license to cherry-pick evidence with reckless abandon if the materials support the ideological agenda of the Federalist Society.

Texas, it is worth stressing, was hardly alone in embracing a robust view of state police-power authority over regulation of arms in public. Georgia's 1868 arms-bearing provision declared that: "The right of the people to bear arms in defense of themselves and the lawful authority of the State, shall not be infringed, but the Legislature may prescribe the manner in which they may be borne." The reconstructed southern states and newly admitted western states all drafted new arms-bearing provisions in their state constitutions, casting aside the Founding-era focus on militias, substituting new language more individualistic in focus. Justice Samuel Alito recognized this fact in *McDonald v. City of Chicago* but stopped reading the text of these provisions in mid-sentence because all these provisions went on to affirm the sweeping police-power authority of the states to regulate arms in public. In *District of Columbia v. Heller*, Justice Antonin Scalia read the Second Amendment backward, and in *McDonald*, Alito stopped reading the text mid-sentence. If anyone had any doubts that the new originalism was **the Federalist Society's latest intellectual scam**, then these two approaches to reading constitutional texts ought to dispel any lingering doubts. In the hands of this court, originalism is a constitutional "Etch A Sketch," in which judges can erase texts at will and read them backward if necessary.

Twelve million Americans during the Reconstruction period were living under state constitutional arms-bearing provisions that reflected this new regulatory paradigm, a model that forged an indissoluble link between the right to regulate and the right to bear arms. For Thomas, twelve million is too little to be consequential. The court's right-wing originalist supermajority, including Thomas, Alito, and their ideological co-conspirators, are making up the rules of evidence and historical interpretation on the fly, constantly shifting the burden of proof, to suit their agenda.

Even more galling, assuming that historical accuracy is still a value for the court's originalist ideologues, is the absence of any attention to local gun regulation, which increased dramatically during Reconstruction. Contrary to the patently false claims made by Thomas, states and localities acted on the language in the new state arms-bearing provisions, including enacting permit schemes based on a specified need for self-defense, precisely the type of regulatory regime at issue in *Bruen*. Thomas treats New York's law as if it emerged out of nowhere in the early 20th century, but the truth is that a host of localities had enacted similar laws starting in the 1870s, which means that New York's law was firmly rooted in Reconstruction-era conceptions of the scope of permissible regulation under the Second Amendment.

Many of these laws, excavated from obscure sources, were presented to the court in a remarkable **appendix** to a brief submitted by Air Force historian Patrick Charles. This evidence contradicts Thomas' facile claims that Texas-style gun control was an anomaly. Nor does Thomas acknowledge the evidence presented in the **historians and law professors' brief submitted** in *Bruen*. It discussed the spread of permit schemes in California and other parts of the nation after the Civil War. By the last decade of the 19th century, **more than half the population of the state living in its cities and towns** were living under these types of restrictions. Again, in the surreal originalist universe inhabited by Thomas and his colleagues, if 50% of a state lived under New York-style restrictions, this also fails to reach a sufficient threshold to provide historical evidence supporting gun regulation.

Nor were these restrictive public-carry regimes an exclusively western development. In **1873,** Jersey City prohibited carrying dangerous weapons without a permit, which the city's municipal court could grant to people "from the nature of their profession, business or occupation, or from peculiar circumstances." Jersey City was hardly one of the "cattle towns" of the Old West, another body of evidence that Thomas simply discounts because it is inconsistent with his ideological agenda. The map below graphically underscores how wrong Thomas got the history in *Bruen*. It shows that millions of Americans were living under restrictive public-carry laws similar in scope to the New York law at issue in *Bruen* for decades before the Sullivan Act.

Distorting the past to further his ideological agenda has become a trademark feature of

4/19/23, 11:50 AM
Cherry-picked history and ideology-driven outcomes: Bruen's originalist distortions - SCOTUSblog
Case: 1:21-cv-04595 Document #: 98-8 Filed: 04/24/23 Page 113 of 158 PageID #:3063

Thomas. What is more disheartening is that the court's newest originalists, Justices Neil Gorsuch and Amy Coney Barrett, signed on to this historical charade. Despite protestations that they are not ideological warriors and political hacks, Gorsuch and Barrett missed an opportunity to prove that originalism can be applied in a rigorous and neutral manner. Apparently, that claim continues to a be a promise as yet unfilled.



Graphic courtesy of Hastings Constitutional Law Quarterly, Saul Cornell, "History and Tradition or Fantasy and Fiction: Which Version of the Past Will the Supreme Court Choose in NYSRPA v. Bruen" (June, 2022).

Posted in **Symposium on the court's ruling in New York State Rifle & Pistol Association v. Bruen**, **Merits Cases**

Cases: **New York State Rifle & Pistol Association Inc. v. Bruen**

**Recommended Citation:** Saul Cornell, *Cherry-picked history and ideology-driven outcomes: Bruen's originalist distortions*, SCOTUSblog (Jun. 27, 2022, 5:05 PM), https://www.scotusblog.com/2022/06/cherry-picked-history-and-ideology-driven-outcomes-bruens-originalist-distortions/



Unable to load Tweets

**Follow**

# EXHIBIT 80

# AMERICAN HOMICIDE

## RANDOLPH ROTH



Copyright © 2009 by the President and Fellows of Harvard College
All rights reserved
Printed in the United States of America

*Library of Congress Cataloging-in-Publication Data*

Roth, Randolph, 1951–
       American homicide / Randolph Roth.
          p.   cm.
       Includes bibliographical references and index.
       ISBN 978-0-674-03520-1 (cloth : alk. paper)
       1. Homicide—United States—History.   I. Title.

   HV6524.R68 2009
   364.1520973—dc22        2009016830

# "A Sense of Their Rights"

*Homicide in the Age of Revolution*

Although rates of family and intimate homicide remained low for most people in western Europe and North America well into the nineteenth century, the long decline in homicide among unrelated adults ended amid the revolutionary turmoil of the late eighteenth century. The political stability that had prevailed through most of the Western world since the mid-seventeenth century was shattered by a succession of revolutions, civil wars, and military conquests. National loyalties and faith in government were strained and sometimes destroyed by revolutionary ideas, popular protests, and divisive wars. Some regimes collapsed, and those that survived found it difficult to reestablish their authority and revive patriotic feeling among their citizens. Beset by treasonous plots and rebellions and plagued by threats from abroad, newly emerged governments floundered. Their citizens fell to squabbling among themselves over politics, questioning one another's loyalties and refusing to obey laws or administrations they considered illegitimate. The three most important correlates of homicide were thus in place in much of the Western world during the Age of Revolution: political instability, a loss of government legitimacy, and a decline in fellow feeling among citizens. Together, these conditions created the feelings of anger, alienation, and powerlessness that caused homicide rates to spike.

Nowhere was the rise in homicide greater than in revolutionary

**145**

This content downloaded from 198.91.37.2 on Thu, 20 Apr 2023 16:23:24 UTC
All use subject to https://about.jstor.org/terms

Case: 1:21-cv-04595 Document #: 98-8 Filed: 04/24/23 Page 118 of 158 PageID #:30

France. The collapse of the ancien régime, which had governed with a strong hand since the late seventeenth century, led to a brutal struggle for power that lasted from the fall of the Bastille in 1789 until 1802, when Napoleon ended the French Revolution by establishing a dictatorship. By the mid-1790s the homicide rate probably ranged from 30 to 80 per 100,000 adults per year in eastern, southern, and western France, where the republican government was weak and citizens were divided by the Revolution or openly hostile to it. The homicide problem may have been less severe in and around Paris, where the post-Jacobin government had established its authority. But the actual homicide rate for all of France will probably prove to have been 40 per 100,000 adults per year or more, once government and newspaper accounts of homicides are taken into account.[1]

France was not the only Western nation to experience a dramatic rise in homicide during the Age of Revolution. In England and in Sweden, the two countries for which national statistics are available, homicide rates doubled between the 1780s and the 1830s. According to studies of selected towns, homicide rates also appear to have doubled in Germany, Switzerland, and Italy. The rate rose to 20 per 100,000 adults per year in Geneva after that city-state's elite crushed an uprising in 1782 led by the Représentants, the delegates to the lower house of Geneva's ruling council, who had demanded political equality for lower-ranking citizens. In Leiden the rate rose to 30 per 100,000 adults per year after 1801, when Napoleon imposed an authoritarian government on the Netherlands. Rates fell gradually in Canada, where political calm prevailed until the Patriote uprising of 1837, but they increased everywhere else as political stability, faith in government, and national feeling faltered.[2]

Homicide rates among unrelated adults in the United States did not follow a uniform pattern, but in the states and counties studied intensively the number of homicides soared wherever the Revolution divided people into Tory and rebel camps. In other words, homicide rates were highest where the struggle for power between Tories and rebels—and between the British and Continental armies—was most intense. In the countryside around New York City and Philadelphia, in the Ohio Valley, and in the backcountry from southwestern Virginia to northwestern Georgia, homicide rates reached seventeenth-century levels as governments collapsed, law and order broke down,

This content downloaded from 198.91.37.2 on Thu, 20 Apr 2023 16:23:24 UTC
All use subject to https://about.jstor.org/terms

and neighbor turned against neighbor. For most white Americans, the Revolution was profoundly disruptive and divisive, but in those areas it was a genuine civil war. The criminal justice system disbanded or became the partisan tool of whoever was in power locally. Vigilante and revenge killings ensued, some motivated by politics, some not. As in revolutionary France, the proliferation of politically charged homicides was matched by an increase in garden-variety homicides as individuals adopted the same hostile and predatory attitudes toward their neighbors that political partisans showed toward their opponents. The extremely high homicide rates persisted until the end of the War of 1812, when they finally returned to the levels that prevailed in the rest of the nation.

Homicide rates doubled even in places where the struggle for power between Tories and rebels was intermittent or short-lived and the criminal justice system remained effective, like New England and the Chesapeake. In colonies that experienced political violence during the imperial crisis of the 1760s and early 1770s, like Pennsylvania, Massachusetts, and North Carolina, the increase in homicide began before the Revolution as the withering of British patriotism and the erosion of loyalty to the governments imposed upon the colonies by the crown undermined the fellow feeling that had kept homicide in check since the late seventeenth century. And in most communities within those colonies, the revolutionary movement was too divisive for solidarity to be reestablished while the outcome of the Revolution remained in doubt. But in places like the Shenandoah Valley of Virginia, where the Revolution won broad support and caused little disruption, the homicide rate among unrelated white adults continued to fall in the late eighteenth century. Homicide rates also continued to fall for African Americans in the South and in New England. Blacks were less likely to be murdered by whites and by one another, in large part because of the vitality of the antislavery movement, which freed many slaves and increased humanitarian regard for blacks. The movement also forged greater solidarity among blacks and gave them hope for a better future.

Wherever government broke down, political, robbery, and revenge homicides proliferated. The political upheaval undermined existing loyalties and institutions and made people from all walks of life more impatient with legal and economic restraints and more sensitive to

This content downloaded from 198.91.37.2 on Thu, 20 Apr 2023 16:23:24 UTC
All use subject to https://about.jstor.org/terms

ase: 1:21-cv-04595 Document #: 98-8 Filed: 04/24/23 Page 120 of 158 PageID #:30

personal slights. Ordinary men were suddenly more likely to kill to defend their reputations, property, or rights. Public men—politicians, military officers, attorneys, and newspaper editors—were particularly vulnerable to the Revolution's disruptive effects. In a republic that had yet to develop strong parties or political institutions, they were at the mercy of public opinion, and a surprising number of them died trying to defend their honor in duels.

The American Revolution might have had an even worse effect on the homicide rate if it had created a long-lasting economic crisis or a deep-seated disruption of the social hierarchy. Life was difficult for the poor in America's largest cities—Boston, New York, and Philadelphia—and the urban poor were especially restive and violent in the late eighteenth century.[3] But in small towns and in the countryside, most people were still able to form households and to buy their own shops or farms, thanks to the British victory in the French and Indian War, which had opened vast tracts of land to settlement. African Americans everywhere looked forward to new opportunities because of the decline of slavery. In the slaveholding South, revolutionary ideas would challenge the social hierarchy and lead to a permanent increase in homicides there, but almost everywhere else the Revolution's impact on homicide was confined to the years between 1764 and 1790, when government broke down and fellow feeling declined.

The increase in all kinds of homicides among unrelated adults began the moment conflict between colonists and the government turned violent. Homicide rates rose in Pennsylvania, North Carolina, and South Carolina after revolts broke out in the backcountry in the 1760s over Indian policy, land policy, and the failure to grant newly settled counties adequate representation in colonial assemblies (Figure 2.2). The turning point in New England was 1770, the year of the Boston Massacre (Figure 1.2). In the Chesapeake politics remained nonhomicidal until 1775, when fighting broke out between loyalist and patriot forces (Figure 1.3). Many of the homicides that occurred were political or war-related. In southern New England and the Chesapeake, where the homicide rate for whites doubled, such homicides were probably responsible for a third of the increase in the 1770s and early 1780s. On the Vermont frontier and in the southern and western backcountry, political homicides were responsible for more than half the increase.[4]

This content downloaded from 198.91.37.2 on Thu, 20 Apr 2023 16:23:24 UTC
All use subject to https://about.jstor.org/terms

The revolutionary conflict had a direct impact on the homicide rate everywhere, but in most parts of the country its indirect impact on the homicide rate was even greater. By eroding British patriotism, undermining the legitimacy of political institutions and political leaders of all stripes, weakening the legal system, and generally vitiating the social contract that kept the peace, the conflict that gave rise to political homicides generated more hostile, defensive, and predatory behavior and spawned other kinds of homicide, such as robbery and revenge murders.

### The Rise in Homicide throughout the Country

British patriotism had been on the wane since the mid-1750s. Colonists who served in the armed forces during the French and Indian War—probably one of every three adult males—saw British soldiers up close for the first time and did not like what they saw. They were stunned by the arrogance of British officers, who considered all colonials their inferiors, and shocked by their brutality toward enlisted men. They found regular British soldiers servile, profane, and impious.[5]

The colonists were further alienated by the Stamp Act, which made it clear that their interests were not safe in British hands. Many of them began referring to themselves explicitly as "American" rather than "British." In colonial newspapers the proportion of references to the colonies as "British" or "royal" fell from 38 percent before the war to only 6 percent by its end; references to the colonies as "American" rose from 20 percent to 43 percent. The share of implicit references to the colonies as American also rose, from 5 percent to 17 percent. The erosion of British patriotism was also evident in the names colonial assemblies gave new counties. The proportion of new counties named for British notables fell from 81 percent in the first half of the eighteenth century to 64 percent in the third quarter of the century as disputes over colonial policies intensified. It then plummeted to 18 percent from 1775 to 1789, and to 2 percent in the last decade of the eighteenth century (Figure 2.1).[6]

In New England anti-British feeling generated political homicides long before the war began, during riots against British officials, soldiers, and sympathizers. Ebenezer Richardson was a Boston customs

This content downloaded from 198.91.37.2 on Thu, 20 Apr 2023 16:23:24 UTC
All use subject to https://about.jstor.org/terms

Case: 1:21-cv-04595 Document #: 98-8 Filed: 04/24/23 Page 122 of 158 PageID #:30

collector suspected of informing on merchants who were violating Britain's import and export laws. In February 1770 a mob gathered in front of his house and began to break his windows. He fired on them, wounding one young man and killing another. Less than two weeks later a group of young men began pelting British sentries with rocks and ice to protest the presence of British troops in Boston. The sentries opened fire, killing five protesters in what became known as the Boston Massacre. A mob was responsible for the death of John Taylor, a Tory from Washington, New Hampshire. According to local tradition, Taylor was being ridden out of town on a rail. Hoping to make his departure as painful as possible, a number of men grabbed his legs and began lifting him up off the rail and slamming him down again. His scrotum got caught on a splinter, his testicles were torn off, and he bled to death.[7]

Once the Revolution got underway, it became difficult to distinguish between homicide and acts of war. After the British army withdrew from New England in March 1776, many loyalists fled, and the patriots were left in firm control of Massachusetts, New Hampshire, and most of Connecticut and Rhode Island. They posted sentries to apprehend loyalist spies, and they established prisoner-of-war camps. Occasionally sentries shot travelers who refused to identify themselves, sentries were themselves shot by spies, and prisoners of war were shot while trying to escape. Some of these killings ended up being adjudicated as homicides, although in most cases verdicts of manslaughter were returned.[8]

In Vermont, southern Connecticut, and eastern Maine, where the patriots did not have firm control, the situation was much more chaotic, and it was more difficult to prosecute political killings. The British staged raids from New York, Long Island, and Canada throughout the war, sometimes with the help of loyalists, and loyalists staged raids of their own. Both loyalists and patriots ambushed and killed people they knew to be political enemies. When the struggle for control of western Vermont intensified in 1777 in anticipation of a British invasion from Canada, neighbor turned against neighbor. John Irish, a loyalist farmer from Tinmouth, was ambushed and killed near his home by an unknown patriot. David Mallory, a medical student from Arlington, was killed by a group of loyalists led by Mallory's teacher, Dr. Samuel Adams. A few people took advantage of the political situation

This content downloaded from 198.91.37.2 on Thu, 20 Apr 2023 16:23:24 UTC
All use subject to https://about.jstor.org/terms

to settle scores. William Prindle, for example, a farm laborer who claimed to be a loyalist, struck a blow for England by killing his patriot employer and cutting off his head.[9]

Internal divisions also claimed lives in New England during the revolutionary period. Conservative patriots were pitted against more radical patriots. Quarrels that might once have been referred to the courts or to colonial assemblies now led to armed confrontation. For instance, some Vermonters wanted independence from New York, while others had reason to be content with the status quo. In 1775 supporters of New York rule fired into a party of protesters who had gathered to prevent the sitting of a county court created by New York. Two men were killed. In turn Vermont's insurgent militia, the Green Mountain Boys, killed at least one supporter of New York rule while suppressing a pro–New Yorker rising in Windham County in 1784. In 1786–87 farmers in western Massachusetts rose against their own county courts to protest foreclosures and the low commodity prices and tight monetary policies that had caused them. The governor of Massachusetts called up militiamen from eastern Massachusetts to subdue the protesters, who were led by Captain Daniel Shays, a Revolutionary War veteran. In Springfield the protesters tried to seize a state armory guarded by the governor's militiamen, and the militia opened fire, killing five rebels and one of their own officers. The show of force persuaded most protesters to abandon the cause, but small bands continued to clash with the militia and with the governor's local supporters over the next four weeks. Those skirmishes claimed at least ten more lives.[10]

In Pennsylvania political discontent spawned a number of homicides in the backcountry in the 1760s, after the French and Indian War. The provincial government had advanced the interests of the Penn family and other land speculators, but it had not protected backcountry settlers against Indian attacks or given them adequate courts or representation in the colonial assembly. Many settlers, hoping that British rule would be more effective and disinterested, supported a campaign by the Pennsylvania assembly in 1764–65 to replace the proprietary government with a royal government. When that campaign failed, a militant minority took Indian policy into its own hands, determined to expel or exterminate the colony's entire Native population.[11]

The killings began in 1763, when soldiers massacred Moravian con-

This content downloaded from 198.91.37.2 on Thu, 20 Apr 2023 16:23:24 UTC
All use subject to https://about.jstor.org/terms

verts at Lehigh Gap and Conestoga, and settlers burned a settlement of displaced Delawares, Mohicans, and Shawnees in the Wyoming Valley and assassinated their leader, Teedyuscung. After these attacks, murders of Indians almost became casual. Native Americans retaliated for these and other murders, initiating a cycle of murder and revenge that lasted through the Revolution.[12]

Since racial solidarity generally correlates with low homicide rates, the settlers might have been expected to set aside their own differences as they banded together against the Indians. They did not, however, because Pennsylvania settlers were as divided over Indian policy in the 1760s as Virginia settlers had been at the time of Bacon's Rebellion. Most citizens supported the state's attempts to restore peaceful relations with Native Americans. But settlers who lived on the frontier were furious with the proprietary government for refusing to lift a hand to defend them against Indian attacks. Their anger expressed itself in a complete repudiation of government institutions and officials. They would no longer turn to the state for help; instead they would settle disputes themselves. They soon produced prodigious homicide rates, especially in the Wyoming Valley in northeastern Pennsylvania. In the 1770s and early 1780s settlers from Pennsylvania fought for control of the valley with migrants from New England, who were sponsored by the government of Connecticut and its development arm, the Susquehannah Land Company. Dozens of people died. Settlers also attacked traders and government officials who appeared to be siding with Native Americans. The "Black Boys" of Cumberland County in south-central Pennsylvania attacked westbound pack trains that they believed were carrying arms to the Natives, and they fought British soldiers and Pennsylvania officials who tried to arrest them.[13]

As the Revolution got underway, clashes between Tories and rebels made the bloodshed even worse. Tories and their Native allies massacred over 200 settlers in July 1778. Political killings continued in the backcountry during the Whiskey Rebellion of 1794. At least six men died near Pittsburgh during protests against the federal excise tax on liquor.[14]

Southeastern Pennsylvania saw only a few political homicides during the Revolutionary era. Relations among non-Tories were tense, however, because the Constitutionalists, who controlled Pennsylvania's rebel government during the war, governed in a high-handed fashion, persecuting not only Tories but also neutrals, pietists, and lukewarm

This content downloaded from 198.91.37.2 on Thu, 20 Apr 2023 16:23:24 UTC
All use subject to https://about.jstor.org/terms

patriots. In March 1777 the Constitutionalists passed a Militia Act, which compelled men between the ages of eighteen and fifty-three to serve in the militia or pay heavy fines; and three months later they passed the Test Act, which deprived men of their civil rights if they did not swear allegiance to the state. These acts disfranchised the majority of men in Pennsylvania and threatened to bankrupt Quakers, Moravians, and Mennonites, who could not swear oaths or serve in the military.[15]

Opponents of the Constitutionalists rallied around the Republicans, who favored an inclusive franchise, peaceful relations with neutrals, and waivers from military service for pacifists. They clashed with Constitutionalist militiamen in Philadelphia in October 1779, after the city's Republican leaders put an end to price controls and allowed merchants to charge whatever the market would bear. The militiamen were angry that the wealthy had left the fighting and suffering to the poor, and they attacked a house where Republican leaders had taken refuge. At least six people were killed and seventeen wounded in the showdown between the two factions. Militant neutrals formed neighborhood associations to resist tax collectors and military recruiters. William Boyd, a tax collector in Chester County, was killed on his rounds by such resisters in 1780. Political homicides were less frequent in interior counties than in the southeast or on the frontier, but they occurred everywhere in Pennsylvania during the Revolution.[16]

Unlike New England and Pennsylvania, the Chesapeake did not suffer any political homicides before the Revolution began. The only protests that ended in homicide occurred late in the war, during the British invasion of 1780–81, when Virginia imposed a military draft and requisitioned beef and clothing for its troops. The draft sparked riots in a number of counties. The rioters, most of whom lived on the frontier, the Northern Neck, or the Eastern Shore, had legitimate grievances. They did not want to be paid in Continental currency, which was nearly worthless, and they were afraid their families would be left defenseless against Indians, slaves, and loyalist raiders. County officials did not back down, however, and confrontations between militia and protesters left at least two people dead. The toll could have been much higher, but Governor Thomas Jefferson counseled restraint and told local militia officers to track down individual protesters at night and take them "out of their Beds singly and without Noise."[17]

During the war, however, the Chesapeake saw political homicides

This content downloaded from 198.91.37.2 on Thu, 20 Apr 2023 16:23:24 UTC
All use subject to https://about.jstor.org/terms

ase: 1:21-cv-04595 Document #: 98-8 Filed: 04/24/23 Page 126 of 158 PageID #:30

wherever British forces were powerful enough to undermine patriot authority and encourage loyalist resistance. Such homicides occurred in 1775–76 in and around the adjoining towns of Norfolk and Portsmouth, where the royal governor, Lord Dunmore, ordered his forces to make their last stand. They also occurred throughout the war wherever the British navy and local loyalists raided patriot ships and plantations, and they appeared again when the British invaded Virginia in 1779 and 1780–81.

Patriots kept the upper hand on the Eastern Shore, another loyalist stronghold, despite constant raids by British and loyalist privateers on patriot plantations near the bay. Realizing that there was no hope of an immediate British landing, the loyalists kept a low profile, spying for the British and destroying patriot property. The patriots, who controlled the local government, found that mild sanctions like fines and peace bonds could keep the loyalists in check as long as the British army and navy focused their attention elsewhere. But the potential for violence was always there. In July 1781 a patriot planter came upon three loyalists trying to persuade one of his slaves to join a loyalist raiding party. The loyalists murdered the planter and fled, but the slave told neighbors what had happened, and the loyalists were hunted down. The posse gave them time to pray and then hanged them.[18]

The proliferation of politically charged homicides during the Revolution was accompanied by an increase in other kinds of homicides, especially robbery murders. The line between political murder and robbery murder was sometimes hard to define. Josiah Philips was already a convicted criminal when he declared himself a loyalist and was licensed by Lord Dunmore to rob patriots in the Norfolk area. His interracial gang, which at its peak had fifty members, stole livestock, burned buildings, and killed whoever tried to stop them. Most robbery murders, however, were committed by men who had no political affiliation or who had lost faith in the cause they were fighting for. They murdered their victims to prevent them from talking or killed the officers who uncovered their operations. The majority of them were never caught.[19]

Public violence weakened law enforcement and had a corrosive effect on personal morality. During the war, young men in particular were more liable to break with ordinary standards of right and wrong as they witnessed the violence erupting around them. Teenaged broth-

This content downloaded from 198.91.37.2 on Thu, 20 Apr 2023 16:23:24 UTC
All use subject to https://about.jstor.org/terms

ers Barnett and Nicholas Davenport worked as farm laborers for a wealthy couple. One day they clubbed the couple to death, killed their three young grandchildren, looted their house, and set it on fire. Such cold-blooded murders, which had all but disappeared from New England after King Philip's War and from the Chesapeake after Bacon's Rebellion, reappeared once the revolutionary crisis began. Gun violence, where it can be measured, was also more common. In New England the proportion of political and nonpolitical homicides committed with guns rose from 13 percent before the Revolution to 52 percent.[20] The increase suggests that more of these homicides were premeditated.

Retaliatory and vigilante murders also increased, at least among whites. Occasionally these murders occurred among criminals. In 1779 Younger Hardwick apparently killed fellow gang member Erasmus Whitworth in Amelia County, Virginia, because Whitworth had stolen part of Hardwick's share of the loot. But most perpetrators and victims were law-abiding citizens. In Albemarle County, Virginia, a local man stepped into a tavern and imprudently told a table of "gamesters" that he had just collected a debt. When he left, one of the gamblers sneaked out after him. Several men took note and followed the gambler. They found their neighbor dead, his throat cut and his money gone. They tracked the gambler to a canebrake where he was washing blood from his hands and hanged him on the spot.[21]

Pennsylvania suffered a rash of deadly brawls and robberies from the mid-1760s into the early 1790s, most of which occurred among strangers. Travelers were waylaid, sailors stabbed, and merchants terrorized by a floating population of former soldiers, runaway servants, gang members, and war refugees, who had no qualms about cutting throats to steal whatever they could. But even for law-abiding citizens, the violent ways learned during the Revolution died hard. John Lacey was a fervent patriot from Bucks County who had once ordered his men to shoot on sight any farmer caught trading with the enemy in Philadelphia. After the war he got into a business dispute with a man named Joel Cooke, who he thought was trying to defraud him. Lacey shot Cooke dead behind a Quaker meetinghouse.[22]

Revenge homicides, robbery homicides, political homicides, and vigilante homicides had always been common on contested frontiers, where no government or coalition of governments could gain the up-

This content downloaded from 198.91.37.2 on Thu, 20 Apr 2023 16:23:24 UTC
All use subject to https://about.jstor.org/terms

per hand; and in effect, the Revolution turned the entire country—even long-settled areas like southern New England, southeastern Pennsylvania, and the Chesapeake—into a contested frontier. The decline in British patriotism, the weakening of white solidarity as the threat from Native Americans diminished, and the rise of democratic, egalitarian protest movements facilitated all types of homicide by eroding civility, mutual forbearance, and fellow feeling among unrelated whites, but the lack of a stable government was what truly opened the floodgates to a torrent of murders. Perhaps no homicides were more indicative of the fear and hostility that government instability engendered among colonists than two senseless killings that occurred during this period in Philadelphia. The first murder was committed in 1776, while the Second Continental Congress was meeting in the State House to debate the future of the colonies. A few people began to taunt a lone woman in the street. Someone called her a witch. Others took up the cry, and within minutes a crowd had stoned her to death. A decade later it happened again. A mob seized an elderly woman, accused her of being a witch, and carried her through the streets, all the while pelting her with stones. She died a few days later.[23]

The homicide rate would probably not have risen as precipitously during the Revolution if revolutionary leaders had been able to set up strong, unified governments in every colony and if allegiance to the new nation had immediately taken the place of allegiance to Great Britain; but every state government had difficulty establishing its authority, and American patriotism grew slowly. Nominal loyalty to the United States was widespread once the Revolution was won, but the depth of that loyalty was questionable. Efforts to create national solidarity in the 1780s and 1790s through patriotic celebrations, oratory, and literature foundered over real differences in values and interests. Most nationalist celebrations were partisan, despite the claims of organizers. Political adversaries—Federalist and anti-Federalist, Hamiltonian and Jeffersonian—used feast days, thanksgiving days, militia musters, Fourth of July celebrations, and tributes to George Washington or the French Revolution to promote their particular visions of the American nation. These celebrations had some success in helping majorities to consolidate their power, nationally and locally. They forged solidarity among party supporters and drew a broad range of men and women into nationalistic partisan movements. That was no small

This content downloaded from 198.91.37.2 on Thu, 20 Apr 2023 16:23:24 UTC
All use subject to https://about.jstor.org/terms

achievement, but it would take time to recreate the sense of unity that had existed under the British Empire and to establish the legitimacy of the new central government.[24]

Race was no more effective than patriotism in binding whites together in the late eighteenth century. Fear of Native Americans declined after the French and Indian War. Indian peoples no longer posed a military threat to most whites, except on the frontier, so the need for white solidarity was less pressing, and a growing number of whites expressed outrage at massacres of friendly Indians and the seizure of Native lands. The campaign against slavery also divided whites. Launched in the 1750s and 1760s by Quakers, evangelicals, and enlightened thinkers, the antislavery movement blossomed during the Revolution, and more whites, especially in the North and the Upper South, began to condemn slavery as inhumane and as inconsistent with revolutionary ideals and a free, mobile society. The rift between the Deep South and other areas of the nation began to widen, and northerners began to look askance at states whose economies were dependent on slave labor. Few whites were willing to incorporate blacks or Indians as citizens into American society, and race remained an important bond among whites, but in the late eighteenth century it was not as powerful as it had been.[25]

Local loyalties were more important than they had been before the Revolution. In the 1790s the proportion of new counties named for local heroes was higher than the proportion named for national figures: 43 percent versus 38 percent (Figure 2.1). Many of those local notables were heroes of the Revolution, and local loyalties were not necessarily incompatible with national loyalties. But as new divisions arose over slavery, economic policy, and the western territories, local and regional loyalties sometimes conflicted with national or interregional loyalties, especially for New England Federalists, southern Republicans, and westerners of both parties, who articulated their own regional versions of nationalism. Only time would tell if national loyalties or amalgams of local and national loyalties would prove powerful enough to rebuild the fellow feeling that had existed before the Revolution.[26]

In the short run, revolutionary ideology weakened the bonds that had deterred homicide among unrelated whites. The increase in murders over property and reputation in the late eighteenth century sug-

This content downloaded from 198.91.37.2 on Thu, 20 Apr 2023 16:23:24 UTC
All use subject to https://about.jstor.org/terms

Case: 1:21-cv-04595 Document #: 98-8 Filed: 04/24/23 Page 130 of 158 PageID #:30

gests that whites became more protective of their rights and their good names once the Revolution began. The concern with reputation manifested itself in the sudden resurgence of dueling, which had all but disappeared in British North America in the late seventeenth and early eighteenth centuries. The only colony where duels had persisted into the 1680s and 1690s was South Carolina, where planter "aristocrats" from the West Indies kept the custom alive. One or two isolated instances of dueling cropped up elsewhere in the early to mid-eighteenth century. In 1728, for instance, Benjamin Woodbridge, the son of an admiralty judge from Barbados, was killed in a duel on Boston Common. He and Henry Phillips, a recent graduate of Harvard, had quarreled after Woodbridge asked Phillips to sign a note for a gambling debt he owed him and Phillips refused. The men called each other thieves and liars and, in accordance with the code of dueling, borrowed swords so that they could settle their differences honorably. Their friends thought they were joking and learned that Woodbridge had been wounded only when Phillips ran to a tavern for help. Phillips fled rather than face prosecution.[27]

Bostonians were shocked by Woodbridge's death. Clearly, they felt that society had moved beyond dueling. The Reverend Joseph Sewall captured their feelings in a sermon endorsed by all of Boston's ministers in which he denounced "the Society of Evil Doers" that encouraged young men to fight "Bloody and Mortal Duels." Colonial gentlemen rarely fought or challenged each other—it simply was not done. Émigrés might resort to dueling, but colonial gentlemen settled their differences peacefully.[28]

That pattern changed abruptly during the Stamp Act crisis of 1765. The trust and mutual regard that had existed among elites were shattered, and men began to attack each other furiously over political differences. One Virginian, who lamented the new incivility in public life, tried to explain the extreme reactions of friends whose letters to the editor drew public criticism. "Our writers are generally such as have been very little used to Contradiction, and know not how to bear it from one another; and when they find their Writings not treated with that Respect they have been accustomed to in their private Characters, they grow angry, and sometimes abuse one another." Gentlemen who took Britain's side or who wavered before taking the patriot side were subjected to all kinds of public abuse, verbal and physical. Those who

This content downloaded from 198.91.37.2 on Thu, 20 Apr 2023 16:23:24 UTC
All use subject to https://about.jstor.org/terms

accepted stamp distributorships were branded traitors. Many of them were burned in effigy or had their houses vandalized.[29]

Taken aback by this turn of events, gentlemen defended their reputations and proclaimed their superior status (and their disdain for society's legal institutions) by reviving the custom of dueling. They opposed the leveling force of revolutionary ideology by resuming a practice that made it impossible to command the respect of others without resorting to violence. In doing so they helped to create conditions that strongly correlate with higher homicide rates. Yet most challenges came to nothing or were resolved in other ways. Williamsburg attorney James Mercer, whose brother Richard had accepted a stamp distributorship, challenged Arthur Lee, a young physician whose brother Richard Henry had incited the mob that had sent Richard Mercer scurrying back to England. They agreed to a duel with pistols at a race ground, but their shots went wide, and each accused the other of cowardice. The dispute ended in a coffeehouse, where Lee tried to cane Mercer. The crowd took away their canes and pistols, but Mercer would not give up. He pummeled Lee, bloodying his nose and blackening his eyes. The local paper had the last word:

> To fisty-cuffs go the exalted duelists. O sad, sad! the Doctor [Lee], instead of being handsomely run or fired through the body, which would have given him infinite satisfaction, is bled at the nose, and has his eyes closed, as if he had been no better than a clown or peasant. The poor, abus[e]d, unfortunate Doctor, lifts his discomposed, tumefied, bloody, and sightless head; and, notwithstanding the inconvenience of such a situation for the display of oratory, makes a very fine harangue on the most grossly and shamefully violated laws of honour; for which, as a mischief to society, with a truly disinterested spirit, he expresses more concern than for any injury done to his own person. The Coffee-House world manifest their esteem by laughing.

With that peculiarly American scorn for pretension, the editor savaged the duelists for setting themselves above the common man with their silly rituals and pompous speechifying.[30]

Fear of ridicule, however, was no longer enough to deter duelists. Political passions were simply too intense. Colonel James Bayliss died in 1765 in a duel in Dumfries, Virginia, two days after rioters paraded effigies of the colony's new stamp collectors through town with copies

This content downloaded from 198.91.37.2 on Thu, 20 Apr 2023 16:23:24 UTC
All use subject to https://about.jstor.org/terms

of the Stamp Act wrapped around their necks like halters. The effigies had "receiv'd the Insults of the Congregation, by Caneing, Whipping, (the Mosaic Law) Pillorying, Cropping, Hanging, and Burning." It is not clear which side Bayliss was on.[31]

Dueling resurfaced in the late eighteenth and the nineteenth centuries wherever politics became competitive and democracy reared its uncouth head: in Ireland (where the modern rules of dueling were first codified) during the campaign for home rule in the 1760s and 1770s, in England during the controversy over the Reform Bill, in Belgium after the revolt of 1830, in Italy after the unification of 1860, and in Portugal with the advent of contested parliamentary elections in the 1880s. In these nations, as in the United States, public men who went in for dueling affirmed the democratic revolution by acknowledging the importance of public opinion, but at the same time they were also rejecting the revolution by reviving an aristocratic practice that placed them above the "rabble." Dueling combatants were almost always men in the public eye—politicians, newspaper editors, attorneys, and military officers—who were exposed to harsh criticism as politics became more democratic and more confrontational and as the political structures that had kept the peace among political leaders since the Glorious Revolution were dissolved. No longer insulated by the privileges of their class, these men stood before their readers and constituents as individuals, and since their success depended almost solely on the public's perception of them, they could not let slanderous remarks go unchallenged.[32]

Dueling could enhance a man's reputation; a refusal to fight could tarnish his good name and ruin his career. As a Virginian who wrote an "Essay on Honor" said, "the opinion of mankind, which is as forcible as a law, calls upon a man to resent an affront, and fixes the contempt of a coward upon him if he refuses." This attitude was not confined to southern gentlemen. John Farnham, a Harvard student, declared that "it is in vain to expect or presume that . . . [a] man will ever obtain any consequence & respect who suffers himself to be trodden under foot." Ira Allen, a brother of Ethan Allen and the leader of the faction that governed Vermont in the early 1790s, responded immediately when he was insulted by the leader of the opposing faction, Isaac Tichenor, a Princeton graduate referred to by his enemies as "The Jersey Slick." Tichenor claimed to have "slipped General Allen's

This content downloaded from 198.91.37.2 on Thu, 20 Apr 2023 16:23:24 UTC
All use subject to https://about.jstor.org/terms

nose"—that is, pulled it in an insulting way. Allen went across the Connecticut River to New Hampshire to duel with him. The two faced each other, pistols in hand, and were preparing to fire when spectators rushed in to stop them.[33]

Scores of distinguished men met untimely ends in duels. Button Gwinnett, the leader of the radical patriots in Georgia, and Lachlan McIntosh, a leader of the conservative patriots, were political and personal enemies. When command of the Continental forces in Georgia went to McIntosh, Gwinnett tried to embarrass him by arresting his brother on the charge of being a Tory. The two men quarreled so fiercely during the 1777 military campaign in eastern Florida that they had to cede command to a third man. When they got home, the assembly—which Gwinnett controlled—censured McIntosh and exonerated Gwinnett. McIntosh called Gwinnett "a Scoundrell & lying Rascal" and challenged him to a duel. Both men were seriously wounded, and Gwinnett died three days later. The same fate befell Alexander Hamilton's nineteen-year-old son Philip in 1801. After New York City attorney George Eacker insinuated publicly that Hamilton would not oppose the violent overthrow of President Thomas Jefferson, Philip and his friend Richard Price confronted him, and Eacker called them both "damned rascals." They challenged him to a duel. Price escaped unscathed, but Philip was killed. Hamilton became deeply depressed. Two and a half years later he accepted a challenge from Aaron Burr, even though his friends assured him that he had no need to fight because Burr's reputation was so far beneath his. That so many promising or accomplished men chose to risk death rather than their reputations shows how forceful the homicidal impact of the Revolution was. By undermining the unity and mutual regard of the American people and their willingness to accept the legitimacy of government by their political adversaries, the Revolution had created conditions ripe for homicide, even among elites who shared a commitment to republicanism and revolution.[34]

### Homicide on the Southern and Western Frontiers

Public men were not the only ones to experience increased volatility in their dealings with other people. The Revolution made all relationships more violent, especially in the southern and western back-

This content downloaded from 198.91.37.2 on Thu, 20 Apr 2023 16:23:24 UTC
All use subject to https://about.jstor.org/terms

country, where it took decades to create strong, stable governments and where men created their own justice by killing people who wronged them. From the Georgia Piedmont to the Ohio River Valley, homicide rates were extremely high from the mid-1760s through the War of 1812. Rates of 25 to 30 per 100,000 per year were common for white adults in areas where county governments had been established (Figures 4.1 and 4.2). In the backcountry, where settlers and Indians (and the Spanish and British) were still fighting for control, rates probably reached 200 or more per 100,000. Those numbers had not been seen since the early seventeenth century.

Like previous frontiers that were politically unstable and lacked strong institutions that could uphold law and order, the revolutionary backcountry was plagued by vigilantism, revenge murders, political murders, systematic violence by criminal gangs, and campaigns against peaceable Native Americans who did not move on after they were defeated militarily. During the Revolution more backcountry whites took the law into their own hands and killed to advance their interests or defend their rights, lives, and property. This pattern would reappear later in Florida, the Southwest Territory, the lower Mississippi Valley, Texas, and California.



**Figure 4.1** Homicide rate in plantation counties in Georgia, 1790–1900 (per 100,000 adults per year). Franklin, Jasper, and Wilkes Counties.

This content downloaded from 198.91.37.2 on Thu, 20 Apr 2023 16:23:24 UTC
All use subject to https://about.jstor.org/terms

The Revolution came at a difficult time for settlers in the southern backcountry. They lacked the means to govern or defend themselves adequately, and they were divided over whether their interests would be better served by the British government or by patriot governments dominated by coastal elites. Virginia's government took steps before the Revolution to maintain law and order by establishing county governments in the southwest, paying for local improvements, and giving settlers adequate representation in the General Assembly. But the planters and merchants of coastal North Carolina, South Carolina, and Georgia did not want to share power with the frontier population; they deliberately delayed the formation of new counties and refused to give settlers adequate representation in state assemblies or funding for public projects. Their actions compounded the homicide problem in the Lower South by depriving settlers of courts, constables, and militia companies. Settlers in that region had no choice but to take the law into their own hands, and their efforts to protect themselves against criminals and Indian attacks were probably responsible



**Figure 4.2** Unrelated-adult homicide rates in rural Ohio, 1798–1900 (per 100,000 adults per year).

This content downloaded from 198.91.37.2 on Thu, 20 Apr 2023 16:23:24 UTC
All use subject to https://about.jstor.org/terms

for as many homicides as political violence was. Jittery farmers gunned down friendly Creeks or Cherokees who wandered near their houses, and residents who tracked down thieves ended up in deadly shootouts. Local vigilantes known as Regulators organized in the 1760s in North and South Carolina to carry out their own brand of justice against criminals. Colonial governments suppressed the Regulators, but fifty lives were lost in a battle between Regulators and state militiamen at Alamance Creek in North Carolina in 1771. Southwestern Virginians fared better, but their county governments were not entirely effective because officials did not have time to establish their legitimacy.[35]

The situation only deteriorated when the British made the southern backcountry a major theater of operations. They invaded the area several times and encouraged loyalists and their Native allies to attack patriots. The battle was joined first in southwestern Virginia. William Campbell, a militia officer in Washington County, stopped a suspicious traveler in 1777 and discovered that the man had been paid by the British to smuggle letters to Cherokee leaders, asking them to attack settlers. Campbell and his friends hanged the man on the spot. Local loyalists, joined by men from North Carolina, attacked patriots and plotted to destroy the lead mines in Montgomery County, which were vital to Virginia's war effort. The outcome of the struggle was in doubt until patriot militia leaders like Campbell, Walter Crockett of Montgomery County, and Charles Lynch of Bedford County (the state superintendent of the lead mines, whose followers allegedly coined the term "Lynch Law" to celebrate his brand of vigilante justice) decided in 1779–80 to fight terror with terror. Tradition has it that during their campaign they shot or hanged a large number of suspected loyalists and forced the British to turn their attentions farther south.[36]

Political violence, including lynchings and murders of prisoners, was most intense in and around Augusta, Georgia, the frontier settlement that held the key to controlling the upper Savannah River watershed. Residents of adjacent areas, including Wilkes County in Georgia and Ninety-Six District in South Carolina, suffered through a six-year reign of terror as British and American forces tried unsuccessfully to establish control over the region. Patriots and loyalists battled back and forth for Augusta and the surrounding countryside. The combatants united briefly in 1779 for a joint expedition against the Cherokees but soon returned to fighting each other.

This content downloaded from 198.91.37.2 on Thu, 20 Apr 2023 16:23:24 UTC
All use subject to https://about.jstor.org/terms

When the British recaptured Augusta in the spring of 1780, loyalists went on a rampage in the countryside and took revenge on patriots, who had held the upper hand the previous year. A band of loyalists rode up to the farm of Colonel John Dooley, a patriot who had killed a number of loyalists to avenge the murder of his brother, and shot him dead in front of his family. After discovering that the Hart family had once hidden a patriot soldier in their house, loyalists looted the Harts' farm, took Nancy Hart hostage, and ordered her to cook them a meal. As they waited by the hearth, Hart quietly gathered up their muskets and started to push them outside through a chink in the cabin wall. When the Tories saw what she was doing, she took up a musket and threatened to shoot the first man who moved. Two men rushed her, and she shot them both. Meanwhile her daughter had called for help by blowing on a conch shell, and her husband and neighbors came running. They hanged the rest of the group.[37]

Across the Savannah River in Ninety-Six District, South Carolina, loyalists were better organized and more equally matched with patriots, so a greater portion of killings occurred during or shortly after pitched battles. A band of thirty patriots rode out in 1781 in pursuit of a small band of loyalists who had stolen horses. They recovered the horses, but they did not realize that the loyalists were part of a band of 300 under "Bloody Bill" Cunningham, and they made the mistake of camping at Cloud's Creek before completing their journey home. The loyalists surrounded them and refused them terms, because the group included a young man, John Butler Jr., who had killed a loyalist earlier. The young man's father offered to exchange himself for his son, but his son grabbed a rifle and killed a loyalist before he was gunned down. The surviving patriots surrendered, but the loyalists spared only one man, in recognition of the fact that local patriots had spared one of theirs in a recent battle. They hacked the others to death with swords. John Butler Sr. grabbed a pitchfork and defended himself as best he could, but the loyalists chopped off his hands and then killed him.[38]

The next year a band of patriots led by another of John Butler's sons, William, surprised Cunningham's depleted force near Baulknight's Ferry. Cunningham abandoned his men and rode off. Butler gave chase but was unable to catch him. When he returned, he found that one of his men had already killed one of the loyalists. Butler was

This content downloaded from 198.91.37.2 on Thu, 20 Apr 2023 16:23:24 UTC
All use subject to https://about.jstor.org/terms

Case: 1:21-cv-04595 Document #: 98-8 Filed: 04/24/23 Page 138 of 158 PageID #:30

exasperated: he was not out to avenge Cloud's Creek; he wanted to round up the loyalists and put an end to the killing, now that the war was all but over. His men would not let him punish the killer, however, because the dead man had once tortured the killer's mother in a futile effort to get her to disclose her son's whereabouts. Butler let that killing pass, but later that day they came upon several of Cunningham's stragglers, and another of his men refused his direct order not to shoot. It was clear that no cease-fire could put an end to the enmity between the two camps: it was too strong and too personal, and it would spill past the verges of the war and seep into the lives of the children and grandchildren of combatants.[39]

Harassment of loyalists continued after the war. In Wilkes County, Georgia, where feelings remained bitter, it was not uncommon for jurors deliberating on the courthouse steps to chase down and beat up a loyalist who happened to pass by. Churchgoers forcibly ejected loyalists who dared to show up for services. "Lynch's Law," which referred not just to hanging but to vigilante justice of any kind, became the preferred method of dealing with disputes both personal and political and was celebrated in song and story. This poem appeared in the *Augusta Chronicle* in 1794:

> Some time ago, Augusta acted right,
> To punish one, and put two more to flight;
> Lynch's law, ought still to be in vogue,
> It will rid the town of every cursed rogue.
> . . .
> The state is robb'd, and plunder'd of its right,
> It'll not be so, if Lynch be kept in sight.[40]

For the most part, vigilante justice stopped short of murder. Men ganged up on people they didn't like and beat them. Twenty armed men stormed the house of Colonel Henry Kerr in Wilkes County in 1793 and carried off Kerr, a friend, and seven of his slaves because of a property dispute. In Augusta, Major Fields Perdue gathered a gang together and went after a former employee, George Tucker, who had had the effrontery to quit and demand his pay. Perdue and his entourage dragged Tucker from his boardinghouse and marched him at gunpoint to the Carolina side of the Savannah River. Tucker reported that they "stripped me naked, and tied my hands with hickory bark,

This content downloaded from 198.91.37.2 on Thu, 20 Apr 2023 16:23:24 UTC
All use subject to https://about.jstor.org/terms

ase: 1:21-cv-04595 Document #: 98-8 Filed: 04/24/23 Page 139 of 158 PageID #:30

and stood round me with pistols cock'd and sticks" while Perdue gave him thirty lashes. He finally broke free and jumped into the river, where he was rescued by a passing boat.[41]

In more than a few instances this kind of vigilantism did end in death. After a Wilkes County grand jury refused to indict Robert Stewart for murder in 1795, his neighbors got together and killed him. In Richmond County in 1797, a party of drunken men seized a man "on suspicion of several crimes" and hanged him from a tree in the woods. In Franklin County in 1800, John and Julius Neal got a gang together and went after Cormack Higgins, who they believed had robbed and murdered their brother. They brought Higgins to the county seat and took him to the gallows, where another murderer had just been hanged. There they sat him on a horse and put a rope around his neck. Higgins refused to confess, however, even after the Neals shooed the horse out from under him and let him hang awhile, so they cut him down and asked friends to help them take him to their house. John Neal went on ahead. As the rest of the party crossed a river, a single shot from the far bank killed Higgins instantly.[42]

Because the violence between patriots and loyalists had legitimized lynchings, beatings, and revenge murder, vigilante justice gained a measure of approval in the backcountry that it did not have elsewhere. Jurors or grand jurors acquitted all these vigilantes of murder, even the ones in Richmond County whose victim turned out to be innocent. In the eyes of the grand jury, the victim's bad reputation justified the killing.

The movement of settlers into the backcountry also increased the homicide rate after the Revolution by setting up a conflict of interest between settlers and federal, state, and territorial governments. The federal government incurred the settlers' wrath during the Confederation period and Washington's presidency when it tried to enforce the terms of Indian treaties in hopes of preventing violence and building a military alliance with western tribes. The government repeatedly sent troops into the Ohio River Valley in the mid-1780s to tear down homes that squatters had built on Shawnee land. In Georgia the federal government repudiated treaties that the state government had coerced some of the Creeks into signing in the mid-1780s. Those treaties had ceded to the state all the land between the Ogeechee and Oconee rivers in central Georgia. By 1790, however, the flood of settlers into

This content downloaded from 198.91.37.2 on Thu, 20 Apr 2023 16:23:24 UTC
All use subject to https://about.jstor.org/terms

Case: 1:21-cv-04595 Document #: 98-8 Filed: 04/24/23 Page 140 of 158 PageID #:30

the disputed territory was so overwhelming that Creek leaders accepted the loss of their land east of the Oconee in return for a prohibition of white settlement west of the Oconee, to be enforced by federal troops and by Creek authorities. The Creeks were permitted to arrest or kill any white who set foot west of the Oconee without a pass from Creek or federal authorities.[43]

Washington's administration stationed troops along the Oconee, but the bloodshed continued. Creek warriors who opposed the 1790 cession or were determined to avenge the deaths of friends and relatives defied tribal leaders and raided farms and plantations east of the river. Settlers raided deep into Creek territory, often with the help of the Georgia militia, which the state had garrisoned along the Oconee to protect settlers and to counter federal support for the Creeks. Elijah Clarke, a Revolutionary War hero and a champion of settlers' rights, took matters into his own hands in 1794 and established the "Trans-Oconee Republic" west of the river. He and his supporters declared their independence, set up a government, issued land grants, and built a bustling farm community under the protection of "Fort Defiance" before federal troops forced them back across the Oconee and burned their settlement.

Settlers in Kentucky felt abandoned by the federal government. In the 1780s many considered seceding from the United States and establishing an independent republic. They welcomed federal forces whenever they arrived to fight the Indians, but they railed against the government when it took the Natives' side or tried to mediate the conflict. Like Bacon's Rebels before them, they hated the East Coast elites who had rid themselves of Indians but would not allow settlers in the backcountry to do the same.[44]

Backcountry settlers were also alienated from their state governments, and with good reason. Wherever state governments held title to western lands there was massive fraud, corruption, and claim jumping. The Georgia legislature of 1794 was probably the most corrupt. It gave four land companies—all of which included state legislators as investors—huge land grants for only pennies an acre. Public outrage over the Yazoo land fraud led to the ousting of many of these legislators, but the damage could not be undone, because the courts ruled the grants legally binding.[45]

Virginia's government was less corrupt, but it issued conflicting land

This content downloaded from 198.91.37.2 on Thu, 20 Apr 2023 16:23:24 UTC
All use subject to https://about.jstor.org/terms

grants in the future state of Kentucky and failed to provide for a comprehensive survey. As a result, settlers had to defend their claims in court against well-financed, well-represented speculators, who won almost every case. Settlers who could not afford legal fees had little choice but to sell their land at a fraction of its value to those who could afford to fight in court. The economic consequences of these policies for settlers were disastrous. By the time Kentucky became a state in 1792, two out of three families there owned no land at all, and the numbers were not much better on the Georgia frontier. For most families in these areas, all the hard work they had done and the hardships they had endured went for naught, and all the loved ones they had lost in battles with the Indians died in vain.[46]

In some cases the rage engendered by government actions led directly to homicide. In 1794, when anger against the federal government was at a fever pitch in Georgia because of the suppression of the Trans-Oconee Republic, a Methodist minister named Beverley Allen, who refused to acknowledge the jurisdiction of federal courts in the state of Georgia, shot and killed a U.S. marshal in Augusta. In 1795, when anger over the Yazoo fraud was most intense, Robert Thomas, a state senator who had profited from the fraud, was assassinated by one of his constituents. But antigovernment feeling also increased homicides indirectly by convincing settlers that their governments were illegitimate. It was generally agreed that the "spirit of speculation which seems to have seized hold on all departments, and orders of people, from the man in office to the tiller of the soil," had corrupted government on all levels, and that the right of states to conduct their own affairs where Native Americans or western lands were concerned had been "trampled under the federal foot." In the eyes of many people on the southern and western frontier, governments existed only to swindle the common man out of the fruits of his labor. If they wanted justice, they would have to create it themselves.[47]

In time the federal government did force the Creeks, Cherokees, Shawnees, and other Native peoples out of Georgia, Kentucky, and Ohio, and it established an orderly system for selling federal lands in the Northwest and Southwest Territories. Legislators in Georgia and Virginia tried belatedly to end corruption and ensure that farm families had a fair chance to buy land, and every new state in the trans-Appalachian West empowered poor white men by ending property re-

This content downloaded from 198.91.37.2 on Thu, 20 Apr 2023 16:23:24 UTC
All use subject to https://about.jstor.org/terms

strictions on voting. It would take several decades, however, to alleviate the bitter feelings of the 1780s and 1790s, and the hatred of government engendered in the southern backcountry during those decades never truly disappeared.

The frustration of settlers in the postrevolutionary backcountry manifested itself in high homicide rates. Settlers were quick to take the law into their own hands and kill people who appropriated their property or damaged it in any way. Murders occurred over the right to set up fish traps, over attachments for debt, or over hunting dogs that had been shot. Settlers were also quick to kill people who insulted them or failed to show proper respect. Poor people seldom fought duels, but like revolutionary-era public men they felt compelled to defend their reputations and sometimes judged it better to kill or be killed than to tolerate a public affront. Turning the other cheek could be interpreted as a sign of weakness. If a settler did not respond to a challenge, he risked further bullying and intimidation. In taverns and at the saltworks in Ross County, Ohio, for example, men used guns and knives freely and showed no remorse over killing men who had insulted them. After finishing off his victim one murderer declared with satisfaction that "the damned rascal deserved it." Near Augusta, Georgia, a man was stabbed to death in his sleep for having ridiculed another man in front of a crowd, and a man murdered a neighbor for calling him a rogue and a liar at a militia election.[48]

Continuing genocidal violence against Native Americans also boosted the homicide rate in the backcountry after the Revolution. Some men murdered Indians by stealth; others killed them openly and boasted about it to friends. Tom Lion was killed quietly. An elderly Mohican who lived alone in Holmes County, Ohio, Lion made a living by trading game for the supplies he needed, like flour and gunpowder. He enjoyed annoying the settlers, who considered him a harmless nuisance, and he liked to tell stories about all the whites he had killed in his youth. He claimed to have ninety-nine dried human tongues in his cabin. One day he got drunk at a house-raising, and when the conversation turned to the murder of the Hochstetler family on the Pennsylvania border, he bragged that he knew all about the case. A relative of the Hochstetlers overheard him and followed him home that night. Lion was never seen again—murdered, it was believed, his body submerged in a cranberry bog.[49]

This content downloaded from 198.91.37.2 on Thu, 20 Apr 2023 16:23:24 UTC
All use subject to https://about.jstor.org/terms

Other people killed Natives randomly and without compunction. Three men passing through Lancaster, Ohio, saw an Indian man, woman, and child and decided to kill them on the spot. In 1813 Thomas Griffee of Williamson County, Illinois, was aiming at a bear in a tree when he saw an Indian taking aim at the same bear. He leveled his gun at the man and shot him. Henry Parsons, remembered in Williamson County's history as "a cold, calculating miscreant," shot at least two Native hunters in similar fashion and swore that he would kill any Indian who crossed his path in the woods.[50]

Murders by criminal gangs added to the homicide tally. The cattle and horse thieves who had plagued the southern backcountry before the Revolution were not especially murderous. They had returned fire when cornered but avoided armed conflict whenever possible. They had made money by selling stolen horses and cattle in Chesapeake markets and prospered through speed and stealth, not violence. In the postrevolutionary backcountry many criminal gangs had no qualms about killing hunters, settlers, or travelers for their cash or belongings. When the conflict between settlers and the Creeks was at its height in central Georgia, white gangs took advantage of the situation by murdering and scalping the families they robbed to make it look as if they had been victims of Creek raiders. The practice was so common that by the mid-1780s authorities admitted they could never be sure whether "white or red savages" were at fault.[51]

The most infamous of these criminal gangs were two brothers from a disaffected Tory family. The Harpes terrorized Tennessee and Kentucky in 1798–99, stealing money, clothes, and horses and killing thirty or forty people, some of them children, to eliminate potential witnesses. They were said to have been the sons of a loyalist raider from North Carolina who had fought at Kings Mountain. The family was ostracized after the war, and their neighbors' animosity made a deep impression on the Harpe boys. Before he died, the eldest declared that "he had been badly treated and consequently had become disgusted with all mankind."[52]

Almost as famous as the Harpes, and also a product of the war, was the Cave-in-Rock gang. They robbed and murdered travelers who went down the Ohio River in flatboats in 1797. The leader of the gang, Samuel Mason, came from a prominent Virginia family and had been a captain in the Virginia militia during the Revolution, but his experi-

This content downloaded from 198.91.37.2 on Thu, 20 Apr 2023 16:23:24 UTC
All use subject to https://about.jstor.org/terms

ences during and after the war had embittered him. As commander of the militia at Fort Henry he had seen more than his share of death. He was the sole survivor when his company of fourteen men was ambushed by Indians in 1777, and the company that rescued him lost all but four men. In 1782 he was trying to carve a farm from the wilderness near Wheeling Creek when Native American raiders stole several of his slaves. Mason and a friend pursued the raiders, but they fell into an ambush, and his friend was shot dead. Within months Mason had turned horse thief, trying to recoup his losses at his neighbors' expense and bitter that, having risked so much for them, he had so much less to show for it. He moved in and out of respectable society for the next few years but turned outlaw for good in the mid-1790s. Like every war in history, the Revolution left behind its share of traumatized or resentful veterans who could no longer function in society. The backcountry afforded these people both a refuge from civilization and nearly unlimited opportunities for criminal activity.[53]

The Revolution left a legacy of violence across the Ohio River Valley and the southern backcountry. It legitimized killing in defense of property, reputation, and rights, but, more important, it transferred authority for life-and-death decisions from the government to ordinary citizens. This legacy fused with the hatred of government across the entire southern frontier. People approached confrontations with the conviction that they had to take full responsibility for safeguarding their rights and reputations. Looking to the despised government for justice was worse than useless: it was shameful. It was up to individuals to see that justice was done.

### Homicide on the Northern Frontier

New England's backcountry did not witness as many homicides after the Revolution as the Ohio River Valley or the South, but wherever the government thwarted dreams of landownership or threatened the livelihood of settlers, New Englanders could also be murderous. After the Revolution squatters settled on land in Maine that had been deeded in colonial times to two syndicates of land speculators, the Pejepscot and Kennebec grantees, because they were sure that the speculators' royal charters would be voided. However, the courts ruled in the proprietors' favor. Years of antiproprietary riots and demonstrations ensued,

This content downloaded from 198.91.37.2 on Thu, 20 Apr 2023 16:23:24 UTC
All use subject to https://about.jstor.org/terms

and in 1808 a settler murdered a member of a proprietary surveying party.[54]

A dozen political homicides occurred in northern Vermont during the embargo crisis of 1807–1809 and the War of 1812. Seizures of American ships and sailors by France and Britain during the Napoleonic War prompted Jefferson's administration to prohibit foreign trade in the hope that the denial of American naval stores and foodstuff would force European powers to respect America's right as a neutral power to trade with all nations. The Madison administration set aside Jefferson's unpopular no-trade policy and allowed trade with neutral powers, but depredations against American shipping continued. The embargo and the ensuing war with Britain proved divisive in northern Vermont, where people depended on trading grain, lumber, and livestock with Canada. Political adversaries took up arms against one another. Smugglers killed at least five revenue agents and toll collectors, and at least three smugglers were killed. During the war, a Vermont militiaman who refused to support the invasion of Canada was shot for resisting arrest as a deserter, and two suspected spies were shot by American troops.[55]

Violence against Native Americans persisted in a few areas of the northern backcountry. Some settlers were simply unwilling to live with Indians, many of whom declined to leave after they had been defeated militarily. In Vermont, George Sheldon feuded with Abenakis from St. Francis, Canada, who returned to their home on Vermont's Missisquoi River each spring to hunt and fish. Although the details are hazy, Sheldon apparently believed that the Abenakis had burned his barn, and sometime in the early 1790s he shot two of them dead. Such "ethnic cleansing" kept the homicide rate for Native Americans high long after the backcountry had ceased to be a frontier.[56]

### Homicide in the Shenandoah Valley

Homicide was not a problem everywhere during and after the Revolution. In the Shenandoah Valley of Virginia, for instance, where the Revolution had enjoyed broad support, the homicide rate fell, and political homicides were rare (Figure 1.3). Valley patriots never faced an invasion by the British or their Native allies, so their leaders maintained a firm grip on power. They were able to protect residents, pro-

This content downloaded from 198.91.37.2 on Thu, 20 Apr 2023 16:23:24 UTC
All use subject to https://about.jstor.org/terms

vide basic services, and uphold law and order. The valley's residents embraced the Revolution with near unanimity because it promised to protect that order. As a result, patriot leaders had little trouble putting down draft resisters in Augusta County or defeating a small band of local loyalists who gathered at Massanutten in Rockbridge County.[57]

Per capita, the Shenandoah Valley may have committed more men and supplies to the war effort than any other region in the country, sending over 500 officers and thousands of enlisted men into the Continental army. Augusta County alone raised thirty-eight companies between 1776 and 1781. The valley's residents were most interested, however, in carrying the war to the British and their native allies in the Ohio River Valley. Having experienced a devastating Indian war as recently as 1764–1766, and hoping to profit from the opening of new lands in the West, they were particularly supportive of George Rogers Clark's trans-Appalachian campaigns. Valley soldiers were responsible for some of the greatest victories over Native forces and for some of the most infamous massacres, including the murder of the Shawnee chief Cornstalk and other hostages held by Rockbridge County soldiers garrisoned at Point Pleasant on the Ohio River.[58]

The valley's support for the Revolution extended to the new national government. Delegates to Virginia's ratification convention from the valley and from the trans-Allegheny West voted 27 to 1 in favor of the new federal constitution and provided the margin of victory, since delegates from the rest of Virginia voted 61 to 78 against it.[59] Given the almost complete absence of political conflict in the valley, the depth of its citizens' commitment to the Revolution and to the Indian war, and their solid support for both local and national revolutionary governments, it is not surprising that the rate at which unrelated whites murdered each other fell during the Revolution. The rate at which murder suspects were brought in for questioning—the only measure we have of murder activity in the valley—declined from 5.4 per 100,000 white adults in the decade before the Revolution to only 2.2 per 100,000 from 1775 to 1800 (Figure 1.3). Compared to rates from the rest of the slaveholding South or Pennsylvania, which had a similar mix of German, Scots-Irish, and English settlers, that rate was startlingly low. It was comparable to New England's rate during the Revolution, which was the lowest in the nation. Wherever the transition from the old government to the new government and from old

This content downloaded from 198.91.37.2 on Thu, 20 Apr 2023 16:23:24 UTC
All use subject to https://about.jstor.org/terms

loyalties to new loyalties went well, homicide rates among unrelated adults remained low or even declined.

### African American Homicide

African Americans also saw their homicide rate decline during the Revolution in New England, the Chesapeake, and the Shenandoah Valley. In New England the rate for blacks dropped to between 1 and 2 per 100,000 adults per year, which was as low as the rate for whites (Figure 2.3). There was only one known case of a black murdering another black, and there were only five known cases of whites murdering blacks. Two enslaved men died of neglect or abuse, but racial hostility played no apparent role in the other three deaths. Crispus Attucks was killed in the Boston Massacre; a suspected thief who attacked his captors with an ax was shot to death; and a man involved in street brawl in Boston was so "disordered in his senses" from a blow to the head that he wandered into the harbor three weeks later and drowned.[60]

In the Chesapeake and the Shenandoah Valley, the rate at which blacks were examined for killing other blacks fell by half, to only 1.2 per 100,000 adults per year, and the rate at which whites were questioned for killing blacks also fell by half, to only 2 per 100,000 adults per year (Figure 1.3). The circumstances of these homicides, where known, were not unusual: a field hand was killed for refusing to be whipped for visiting a woman in the plantation's spinning room; a hired slave was clubbed to death for pocketing wages he had earned by hauling tobacco; and slaves died in fights with other slaves.[61]

Unlike those for most whites, African American homicide rates continued to decline during the Revolution largely because the forces that had depressed the rates in the mid-eighteenth century were still at work. There was growing solidarity among African Americans, and many European Americans had more humane attitudes toward them. It would be a mistake, however, to think that all whites became less violent toward blacks in the late eighteenth century. Where slavery survived, it remained a violent institution. Frustrated or sadistic masters inflicted horrible beatings on slaves. White posses hunted down and killed slaves who took advantage of the lawlessness of the Georgia–South Carolina backcountry to establish maroon communities in swamps along the Savannah River. The same fate awaited slaves who

This content downloaded from 198.91.37.2 on Thu, 20 Apr 2023 16:23:24 UTC
All use subject to https://about.jstor.org/terms

hid in swamps along the North Carolina coast and raided local planta-
tions. Nervous whites hanged slaves and free blacks suspected of orga-
nizing slave rebellions. Prosecutions for "conspiracy" peaked in Vir-
ginia in 1775–1777, when slaveholders feared that their slaves might
rise up and join the British. Charleston magistrates hanged Thomas
Jeremiah, a free black harbor pilot, because they believed he was help-
ing the British and organizing a slave revolt.[62]

Many blacks caught up in the conflict itself were killed. During the
British campaign to capture Charleston, South Carolina, patriot sol-
diers captured four men outside their lines—two whites, a mulatto,
and a black—who they suspected were deserting to the enemy. Gover-
nor John Rutledge ordered the soldiers to "hang them up" on the
beam above the fort gate as a warning to others. The British captured a
slave named Ned in Redding, Connecticut, who was fighting with a
band of patriots. After executing the whites, a British officer asked
what should be done with "the negro." His superior said, "damn him,
kill him." The officer stabbed Ned and then cut off his head. When
Cornwallis' soldiers ran low on food at Yorktown, they drove blacks out
of their camp. Dozens were stranded in the no-man's-land between the
British and American forces and were killed in crossfire.[63]

Blacks were far less likely than whites to be victims of political homi-
cides or war crimes during the Revolution. Most did not have an op-
portunity to choose sides, and many who did were wary of the inten-
tions of both sides. Some 5,000 blacks enrolled in patriot militias or in
the Continental army, and a lesser number in loyalist or British forces;
but they joined in smaller proportions than did whites, even in patriot
New England, which integrated its forces early and relied on slaves and
free blacks to help meet induction quotas for the Continental army.
Outside New England, blacks who enlisted or were purchased or dra-
gooned by military forces usually worked as cooks, servants, teamsters,
or laborers rather than as soldiers. The custom of assigning them sup-
port duties probably explains why the British officer in Redding asked
what to do with Ned. Blacks were seldom used or perceived as combat-
ants.[64]

The humanitarian spirit that many whites began to embrace dur-
ing the Revolution probably helped keep the black homicide rate
low. It was undoubtedly responsible for the continued decline in le-
thal discipline of slaves and in extralegal violence against all blacks.
Baptist, Methodist, and revolutionary leaders who rejected slavery

This content downloaded from 198.91.37.2 on Thu, 20 Apr 2023 16:23:24 UTC
All use subject to https://about.jstor.org/terms

did their best in the 1770s and 1780s to increase sympathy for the sufferings of blacks. New Light Calvinists like Samuel Hopkins of Newport, Rhode Island, along with enlightened thinkers like Benjamin Rush of Philadelphia and the Methodist ministers of the Virginia Conference, vilified slavery "as contrary to the Golden Law of God on which hang all the Law and the Prophets, and the unalienable Rights of Mankind, as well as every Principle of the Revolution." Humane attitudes led to the gradual abolition of slavery in the northern United States and the passage of laws in the Upper South that criminalized the unintentional killing of slaves during discipline and allowed manumission of slaves without government interference. The latter laws led to the freeing of 20,000 slaves in Maryland and Virginia.[65]

Among blacks themselves, the decline in homicide was most likely a consequence of a continuing increase in racial solidarity. The rise in the proportion of African Americans who were native-born and the increasing cultural and linguistic unity of African Americans helped enslaved and free blacks form stronger communities. The rapid spread of evangelical Christianity and republican ideology, both of which gained currency among blacks as white Christians and revolutionaries turned against slavery, accelerated the process. Many African Americans formed Christian fellowships and campaigned openly against slavery where they could. Had the opportunity presented itself, it is likely that blacks everywhere would have organized self-help societies like the Free African Union Society of Newport, Rhode Island, or churches like the African Church in Boston. But even where freedom was not yet a possibility, African Americans banded together to improve their lives. For instance, slaves in Granville County, North Carolina, tried to hold an "election" among themselves for justices and sheriffs. They wanted to "have equal Justice distributed so that a weak person might collect his debts, as well as a Strong one."[66]

Although the surviving evidence is slim, it is clear that the dream of freedom and equality that the Revolution created had a profound psychological effect on the black community, making it more unified and less homicidal. African Americans may have taken different sides during the Revolution, or no side at all, but from the beginning they wholeheartedly embraced the idea of freedom. In Charleston, South Carolina, in 1765, during a demonstration against the Stamp Act, a group of slaves started chanting "Liberty." In Maine in 1774 a slave

This content downloaded from 198.91.37.2 on Thu, 20 Apr 2023 16:23:24 UTC
All use subject to https://about.jstor.org/terms

wrote a letter to a prominent citizen to ask for help to secure his freedom, saying, "Yu know the Situation of us poor Slaves, you know what a valuable thing Liberty is to all men leave alone the Poor Unhappy Slaves, we are flesh and blood as much as them of another Colour, but that Cruel yoke of Slavery, hard to be born." Jehu Grant, who ran away from his loyalist master in Rhode Island to join the Continental army, said that "when I saw liberty poles and the people all engaged for the support of freedom, I could not but like and be pleased with such thing (God forgive me if I sinned in so feeling). . . . The songs of liberty that saluted my ear, thrilled through my heart."[67]

When Governor Dunmore of Virginia offered freedom to any slave who fought for Britain and when law and order collapsed in Georgia, slaves ran by the thousands. There were few happy endings for these people. Most of the slaves who escaped to Dunmore perished in the epidemic that swept through his ships. Some Georgia fugitives starved to death in eastern Florida. When Massachusetts abolished slavery, fugitive and free blacks alike were kidnapped and sold.[68] Despite these setbacks, the Revolution raised blacks' hopes that their time was coming. It never had the divisive effect among blacks that it did among whites, nor did it lead initially to more hostile attitudes among whites toward blacks.

The rate at which blacks murdered whites also remained low during the revolutionary period. There was only one known homicide of a white by a black in New England. Pomp, an apprentice, killed his employer, Captain Charles Furbush, after Furbush reneged on a promise to free Pomp from his indentures early and make him his heir. In Virginia, beginning in the 1760s, enslaved men and women sometimes banded together to murder their masters or overseers. Eight slaves conspired to kill Lockey Collier in Elizabeth City County, Virginia. They worked for hours to clean up the scene of the crime but were caught anyway. Blacks who joined loyalist and patriot gangs probably committed some murders, and individual blacks committed murder in the course of armed robberies, but the rate at which blacks murdered whites did not rise.[69]

As in the mid-eighteenth century, the fundamental reason for the low black-on-white homicide rate was the futility of homicide as a form of resistance. Killing whites meant almost certain death for the perpetrator and increased repression for other blacks. Enslaved blacks ran

This content downloaded from 198.91.37.2 on Thu, 20 Apr 2023 16:23:24 UTC
All use subject to https://about.jstor.org/terms

away in great numbers during the Revolution—a third of all slaves fled plantations in Georgia, for example—and blacks were eager to fight for their freedom alongside whites. But it made little sense for them to murder whites or to launch a revolt against them, especially when the abolition movement was making such progress. The Haitian Revolution in 1791 inspired talk of an uprising in the United States, but most slaves appeared to hope that the abolitionists would succeed in bringing a peaceful end to the peculiar institution.[70]

This content downloaded from 198.91.37.2 on Thu, 20 Apr 2023 16:23:24 UTC
All use subject to https://about.jstor.org/terms

CHAPTER 5

# The Emergence of Regional Differences

*Homicide in the Postrevolutionary Period*

Homicide rates increased in most American communities during and immediately after the Revolution, but as the long-term consequences of the Revolution became clear, they began to fall in the North and the mountain South. By the 1820s rates in the North were at historic lows that ranged from under 1 to just over 6 per 100,000 adults. They would remain at that level through the early 1840s. Those rates were comparable to rates in Canada, Sweden, and the Low Countries, and lower than rates in the rest of Europe. The United States would never see numbers that low again.[1]

In the Ozark and Appalachian highlands of the South, where there were few slaves, homicide rates were as low as those in the rural Midwest by the 1830s and early 1840s. But the populations there were too small to affect the South's overall homicide rate. In slaveholding areas of the South, the homicide rate after 1800 ranged from 8 to 28 per 100,000 adults per year—at least twice what it had been for whites at its low point in the Chesapeake in the late 1750s and 1760s and three times what it had been for blacks in the 1780s and 1790s. After the Revolution homicide rates were thus most strongly linked to the presence or absence of slavery.[2]

It took time for these distinct patterns to take shape in the North, the mountain South, and the slave South. Backcountry violence was an interregional problem until the end of the War of 1812, when homi-

180

This content downloaded from 198.91.37.2 on Thu, 20 Apr 2023 16:23:28 UTC
All use subject to https://about.jstor.org/terms

cide rates in Ohio finally fell below those in the Georgia Piedmont (Figures 4.1 and 4.2). Dueling was a national problem until the death of Alexander Hamilton in 1804, after which northerners made it clear that anyone who killed a man in a duel would be drummed out of public life. Homicide rates were high in northern and southern port cities through the War of 1812. Independence opened American ports to ships of all nations, and international tensions created hostility among American and foreign sailors, especially during the Napoleonic era. In Boston, for instance, in the decade after the British occupation, Portuguese, English, American, and French sailors were all involved in murders over women, national honor, or turf. In Savannah, Georgia, thirteen sailors were murdered from 1804 to 1815: a German, a Swede, a Norwegian, two Englishmen, two Frenchmen, two Irishmen, and four Americans. These homicides peaked in 1811–1813, when riots among sailors led to killings in New York, Norfolk, Charleston, Savannah, and New Orleans. The surge in such homicides subsided after the Napoleonic Wars as the maritime economy rebounded.[3]

After the War of 1812 it was clear even to contemporaries that homicide rates in the slave South were diverging from those in the rest of the nation. In the North and the mountain South the homicide rate among unrelated adults fell to its lowest level in American history as loyalist-patriot divisions disappeared and patriotism soared. People in those regions began to boast about America's superiority and to celebrate the unique character of America's political institutions. Edward Tiffin, Ohio's first governor, extolled the transformation of the government from one under which "we [could only] *breathe,* to one under which we may *live.*" The Reverend Samuel Williams of Vermont was confident that Americans had devised the finest government in the world. It was, he said, a government that "reverences the people." He considered the United States "the best poor man's country," a place of opportunity where "the highest perfection and felicity, which man is permitted to hope for in the present life, may rationally be expected."[4]

Widespread self-employment and the removal of many legal and institutional barriers to advancement based on religion, class, or race, including slavery, persuaded the vast majority of northerners and whites in the mountain South that their social hierarchy was becoming more legitimate. A "Citizen of Color" captured the optimism of northern blacks when he wrote in 1814 that "we dwell in safety and pursue our

This content downloaded from 198.91.37.2 on Thu, 20 Apr 2023 16:23:28 UTC
All use subject to https://about.jstor.org/terms

honest callings" with "none daring to molest us, whatever his complexion or circumstances."[5] Homicide was still a problem in urban neighborhoods where the level of self-employment was low and on frontiers that did not yet have effective governments, and the decline in self-employment that began in the 1820s and 1830s caused widespread anxiety and prompted riots that were responsible for a number of deaths in northern cities. But elsewhere in these regions homicides were rare.

The situation was very different in the slave South. Revolutionary ideas and aspirations wreaked havoc with the status hierarchy of slave society in a number of ways. Poor and middle-class whites were increasingly frustrated by their inability to rise in a society that remained class-bound and hierarchical. Prominent whites were subjected to the rough-and-tumble of democracy and were infuriated by the way they were treated. Blacks despaired over the failure of the abolition movement in the South, and whites were more fearful than ever of black rebellion. As a result, impatience with restraint and sensitivity to insult were more intense in the slave South, and during this period the region saw more than its share of deadly quarrels, property disputes, duels, and interracial killings.

People in the slaveholding South were also less likely than people in the North or the mountain South to trust the federal government and to identify with the new nation. Distrust blossomed in the 1820s and 1830s as proslavery southerners realized that the federal government had turned against them on a number of vital issues, including the admission of new slave states and territories and the suppression of abolitionist speech. The distrust may not have been strong enough to raise the homicide rate, but it was strong enough to nullify the dampening effect that the patriotism of the post–War of 1812 period should have had on the homicide rate among whites. In those decades, when American nationalism reached its nineteenth-century peak, identification with national heroes was weaker in the South than in the nation as a whole. The difference was so strong that a higher percentage of places were named in the North than in the South for the South's national heroes, including Washington, Jefferson, and Jackson. Regional differences in national loyalty would become even more marked in the 1850s, of course, and again in the 1890s. But they were substantial enough in the postrevolutionary period to help raise the homicide

This content downloaded from 198.91.37.2 on Thu, 20 Apr 2023 16:23:28 UTC
All use subject to https://about.jstor.org/terms

rate above the levels of the middle and late eighteenth century.[6] The slaveholding South thus became the first region of the United States to deviate from the long-term trend toward lower homicide rates in North America and western Europe.

None of the correlates of lower homicide rates were present in the Southwest. In the Mexican borderlands rates tripled from the 1820s to the 1840s, probably reaching 40 per 100,000 adults per year in the Rio Grande Valley of New Mexico and in slaveholding areas of east Texas, and 100 or more per 100,000 in California and Hispanic areas of Texas. Mexico's war for independence from Spain (1810–1821) unsettled relations among classes and racial castes, just as the American Revolution had done in the slaveholding South, and led to murders that crossed class and racial lines. Government instability and frontier violence compounded the problem; Mexicans, Americans, and Native Americans killed one another over trade and territory. Mexico's counterrevolution of 1834 set off violent rebellions in nine of Mexico's twenty-seven states and territories, including Texas, California, and New Mexico, which led to a cycle of political killings, robbery murders, revenge murders, and vigilantism. Together, political instability, the failure of the federal and territorial governments to establish their legitimacy, the lack of national feeling, and the delegitimation of the social hierarchy made the Southwest one of the most homicidal regions in North America.

### The Decline of Homicide in the North

The turning point in homicide rates in the northern backcountry and in northern ports like New York City was the end of the War of 1812 (Figures 4.2 and 5.1–5.3). Elsewhere in the North, particularly in southern New England and eastern Pennsylvania, the turning point had occurred in the late 1780s (Figures 1.2 and 2.2). Homicide rates declined as soon as political conflict subsided, the Constitution was ratified, and a stronger national government emerged. In Pennsylvania, for example, moderates were determined to build a stronger, more inclusive state government and to lay to rest the divisions of the war years. In 1786 moderate assemblymen altered the Test Act so that pietists could affirm their loyalty without swearing oaths. Two years later they gutted the Militia Act by suspending the fines for refusing

This content downloaded from 198.91.37.2 on Thu, 20 Apr 2023 16:23:28 UTC
All use subject to https://about.jstor.org/terms

**184** • THE EMERGENCE OF REGIONAL DIFFERENCES



**Figure 5.1** Unrelated-adult homicide rate in New Hampshire and Vermont, 1775–1900 (per 100,000 adults per year).



**Figure 5.2** Unrelated-adult homicide rates in rural Illinois, 1820–1900 (per 100,000 adults per year).

This content downloaded from 198.91.37.2 on Thu, 20 Apr 2023 16:23:28 UTC
All use subject to https://about.jstor.org/terms

military service. As their hold on power strengthened in the 1790s, they abolished other unpopular wartime acts and implemented universal male suffrage and a volunteer militia—measures that proved widely popular. The legitimacy of government was rebuilt that way in every state, step by step.[7]

The Revolution had undermined fellow feeling in the North, especially among white Protestants, in ways that would take a generation to repair. Patriotic feeling did not really began to flourish until the 1820s and early 1830s (Figure 2.1), and many northerners still questioned the legitimacy of the central government and the character of the men who ran it. But the Revolution also fostered a belief in the unique promise of the new nation that seemed to help suppress homicide. America would be a country where everyone had a chance to be eco-



**Figure 5.3** Urban homicide rates in the northern United States, 1797–1900 (per 100,000 adults per year).

This content downloaded from 198.91.37.2 on Thu, 20 Apr 2023 16:23:28 UTC
All use subject to https://about.jstor.org/terms

nomically independent. The abolition of slavery, the extension of voting rights, increased toleration for religious dissenters, and high levels of homeownership and self-employment convinced the vast majority of northerners that they were on their way toward putting an end to the oppression and prejudice that had kept people in abject poverty for centuries in aristocratic and monarchical societies. Obviously there was room for improvement in their society, but most people believed that now everyone could get married, set up a household, and own a shop or farm. The sole requisite for success was hard work. Even the poor, Catholics, and former slaves shared that belief, despite the financial obstacles and social prejudices they faced. The social hierarchy that emerged in the North after the Revolution was thus perceived as far more legitimate than any that had preceded it.

The belief that they had created a society in which everyone had a chance to get ahead did not create the kind of solidarity that fear of Indians, anti-Catholicism, or patriotism had among European colonists in the late seventeenth century. But most northerners believed they had a shared interest in sustaining the social and political order that emerged after the Revolution. The hatred they might have harbored for wartime enemies—many of whom had packed up and left for Canada anyway—was displaced by pride in their extraordinary victory over the British. The hostile, defensive, and predatory emotions that lay behind the murders of friends, acquaintances, and strangers—never as strong in the North as in the South or on the frontier—were supplanted by the feeling that everyone in America could participate in this grand social and political experiment.

For most people this faith in the social and political order of the postrevolutionary North was justified. By the end of the War of 1812, 60 percent of all adult men in the North owned their own shops or farms; the proportion was closer to 80 percent for men in their midthirties and older. Most of those who did not own shops or farms at least owned homes or headed independent households. Owning a house or shop or farm was the standard by which people were judged. Those who owned property had a sense of accomplishment, greater resilience in the face of disappointments, and a strong bond with other property owners.[8]

It is impossible to prove that the growing legitimacy of the North's social hierarchy and the respect and satisfaction derived from eco-

This content downloaded from 198.91.37.2 on Thu, 20 Apr 2023 16:23:28 UTC
All use subject to https://about.jstor.org/terms