EXHIBIT 86

# The FBI and the American Gangster, 1924-1938

The "war to end all wars" was over, but a new one was just beginning—on the streets of America.

It wasn't much of a fight, really—at least at the start.

On the one side was a rising tide of professional criminals, made richer and bolder by Prohibition, which had turned the nation "dry" in 1920. In one big city alone— Chicago—an estimated 1,300 gangs had spread like a deadly virus by the mid-1920s. There was no easy cure. With wallets bursting from bootlegging profits, gangs outfitted themselves with "Tommy" guns and operated with impunity by paying off politicians and police alike. Rival gangs led by the powerful Al "Scarface" Capone and the hot-headed George "Bugs" Moran turned the city streets into a virtual war zone with their gangland clashes. By 1926, more than 12,000 murders were taking place every year across America.

On the other side was law enforcement, which was outgunned (literally) and ill-prepared at this point in history to take on the surging national crime wave. Dealing with the bootlegging and speakeasies was challenging enough, but the "Roaring Twenties" also saw bank robbery, kidnapping, auto theft, gambling, and drug trafficking become increasingly common crimes. More often than not, local police forces were hobbled by the lack of modern tools and training. And their jurisdictions stopped abruptly at their borders.

In the young Bureau of Investigation, things were not much better. In the early twenties, the agency was no model of efficiency. It had a growing reputation for politicized investigations. In 1923, in the midst of the Teapot Dome scandal that rocked the Harding Administration, the nation learned that Department of Justice officials had sent Bureau agents to spy on members of Congress who had opposed its policies. Not long after the news of these secret activities broke, President Calvin Coolidge fired Harding's Attorney General Harry Daugherty, naming Harlan Fiske Stone as his successor in 1924.



**Al Capone after his arrest in 1929.**



**The first graduates of the Bureau's training program for national police executives, the forerunner of today's National Academy, in 1935.**

A good housecleaning was in order for the Bureau, and it came at the

hands of a young lawyer by the name of J. Edgar Hoover. Hoover had joined the Department of Justice in 1917 and had quickly risen through its ranks. In 1921, he was named Assistant Director of the Bureau. Three years later, Stone named him Director. Hoover would go on to serve for nearly another half century.

At the outset, the 29-year-old Hoover was determined to reform the Bureau, quickly and thoroughly, to make it a model of professionalism. He did so by weeding out the "political hacks" and incompetents, laying down a strict code of conduct for agents, and instituting regular inspections of Headquarters and field operations. He insisted on rigorous hiring criteria, including background checks, interviews, and physical tests for all special agent applicants, and in January 1928, he launched the first formal training for incoming agents, a two-month course of instruction and practical exercises in Washington, D.C. Under Hoover's direction, new agents were also required to be 25 to 35 years old, preferably with experience in law or accounting.

When Hoover took over in 1924, the Bureau had about 650 employees, including 441 special agents. In five years, with the rash of firings it had just 339 special agents and less than 600 total employees. But it was beginning to become the organized, professional, and effective force that Hoover envisioned.

One important step in that direction came during Hoover's first year at the helm, when the Bureau was given the responsibility of consolidating the nation's two major collections of fingerprint files. In the summer of 1924, Hoover quickly created an Identification Division (informally called "Ident" in the organization for many years to come) to gather prints from police agencies nationwide and to search them upon request for matches to criminals and crime evidence.



A young J. Edgar Hoover



New agents train on the rooftop of the Department of Justice building in Washington, D.C., where FBI Headquarters was located from 1933 to 1972.

It was a vital new tool for all of law enforcement—the first major building block in Hoover's growing quest to bring the discipline of science to Bureau investigations and scientific services to law enforcement nationwide. Combined with its identification orders, or IOs—early wanted posters that included fingerprints and all manner of details about criminal suspects on the run—the Bureau was fast becoming a national hub for crime records. In the late 1920s, the Bureau began exchanging fingerprints with Canada and added more friendly foreign governments in 1932; the following year, it created a corresponding civil fingerprint file for non-criminal cases. By 1936, the agency had a total reservoir of 100,000 fingerprint cards; by 1946, that number had swelled to 100 million.

## Welcome to the World of Fingerprints



**William West**



**Will West**

We take it for granted now, but at the turn of the twentieth century the use of fingerprints to identify criminals was still in its infancy.

More popular was the Bertillon system, which measured dozens of features of a criminal's face and body and recorded the series of precise numbers on a large card along with a photograph.

After all, the thinking went, what were the chances that two different people would look the same and have identical measurements in all the minute particulars logged by the Bertillon method?

Not great, of course. But inevitably a case came along to beat the odds.

It happened this way. In 1903, a convicted criminal named Will West was taken to Leavenworth federal prison in Kansas. The clerk at the admissions desk, thinking he recognized West, asked if he'd ever been to Leavenworth. The new prisoner denied it. The clerk took his Bertillon measurements and went to the files, only to return with a card for a "William" West. Turns out, Will and William bore an uncanny resemblance (they may have been identical twins). And their Bertillon measurements were a near match.

The clerk asked Will again if he'd ever been to the prison. "Never," he protested. When the clerk flipped the card over, he discovered Will was telling the truth. "William" was already in Leavenworth, serving a life sentence for murder! Soon after, the fingerprints of both men were taken, and they were clearly different.

It was this incident that caused the Bertillon system to fall "flat on its face," as reporter Don Whitehead aptly put it. The next year, Leavenworth abandoned the method and start fingerprinting its inmates. Thus began the first federal fingerprint collection.

In New York, the state prison had begun fingerprinting its inmates as early as 1903. Following the event at Leavenworth, other police and prison officials followed suit. Leavenworth itself eventually began swapping prints with other agencies, and its collection swelled to more than 800,000 individual records.

By 1920, though, the International Association of Chiefs of Police had become concerned about the erratic quality and disorganization of criminal identification records in America. It urged the Department of Justice to merge the country's two major fingerprint collections—the federal one at Leavenworth and its own set of state and local ones held in Chicago.

Four years later, a bill was passed providing the funds and giving the task to the young Bureau of Investigation. On July 1, 1924, J. Edgar Hoover, who had been appointed Acting Director less than two months earlier, quickly formed a Division of Identification. He announced that the Bureau would welcome submissions from other jurisdictions and provide identification services to all law enforcement partners.

The FBI has done so ever since.

Using fingerprints to catch the guilty and free the innocent was just the beginning. The lawlessness of the 1920s got the nation's attention, and a number of independent studies—including the Wickersham Commission set up by President Herbert Hoover in May 1929—confirmed what everyone seemed to already know: that law enforcement at every level needed to modernize.

One glaring need was to get a handle on the national scope of crime by collecting statistics that would enable authorities to understand trends and better focus resources. Taking the lead as it did in many police reforms in the early twentieth century, the International Association of Chiefs of Police created a committee to advance the issue, with Hoover and the Bureau participating. In 1929, the Chiefs adopted a system to classify and report crimes and began to collect crime statistics. The association recommended that the Bureau—with its experience in centralizing criminal records—take the lead. Congress agreed, and the Bureau assumed responsibility for the program in 1930. It has been taking this national pulse on crime ever since.

The third major development was a scientific crime lab, long a keen interest of Hoover's. After becoming Director, he had encouraged his agents to keep an eye on advances in science. By 1930, the Bureau was hiring outside experts on a case-by-case basis. Over the next few years, the Bureau's first technical laboratory took root, thanks in large part to a visionary special agent named Charles Appel. By 1932, the lab was fully operational and soon providing scientific examinations and analysis for the Bureau and its partners around the country.



**Employees of the "Ident" division in 1929. The Bureau began managing the nation's fingerprint collections five years earlier.**

This trio of advances came just in time, as the crime wave that began in the 1920s was about to reach its peak. By the early 1930s, cities like St. Paul, Minnesota, had become virtual training grounds for young crooks, while Hot Springs, Arkansas, had turned into a safe haven and even a vacation spot for the criminal underworld. Al Capone was locked away for good in 1931 (thanks in part to the Bureau), but his Chicago Outfit carried on fine without him and would actually experience a resurgence in the coming decades. The "Five Families" of the New York Mafia were also emerging during this period, with "Lucky" Luciano setting up the "Commission" to unite the mob and "Murder, Inc." to carry out its hits. Prohibition was ultimately repealed in 1933, but by then, the Great Depression was in full force, and with honest

jobs harder to come by than ever, the dishonest ones sometimes seemed more attractive than standing in soup lines.

By 1933, an assortment of dangerous and criminally prolific gangsters was wreaking havoc across America, especially in the Midwest. Their names would soon be known far and wide.

There was John Dillinger, with his crooked smile, who managed to charm the press and much of America into believing he was nothing more than a harmless, modern-day Robin Hood. In reality, Dillinger and his revolving crew of gunslingers—violent thugs like Homer Van Meter, Harry "Pete" Pierpont, and John "Red" Hamilton—were shooting up banks across America's heartland, stealing hundreds of thousands of dollars and murdering at least one policeman along the way.

**The Birth of the FBI Lab**

In the pages of FBI history, November 24, 1932, is considered the official birthday of the FBI

Laboratory. But it is really a "declared" anniversary for what was an evolving concept.

From the 1920s on, Director Hoover had been actively interested in scientific analysis, and by 1930 he had authorized the use of outside experts on a case-by-case basis in identification and evidence examination matters. Then, over a two-year period, the first true "technical" laboratory functions began to take shape. When all these functions moved into Room 802 of the Old Southern Railway Building in Washington, D.C., it seemed appropriate to recognize that a true lab had been born.

It was Special Agent Charles Appel (pictured) who was its midwife. He had served as an aviator in World War I before joining the Bureau in 1924—and right from the start he focused on meticulous investigations based on scientific detection.

Appel was an extraordinary man with extraordinary vision, fully backed by Director Hoover with the necessary resources. He took courses to further his knowledge of state-of-the-art techniques, and by 1931, he began seeking expert opinion on starting a crime lab. In July 1932, when he proposed "a separate division for the handling of so-called crime prevention work" under which "the criminological research laboratory could be placed," he got an immediate endorsement. By September, Room 802 in the Old Southern Railway building was fully equipped. By November 24, it was in business.

The new lab was pretty sophisticated by 1932 standards. It included a brand new ultra-violet light machine; a microscope, on loan from Bausch and Lomb until the requisition for its purchase could be finalized; moulage kits (for taking impressions); photographic supplies; and chemical sets. A machine to examine the interior of gun barrels was on order.

For about a year, Appel was the Bureau's one-man lab. His handwriting and typewriter font analysis solved a poisoning case in 1933. His analysis of handwriting on the Lindbergh kidnapping ransom notes ultimately helped convict Bruno Richard Hauptmann.

Agents across the Bureau soon started receiving training on what this new lab could do for them and their cases, and they spread the word about the value of scientific work to their law enforcement partners.

By January 1940, the lab had a total of 46 employees. As America headed into a second world war, its growing skills and capabilities would be needed more than ever.

There was Clyde Barrow and his girlfriend Bonnie Parker, an inseparable, love-struck couple who—partnered at times with the Barrow brothers and others—were robbing and murdering their way across a half dozen or so states.

There was the ruthless, almost psychopathic "Baby Face" Nelson, who worked with everyone from Roger "The Terrible" Touhy to Al Capone and Dillinger over the course of his crime career and teamed up with John Paul Chase and Fatso Negri in his latter days. Nelson was a callous killer who thought nothing of murdering lawmen; he gunned down three Bureau agents, for instance, in the span of seven months. And there was the cunning Alvin Karpis and his Barker brother sidekicks, who not only robbed banks and trains but engineered two major kidnappings of rich Minnesota business executives in 1933.

All of these criminals would become "public enemies," actively hunted by law enforcement nationwide. At first, the Bureau was playing only a bit part in pursuing these gangsters, since few of their crimes violated federal laws. But that began to change with the 1932 Lindbergh kidnapping, which gave the Bureau jurisdiction in these cases for the first time; with the "Kansas City Massacre" in June 1933, a bloody slaughter at a train station that claimed the lives of four lawmen, including a Bureau agent; and with the rise to national prominence of John Dillinger.



The rising popularity of the FBI's "G-men" spawned hundreds of toys and games.

Using whatever federal laws it could hang its hat on, the Bureau turned its full attention to catching these gangsters. And despite some stumbles along the way, the successes began to add up. By the end of 1934, most of these public enemies had been killed or captured.

Bonnie and Clyde were the first to fall, in May 1934, at the hands of Texas lawmen (with the Bureau playing a small supporting role in tracking them down). In July, Melvin Purvis and a team of agents caught up with Dillinger, who was shot dead leaving a Chicago theater. "Pretty Boy" Floyd, one of the hired hands of the Kansas City Massacre, was killed in a shootout with Bureau agents and local law enforcement on an Ohio farm in October 1934. And Nelson died the following month after a bloody firefight with two special agents, who were also killed.

The Bureau caught up with the rest soon enough. Agents arrested "Doc" Barker in January 1935, and the infamous "Ma" Barker and her son Fred were killed by Bureau agents in Florida eight days later. Alvin Karpis, the brains of the gang, was captured in May 1936 and ended up in Alcatraz.



The Florida home (right) where "Doc" and "Ma" Barker were killed in a shootout with Bureau agents. The cache of Barker weapons recovered by agents after the firefight is shown in the inset.

In just a few transformative years, thanks to the successful battle against gangsters, the once unknown Bureau and its "G-Men" became household names and icons of popular culture. Along the way, Congress had given it newfound powers, too, including the ability to carry guns and make arrests. In July 1935, as the capstone of its newfound identity, the organization was renamed the Federal Bureau of Investigation—the FBI.

As the decade came to a close, the FBI would find itself shifting gears once again. War was brewing in Europe, and pro-Nazi groups were becoming more and more vocal in the U.S., claiming fascism was the answer to American woes. The gangsters, it turned out, were just a prelude to the dark days to come.

### "Machine Gun" Kelly and the Legend of the G-Men

Before 1934, "G-Man" was underworld slang for any and all government agents. In fact, the detectives in J. Edgar Hoover's Bureau of Investigation were so little known that they were often confused with Secret Service or Prohibition Bureau agents. By 1935, though, only one kind of government employee was known by that name, the special agents of the Bureau.

How this change came about is not entirely clear, but September 26, 1933, played a central role in the apocryphal origins of this change.

On that day, Bureau of Investigation agents and Tennessee police officers arrested gangster George "Machine Gun" Kelly. He was a "wanted fugitive" for good reason. Two months earlier Kelly had kidnapped oil magnate Charles Urschel and held him for $200,000 in ransom. After Urschel was released, the Bureau coordinated a multi-state investigation, drawing investigative information from its own field offices as well as from other police sources, as it identified and then tracked the notorious gangster across the country.

On September 26, "Machine Gun" Kelly was found hiding in a decrepit Memphis residence. Some early press reports said that a tired, perhaps hung-over Kelly stumbled out of his bed mumbling something like "I was expecting you." Another version of the event held that Kelly emerged from his room, hands-up, crying "Don't shoot G-Men, don't shoot." Either way, Kelly was arrested without violence.

The rest is history. The more colorful version sparked the popular imagination and "G-Men" became synonymous with the special agents of the FBI.

# EXHIBIT 87

 

SUBSCRIBE

**POLITICS**

# All-American Killer: How the AR-15 Became Mass Shooters' Weapon of Choice

An assault rifle designed for the battlefield has become a windfall for the gun industry and common in mass shootings

BY TIM DICKINSON

FEBRUARY 22, 2018



# You're running out of free articles.

Subscribe today to get unlimited Rolling Stone access.

SEE MY OPTIONS

ALREADY A SUBSCRIBER? **LOG IN**

*The July 20th, 2012, shooting in Aurora, Colorado. 12 Dead. 58 wounded. 7 minutes. James Holmes' Smith & Wesson AR-15 rifle at the crime scene.*

THE AR 15 ASSAULT rifle was engineered to create what one of its designers called "maximum wound effect." Its tiny bullets – needle nosed and weighing less than four grams   travel nearly three times the speed of sound. As the bullet strikes the body, the payload of kinetic energy rips open a cavity inside the flesh – essentially inert space – which collapses back on itself, destroying inelastic tissue, including nerves, blood vessels and vital organs. "It's a perfect killing machine," says Dr. Peter Rhee, a leading trauma surgeon and retired captain with 24 years of active-duty service in the Navy.

Rhee is most famous at home for saving the life of Arizona Rep. Gabby Giffords after she was shot point blank in the head with a handgun fired by a mass shooter in 2011. "A handgun [wound] is simply a stabbing with a bullet," says Rhee. "It goes in like a nail." With the high-velocity rounds of the AR-15, he adds, "its as if you shot somebody with a Coke can."

Versions of the AR-15 have been the U.S. military's standard-issue assault rifle in every war since Vietnam. But only in the past dozen years have semi-automatic models become a fixture of American life. Gun-makers – emboldened by Congress and cloaked in the Second Amendment   have elevated the AR 15 into an avatar of civilian manhood, independence and patriotism. In the process, this off-patent combat rifle has become an infinitely customizable weapon platform that now accounts for nearly one in five guns sold in America. The federal government has deemed them "semi-automatic assault rifles" with magazine capacities that serve "no sporting purpose." But the National Rifle Association now simply calls the AR-15 "America's Rifle."

──────────────── ADVERTISEMENT ────────────────

The mass-market boom of the AR has been horrific for the rest of us. Adam Lanza stormed Sandy Hook Elementary with a Bushmaster AR-15, laying down more than 150 rounds in less than five minutes and slaughtering 20 first graders. James Holmes wielded a Smith & Wesson "Military & Police" (M&P) AR-15 fitted with a 100-round drum magazine in his siege of a movie theater that killed 12 and wounded 58. The San Bernardino, California, shooters carried a pair of AR-15s in their ISIS-inspired rampage that left 14 dead. Orlando shooter Omar Mateen deployed Sig Sauer's concealable "next generation AR" to murder 49 and injure dozens more at the Pulse nightclub – the deadliest mass shooting in modern American history.

## EDITOR'S PICKS

▶ **The 50 Worst Decisions in Music History**

▶ **The 200 Greatest Singers of All Time**

---

▶ **The 500 Greatest Songs of All Time**

---

▶ **The 100 Greatest TV Shows of All Time**

---

"Time and time again we see it used to do what it was designed to do, which is to kill a lot of people in a short amount of time," says Mark Barden, managing director of the Sandy Hook Promise, a group dedicated to protecting children from gun violence. Barden's son Daniel – precocious, kindhearted, an ace at foosball – was one of the students murdered in Newtown, Connecticut. "It's designed for combat," he says. "It doesn't have any practical application in civilized society."

Gun-makers call the civilian AR-15 a "modern sporting rifle," and insist that the restriction on automatic fire somehow neuters the weapon. The industry's trade group, the National Shooting Sports Foundation (NSSF), maintains that "AR-15-style rifles are NOT 'assault weapons,'" adding that the guns "look like military rifles . . . but function like other semi-automatic civilian sporting firearms." This line of argument is hard to square with the Army's own Field Manual, which instructs soldiers that semi-automatic fire is the "most important firing technique during fast-moving, modern combat," adding, "It is surprising how devastatingly accurate rapid semi-automatic fire can be."

ADVERTISEMENT

The U.S. military chose the AR as its infantry rifle for the same reason it's a clear and present danger in the civilian world: It is uncannily easy to use. Before a trip to Threat Dynamics' firing range in August, I had never shot a firearm. My trainer – a pale-eyed ex-cop named Chris – hands me an AR made by Daniel Defense, which markets its guns with photographs of U.S. soldiers and the tag line "Use What They Use."

Despite the menacing look of the weapon, Chris assures me, "Little kids can shoot 'em – there's so little recoil." Inside the range, I assume a combat stance. Hips nearly square to the target. Knees bent. Crunching slightly forward at the waist. Right eye behind the scope. Thumb on the safety. Flick. Release.

Firing at the torso of the man-size silhouette, I blast through two boxes of ammunition. When my half-hour session with Chris is almost up, I load a final 20 rounds into my magazine, place the head of the target in my sights, 60 feet downrange – and unload.

# RELATED

▶ **The NRA vs. America**

---

▶ **Kamala Harris Slams 'Pitiful' Congress for Cowering Before Gun Lobby**

The rifle shoots faster than I can aim, but I'm learning the bouncing rhythm of the muzzle. How it rises with each shot, before settling back on target. Faster now. Boom. Boom boom. Boomboomboom. In less than a minute, my magazine is empty. Eighteen shots are direct hits – to the forehead, face and chin. One bullet drifted down the jugular. I miss only once.

The story of how this masterpiece of war technology morphed into a billion dollar blockbuster for domestic gun makers lays bare both the power, and recklessness, of the gun industry. With millions of semi-automatic assault rifles now in civilian hands, and little more than a credit card swipe standing between an unhinged killer and one of these weapons, the AR-15 has emerged as the brightest flashpoint in America's gun debate. Following each new attack, as gun-control advocates demand tighter restrictions on assault rifles, customers rush to local gun shops to stockpile more, driving a surge in gun-maker profits.

Before the election of Donald Trump, the legal tide had been turning. Federal courts had backed state laws limiting the deadliness of the AR-15. The Supreme Court even let stand a local ordinance banning them outright. The NRA would never admit it, says Adam Skaggs, litigation director for the Law Center to Prevent Gun Violence, but current precedent is clear: The Second

Amendment, he says, "is not violated by a law that says you can't walk down the street with an AR-15 and a 30-round magazine."

ADVERTISEMENT

Now, the future of civilian assault rifles looks much more secure. Trump, helped to the White House by millions in advertising paid for by the NRA, is poised to overhaul the federal judiciary to the gun lobby's specifications. That process begins with the replacement of the late Supreme Court justice Antonin Scalia with another pro-gun stalwart. During the campaign, Trump blasted assault-weapon restrictions as "a total failure." "The government," his platform says, "has no business dictating what types of firearms good, honest people are allowed to own."

The assault rifle was born in World War II. The Nazi "Sturm-gewehr," or "storm rifle," introduced in 1944, was designed to marry the light weight and rapid fire of a submachine gun to the power and accuracy of a rifle. It came equipped with a 30 round detachable magazine, and proved a deadly asset to Nazis mowing down waves of Russian conscripts on the Eastern Front. The Soviets debuted their own combat rifle in 1947: the rugged, nearly indestructible Avtomat Kalashnikova, or AK-47 – faced by American GIs in virtually every military conflict since.

The "assault rifle" (a de-Hitlerized translation) evolved as warfare leaped out of the trenches into more open, guerrilla-style clashes. The United States was late to enter the light-arms race, but would eventually answer with the AR 15. The "AR" doesn't stand for

"assault rifle"; it stands for Armalite Rifle – named for the small California company that designed the weapon. A subsidiary of an airplane manufacturer, Armalite fashioned lightweight guns from aircraft grade aluminum and modern plastics, aiming to bring the bulky wood-and-steel rifles lugged by soldiers in World War II and Korea into the jet age.

ADVERTISEMENT

In 1957, the Army approached Armalite's star gun designer, Eugene Stoner, with a tall order: Produce a six-pound, high-velocity rifle, firing in semi- and full-automatic modes, with firepower capable "of penetrating a steel helmet or standard body armor at 500 yards." Stoner was a brilliant Marine Corps vet with no more than a high school degree from Long Beach Poly. He wore owlish glasses and had a taste for bow ties, giving him an unassuming look, the Orville Redenbacher of machine-gun design. His answer to the Army's request was the AR-15, an exceptionally balanced gun with little recoil – meaning soldiers could more easily keep the rifle level, and on target, in a firefight.

By the Army's own metrics, Stoner had built a superior war-fighting machine. A 1959 Pentagon report found that Stoner's gun was "much more effective" both in "volume of fire and number of targets hit" than its competition, the M14 rifle, concluding that a "5- to 7- man squad armed with the AR-15 would be as effective as a 10-man squad armed with the M14." The chief of the Air Force, Curtis LeMay, famous for directing the firebombing of Tokyo and inspiring the cigar-chomping General Ripper character in Dr. Strangelove, had fallen hard for the gun while shooting watermelons with an AR-15 at a Fourth of July celebration. After atomizing two of the party's three melons, legend has it, LeMay placed the third in his sights before reconsidering: "Let's eat the son of a bitch."

But the M14 had other powerful champions – and inertia – on its side. The gun fired the large-caliber bullets that the Army had trusted for decades, and the "big bore" boys at the Pentagon hated the tiny, high-velocity rounds of the AR. Tradition won out; the M14 moved into production. President Kennedy personally ordered

General LeMay to stop pestering the Pentagon. Armalite, unconvinced its gun had a military future, sold the rights to Colt for $75,000 and a royalty of 4.5 percent on future manufacture.

It would take the Advanced Research Projects Agency (ARPA) – the tech-focused Pentagon arm today known as DARPA – to assure the AR-15's future as a combat weapon. It lobbied Pentagon brass to secure 1,000 rifles for use by South Vietnamese troops and their American special-forces trainers in 1961. The rifle surpassed all expectations in combat. And by August 1962, ARPA had issued a confidential report on the weapon's performance in war.

ADVERTISEMENT

The AR-15 suited the "violent short clashes at close ranges which are characteristic of guerrilla warfare in Vietnam," ARPA reported, noting that this "extremely mobile type of offensive warfare" had placed a "high premium on small, lightweight weapons." The AR-15 is now marketed as a macho gun; a notorious Bushmaster ad touts the rifle with the slogan "Consider your man card reissued." But ARPA praised the weapon as "well-suited to the small stature of the Vietnamese," whose "average soldier," it reported, "stands five feet tall and weighs 90 pounds."

But it was the killing power of the AR-15 that turned the heads of Pentagon bureaucrats and congressional appropriators alike. The battlefield testimonials included in the ARPA report are horrific: One describes an Army Ranger killing a Viet Cong soldier at about 15 meters with a three-round burst. "One round in the head – took it

completely off," it reads. "Another in the right arm, took it completely off, too. One round hit him in the right side, causing a hole about five inches in diameter." Each shot was a killer: "Any one of the three would have caused death."

Another battlefield dispatch records the carnage after a team of Rangers ambushed a Viet Cong position, killing five. The report enumerated the wounds inflicted, including: a back wound that "caused the thoracic cavity to explode"; a buttock wound that "destroyed all tissue of both buttocks"; and finally "a heel wound," where "the projectile entered the bottom of the right foot causing the leg to split from the foot to the hip." All the deaths were "instantaneous," ARPA reported, "except the buttock wound. He lived approximately five minutes."

The "phenomenal lethality" of the AR-15 described by ARPA was decisive, according to a later Pentagon report. LeMay's pending request for the Air Force to procure AR-15s got the green light. In December 1963, the Army adopted the AR-15 – rebranding it the M16. President Kennedy was soon photographed admiring one in the Oval Office. After a rocky rollout – early models were prone to jam – AR-platform combat rifles and carbines have towered as the U.S. military's infantry weapons of choice ever since.

ADVERTISEMENT

The AR-15 did not immediately pop as a mass-market gun. It was introduced to civilians in the early 1960s, when Colt's "AR-15 Sporter" was pitched as a "superb hunting partner." But the rifle –

tarnished by its association with America's deadly misadventure in Vietnam – didn't prove popular with the gun-buying public until this century, when production soared from 60,500 in 2001 to 1.27 million in 2012.

The boom was ignited by the expiration of the federal assault-weapons ban in 2004. The ban, enacted by President Bill Clinton, had done little to limit the deadliness of the AR-15; John Allen Muhammad and Lee Boyd Malvo, the D.C. snipers, wielded a "ban-compliant" Bushmaster in 2002. But the law had blocked sale of militarized upgrades – ranging from 30-round magazines to flash suppressors and grenade launchers. "The end of the assault-weapons ban," says Josh Sugarmann, executive director of the Violence Policy Center, "allowed for the customization and modification of these weapons to make them look even more militaristic, even more grand in the eyes of their owners."

The following year, amid a $1.7 million lobbying blitz by the NRA, Congress passed a sweeping change to American gun law. The Protection of Lawful Commerce in Arms Act (PLCAA), signed by President George W. Bush, provides gun manufacturers with near-total liability protection for the criminal misuse of their products. "The perception for the gun industry is: 'We can't get sued,'" says Josh Koskoff, a Connecticut attorney who filed a case on behalf of Newtown families. "'We can be as unethical and as wild and as aggressive in the marketing as we want.'" (The industry's trade group, the NSSF, declined to comment.)

Sales soared as a torrent of consumer gun marketing played up the battlefield appeal of these weapons, including tag lines such as: "The closest you can get without having to enlist." Other gun-makers now pitch their weapons with explicit depictions of combat, or under the label "tactical" – referring to SWAT-style urban warfare. Many

invoke what Tom Diaz, a top expert on gun violence, calls "the portentous scenario." It's never quite clear what's gone wrong – an invasion, a race war, social breakdown. "They connect that to this rifle," says Diaz. " 'And you're gonna need it. And if you have it, you're gonna have a fighting chance.'"

ADVERTISEMENT

There are now more than 8.5 million civilian assault rifles on the U.S. market, an arsenal owned by some 5 million people. In 2014, according to an industry estimate, the total retail market for civilian assault rifles was at least $1.4 billion. These totals include weapons inspired by the Soviets' AK. But the AR is far and away America's favorite, with about 90 percent of civilian assault-rifle owners possessing at least one AR.

While gun-makers hype the killing power of the AR-15 to move product, the NSSF presents a softer face to policymakers, investors and journalists. In addition to its insistence that civilian assault rifles be called "modern sporting rifles" – newspeak first rolled out amid fears of regulation from Washington – the NSSF portrays the AR-15 as little more than a modern evolution of Grandpa's hunting rifle. Even traditional bolt-action rifles, the group notes, had once evolved from weapons used in World War I.

While the AR platform has increasingly become the go-to rifle of mass killers – including self-radicalized terrorists like the San Bernardino shooters – the NRA extols the AR-15 as "Americans' Best Defense Against Terror and Crime." The group also promotes

childhood exposure to the combat weapon. Its American Rifleman magazine recently featured a dispatch about teaching a "barely five-year-old boy" to shoot a Ruger-branded AR – a "21st Century Gun for a 21st Century Kid" – encouraging use of the "two-finger trigger-pull method" to help the child squeeze off rifle rounds. (The NRA did not respond to a request for comment.)

The NSSF periodically conducts research on civilian assault rifles. It publishes the data in reports intended for gun sellers for which it charges the public as much as $5,000. Their latest survey of civilian assault-rifle ownership, which I obtained, reveals that the average civilian assault-rifle owner keeps a small arsenal, owning three or more of the guns; 27 percent of owners have bought four or more.

The owners of these weapons, nearly without exception, are men. Despite the pink-camo-skinned AR-15s you may see displayed at your local gun seller, 99 percent of those who buy civilian assault rifles are men. They are often older: 61 percent are over 45. And most do not have children in the home – which is a blessing because many civilian assault-rifle owners fail to secure their arms; nearly one owner in five does not lock up his rifle, and more than 30 percent take no care to secure their ammunition.

ADVERTISEMENT

Owning a civilian assault rifle is not a cheap hobby. Respondents reported having spent $1,100 on the last AR-15 they purchased, many of them tricked out with more than $400 in accessories. On average, civilian assault-weapon owners used their guns 16.5 times

in the past year, firing off nearly 1,000 rounds in the process. Eight in 10 owners report they wish they could shoot more, but cite cost of ammo among the biggest impediments. (A single AR-15 round can cost anywhere from 30 cents to a dollar or more.)

The AR-15 is not a singular weapon. It's now an open-source platform. The patent on the gun has long since expired, and its military specifications can be copied and tweaked by anyone. All an AR-15 gun-maker needs is a little startup capital and a marketing

concept. "This is not a difficult industry," says Diaz, the gun-violence expert. "If you have a machine shop, you can go into gun manufacturing."

The part of the weapon that carries a serial number – the thing the government considers the gun – is the "lower receiver." This is the part that holds the trigger and also accepts the magazine. Because manufacturers are all designing from the same specifications, nearly any AR-15 lower receiver can be fitted to any other AR manufacturer's gun parts, including the upper receiver (where the explosive business of firing a bullet happens), barrels, magazines, hand guards and scopes. By mixing and matching, a single registered lower receiver can be turned into any number of assault options. "It's like a Lego set," says Diaz.

ADVERTISEMENT

Take a "mil-spec" AR lower receiver. Using parts from Bushmaster, it can be built into a replica of the gun Adam Lanza wielded in Newtown. Build out the same "lower" again with components from Smith & Wesson's M&P line and you can re-create the rifle James Holmes used to murder movie patrons in Aurora, Colorado. Purists will split hairs over whether the Sig Sauer MCX – the massacre weapon used in Orlando – should rightly be called an AR. Its piston-driven reloading mechanism more closely resembles an AK-47's. No matter: You can use the same generic AR lower receiver to build out an MCX. "The upper is backwards-compatible with any mil-spec AR lower," Sig's marketing materials attest, "allowing you to upgrade your existing AR platform to the Sig MCX."

Efforts to hold the AR-15 industry accountable for its deadly products and militarized marketing practices have been frustrated in court – just as the NRA and the gun industry intended when they persuaded Congress to pass PLCAA. The parents of one Aurora victim sued the online retailers that sold Holmes more than 5,000 rounds of ammo to go along with his 100-round drum magazine. That suit was tossed by a federal judge who ruled that the "plain language of the PLCAA and its stated legislative purpose is to protect firearms and ammunition sellers from liability." Adding insult to injury, the family that sued has been ordered to repay the retailers' $203,000 in legal fees.

Even families of the children of Newtown have been denied a day in court. In a long-shot bid, Koskoff, the Connecticut attorney, filed suit against Remington Outdoor, which celebrates itself to investors as America's "largest producer of commercial MSR" – the acronym for "modern sporting rifles."

One of Remington's top brands is Bushmaster, maker of the rifle Nancy Lanza owned and that her son Adam Lanza used in Newtown. Bushmaster has sold civilian assault rifles under tag lines that include "Forces of opposition, bow down," and its 2016 catalog explicitly markets its AR-15s under the military designations of their Army forebears, including a "20-Inch Barreled M16-Type Rifle" and an "M4-Type Patrolman's Carbine M4-A2."

ADVERTISEMENT

The gun conglomerate is owned by a private-equity group called Cerberus Capital Management. In the aftermath of the Newtown killings, Cerberus – whose clients included the pension funds of

teachers and first-responders – earned a flood of goodwill by vowing to divest itself of the gun business, calling the Sandy Hook tragedy "a watershed event."

But this gesture of humanity quickly took a back seat to business imperatives. Reportedly unable to fetch the $1 billion it wanted for the gun manufacturer, Cerberus opted instead to buy out offended investors. In a letter, the firm reported it was "disappointed" it could not orchestrate "an outright sale," but the buyout would allow the firm to meet its fiduciary "obligations" without getting "drawn into the national debate." In a nifty bit of whitewash, Cerberus' gun holdings, previously known as "Freedom Group," rebranded as "Remington Outdoor Company." (Cerberus declined to comment.)

In December 2014, Koskoff filed a suit on behalf of the Newtown families against Remington over negligent entrustment – an exemption written into PLCAA. Negligent entrustment is a core principle of common law that says you're liable if you give a dangerous object to a person likely to pose an unreasonable risk to themselves or others. The classic example is handing the keys to your car to a drunk person. The theory of the Newtown lawsuit was that it was negligent for Remington to entrust a weapon like the AR-15 to the general public. The suit argued that the weapon – responsibly entrusted to the regimented worlds of the military and law enforcement for which it was designed – should never have been unleashed upon a poorly trained, undisciplined civilian consumer market.

Soldiers, the lawsuit noted, are given more than 100 hours of training before they are trusted to care for their own gun. In the civilian world, by contrast, AR-15s can be bought by people too young to buy alcohol; many states allow AR-15 possession by minors, including by those 14 years old or younger.

ADVERTISEMENT

The lawsuit also contended that Remington knew its sale of AR-15s to civilians would allow "individuals unfit to operate these weapons to gain access" and "inflict unparalleled civilian carnage." In the case of Lanza, the 20-year-old was able to fire at least 154 rounds in an attack lasting just 264 seconds. "It's not like the gun-makers were surprised," Koskoff says. "Oh, my God, an assault weapon was used to kill people in an assault. They cashed in on that imagery. And muscularity. And violence." (Remington did not respond to a request for comment.)

Ultimately, Koskoff's strategy to apply negligent entrustment to a class as broad as "civilians" failed. Dismissing the case in October, Connecticut Superior Court Judge Barbara Bellis wrote that the Newtown families' claims "do not fit" within the "narrow exception" for negligent entrustment written into the law, and that "the criminal misuse of a weapon by Adam Lanza" instead "falls squarely within the broad immunity provided by PLCAA."

Barden, one of the plaintiffs in the case, has made fighting for stricter gun laws his "life's work." The legal setback, he says, was a blow, but he also sees it as a teachable moment. He recalls how, in the weeks after the Newtown shooting, his wife sat at her computer "trying to get her head around how this individual who lived a few blocks away from us got his hands on a military-style assault rifle and carried it into our son's school to kill him." The advertising they encountered was shocking. "The language that they use to market these combat weapons – 'get your man card,' 'the next best thing to

enlisting' and 'forces of opposition, bow down' – is chilling and reckless," he says, noting that it appeals to the worst urges of "these violence-prone, disenfranchised young men."

Barden joined the lawsuit, in part, to highlight what he calls "the gross hypocrisy" of PLCAA. "We wanted to bring awareness," he says, that "the deadliest consumer product known to man enjoys this blanket immunity to liability." That the case was dismissed, he adds, only underscores the message: "Here we have suffered the greatest tragedy – due to someone murderously using this combat weapon on children in a school. And we don't even get our day in court. I think it should wake people up."

ADVERTISEMENT

For years, makers of AR-15s and their allies have shrouded civilian assault rifles in the Constitution. The NRA insists that the "firearms that gun-control supporters call 'assault weapons' and ammunition magazines that they call 'large' are among the arms protected by the Second Amendment."

But this NRA declaration is not grounded in legal precedent. The current interpretation of the Second Amendment, guaranteeing a personal right to firearms ownership, has only been with us since 2008, when Justice Scalia authored the landmark Heller decision. But that case – overturning a ban on handgun possession – opened new legal puzzles. According to the decision, the Second Amendment does not guarantee the "right to keep and carry any weapon whatsoever in any manner whatsoever and for whatever

purpose." And the right to gun ownership is anchored in self-defense, with Scalia dubbing a handgun the "quintessential self-defense weapon."

Since Newtown, states from Connecticut to Colorado to California have passed strict limits on the ownership of civilian assault rifles, focusing chiefly on the capacity of available magazines. To date, federal judges have upheld these restrictions as consistent with Heller.

In fact, courts have found that the Second Amendment allows much stricter regulation. A law passed in 2013 in Highland Park, Illinois – a suburb of Chicago – bans AR-15s by name, along with other "assault weapons" and any magazine with a capacity greater than 10 rounds. Within city limits, the law establishes that AR-15s are "contraband" that "shall be seized and destroyed." Violators are subject to a fine of up to $1,000 and/or six months in jail.

ADVERTISEMENT

Predictably, the law incurred the wrath of the NRA, which argued in an amicus brief that the city's statute was plainly unconstitutional. "Because the Second Amendment right applies to the common semi-automatic firearms and magazines the City targets," NRA lawyers wrote, "they cannot be banned." The federal circuit judge disagreed, ruling that "some categorical bans on the kinds of weapons that can be possessed are proper." The city's assault-weapons ban served a legitimate purpose, he wrote, because it may "reduce the overall

dangerousness of crime" and "may reduce the carnage if a mass shooting occurs."

In December 2015, the Supreme Court declined to review the ruling in the Highland Park case – letting that city's ban stand for now. Justice Clarence Thomas wrote a fiery dissent accusing the circuit court of "relegating the Second Amendment to a second-class right." Only one other justice – Scalia – sided with Thomas, a disturbing sign for the NRA and gun-makers. "Even when Justice Scalia was

alive," says Skaggs, the litigation director of the Law Center to Prevent Gun Violence, "the Supreme Court was signaling that it was constitutional to restrict access to assault weapons."

With the death of Scalia, the NRA's champion on the bench, the gun lobby flexed its muscle in Washington, leading Republicans to blockade President Obama's nomination of Merrick Garland. In March, GOP Senate Majority Leader Mitch McConnell suggested that Garland was unconfirmable due to the influence of the NRA: "I can't imagine that a Republican majority in the United States Senate would want to confirm, in a lame-duck session, a nominee opposed by the National Rifle Association," he said. Looking ahead to a possible Hillary Clinton presidency, Wayne LaPierre, the head of the NRA, called the 2016 election "all or nothing," and his group spent $30 million and aired nearly 16 percent of campaign ads supporting Donald Trump this election cycle.

ADVERTISEMENT

The NRA TV blitz was, in turn, funded by gun-makers. Ruger donated at least $5 million to the fight; Smith & Wesson chipped in another $1 million. The NSSF staged its own electioneering campaign, independent of the NRA, called GunVote, backed by $500,000 from Smith & Wesson, and $100,000 each from Sig Sauer and Ruger. According to exit polls, 60 percent of voters with a gun in the house voted for Trump, as did 75 percent of voters who oppose stricter gun control.

It's no mystery why the NRA was so determined to block Clinton. She campaigned for the White House as the most pro-gun-control presidential candidate in memory. She directly antagonized the NRA, and made her vote against the 2005 gun-liability shield, PLCAA, a central contrast in her contest with Vermont Sen. Bernie Sanders. She called open-carry laws that make it legal to tote a civilian assault rifle in a supermarket "despicable." In the aftermath of Orlando, she insisted flatly, "I believe weapons of war have no place on our streets." Audio surfaced during the campaign of Clinton calling the Supreme Court "wrong on the Second Amendment" and even talking up a gun-buyback program like the one that helped Australia halt its scourge of gun violence.

In the immediate term, Trump's election will not bestow upon the AR-15 the Second Amendment protection the gun lobby seeks. For now, limiting the danger posed by assault rifles is less a constitutional fight than a political one – with states and communities standing up to declare that these combat-ready guns have no place in public life.

For the makers of civilian assault rifles, the arrival of a Trump presidency marks the beginning of a long game. They're counting on the Republican to not only replace Scalia with another gun enthusiast, but to potentially remake the court by replacing aging liberal jurists – Ruth Bader Ginsberg, 83, and Stephen Breyer, 78 – with other Scalia clones. In such a scenario, a narrow 5-4 conservative majority suddenly becomes a seven-justice conservative bloc – of whom only five would need to be convinced that the AR-15 is a common and commonsense weapon for self-defense protected by the Heller decision and the Second Amendment. As Chris Cox, the NRA's top lobbyist, argued at the

GOP Convention, the 2016 election was not about the "next four years; it's about the next 40 years."

Gun control advocates will have to adapt not only to the evolution of the Trump court, but to a gun industry that's already casting about for its next blockbuster weapon. The industry itself is warning of an "AR-15 bubble" and a market that has "matured." It is seeking to replace waning AR profits, warns Sugarmann of the Violence Policy Center, by rolling out even deadlier weapons. That new arsenal includes "next-generation ARs" like the Orlando gun. It means assault pistols – Uzi-size AR-15 variants with shortened muzzles. Shotguns are getting the AR-15 treatment: transformed into semi-automatic assault weapons, equipped with high-capacity magazines. A Georgia company has even revived the Nazi Sturm gewehr, offering what it calls a "modern interpretation of the classic StG 44."

This fight pits communities, seeking to protect the lives of their children from the heavily armed and unhinged, against an industry that is more confident than ever that it cannot be held liable for the carnage its weapons inflict. For now, the gun industry has a president who shares their blind faith in the supremacy of the market – even one where killing power is king. "They've embraced heightened lethality as the marketing lodestar," Sugarmann says. "Things are only going to get worse."

*A version of this story was originally published November 21, 2016*

IN THIS ARTICLE: **Donald Trump, Gun control, school shooting, Supreme Court**

POLITICS ❯ POLITICS FEATURES

## SPONSORED STORIES

By Taboola

**Silence Tinnitus by Doing This Once Daily   It's Genius**
HEALTHY GURU

**The New Hyundai Ioniq Is A Jaw Dropper**
BEST HYUNDAI DEALS | SEARCH ADS

**Norah O'Donnelll Is Married To This Beauty.**
LOAN PRIDE

**The New Subaru Crosstrek Is A Jaw Dropper**
BEST SUBARU DEALS | SEARCH ADS

**New Electric Cars Cost Almost Nothing (Take A Look)**
ELECTRIC CARS | SEARCH ADS

**What Vitamin Causes Immediate Relief From Sciatic Nerve Pain?**
SCIATIEASE

# MORE NEWS

**2024**

## Larry Elder, Failed GOP Gubernatorial Candidate, Announces He's Running Against Trump

BY NIKKI MCCANN RAMIREZ

**TRICKY TED**

## Ted Cruz Pleaded With Fox To Show 'Specific Evidence' of Fraud

BY NIKKI MCCANN RAMIREZ



**DOUBLE STANDARD**

# Tennessee Republican Resigns After Being Caught Sexually Harassing Interns

BY NIKKI MCCANN RAMIREZ

**BAD DATA**

# Mike Lindell Ordered to Pay $5 Million to Trump Voter Who Debunked His Election Lies

BY RYAN BORT AND ASAWIN SUEBSAENG



**DENIED**

## Former Trump Investigator Mark Pomerantz Avoids Jim Jordan Circus for Now

BY VICTORIA BEKIEMPIS

▼ READ MORE ▼

ADVERTISEMENT

# THE LATEST

**FRESH START**

## Anitta Signs With Republic Records After Warner Split

**26 MINS AGO**

**HIT THE LIGHTS**

## Raye and Coi Leray 'Flip a Switch' in New Remix

**1 HOUR AGO**

**2024**

## Larry Elder, Failed GOP Gubernatorial Candidate, Announces He's Running Against Trump

**4 HOURS AGO**

**LAST-MINUTE CHANGE**

## Blink-182 Replace Frank Ocean as Coachella Weekend Two Headliner, Followed by EDM Closer

**4 HOURS AGO**

ADVERTISEMENT

**THE DIGITAL DAILY NEWSLETTER**

# A Cultural Force That Transcends Generations

ENTER YOUR EMAIL

**BY SUBSCRIBING, I AGREE TO THE TERMS OF USE AND PRIVACY POLICY.**

ADVERTISEMENT

ADVERTISEMENT



# MOST POPULAR

**1** *VARIETY*

Jonathan Majors' Issues Worsen as More Alleged Abuse Victims Cooperate With D.A.'s Office (EXCLUSIVE)

**2** **ARTnews**

The Whitney Is the Latest Museum to Utter the D-Word

**3** *she*knows

Meghan Markle Reportedly Wants Archie & Lilibet To Have This Kind of Relationship With King Charles III

**4** *The Hollywood REPORTER*

Clint Eastwood Sets New Movie, 'Juror No. 2,' With Nicholas Hoult, Toni Collette

# YOU MIGHT ALSO LIKE



China Box Office: Japanese Animation 'The First Slam Dunk' Bounces to $13 Million Opening Day

2 HOURS AGO



Inside Retail's Plastic Ba

3 HOURS AGO



GET THE MAGAZINE

GET DIGITAL ACCESS

GIVE A GIFT

CUSTOMER SERVICE

ROLLING STONE ■

LEGAL ■



**OUR SITES**

Rolling Stone is a part of Penske Media Corporation. © 2023 Rolling Stone, LLC. All rights reserved.
Powered by WordPress.com VIP

# EXHIBIT 88



   On Air Now

PLAYLIST

 **DONATE**

NATIONAL SECURITY

# A Brief History Of The AR-15

February 28, 2018 · 12:07 PM ET

Greg Myre



John Jack on, co owner of Capitol City Arm Supply, with an AR 15 rifle for ale at hi tore in Springfield, Ill , in 2013 The emi automatic rifle ha been old to the public ince the 1960 and the NRA e timate that around 8 million AR 15 and related model are in circulation
*Seth Perlman/AP*

What weapon did the gunman use in the recent shooting at Marjory Stoneman Douglas High School in Florida?

If you said the AR-15, you'd be wrong. And we'll explain in a moment.

For more than a half-century, the AR-15 has been popular among gun owners, widely available in gun stores and, for many years, even appeared in the Sears catalog.

Yet over the past decade, the AR-15 and its offshoots have been used in many of the country's worst mass shootings. This has reignited the debate about their widespread availability.

Dick's Sporting Goods announced Wednesday that it would no longer sell these assault style weapons.

"I'm a gun owner myself," Ed Stack, the company's chief executive officer, told ABC's *Good Morning America*. But, he added, "We've just decided that based on what's happened and with these guns, we don't want to be part of this story."

## Many versions



**THE TWO-WAY**

**Dick's Sporting Goods Ends Sale Of Assault-Style Rifles, Citing Florida Shooting**

Here's a quick history lesson on why AR-15 has become the umbrella term for a range of semi automatic rifles made by a host of gun makers.

"AR" comes from the name of the gun's original manufacturer, ArmaLite, Inc. The letters stand for ArmaLite Rifle — and not for "assault rifle" or "automatic rifle."

ArmaLite first developed the AR-15 in the late 1950s as a military rifle, but had limited success in selling it. In 1959 the company sold the design to Colt.

**Sponsor Message**

In 1963, the U.S. military selected Colt to manufacture the automatic rifle that soon became standard issue for U.S. troops in the Vietnam War. It was known as the M 16.

Armed with that success, Colt ramped up production of a semiautomatic version of the M-16 that it sold to law enforcement and the public, marketed as the AR-15.

When Colt's patents for the AR-15 expired in the 1970s, other manufacturers began making similar models.

Those gun makers gave the weapons their own names, yet the popularity of the AR-15 turned it into a generic term for all types of AR-15-style rifles.

These weapons can go for less than $1,000, though they can be customized and cost in the thousands of dollars.

The National Rifle Association estimates there are some eight million AR-15s and its variations in circulation, and says they are so popular that the "AR" should stand for "America's Rifle."

**The Florida shooting**

Which brings us back to our original question about the weapon used in Florida, which is commonly described as an AR-15.

Police say the gunman actually used a Smith and Wesson M&P15, that manufacturer's version of the AR-15.

AR-15-style rifles were around for more than 40 years before one was used in a mass killing, at an apartment in Crandon, Wis., in 2007. The shooter killed six people and then took his own life.

However, gunmen (and at least one gunwoman) have used AR-15-style weapons in most all of the deadliest shootings in this decade.

A partial list includes:

- The Las Vegas slaughter of 58 people last October.

- The Sutherland Springs, Texas, church shooting that claimed 26 lives in November.

- The Pulse nightclub shooting in Orlando, Fla., that left 49 dead in 2016.

- The San Bernardino, Calif., shooting that killed 14 people in 2015.

- The shooting at Sandy Hook Elementary School in Connecticut that took 27 lives in 2012.

**Similar to military weapons**





AR-15-style semiautomatic weapons are civilian versions of military weapons. So what's the difference?

Gun control advocates say the difference is minimal, arguing the AR-15, like its military version, is designed to kill people quickly and in large numbers as a modern assault-style rifle. They say it has no valid recreational use, and civilians should not be allowed to own them.

industry, gun owners and their supporters say AR-15s are used for hunting, target practice and shooting competitions and should remain legal.

Because AR-15-style weapons are semiautomatic, the shooter must pull the trigger to fire each shot from a magazine that often holds 30 rounds.

In contrast, a shooter with a fully automatic assault rifle can pull and hold the trigger and the weapon will keep firing until the ammunition supply is exhausted.

Fully automatic weapons have been tightly restricted in the U.S. since the 1934 National Firearms Act, which was directed against machine guns at the time.

However, a bump stock — a legal device in many places — can be added to a semiautomatic weapon to approximate an automatic rifle.

The Las Vegas shooter had a bump stock, which brought the device to national attention, and has led to calls to ban it in the current gun debate.

**A temporary ban**

In 1994, President Bill Clinton signed an assault weapons ban, which outlawed the AR 15 and other similar semiautomatic rifles.

Mass shootings were down in the decade that followed, compared to the decade before (1984-94) and the one after (2004-14), but they did not end entirely.

After the assault-weapons ban expired in 2004, gun makers quickly reintroduced them and sales were brisk.

"One of the things that we have seen in recent years after the assault weapons ban ended in 2004 was this really huge explosion of these

boutique kind of rifle companies that are producing these very high-end rifles that are very customizable," said Alain Stephens, who's part of NPR's criminal justice team and a former member of the military.

On several occasions, AR-15 sales have spiked when there's renewed talk about banning them.

Laws vary by state, but in Florida, for example, anyone who is 18 or older with a clean record can purchase an AR-15-style rifle with no waiting period.

Republican lawmakers in the state have proposed several steps that include raising the age to 21 for the purchase of all guns, and imposing a three-day waiting period.

However, the Republicans who control the legislature are not calling for a ban on AR-15s or any other gun, and the steps fall far short of what gun-control advocates want to see.

ar-15    mass shootings    gun control



## Sign up for NPR's Up First newsletter.

The news you need to start your day. Nothing more, never less.

| Email address | SUBSCRIBE |
| --- | --- |

See more subscription options

By subscribing, you acknowledge and agree to NPR s Terms of Use and Privacy Policy. NPR may share yo r name and email address with yo r NPR station. See Details

# More Stories From NPR



**WORLD**

## Security comes first in U.S.-China economic relations, says Treasury Secretary Yellen



**WORLD**

## Latest on Ukraine: Russia's prisoners, Brazil's diplomacy, the fight for Bakhmut



**NATIONAL SECURITY**

# What we know about Jack Teixeira, the suspected leaker of Pentagon documents



**LAW**

## Suspected leaker of secret Pentagon documents arraigned in Massachusetts



**ASIA**

## North Korea tests a powerful new kind of missile



NATIONAL SECURITY

## Air National Guardsman arrested as suspected leaker of Pentagon documents

Popular on NPR.org



SPACE

**SpaceX's massive rocket Starship explodes 4 minutes after liftoff**



LAW

**Facebook users can apply for their portion of a $725 million lawsuit settlement**



NATIONAL

**A suspect is wanted in the shooting of a 6-year-old after a ball rolled into his yard**



NATIONAL

## 2 Texas cheerleaders were shot after 1 tried to get in the wrong car after practice



BUSINESS

## 'Leave pity city,' MillerKnoll CEO tells staff who asked whether they'd lose bonuses



**NATIONAL**

## A 5th arrest is made in a birthday party shooting in Alabama

# NPR Editors' Picks



**LAW**

## MyPillow founder Mike Lindell is ordered to pay $5M in election fraud challenge



**WEATHER**

## Tornado forecasts are more accurate. Why aren't they saving more lives?



CLIMATE

## The surprising connection between Arctic ice and Western wildfires



AFRICA

**Khartoum's hospital system has collapsed after cease-fire fails**



NATIONAL

**A massive search for 3 missing American sailors off Mexico coast has been called off**



NATIONAL

# A former pro wrestler is charged in Mississippi with welfare fraud

READ & LISTEN

## Home

## News

## Culture

## Music

## Podcasts & Shows

CONNECT

## Newsletters

## Facebook

## Instagram

## Press

## Contact & Help

ABOUT NPR

## Overview

## Diversity

## Accessibility

## Ethics

## Finances

## Public Editor

## Corrections

GET INVOLVED

## Support Public Radio

## Sponsor NPR

## NPR Careers

## NPR Shop

## NPR Events

## NPR Extra

terms of use

privacy

your privacy choices

text only

© 2023 npr

# EXHIBIT 89

# M16 rifle



M16 assault rifle

**M16 rifle**, also called **AR-15**, assault rifle developed as the AR-15 by American engineer Eugene Stoner of ArmaLite Inc. in the late 1950s. The rifle received high marks for its light weight, its accuracy, and the volume of fire that it could provide.

The AR-15 was developed as a more portable alternative to the 7.62-mm (.308-calibre) battlefield rifles of the day, but ArmaLite had limited success in marketing it to the U.S. military. The AR-15 design was licensed to Colt's Patent Firearms Manufacturing Company (later Colt's Manufacturing LLC) in 1959, and upon its adoption by the U.S. Air Force in 1962, the AR-15 was designated the M16 by the Department of Defense. Modified versions of the AR-15 (designated the XM16E1) were used by American combat troops in the Vietnam War in the mid-1960s. Despite its advantages, it was prone to jamming because of a convergence of factors. Improved training, wider distribution of cleaning kits, and a change in the composition of the powder used in the rifle's ammunition dramatically reduced the rate of malfunction. With some minor adjustments based on recommendations from the field, the rifle, now designated the M16A1, was adopted as the standard infantry weapon for the U.S. military in 1967, superseding the M14 rifle. Colt subsequently marketed a semiautomatic version of the rifle to civilians and law-enforcement personnel as the AR-15, and upon the expiration of various patents in the 1970s, other companies followed suit. That resulted in the application of the term AR-15

both to a specific type of semiautomatic rifle and to the broader family of selective-fire rifles based on the original ArmaLite platform.



M16 assault rifle

The M16 is gas-operated and, in its original configuration, had both semiautomatic (i.e., autoloading) and fully automatic fire-control options. The M16A2, adopted by the U.S. military in the early 1980s, replaced fully automatic fire with a three-round-burst capability that was intended to increase accuracy and reduce ammunition consumption. The use of aluminum and composite materials rather than wood made the various iterations of the M16 significantly lighter than the M14 or the AK-47. The M16A4—the standard infantry weapon of the U.S. Marine Corps since 2003—weighs less than 3.3 kg (just over 7 pounds) unloaded. It measures 100 cm (39 inches) long, has a 20-round or 30-round magazine, and fires 5.56-mm (.223-calibre) ammunition at a rate of 700–950 rounds per minute. Optional enhancements to the M16 family include the M203 grenade launcher, a bayonet, and an assortment of rail-mounted flashlights, scopes, and laser-targeting systems. Although the M16 remained the weapon of choice for military forces around the world into the 21st century, by 2010 the U.S. Army had largely transitioned to the M4, a carbine based on the AR-15 platform, as its primary infantry weapon.

The Editors of Encyclopaedia BritannicaThis article was most recently revised and updated by Adam Augustyn.

Citation Information

Article Title: M16 rifle

Website Name: Encyclopaedia Britannica

Publisher  Encyclopaedia Britannica, Inc

Date Published: 25 May 2022

URL: https://www.britannica.comhttps://www.britannica.com/technology/M16-rifle

Access Date: April 21, 2023

# EXHIBIT 90

NBER WORKING PAPER SERIES

DID CRIMINAL ACTIVITY INCREASE DURING THE 1980s?
COMPARISONS ACROSS DATA SOURCES

Scott Boggess

John Bound

Working Paper No. 4431

NATIONAL BUREAU OF ECONOMIC RESEARCH
1050 Massachusetts Avenue
Cambridge, MA 02138
August 1993

Direct all correspondence to John Bound, Population Studies Center, University of Michigan, 1225 South University Avenue, Ann Arbor, MI 48104-2590. We have benefited from extremely valuable and perceptive comments by Jeff Grogger on an earlier draft. We would also like to thank Jeff Miron for sharing his work in progress, and Carol Crawford and Cindy Glovinsky for manuscript preparation. Scott Boggess gratefully acknowledges support from NICHD training grant #T32-HD07339. This paper is part of NBER's research program in Labor Studies. Any opinions expressed are those of the authors and not those of the National Bureau of Economic Research.

NBER Working Paper #4431
August 1993

## DID CRIMINAL ACTIVITY INCREASE DURING THE 1980s?
## COMPARISONS ACROSS DATA SOURCES

### ABSTRACT

There is a widely held belief that the level of serious criminal activity increased during the 1980s, particularly among the urban underclass. This increase has been mentioned as both a cause and consequence of the increasingly poor labor market prospects of less skilled workers. Significant increases in both Federal and State incarceration rates would seem to support this view. However, data from the Uniform Crime Reports (UCR) suggests only a mild increase in crime over this period, while the National Crime Survey (NCS) actually depicts lower levels of criminal activity. This paper carefully analyzes data from all three sources in an attempt to understand the nature of the series and to come to an informed opinion regarding the apparent differences in their trends. What we discover is that the large increase in the incarceration rate is attributable primarily to an increase in the likelihood of incarceration given arrest. During the latter part of the 1980s a dramatic increase in the number of arrests and incarcerations for drug law violations also played an important role. The increase in drug related activity was not registered by either the UCR or NCS because neither series measures the incidence of victimless crime.

Scott Boggess
Population Studies Center
The University of Michigan
1225 South University Avenue
Ann Arbor, MI 48104-2590

John Bound
Population Studies Center
The University of Michigan
1225 South University Avenue
Ann Arbor, MI 48104-2590
and NBER

# DID CRIMINAL ACTIVITY INCREASE DURING THE 1980s?
## COMPARISONS ACROSS DATA SOURCES

It is commonly believed that there was a rise in the level of criminal activity during the 1980s, particularly among urban minority youth (Wilson 1987). Fueling these concerns have been reports that increasingly large fractions of young black men are, in one way or another, involved with the criminal justice system (in jail or on probation) (The Sentencing Project 1990; Bound and Freeman 1992; BJS 1992d; Langan 1991). It has been argued that the increased involvement with criminal activity has been both cause and consequence of the generally declining labor market prospects of less skilled workers, in particular less skilled black workers (Freeman 1991; Grogger 1992). The rapid increases in the fraction of the population in prison, which occurred during the 1980s, would seem to support this view. However, the most frequently cited indicator of criminal activity, the Uniform Crime Reports' Crime Index (UCR), depicts only a moderate increase in criminal activity and National Crime Survey (NCS) victimization rates actually show some decreases in the rate of criminal activity (Jencks 1991). While the prison population increased by 126 percent from 1979 to 1989, the UCR Crime Index increased by only 4 percent, and the NCS personal victimization rate actually decreased by nearly 27 percent.

In this paper we use available data to both explain the discrepancies between the three indicators of criminal activity and to come to an informed judgment regarding changes in the rate of criminal activity. The first section of this paper presents a brief description of the UCR and NCS and compares trends in the two measures. The next section seeks to explain the large increase in incarceration rates during the 1980s. This is followed by a close examination of recent trends in drug use and drug trafficking. The final section then presents some measures of the current level of criminal involvement by race. A reasonably consistent picture emerges. The statistics do not support the notion that there has been any overall rise in the level of criminal activity, but are consistent with the notion

1

that the introduction of crack cocaine increased some types of criminal activity substantially.

## The Uniform Crime Reports v. The National Crime Survey

### The Uniform Crime Reports

Data for the UCR are collected monthly by the Federal Bureau of Investigation (FBI) from state and local law enforcement agencies. While participation is voluntary, reporting agencies currently cover over 95 percent of the U.S. population (FBI, 1992). The Uniform Crime Reporting Program, developed by the International Association of Chiefs of Police in 1929, collects information on all crimes except federal offenses and traffic violations. However, they only publish data on the number of offenses "known to the public" and their rate of occurrence for arson and a select number of crimes known as *Index crimes. Index Crimes* consist of murder and nonnegligent manslaughter, forcible rape, robbery, aggravated assault, burglary, larceny-theft, and motor vehicle theft, and include both attempted as well as completed incidents. For a crime to be included in the UCR, it must first be discovered and reported to the local police department or sheriff's office, they must then investigate the incident, agree that a crime has occurred, and file an official report of the incident.[1] In the case of rape, homicide, and aggravated assault one crime is counted for each victim, while for property crimes (robbery, burglary, larceny-theft, and motor vehicle theft) one crime is recorded for each incident regardless of the number of victims.[2]

The UCR Crime Index is probably the most frequently cited measure of the extent of crime in the United States. The Crime Index is an unweighted sum of the rate of occurrence of all seven Index offenses. It was designed to allow for the

---

[1] In cases where a particular incident includes multiple offenses, only the most serious offense is reported. The above list ranks the UCR offenses from most to least serious. The exception is arson which is reported even if other more serious crimes have also occurred.

[2] For example, if an individual were to break into a home and murder two of the occupants this would be counted as two homicides. If, on the other hand, the criminal broke into the house and removed possessions belonging to two different individuals this would only be recorded as one burglary.

comparison of the level of serious crime from one time period to another and from one city or state to another. The above seven offenses were chosen as Index crimes because they represent serious crimes which are relatively likely to be reported to police and which can be consistently defined and recorded over time and across agencies.

How well the UCR measures trends in serious crime depends on the *reporting* behavior of individuals and the *recording* behavior of law enforcement agencies. Not all crimes are reported to the police. In many cases the complaintant chooses to deal with the incident informally rather than through official means. The NCS collects extensive information on whether or not a particular incident was reported to police and, if not reported, the reasons for nonreporting. According to these surveys, reporting tends to be positively related to the seriousness of the crime (BJS 1992b).[3] Reporting is also affected by the relationship between the victim and the offender. A crime is least likely to be reported if the victim and offender are related or the incident is commonly viewed as a personal or family problem, and most likely to be reported if the victim and offender are total strangers (BJS 1992b).

The victim-offender relationship also tends to affect police recording behavior. Incidents where the victim and offender are related, or where the offender is young, are less likely to be recorded by the authorities (Block 1974; Black and Reiss 1970; Black 1970). Police recording practices will also tend to vary over time and across agencies. Agencies which are larger, more modern, or more professional will be more likely to record crimes (Skogan 1976). Differences in state and local laws, practices, and policies are also important determinants of how a crime is reported. In addition, the local political climate may influence recording. If a department is in need of funds or has recently received additional funds there is likely to be an increase in the recording of criminal incidents to demonstrate the need for or justify the receipt of these funds (Chambliss 1984). Likewise, a declared intention

---

[3] The BJS estimates that approximately 79 percent of robberies with serious assault are reported to the police, while fewer than 14 percent of larcenies less than $50 are reported (BJS 1992b).

to target certain types of crime should be expected to increase the number of such crimes recorded.

*The National Crime Survey*

The National Crime Survey originated in 1973 and is administered by the Bureau of the Census for the U.S. Department of Justice, Bureau of Justice Statistics. As originally envisioned, the NCS was supposed to capture all crimes known to police as well as many crimes that were either not reported or recorded. While it was recognized that the victimization surveys would not be able to estimate all crimes that actually occurred, it was generally believed that they would provide a more complete picture of the level and trend of serious criminal activity than the UCR.

The NCS surveys a representative sample of approximately 50,000 addresses containing roughly 100,000 individuals age 12 and older. Each address is surveyed every 6 months for 3 years, comprising a total of seven surveys. The NCS questionnaire gathers information on the crimes of rape, robbery, assault (aggravated and simple), personal larceny, burglary, household larceny, and motor vehicle theft, both completed and attempted. Like the UCR, the NCS counts each criminal incident only once by the most severe offense that occurred during the incident. In addition to information on the number of victimizations, the NCS collects detailed information about the victim, the incident, and the perceived characteristics of the offender(s).

There are two primary parts to the questionnaire. The first section collects general information on the household and asks a set of household and individual screening questions designed to discover whether anyone in the household was victimized within the last 6 months. The second section of the questionnaire, administered only if the screening questions indicate that a victimization likely occurred, consists of crime incident reports designed to obtain detailed information

4

on these victimizations. The individual level questions are asked of all household members age 12 and over.[4]

The NCS publishes two aggregate crime measures: the personal victimization rate; composed of the crimes of rape, robbery, assault, and personal larceny; and the household victimization rate; composed of burglary, household larceny, and motor vehicle theft. The personal victimization rate is measured per population age 12 and older while the household victimization rate is measured per 1,000 households. Like the UCR Crime Index, these measures are designed to provide a picture of the overall trend in criminal activity from one year to another.

As mentioned above, the NCS, like the UCR, is unable to accurately estimate all serious criminal activity. Both surveys have a difficult time measuring attempted crimes, since respondents often fail to realize that a crime attempt has occurred. This is especially true for the crimes of burglary and household larceny where there is no direct contact between the victim and offender. In addition, respondents may not define an attempted crime as a crime, especially if there is no property loss. Household victimizations, especially larcenies, are further underreported because the household screening questions are asked of only one individual at each address (Biderman and Lynch 1991). There is also the problem that victims often fail to recall the crime accurately. The issue of recall seems to be most serious for assaultive crimes, where the victim and offender are frequently nonstrangers.[5] For example, if the respondent has been repeatedly victimized in a similar manner over the last 6 months (i.e., domestic violence) they may be unable to recall specific details of each incident. In these instances, known as series victimizations, the NCS interviewer completes one incident report, containing detailed information on only the most recent victimization. Because they cannot

---

[4] Proxy responses from knowledgeable adults are accepted for family members who are unable to respond at the time of the interview.

[5] According to the Bureau of Justice Statistics (BJS), "recall problems may result in a substantial understatement of the actual rate of assault" (BJS 1992b). A cross check of police records on assaults found that, of assaults recorded by the police, 76.3 percent of assaults by a stranger were reported to the NCS interviewer, 56.9 percent of assaults by a nonstranger and only 22.2 percent of assaults by a relative (Turner 1972).

be dated to a specific month, series crimes are not included in NCS incidence and victimization rates thus leading to an underestimation of some types of crime.

The NCS is based on a national stratified multistage cluster sample of addresses, not households. Like other surveys conducted by the Census, the NCS tends to underrepresent "hard-to-find" groups, such as young black men and nonenglish speakers, who are more likely to be victimized than other demographic groups (Block and Block 1984). This too will cause the NCS to underestimate the level of criminal activity.

There is also evidence to suggest that, in some cases, respondents knowingly misreport the number of criminal incidents. In a 1976 article, Levine suggests that respondents may report crimes to the NCS interviewer that never occurred or that occurred to someone outside of their own household in an attempt to dramatize the crime issue or give the interviewer what they believe they are looking for (Levine 1976). In addition, they may fail to report victimizations that actually occurred for fear of prolonging the interview process, this is more likely to be an issue for respondents who reported a victimization in previous interviews (Block and Block 1984).

### Comparisons of Trends

Figure 1 presents the UCR Crime Index, the NCS personal victimization rate, and the NCS household victimization rate for 1973–1991. Although the three series appear to be converging, they depict quite different trends in crime over this period. According to the UCR Crime Index, serious crime has increased by 42 percent since 1973 while, over the same period, the NCS personal victimization rate decreased by 25 percent and the NCS household victimization rate fell by 26 percent. If we focus on the period since 1979, we find that the UCR Crime Index increased by 7 percent while the NCS personal and household victimization rates decreased by 27 and 31 percent respectively.

**Figure 1 About Here**

While both the UCR Crime Index and the NCS estimates are designed to measure the general trend in criminal activity they do possess some significant differences. Unlike the UCR, the NCS, for obvious reasons, does not collect information on commercial crimes or on the crimes of murder and nonnegligent manslaughter.[6] On the other hand, the NCS records the incidence of both simple and aggravated assault while the UCR considers only the latter. In addition, the UCR measures crime occurring to the entire population while the NCS sample is restricted to those 12 and older. Although, because there are not likely to be a significant number of younger victims, and because crimes to those under 12 usually go unreported (O'Brien 1985), this probably has little effect on the numerator of the NCS rates. It is true, however, that during the 1970s and early 1980s the total population grew at a slower rate than either the population 12 and older or the population of households, thus causing the NCS victimization rates to decrease relative to the UCR Crime Index (Blumstein et al. 1991). Another problem with comparing these series is that the NCS measures victimizations on both an individual and household level while the UCR data are all individual level measures.

In an attempt to make the NCS and UCR data more comparable, we omitted homicide from the Crime Index and simple assault from the NCS estimates. We also, when possible, subtracted commercial crimes from the UCR numbers (e.g., nonresidential burglary, shoplifting, and thefts from coin operated machines). We then combined the estimated number of personal and household victimizations and expressed them per 100,000 total population. Figure 2 presents the new or adjusted UCR Crime Index and NCS victimization rate. Again we notice, even after these adjustments, that the two series appear to depict very different trends in serious criminal activity from 1973 to 1991. The adjusted victimization rate decreases by 21.2 percent from 1973 to 1991, an annual rate of decrease of 1.3 percent, and 27.1 percent from its peak in 1979 to 1991, somewhat less than the

---

[6] Commercial crimes comprise approximately one-third of all UCR burglaries and larcenies, 10 percent of motor vehicle thefts, and an unknown number of robberies (FBI 1992; Biderman and Lynch 1991; O'Brien 1985).

7

decreases observed in the unadjusted series in Figure 1. The adjusted UCR crime rate increased by 44.9 percent since 1973, an annual rate of increase of 2.0 percent, and 6.4 percent since 1979, changes slightly larger than those observed in Figure 1. Thus, these adjustments explain little of the difference in trends between the two series.

### Figure 2 About Here

There *is* evidence, however, that part of the difference in trends is due to increased reporting of victimizations to the police. As part of the NCS crime incident report each victim is asked whether or not they reported the incident to the police. According to the BJS, the percentage of victimizations reported to the police increased from 32 percent in 1973 to 38 percent in 1991 (BJS 1992c), an increase of 19 percent. Relative to the NCS, the UCR actually rose by roughly 75 percent. Thus increases in the fraction of crimes reported to the police would seem to account for roughly one-quarter of the discrepency between the UCR and the NCS.

The discussion above suggests that the quality of reporting should vary across offenses. For this reason it is if some interest to compare the UCR and NCS by type of offense. UCR and NCS trends in each of the six common offenses—rape, robbery, aggravated assault, burglary, larceny-theft, and motor vehicle theft— appear in Figure 3. As Figure 3 illustrates, the UCR and NCS trends for robbery, burglary, and motor vehicle theft are relatively similar while those for rape, aggravated assault, and larceny are quite different. Among the common violent crimes, robbery is probably the most accurately measured. Robbery is likely to be well reported both to police and to NCS interviewers not only because it is a serious offense but also because the offender is usually a stranger and rarely a relative (over 80 percent of robberies reported to NCS interviewers were committed by strangers (BJS 1992b)). However, in the case of rape and aggravated assault (the unlawful attack of another, usually involving a weapon, resulting in severe bodily injury) the offender is often a nonstranger (two-thirds of completed rapes and 45

8

percent of aggravated assaults with injury involve nonstrangers (BJS 1992b)) and, as a result, these crimes are probably not measured well by either the UCR or NCS. Among nonviolent crimes, larceny is the least likely to be reported to the police. This is due primarily to the fact that larceny is the least serious of all Index offenses. The NCS estimates that only about one-quarter to one-third of all larceny victimizations are ever reported (BJS 1992b).

### Figure 3 About Here

According to the NCS the type of victimization most likely to be reported to the police is motor vehicle theft. In 1990, NCS respondents reported that a full 75 percent of motor vehicle theft victimizations were brought to the attention of the police (BJS 1992b). Motor vehicle theft is so well reported because an individual's automobile is often one of their most valuable possessions, because it is difficult to conceal the theft for any significant period of time, and because victims are often required to report the theft to police in order to obtain a settlement from their insurance company. Figure 3 clearly shows that the overall trends for motor vehicle theft are more similar than those for the other common offenses.

To summarize, the Uniform Crime Reports' Crime Index depicts a different trend in the level of serious criminal activity than either the National Crime Survey personal victimization rate or the NCS household victimization rate. Adjusting for the types of crime measured and the population base of the two series explains very little of this difference. However, when we decompose the indices into their six common offenses and adjust for measurement differences, we find that it is primarily for those crimes that are known to be poorly measured both by the UCR and NCS; rape, aggravated assault, and larceny; that the trends are significantly different. For those offenses which are measured more accurately; robbery, burglary, and motor vehicle theft; the two data series are much more comparable.

We are, however, still left with large differences in trends for rape, aggravated assault, and larceny. We find it easier to believe that these differences reflect a

9

combination of an increase in the fraction of crimes reported to the police and in the fraction of reported crimes that are formally recorded than any drop in the fraction of crimes reported to NCS interviewers. We have seen evidence that the fraction of crimes reported to the police rose over the last two decades. While we have no hard evidence of any changes in the recording behavior of the police, we do know of forces that could have worked in that direction. As was noted above, modernization itself seems to increase reporting rates. We can also imagine that the significant increases in the likelihood of incarceration given arrest (see Incarceration Rates section), could have encouraged police to file formal reports of these incidents (Jencks 1991; Blumstein et al. 1992).

It is possible to use the NCS to estimate the number of crimes reported to the police. Overall, the ratio of the number of crimes recorded in the UCR to the estimated number of crimes reported to the police rose from roughly 0.6 in 1973 to 1.0 by the end of the 1980s. These numbers are consistent with the notion that what accounts for the discrepency in trends between the NCS and UCR is changes in the fraction of crimes reported to the police that are recorded (Jencks 1991; Blumstein et al. 1992).[7] By implication, trends in the NCS and UCR should be converging. There does seem to be some evidence that this is, in fact, occurring. Figures 2 and 3 suggest that the discrepancy in terms of trends between the NCS and UCR was more dramatic during the 1970s than during the 1980s. However, the time series available are simply too short to allow for any clear resolution of this issue (McDowall and Loftin, 1992).

*Victimization Rates by Race*

The NCS also presents much of its victimization data by race. This data is of interest because the aggregate crime trends may be masking different racial trends in criminal involvement. Figures 4 and 5 depict selected NCS victimization rates by race of the victim and the perceived race of the offender respectively. Since

---

[7] For some crimes, most notably rape, by the end of the 1980s the number of crimes recorded by the police actually exceeds by a nontrivial margin the number the NCS implies was reported to the police (Blumstein et al. 1992). This is consistent with the notion that such crimes are underreported in the NCS.

approximately 72 percent of all violent crimes against whites are committed by whites and roughly 84 percent of all violent crimes against blacks are committed by blacks (BJS 1992b), we can be relatively safe in assuming that trends in black and white victimizations roughly approximate trends in black and white crime. It should be noted that the black estimates will possess greater variability than the white estimates due to the smaller sample size. Looking at victimizations by race of the victim, Figures 4a–4f, we find that, for most offense categories, the black rates and the white rates follow highly similar trends. The one exception to this general rule is auto thefts. Here we see some evidence that during the late 1980s the victimization rate went up more rapidly for blacks than for whites.

Figure 4 About Here

The NCS asks victims of both robbery and aggravated assault to identify the probable race of their assailant; over 95 percent of victims do manage to identify the race of their assailant (BJS 1992c). Figure 5 shows robbery and aggravated assault rates by race of offender.[8] Both races exhibit similar trends in involvement. From 1980 to 1991 the black robbery rate decreased by 3 percent while the white robbery rate decreased 23 percent. Over this same period the black and white aggravated assault rates decreased by approximately 10 and 15 percent respectively.

Figure 5 About Here

*Murder*

Arguably the most reliable indicator of the overall trend in violent crime is the UCR murder rate. Because murder is the most serious of the Index offenses and because it is difficult to conceal from authorities, it is both well reported and well recorded. In addition, there is no reason to believe that there have been changes in either reporting or recording behavior over the last 20 years. Figure 6

---

[8] These figures include only those crimes with a single victim and single offender. In 1991, approximately 50 percent of robberies and 66 percent of aggravated assaults were single victim/single offender incidents (BJS 1992c).

11

presents the overall UCR murder rate and the murder rate by race of offender for single victim/single offender murders from 1976 to 1991.[9] According to the figure, the overall murder rate decreased somewhat over the 1980s from 10.2 per 100,000 in 1980 to 9.8 per 100,000 in 1989. Figure 6 also depicts significant declines in both the black and white murder rates during the 1980s. The black murder rate decreased 25 percent, from 24.6 to 18.5 per 100,000, and the white rate decreased by 24 percent from 3.1 to 2.3 per 100,000.

### Figure 6 About Here

UCR murder data is also available by the race and age of the victim. In Figure 7 we report rates for selected age groups. Here we observe that the murder rates for youth and young adults are substantially higher than those for the rest of the population. It should be noted that the rates for young blacks are inflated by the census undercount of blacks, though the magnitude of the undercount should have remained constant through the 1980s. Also of note is the fact that, unlike the other demographic groups, the murder rate for both white and black youth began to increase during the latter half of the 1980s. This break in trend is particularly stark for black youth.

### Figure 7 About Here

*Summary*

Has criminal activity increased during the 1980s? Data from the FBI and BJS seem to indicate no general increase in the overall level of criminal activity. Evidence from the UCR murder rate and the UCR and NCS robbery rates suggests that there was a 20–30 percent decrease in the level of violent crime in the early 1980s, followed by a 10–20 percent increase in the late 1980s and early 1990s. Furthermore, after peaking in the early 1980s household crime (burglary and larceny) appears to have decreased through the end of the decade. When we analyze the

---

[9] Single victim/single offender murders account for just over 50 percent of all murders. In 99 percent of these murders the race of the offender is available from police records (FBI 1992). This data was first published in 1976.

data separately by race we discover that, in almost all offense categories, the level of criminal involvement among both whites and blacks has actually decreased. There is, however, some evidence that, over the late 1980s, involvement in violent crime (e.g., murder) has increased among both black and white youth.

### Incarceration Rates

Given that there appears to have been no significant upward trend in criminal activity during the 1980s, what accounts for the large increase in the incarceration rate over this period? Obviously not all victimizations result in the incarceration of the perpetrator(s). In order for there to be an incarceration the victimization must first be reported to authorities; the police must file a report of the incident and arrest a suspect(s); the suspect(s) must then be tried, found guilty, and sentenced to prison. Thus it is possible that the large increase in the incarceration rate is due to an increase in either the percentage of victimizations reported to police, the number of arrests per crime, the number of convictions per arrest, or the number of prison sentences per conviction. It could also be the case that the average sentence length has increased and prisoners are, on average, spending an increasingly longer time in prison. This would occur if there has been an increase in the average sentence length for each type of offense or if those sentenced to prison are increasingly likely to be very serious offenders who generally tend to draw longer sentences. Another possibility is that there has been a large increase in serious victimless crimes, such as drug law violations, which are likely to draw prison sentences but which are not represented in the UCR crime and NCS victimization numbers reported above.

The incarceration rate measures the number of prisoners under jurisdiction of Federal and/or State authorities at the end of the year. By restricting the measure to those sentenced to maximum terms of more than 1 year we ensure that we are dealing primarily with felons and not misdemeanants. The incarceration rates show an accelerating trend over the 1970s and 1980s. Between 1970 and 1980 the fraction of the population incarcerated for felonies rose 39 percent from 1 per

13

thousand to 1.39 per thousand while during the 1980s it increased by 112 percent, from 1.39 to 2.95 per thousand population, a rate of increase roughly triple that of the 1970s. Since the State Prison population is more than 10 times the size of the federal prison population, this dramatic rise is dominated by the rise in the number of inmates in state facilities.[10]

In an attempt to help determine which of the above factors was responsible for the dramatic increase in incarceration rates during the 1980s we decomposed the annual rate of change in new court commitments to state prisons, measured in log points, into the sum of the share of each offense in total commitments times the annual rate of change in the rate of new court commitments for that offense.[11] We have

$$dln(I) = \sum_i S_i dln(I_i) \qquad (1)$$

where $dln(I)$ represents the annual rate of growth in new court commitments, $dln(I_i)$ represents the annual rate of growth in new commitments for offense $i$, and $S_i$ represents new commitments for offense $i$ as a share of total new commitments $(S_i = \frac{I_i}{I})$.[12]

We further decomposed the annual rate of change in new court commitments for each offense into the sum of the annual rate of change in arrests and the probability of incarceration given arrest, both measured in log points (equation 2).

$$\sum_i S_i dln(I_i) = \sum_i S_i dln(A_i) + \sum_i S_i dln(P_i) \qquad (2)$$

---

[10] In fact, both the federal and state incarceration rates doubled during the 1980s.
[11] The number of new court commitments was obtained by multiplying the total number of new commitments by the offense distribution for that year. In 1974 and 1979 the total number of new commitments was unavailable and was estimated from the number of state prison admissions in those years and the percentage of admissions which were new court commitments in 1985 (the first year for which this information was available).
[12] This equation was derived as follows: $\sum_i S_i dln(I_i) = \sum_i \frac{I_i}{I} \frac{dI_i}{I_i} = \frac{1}{I} \sum_i dI_i \} dI = dln(I)$.

14

Where $dln(A_i)$ represents the annual rate of change in arrests for offense $i$, and $dln(P_i)$ represents the annual rate of change in the probability of incarceration given arrest for offense $i$.[13]

To implement the decomposition, we classified offenses into one of eight categories: homicide (murder, nonnegligent manslaughter, and negligent manslaughter), rape and other sexual assault, robbery, assault, burglary, larceny and motor vehicle theft, drug law violations, and all other offenses. We perform this decomposition for state prisons over the periods: 1974–1979, 1979–1988, and 1974–1988. For the shares ($S_i$'s) we used shares averaged over the beginning and end periods.[14] To net out population growth we expressed both incarcerations and arrests as fractions of the total population. The results of the decomposition appear in Table 1.

**Table 1 About Here**

From 1974 to 1979 the annual rate of increase in new commitments ($\sum_i S_i dln(I_i)$) was 4.6 percent, the result of a 5.2 percent increase in the annual probability of incarceration conditional on arrest coupled with a .6 percent decrease in the overall annual arrest rate. Of the eight offenses, robbery and burglary combined accounted for approximately 43 percent of this change (.009+.011/.046), due largely to the fact that they represent the largest shares of new commitments, 20 and 24 percent respectively. Looking at columns 2 and 3 we find that the increase in robbery and burglary commitments is due solely to an increase in the probability of incarceration, the likelihood of arrest actually decreased for both offenses. The largest annual rate of increase in new commitments occurs for "other" offenses and is responsible for approximately 30 percent of the total annual rate of increase. Although there was an increase in the probability of arrest for "other" offenses, the increase in new commitments is largely attributable to an 8.7 percent increase

---

[13] Since $\sum_i S_i dln(A_i)$ and $\sum_i S_i dln(P_i)$ represent the change in the arrest and incarceration rates weighted by their relative share in incarcerations, they will not equal the aggregate change in arrests or incarcerations.

[14] While in continuous time equation (1) is an identity, it will only approximately hold in discrete time.

in the annual probability of incarceration given arrest. Interestingly enough we observe that new commitments for drug offenses actually decreased during this period due to a significant decrease in the annual rate of change in the arrest rate for drug law violations.

For the later period, from 1979 to 1988, new court commitments rose at an annual rate of 8.9 percent. Of this increase, a majority was the due to a higher probability of incarceration (.074/.089). Incarceration for drug related offenses was becoming increasingly important over this period. The proportion of new commitments entering state prisons for drug offenses increased from 8 to 25 percent, due to both a 2.4 percent increase in the annual incarceration rate and a 1.2 percent increase in the annual arrest rate for drug law violations. In fact, drug offenses accounted for a full 40 percent of the rise in the prison population between 1979 and 1988.

The data in Table 1 refer to new commitments. However, the ratio of new commitments to the prison population hardly changed over this period of time, indicating that there was little change in the effective sentence length. Additional data from inmate surveys of State prisons and surveys of State courts confirm that, during the 1980s, median State prison sentences and median time served have remained constant or decreased for most offenses (Langan 1991; BJS 1990d; 1992c). Information on Federal sentences during the 1970s and early 1980s also confirms that there has been almost no change in average sentence length or time served for Federal prisoners from 1980 to 1986.

To summarize, the large increase in the incarceration rate in the 1980s seems primarily attributable to two overlapping factors. Most importantly there was an increase in the probability of incarceration conditional on arrest for all offense categories. Also contributing to the increase was a large increase in the number of new commitments for drug law violations. Together, these two factors accounted for over 95 percent of the increase in new court commitments during the 1980s.

**Drug Use and Drug Law Violations**

As mentioned above, one of the factors responsible for the large increase in the incarceration rates during the 1980s was an increase in the incarceration rate for drug law violations. This section takes a closer look at trends in drug use and drug violations over the last decade. Figure 8 presents trends in the arrest rates for Index crimes and drug crimes for the period from 1970 to 1991. While drug arrests are only a fraction of total arrests they represent an increasingly important part of arrests for serious crimes. From 1980 to 1989 the drug arrest rate increased by over 111 percent, from .26 per 1,000 to .55 per 1,000, before decreasing in the early 1990s. During this same period the arrest rate for Index crimes increased by only 19 percent.

**Figure 8 About Here**

There are a number of possible explanations for the recent increase in drug arrests. It could be that there has been a large increase in drug use over the last 10 years and that the higher arrest rates are the result of a larger population being engaged in the sale, manufacture, and possession of serious drugs. Another possibility is that, while the number of individuals involved in drug activity has not changed very much, the country's declared "war on drugs" has resulted in an increase in the amount of resources devoted to the capture and prosecution of both drug dealers and drug users. Since most of the increase in drug arrests and incarcerations has been linked to cocaine we will focus our attention on trends in cocaine use among various segments of the population.[15]

Two of the most prominent surveys that ask about drug use are Monitoring the Future: A Continuing Study of the Lifestyles and Values of Youth (MTF) and the National Household Survey on Drug Abuse (NHSDA). Both MTF and NHSDA are sponsored by the National Institute on Drug Abuse (NIDA). MTF began in 1975

---

[15] According to the FBI, the arrest rate for the sale and/or manufacture of cocaine or heroin increased from 10.8 per 100,000 population in 1980 to 100.6 per 100,000 in 1989, an increase of 831 percent. Over this same time period the arrest rate for cocaine or heroin possession increased by 723 percent, from 22.2 to 182.8 per 100,000 (FBI 1981; 1990).

as an annual survey of high school seniors. Since 1975 MTF has not only collected information on each subsequent class of seniors but also resurveyed a subsample of each previous cohort. An important limitation of the MTF survey is that it does not include the 15–20 percent of each cohort that drop out of school before their senior year. The NHSDA is an occasional survey, which collects information on the prevalence of drug, alcohol, and tobacco use for those age 12 and older. The NHSDA sample is drawn from a national probability sample of households.

Figures 9 and 10 present trends in recent cocaine use by age from MTF and the NHSDA respectively. According to Figure 9, cocaine use among all age groups was relatively constant through the mid 1980s but decreased dramatically after 1986. Disaggregating by race shows similar trends for black and white youth, though the fraction of blacks reporting the use of cocaine is roughly half that of whites (Backman et al. 1991). In addition, Backman et al. (1990) present evidence that the decline in cocaine use that occurred during the 1980s can largely be attributed to changes in the perception of the dangers associated with use.

### Figure 9 About Here

Trends in cocaine use from the NHSDA (Figure 10) depict increasing cocaine use during the 1970s for all three age groups. Cocaine use among those 12 to 25 years old appeared to peak around 1979 and decrease throughout the 1980s, while cocaine use among older adults continued to rise through 1985 before finally tapering off.

### Figure 10 About Here

Neither MTF nor NHSDA are intended to measure the prevalence of drug dependence or drug abuse. The one survey designed to measure such use, the Epidemilogic Catchment Area study (ECA), done in the early 1980s, shows rates of drug abuse that are dramatically lower than the rates of drug use shown in

MTF or NHSDA (Anthony and Helzer 1991; Kandel 1992).[16] Given this large discrepancy it would seem entirely possible that trends in drug use would not necessarily follow trends in drug abuse.

Reliable data on serious drug use is relatively difficult to find. One possible measure of the level of serious cocaine use is the number of individuals treated in hospital emergency rooms for cocaine related problems. NIDA, through the Drug Abuse Warning Network (DAWN), collects annual information on the number of drug related emergency room visits in 21 selected metropolitan areas. While the number of emergency rooms and the size and composition of the population they serve varies somewhat from year to year, these surveys provide us with an alternative measure of drug use. According to Figure 11, cocaine admissions to emergency rooms rose dramatically starting in the mid 1980s. Figure 11 also shows that the bulk of this increase was accounted for by individuals identified as having smoked rather than sniffed the cocaine, a clear indication that a large fraction of the increase in emergency room use was due to the introduction of crack cocaine.

### Figure 11 About Here

The DAWN surveys also reveal some interesting trends in the demographic characteristics of patients with cocaine related emergencies. Two-thirds of all patients were male, a figure that remained fairly constant during the 1980s. The percentage of black and Hispanic patients, however, increased steadily from 45.8 percent in 1981 to 66.6 percent in 1989.[17] There was also a change in the age composition of patients. In 1989, 20 to 29 year olds comprised 45.9 percent of patients, down from 55.1 percent in 1981. This increase was largely offset by an increase in the percentage of 30 to 49 year olds. In addition to the changes in

---

[16] The fraction of the population shown as abusing cocaine in the ECA data was 0.2 percent. In comparison, the NHSDA data show 18.8 percent of young adults and 3.8 percent of older adults using cocaine in 1982.

[17] It is interesting to note that while blacks are under-represented among cocaine users, they are over-represented in the DAWN surveys. This discrepancy may, to some extent, reflect differences in patterns of emergency room use. There is, however, some evidence suggesting that, while blacks are less likely to initiate the use of cocaine, they are more likely to continue to use the substance after initiation (Kandel 1991).

demographic composition of patients there was also a change in their drug use motives. The percentage of patients reporting that they used cocaine because of dependence increased from 48.4 percent in 1981 to 63.2 percent in 1989, while those reporting that they used cocaine for its psychic effects decreased from 33 percent to 19.6 percent.[18] These findings tend to support the belief that there was a cocaine/crack epidemic in the mid 1980s. In the early 1980s, as cocaine became more accessible and new forms of cocaine became available, the majority of users where taking the drug for recreational purposes or out of curiosity but over time, as individuals became more aware of the dangers of cocaine use, the number of new users decreased and a larger and larger fraction of those who were able to quit did so. The result was an increase in both the average age of users and the percentage of those using because of dependence.

Recent trends in cocaine death rates and drug dependence death rates also support the notion that serious or heavy cocaine use increased during the 1980s. The death rate for blacks and whites from cocaine remained essentially zero through the mid 1980s and then began to rise rapidly around 1984. Between 1984 and 1988 , the cocaine related death rate for black males increased by 1,667 percent, from .15 to 2.65 per 100,000, while the death rate for whites increased only 257 percent, from .14 to .50 per 100,000.

The DAWN data and Vital Statistics information on cause of death are both susceptible to systematic reporting biases. As medical professionals become more familiar with the symptoms of serious drug and cocaine use they are more likely to report emergency room visits and deaths as drug/cocaine related. However, both the timing of the increase in emergency room use and the increase in deaths are consistent with what is known regarding the timing of the introduction of crack. After being introduced in Los Angeles around 1982, crack spread rapidly to other major U.S. cities and was available nationwide by 1986 (Lamar 1986; Morganthau et al. 1986).

---

[18] In those instances where more than one drug was mentioned the same motive for use was assigned to all drugs involved.

However, it is important to note that crack cocaine is significantly more toxic than other forms of cocaine. Thus, the increases in emergency room use and in cocaine related deaths could be due either to an increase in the serious use of cocaine or simply to a substitution of more toxic crack for less toxic forms of cocaine (or other drugs). We suspect that, in reality, it was a combination of the two phenomena. The introduction of crack cocaine dramatically reduced the price of cocaine making it available to a much wider spectrum of individuals, likely leading to both an increase in the total demand for cocaine and a shift of this demand towards crack.

An indicator of the level of serious drug trafficking is the number of drug related murders. Data on the total number of murders and drug related murders from 1976 to 1991 appears in Figure 12. The percentage of total murders which were drug related remained constant at just below 2 percent from 1976 to 1982. From 1982 to 1989, however, drug related murders increased from 2 to 7.4 percent of all murders. Furthermore, the increase in the number of drug related murders during this period was more than three times as large as the increase in total murders. While there is good reason to be suspicious that these numbers, to some extent, reflect reporting behavior by the police, the overall murder rate among young adults follows exactly the same type of pattern.

### Figure 12 About Here

In sum, although it is difficult to determine the magnitude of drug use or the drug trade, the fact that all the above series follow the same pattern makes it seem fairly incontrovertible that drug traffic and serious drug use were increasing in the late 1980s. The break in trend that occurred in the mid 1980s would seem to implicate crack. Plausibly, the introduction of crack cocaine expanded the market for cocaine and thereby increased the value of the drug trade. The violence associated with the drug trade increased due to the completely unregulated (i.e., illegal) nature of the market. This interpretation of the evidence is consistent with survey evidence which suggests that youth perceive crime to be more lucrative

21

today than they did a decade ago (Freeman 1991). It is also consistent with recent ethnographic evidence that shows gangs during the 1980s putting an increased emphasis on money making through the sale of cocaine (Freeman 1992; Huff 1990; Sullivan 1989; Williams 1989).

### Recent Estimates of the Level of Involvement in Criminal Activity and Drug Use

While most of this paper has focused on recent trends in criminal involvement, the final section of the paper examines various measures of the level of crime and drug activity by race and age. Given that drug/cocaine related activity has increased rapidly during the 1980s, how does the current level of drug/cocaine involvement compare with involvement in other types of crime? Table 2 presents recent victimization rates, murder rates, arrest rates, incarceration rates, emergency room cocaine admission rates, and cocaine death rates for various demographic groups.

### Table 2 About Here

Our two measures of the level of drug crime are the 1990 drug arrest rate and the 1988 drug incarceration rate. In 1990, the arrest rate for drug law violations was 2.52 per 1,000 for whites and 11.67 per 1,000 for blacks. These rates are greater than the arrest rates for violent crime and motor vehicle theft combined and account for over 25 percent of all arrests for serious crimes (Index crimes and drug offenses). When we consider that the majority of those arrested for serious crimes are young males and that arrests for serious crimes generally constitute less than 15 percent of all arrests, we find that the actual level of criminal involvement for young men, especially young black men, is significantly higher.

If we compare the drug arrest rates to recent victimization rates we find that blacks are more than three times as likely to be victims of violent crime (rape, robbery, and assault) and more than five times as likely to be victims of theft than they are to be arrested for a drug offense. Whites, on the other hand, are

11 times as likely to be victims of violent crime and more than 25 times as likely to be victims of theft than they are to be arrested for a drug law violation.[19]

Because a large fraction of those arrested are never sentenced to prison it should not be surprising to find that incarceration rates are much smaller than arrest rates. In 1988, the drug offense incarceration rate was .09 per 1,000 for whites and .89 per 1,000 for blacks. These rates are roughly comparable to the total violent crime incarceration rates and are approximately 10 times as large as the incarceration rates for murder and motor vehicle theft. Of all individuals incarcerated for serious crimes, approximately 28 percent of whites and 34 percent of blacks were incarcerated for drug law violations.[20] Comparing these numbers to recent murder rates we find that, in a given year, whites and blacks are roughly twice as likely to be incarcerated for drugs as they are to be murdered. This comparison is, however, somewhat misleading as an individual may be incarcerated multiple times while he/she can only be murdered once. In sum, while drug crime appears to represent a significant share of total criminal activity, the level of serious criminal involvement with drugs, as measured by the drug incarceration rate, is relatively small—fewer than one in 10,000 whites and one in 1,000 blacks were incarcerated for drug law violations in 1990.

How do our measures of serious criminal involvement with drugs/cocaine compare with our measures of serious drug/cocaine use? According to the final sections of Table 2, the likelihood of being treated in an emergency room for a cocaine related emergency is slightly greater than the probability of being incarcerated for a drug offense and roughly three times as large as the single-year murder rate. However, as with arrests and victimizations, many of those seen for cocaine related emergencies are likely to be treated more than once in a particular year. Cocaine death rates are clearly the smallest of the rates in Table 2. They indicate that

---

[19] Because an individual may be arrested or victimized more than once in a particular year, the above rates will all tend to overestimate the actual level of criminal activity.

[20] In the section on Incarceration Rates we noted that 25 percent of individuals incarcerated for all felonies were incarcerated for drug law violations. Serious crimes include all felonies except kidnapping, negligent manslaughter, "other violent" crimes, fraud, public order offenses, and "other" offenses.

fewer than one in 3 million whites and one in 625,000 blacks died from cocaine related causes in 1988. These numbers are likely to be underestimates as many drug related deaths are attributed to other causes (e.g., cardiac arrest).

Evidence from Table 2 also seems to suggest that blacks have borne a disproportionate share of the costs of increased drug use and drug trafficking. While the violent crime and personal theft victimization rates are roughly comparable for blacks and whites; the drug arrest rates, incarceration rates, ER admission rates, and cocaine death rates are 5 to 12 times as large for blacks as they are for whites.

## Discussion

This paper employs data from the UCR and NCS to examine the widely held belief that there was a significant increase in the level of criminal activity during the 1980s. In general, we find that neither data source depicts increasing levels of crime over this period. The only exceptions seem to be murders among young adults and motor vehicle theft both of which exhibit significant upward trends in the mid to late 1980s. While the level of criminal activity remained relatively stable during the 1980s, there was a large increase in the incarceration rate, primarily attributable to an increased probability of incarceration given arrest for all offense categories and a sizable increase in the number of arrests and incarcerations for drug law violations.

Data on cocaine related emergency room visits, drug deaths, and drug related murders suggests that the increase in the number of incarcerations for drug offenses is the result not only of increased enforcement of existing drug laws but also of a significant increase in the use and sale of crack cocaine. This increase does not appear in either the UCR or the NCS numbers because neither data source measures the incidence of victimless crime. The spread of crack through the central cities of the U.S. seems reminiscent of the spread of heroin a generation earlier (Clark 1965; HARYOU 1964).

24

## REFERENCES

Anthony, J. C. and J. E. Helzer. 1991. "Syndromes of Drug Abuse and Dependence." Pp. 116–154 in L. Robins and D. Reiger (eds.), *Psychiatric Disorders in America*. New York: Free Press.

Bachman, Jerald G., L. D. Johnston, and P. M. O'Malley. 1990. "Explaining the Recent Decline in Cocaine Use among Young Adults: Further Evidence That Perceived Risks and Disapproval Lead to Reduced Drug Use," *Journal of Health and Social Behavior* 31(June):173–184.

Bachman, Jerald G., J. M. Wallace, Jr., P. M. O'Malley, L. D. Johnston, C. L. Kurth, and H. W. Neighbors. 1991. "Racial/Ethnic Differences in Smoking, Drinking, and Illicit Drug Use among American High School Seniors, 1976–89, *American Journal of Public Health* 81(3):372–377.

Biderman, Albert D. and J. P. Lynch. 1991. *Understanding Crime Incidence Statistics. Why the UCR Diverges From the NCS*. New York, NY: Springer-Verlag.

Black Donald J. 1970. "The Production of Crime Rates," *American Sociological Review* 35:733–748.

Black, Donald J. and A. J. Reiss, Jr. 1970. "Police Control of Juveniles," *American Sociological Review* 35:63–77.

Block, Carolyn R. and R. L. Block. 1984. "Crime Definition, Crime Measurement, and Victim Surveys," *Journal of Social Issues* 40:137–160.

Block, Richard L. 1974. "Why Notify the Police," *Criminology* 11:555–569.

Blumstein, Alfred, Cohen, J. and R. Rosenfeld. 1991. "Trend and Deviation in Crime Rates: A Comparison of the UCR and NCS Data for Burglary and Robbery," *Criminology* 29:237–263.

Blumstein, Alfred, Cohen, J. and R. Rosenfeld. 1992. "The UCR-NCS Relationship Revisited: A Reply to Menard," *Criminology* 30:115–124.

Bureau of the Census. 1971–1993. *Statistical Abstract of the United States, 1970–1992.* Washington, DC: U.S. Department of Commerce, Bureau of the Census.

Bureau of Justice Statistics. 1992a. *Criminal Victimization 1991.* Washington, DC. U.S. Department of Justice.

Bureau of Justice Statistics. 1975b–1992b; 1992c. *Criminal Victimization in the United States 1973–1991.* Washington, DC: U.S. Department of Justice.

Bureau of Justice Statistics. 1989c. *Felony Sentences in State Courts, 1986.* Washington, DC: U.S. Department of Justice.

Bureau of Justice Statistics. 1990c. *Felony Sentences in State Courts, 1988.* Washington, DC: U.S. Department of Justice.

Bureau of Justice Statistics. 1992d. *National Corrections Reporting Program, 1988.* Washington, DC: U.S. Department of Justice.

Bureau of Justice Statistics. 1990d. *National Corrections Reporting Program, 1985.* Washington, DC: U.S. Department of Justice.

Bureau of Justice Statistics. 1971e–1992e. *Sourcebook of Criminal Justice Statistics 1970–1991.* Washington, DC: U.S. Department of Justice.

Chambliss, William J. 1984. "Crime Rates and Crime Myths." Pp. 167–177 in W. J. Chambliss (ed.), *Criminal Law in Action.* New York, NY: John Wiley.

Clark, K. B. 1965. *Dark Ghetto: Dilemmas of Social Power.* New York: Harper and Row.

Federal Bureau of Investigation. 1971–1992. *Crime in the United States: Uniform Crime Reports 1970–1991.* Washington, DC: U.S. Department of Justice, The Federal Bureau of Investigation.

Freeman, Richard B. 1992. "Understanding Crime, Gangs, and Neighborhoods: Ethnographic Research and Social Science Analysis." In J. Fagan (ed.), *The Ecology of Crime and Drug Use in American Inner Cities: Social Structure and Neighborhood Dynamics,* forthcoming.

Freeman, Richard B. 1991. "Crime and the Economic Status of Disadvantaged Young Men," Paper presented at the Conference on Urban Labor Markets and Labor Mobility, Airlie House, VA, March 7, 1991.

Grogger, Jeff. 1992. "Criminal Opportunities, Criminal Activity, and Young Men's Labor Supply." Working Paper, Department of Economics, University of California, Santa Barbara, CA.

HARYOU. 1964. *Youth in the Ghetto: A Study of the Consequences of Powerlessness and a Blueprint for Change.* New York: Harlem Youth Opportunities Unlimited.

Huff, C. Ronald (ed.). 1990. *Gangs in America.* Newbury Park, CA: Sage Publications.

Jencks, Christopher. 1991. "Is the American Underclass Growing?" Pp. 28–100 in Christopher Jencks and Paul E. Peterson (eds.), *The Urban Underclass.* Washington, DC: The Brookings Institution.

Kandel, Denise B. 1991. "The Social Demography of Drug Use," *The Milbank Quarterly* 69(3):365–414.

Kornblum, William. 1991. "Drug Legalization and the Minority Poor," *The Milbank Quarterly* 69(3):415–435.

Lamar, Jacob V. 1986. "Crack," *Time* 127:16–18.

Langan, Patrick A. 1991. "America's Soaring Prison Population," *Science* 251:1568–1573.

Levine, James P. 1976. "The Potential for Crime Overreporting in Criminal Victimization Surveys," *Criminology* 14:307–330.

McDowall, David and Colin Loftin. 1992. "Comparing the UCR and NCS Over Time," *Criminology* 30:125–132.

Morganthau, Tom, Greenberg, N. F., Murr, A., Miller, M., and G. Raine. 1986. "Crack and Cocaine," *Newsweek* 107:16–22.

National Center for Health Statistics. 1977–1991. *Vital Statistics of the United States, 1973–1988*, Vol. 2, Mortality, Part A. Public Health Service, Washington, DC: U.S. Government Printing Office.

National Institute on Drug Abuse. 1982–1991a. *Annual Data 19–: Data From the Drug Abuse Warning Network*, 1981–1990. Washington, DC: U.S. Department of Health and Human Services.

National Institute on Drug Abuse. 1991b. *Drug Use Among American High School Seniors, College Students, and Young Adults, 1975-1990*, Vol. 1: High School Seniors. Washington, DC: U.S. Department of Health and Human Services.

National Institute on Drug Abuse. 1991c. *Drug Use Among American High School Seniors, College Students, and Young Adults, 1975–1990*, Vol. 2: College Students and Young Adults. Washington, DC: U.S. Department of Health and Human Services.

National Institute on Drug Abuse. 1991d. *National Household Survey on Drug Abuse: Highlights 1990*. Washington, DC: U.S. Department of Health and Human Services.

National Institute on Drug Abuse. 1991e. *National Household Survey on Drug Abuse: Main Findings 1990.* Washington, DC: U.S. Department of Health and Human Services.

O'Brien, Robert M. 1985. *Crime and Victimization Data: Volume 4, Law and Criminal Justice Series.* Beverly Hills, CA: SAGE Publications.

Skogan, Wesley G. (ed.). 1976. *Sample Surveys of Victims of Crime.* Cambridge, MA: Ballinger.

Sullivan, Mercer. 1989. *Getting Paid: Youth Crime and Work in the Inner City.* New York: Cornell University Press.

Turner, Anthony G. 1972. *The San Jose Methods Test of Known Crime Victims.* National Criminal Justice Information and Statistics Service, Law Enforcement Assistance Administration. Washington, DC: U.S. Government Printing Office.

U.S. Bureau of the Census. 1993. Current Population Reports, P25–1095, U.S. Population Estimates by Age, Sex, Race, and Hispanic Origin: 1980 to 1991. Washington, D.C.: U.S. Government Printing Office.

Williams, T. 1989. *The Cocaine Kids.* Reading, Mass.: Addison Wesley.

Wilson, William Julius. 1987. *The Truly Disadvantaged: The Inner City, the Underclass, and Public Policy.* Chicago, IL: University of Chicago Press.

TABLE 1: INCARCERATION RATE DECOMPOSITION 1974–1979

| Offense | Si | dln(Ai) | dln(Pi) | dln(Ii) | Si[dln(Ai)] | Si[dln(Pi)] | Si[dln(Ii)] |
|---|---|---|---|---|---|---|---|
| | | | | 1974–1979 | | | |
| Homicide | 0.09 | −0.010 | 0.057 | 0.046 | −0.001 | 0.005 | 0.004 |
| Rape | 0.05 | 0.025 | 0.021 | 0.046 | 0.001 | 0.001 | 0.002 |
| Robbery | 0.20 | −0.021 | 0.068 | 0.046 | −0.004 | 0.014 | 0.009 |
| Assault | 0.08 | 0.023 | 0.024 | 0.046 | 0.002 | 0.002 | 0.004 |
| Burglary | 0.24 | −0.015 | 0.061 | 0.046 | −0.004 | 0.015 | 0.011 |
| Larceny | 0.11 | 0.012 | 0.034 | 0.046 | 0.001 | 0.004 | 0.005 |
| Drugs | 0.10 | −0.038 | 0.003 | −0.035 | −0.004 | 0.000 | −0.003 |
| Other | 0.13 | 0.021 | 0.087 | 0.108 | 0.003 | 0.011 | 0.014 |
| Total | 1.00 | | | | −0.006 | 0.052 | 0.046 |
| | | | | 1979–1988 | | | |
| Homicide | 0.07 | 0.001 | 0.022 | 0.023 | 0.000 | 0.002 | 0.002 |
| Rape | 0.06 | 0.016 | 0.092 | 0.108 | 0.001 | 0.005 | 0.006 |
| Robbery | 0.16 | −0.003 | 0.025 | 0.022 | −0.001 | 0.004 | 0.003 |
| Assault | 0.08 | 0.036 | 0.037 | 0.073 | 0.003 | 0.003 | 0.005 |
| Burglary | 0.21 | −0.019 | 0.075 | 0.056 | −0.004 | 0.016 | 0.012 |
| Larceny | 0.12 | 0.022 | 0.075 | 0.098 | 0.003 | 0.009 | 0.011 |
| Drugs | 0.17 | 0.071 | 0.143 | 0.215 | 0.012 | 0.024 | 0.035 |
| Other | 0.16 | 0.023 | 0.073 | 0.095 | 0.003 | 0.011 | 0.015 |
| Total | 1.00 | | | | 0.017 | 0.074 | 0.089 |
| | | | | 1974–1988 | | | |
| Homicide | 0.07 | −0.003 | 0.034 | 0.031 | 0.000 | 0.002 | 0.002 |
| Rape | 0.06 | 0.019 | 0.067 | 0.086 | 0.001 | 0.004 | 0.005 |
| Robbery | 0.16 | −0.010 | 0.040 | 0.030 | −0.002 | 0.006 | 0.005 |
| Assault | 0.08 | 0.031 | 0.032 | 0.064 | 0.002 | 0.002 | 0.005 |
| Burglary | 0.21 | −0.017 | 0.070 | 0.053 | −0.004 | 0.015 | 0.013 |
| Larceny | 0.12 | 0.019 | 0.061 | 0.079 | 0.002 | 0.007 | 0.009 |
| Drugs | 0.19 | 0.032 | 0.093 | 0.126 | 0.006 | 0.017 | 0.023 |
| Other | 0.14 | 0.022 | 0.078 | 0.100 | 0.003 | 0.011 | 0.013 |
| Total | 1.00 | | | | 0.008 | 0.064 | 0.073 |

Source: Langan, Patrick. "America's Soaring Prison Population." *Science* 251:1568–1573.
National Corrections Reporting Program, 1988. Statistical Abstract of the U.S., various years.

TABLE 2: RECENT ESTIMATES OF THE LEVEL OF CRIMINAL ACTIVITY AND DRUG USE

|  | White | Black |
|---|---|---|
| Violent Crime Victimization Rate, 1990 | 28.2 | 39.7 |
| Violent Crime Victizimation Rate 20–24, 1990 | 64.7 | 64.7 |
| Violent Crime Victizimation Rate Male 20–24, 1990 | 79.9 | 82.0 |
| Personal Theft Victimization Rate, 1990 | 63.6 | 64.0 |
| Personal Theft Victimization Rate 20–24, 1990 | 111.2 | 116.8 |
| Murder Rate, 1990 | 0.05 | 0.32 |
| Murder Rate 20–24, 1990 | 0.10 | 0.71 |
| Murder Arrest Rate, 1990 | 0.04 | 0.33 |
| Violent Crime Arrest Rate, 1990 | 1.42 | 7.89 |
| Motor Vehicle Theft Arrest Rate, 1990 | 0.50 | 2.15 |
| Drug Arrest Rate, 1990 | 2.52 | 11.67 |
| Total Arrest Rate for Index Crimes* and Drug Crimes, 1990 | 9.74 | 37.62 |
| Murder Incarceration Rate, 1988 | 0.01 | 0.10 |
| Violent Crime Incarceration Rate, 1988 | 0.07 | 0.80 |
| Motor Vehicle Theft Incarceration Rate, 1988 | 0.01 | 0.08 |
| Drug Offense Incarceration Rate, 1988 | 0.09 | 0.89 |
| Total Incarceration Rate for Index Crimes and Drug Crimes, 1988 | 0.32 | 2.65 |
| Estimated ER Cocaine Admission Rate, 1990 | 0.12 | 1.43 |
| Estimated ER Cocaine Admission Rate 20–29, 1990 | 0.31 | 3.29 |
| Total Cocaine Death Rate, 1988 | 0.0003 | 0.0016 |

*Excluding forcible rape.

Notes: Victimization Rates are per 1,000 12 and over.
Arrest Rates, Death Rates, Incarceration Rates, and ER Admission Rates are per 1,000 resident population.

Source: Statistical Abstract of the U.S., Crime in the U.S., Criminal Victimization in the U.S., Vital Statistics of the U.S., various years. Annual Data 1990: Data from the Drug Abuse Warning Network.



FIGURE 1: COMPARISON OF TRENDS IN THE UCR CRIME INDEX (PER 100,000 POPULATION), THE NCS PERSONAL VICTIMIZATION RATE (PER 100,000 AGE 12 AND OLDER), AND THE NCS HOUSEHOLD VICTIMIZATION RATE (PER 100,000 HOUSEHOLDS).

Source: Statistical Abstract of the U.S., Criminal Victimization in the U.S., and Crime in the U.S., various years.



FIGURE 2: COMPARISON OF THE ADJUSTED UCR CRIME INDEX AND NCS TOTAL VICTIMIZATION RATE (BOTH PER 100,000 POPULATION).

Source: Statistical Abstract of the U.S., Criminal Victimization in the U.S., and Crime in the U.S., various years.



FIGURE 3: COMPARISON OF UCR CRIME RATES AND NCS VICTIMIZATION RATES FOR VARIOUS OFFENSES, 1973-1991 (RATE PER 100,000 RESIDENT POPULATION)

Source: Statistical Abstract of the U.S., Criminal Victimization in the U.S., and Crime in the U.S., various years

FIGURE 4: ESTIMATED VICTIMIZATION RATES BY RACE OF VICTIM, 1973-1991.



Source: Current Population Reports, P25-1095; Statistical Abstract of the U.S. and Criminal Victimization in the U.S., various years.



FIGURE 5: SELECTED VICTIMIZATION RATES BY RACE OF OFFENDER, 1977-1991.

Perceived characteristics in lone offender victimizations.

Source: Current Population Reports, P25-1095; Statistical Abstract of the U.S., Sourcebook of Criminal Justice Statistics, Crime in the U.S., and Criminal Victimization in the U.S., various years.



FIGURE 6: UCR MURDER RATES BY RACE OF OFFENDER, 1976-1991.

Race specific data is for single victim/single offender murders.

Source: Current Population Reports, P25-1095; Crime in the U.S. and Statistical Abstract of the U.S., various years.

FIGURE 7: MURDER RATES BY RACE AND AGE OF THE VICTIM, 1973-1991.



Source: Current Population Reports, P25-1095; Crime in the U.S. and Statistical Abstract of the U.S., various years.



FIGURE 8: TOTAL ESTIMATED ARREST RATE FOR INDEX CRIMES AND DRUG CRIMES, 1970-1991.

Based on reporting agencies and estimates for unreported areas.
Source: Crime in the United States, various years.

FIGURE 9: REPORTED RECENCY OF COCAINE USE AMONG HIGH SCHOOL SENIORS, COLLEGE STUDENTS, AND YOUNG ADULTS, 1975-1991.



a



b

Source: Sourcebook of Criminal Justice Statistics, 1991. Drug Use Among American High School Seniors, College Students, and Young Adults, 1975-1990, Vols. 1 and 2.

FIGURE 10: ESTIMATED PREVALENCE OF COCAINE USE BY AGE, SELECTED YEARS 1972-1990.



a



b

Source: National Household Survey on Drug Abuse: Main Findings 1990. Sourcebook of Criminal Justice Statistics, 1991.



FIGURE 11: EMERGENCY ROOM COCAINE ADMISSIONS BY ROUTE OF DRUG ADMINISTRATION, 1981-1989.

Source: National Institute on Drug Abuse Statistical Series: Data from the Drug Abuse Warning Network, various years.



FIGURE 12: DRUG AND NONDRUG RELATED MURDER RATES, 1976-1991.

Drug and NonDrug Murder Rates

Source: Crime in the U.S. and Statistical Abstract of the U.S., various years