# EXHIBIT 1



# Transcript of the Deposition of
# **Cutberto Viramontes**

**Case:** Cutberto Viramontes; et al. v. The County of Cook; et al.

**Taken On:** February 9, 2022

Royal Reporting Services, Inc.
Phone:312.361.8851
Email:info@royalreportingservices.com
Website: www.royalreportingservices.com

Cutberto Viramontes; et al. v. The County of Cook; et al.
Deposition of Cutberto Viramontes - Taken 2/9/2022

Page 1

IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

CUTBERTO VIRAMONTES, et al., )
)
Plaintiffs, )
)
-vs- ) No. 1:21-CV-04595
)
THE COUNTY OF COOK, et al., )
)
Defendants. )

The deposition of CUTBERTO VIRAMONTES, taken pursuant to notice and the Federal Rules of Civil procedure for the United States District Courts, reported by Sally Durkin, Certified Shorthand Reporter and Notary Public within and for the County of Cook, State of Illinois, via videoconference from Chicago, Illinois, on Wednesday, February 9, 2022, at the hour of 9:30 o'clock a.m.

Royal Reporting Services, Inc.
312.361.8851

Cutberto Viramontes; et al. v. The County of Cook; et al.
Deposition of Cutberto Viramontes - Taken 2/9/2022

Page 2

APPEARANCES VIA VIDEOCONFERENCE:

COOPER & KIRK, PLLC
BY: MR. WILLIAM V. BERGSTROM and
MR. PETE PATTERSON
1523 New Hampshire Avenue, N.W.
Washington, D.C. 20036
(202) 220-9600
wbergstrom@cooperkirk.com
ppatterson@cooperkirk.com

On behalf of the Plaintiffs;

COOK COUNTY STATE'S ATTORNEY'S OFFICE -
COMPLEX LITIGATION SECTION
BY: MR. DAVID A. ADELMAN and
MS. HELLIN JANG
500 Richard J. Daley Center
Chicago, Illinois 60602
(312) 603-5440
david.adelman@cookcountyil.gov
hellin.jang@cookcountyil.gov

On behalf of the Defendants.

*****

Royal Reporting Services, Inc.
312.361.8851

Cutberto Viramontes; et al. v. The County of Cook; et al.
Deposition of Cutberto Viramontes - Taken 2/9/2022

Page 3

I N D E X

| WITNESS | PAGE | LINE |
| --- | --- | --- |
| CUTBERTO VIRAMONTES | | |
| Examination By Mr. Adelman | 6 | 12 |

EXHIBITS

| EXHIBITS | PAGE | LINE |
| --- | --- | --- |
| Exhibit No. 1 | 10 | 21 |

Royal Reporting Services, Inc.
312.361.8851

Page 4

THE REPORTER: Before we proceed, I'll ask counsel to agree on the record that under the current national emergency pursuant to Section 319 of the Public Health Service Act, there is no objection to this deposition officer administering a binding oath to the witness remotely.

Please state your agreement on the record.

MR. ADELMAN: This is David Adelman on behalf of the defendants. We agree.

MR. BERGSTROM: This is Will Bergstrom on behalf of plaintiffs. We agree.

(Witness sworn.)

MR. ADELMAN: All right. Good morning, Mr. Viramontes.

How are you?

THE WITNESS: Good morning.

MR. ADELMAN: You were a little frozen there for a minute.

THE WITNESS: Yeah. I am sorry. I'm using Wi-Fi.

MR. ADELMAN: Okay. This deposition is of Cutberto Viramontes, one of the plaintiffs in the Viramontes, et al versus County of Cook, et al, 21-cv-04595, pending in the United States District

Page 5

Court for the Northern District of Illinois before District Court Judge and Chief Judge Rebecca Pallmeyer.

My name is David Adelman, and I'm representing the defendants that you have sued.

Mr. Viramontes, I will be asking you a number of questions which you have to answer truthfully since you are under oath.

If you do not understand any questions, you know, please let me know, and I'll be happy to rephrase it. But if you -- but on the same token, if you give an answer, then I'll assume you understood it.

Is that fair?

THE WITNESS: I understand. Yes.

MR. ADELMAN: Okay. And when you do make an answer, please answer so we can hear you.

The court reporter cannot take down a shake of the head or --

THE WITNESS: Okay.

MR. ADELMAN: -- a shrug of the shoulder. It has to be a yes or no or articulate the answer.

Okay?

THE WITNESS: Okay.

Page 6

MR. ADELMAN: And also if you need a break at any time, just let me know. It's not a problem.

But if there is a question pending, you have to finish answering the question first before we go ahead and break.

Understand?

THE WITNESS: Yes.

CUTBERTO VIRAMONTES,
having been first duly sworn, was
examined and testified as follows:

EXAMINATION

BY MR. ADELMAN:

**Q. Okay. All right. Can you state your name for the record?**

A. Cutberto Viramontes.

**Q. Okay. And do you have a middle name?**

A. No.

**Q. Okay. And what is your date of birth?**

A. January 25, 1990.

**Q. And what is your address?**

A. [redacted], Chicago, Illinois [redacted].

**Q. Is that a house or apartment?**

A. Apartment.

Page 7

**Q. All right. Have you ever been known by any other name?**

A. No. Well, Bert is a nickname I have at work. Short for Cutberto.

**Q. How do you spell that?**

A. B-E-R-T.

**Q. Okay. So why do you have that nickname at work?**

A. Because it's short for Cutberto. My name is long and hard to pronounce for some.

**Q. I see. And do you live with anyone?**

A. Yes. My brother. My sibling and my mother.

**Q. And what is your brother's name?**

A. Alfredo Arroyo.

**Q. And what is your mother's name?**

A. I am sorry. Did you ask --

**Q. What's your mother's name?**

A. Rosa Maria Viramontes.

**Q. Let's see. How long have you lived there?**

A. Maybe three years.

**Q. Okay. So it would be in 2019 you moved there?**

A. That sounds right.

**Q. Okay. Where did you live before then?**

Page 8

A. I lived in -- not much further. Maybe like 10 minutes east over in McKinley Park.
**Q. How long did you live there?**
A. Maybe five years.
**Q. What's the address, do you remember?**
A. [REDACTED], I believe.
**Q. Okay. And you said that the place you were living now at [REDACTED] is an apartment building, correct?**
A. [REDACTED]. It's an apartment.
**Q. How many apartments are in that building?**
A. It's two. Just a top and a bottom floor.
**Q. Okay. So how are you feeling today?**
A. I'm feeling well, good.
**Q. Do you have any conditions that would impair your memory?**
A. No.
**Q. Okay. So are you able to testify accurately today?**
A. Yes.
**Q. Okay. Are you taking any medication that would interfere with your memory?**
A. No.
**Q. Do you have any medical conditions that might interfere with your memory?**

Page 9

A. No.
**Q. Okay. Now, did you prepare for this deposition?**
A. I spoke with my attorneys before.
**Q. Okay. Now, I'm not asking what you talked about. That's privileged, and I am not going to ask you about that.**
**But how many times did you meet with your attorney?**
A. Most recently, just once.
**Q. You said most recently?**
A. Uh-huh.
**Q. How many times have you met?**
A. Well, we have had correspondence through email.
**Q. Okay. And so before the deposition you only met with your attorney once?**
A. Face-to-face, yes.
**Q. Okay. Was this at his office or by Zoom?**
A. Also through Zoom remotely, yes.
**Q. And did you review any documents?**
A. Not during the meeting.
**Q. Sorry. We're talking over each other.**

Page 10

**Did you review any documents to prepare for this deposition?**
A. I pulled one document, the complaint. But this was just a few minutes ago.
**Q. But you didn't review anything else for the deposition?**
A. For the deposition other than this, no.
**Q. Okay. Okay. Did you speak with anyone else about this deposition?**
A. My mother knows that I have this going on here in my room, but that's it.
**Q. All right. Do you have the complaint before you or with you right now?**
A. I have it here on the monitor on my desktop, yes.
MR. ADELMAN: Okay. Actually, Ms. Court Reporter, you have it.
Can you share your screen?
So showing you what will be marked as Exhibit No. 1.
(Whereupon, Exhibit No. 1 was identified.)
BY MR. ADELMAN:
**Q. Do you recognize what this document is?**

Page 11

A. Yes. The complaint.
**Q. What is it?**
A. The complaint.
**Q. Okay. Now, who prepared this complaint? Was this prepared by your attorneys?**
A. Yes.
MR. ADELMAN: Okay. Now, can you go to the last page, Ms. Court Reporter?
BY MR. ADELMAN:
**Q. So you did not sign this document, correct?**
A. I am sorry. One moment.
**Q. Okay. Did you sign the complaint before it was filed?**
A. I did sign something. I don't think this is the copy that I signed.
**Q. Okay. Did you read the complaint before it was filed?**
A. I did.
**Q. Okay. And did you make sure it was accurate before it was filed?**
A. I did.
MR. ADELMAN: All right. Ms. Court Reporter, you can take it down for now. We'll need it back up in a little bit.

Cutberto Viramontes; et al. v. The County of Cook; et al.
Deposition of Cutberto Viramontes - Taken 2/9/2022

Page 12

BY MR. ADELMAN:
**Q. Okay. Do you know Rubi Joyal -- that's R-U-B-I. J-O-Y-A-L -- one of your co-plaintiffs?**
A. I've not met her personally, but I've read the individuals involved in this lawsuit.
**Q. Okay. So Rubi Joyal is a male or a female?**
A. As I said --
**Q. You kind of froze there.**
A. Oh, Rubi, I have never met her in person. So I don't know. These are people that I only know through the paperwork. I've never, like, interacted with them in person.
**Q. Okay. So you don't have any sort of relationship with Rubi whether friends or --**
A. Correct.
**Q. What about Christopher Khaya -- that's K-H-A-Y-A -- the other co-plaintiff?**
A. Same situation. No personal relationship.
**Q. Okay. Have you ever spoken with Christopher? Have you ever spoken with Christopher?**
A. No.
**Q. And have you ever spoken to Rubi?**
A. No.
**Q. Do you know what the Second Amendment**

Page 13

**Foundation is?**
A. Yes.
**Q. And are you a member?**
A. I am.
**Q. And how long have you been a member?**
A. Maybe two years.
**Q. Okay. So what does membership entail for you?**
A. I am sorry. You got cut off there.
**Q. I asked, what does membership entail for you?**
A. All they do is I pay them dues, and they fight for our Second Amendment rights.
**Q. Okay. Do you have any involvement in the activities of the foundation?**
A. Outside of this, no.
**Q. And when you say this, you mean this lawsuit?**
A. They're involved, yes.
**Q. And do you know the Firearms Policy Coalition, Inc.?**
A. Yes.
**Q. Are you a member of that?**
A. Yes.
**Q. How long have you been a member?**
A. I joined about the same time. So also about

Page 14

two years.
**Q. Okay. So why did you join both the Second Amendment Foundation and Firearms Policy Coalition?**
A. I wanted to join some groups that were very active in Chicago --
**Q. Sorry. You cut out.**
A. -- about second amendment rights.
And I haven't been a big fan of the NRA. I don't like the way that they're run and they handle things.
And these two organizations seemed to have played a big role in the McDonald case allowing us to have pistols here in Chicago, and that's why I decided to join them because I like their work for that.
**Q. So how did you find out about each of them?**
A. When I was looking for an alternative in supporting the Second Amendment Organization other than the NRA, I researched, and I came across these two.
**Q. So now this is a yes-or-no question.**
**Was it your idea to file this lawsuit?**
A. No.
**Q. Okay. I guess that's a yes-or-no question.**
A. Uh-huh.

Page 15

**Q. Was filing this lawsuit, to your knowledge, an idea from the Second Amendment Foundation?**
MR. BERGSTROM: Objection. Form.
BY MR. ADELMAN:
**Q. To the best of your knowledge?**
**If you don't know, then say you don't know.**
A. Not that one in particular.
**Q. Okay. Was filing this lawsuit an idea of someone at the Firearms Policy Coalition?**
MR. BERGSTROM: Objection. Form.
BY MR. ADELMAN:
**Q. You can answer.**
A. To my knowledge, it was the Firearms Policy Coalition.
**Q. Who at the Firearms Policy Coalition were you referring to?**
A. No individual in particular.
THE REPORTER: The witness keeps buffering.
MR. ADELMAN: Yeah. I was going to ask you, Ms. Court Reporter, if you got that.
THE REPORTER: There has been a couple times where he keeps buffering.
BY MR. ADELMAN:
**Q. Can you repeat that, Mr. Viramontes?**

6 (Pages 12 to 15)

Royal Reporting Services, Inc.
312.361.8851

Cutberto Viramontes; et al. v. The County of Cook; et al.
Deposition of Cutberto Viramontes - Taken 2/9/2022

Page 16

A. I am sorry. What was the question again?
MR. ADELMAN: Can you read it back?
(The record was read as requested.)
THE WITNESS: Okay. That is all I said, and no one in particular. I didn't say anything after that.
BY MR. ADELMAN:
**Q. Okay. You had mentioned that you joined these organizations, or one of the reasons was because you did not like the policies of the National Rifle Association.**
**Do you recall saying that?**
A. I just don't think they're very effective and well run.
**Q. Okay. So why do you say that?**
A. They have -- they give up a little bit too easy in terms of some of our rights. It seems like they've had a lot of issues with misuse of funds. Instead of using it towards legislation, they use it for their own personal use sometimes. It seems to be on the news a lot. So that's one of the reasons why I wanted a different --
**Q. What do you base that on?**
A. -- a different organization. The use of those funds for illegal, these are just things I have

Page 17

read online.
**Q. Is there any policy of the NRA that you do not like?**
A. In particular the policies, not so much. It's just the misuse of funds that I have an issue with.
**Q. All right. Let's talk about your background a little bit.**
**What is your highest level of education?**
A. Three years of college.
**Q. Okay. And where at?**
A. St. Xavier University.
**Q. Did you graduate?**
A. I did not.
**Q. Are you currently enrolled in college?**
A. No.
**Q. And when did you attend St. Xavier?**
A. Ten years ago.
**Q. So?**
A. So 2011-12. Around there.
**Q. What was your major?**
A. General biology.
**Q. Okay. So how come you stopped going to school?**

Page 18

A. I didn't really have a sense of direction, and it was very expensive, and I wasn't comfortable taking on that much debt for something I wasn't sure I was going to do.
**Q. Have you had any certification or training since then?**
A. I became a realtor for a little bit.
**Q. We'll get into that in a minute. All right. Let's talk about your employment.**
**Are you currently employed?**
A. Yes.
**Q. Where do you work?**
A. Onward Technologies.
**Q. What is it called?**
A. Onward Technologies.
**Q. Okay. And when did you start there?**
A. Maybe four years ago.
**Q. So it would be what year?**
A. I think it was '17.
**Q. 2017?**
A. Sounds right, yes.
**Q. Okay. So what position do you have there?**
A. I'm the administrative assistant, office manager, I guess.

Page 19

**Q. And what was your previous employer?**
A. At the time it was called Zugress Security.
**Q. How do you spell that?**
A. Z-U-G-R-E-S-S.
**Q. Where is that?**
**Actually, going back to Onward, where is Onward located, what city?**
A. I am sorry. One more time. You cut off.
**Q. Where is Onward located?**
A. It's in Michigan Plaza in the loop.
**Q. Do you know the address?**
A. 233 North Michigan.
**Q. That's in Chicago?**
A. Yes.
**Q. Okay. And Zugress Security, where is that located?**
A. That was in the South Loop on Wells.
**Q. Do you know the address for that -- for Zugress?**
A. I do not remember. It's in the Cacciatore Building.
**Q. Can you spell that building? Do you know?**
A. I'm not sure. I can try to spell it. C-A-C-I-A-T-O-R-E. I'm not sure if that's correct.

7 (Pages 16 to 19)

Royal Reporting Services, Inc.
312.361.8851

Cutberto Viramontes; et al. v. The County of Cook; et al.
Deposition of Cutberto Viramontes - Taken 2/9/2022

Page 20

**Q. So what did you do for Zugress?**
A. I worked in the payroll department.
**Q. So when did you start at Zugress, and when did you leave?**
A. Well, I was there for another five years. So going back from starting in 2017 onward. So maybe 2002. Or '12, I mean.
**Q. So you were there from 2012 to 2017?**
A. Yes. And I switched to Onward.
**Q. Okay. And during those five years, you were always in the payroll department?**
A. Yes.
**Q. Okay. Now, did you work anywhere before Zugress?**
A. No. That was my first place.
**Q. Okay.**
A. My first job.
**Q. Have you had any law enforcement training?**
A. No.
**Q. Have you ever been employed by law enforcement?**
A. No.
**Q. Have you ever volunteered for any law enforcement department or agency?**

Page 21

A. No.
**Q. Have you ever been in the military?**
A. No.
**Q. Okay. You know, I have to ask this.**
**Have you ever been convicted of a crime?**
A. No.
**Q. Have you ever been arrested for a crime?**
A. No.
**Q. Have you ever had any medical or first-aid training?**
A. No.
**Q. Okay. Do you have -- you know what a FOID card is, right, F-O-I-D?**
A. Yes.
**Q. And what would you describe it as?**
A. It is a card that the state issues that says I am able to own a firearm.
**Q. Okay. And the FOID is an acronym, correct, for Firearm --**
A. Firearm Owner's Identification Card, I think.
**Q. Okay. So when did you get it? When did you get the FOID card?**
A. I cannot remember.
**Q. How long have you had it for?**

Page 22

A. Several years. I would just be guessing. I would say maybe six, seven years.
**Q. So why did you get a FOID card?**
A. Yes.
**Q. No. Why did you get a FOID card?**
A. Oh, because I wanted to own a firearm.
**Q. Why did you own one?**
A. Self-defense.
**Q. Does anyone else in your household have a FOID card?**
A. Not that I know of.
**Q. Did you have to go through any training in order to get the FOID card?**
A. I'm sorry.
**Q. Did you have to go through any firearms training in order -- or any other sort of training to get a FOID card?**
A. Not the FOID card, no.
**Q. Did you have any sort of firearms-related training before getting the FOID card?**
A. Not before.
**Q. All right. Now, you know Chicago has a conceal carry card, correct?**
A. I am sorry.

Page 23

**Q. Concealed carry, you have to have a special card just like the FOID card, correct?**
A. Correct.
**Q. Okay. Do you have a concealed carry card?**
A. Yes.
**Q. All right. When did you get that?**
A. Maybe two years ago.
**Q. So in what year?**
A. 2020.
**Q. Do you know what month?**
A. I am sorry.
**Q. Do you know what month in 2020 you obtained your conceal carry card?**
A. No, I don't remember the month.
**Q. Okay. And now the concealed carry card that you obtained, is that issued by the state or by Chicago?**
A. By the state, I believe.
**Q. Okay. So why did you get a concealed carry card?**
A. Also because I wanted to carry a firearm for self defense in public.
**Q. Does anyone else in your household have a concealed carry card?**

8 (Pages 20 to 23)

Royal Reporting Services, Inc.
312.361.8851

Cutberto Viramontes; et al. v. The County of Cook; et al.
Deposition of Cutberto Viramontes - Taken 2/9/2022

Page 24

A. Not that I'm aware of.
**Q. Was any training required of you in order for you to obtain the concealed carry card?**
A. Yes.
**Q. What is the training?**
A. From what I remember, it consists of two, 8-hour classes. So 16 hours total.
**Q. And did you complete the two, 8-hour classes?**
A. Yes.
**Q. Okay. And what did the classes consist of?**
A. Going over fundamentals, unloading and loading a firearm, the functions. There was an actual shooting test at the end at the range.
**Q. Now, did you have to have some sort of accuracy or a minimum level of accuracy in order to pass?**
A. There was.
**Q. And what was the accuracy requirement?**
A. I do not remember.
**Q. Do you remember what your score was?**
A. I do not remember.
**Q. So where did you take the class at? Yeah. The two, 8-hour classes, where did you take them at?**
A. I do not remember the instructor's business.

Page 25

It was a place I found online. I remember that.
**Q. Do you remember -- so you don't remember the name of the place?**
A. I don't remember the name of the place, no.
**Q. All right. Where was it located?**
A. I mean, I have the certificate with everything on it. It was -- I remember it was quite south. Maybe like 20 miles south. That's all I remember.
**Q. But you don't remember the town that it was in?**
A. I don't remember what town.
**Q. 20 miles south. So was that still in Cook County?**
A. I mean, Cook County is very large.
**Q. I know. That's why I am asking.**
A. I am not sure. It very well could be. I don't know.
**Q. Okay. Now, other than the two, 8-hour classes you were describing for your concealed carry card, have you ever had any other type of firearm training?**
A. No.
**Q. All right. So all the training you've had**

Page 26

**are just those two, 8-hour classes, correct?**
A. As far as professional training, yes.
**Q. What do you mean in terms of professional training?**
A. I mean, everything else is just me going to the range and using my own -- just learning things on my own.
**Q. What range do you commonly go to?**
A. I go to Midwest Guns.
**Q. And where is that located?**
A. In Lyons.
**Q. Lyons, Illinois?**
A. Yes.
**Q. And so is that a shooting range, or describe the place?**
A. It's a shooting range and gun store.
**Q. And do you bring your own weapon there, or do you rent weapons from there?**
A. You are allowed to do both. I usually --
**Q. What do you do?**
A. I usually just bring my own.
**Q. Now, do you get any sort of instruction while you're there?**
A. I mean, just the basic safety tips same as

Page 27

anywhere else. No double tapping, no rifles, no cell phones.
**Q. So is this someone actually telling you this, or is it just like a sign on a wall?**
A. I mean, there is a sign on the wall. But there is also the range officer that kind of sits behind us watching everything, make sure no rules are violated.
**Q. All right. So other than having someone sit behind and make sure no rules are violated, do you receive any sort of advice or guidance or instruction while you're using the gun range?**
A. No.
**Q. So basically you're figuring it out for yourself how to use the weapon, correct?**
A. Correct.
**Q. Okay. All right. So what type of firearms do you -- well, you talked about bringing your own weapon.**
**What weapon would you bring to Midwest Guns?**
A. I would bring a Glock 19.
**Q. Do you own any other firearms?**
A. No. Just that.
**Q. When did you buy it?**

9 (Pages 24 to 27)

Royal Reporting Services, Inc.
312.361.8851

Cutberto Viramontes; et al. v. The County of Cook; et al.
Deposition of Cutberto Viramontes - Taken 2/9/2022

Page 28

A. Well, like pretty much right around the same time I got my FOID card. Soon after.
**Q. So that would be six or seven years ago now?**
A. Yes.
**Q. Okay. And how much did it cost you?**
A. I am sorry. One more time?
**Q. How much did you pay for the Glock 19?**
A. From what I remember maybe between 5- and $600.
**Q. Okay. And where did you buy it?**
A. That same place, Midwest Guns.
**Q. All right. The Glock 19 is a handgun, correct?**
A. Correct.
**Q. Would it be classified as a semiautomatic, or no?**
A. Yes.
**Q. It is a semi?**
A. I think so.
**Q. So what about the Glock 19 makes it considered a semiautomatic?**
A. Pull the trigger once, it fires once.
**Q. That can be said of revolvers too. So what is it about the Glock that makes it considered a**

Page 29

**semiautomatic?**
A. My understanding is just there is just semiautomatic and full autos. Semiautomatic is just with each pull one bullet is fired as opposed to a full automatic one, you pull it once, and it keeps firing.
**Q. I see. So what made you decide to buy that Glock 19 as opposed to some other type?**
A. I liked the caliber. I have a preference for 9 millimeter because, as I understand, it's as effective as say a 45, but it's more widely produced. So it's cheaper, and ammo is more available.
And I like the size of the weapon. It's not too big, and it's not too small. So it's kind of in the middle. I think makes it ideal for concealed carry.
**Q. So what's the purpose of you having the Glock 19?**
A. Self defense.
**Q. All right. Have you ever had to use your Glock 19 in self defense?**
A. No. I never had to use it. Fortunately, no.
**Q. Have you ever shot anyone with it?**
A. No.

Page 30

**Q. Have you ever seen -- now, I'm not talking about on TV or whatever, but have you ever seen in person someone suffer from a gunshot wound?**
A. No. Not in person.
**Q. Have you ever seen someone with a gunshot wound -- you said not in person.**
**So have you ever seen someone with a gunshot wound either on TV or over the computer?**
A. Yes.
**Q. Okay. And I'm not talking about a Hollywood produced TV show. I mean, like a real gunshot wound?**
A. I've seen some police cam footage.
**Q. Okay. And where did you see police cam footage?**
A. On the internet.
**Q. What website?**
A. No particular website that comes to mind. Just Googling it, and it comes up.
**Q. So if you want to watch something like that, where would you go to see it?**
A. I just Google. If something happens, the search engine will take me to the appropriate site.
**Q. Well, did you make a specific effort to Google this kind of footage?**

Page 31

A. Yes.
**Q. Why did you do that?**
A. Curiosity.
**Q. Why were you curious?**
A. It was getting a lot of media attention.
**Q. Let's back up.**
**So what was the media attention you are referring to that made you --**
MR. BERGSTROM: Objection. Relevance.
BY MR. ADELMAN:
**Q. He can answer.**
A. I'm referring to the Toledo shooting.
**Q. Okay. And so what about it made you want to Google police cam footage?**
A. Just --
MR. BERGSTROM: Objection.
THE WITNESS: As I stated, it was getting a lot of attention, and I wanted to see for myself what happened.
BY MR. ADELMAN:
**Q. Okay. Now, in this police cam footage you are talking about, was this footage of the Toledo shooting?**
A. Yes.

10 (Pages 28 to 31)

Royal Reporting Services, Inc.
312.361.8851

Cutberto Viramontes; et al. v. The County of Cook; et al.
Deposition of Cutberto Viramontes - Taken 2/9/2022

Page 32

**Q. Okay. Now, did you actually see a gunshot injury when you were watching?**
MR. BERGSTROM: Same objection.
BY MR. ADELMAN:
**Q. You can answer.**
A. I'm trying to remember, and I don't remember if you actually see the wound.
**Q. Okay. Well, so when I ask you if you have ever -- all right. Well, maybe I wasn't specific enough when I asked you if you saw someone in person or saw someone on some other medium with a gunshot wound.**
**Have you actually seen a gunshot wound itself, whether on TV or computer? And you said not in person.**
**But on any of those mediums have you ever seen an actual gunshot wound?**
MR. BERGSTROM: Objection. Relevance. And I'll just leave that for the whole line of questioning.
BY MR. ADELMAN:
**Q. Yeah. You can still answer.**
A. Yes, I have still seen them.
**Q. Okay. All right. Based on your testimony that rules out your video of the Toledo shooting.**

Page 33

**So what footage are you referring to when you said you have seen an actual bullet wound?**
A. I have seen sometimes videos of accidents that people have had.
**Q. And these videos show the actual wound?**
A. You see them kind of grabbing and blood, and sometimes you see pictures.
**Q. Okay. And do you remember what websites you've gone to to see these?**
A. A lot of time they just pop up randomly. Possibly I read it. I may have seen it.
**Q. How many of these videos or pictures have you seen?**
A. Not too many.
**Q. Well, can you give me an estimate, like four, five, ten, one? What would you estimate?**
A. That's about right.
**Q. Can you give me a number, four or five?**
A. Four or five.
**Q. Okay. But you said you've never seen a gunshot wound in person, correct?**
A. Not in person, correct.
**Q. Okay. So would it be fair to say you don't really have any experience with people who have**

Page 34

**gunshot wounds?**
A. Right.
**Q. All right. Do you consider yourself knowledgeable about handguns?**
A. I feel like I still have more to learn, but I think I'm adequately knowledgeable.
**Q. So how have you tried to educate yourself on handguns?**
A. Usually -- sometimes I read books, and sometimes I watch YouTube videos from other people who seem to be experts in that. And, of course, practice as well at the range.
**Q. So what are the different kinds of handguns?**
A. What do you mean? You mean like revolvers and the standard striker handguns?
**Q. Whatever you know. What types of handguns do you know of?**
A. I mean, it's pretty -- I don't know what in particular you want me to say. I know there is revolvers. There is standard handguns of various calibers. There is different manufacturers. Then I listed some of those manufacturers like Smith & Wesson --
THE REPORTER: He keeps buffering.

Page 35

THE WITNESS: -- and SIG Sauer, Glock.
I stated those specific manufacturers such as SIG Sauer, Smith & Wesson, and Glock.
BY MR. ADELMAN:
**Q. Six-Hour, you said?**
A. SIG Sauer.
**Q. And Glock?**
A. Yeah.
**Q. Do you know the difference between a centerfire pistol and a rimfire pistol?**
A. Yes.
**Q. What is the difference?**
A. I believe it refers to where the pin strikes the bullet, whether it's right in the center or as opposed to more towards the edge.
**Q. What are the advantages of having a centerfire pistol over a rimfire pistol?**
MR. BERGSTROM: Objection. Form. You can answer.
MR. ADELMAN: Well, let me rephrase it.
BY MR. ADELMAN:
**Q. Do you know what the advantages of having a centerfire pistol are?**
A. Specifically, typically --
THE REPORTER: Counsel, I didn't get that answer.

11 (Pages 32 to 35)

Royal Reporting Services, Inc.
312.361.8851

Cutberto Viramontes; et al. v. The County of Cook; et al.
Deposition of Cutberto Viramontes - Taken 2/9/2022

Page 36

THE WITNESS: No.
BY MR. ADELMAN:
**Q. Okay. When I asked you --**
A. No. I said no.
**Q. Okay. Do you know the disadvantages of having a centerfire pistol?**
A. I am not aware of disadvantages.
**Q. Okay. Now, about the rimfire pistol, do you know any advantages of having a rimfire pistol?**
MR. BERGSTROM: Objection. Relevance.
BY MR. ADELMAN:
**Q. You can answer.**
A. No.
**Q. And do you know any disadvantages of having a rimfire pistol?**
MR. BERGSTROM: Same objection.
BY MR. ADELMAN:
**Q. You can answer.**
A. No.
**Q. In terms of firearms, round capacity, is it fair to say that means how many bullets any particular firearm can accommodate at one time?**
A. Yes.
**Q. Is there a difference in round capacity**

Page 37

**between a centerfire pistol and a rimfire pistol?**
MR. BERGSTROM: Objection. Relevance.
BY MR. ADELMAN:
**Q. If you know.**
MR. BERGSTROM: When I object, Cutberto, you can just answer afterwards.
THE WITNESS: I am not aware of a difference in terms of those two firearms.
BY MR. ADELMAN:
**Q. Okay. And do you know whether there is any difference between a centerfire pistol and a rimfire pistol?**
**Do you know if there is any difference in how many rounds per second each one fires?**
A. No.
**Q. All right. Now, earlier you had talked about how the Glock is the semiautomatic, the weapon, and you had mentioned --**
A. Right.
**Q. You had mentioned automatic weapons.**
**So you know what an automatic weapon is, correct?**
A. Yes.
**Q. How would you describe an automatic weapon?**

Page 38

A. It's a weapon in which you pull the trigger once, and it continuously fires more than one round out of it.
**Q. All right. So what are the advantages of having -- so what advantage does an automatic weapon have over a semiautomatic weapon?**
MR. BERGSTROM: Objection. Form.
THE WITNESS: Well, in terms of advantages, I guess one would see the increased firepower as a possible advantage.
BY MR. ADELMAN:
**Q. All right. And so you had mentioned that you used a Glock or that you purchased a Glock for self defense.**
**And you mentioned that an advantage of automatic weapons would be an increase of firepower.**
**So would an increase of firepower be an advantage in a self defense situation?**
A. To an extent, but not -- I would not want full auto for self defense, if that's what you mean.
**Q. Why not?**
A. I find full autos to be too unpredictable. It's more recoil, hard to control. I think semi-auto is more advantageous for self defense. You have

Page 39

better control of the weapon.
**Q. So you said semiautomatic is better to control?**
A. Yes.
**Q. And so what's the round capacity of your Glock?**
A. 15 plus 1.
**Q. What's the plus 1?**
A. The one in the chamber.
**Q. Okay. So does that mean you have one bullet in the chamber and then 15 --**
A. That would be, yes, correct.
**Q. Where does the cartridge containing the 15 rounds go?**
A. I'm sorry.
**Q. You said the cartridge with 15 rounds, where in the Glock does that fit?**
A. On the handle.
**Q. It goes inside the handle?**
A. Yes. The magazine.
**Q. Okay. So how many rounds per second does your Glock fire?**
A. Honestly, I don't shoot it that fast. So I don't know that.

12 (Pages 36 to 39)

Royal Reporting Services, Inc.
312.361.8851

Cutberto Viramontes; et al. v. The County of Cook; et al.
Deposition of Cutberto Viramontes - Taken 2/9/2022

Page 40

**Q. And how many rounds per second does an automatic weapon fire?**
A. I'm sorry.
**Q. Are you familiar with AR-15s?**
A. Yes.
**Q. And that's an automatic weapon, correct?**
A. No. It's semiautomatic.
**Q. And why do you call it semiautomatic?**
A. Because you pull the trigger once, and it fires once.
**Q. But an AR-15 is also considered an assault weapon, correct?**
A. Some people would label it as such.
**Q. And what do you label it as?**
A. I think assault is a matter of opinion, and what you use it for. It's just a riffle, just a weapon.
**Q. So do you consider a handgun a self defense weapon?**
A. Yes.
**Q. And it's easier to store in a location that's readily accessible in an emergency, correct?**
A. Yes.
**Q. Okay. And you could store it next to your**

Page 41

**bed, a handgun, correct?**
A. Yes.
**Q. All right. Now, where do you store your handgun, your Glock?**
A. If I am in the home, I keep it in a drawer.
**Q. The drawer, is it in a table, cabinet, desk?**
A. It's a cabinet.
**Q. Cabinet?**
A. Uh-huh.
**Q. In what room of your apartment is it in?**
A. My room.
**Q. In your bedroom?**
A. Yes.
**Q. Is it fair to say that one of the advantages of using a handgun as a self defense weapon is that you can use it in the house without endangering family members?**
MR. BERGSTROM: Objection. Form.
THE WITNESS: I am sorry. What was the question?
BY MR. ADELMAN:
**Q. Is it fair to say that you can use a handgun in the house without endangering family members?**
A. Yes.
**Q. Okay. And is it fair to say that it cannot**

Page 42

**easily be redirected or wrestled away by an attacker?**
A. Yeah.
MR. BERGSTROM: Objection. Form.
THE WITNESS: Yes.
BY MR. ADELMAN:
**Q. Okay. Now, do you believe that a handgun is easier to use by those without the upper body strength needed to use a long gun?**
MR. BERGSTROM: Objection. Form.
BY MR. ADELMAN:
**Q. You can answer.**
A. It might be.
**Q. Okay. Well, you know what a long gun is, right?**
A. Yes.
**Q. All right. How would you define it?**
A. Just a long -- like a rifle-like firearm. A stock, long barrel.
**Q. Okay. And does lifting a long barrel gun like that require two hands?**
A. I guess you could lift it with one hand, but it's easier with two hands.
**Q. And to use it properly do you need two hands?**
A. Yes.

Page 43

**Q. Okay. Whereas, it's possible to aim a handgun with only one hand, correct?**
A. Yes. Also correct, but it won't be as accurate.
**Q. Training recommends two hands, correct?**
A. Yes.
**Q. But it's still possible to use a handgun with one hand, correct?**
A. Yes.
**Q. So like if you are holding it in one hand, you can use the other hand to dial the police at the same time is?**
MR. BERGSTROM: Objection. Form.
BY MR. ADELMAN:
**Q. Correct?**
A. Yes, correct.
**Q. Okay. Do you know other people who have handguns?**
A. Yes.
**Q. Okay. How many other people do you know that have handguns?**
A. Four for five. About five.
**Q. Okay. Are these friends, relatives?**
A. Both.

13 (Pages 40 to 43)

Royal Reporting Services, Inc.
312.361.8851

Cutberto Viramontes; et al. v. The County of Cook; et al.
Deposition of Cutberto Viramontes - Taken 2/9/2022

Page 44

**Q. Okay. So would you say that handguns then are a popular choice for self defense?**
MR. BERGSTROM: Objection. Form.
BY MR. ADELMAN:
**Q. You can answer.**
A. I would say, yes, here they're popular.
**Q. Now, under what circumstances would a handgun be insufficient for self defense?**
MR. BERGSTROM: Objection. Form.
BY MR. ADELMAN:
**Q. You can answer.**
A. I believe it would be problematic if it was a situation in which there were multiple attackers, and perhaps they have -- they're all armed, a single person with a firearm might be at a disadvantage.
**Q. So are you afraid that there would be multiple people breaking in your house at the same time?**
A. I believe so.
MR. BERGSTROM: Objection. Form.
BY MR. ADELMAN:
**Q. Do you read any magazines dedicated to firearms?**
A. Magazines, no.

Page 45

**Q. Do you visit any websites dedicated to firearms?**
A. Occasionally, yes. I will read on blog posts and various things.
**Q. Can you repeat the name of it? I didn't catch it.**
A. No name in particular. Just various blogs. I said nothing in particular. It's just blog posts.
**Q. Oh, blog posts. Okay.**
A. Yes.
**Q. So what blogs do you visit?**
A. I said these are -- none in particular. They are various.
**Q. Can you think of one off the top of your head?**
A. The NRA has a blog. So that's one I sometimes read on.
**Q. What kinds of things do you read on the blog post from the NRA?**
MR. BERGSTROM: Objection. Relevance.
THE WITNESS: I mean, in particular, in this particular situation, I was trying to read something on how to correct an error in my shooting.

Page 46

BY MR. ADELMAN:
**Q. Can you remember any other blogs that you visited?**
A. No. I don't remember names.
**Q. Okay. Now, is it your understanding that it's common to own an assault weapon like we discussed?**
MR. BERGSTROM: Objection. Form.
THE WITNESS: Like what is labeled as an assault weapon?
BY MR. ADELMAN:
**Q. Yeah.**
A. Like an AR-15.
**Q. Let's use that as an example.**
**Yeah. Is it your understanding that it's common to own an assault weapon like an AR-15?**
A. I believe in America the AR-15 is a pretty common weapon among various people. Obviously not here because we're not allowed to.
**Q. Okay. What do you base that opinion on?**
A. Just things that I read online, and what I see in terms of people who own firearms and fire them. Them having an AR-15 is not uncommon.
**Q. And when you say things you read online, you**

Page 47

**are referring to these blog posts that you were talking about?**
A. Various websites.
MR. BERGSTROM: Form.
BY MR. ADELMAN:
**Q. Do you know how many assault weapons are owned by people in the United States?**
MR. BERGSTROM: Objection. Form.
THE WITNESS: No.
BY MR. ADELMAN:
**Q. Can you make a reasonable estimate of how many are owned in the United States?**
MR. BERGSTROM: Objection. Form.
BY MR. ADELMAN:
**Q. You can answer.**
**I won't hold you to an exact number, but do you have like an estimate in mind when you consider when you make this claim that it's common to own an assault weapon?**
MR. BERGSTROM: Objection. Form.
THE WITNESS: No.
BY MR. ADELMAN:
**Q. All right. So you have no estimate?**
A. For that particular firearm, no.

14 (Pages 44 to 47)

Royal Reporting Services, Inc.
312.361.8851

Page 48

**Q. Or any -- it doesn't have to be an AR-15 in particular but any similar type of firearm?**
MR. BERGSTROM: Same objection.
THE WITNESS: No.
BY MR. ADELMAN:
**Q. Do you think maybe it's like 5 million people own firearms -- or strike that.**
**5 million people own assault weapons similar to the AR-15?**
MR. BERGSTROM: Objection. Form.
BY MR. ADELMAN:
**Q. You can answer.**
A. I don't know the specific number.
**Q. So you don't know if it's 1 million, 5 million, 10 million, any number like that, correct?**
MR. BERGSTROM: Objection. Asked and answered.
BY MR. ADELMAN:
**Q. You can answer.**
A. As I said, I don't know a specific number.
**Q. Okay. So if you don't know the number then you can't state what percentage of people in the US actually own assault weapons, correct?**
MR. BERGSTROM: Objection. Form.
BY MR. ADELMAN:

Page 49

**Q. You can answer.**
A. No, I don't know the particular percentage.
**Q. Okay. So if you don't know how many people own an assault weapon, and you don't know what percentage of the population of the United States own an assault weapon, how is it that you can say that it's common to own an assault weapon?**
MR. BERGSTROM: Objection. Form.
BY MR. ADELMAN:
**Q. You can answer.**
A. I believe it's difficult to really come up with a number when there is -- we're thinking that big in terms of entire population, in the population how many have firearms, how many have that particular weapon. I believe it's much more common to try to come up with what is considered common than uncommon.
**Q. Okay. Well, since you don't know the number, then you don't know whether it's common or not, correct?**
MR. BERGSTROM: Same objection.
THE WITNESS: Well, I mean, to me it doesn't seem unusual. So I wouldn't say it's uncommon.
I am sorry.
MR. ADELMAN: You were frozen there for a minute.

Page 50

Ms. Court Reporter, did you get that, or did you need him to repeat it?
THE REPORTER: The answer I have is:
Well, I mean, to me it doesn't seem unusual. So I wouldn't say it's uncommon.
BY MR. ADELMAN:
**Q. What do you base that comment that it's not unusual on if you don't know how many people in the US own assault weapons, and you can't say what percentage of people in the US do?**
MR. BERGSTROM: Objection. Form.
BY MR. ADELMAN:
**Q. So what do you base your comment on?**
A. To me, it seems to be -- it doesn't seem unusual for people in other states to own something like that. Perhaps in states more down south.
**Q. And what do you base that on?**
MR. BERGSTROM: Objection. Form.
BY MR. ADELMAN:
**Q. You can answer.**
A. Just other things that I read online from other shooting activities that occur in other states in other areas. When people go shooting, they do carry weapons like that.

Page 51

**Q. Okay. But you haven't participated in any studies regarding assault weapons or the commonality of assault weapons, correct?**
A. No.
**Q. And you haven't read any studies concerning assault weapons, correct?**
A. I might have read stuff before, but I honestly can't remember the specifics.
**Q. So as you sit here today, you can't say with any sort of reasonable degree of certainty as to how common or uncommon an assault weapon actually -- ownership of an assault weapon actually is?**
MR. BERGSTROM: Objection. Form.
BY MR. ADELMAN:
**Q. You just don't know, correct?**
MR. BERGSTROM: Same objection.
BY MR. ADELMAN:
**Q. You can answer.**
A. To me it seems like in other states, it is something that isn't uncommon. So I can't really -- it's difficult for me to say whether it's uncommon or common because I don't know what people have in their homes.
**Q. Okay. So you're familiar with the Cook**

Cutberto Viramontes; et al. v. The County of Cook; et al.
Deposition of Cutberto Viramontes - Taken 2/9/2022

Page 52

**County ordinance that prohibits assault weapons, correct?**
A. Well, you got cut off.
If I am familiar with the Cook County --
**Q. Ordinance that prohibits assault weapons, correct?**
A. Yes.
**Q. Okay. And is there a particular type of assault weapon that you actually want to buy?**
A. Yes.
**Q. What type is that?**
A. One particular type is I wanted to get an AR-15.
**Q. Made by who? Who is the manufacturer?**
A. Smith & Wesson M&P15. I am sorry.
**Q. No. I didn't say anything. Why is it that you want to get an AR-15?**
A. Also for self defense.
**Q. And you had said before that it would be for self defense if you were attacked by multiple people who are armed, is that the reason?**
A. Yes.
MR. BERGSTROM: Objection. Form.
BY MR. ADELMAN:

Page 53

**Q. Okay. Now, in your experience, are handguns more common than AR-15s?**
MR. BERGSTROM: Objection. Form.
BY MR. ADELMAN:
**Q. In your experience, is it more common for people to own handguns for self defense than AR-15s?**
A. In Chicago, yes.
**Q. Okay. What about nationwide?**
MR. BERGSTROM: Objection. Form.
THE WITNESS: They seem to be the most popular, and there is also restrictions.
BY MR. ADELMAN:
**Q. So if you were allowed to purchase assault weapons, how many assault weapons would you purchase?**
A. One.
**Q. Where would you store it? Where would you store the AR-15 if you were allowed to purchase it?**
A. I would purchase a long, full-sized safe to keep that.
**Q. Then would you store the weapon in there?**
A. Yes.
**Q. Okay. What room do you think you would put the full-size safe in?**
A. Also in my room, my bedroom.

Page 54

**Q. Would you store the AR-15 loaded or unloaded?**
A. Loaded.
**Q. And where would you store the ammunition?**
A. That same safe.
**Q. The ammunition that's not actually loaded in the AR-15?**
A. That same safe.
**Q. You know what, this reminds me I forgot to ask you.**
**You had said that you store your Glock in the cabinet drawer in your bedroom.**
**That's correct?**
A. When I am here. When I am here, yes.
**Q. Yeah, at home. Do you store it loaded or unloaded?**
A. Loaded.
**Q. And where do you keep the ammunition to your Glock?**
A. I keep it in my range bag.
**Q. And where is your range bag when you are at home?**
A. In my closet.
**Q. So the Glock is stored loaded in the cabinet drawer, and the ammunition is in the bag in your**

Page 55

**closet, correct?**
A. Spare ammunition, yes.
**Q. All right. So if you were able to buy an assault weapon like an AR-15, what's your intended use for it?**
A. Mainly self defense. Outside of that taking it to the range to improve my skills.
**Q. So other than for the range, that's self-explanatory.**
**But for self defense, do you mean for defense of the home?**
A. Yes.
**Q. Do you plan to open carry it outside?**
A. No.
**Q. So if there is another riot in the city, would you be taking your AR-15 out in public?**
MR. BERGSTROM: Objection. Form.
THE WITNESS: I didn't hear the question.
MR. ADELMAN: Let me rephrase it before you answer.
BY MR. ADELMAN:
**Q. If you are allowed to buy an AR-15, and there is another riot in the city, is it your intent to take the AR-15 out in public at that point?**

16 (Pages 52 to 55)

Royal Reporting Services, Inc.
312.361.8851

Cutberto Viramontes; et al. v. The County of Cook; et al.
Deposition of Cutberto Viramontes - Taken 2/9/2022

Page 56

A. No.
**Q. All right. So what do you know about the destructive potential of an AR-15?**
MR. BERGSTROM: Objection. Form.
MR. ADELMAN: All right. Let me rephrase.
BY MR. ADELMAN:
**Q. Do you know what the destructive potential of an AR-15 is?**
A. Nothing that sets if apart from -- no.
**Q. Well, you started to say, nothing that sets it apart.**
**So finish that thought.**
A. I'm sorry.
**Q. Finish the thought. You started to say something, and then you stopped and then said no.**
**So what was your thought?**
A. I was trying to differentiate it from like a normal 9-millimeter bullet, and then I said no. It's a bullet. It's a firearm. So it's gonna -- it does have destructive potential like any other firearm.
**Q. Is it your belief that an AR-15's destructive potential is the same as a 9-millimeter?**
A. No.
**Q. All right. So it's not the same.**

Page 57

**So how is it different?**
A. I would say it has a bit more destructive potential.
**Q. The AR-15?**
A. Yes.
**Q. So the AR-15 has more destructive potential?**
A. It has more stopping power.
**Q. What does that mean?**
A. It has a higher capability of taking down an attacker much quicker than the standard 9-millimeter.
**Q. And how does it do that?**
A. It is a bit more -- it has a bit more power.
**Q. So what -- specifically, what do you mean by power? What gives it that power?**
A. The bullets have more energy. The bullets are longer, and more black powder gives the bullet more energy when it leaves.
**Q. So does that mean that the bullets go faster out of an AR-15 than they do out of a 9-millimeter?**
A. My understanding is yes.
**Q. And can an AR-15 fire bullets faster -- at a faster rate than a 9-millimeter handgun?**
MR. BERGSTROM: Objection. Form.
BY MR. ADELMAN:

Page 58

**Q. If you know?**
A. I don't know.
**Q. So what size of magazine would you want to buy if you were allowed to buy an AR-15?**
A. Sorry.
**Q. If you are allowed to buy an AR-15, what size magazine would you want?**
MR. BERGSTROM: Objection.
THE WITNESS: For now, I would stick with a 10-round magazine.
BY MR. ADELMAN:
**Q. So why would you want a 10-round magazine?**
A. I feel like it would be adequate.
**Q. All right. You said for now.**
**So what do you mean for now a 10-round magazine?**
A. I don't recall saying for now.
MR. ADELMAN: Madam Court Reporter, can you read back his answer.
(The record was read as requested.)
BY MR. ADELMAN:
**Q. Okay. So what did you mean by for now?**
A. Well, I would say that a 10-round magazine would be adequate unless things change in the future

Page 59

that would make me change my mind.
**Q. What would make your change your mind?**
A. Something. More instability. I don't know. It could be anything.
**Q. Well, so how would you define more instability?**
A. Just more social unrest, more issues with police response being more delayed. Something like that that would cause me concern.
**Q. So how would you use the AR-15 in the event of more instability?**
A. I would just protect my home here and stay inside.
**Q. Do you believe that an AR-15 and weapons like it is deadlier than a handgun?**
MR. BERGSTROM: Objection. Form.
BY MR. ADELMAN:
**Q. You can answer.**
A. One more time.
**Q. All right. Let me rephrase that.**
**Do you believe an AR-15 is deadlier than a 9-millimeter handgun?**
A. I think it depends on circumstances.
**Q. What circumstances would it depend on?**

17 (Pages 56 to 59)

Royal Reporting Services, Inc.
312.361.8851

Cutberto Viramontes; et al. v. The County of Cook; et al.
Deposition of Cutberto Viramontes - Taken 2/9/2022

Page 60

A. It would depend on who the shooter is, whether they're accurate, what their intentions are, what they have on it. Anything.
**Q. How does that impact how deadly a weapon is?**
A. Well, somebody --
**Q. No. Go ahead.**
A. Well, somebody who is more skilled with one particular weapon could be more dangerous with that particular weapon.
**Q. You cut out there.**
**Again, like a person who is more skilled in?**
A. I would say a person who is skilled more with a particular weapon could be perceived as more deadly with that weapon.
**Q. So if someone is skilled on both -- all things being equal, someone who is skilled with the AR-15 and skilled with a 9-millimeter weapon, would the AR-15 be deadlier?**
MR. BERGSTROM: Objection. Form.
MR. ADELMAN: Well, let me rephrase that.
BY MR. ADELMAN:
**Q. If a person has the same skill level with both an AR-15 and a 9-millimeter weapon, would using the AR-15 be deadlier than using a 9-millimeter**

Page 61

**weapon?**
MR. BERGSTROM: Objection. Form.
THE WITNESS: Possibly.
BY MR. ADELMAN:
**Q. You said possibly?**
A. Yes.
**Q. Do you believe an AR-15 is more dangerous than a 9-millimeter weapon?**
MR. BERGSTROM: Objection. Form.
THE WITNESS: I believe they're both firearms. They are both equally dangerous in and of itself.
BY MR. ADELMAN:
**Q. But you said before that the bullets go faster with an AR-15, correct?**
A. Yes.
**Q. An AR-15 has more power, correct?**
A. Right.
**Q. Okay. Can you describe to me what you believe responsible ownership of an automatic weapon would be?**
A. I would say just always have it locked and out of the hands of children. If it's going to be loaded, make sure that all the adults present in the home are responsible with it, that there is no issue

Page 62

of it being misused.
**Q. Okay. And can you describe what you believe responsible ownership of an AR-15 is?**
A. Same thing. Being very careful about storage and being trained to use the firearm properly would be responsible ownership.
**Q. And what would irresponsible behavior be for an AR-15 owner?**
A. Irresponsible, you said?
**Q. Yes.**
A. Misusing it in any way. Using it for illegal means, for example. Having it out when there is children present.
**Q. And so would you say an AR-15 is dangerous if it's in the wrong hands?**
MR. BERGSTROM: Objection. Form.
BY MR. ADELMAN:
**Q. You can answer.**
A. All firearms are dangerous in the wrong hands.
**Q. Okay. What are the dangers?**
A. Misuse.
**Q. Do you hunt?**
A. No.

Page 63

**Q. Have you ever gone hunting?**
A. No.
**Q. Okay. Going back to towards the beginning of the deposition, you had mentioned that you are a member of the Firearms Policy Coalition.**
**Do you recall that?**
A. Yes.
**Q. Okay. Have you had any discussions whether by phone, virtually, or email with any members of the Firearms Policy Coalition about this lawsuit?**
A. We've discussed it, yes, as it's progressed.
**Q. Who have you discussed it with?**
A. Will, Peter.
MR. BERGSTROM: Objection.
BY MR. ADELMAN:
**Q. Yeah, yeah. Not talking about any attorneys, okay, because whatever you tell your attorney is privileged. So I'm not asking about that.**
**But any other members of the Firearms Policy Coalition, have you had any discussions about this lawsuit?**
A. One more, yes.
**Q. Who?**
A. Mike. I don't remember the last name.

18 (Pages 60 to 63)

Royal Reporting Services, Inc.
312.361.8851

Cutberto Viramontes; et al. v. The County of Cook; et al.
Deposition of Cutberto Viramontes - Taken 2/9/2022

Page 64

**Q. Does he hold a leadership position with the coalition?**
A. I believe so.
**Q. Do you know what his position is?**
A. I said I believe so.
**Q. Yeah. And what is his position?**
A. He is involved in the -- I know it's the legal department. I don't know what his exact title is.
**Q. Is he a lawyer or not?**
A. I believe so.
**Q. Okay. Then --**
MR. BERGSTROM: Objection to the extent it's privileged.
MR. ADELMAN: Yeah. Then I am not going to ask anything further on him.
BY MR. ADELMAN:
**Q. Have you had any conversations with Brandon Combs?**
A. Brendan. One more time, what was the name?
**Q. Brandon Combs. C-O-M-B-S.**
A. That name does not sound familiar.
MR. ADELMAN: Can we take a 5-minute break?
MR. BERGSTROM: Sure.

Page 65

(A break was taken.)
MR. ADELMAN: All right. Back on the record.
BY MR. ADELMAN:
**Q. All right. Mr. Viramontes, you had said before that you never actually shot a firearm in self defense, correct?**
A. Correct.
**Q. Have you ever pulled or brandished a firearm in self defense?**
A. No.
**Q. Were you ever present in a situation where someone else did that?**
A. No.
**Q. Okay. All right. Let's take a look at the complaint, Exhibit No. 1.**
**Do you have that before you?**
A. Give me --
MR. ADELMAN: Ms. Court Reporter, can you bring it so it shows paragraph No. 3.
Actually, you know, I am changing my mind. You can take that down.
BY MR. ADELMAN:
**Q. Now, have you ever heard of an AR-15 type of weapon ever being misused?**

Page 66

A. Yes.
**Q. And when?**
A. I have heard of situations with mass shootings.
**Q. And so what mass shootings are you referring to?**
A. Specifically Columbine is one.
**Q. And, actually, let's back up a little bit.**
**How would you define a mass shooting?**
MR. BERGSTROM: Objection. Relevance.
MR. ADELMAN: Well, he just said mass shootings are a way that -- a type of misuse that he has heard of.
BY MR. ADELMAN:
**Q. So how does he define a mass shooting?**
**You can answer.**
A. I would go with what I believe to be the FBI's definition which is when there is one shooter and at least four more people are shot.
**Q. Okay. And then in these mass shootings, what are the common weapons that are used in the mass shootings you have heard about?**
A. I have heard of various. Sometimes they use pistols.

Page 67

**Q. Okay. Let's go to Columbine since you mentioned that.**
**What kind of weapon did the shooter at the Columbine shooting use?**
MR. BERGSTROM: Objection. Form.
THE WITNESS: That I am aware of, I believe he had --
BY MR. ADELMAN:
**Q. I am sorry. Can you repeat that?**
A. I believe they had a various assortment of weapons and firearms.
**Q. So would that include AR-15s?**
MR. BERGSTROM: Objection. Form.
THE WITNESS: I do not recall what specific type of rifles they had.
BY MR. ADELMAN:
**Q. Do you think an AR-15 was included among the types of weapons that he had?**
MR. BERGSTROM: Objection. Form.
THE WITNESS: I'm sorry.
BY MR. ADELMAN:
**Q. Do you think an AR-15 is among the various assortment of rifles you said that he had?**
A. I'm not sure.

19 (Pages 64 to 67)

Royal Reporting Services, Inc.
312.361.8851

Cutberto Viramontes; et al. v. The County of Cook; et al.
Deposition of Cutberto Viramontes - Taken 2/9/2022

Page 68

**Q. What other mass shootings are you aware of?**
MR. BERGSTROM: Objection. Relevance.
BY MR. ADELMAN:
**Q. Let's back up a little bit.**
**Columbine, where was that located, that mass shooting?**
A. Pardon.
**Q. The Columbine shooting, what state was that in?**
A. Colorado.
**Q. All right. And you said that you've, you know, in terms of a weapon -- a weapon being misused were mass shootings.**
**So what other mass shootings besides Columbine are you referring to?**
A. There was another one where a student had two handguns and shot various people. I do not remember the name of that school in particular.
**Q. Can you think of anything else?**
A. There was that one incident at the concert, I believe.
**Q. Are you talking about the one in Las Vegas?**
A. I believe it was Las Vegas, actually. I'm not sure.

Page 69

**Q. Are you familiar -- let's see. Well, do you recall that there was a mass shooting at a country music concert in Las Vegas within the last few years?**
MR. BERGSTROM: Objection. Relevance, form.
THE WITNESS: It sounds familiar.
BY MR. ADELMAN:
**Q. Well, do you recall hearing about it?**
A. If it's what I think it is, I do remember something like that.
**Q. All right. Well, what do you think it is?**
MR. BERGSTROM: Same objection.
THE WITNESS: I do remember an incident where somebody fired from a hotel, I believe.
BY MR. ADELMAN:
**Q. Okay. What kinds of weapons do you recall that the person used?**
MR. BERGSTROM: Objection. Form.
THE WITNESS: I do not know what particular model weapons he had.
BY MR. ADELMAN:
**Q. Well, the category? What kind of category? It wasn't a handgun, correct?**
MR. BERGSTROM: Same objection.
BY MR. ADELMAN:

Page 70

**Q. You can answer.**
A. I know it wasn't a handgun, but I am not for sure what gun in particular he had. Some sort of long rifle.
**Q. Okay. Isn't it true that it was an AR-15?**
MR. BERGSTROM: Objection. Form.
MR. ADELMAN: Sorry. I took a breath. I wasn't done.
MR. BERGSTROM: Sorry.
BY MR. ADELMAN:
**Q. Isn't it true that the shooter used an AR-15-type rifle with a bumper side modification?**
MR. BERGSTROM: Objection. Form.
THE WITNESS: I do not recall if he had a bumper stock on there.
BY MR. ADELMAN:
**Q. Okay. But it was an AR-15 type of rifle?**
MR. BERGSTROM: Objection. Form.
BY MR. ADELMAN:
**Q. Correct?**
A. I'm not sure.
**Q. Okay. But either way it certainly was not a handgun, correct?**
MR. BERGSTROM: Objection. Form.

Page 71

THE WITNESS: Correct.
BY MR. ADELMAN:
**Q. That was correct?**
A. Yes.
**Q. Okay. Do you have any knowledge generally about the fatality rate of shooting when an AR-15 is used as opposed to a non -- as opposed to handgun?**
MR. BERGSTROM: Objection. Relevance, form.
THE WITNESS: No. I don't know specific numbers.
BY MR. ADELMAN:
**Q. What about generally?**
MR. BERGSTROM: Same objection.
THE WITNESS: I can't say generally.
BY MR. ADELMAN:
**Q. What is your understanding of how shootings differ when an automatic -- when an assault weapon -- sorry. Let me start over.**
**What is your understanding of how shootings differ when an assault weapon is used versus a non-assault weapon?**
MR. BERGSTROM: Same objection.
THE WITNESS: I believe it's still a shooting.
BY MR. ADELMAN:
**Q. And how do those shootings differ based on**

20 (Pages 68 to 71)

Royal Reporting Services, Inc.
312.361.8851

Page 72

**your understanding?**
MR. BERGSTROM: Same objection.
THE WITNESS: I didn't hear.
BY MR. ADELMAN:
**Q. What is your understanding of how those different types of shootings differ -- how a shooting differs when an assault weapon is used versus a non-assault weapon?**
MR. BERGSTROM: Same objection.
THE WITNESS: I can't say how in particular they differ.
BY MR. ADELMAN:
**Q. Do you think increased firepower of an assault weapon, isn't it true that there would be more casualties in a shooting that is done by an assault weapon as opposed to a non-assault weapon?**
MR. BERGSTROM: Objection. Form. Relevance.
BY MR. ADELMAN:
**Q. You can answer.**
A. I think it depends.
**Q. And depends on what?**
MR. BERGSTROM: Objection. Form.
THE WITNESS: It depends on the assault weapon or what is labeled as an assault weapon.

Page 73

BY MR. ADELMAN:
**Q. Well, we have been talking about AR-15s and similar models.**
**So using that as a definition, wouldn't that be correct?**
A. Well, it depends because AR-15s have various calibers as well.
**Q. Okay. Well, explain that to me.**
A. I mean, it could be a 2-2-3. It could be a 5-5-6. It could even be -- there are some AR-15s that are like a long rifle.
A lot of people would say that is an inferior round than like the standard 9-millimeter.
**Q. Now, assault weapons like the AR-15 are not allowed in Illinois, correct?**
A. One more time.
**Q. Assault weapons like the AR-15 are not allowed in Illinois, correct?**
A. In Cook County.
**Q. All right. They are not allowed in Cook County, correct?**
A. Yes.
**Q. But they are allowed in other states, correct?**

Page 74

A. Yes.
**Q. They're allowed in Colorado where the Columbine shooting happened, correct?**
A. I don't know how it is there now.
**Q. Well, back when the Columbine shooting happened, do you know whether or not assault weapons like the AR-15 were allowed in Colorado?**
A. No, I do not know if they owned those legally or not.
**Q. Well, that's not my question as to whether they owned it legally because it is possible to not own something legally even though the category is allowed.**
A. Yes.
**Q. So I am asking about whether the State of Colorado at the time of the Columbine shooting to your knowledge allowed AR-15s and similar assault weapons?**
A. I am unsure of their legal status at that time.
**Q. Okay. So have you been personally impacted by a mass shooting?**
A. No.
**Q. Have you been impacted from watching a mass shooting on TV?**

Page 75

A. I mean, I feel terrible for the event that occurs. Sympathy.
**Q. So do you have any other emotional reaction to hearing about mass shooting events on television or on the internet?**
A. Mostly just sympathy for those affected.
**Q. Do you have any concern that a mass shooting may occur at a public event you are attending?**
A. Like in general?
**Q. Yeah.**
A. It's always possible.
**Q. Do you have any actual concern that it may happen?**
A. Yes.
**Q. Do you feel relatively safe?**
A. I always have some concern.
**Q. But not an overwhelming concern?**
A. Not overwhelming, correct.
**Q. Okay. And the same for when you are in a public place?**
A. Uh-huh.
**Q. Even if it's not a public event, it's the same for being out in public. You don't have any overwhelming concern about a mass shooting here in**

Page 76

**Cook County, correct?**
MR. BERGSTROM: Objection. Form.
THE WITNESS: I feel it's still possible here in Cook County.
BY MR. ADELMAN:
**Q. But it's not an overwhelming concern, correct?**
A. It's not an overwhelming concern.
**Q. Do you have any kids?**
A. No.
**Q. Do you have any relatives who are in school at the moment?**
A. No.
MR. ADELMAN: All right. I may be done. Just give me a couple minutes to review off the record.
(A break was taken.)
MR. ADELMAN: Back on the record.
BY MR. ADELMAN:
**Q. Okay. Mr. Viramontes, you had said that you had been a realtor for a little while --**
A. Yes.
**Q. -- correct?**
A. Yes.
**Q. Okay. Do you currently have an active**

Page 77

**realtor license?**
A. Yes. For two more months.
**Q. And when does it expire?**
A. It ends in April.
**Q. Did you plan on renewing it?**
A. No.
**Q. So you are just sticking with the job at Onward Technologies then, correct?**
A. Correct.
MR. ADELMAN: All right. At this point I have nothing further subject to redirect.
So, Counsel, if you want to cross him.
MR. BERGSTROM: No questions for me.
MR. ADELMAN: Okay. Are you reserving signature?
MR. BERGSTROM: Yeah. We'll read and review.
MR. ADELMAN: Okay. All right. That's all. Thank you very much, Mr. Viramontes.
THE WITNESS: Thank you.
MR. ADELMAN: And, Sally, off the record now. We'll order.
THE REPORTER: What format do you prefer?
MR. ADELMAN: PDF.
THE REPORTER: Counsel, do you want a copy?
MR. BERGSTROM: Yes, please.

Page 78

THE REPORTER: Format?
MR. BERGSTROM: PDF.

****

Cutberto Viramontes; et al. v. The County of Cook; et al.
Deposition of Cutberto Viramontes - Taken 2/9/2022

Page 79

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

VIRAMONTES vs. COUNTY OF COOK
1:21-CV-04595

I hereby certify that I have read the foregoing transcript of my deposition given on Wednesday, February 9, 2022, consisting of pages 1 through 80 inclusive, and I do again subscribe and make oath that the same is a true, correct, and complete transcript of my deposition so given as aforesaid as it now appears.

Please check one:

________ I have no corrections.

________ Number of errata sheets enclosed.

__________________________________
CUTBERTO VIRAMONTES

SUBSCRIBED AND SWORN TO
before me this__________
day of______________20__.

______________________
Notary Public

Royal Reporting Services, Inc.
312.361.8851

Cutberto Viramontes; et al. v. The County of Cook; et al.
Deposition of Cutberto Viramontes - Taken 2/9/2022

Page 80

STATE OF ILLINOIS )
) SS.
COUNTY OF COOK )

I, Sally A. Durkin, Illinois CSR, and Notary Public, do hereby certify that on Wednesday, February 9, 2022, at the hour of 9:30 o'clock a.m. appeared before me via Zoom videoconference from Chicago, Illinois, CUTBERTO VIRAMONTES, in a certain cause now pending and undetermined in the Circuit Court of Cook County, County Department, Law Division.

I further certify that the said witness was first duly sworn to testify to the truth, the whole truth, and nothing but the truth in the cause aforesaid; that the testimony then given by said witness was reported stenographically by me in the presence of the said witness, and afterwards was transcribed via computer-aided transcription, and the foregoing is a true and correct transcript of the testimony so given by said witness.

I further certify that I am not counsel for nor in any way related to any of the parties to this suit nor am I in any way interested in the outcome thereof.

IN TESTIMONY WHEREOF, I have hereunto set my hand and affixed my notarial seal on February 25, 2022.

NDTCA · Signed Electronic Transcript

Sally A. Durkin, CSR
State of Illinois
CSR License No. 003144
161 North Clark Street
Suite 3050
Chicago, Illinois 60601
(312) 361-8851

Royal Reporting Services, Inc.
312.361.8851

**A**

**a.m** 1:18 80:5
**able** 8:18 21:17 55:3
**accessible** 40:22
**accidents** 33:3
**accommodate** 36:22
**accuracy** 24:15 24:15,18
**accurate** 11:19 43:4 60:2
**accurately** 8:18
**acronym** 21:18
**Act** 4:4
**active** 14:5 76:24
**activities** 13:14 50:22
**actual** 24:12 32:17 33:2,5 75:12
**address** 6:20 8:5 19:11,18
**Adelman** 2:10 3:6 4:9,9,14,18 4:21 5:4,16,21 6:1,12 10:16 10:23 11:7,9 11:22 12:1 15:4,11,19,23 16:2,6 31:10 31:20 32:4,20 35:4,19,20 36:2,11,17 37:3,9 38:11 41:20 42:5,10 43:14 44:4,10 44:21 46:1,11 47:5,10,14,22 48:5,11,17,24 49:9,24 50:6 50:12,19 51:14 51:17 52:24 53:4,12 55:19 55:21 56:5,6 57:24 58:11,18 58:21 59:17 60:20,21 61:4 61:12 62:17 63:15 64:15,17 64:23 65:2,3 65:18,22 66:11 66:14 67:8,16 67:21 68:3 69:6,14,20,24 70:7,10,16,19 71:2,10,14,23 72:4,12,18 73:1 76:5,14 76:17,18 77:10 77:14,16,19,22
**adequate** 58:13 58:24
**adequately** 34:6
**administering** 4:5
**administrative** 18:23
**adults** 61:23
**advantage** 38:5 38:10,15,18
**advantageous** 38:24
**advantages** 35:16,21 36:9 38:4,8 41:14
**advice** 27:11
**affixed** 80:14
**aforesaid** 79:13 80:9
**afraid** 44:16
**agency** 20:24
**ago** 10:4 17:18 18:17 23:7 28:3
**agree** 4:2,10,12
**agreement** 4:7
**ahead** 6:5 60:6
**aim** 43:1
**al** 1:4,7 4:23,23
**Alfredo** 7:14
**allowed** 26:19 46:19 53:13,17 55:22 58:4,6 73:15,18,20,23 74:2,7,13,17
**allowing** 14:12
**alternative** 14:16
**amendment** 12:24 13:12 14:3,7,17 15:2
**America** 46:17
**ammo** 29:12
**ammunition** 54:3,5,17,24 55:2
**answer** 5:7,12 5:17,17,22 15:12 31:11 32:5,21 35:18 35:24 36:12,18 37:6 42:11 44:5,11 47:15 48:12,18 49:1 49:10 50:3,20 51:18 55:20 58:19 59:18 62:18 66:16 70:1 72:19
**answered** 48:16
**answering** 6:4
**apart** 56:9,11
**apartment** 6:23 6:24 8:8,10 41:10
**apartments** 8:11
**APPEARAN...** 2:1
**appeared** 80:5
**appears** 79:13
**appropriate** 30:22
**April** 77:4
**AR-15** 40:11 46:13,16,17,23 48:1,9 52:13 52:17 53:17 54:1,6 55:4,16 55:22,24 56:3 56:8 57:4,6,19 57:21 58:4,6 59:10,14,21 60:17,18,23,24 61:7,14,16 62:3,8,14 65:23 67:17,22 70:5,17 71:6 73:14,17 74:7
**AR-15's** 56:21
**AR-15-type** 70:12
**AR-15s** 40:4 53:2,6 67:12 73:2,6,10 74:17
**areas** 50:23
**armed** 44:14 52:21
**arrested** 21:7
**Arroyo** 7:14
**articulate** 5:22
**asked** 13:10 32:10 36:3 48:16
**asking** 5:6 9:6 25:16 63:18 74:15
**assault** 40:11,15 46:6,9,16 47:6 47:19 48:8,22 49:4,6,7 50:9 51:2,3,6,11,12 52:1,5,9 53:13 53:14 55:4 71:16,19 72:7 72:14,15,23,24 73:14,17 74:6 74:17
**assistant** 18:23
**Association** 16:10
**assortment** 67:10,23
**assume** 5:12
**attacked** 52:20
**attacker** 42:1 57:10
**attackers** 44:13
**attend** 17:17
**attending** 75:8
**attention** 31:5,7 31:18
**attorney** 9:10,18 63:17
**ATTORNEY'S** 2:9
**attorneys** 9:5 11:5 63:16
**auto** 38:20
**automatic** 29:5 37:20,21,24 38:5,16 40:2,6 61:19 71:16
**autos** 29:3 38:22
**available** 29:12
**Avenue** 2:4 6:21 8:6
**aware** 24:1 36:7 37:7 67:6 68:1

**B**

**B-E-R-T** 7:6
**back** 11:23 16:2 19:6 20:6 31:6 58:19 63:3 65:2 66:8 68:4 74:5 76:17
**background** 17:7
**bag** 54:19,20,24
**barrel** 42:18,19
**base** 16:22 46:20

50:7,13,17
**based** 32:23 71:24
**basic** 26:24
**basically** 27:14
**bed** 41:1
**bedroom** 41:12 53:24 54:11
**beginning** 63:3
**behalf** 2:7,14 4:9,11
**behavior** 62:7
**belief** 56:21
**believe** 8:6 23:18 35:13 42:6 44:12,19 46:17 49:11,15 59:14,21 61:7 61:10,19 62:2 64:3,5,11 66:17 67:6,10 68:21,23 69:13 71:22
**Bergstrom** 2:3 4:11,11 15:3 15:10 31:9,16 32:3,18 35:18 36:10,16 37:2 37:5 38:7 41:18 42:3,9 43:13 44:3,9 44:20 45:20 46:8 47:4,8,13 47:20 48:3,10 48:16,23 49:8 49:20 50:11,18 51:13,16 52:23 53:3,9 55:17 56:4 57:23 58:8 59:16 60:19 61:2,9 62:16 63:14 64:13,24 66:10 67:5,13,19 68:2 69:4,11 69:17,23 70:6 70:9,13,18,24 71:8,12,21 72:2,9,17,22 76:2 77:13,15 77:24 78:2
**Bert** 7:3
**best** 15:5
**better** 39:1,2
**big** 14:8,12 29:14 49:12
**binding** 4:5
**biology** 17:22
**birth** 6:18
**bit** 11:24 16:15 17:8 18:7 57:2 57:12,12 66:8 68:4
**black** 57:16
**blog** 45:3,8,9,16 45:18 47:1
**blogs** 45:7,11 46:2
**blood** 33:6
**body** 42:7
**books** 34:9
**bottom** 8:12
**brandished** 65:8
**Brandon** 64:18 64:21
**break** 6:1,5 64:23 65:1 76:16
**breaking** 44:17
**breath** 70:7
**Brendan** 64:20
**bring** 26:17,21 27:20,21 65:18
**bringing** 27:18
**brother** 7:12
**brother's** 7:13
**buffering** 15:18 15:22 34:24
**building** 8:9,11 19:21,22
**bullet** 29:4 33:2 35:14 39:10 56:18,19 57:16
**bullets** 36:21 57:15,15,18,21 61:13
**bumper** 70:12 70:14
**business** 24:24
**buy** 27:24 28:10 29:7 52:9 55:3 55:22 58:4,4,6

**C**

**C-A-C-I-A-T-...** 19:24
**C-O-M-B-S** 64:21
**cabinet** 41:6,7,8 54:11,23
**Cacciatore** 19:20
**caliber** 29:9
**calibers** 34:21 73:7
**call** 40:8
**called** 18:14 19:2
**cam** 30:12,13 31:14,21
**capability** 57:9
**capacity** 36:20 36:24 39:5
**card** 21:13,16 21:20,22 22:3 22:5,10,13,17 22:18,20,23 23:2,2,4,13,15 23:20,24 24:3 25:21 28:2
**careful** 62:4
**carry** 22:23 23:1 23:4,13,15,19 23:21,24 24:3 25:20 29:16
50:24 55:13
**cartridge** 39:13 39:16
**case** 14:12
**casualties** 72:15
**catch** 45:6
**category** 69:21 69:21 74:12
**cause** 59:9 80:6 80:8
**cell** 27:1
**center** 2:11 35:14
**centerfire** 35:10 35:17,22 36:6 37:1,11
**certain** 80:6
**certainly** 70:22
**certainty** 51:10
**certificate** 25:6
**certification** 18:5
**Certified** 1:14
**certify** 79:7 80:4 80:7,12
**chamber** 39:9 39:11
**change** 58:24 59:1,2
**changing** 65:20
**cheaper** 29:12
**check** 79:15
**Chicago** 1:16 2:12 6:22 14:5 14:13 19:13 22:22 23:17 53:7 80:5,20
**Chief** 5:2
**children** 61:22 62:13
**choice** 44:2
**Christopher** 12:16,19,20
**Circuit** 80:6
**circumstances**
44:7 59:23,24
**city** 19:7 55:15 55:23
**Civil** 1:13
**claim** 47:18
**Clark** 80:19
**class** 24:22
**classes** 24:7,8,10 24:23 25:20 26:1
**classified** 28:15
**closet** 54:22 55:1
**co-plaintiff** 12:17
**co-plaintiffs** 12:3
**coalition** 13:19 14:3 15:9,14 15:15 63:5,10 63:20 64:2
**college** 17:10,15
**Colorado** 68:10 74:2,7,16
**Columbine** 66:7 67:1,4 68:5,8 68:15 74:3,5 74:16
**Combs** 64:19,21
**come** 17:23 49:11,16
**comes** 30:17,18
**comfortable** 18:2
**comment** 50:7 50:13
**common** 46:6,16 46:18 47:18 49:7,15,16,18 51:11,22 53:2 53:5 66:21
**commonality** 51:2
**commonly** 26:8
**complaint** 10:3 10:12 11:1,3,4

11:12,16 65:15
**complete** 24:8 79:12
**COMPLEX** 2:10
**computer** 30:8 32:14
**computer-aided** 80:10
**conceal** 22:23 23:13
**concealed** 23:1,4 23:15,19,24 24:3 25:20 29:15
**concern** 59:9 75:7,12,16,17 75:24 76:6,8
**concerning** 51:5
**concert** 68:20 69:3
**conditions** 8:15 8:24
**consider** 34:3 40:18 47:17
**considered** 28:21,24 40:11 49:16
**consist** 24:10
**consisting** 79:9
**consists** 24:6
**containing** 39:13
**continuously** 38:2
**control** 38:23 39:1,3
**conversations** 64:18
**convicted** 21:5
**Cook** 1:7,15 2:9 4:23 25:13,15 51:24 52:4 73:19,20 76:1 76:4 79:5 80:2
80:6
**COOPER** 2:3
**copy** 11:15 77:23
**correct** 8:9 11:10 12:15 19:24 21:18 22:23 23:2,3 26:1 27:15,16 28:13,14 33:21 33:22 37:22 39:12 40:6,12 40:22 41:1 43:2,3,5,8,15 43:16 45:23 48:15,22 49:19 51:3,6,15 52:2 52:6 54:12 55:1 61:14,16 65:6,7 69:22 70:20,23 71:1 71:3 73:5,15 73:18,21,24 74:3 75:18 76:1,7,22 77:8 77:9 79:11 80:11
**corrections** 79:16
**correspondence** 9:15
**cost** 28:5
**counsel** 4:1 35:24 77:12,23 80:12
**country** 69:2
**County** 1:7,15 2:9 4:23 25:14 25:15 52:1,4 73:19,21 76:1 76:4 79:5 80:2 80:7,7
**couple** 15:21 76:15
**course** 34:11
**court** 1:1 5:1,2 5:18 10:16 11:8,22 15:20 50:1 58:18 65:18 79:1 80:6
**Courts** 1:13
**crime** 21:5,7
**cross** 77:12
**CSR** 80:4,18,19
**Curiosity** 31:3
**curious** 31:4
**current** 4:2
**currently** 17:15 18:10 76:24
**cut** 13:9 14:6 19:8 52:3 60:10
**Cutberto** 1:4,11 3:5 4:22 6:8,15 7:4,9 37:5 79:19 80:6

**D**

**D** 3:1
**D.C** 2:5
**Daley** 2:11
**dangerous** 60:8 61:7,11 62:14 62:19
**dangers** 62:21
**date** 6:18
**David** 2:10 4:9 5:4
**david.adelma...** 2:13
**day** 79:22
**deadlier** 59:15 59:21 60:18,24
**deadly** 60:4,13
**debt** 18:3
**decide** 29:7
**decided** 14:13
**dedicated** 44:22 45:1
**defendants** 1:8 2:14 4:10 5:5
**defense** 23:22 29:19,21 38:14 38:18,20,24 40:18 41:15 44:2,8 52:18 52:20 53:6 55:6,10,10 65:6,9
**define** 42:16 59:5 66:9,15
**definition** 66:18 73:4
**degree** 51:10
**delayed** 59:8
**department** 20:2,11,24 64:8 80:7
**depend** 59:24 60:1
**depends** 59:23 72:20,21,23 73:6
**deposition** 1:11 4:4,21 9:4,17 10:2,6,7,9 63:4 79:8,12
**describe** 21:15 26:14 37:24 61:18 62:2
**describing** 25:20
**desk** 41:6
**desktop** 10:14
**destructive** 56:3 56:7,20,21 57:2,6
**dial** 43:11
**differ** 71:16,19 71:24 72:6,11
**difference** 35:9 35:12 36:24 37:7,11,13
**different** 16:21
16:23 34:13,21 57:1 72:6
**differentiate** 56:17
**differs** 72:7
**difficult** 49:11 51:21
**direction** 18:1
**disadvantage** 44:15
**disadvantages** 36:5,7,14
**discussed** 46:7 63:11,12
**discussions** 63:8 63:20
**District** 1:1,1,13 4:24 5:1,2 79:1 79:1
**Division** 1:2 79:2 80:7
**document** 10:3 10:24 11:10
**documents** 9:22 10:1
**double** 27:1
**drawer** 41:5,6 54:11,24
**dues** 13:11
**duly** 6:9 80:8
**Durkin** 1:14 80:4,18

**E**

**E** 3:1
**earlier** 37:16
**easier** 40:21 42:7,22
**easily** 42:1
**east** 8:2
**EASTERN** 1:2 79:2
**easy** 16:16
**edge** 35:15
**educate** 34:7

**education** 17:9
**effective** 16:12 29:11
**effort** 30:23
**either** 30:8 70:22
**email** 9:16 63:9
**emergency** 4:3 40:22
**emotional** 75:3
**employed** 18:10 20:20
**employer** 19:1
**employment** 18:9
**enclosed** 79:17
**endangering** 41:16,22
**ends** 77:4
**energy** 57:15,17
**enforcement** 20:18,21,24
**engine** 30:22
**enrolled** 17:15
**entail** 13:7,10
**entire** 49:13
**equal** 60:16
**equally** 61:11
**errata** 79:17
**error** 45:23
**estimate** 33:15 33:16 47:11,17 47:23
**et** 1:4,7 4:23,23
**event** 59:10 75:1 75:8,22
**events** 75:4
**exact** 47:16 64:8
**Examination** 3:6 6:11
**examined** 6:10
**example** 46:14 62:12
**Exhibit** 3:12 10:20,21 65:15
**EXHIBITS** 3:8 3:10
**expensive** 18:2
**experience** 33:24 53:1,5
**experts** 34:11
**expire** 77:3
**explain** 73:8
**extent** 38:19 64:13

**F**

**F-O-I-D** 21:13
**Face-to-face** 9:19
**fair** 5:14 33:23 36:21 41:14,21 41:24
**familiar** 40:4 51:24 52:4 64:22 69:1,5
**family** 41:16,22
**fan** 14:8
**far** 26:2
**fast** 39:23
**faster** 57:18,21 57:22 61:14
**fatality** 71:6
**FBI's** 66:18
**February** 1:17 79:9 80:4,14
**Federal** 1:12
**feel** 34:5 58:13 75:1,15 76:3
**feeling** 8:13,14
**female** 12:6
**fight** 13:12
**figuring** 27:14
**file** 14:21
**filed** 11:13,17,20
**filing** 15:1,8
**find** 14:15 38:22
**finish** 6:4 56:12 56:14
**fire** 39:22 40:2 46:22 57:21
**firearm** 21:17 21:19,20 22:6 23:21 24:12 25:21 36:22 42:17 44:15 47:24 48:2 56:19,20 62:5 65:5,8
**firearms** 13:18 14:3 15:9,13 15:15 22:15 27:17,22 36:20 37:8 44:23 45:2 46:22 48:7 49:14 61:10 62:19 63:5,10,19 67:11
**firearms-relat...** 22:19
**fired** 29:4 69:13
**firepower** 38:9 38:16,17 72:13
**fires** 28:22 37:14 38:2 40:10
**firing** 29:6
**first** 6:4,9 20:15 20:17 80:8
**first-aid** 21:9
**fit** 39:17
**five** 8:4 20:5,10 33:16,18,19 43:22,22
**floor** 6:21 8:12
**FOID** 21:12,18 21:22 22:3,5 22:10,13,17,18 22:20 23:2 28:2
**follows** 6:10
**footage** 30:12,14 30:24 31:14,21 31:22 33:1
**foregoing** 79:8
80:11
**forgot** 54:8
**form** 15:3,10 35:18 38:7 41:18 42:3,9 43:13 44:3,9 44:20 46:8 47:4,8,13,20 48:10,23 49:8 50:11,18 51:13 52:23 53:3,9 55:17 56:4 57:23 59:16 60:19 61:2,9 62:16 67:5,13 67:19 69:4,17 70:6,13,18,24 71:8 72:17,22 76:2
**format** 77:21 78:1
**Fortunately** 29:22
**found** 25:1
**foundation** 13:1 13:14 14:3 15:2
**four** 18:17 33:15 33:18,19 43:22 66:19
**friends** 12:14 43:23
**froze** 12:8
**frozen** 4:18 49:24
**full** 29:3,5 38:20 38:22
**full-size** 53:23
**full-sized** 53:18
**functions** 24:12
**fundamentals** 24:11
**funds** 16:17,24 17:5
**further** 8:1 64:16 77:11 80:7,12
**future** 58:24

**G**

**general** 17:22 75:9
**generally** 71:5 71:11,13
**getting** 22:20 31:5,17
**give** 5:12 16:15 33:15,18 65:17 76:15
**given** 79:8,12 80:9,11
**gives** 57:14,16
**Glock** 27:21 28:7,12,20,24 29:8,17,21 35:1,3,7 37:17 38:13,13 39:6 39:17,22 41:4 54:10,18,23
**go** 6:5 11:7 22:12,15 26:8 26:9 30:20 39:14 50:23 57:18 60:6 61:13 66:17 67:1
**goes** 39:19
**going** 9:7 10:10 15:19 17:23 18:4 19:6 20:6 24:11 26:5 61:22 63:3 64:15
**gonna** 56:19
**good** 4:14,17 8:14
**Google** 30:21,24 31:14
**Googling** 30:18
**grabbing** 33:6

**graduate** 17:13
**groups** 14:4
**guess** 14:23 18:24 38:9 42:21
**guessing** 22:1
**guidance** 27:11
**gun** 26:16 27:12 42:8,13,19 70:3
**Guns** 26:9 27:20 28:11
**gunshot** 30:3,5,7 30:11 32:1,11 32:13,17 33:21 34:1

**H**

**Hampshire** 2:4
**hand** 42:21 43:2 43:8,10,11 80:14
**handgun** 28:12 40:18 41:1,4 41:15,21 42:6 43:2,7 44:7 57:22 59:15,22 69:22 70:2,23 71:7
**handguns** 34:4,8 34:13,15,16,20 43:18,21 44:1 53:1,6 68:17
**handle** 14:9 39:18,19
**hands** 42:20,22 42:23 43:5 61:22 62:15,20
**happen** 75:13
**happened** 31:19 74:3,6
**happens** 30:21
**happy** 5:10
**hard** 7:10 38:23
**head** 5:19 45:15
**Health** 4:3
**hear** 5:17 55:18 72:3
**heard** 65:23 66:3,12,22,23
**hearing** 69:7 75:4
**HELLIN** 2:11
**hellin.jang@c...** 2:13
**hereunto** 80:14
**higher** 57:9
**highest** 17:9
**hold** 47:16 64:1
**holding** 43:10
**Hollywood** 30:10
**home** 41:5 54:14 54:21 55:11 59:12 61:24
**homes** 51:23
**honestly** 39:23 51:8
**hotel** 69:13
**hour** 1:17 80:5
**hours** 24:7
**house** 6:23 41:16,22 44:17
**household** 22:9 23:23
**hunt** 62:23
**hunting** 63:1

**I**

**idea** 14:21 15:2 15:8
**ideal** 29:15
**Identification** 21:20
**identified** 10:22
**illegal** 16:24 62:11
**Illinois** 1:1,16 1:17 2:12 5:1 6:22 26:12 73:15,18 79:1 80:1,4,6,18,20
**impact** 60:4
**impacted** 74:20 74:23
**impair** 8:15
**improve** 55:7
**incident** 68:20 69:12
**include** 67:12
**included** 67:17
**inclusive** 79:10
**increase** 38:16 38:17
**increased** 38:9 72:13
**individual** 15:17
**individuals** 12:5
**inferior** 73:12
**injury** 32:2
**inside** 39:19 59:13
**instability** 59:3 59:6,11
**instruction** 26:22 27:11
**instructor's** 24:24
**insufficient** 44:8
**intended** 55:4
**intent** 55:23
**intentions** 60:2
**interacted** 12:11
**interested** 80:13
**interfere** 8:22 9:1
**internet** 30:15 75:5
**involved** 12:5 13:17 64:7
**involvement** 13:13
**irresponsible** 62:7,9
**issue** 17:5 61:24
**issued** 23:16
**issues** 16:17 21:16 59:7

**J**

**J** 2:11
**J-O-Y-A-L** 12:3
**JANG** 2:11
**January** 6:19
**job** 20:17 77:7
**join** 14:2,4,14
**joined** 13:24 16:7
**Joyal** 12:2,6
**Judge** 5:2,2

**K**

**K-H-A-Y-A** 12:17
**keep** 41:5 53:19 54:17,19
**keeps** 15:18,22 29:5 34:24
**Khaya** 12:16
**kids** 76:9
**kind** 12:8 27:6 29:14 30:24 33:6 67:3 69:21
**kinds** 34:13 45:18 69:15
**KIRK** 2:3
**know** 5:10,10 6:2 12:2,10,10 12:24 13:18 15:6,6 19:11 19:18,22 21:4 21:12 22:11,22 23:10,12 25:16 25:18 34:16,17 34:18,19 35:9 35:21 36:5,9 36:14 37:4,10 37:13,21 39:24 42:13 43:17,20 47:6 48:13,14 48:19,20 49:2 49:3,4,17,18 50:8 51:15,22 54:8 56:2,7 58:1,2 59:3 64:4,7,8 65:20 68:12 69:18 70:2 71:9 74:4 74:6,8
**knowledge** 15:1 15:5,13 71:5 74:17
**knowledgeable** 34:4,6
**known** 7:1
**knows** 10:10

**L**

**label** 40:13,14
**labeled** 46:9 72:24
**large** 25:15
**Las** 68:22,23 69:3
**law** 20:18,20,23 80:7
**lawsuit** 12:5 13:16 14:21 15:1,8 63:10 63:21
**lawyer** 64:10
**leadership** 64:1
**learn** 34:5
**learning** 26:6
**leave** 20:4 32:19
**leaves** 57:17
**legal** 64:8 74:18
**legally** 74:8,11 74:12
**legislation** 16:18
**let's** 7:19 17:7 18:9 31:6 46:14 65:14 66:8 67:1 68:4

69:1
**level** 17:9 24:15 60:22
**license** 77:1 80:19
**lift** 42:21
**lifting** 42:19
**liked** 29:9
**line** 3:3,10 32:19
**listed** 34:22
**LITIGATION** 2:10
**little** 4:18 11:24 16:15 17:8 18:7 66:8 68:4 76:20
**live** 7:11,24 8:3
**lived** 7:19 8:1
**living** 8:8
**loaded** 54:1,2,5 54:14,16,23 61:23
**loading** 24:12
**located** 19:7,9 19:16 25:5 26:10 68:5
**location** 40:21
**locked** 61:21
**long** 7:10,19 8:3 13:5,23 21:24 42:8,13,17,18 42:19 53:18 70:3 73:11
**longer** 57:16
**look** 65:14
**looking** 14:16
**loop** 19:10,17
**lot** 16:17,20 31:5 31:17 33:10 73:12
**Lyons** 26:11,12

**M**

**M&P15** 52:15
**Madam** 58:18
**magazine** 39:20 58:3,7,10,12 58:16,23
**magazines** 44:22,24
**major** 17:21
**male** 12:6
**manager** 18:24
**manufacturer** 52:14
**manufacturers** 34:21,22 35:2
**Maria** 7:18
**marked** 10:19
**mass** 66:3,5,9,11 66:15,20,21 68:1,5,13,14 69:2 74:21,23 75:4,7,24
**matter** 40:15
**McDonald** 14:12
**McKinley** 8:2
**mean** 13:16 20:7 25:6,15 26:3,5 26:24 27:5 30:11 34:14,14 34:18 38:20 39:10 45:21 49:21 50:4 55:10 57:8,13 57:18 58:15,22 73:9 75:1
**means** 36:21 62:12
**media** 31:5,7
**medical** 8:24 21:9
**medication** 8:21
**medium** 32:11
**mediums** 32:16
**meet** 9:9
**meeting** 9:23
**member** 13:3,5 13:21,23 63:5
**members** 41:17 41:22 63:9,19
**membership** 13:7,10
**memory** 8:16,22 9:1
**mentioned** 16:7 37:18,20 38:12 38:15 63:4 67:2
**met** 9:14,18 12:4 12:9
**Michigan** 19:10 19:12
**middle** 6:16 29:15
**Midwest** 26:9 27:20 28:11
**Mike** 63:24
**miles** 25:8,13
**military** 21:2
**millimeter** 29:10
**million** 48:6,8 48:14,15,15
**mind** 30:17 47:17 59:1,2 65:21
**minimum** 24:15
**minute** 4:19 18:8 49:24
**minutes** 8:2 10:4 76:15
**misuse** 16:17 17:5 62:22 66:12
**misused** 62:1 65:24 68:12
**Misusing** 62:11
**model** 69:18
**models** 73:3
**modification** 70:12
**moment** 11:11 76:12
**monitor** 10:14
**month** 23:10,12 23:14
**months** 77:2
**morning** 4:14,17
**mother** 7:12 10:10
**mother's** 7:15 7:17
**moved** 7:21
**multiple** 44:13 44:17 52:20
**music** 69:3

**N**

**N** 3:1
**N.W** 2:4
**name** 5:4 6:13 6:16 7:2,9,13 7:15,17 25:3,4 45:5,7 63:24 64:20,22 68:18
**names** 46:4
**national** 4:2 16:9
**nationwide** 53:8
**need** 6:1 11:23 42:23 50:2
**needed** 42:8
**never** 12:9,11 29:22 33:20 65:5
**New** 2:4
**news** 16:20
**nickname** 7:3,7
**non** 71:7
**non-assault** 71:20 72:8,16
**normal** 56:18
**North** 19:12 80:19
**Northern** 1:1 5:1 79:1
**notarial** 80:14
**Notary** 1:15
79:24 80:4
**notice** 1:12
**NRA** 14:8,18 17:2 45:16,19
**number** 5:7 33:18 47:16 48:13,15,19,20 49:12,17 79:17
**numbers** 71:9

**O**

**o'clock** 1:18 80:5
**oath** 4:5 5:8 79:11
**object** 37:5
**objection** 4:4 15:3,10 31:9 31:16 32:3,18 35:18 36:10,16 37:2 38:7 41:18 42:3,9 43:13 44:3,9 44:20 45:20 46:8 47:8,13 47:20 48:3,10 48:16,23 49:8 49:20 50:11,18 51:13,16 52:23 53:3,9 55:17 56:4 57:23 58:8 59:16 60:19 61:2,9 62:16 63:14 64:13 66:10 67:5,13,19 68:2 69:4,11 69:17,23 70:6 70:13,18,24 71:8,12,21 72:2,9,17,22 76:2
**obtain** 24:3
**obtained** 23:12 23:16

**Obviously** 46:18
**Occasionally** 45:3
**occur** 50:22 75:8
**occurs** 75:2
**office** 2:9 9:20 18:23
**officer** 4:5 27:6
**Oh** 12:9 22:6 45:9
**okay** 4:21 5:16 5:20,23,24 6:13,16,18 7:7 7:21,24 8:7,13 8:18,21 9:3,6 9:17,20 10:8,8 10:16 11:4,7 11:12,16,19 12:2,6,13,19 13:7,13 14:2 14:23 15:8 16:4,7,14 17:11,23 18:16 18:22 19:15 20:10,13,16 21:4,12,18,21 23:4,15,19 24:10 25:19 27:17 28:5,10 30:10,13 31:13 31:21 32:1,8 32:23 33:8,20 33:23 36:3,5,8 37:10 39:10,21 40:24 41:24 42:6,13,19 43:1,17,20,23 44:1 45:9 46:5 46:20 48:20 49:3,17 51:1 51:24 52:8 53:1,8,22 58:22 61:18 62:2,21 63:3,8 63:17 64:12 65:14 66:20 67:1 69:15 70:5,17,22 71:5 73:8 74:20 75:19 76:19,24 77:14 77:16
**once** 9:11,18 28:22,22 29:5 38:2 40:9,10
**online** 17:1 25:1 46:21,24 50:21
**onward** 18:13 18:15 19:6,7,9 20:6,9 77:8
**open** 55:13
**opinion** 40:15 46:20
**opposed** 29:4,8 35:15 71:7,7 72:16
**order** 22:13,16 24:2,15 77:20
**ordinance** 52:1 52:5
**organization** 14:17 16:23
**organizations** 14:11 16:8
**outcome** 80:13
**outside** 13:15 55:6,13
**overwhelming** 75:17,18,24 76:6,8
**owned** 47:7,12 74:8,11
**owner** 62:8
**Owner's** 21:20
**ownership** 51:12 61:19 62:3,6

**P**

**page** 3:3,10 11:8
**pages** 79:9
**Pallmeyer** 5:3
**paperwork** 12:11
**paragraph** 65:19
**Pardon** 68:7
**Park** 8:2
**participated** 51:1
**particular** 15:7 15:17 16:5 17:4 30:17 34:19 36:21 45:7,8,12,21 45:22 47:24 48:2 49:2,14 52:8,12 60:8,9 60:13 68:18 69:18 70:3 72:10
**parties** 80:12
**pass** 24:16
**PATTERSON** 2:4
**pay** 13:11 28:7
**payroll** 20:2,11
**PDF** 77:22 78:2
**pending** 4:24 6:3 80:6
**people** 12:10 33:4,24 34:10 40:13 43:17,20 44:17 46:18,22 47:7 48:6,8,21 49:3 50:8,10 50:15,23 51:22 52:20 53:6 66:19 68:17 73:12
**perceived** 60:13
**percentage** 48:21 49:2,5 50:9
**person** 12:9,12 30:3,4,6 32:10 32:15 33:21,22 44:15 60:11,12 60:22 69:16
**personal** 12:18 16:19
**personally** 12:4 74:20
**PETE** 2:4
**Peter** 63:13
**phone** 63:9
**phones** 27:2
**pictures** 33:7,12
**pin** 35:13
**pistol** 35:10,10 35:17,17,22 36:6,8,9,15 37:1,1,11,12
**pistols** 14:13 66:24
**place** 8:7 20:15 25:1,3,4 26:15 28:11 75:20
**plaintiffs** 1:5 2:7 4:12,22
**plan** 55:13 77:5
**played** 14:12
**Plaza** 19:10
**please** 4:7 5:10 5:17 77:24 79:15
**PLLC** 2:3
**plus** 39:7,8
**point** 55:24 77:10
**police** 30:12,13 31:14,21 43:11 59:8
**policies** 16:9 17:4
**policy** 13:18 14:3 15:9,13 15:15 17:2 63:5,10,19
**pop** 33:10
**popular** 44:2,6 53:10
**population** 49:5 49:13,13
**position** 18:22 64:1,4,6
**possible** 38:10 43:1,7 74:11 75:11 76:3
**possibly** 33:11 61:3,5
**post** 45:19
**posts** 45:3,8,9 47:1
**potential** 56:3,7 56:20,22 57:3 57:6
**powder** 57:16
**power** 57:7,12 57:14,14 61:16
**ppatterson@c...** 2:6
**practice** 34:11
**prefer** 77:21
**preference** 29:9
**prepare** 9:3 10:1
**prepared** 11:4,5
**presence** 80:10
**present** 61:23 62:13 65:11
**pretty** 28:1 34:18 46:17
**previous** 19:1
**privileged** 9:7 63:18 64:14
**problem** 6:2
**problematic** 44:12
**procedure** 1:13
**proceed** 4:1
**produced** 29:11 30:11
**professional** 26:2,3
**progressed**

63:11
**prohibits** 52:1,5
**pronounce** 7:10
**properly** 42:23 62:5
**protect** 59:12
**public** 1:15 4:3 23:22 55:16,24 75:8,20,22,23 79:24 80:4
**pull** 28:22 29:4 29:5 38:1 40:9
**pulled** 10:3 65:8
**purchase** 53:13 53:14,17,18
**purchased** 38:13
**purpose** 29:17
**pursuant** 1:12 4:3
**put** 53:22

**Q**

**question** 6:3,4 14:20,23 16:1 41:19 55:18 74:10
**questioning** 32:19
**questions** 5:7,9 77:13
**quicker** 57:10
**quite** 25:7

**R**

**R-U-B-I** 12:3
**randomly** 33:10
**range** 24:13 26:6,8,14,16 27:6,12 34:12 54:19,20 55:7 55:8
**rate** 57:22 71:6
**reaction** 75:3
**read** 11:16 12:4 16:2,3 17:1 33:11 34:9 44:22 45:3,17 45:18,22 46:21 46:24 50:21 51:5,7 58:18 58:20 77:15 79:7
**readily** 40:22
**real** 30:11
**really** 18:1 33:24 49:11 51:20
**realtor** 18:7 76:20 77:1
**reason** 52:21
**reasonable** 47:11 51:10
**reasons** 16:8,20
**Rebecca** 5:2
**recall** 16:11 58:17 63:6 67:14 69:2,7 69:15 70:14
**receive** 27:11
**recognize** 10:24
**recoil** 38:23
**recommends** 43:5
**record** 4:2,8 6:14 16:3 58:20 65:2 76:15,17 77:19
**redirect** 77:11
**redirected** 42:1
**referring** 15:16 31:8,12 33:1 47:1 66:5 68:15
**refers** 35:13
**regarding** 51:2
**related** 80:12
**relationship** 12:14,18
**relatively** 75:15
**relatives** 43:23 76:11
**Relevance** 31:9 32:18 36:10 37:2 45:20 66:10 68:2 69:4 71:8 72:17
**remember** 8:5 19:20 21:23 23:14 24:6,19 24:20,21,24 25:1,2,2,4,7,9 25:10,12 28:8 32:6,6 33:8 46:2,4 51:8 63:24 68:17 69:8,12
**reminds** 54:8
**remotely** 4:6 9:21
**renewing** 77:5
**rent** 26:18
**repeat** 15:24 45:5 50:2 67:9
**rephrase** 5:11 35:19 55:19 56:5 59:20 60:20
**reported** 1:14 80:9
**reporter** 1:14 4:1 5:18 10:16 11:8,22 15:18 15:20,21 34:24 35:24 50:1,3 58:18 65:18 77:21,23 78:1
**representing** 5:5
**requested** 16:3 58:20
**require** 42:20
**required** 24:2
**requirement** 24:18
**researched** 14:18
**reserving** 77:14
**response** 59:8
**responsible** 61:19,24 62:3 62:6
**restrictions** 53:11
**review** 9:22 10:1 10:5 76:15 77:15
**revolvers** 28:23 34:14,20
**Richard** 2:11
**riffle** 16:9 40:16
**rifle** 70:4,12,17 73:11
**rifle-like** 42:17
**rifles** 27:1 67:15 67:23
**right** 4:14 6:13 7:1,23 10:12 10:13 11:22 17:7 18:8,21 21:13 22:22 23:6 25:5,24 27:9,17 28:1 28:12 29:20 32:9,23 33:17 34:2,3 35:14 37:16,19 38:4 38:12 41:3 42:14,16 47:23 55:3 56:2,5,24 58:14 59:20 61:17 65:2,4 65:14 68:11 69:10 73:20 76:14 77:10,16
**rights** 13:12 14:7 16:16
**rimfire** 35:10,17 36:8,9,15 37:1 37:11
**riot** 55:15,23
**role** 14:12
**room** 10:11 41:10,11 53:22 53:24
**Rosa** 7:18
**round** 36:20,24 38:2 39:5 73:13
**rounds** 37:14 39:14,16,21 40:1
**Rubi** 12:2,6,9,14 12:22
**rules** 1:12 27:7 27:10 32:24
**run** 14:9 16:13

**S**

**Sacramento** 6:21 8:8
**safe** 53:18,23 54:4,7 75:15
**safety** 26:24
**Sally** 1:14 77:19 80:4,18
**Sauer** 35:1,3,6
**saw** 32:10,11
**saying** 16:11 58:17
**says** 21:16
**school** 17:24 68:18 76:11
**score** 24:20
**screen** 10:18
**seal** 80:14
**search** 30:22
**second** 12:24 13:12 14:2,7 14:17 15:2 37:14 39:21 40:1
**Section** 2:10 4:3
**Security** 19:2,15
**see** 7:11,19 29:7

30:13,20 31:18 32:1,7 33:6,7,9 38:9 46:22 69:1
**seen** 30:1,2,5,7 30:12 32:13,17 32:22 33:2,3 33:11,13,20
**self** 23:22 29:19 29:21 38:13,18 38:20,24 40:18 41:15 44:2,8 52:18,20 53:6 55:6,10 65:5,9
**Self-defense** 22:8
**self-explanatory** 55:9
**semi** 28:18
**semi-auto** 38:23
**semiautomatic** 28:15,21 29:1 29:3,3 37:17 38:6 39:2 40:7 40:8
**sense** 18:1
**Service** 4:4
**set** 80:14
**sets** 56:9,10
**seven** 22:2 28:3
**shake** 5:19
**share** 10:18
**sheets** 79:17
**shoot** 39:23
**shooter** 60:1 66:18 67:3 70:11
**shooting** 24:13 26:14,16 31:12 31:23 32:24 45:23 50:22,23 66:9,15 67:4 68:6,8 69:2 71:6,22 72:6 72:15 74:3,5 74:16,21,24 75:4,7,24
**shootings** 66:4,5 66:11,20,22 68:1,13,14 71:15,18,24 72:6
**short** 7:4,9
**Shorthand** 1:14
**shot** 29:23 65:5 66:19 68:17
**shoulder** 5:21
**show** 30:11 33:5
**showing** 10:19
**shows** 65:19
**shrug** 5:21
**sibling** 7:12
**side** 70:12
**SIG** 35:1,3,6
**sign** 11:10,12,14 27:4,5
**signature** 77:14
**signed** 11:15
**similar** 48:2,8 73:3 74:17
**single** 44:14
**sit** 27:9 51:9
**site** 30:22
**sits** 27:6
**situation** 12:18 38:18 44:13 45:22 65:11
**situations** 66:3
**six** 22:2 28:3
**Six-Hour** 35:5
**size** 29:13 58:3,6
**skill** 60:22
**skilled** 60:7,11 60:12,15,16,17
**skills** 55:7
**small** 29:14
**Smith** 34:22 35:3 52:15
**social** 59:7
**somebody** 60:5 60:7 69:13
**Soon** 28:2
**sorry** 4:20 7:16 9:24 11:11 13:9 14:6 16:1 19:8 22:14,24 23:11 28:6 39:15 40:3 41:19 49:23 52:15 56:13 58:5 67:9,20 70:7,9 71:17
**sort** 12:13 22:16 22:19 24:14 26:22 27:11 51:10 70:3
**sound** 64:22
**sounds** 7:23 18:21 69:5
**south** 6:21 8:6,8 19:17 25:8,8 25:13 50:16
**Spare** 55:2
**speak** 10:8
**special** 23:1
**specific** 30:23 32:9 35:2 48:13,19 67:14 71:9
**specifically** 35:23 57:13 66:7
**specifics** 51:8
**spell** 7:5 19:3,22 19:23
**spoke** 9:5
**spoken** 12:19,20 12:22
**SS** 80:1
**St** 17:12,17
**standard** 34:15 34:20 57:10 73:13
**start** 18:16 20:3 71:17
**started** 56:10,14
**starting** 20:6
**state** 1:16 4:7 6:13 21:16 23:16,18 48:21 68:8 74:15 80:1,18
**STATE'S** 2:9
**stated** 31:17 35:2
**states** 1:1,13 4:24 47:7,12 49:5 50:15,16 50:22 51:19 73:23 79:1
**status** 74:18
**stay** 59:12
**stenographica...** 80:9
**stick** 58:9
**sticking** 77:7
**stock** 42:18 70:15
**stopped** 17:23 56:15
**stopping** 57:7
**storage** 62:4
**store** 26:16 40:21,24 41:3 53:16,17,20 54:1,3,10,14
**stored** 54:23
**Street** 80:19
**strength** 42:7
**strike** 48:7
**striker** 34:15
**strikes** 35:13
**student** 68:16
**studies** 51:2,5
**stuff** 51:7
**subject** 77:11
**subscribe** 79:10
**SUBSCRIBED** 79:21
**sued** 5:5
**suffer** 30:3
**suit** 80:13
**Suite** 80:20
**supporting** 14:17
**sure** 11:19 18:3 19:23,24 25:17 27:7,10 61:23 64:24 67:24 68:24 70:3,21
**switched** 20:9
**sworn** 4:13 6:9 79:21 80:8
**sympathy** 75:2,6

**T**

**table** 41:6
**take** 5:18 11:23 24:22,23 30:22 55:23 64:23 65:14,21
**taken** 1:12 65:1 76:16
**talk** 17:7 18:9
**talked** 9:6 27:18 37:16
**talking** 9:24 30:1,10 31:22 47:2 63:16 68:22 73:2
**tapping** 27:1
**Technologies** 18:13,15 77:8
**television** 75:4
**tell** 63:17
**telling** 27:3
**ten** 17:18 33:16
**terms** 16:16 26:3 36:20 37:8 38:8 46:22 49:13 68:12
**terrible** 75:1
**test** 24:13
**testified** 6:10

Cutberto Viramontes; et al. v. The County of Cook; et al.
Deposition of Cutberto Viramontes - Taken 2/9/2022

Page 90

**testify** 8:18 80:8
**testimony** 32:23 80:9,11,14
**Thank** 77:17,18
**thereof** 80:13
**thing** 62:4
**things** 14:10 16:24 26:6 45:4,18 46:21 46:24 50:21 58:24 60:16
**think** 11:14 16:12 18:19 21:20 28:19 29:15 34:6 38:23 40:15 45:14 48:6 53:22 59:23 67:17,22 68:19 69:8,10 72:13 72:20
**thinking** 49:12
**thought** 56:12 56:14,16
**three** 7:20 17:10
**time** 6:2 13:24 19:2,8 28:2,6 33:10 36:22 43:12 44:18 59:19 64:20 73:16 74:16,19
**times** 9:9,14 15:21
**tips** 26:24
**title** 64:8
**today** 8:13,19 51:9
**token** 5:11
**Toledo** 31:12,22 32:24
**top** 8:12 45:14
**total** 24:7
**town** 25:10,12
**trained** 62:5
**training** 18:5 20:18 21:10 22:12,16,16,20 24:2,5 25:22 25:24 26:2,4 43:5
**transcribed** 80:10
**transcript** 79:8 79:12 80:11
**transcription** 80:10
**tried** 34:7
**trigger** 28:22 38:1 40:9
**true** 70:5,11 72:14 79:11 80:11
**truth** 80:8,8,8
**truthfully** 5:8
**try** 19:23 49:15
**trying** 32:6 45:22 56:17
**TV** 30:2,8,11 32:14 74:24
**two** 8:12 13:6 14:1,11,19 23:7 24:6,8,23 25:19 26:1 37:8 42:20,22 42:23 43:5 68:16 77:2
**type** 25:21 27:17 29:8 48:2 52:8 52:11,12 65:23 66:12 67:14 70:17
**types** 34:16 67:18 72:6
**typically** 35:23

**U**

**Uh-huh** 9:13 14:24 41:9 75:21
**uncommon** 46:23 49:16,22 50:5 51:11,20 51:21
**understand** 5:9 5:15 6:6 29:10
**understanding** 29:2 46:5,15 57:20 71:15,18 72:1,5
**understood** 5:12
**undetermined** 80:6
**United** 1:1,13 4:24 47:7,12 49:5 79:1
**University** 17:12
**unloaded** 54:1 54:15
**unloading** 24:11
**unpredictable** 38:22
**unrest** 59:7
**unsure** 74:18
**unusual** 49:22 50:4,8,15
**upper** 42:7
**use** 16:18,19,23 27:15 29:20,22 40:16 41:16,21 42:7,8,23 43:7 43:11 46:14 55:4 59:10 62:5 66:23 67:4
**usually** 26:19,21 34:9

**V**

**V** 2:3
**various** 34:20 45:4,7,13 46:18 47:3 66:23 67:10,22 68:17 73:6
**Vegas** 68:22,23 69:3
**versus** 4:23 71:19 72:7
**video** 32:24
**videoconference** 1:16 2:1 80:5
**videos** 33:3,5,12 34:10
**violated** 27:8,10
**Viramontes** 1:4 1:11 3:5 4:15 4:22,23 5:6 6:8 6:15 7:18 15:24 65:4 76:19 77:17 79:5,19 80:6
**virtually** 63:9
**visit** 45:1,11
**visited** 46:3
**volunteered** 20:23
**vs** 79:5
**vs-** 1:6

**W**

**wall** 27:4,5
**want** 30:19 31:13 34:19 38:19 52:9,17 58:3,7,12 77:12,23
**wanted** 14:4 16:21 22:6 23:21 31:18 52:12
**Washington** 2:5
**wasn't** 18:2,3 32:9 69:22 70:2,7
**watch** 30:19 34:10
**watching** 27:7 32:2 74:23
**way** 14:9 62:11 66:12 70:22 80:12,13
**wbergstrom@...** 2:6
**We'll** 11:23 18:8 77:15,20
**we're** 9:24 46:19 49:12
**We've** 63:11
**weapon** 26:17 27:15,19,20 29:13 37:17,21 37:24 38:1,5,6 39:1 40:2,6,12 40:17,19 41:15 46:6,10,16,18 47:19 49:4,6,7 49:15 51:11,12 52:9 53:20 55:4 60:4,8,9 60:13,14,17,23 61:1,8,19 65:24 67:3 68:12,12 71:16 71:19,20 72:7 72:8,14,16,16 72:23,24
**weapons** 26:18 37:20 38:16 47:6 48:8,22 50:9,24 51:2,3 51:6 52:1,5 53:14,14 59:14 66:21 67:11,18 69:15,19 73:14 73:17 74:6,17
**website** 30:16,17
**websites** 33:8 45:1 47:3
**Wednesday** 1:17 79:9 80:4
**Wells** 19:17
**Wesson** 34:23 35:3 52:15
**Western** 8:6

Royal Reporting Services, Inc.
312.361.8851

**WHEREOF** 80:14
**Wi-Fi** 4:20
**widely** 29:11
**WILLIAM** 2:3
**witness** 3:3 4:5 4:13,17,20 5:15,20,24 6:7 15:18 16:4 31:17 35:1 36:1 37:7 38:8 41:19 42:4 45:21 46:9 47:9,21 48:4 49:21 53:10 55:18 58:9 61:3,10 67:6 67:14,20 69:5 69:12,18 70:14 71:1,9,13,22 72:3,10,23 76:3 77:18 80:7,9,10,11
**work** 7:3,8 14:14 18:12 20:13
**worked** 20:2
**wouldn't** 49:22 50:5 73:4
**wound** 30:3,6,8 30:11 32:7,12 32:13,17 33:2 33:5,21
**wounds** 34:1
**wrestled** 42:1
**wrong** 62:15,19

**X**

**X** 3:1
**Xavier** 17:12,17

**Y**

**yeah** 4:20 15:19 24:22 32:21 35:8 42:2 46:12,15 54:14 63:16,16 64:6 64:15 75:10 77:15
**year** 18:18 23:8
**years** 7:20 8:4 13:6 14:1 17:10,18 18:17 20:5,10 22:1,2 23:7 28:3 69:3
**yes-or-no** 14:20 14:23
**YouTube** 34:10

**Z**

**Z-U-G-R-E-S-S** 19:4
**Zoom** 9:20,21 80:5
**Zugress** 19:2,15 19:19 20:1,3 20:14

**0**

**003144** 80:19

**1**

**1** 3:12 10:20,21 39:7,8 48:14 65:15 79:9
**1:21-CV-04595** 1:6 79:5
**10** 3:12 8:2 48:15
**10-round** 58:10 58:12,15,23
**12** 3:6 20:7
**15** 39:7,11,13,16
**1523** 2:4
**16** 24:7
**161** 80:19
**17** 18:19
**19** 27:21 28:7,12 28:20 29:8,18 29:21
**1990** 6:19

**2**

**2** 6:21
**2-2-3** 73:9
**20** 25:8,13 79:22
**2002** 20:7
**20036** 2:5
**2011-12** 17:20
**2012** 20:8
**2017** 18:20 20:6 20:8
**2019** 7:21
**202** 2:5
**2020** 23:9,12
**2022** 1:17 79:9 80:5,15
**21** 3:12
**21-cv-04595** 4:24
**220-9600** 2:5
**2302** 8:8
**233** 19:12
**25** 6:19 80:14

**3**

**3** 65:19
**3050** 80:20
**312** 2:12 80:21
**319** 4:3
**3335** 8:6
**361-8851** 80:21

**4**

**4302** 6:21 8:10
**45** 29:11

**5**

**5** 48:6,8,15
**5-** 28:8
**5-5-6** 73:10
**5-minute** 64:23
**500** 2:11

**6**

**6** 3:6
**600** 28:9
**603-5440** 2:12
**60601** 80:20
**60602** 2:12
**60632** 6:22

**7**

**8**

**8-hour** 24:7,8,23 25:19 26:1
**80** 79:10

**9**

**9** 1:17 29:10 79:9 80:5
**9-millimeter** 56:18,22 57:10 57:19,22 59:22 60:17,23,24 61:8 73:13
**9:30** 1:18 80:5

Cutberto Viramontes; et al. v. The County of Cook; et al.
Deposition of Cutberto Viramontes - Taken 2/9/2022

Page 79

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

VIRAMONTES vs. COUNTY OF COOK
1:21-CV-04595

I hereby certify that I have read the foregoing transcript of my deposition given on Wednesday, February 9, 2022, consisting of pages 1 through 80 inclusive, and I do again subscribe and make oath that the same is a true, correct, and complete transcript of my deposition so given as aforesaid as it now appears.

Please check one:

________ I have no corrections.

___1___ Number of errata sheets enclosed.

[signature]
CUTBERTO VIRAMONTES

SUBSCRIBED AND SWORN TO
before me this 23
day of March 2022.

[signature]
Notary Public

NATARI V THOMAS
Official Seal
Notary Public - State of Illinois
My Commission Expires Aug 9, 2025

Royal Reporting Services, Inc.
312.361.8851



ROYAL REPORTING SERVICES
INCORPORATED

161 NORTH CLARK STREET SUITE 3050
CHICAGO, ILLINOIS 60601
WWW.ROYALREPORTINGSERVICES.COM

PHONE: 312.361.8851
FAX: 312.361.8861
INFO@ROYALREPORTINGSERVICES.COM

## ERRATA SHEET

I wish to make the following changes for the following reasons:

| Page: | Line: | |
|---|---|---|
| 53 | 11 | Change: where there are less restrictions |
| | | Reason: Incorrect verbiage |
| 66 | 19 | Change: and at least four or more people are shot |
| | | Reason: missing words |
| 73 | 11 | Change: are like a 22 long rifle |
| | | Reason: missing word/number |
| | | Change: |
| | | Reason: |
| | | Change: |
| | | Reason: |
| | | Change: |
| | | Reason: |
| | | Change: |
| | | Reason: |
| | | Change: |
| | | Reason: |
| | | Change: |
| | | Reason: |

Signed: [signature] Date: 3/23/22