# EXHIBIT 2



Transcript of the Deposition of
**Christopher Khaya**
**Case:** Cutberto Viramontes; et al. v. The Cook County; et al.
**Taken On:** February 14, 2022

Royal Reporting Services, Inc.
Phone:312.361.8851
Email:info@royalreportingservices.com
Website: www.royalreportingservices.com

Cutberto Viramontes; et al. v. The Cook County; et al.
Deposition of Christopher Khaya - Taken 2/14/2022

Page 1

IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

CUTBERTO VIRAMONTES, et al.,     )
                                 )
              Plaintiffs,        )
                                 )
     -vs-                        )   No. 1:21-CV-04595
                                 )
THE COUNTY OF COOK, et al.,      )
                                 )
              Defendants.        )
_____)


        The deposition of CHRISTOPHER KHAYA, called by
the Defendants for examination, pursuant to notice and
pursuant to the Federal Rules of Civil Procedure for the
United States District Courts pertaining to the taking of
depositions, taken via videoconference before Aneesha L.
Williams, Registered Professional Reporter and Notary
Public, within and for the County of Cook and State of
Illinois, commencing at the hour of 9:30 a.m., on the
14th day of February, A.D., 2022.

Cutberto Viramontes; et al. v. The Cook County; et al.
Deposition of Christopher Khaya - Taken 2/14/2022

Page 2

```
 1    APPEARANCES (via videoconference):

 2

          COOPER & KIRK, PLLC
 3        BY: MR. WILLIAM V. BERGSTROM
          1523 New Hampshire Avenue, NW
 4        Washington, DC 20036
          Phone: (202) 220-9600
 5        Email: wbergstrom@cooperkirk.com

 6             On behalf of the Plaintiffs;

 7

          COOK COUNTY STATE'S ATTORNEY'S OFFICE -
 8        COMPLEX LITIGATION SECTION
          BY: MS. HELLIN JANG
 9           MR. DAVID A. ADELMAN
          500 Richard J. Daley Center
10        Chicago, Illinois 60602
          Phone: (312) 603-5440
11        Email: hellin.jang@cookcountyil.gov
                 david.adelman@cookcountyil.gov
12
               On behalf of the Defendants.
13

14

15

16

17

18

19

20

21

22

23

24
```

Cutberto Viramontes; et al. v. The Cook County; et al.
Deposition of Christopher Khaya - Taken 2/14/2022

Page 3

1                         I N D E X

2

3    Testimony of Christopher Khaya

4    Examination By Ms. Jang ........................... 6

5

6

7

8

9                     INDEX OF EXHIBITS

10   EXHIBIT 1        Complaint 1                        13

11

12

13

14

15

16

17

18

19

20

21

22

23

24

Cutberto Viramontes; et al. v. The Cook County; et al.
Deposition of Christopher Khaya - Taken 2/14/2022

Page 4

1          (Witness sworn.)
2          COURT REPORTER: Would counsel and witness please
3    state their appearance for the record and express their
4    stipulation that this deposition may take place with
5    remote administration of the oath and remote reporting of
6    the deposition and that the oath has the same force and
7    effect as if done in person under the penalty of perjury.
8          MR. BERGSTROM: William Bergstrom for the plaintiff,
9    and we agree.
10         MS. JANG: Hellin Jang and David Adelman, and we
11   agree on behalf of the defendants.
12         Good morning, Mr. Khaya. How are you doing
13   this morning?
14         THE WITNESS: Fine.
15         MS. JANG: This is the deposition of Christopher
16   Khaya, one of the plaintiffs in the matter of Cutberto
17   Viramontes, et al., versus the County of Cook County,
18   et al., 21 CV 04595, pending in the United States
19   District Court for the Northern District of Illinois
20   before Chief Judge Rebecca Pallmeyer.
21         My name is Hellin Jang, and I'm an Assistant
22   State's Attorney --
23         (Technical interruption.)
24         MS. JANG: My name is Hellin Jang. I'm an assistant

Page 5

1    state's attorney with the Cook County State's Attorney's
2    Office, and I'm representing the defendants you have sued
3    in this lawsuit.
4          I will be asking you a number of questions,
5    which you have to answer truthfully since you are under
6    oath. If you do not understand my question, please let
7    me know, and I will rephrase it --
8          (Technical interruption.)
9          MS. JANG: I will assume you understood the
10   question. Is that fair?
11         (Reporter clarification.)
12         MS. JANG: Can we go off the record?
13         (Discussion off the record.)
14         (The record was read as requested.)
15         MS. JANG: I'll back up a little bit.
16         I will be asking you a number of questions,
17   which you have to answer truthfully since you are under
18   oath. If you do not understand my question, please let
19   me know, and I will rephrase it; but if you give an
20   answer, I will assume you understood the question. Is
21   that fair?
22         THE WITNESS: Fair.
23         MS. JANG: When you answer, please answer so we can
24   hear you. The court reporter cannot take down a shrug of

Page 6

1    the shoulder or nod of the head. Your answer has to be
2    yes or no.
3          Is that understood?
4          THE WITNESS: Yes.
5          MS. JANG: And if you need to take a break at any
6    time, just let me know; but if there is a question
7    already pending, you have to answer before taking a
8    break. Okay?
9          THE WITNESS: Okay.
10         CHRISTOPHER KHAYA,
11   was called as a witness and, having first been duly
12   sworn, testified as follows:
13         EXAMINATION
14   BY MS. JANG:
15         Q. What is your name?
16         A. Christopher Shamoon Khaya.
17         Q. And can you spell that, please?
18         A. The middle name?
19         Q. Yes.
20         A. S-H-A-M-O-O-N.
21         Q. And you said you pronounce your name Mr. Khaya?
22         A. Yes.
23         Q. Have you ever been known by any other name?
24         A. No.

Page 7

1          Q. And what is your date of birth?
2          A. September 8th, 1996.
3          COURT REPORTER: I'm sorry. Sir, did you say
4    September?
5          THE WITNESS: Yes. September 8th, 1996.
6    BY MS. JANG:
7          Q. Have you ever given testimony in a deposition
8    before?
9          A. No. This is my first time.
10         Q. And have you ever testified in court before?
11         A. No.
12         Q. Have you ever been a plaintiff or a defendant
13   in a case before, either civil or criminal?
14         A. No.
15         Q. And where do you live?
16         A. In Cook County, in Chicago.
17         Q. And what is your address?
18         A. ███████████ Chicago,
19   Illinois.
20         Q. Go ahead. Chicago. Chicago, Illinois.
21         What is your ZIP code?
22         A. █████.
23         Q. And how many floors does your apartment
24   building have?

4  (Pages 4 to 7)

Cutberto Viramontes; et al. v. The Cook County; et al.
Deposition of Christopher Khaya - Taken 2/14/2022

Page 8

1    A.  Three.
2    Q.  And how many apartment units are there?
3    A.  It's three units and a basement.
4    Q.  And you said that you're in Apartment No. ▮?
5    A.  Yes.
6    Q.  Is that on the ▮ floor?
7    A.  Yes, that's the ▮ floor.
8    Q.  And so each apartment is the entire floor; is
9    that correct?
10   A.  Yeah.
11   Q.  How long have you lived at that address?
12   A.  Since August of 2011.
13   Q.  And where did you live prior to 2011?
14   A.  Surprise, Arizona.
15   Q.  Which city in Arizona?
16   A.  Surprise.  Sun City.
17   Q.  And who else do you currently live with?
18   A.  It's me, my mom, my dad, and my sister.
19   Q.  And what are their names?
20   A.  My father's name is Ramiz Khaya; my mother's
21   name is Janet Khaya; and my sister's name is Crystal
22   Khaya.
23       (Reporter clarification.)
24   THE WITNESS:  Ramiz, R-A-M-I-Z.

Page 9

1    BY MS. JANG:
2    Q.  And how old is your sister?
3    A.  21.
4    Q.  And how are you feeling today?
5    A.  How am I feeling?  A little bit nervous.  This
6    is the first time I've ever did this, so...
7    Q.  You're fine.
8        Do you have any medical conditions that would
9    impair your memory?
10   A.  No.
11   Q.  So you're able to accurately testify today?
12   A.  Yes.
13   Q.  Are you taking any medications that would
14   interfere with your memory?
15   A.  No.
16   Q.  Do you have any medical conditions that would
17   interfere with your memory?
18   A.  No.
19   Q.  Did you prepare for this deposition?
20   A.  I guess with my attorney.
21   Q.  You said you met with your attorney?
22   A.  Yeah, met with my -- yeah, I prepared with my
23   attorney.
24   Q.  And I'm not going to ask you what you and your

Page 10

1    attorney talked about because that's privileged.
2        But you prepared with your attorney.  When was
3    this?
4    A.  Last Wednesday.
5    Q.  And was it over Zoom?
6    A.  Yes.
7    Q.  And how long did you meet with him for over
8    Zoom?
9    A.  30 minutes.
10   Q.  Did you review any documents?
11   A.  No.
12   MR. BERGSTROM:  Objection.
13   BY MS. JANG:
14   Q.  Did you speak with anyone else about your
15   deposition?
16   A.  No.
17   MS. JANG:  And Ms. Court Reporter, if you could pull
18   up the complaint, and we'll mark that as Exhibit 1.  I
19   have just a couple extra questions before we show the
20   complaint on the screen.
21       (Discussion off the record.)
22   BY MS. JANG:
23   Q.  Did you speak with your parents about this
24   deposition?

Page 11

1    A.  Yes.
2    Q.  Which of your parents did you speak with or
3    both?
4    A.  My dad -- my father.
5    Q.  And when did you speak with your father about
6    this deposition?
7    A.  This morning.
8    Q.  And what did you discuss?
9    A.  I think I just told him I'm going to be in this
10   deposition for probably an hour to a couple of hours.  I
11   don't know the time, so...
12   Q.  Did you discuss at all about your testimony?
13   A.  No.  I just told him I'm going to have a
14   deposition.
15   Q.  Okay.  Did you speak with your sister about
16   this deposition?
17   A.  No.  She's at school.
18   Q.  And did you speak with your mother about this
19   deposition?
20   A.  No.
21   Q.  Did you speak with either your parents or your
22   sister about this lawsuit that you filed?
23   A.  Just my father.
24   Q.  And what did you discuss?

5 (Pages 8 to 11)

Royal Reporting Services, Inc.
312.361.8851

Cutberto Viramontes; et al. v. The Cook County; et al.
Deposition of Christopher Khaya - Taken 2/14/2022

Page 12

1   A. I just told him this is -- I just told him the
2   Cook County -- the weapons --
3       (Reporter clarification.)
4       THE WITNESS: Oh, I told him about the background of
5   the lawsuit, and that's it. I didn't explain the point
6   of argument or anything, just a summary of -- a summary
7   of the lawsuit.
8   BY MS. JANG:
9       Q. And when did you have this conversation with
10  your father?
11      A. This morning.
12      Q. Did you speak with your father prior to this
13  morning about this lawsuit?
14      A. No.
15      Q. How long did you discuss this lawsuit with your
16  father this morning?
17      A. 10 minutes.
18      Q. And when you say "background of this lawsuit,"
19  can you explain what you told him?
20      A. Just the info of it. I just told him about the
21  Cook County weapons ban, like just -- just challenging
22  the weapons ban. That's what I was telling him. That's
23  what it basically is, just questioning it.
24      Q. Did your father say anything?

Page 13

1       A. He didn't understand what a deposition is, so I
2   had to explain it.
3       Q. And did he say anything about the lawsuit?
4       A. No.
5       MS. JANG: Okay. If you would pull up the complaint
6   on screen. This will be Exhibit No. 1.
7       (Deposition Exhibit No. 1 was
8       marked for identification.)
9   BY MS. JANG:
10      Q. Okay. Mr. Khaya, can you see the complaint on
11  the screen?
12      A. Yes, I can.
13      Q. Who prepared this complaint?
14      A. The Firearms Policy Coalition.
15      Q. And who at the Firearms Policy Coalition
16  prepared this complaint?
17      A. The Second Amendment Foundation.
18      Q. Okay. So there's two separate organizations.
19  And so do you know which of the two organizations
20  prepared the complaint, or is it your understanding that
21  both of them together prepared this complaint?
22      A. Both of them.
23      Q. You said both of them together?
24      A. Yeah, because there's an ad next to the Second

Page 14

1   Amendment and Firearms Policy Coalition.
2       Q. And who at the Firearms Policy Coalition did
3   you speak with?
4       MR. BERGSTROM: Objection; form.
5       MS. JANG: I'll withdraw.
6   BY MR. BERGSTROM:
7       Q. How do you know that the Firearms Policy
8   Coalition prepared this complaint?
9       A. Because one of the attorneys that sent me this
10  complaint --
11      MR. BERGSTROM: Let me jump in here. Christopher,
12  to the extent you're about to say something that I have
13  said to you or that you've heard from another attorney,
14  don't answer any questions. That's privileged
15  information.
16      You can answer from personal knowledge but not
17  from anything that I've told you or that you understand
18  from communication with me or Pete or any of the other
19  attorneys.
20      MS. JANG: Okay. Yeah, I'll ask another question.
21  BY MS. JANG:
22      Q. Did you speak directly with somebody from the
23  Firearms Policy Coalition?
24      A. No.

Page 15

1       Q. Did you speak directly with somebody from the
2   Second Amendment Foundation?
3       A. No.
4       Q. Did you sign this complaint before it was
5   filed?
6       A. Yes.
7       Q. You did sign this complaint?
8       A. Yes. I made a statement at this point, so I
9   signed it.
10      Q. Okay. So you did read the complaint before it
11  was filed?
12      A. Yes.
13      Q. And you reviewed the complaint to make sure
14  that it was accurate before it was filed?
15      A. Yes.
16      Q. And if we can scroll down, Mr. Khaya, you said
17  that you signed the complaint.
18      Do you see your signature on this page?
19      A. No, I don't see it on this page. No.
20      Q. But you did sign a copy of the complaint in a
21  different version?
22      A. Yes.
23      Q. When you reviewed the complaint, did you make
24  sure that it was accurate?

6  (Pages 12 to 15)

Cutberto Viramontes; et al. v. The Cook County; et al.
Deposition of Christopher Khaya - Taken 2/14/2022

Page 16

1    A.  Yes.
2    Q.  Do you know Cutberto Viramontes?
3    A.  No.
4    Q.  And so you have not spoken with Cutberto
5    Viramontes, who is another plaintiff in this case?
6    A.  No.
7    Q.  And do you know Ruby Joyal, another plaintiff
8    in this case?
9    A.  No.
10   Q.  And so you have not spoken with Ruby Joyal?
11   A.  No.
12   Q.  Are you familiar with the Second Amendment
13   Foundation?  You said you were, right?
14   A.  Yes.
15   Q.  And you said that you did not directly speak
16   with anybody from the Second Amendment Foundation?
17   A.  No.
18   Q.  Are you a member of this organization?
19   A.  Yes.
20   Q.  And when did you become a member?
21   A.  I believe it was last year of March when I
22   joined the Firearms Policy Coalition.
23   Q.  Okay.  So for the Firearms Policy Coalition,
24   you registered in March of 2021?

Page 17

1    A.  Yes.
2    Q.  And what about for the Second Amendment
3    Foundation?  When did you register for the Second
4    Amendment Foundation?
5    A.  I believe I was registered automatically.  I
6    didn't register directly to them.
7    Q.  Okay.  Are you a member of the Second Amendment
8    Foundation?
9    A.  Yes.
10   Q.  But you did not register directly with them?
11   A.  No.  I was registered automatically, assuming I
12   was a -- assumed I was a member of the Firearms Policy
13   Coalition.
14   Q.  And when you say you were "registered
15   automatically," what do you mean by that?
16   A.  Meaning, as soon as I joined the Firearms
17   Policy Coalition, I automatically -- meaning, I just
18   joined the Second Amendment Foundation through them.
19   Q.  Okay.  You did sign up for the Firearms Policy
20   Coalition, right?
21   A.  Yes.
22   Q.  And then you believe that you were
23   automatically because of your membership with the
24   Firearms Policy Coalition registered with the Second

Page 18

1    Amendment Foundation?
2    A.  Yes.
3    Q.  And why did you join the Firearms Policy
4    Coalition?
5    A.  To stand up for Second Amendment rights.
6    Q.  And how did you find the Firearms Policy
7    Coalition?
8    A.  A couple of YouTube channels.
9    Q.  Which ones?
10   A.  Let's see.  Let me see.  It's called -- one is
11   called the Gun Collectors.  It's a YouTube channel about
12   a gun reviewer, a guy who reviews guns basically.
13   Q.  Do you know the name of that gun reviewer?
14   A.  Yes.  The name of it, no, but I know his
15   YouTube channel name, just the YouTube channel of it.
16   Q.  And what is the YouTube channel name?
17   A.  It's called The Gun Collectors.
18   Q.  And how long have you been watching this
19   YouTube channel?
20   A.  About a year.
21   Q.  And that's how you found out about the Firearms
22   Policy Coalition?
23   A.  Yes.
24   Q.  Are there dues for the Firearms Policy

Page 19

1    Coalition?
2    A.  Membership?
3    Q.  Yes, membership dues.
4    A.  There's one time and then there's monthly.  I
5    did the one time.
6    Q.  And how much was that?
7    A.  $25.
8    Q.  And is that on a yearly basis, or you just pay
9    one time and you're a member for life?
10   A.  One time.
11   Q.  And what other activities, if any, do you do
12   with the Firearms Policy Coalition?
13   A.  Nothing.  I just read their news articles or
14   any news-related topics, other similar lawsuits around
15   the United States for the Firearms Policy Coalition.
16   That's it.
17   Q.  Do they send out a newsletter?  What do you
18   mean when you say you read their news?
19   A.  I read their newsletter, yes, like every week
20   or every other day.
21   Q.  Do you read this online, or do you get the
22   newsletter by e-mail?
23   A.  E-mail.
24   Q.  And how often do they come into your e-mail?

7  (Pages 16 to 19)

Cutberto Viramontes; et al. v. The Cook County; et al.
Deposition of Christopher Khaya - Taken 2/14/2022

Page 20

1    A    Once a week or sometimes every other day   It
2    depends
3        Q.   And besides reading their newsletters, are
4    there any other activities you do with the Firearms
5    Policy Coalition?
6        A    No
7        Q.   And you said that you believe that you were
8    automatically enrolled in the Second Amendment Foundation
9    due to your membership with the Firearms Policy
10   Coalition?
11       A    Yes
12       Q.   And are there any dues for the Second Amendment
13   Foundation?
14       A    No
15       Q.   And do you do any activities with the Second
16   Amendment Foundation?
17       A    No
18       Q.   And did you join either of these organizations
19   so you could be a party to this lawsuit?
20       A    Yes
21       Q.   Which organizations or is it both
22   organizations?
23       A    Both
24       Q.   And what is the driving force of you deciding

Page 21

1    to join?
2        A.   To stand up for gun rights.
3        Q.   And anything specifically?  What do you mean by
4    "standing up for gun rights"?
5        A.   Mainly challenging the ban on assault rifles.
6        Q.   And are you familiar with the NRA, the National
7    Rifle Association?
8        A.   Yes.
9        Q.   And are you a member of the NRA?
10       A.   No.
11       Q.   And why not?  Is there any reason why you're
12   not a member of the NRA?
13       A.   I'm just not interested in the NRA.  I was more
14   interested more towards the Firearms Policy Coalition.
15       Q.   And are there any other organizations regarding
16   firearms that you're involved with besides the Firearms
17   Policy Coalition and the Second Amendment Foundation?
18       A.   No.
19       Q.   Do you know Alan Gottlieb of the Second
20   Amendment Foundation?
21       A.   No.
22       Q.   And do you know Brandon Combs of the Firearms
23   Policy Coalition?
24       A.   No.

Page 22

1        Q.   What is your highest level of education?
2        A.   An associate's degree.
3        Q.   And where did you get that from?
4        A.   Harry S. Truman College.
5        Q.   And when did you receive your associate's
6    degree?
7        A.   2020, the fall.
8        Q.   And what was your degree in?
9        A.   General education.
10       Q.   Was there any major or specialty associated
11   with that?
12       A.   No.
13       Q.   And how long did you attend Truman College
14   before receiving your associate's degree?
15       A.   From 2015 to 2020; so five years.
16       Q.   Did you take any time off during that time, or
17   did you go for the entire length of time, from 2015 to
18   2020?
19       A.   I took one semester off in 2018.
20       Q.   And what was the reason for that?
21       A.   Take a break from school, just to relax.
22       Q.   Do you have any intentions of applying to
23   another educational program since you've received your
24   associate's degree or have you?

Page 23

1        A.   Yes.
2        Q.   Okay.  And what are you planning to do?
3        A.   I'm already at the University of Phoenix.  That
4    was my intention.
5        Q.   You are currently at the University of Phoenix,
6    or you intend to apply to the University of Phoenix?
7        A.   I'm currently attending.
8        Q.   And when did you start that?
9        A.   Last month, January.
10       Q.   So last month, January of 2022?
11       A.   Yes.
12       Q.   And that's an entirely online program?
13       A.   Yes, it's self-paced.
14       Q.   What are you studying there?
15       A.   Information technology.
16       Q.   And did you take any educational classes
17   between the fall of 2020 and January of 2022?
18       A.   No.
19       Q.   Do you have any other certification or
20   training?
21       A.   No.
22       Q.   Are you currently employed?
23       A.   Self-employed.
24       Q.   And what do you do?

8  (Pages 20 to 23)

Cutberto Viramontes; et al. v. The Cook County; et al.
Deposition of Christopher Khaya - Taken 2/14/2022

Page 24

1    A. I was a delivery driver called Go Puff, G-O
2  P-U-F-F.
3    Q. And how long have you been a delivery driver
4  for Go Puff?
5    A. Since September of 2020.
6    Q. Are you still a delivery driver for Go Puff
7  while you're attending the online classes at the
8  University of Phoenix?
9    A. Yes.
10   Q. So are you an independent contractor for the Go
11 Puff company?
12   A. Yes.
13   Q. Can you briefly describe what you do?
14   A. Mainly deliver groceries, snacks.
15   Q. Do you set your own hours?
16   A. Yes.
17   Q. And about how many hours do you work a week?
18   A. I work about 40 to 50 hours a week.
19   Q. And just to make sure, that is not your
20 company, right, Go Puff?
21   A. No. It's a company -- it's a company, not
22 mine.
23   Q. Did you hold any other positions during this
24 time, from September 2020 to now, driving for Go Puff?

Page 25

1  Have you held any other employment positions?
2    A. Last year of June I held one month -- one week
3  at Schneider.
4    Q. And what is Schneider?
5    A. The trucking company.
6    Q. Okay. And how do you spell Schneider?
7    A. S-C-H-I-E-N-D-E-R (sic).
8    Q. And you said this is a trucking company?
9    A. Yes.
10   Q. And you worked there for one week?
11   A. One week. I was training.
12   Q. And what did you do after the one week
13 training?
14   A. Decided I didn't like the job, so I decided to
15 go back and do delivery.
16   Q. Is there anything else that you did from
17 September 2020 until now?
18   A. No, that's it.
19   Q. And then prior to September 2020, I know you
20 said you were attending Truman College. Is there any
21 other employment position that you held?
22   A. Yeah.
23   Q. What did you do?
24   A. So I was at Schneider again, but for a

Page 26

1  different position. I did that -- I did it for one
2  month, but I didn't like that position either.
3    Q. And when was that?
4    A. That was from August 2020 to September 2020.
5    Q. Okay. Is there any other employment positions
6  you held prior to that?
7    A. I did another independent contractor job. It's
8  called Amazon Flex.
9    Q. Is that affiliated with the Amazon company?
10   A. Yes.
11   Q. What did you do for Amazon Flex?
12   A. I delivered packages, sometimes groceries.
13   Q. And how long did you do that for?
14   A. About -- so three months.
15   Q. You said three months in the year of 2020?
16   A. Yes.
17   Q. Have you held any other positions?
18   A. Worked one -- I worked one week during March of
19 2020 at one of my uncle's friend's warehouse, a printing
20 company.
21   Q. Are there any other positions that you've held?
22   A. Prior to 2020?
23   Q. Yes, prior to this printing company work that
24 you did in 2020.

Page 27

1    A. I did Roehl -- a different trucking company
2  from the end of December -- end of -- the first week of
3  January until the second week of January.
4    (Reporter clarification.)
5    THE WITNESS: The company? Roehl, R-O-E-H-L.
6  BY MS. JANG:
7    Q. And you said that was also a trucking company?
8    A. Yes.
9    Q. Going back to your Amazon Flex position, you
10 said you worked for three months.
11   Do you remember which three months you worked
12 in 2020 at Amazon Flex?
13   A. Three months. It was April, May, June, and
14 July.
15   Q. And you had said you worked at Roehl trucking
16 company for one week?
17   A. Yes.
18   Q. And is there any other employment positions you
19 held?
20   A. A company called Coach U.S.A. from May of 2019
21 until the end of December of 2019.
22   Q. You said called Coach?
23   A. Coach U.S.A.
24   Q. Anything prior to that?

9 (Pages 24 to 27)

Cutberto Viramontes; et al. v. The Cook County; et al.
Deposition of Christopher Khaya - Taken 2/14/2022

Page 28

1    A.  I drove for Lyft, another independent
2  contracting job.
3    Q.  And when was that?
4    A.  I've applied there since 2017 of December --
5  it's an on-and-off job.
6    Q.  And when you say "on and off," you said you
7  started in December of 2017?
8    A.  Yes.
9    Q.  And are you still sometimes working on that
10  job, or have you completed your work with them?
11    A.  Time to time.
12    Q.  You said you started in December of 2017.  So
13  how about 2018?  How often did you work for them, for
14  Lyft in 2018?
15    A.  I worked there every day.  I worked six hours a
16  day.
17    Q.  And you say every day in 2018.  Like throughout
18  the whole year?
19    A.  Yeah.
20    Q.  Okay.  From January to December of 2018, you
21  worked approximately six hours every day?
22    A.  Yes.
23    Q.  And what about 2019?
24    A.  2019.  2019 I worked like two, three hours a

Page 29

1  day.
2    Q.  And that was two, three hours a day every day
3  in 2019?
4    A.  Yes.
5    Q.  And then what about 2020?
6    A.  I didn't do anything in 2020 with Lyft.
7    Q.  And then 2021?
8    A.  No.
9    Q.  And have you done anything in 2022 yet?
10    A.  Not yet.
11    Q.  And are there any other employment positions
12  you've held?
13    A.  I've worked at movie theaters.  That was in
14  2018.  It was -- it was July of 2018 until November of
15  2018.
16    Q.  Was this a part-time job position?
17      (Technical interruption.)
18      (Reporter clarification.)
19  BY MS. JANG:
20    Q.  And that was a part-time position at the movie
21  theater?
22    A.  Yes, it was.
23    Q.  Okay.
24    A.  In 2017, I worked at another independent

Page 30

1  contracting company.  It's called DoorDash.  I mainly
2  delivered food for restaurants.
3    Q.  And was that part-time or full-time?
4    A.  It was full-time.
5    Q.  And was that from January 2017 to December
6  2017?
7    A.  No.  It was from October of 2016 until December
8  of 2017.
9    Q.  Okay.  Is there any other employment that
10  you've had?
11    A.  I worked at FedEx between October of 2016
12  until December of 2016.
13    Q.  And what did you do at FedEx?
14    A.  I was a package handler.  I scanned packages
15  and placed them in the truck.
16    Q.  Are there any other employment positions you've
17  held?
18    A.  I worked at a restaurant called Maggiano's.  I
19  was a dishwasher for one and a busser for two months.
20    Q.  And when did you start as a dishwasher?  And
21  then when did you end your employment at Maggiano's?
22    A.  June of 2016 until -- until September of 2016.
23    Q.  Have you had any other employment positions?
24    A.  Yes, at The Cheesecake Factory.  That was in

Page 31

1  June 2015 till June 2016.
2    Q.  And what did you do at The Cheesecake Factory?
3    A.  I was mostly a busser.
4    Q.  And was that full-time or part-time?
5    A.  Part-time.
6    Q.  Have you held any other positions, employment
7  positions?
8    A.  I worked at Postmates between April of 2015
9  till June of 2015.
10    Q.  And what did you do there?
11    A.  I delivered groceries on my bike.
12    Q.  And was that part-time or full-time?
13    A.  Part-time.
14    Q.  Have you held any other employment positions?
15    A.  That's it.
16    Q.  So that started, you said, in April of 2015?
17    A.  Yes.
18    Q.  And when did you graduate high school?
19    A.  June of 2015.
20    Q.  So you started at Postmates a little before you
21  graduated high school in June of 2015?
22    A.  Yes.
23    Q.  Okay.  Have you ever had any law enforcement
24  training?

10  (Pages 28 to 31)

Royal Reporting Services, Inc.
312.361.8851

Cutberto Viramontes; et al. v. The Cook County; et al.
Deposition of Christopher Khaya - Taken 2/14/2022

Page 32

1    A.  No.
2    Q.  Have you ever been employed by law enforcement?
3    A.  No.
4    Q.  And have you ever volunteered for any law
5    enforcement agency or department?
6    A.  No.
7    Q.  Have you ever served in the military?
8    A.  No.
9    Q.  And I have to ask this.  But have you ever been
10   convicted of a crime?
11   A.  No.
12   Q.  Have you ever been arrested for a crime?
13   A.  No.
14   Q.  Have you ever had any medical or first-aid
15   training?
16   A.  No.
17   Q.  So let's turn to the FOID card.  Do you know
18   what the FOID card is?
19   A.  Yes, it is.
20   Q.  And do you know what FOID stands for?
21   A.  Firearms identification card.
22   Q.  And when did you receive your FOID card?
23   A.  July of 2021.
24   Q.  And why did you apply for a FOID card?

Page 33

1    A.  To own a firearm.
2    Q.  Why did you want to own a firearm?
3    A.  It was -- it was mainly for self-protection.
4    Q.  Did you have a particular firearm in mind when
5    you applied for the FOID card?
6    A.  No, I hadn't when I applied.
7    Q.  And does anyone else in your household have a
8    FOID card?
9    A.  My father.
10   Q.  When did your father receive a FOID card?
11   A.  I believe in 2018 -- 2017 to 2018.
12   Q.  Is there any training required for you to
13   receive a FOID card?
14   A.  No.
15   Q.  And did you receive any training before getting
16   a FOID card?
17   A.  No.
18   Q.  You said your father received a FOID card in
19   2017 or 2018.
20        So did he purchase a firearm after he got a
21   FOID card?
22   A.  No.
23   Q.  You said no?
24   A.  No.

Page 34

1    Q.  So he did not own a firearm after he got a FOID
2    card?
3    A.  No.
4    Q.  Was there any firearm in the house prior to you
5    getting your FOID card in 2021?
6    A.  No.
7    Q.  Does your father own a firearm now?
8    A.  No.
9    Q.  And to your knowledge, has your father ever
10   purchased a firearm?
11   A.  No.
12   Q.  Do you own a firearm?
13   A.  Yes, I do.
14   Q.  And how many do you own?
15   A.  Two.
16   Q.  And what are they?
17   A.  One is a .22 caliber called Rossi, R-O-S-S-I,
18   RS22.
19   Q.  Can you say that one more time?
20   A.  Rossi, R-O-S-S-I, RS22.
21   Q.  And you said you had a second firearm?
22   A.  Yes.
23   Q.  What is that?
24   A.  A Smith & Wesson MP 9 Shield Plus.

Page 35

1    Q.  You said Smith & Wesson MP --
2    A.  MP 9 Shield Plus.
3    Q.  Is your  22 Rossi a handgun?
4    A.  No.  It's a rifle.
5    Q.  And is your -- do you call it a 9 Shield Plus?
6    How do you refer to the second gun that you own?
7    A.  Yes, 9 Shield Plus.
8    Q.  Is your 9 Shield Plus a handgun?
9    A.  Yes, it is.
10   Q.  And we'll go back to these two firearms later
11   in your deposition.  But for now, do you have a concealed
12   carry card?
13   A.  Yes, I do.
14   Q.  And when did you get your concealed carry card?
15   A.  I got that in October -- around October of '14.
16   Q.  You said in October of 2014?
17   A.  October of 2021.
18   Q.  So you applied for your concealed carry card
19   approximately three months after you received your FOID
20   card?
21   A.  Yes.
22   Q.  First of all, what is a concealed carry card?
23   A.  A concealed carry card allows you to conceal
24   carry a firearm.

11  (Pages 32 to 35)

Cutberto Viramontes; et al. v. The Cook County; et al.
Deposition of Christopher Khaya - Taken 2/14/2022

Page 36

1    Q.  And why did you get the concealed carry
2  license?
3    A.  It was due to increase in crime in the area,
4  mainly for self-protection.
5    Q.  Does anyone else in your household have a
6  concealed carry license?
7    A.  No.
8    Q.  So your father does not have a CCL?
9    A.  No.
10   Q.  And where do you conceal carry a firearm?
11   A.  Yes.  Sometimes I do, sometimes I don't.
12   Q.  And where do you conceal carry your firearm?
13  Which of the firearms do you conceal carry, or do you
14  conceal carry both firearms?
15   A.  I only conceal carry the Smith & Wesson.
16   Q.  And where do you take that firearm?
17   A.  Mostly by my work, but I can't bring it inside
18  because there's a "no weapons" sign.  So I have to put my
19  weapon in the trunk of my car and rack the slide in --
20  lock the gun up and separate the magazine and ammo.
21   Q.  And are you aware of where you can conceal
22  carry a firearm with a concealed carry license?
23   A.  Yes.
24   Q.  And where is that?

Page 37

1    A.  I can conceal carry anywhere away from -- 1,000
2  feet away from a park, school, church or mixed building
3  or public housing.
4    Q.  And you say you sometimes conceal carry your 9
5  Shield Plus, right?
6    A.  Yes.
7    Q.  And when you say you sometimes conceal carry
8  your 9 Shield Plus and sometimes you don't, can you
9  describe what you mean by that?
10   A.  Like a few times I would carry it, but it's not
11  really worth it since I'm mostly -- mostly the area I
12  work at is prohibited from carrying within 100 feet of
13  any public property.  So I mainly leave it in the car.
14   Q.  So how many times have you concealed carried
15  that firearm?
16   A.  I've concealed carried three times.
17   Q.  So you've concealed carried your firearm three
18  times since October of 2021?
19   A.  Yes.
20   Q.  And when was those three times that you
21  concealed carried?
22   A.  I believe one was in -- it was in December I've
23  carried three -- no, November I carried three times.
24   Q.  November of what year?

Page 38

1    A.  2021.
2    Q.  So the month after you received your concealed
3  carry license, you conceal carried your firearm three
4  times?
5    A.  Yes.
6    Q.  And where did you conceal carry?  Where did you
7  go with your firearm?
8    A.  It was two times at my work and then -- like
9  two days I was at my work and one day a family friend at
10  a liquor store.
11   Q.  So you took your concealed carry firearm to
12  your relative or family friend's liquor store?
13   A.  Yes.
14   Q.  And why did you take your firearm there?
15   A.  Just to carry, just to see -- just to get the
16  feeling of -- get the feeling of getting used to carrying
17  a gun.
18   Q.  And you said the two times that you took it to
19  work, did you have to lock it up in your trunk?
20   A.  Yes.
21   Q.  And do you remember when in November 2021 you
22  conceal carried those three times?
23   A.  It was the second week of November -- yeah, the
24  second week of November and Saturday that I carried.

Page 39

1    Q.  You said in the second week of November on a
2  Saturday, you conceal carried.  Was that to your work or
3  to the liquor store?
4    A.  My work.
5    Q.  And so it was multiple Saturdays that you took
6  it to work?
7    A.  No.  It was one Saturday and then a Monday.
8    Q.  And do you know when you took it to the liquor
9  store?
10   A.  It was the third week of -- third week of
11  November, around Wednesday.
12   Q.  And you had said that there was an increase of
13  crime in the area.  Can you elaborate on that?
14   A.  Armed robberies, carjackings, violent crimes, a
15  few times shootings, that nature.
16   Q.  And did you witness any of those incidents?
17   A.  No.
18   Q.  So how did you come to learn of those
19  instances?
20   A.  News sources.
21   Q.  You watch the news?  And were they -- I'm
22  sorry.  Go ahead.
23   A.  No.  I said, yes, I watched some news sources
24  too.

12  (Pages 36 to 39)

Cutberto Viramontes; et al. v. The Cook County; et al.
Deposition of Christopher Khaya - Taken 2/14/2022

---

Page 40

1     **Q.** And what news do you watch?
2     A. One is CWB Chicago and then the Chicago
3 Sun-Times.
4     **Q.** Do you watch this on the TV or on the Internet
5 or both?
6     A. Internet.
7     **Q.** Are there any other websites or pages that you
8 go to on the Internet to get your news?
9     A. Besides CW Chicago and the Chicago Sun-Times,
10 sometimes WGN and sometimes ABC 7 Chicago.
11     **Q.** Is there anything else?
12     A. No.
13     **Q.** When you bring your gun outside the home, those
14 three instances you said in November of 2021, where on
15 your body do you keep the firearm?
16     A. Shoulder -- I have a shoulder holster.
17     **Q.** And have you ever used your weapon?
18     A. No, I haven't.
19     **Q.** Going back to your shoulder holster, first are
20 you left- or right-handed?
21     A. Right-handed.
22     **Q.** So which side is the shoulder holster on?
23     A. The left side.
24     **Q.** Let me clarify my previous question of have you

---

Page 41

1 used the firearm.
2     Have you ever fired either of the two, the .22
3 Rossi or the 9 Shield Plus? Either of those two firearms
4 you own, have you used them either inside or outside your
5 home?
6     A. No.
7     **Q.** And was there any training required for the
8 CCL?
9     A. Yes, there was.
10     **Q.** And what was that?
11     A. There was a 16-hour course learning the
12 Illinois laws and how to safely -- how to safely use the
13 weapon and how to load and unload it, clean it, and how
14 to shoot it.
15     **Q.** And where did you take the classes?
16     A. I took it at a school called Illinois Concealed
17 Carry Training Center.
18     **Q.** And where is that located?
19     A. It was around Belmont and Sacramento.
20     **Q.** And you said there was also a shooting test
21 involved?
22     A. Yes.
23     **Q.** And where did you take the shooting test?
24     A. Gat Guns.

---

Page 42

1     **Q.** Say that one more time.
2     A. Gat Guns.
3     **Q.** Can you spell it?
4     A. G-A-T G-U-N-S.
5     **Q.** And where is Gat Guns located?
6     A. It was in Dundee, Illinois.
7     **Q.** And was there a minimal score that was required
8 in order to pass the shooting test?
9     A. Yes, there was.
10     **Q.** Do you remember what that was?
11     A. It was 21 out of the 30 bullets.
12     **Q.** And what score did you receive?
13     A. A 21.
14     **Q.** So when you had this shooting test, did they
15 provide a gun for you to shoot?
16     A. Yes.
17     **Q.** Do you remember what kind of gun that was?
18     A. Yes, it was a Glock 9.
19     **Q.** Do you do any firearm training on your own?
20     A. I've watched YouTube videos on firearms
21 training. That's it.
22     **Q.** Did you ever go to the shooting range?
23     A. A few times.
24     **Q.** So I'm just going to ask you a series of

---

Page 43

1 questions that -- about the few times that you went to
2 shooting range.
3     So when was that?
4     A. I've went -- I've went on October of 2021.
5     **Q.** Can you estimate the total number of times
6 you've gone to the shooting range?
7     A. Estimate, I've went about five times.
8     **Q.** So you said the first time you went to a
9 shooting range outside of the shooting test that you had
10 to take for the CCL was in October of 2021?
11     A. Yes.
12     **Q.** And where did you go?
13     A. I went to Shore Galleries.
14     **Q.** Can you spell that?
15     A. S-H-O-R-E G-A-L-L-E-R-I-E-S.
16     **Q.** Where is Shore Galleries located?
17     A. It's located on Devon and McCormick.
18     **Q.** And what city is that in?
19     A. That's in Lincolnwood.
20     **Q.** And how many times have you gone to Shore
21 Galleries?
22     A. I've gone -- estimated about five times.
23     **Q.** And what other dates did you go to Shore
24 Galleries?

---

13 (Pages 40 to 43)

Cutberto Viramontes; et al. v. The Cook County; et al.
Deposition of Christopher Khaya - Taken 2/14/2022

Page 44

1    A.  It was every Sunday between the end of October
2    till mid week November.
3    Q.  And the approximately five times that you went
4    to Shore Galleries, did you go with anybody else?
5    A.  My cousin and my brother.
6    Q.  And do either of them have FOID cards?
7    A.  My cousin does.  My older brother, no.
8    Q.  And did you go with your cousin and your
9    brother every time you went to Shore Galleries?
10   A.  Well, the first time was he and my brother, and
11   the rest of the time, my cousin tagged -- the rest of the
12   four times my cousin tagged along.
13   Q.  And so whose gun or guns did you, your cousin,
14   and your brother use when you went to the shooting range?
15   A.  The first time it was my guns, the second time
16   I rented it from Shore Galleries, and then the rest of
17   the three times was my Shield Plus.
18   Q.  When you say "my guns," do you mean both guns?
19   A.  Yes.
20   Q.  So you take both your .22 Rossi and the 9
21   Shield Plus to the shooting range?
22   A.  Well, the first time the Rossi, then I left the
23   Rossi at home.  Then rest of the times -- it was three to
24   five times where I did bring the Shield Plus.

Page 45

1    Q.  And what is your cousin's name, the cousin that
2    you go to the shooting range with?
3    A.  Zac Khaya.
4    Q.  Say that one more time.
5    A.  Zac Khaya, Z-A-C.
6    Q.  Just Z-A-C?
7    A.  Z-A-C, yes.
8    Q.  And how do you spell Khaya?
9    A.  K-H-A-Y-A, same as my last name.
10   Q.  And what is your brother's name?
11   A.  Kevin.
12   Q.  And same last name?
13   A.  Yes.
14   Q.  So have you been to any other shooting ranges
15   besides Shore Galleries?
16   A.  No.
17   Q.  And besides the five times that you went to
18   Shore Galleries in October and November of 2021, have you
19   gone shooting?
20   A.  No.
21   Q.  At a range, anywhere since then?
22   A.  No.
23   Q.  And when you have gone to Shore Galleries, do
24   you receive any kind of instruction or advice?

Page 46

1    A.  Rules.  There's rules and that stuff.
2    Q.  Does somebody tell you the rules when you get
3    there?
4    A.  Yes.  The firearm -- the instructors at the
5    front desk, the cash registers.
6    Q.  And what do they tell you?
7    A.  Don't point the firearm in a unsafe direction,
8    keep your finger off the trigger, and then -- and then
9    that's it.
10   Q.  And is there any other instruction that they
11   provide?
12   A.  That's it.
13   Q.  Is there any difference between you and your
14   cousin who have FOID cards versus your brother who does
15   not have a FOID card in terms of what you can and can't
16   do at the shooting range?
17   A.  No.  For a FOID card you have to bring -- you
18   can bring a guest.
19   Q.  And does he come as your guest or your cousin's
20   guest?
21   A.  My guest, yes.
22   Q.  Your brother goes as your guest?
23   A.  Yes.
24   Q.  And he's able to use your firearm as your

Page 47

1    guest?
2    A.  Yes.
3    Q.  And you said you have not shot either of your
4    two guns outside of the shooting range, right?
5    A.  No.
6    Q.  Is that correct, that you have not used it
7    except for at the shooting range?
8    A.  Yes.
9    Q.  And you have not used either of those firearms
10   or any firearm for self-defense?
11   A.  No.
12   MR. BERGSTROM:  I'm sorry.  My connection broke up
13   there for a second.  Could you re-ask that question?
14   MS. JANG:  Sure.
15   BY MS. JANG:
16   Q.  Have you ever used any firearm for
17   self-defense?
18   A.  No.
19   Q.  You had said that you currently own the .22
20   Rossi and the 9 Shield Plus.
21   A.  Yes.
22   Q.  Have you owned any other firearms before?
23   A.  No.
24   Q.  And what is the magazine size for -- let's

14  (Pages 44 to 47)

Cutberto Viramontes; et al. v. The Cook County; et al.
Deposition of Christopher Khaya - Taken 2/14/2022

Page 48

1    start with the .22 Rossi.
2        A.  10 rounds.
3        Q.  And is that the same thing as the round
4    capacity?
5        A.  Yes.
6        Q.  So would the round capacity of your .22 Rossi
7    be 10, plus one?
8        A.  Yeah.
9        Q.  Yes, it is?
10       A.  Yes, it is.
11       Q.  Okay.  And what about with the 9 Shield Plus?
12   What is the magazine size for your 9 Shield Plus?
13       A.  10 rounds, plus one in the chamber.
14       Q.  And did you buy both firearms at the same time
15   or at different times?
16       A.  Different times.
17       Q.  Okay.  So let's start with which one did you
18   buy first?
19       A.  The Rossi RS22.
20       Q.  And when did you buy it?
21       A.  October of 2021.
22       Q.  And where?
23       A.  Shore Galleries.
24       Q.  And who were you with when you purchased it?

Page 49

1        A.  I was by myself.
2        Q.  Was it one of the times that you went shooting
3    at the range?
4        A.  No.  It was a separate time.
5        Q.  And how much did it cost?
6        A.  With the FFL license, transfer, and the gun,
7    180 -- 185.26?
8        Q.  $185?
9        A.  And 26 cents.
10       Q.  And that included what exactly?
11       A.  FFL transfer, taxes, and the firearm.
12       Q.  And you said that's a rifle?
13       A.  Yes.
14       Q.  Is that a semi-automatic?
15       A.  Yes.
16       Q.  And what is your understanding of what a
17   semi-automatic is?
18       A.  Semi-automatic is when you press the trigger
19   once it'll fire.  Like, it'll just keep firing as long as
20   you pull the trigger.
21       Q.  And why do you choose to buy the Rossi .22?
22       A.  Because it's more -- more stable.
23       Q.  What do you mean by that?
24       A.  Well, because it most likely the -- had better

Page 50

1    recoil.  It means you have better control of the gun.
2        Q.  And why did you buy the .22 Rossi?
3        A.  Mainly for the house, self-defense.
4        Q.  And where do you store your .22 Rossi?
5        A.  In a storage case along with my handgun.
6        Q.  And where do you keep that storage case?
7        A.  Under my bed.
8        Q.  Is the storage case locked or unlocked?
9        A.  Locked.
10       Q.  And is your .22 Rossi loaded or unloaded?
11       A.  Unloaded and locked.
12       Q.  And what about your 9 Shield Plus?  You said
13   it's in the storage case, and it's under your bed,
14   correct?
15       A.  Yes.
16       Q.  Is your 9 Shield Plus loaded or unloaded?
17       A.  Unloaded and locked.
18       Q.  Is the ammunition different for both types of
19   firearms or the same?
20       A.  Different.
21       Q.  And where do you store each of the ammunitions?
22       A.  I store it separately in a closet.  I store it
23   separately in a closet in a vault.
24       Q.  Which closet?

Page 51

1        A.  My room closet.
2        Q.  You said in a vault?
3        A.  Yes.
4        Q.  Do you store the two types of ammunition in the
5    same vault?
6        A.  No.  I separate the ammunition.
7        Q.  So do you have to do separate vaults?
8        A.  Yes.
9        Q.  And do you keep the vault locked?
10       A.  Yes, I do.
11       Q.  Just to finish off, I know we started off and
12   then merged.  We started off with the Rossi.
13           That's the one that you purchased first?
14       A.  Yes.
15       Q.  So let's move on to the 9 Shield Plus.  When
16   did you buy that?
17       A.  Around the first week of -- around the end
18   of -- around the first week of November.
19       Q.  Of 2021?
20       A.  Yes.
21       Q.  So it was approximately one month or less than
22   one month after you purchased the .22 Rossi?
23       A.  Yes.
24       Q.  And why did you choose to purchase the second

15  (Pages 48 to 51)

Cutberto Viramontes; et al. v. The Cook County; et al.
Deposition of Christopher Khaya - Taken 2/14/2022

|  | Page 52 |
|---|---|

1    gun?
2        A.  Mainly for concealed carry.
3        Q.  **And how much did the 9 Shield Plus cost?**
4        A.  It cost me 499.
5        Q.  **That was for everything, the gun, the transfer**
6    **the taxes?**
7        A.  No.  Everything -- the gun was 499 itself.
8    With taxes, it's 530.  Ended up being a total $530.
9        Q.  **And why, in particular, did you want to**
10    **purchase the 9 Shield Plus versus a different handgun**
11    **that you can conceal carry?**
12        A.  The Shield Plus is more easier to handle.
13        Q.  **Are you saying that it's easier to handle**
14    **compared to your .22 Rossi rifle?**
15        A.  Yes.
16        Q.  **And why is it easier?**
17        A.  Not easier.  I can't conceal carry a Rossi, the
18    rifle.
19        Q.  **Besides the difference of being able to conceal**
20    **carry your handgun and not conceal carry your .22 Rossi,**
21    **is the handgun also more -- is the handgun easier to**
22    **handle?**
23        A.  Yes, it is.
24        Q.  **How so?**

|  | Page 53 |
|---|---|

1        A.  It has a better grip and the recoil is more
2    stable.
3        Q.  **Anything else?**
4        A.  That's it.
5        Q.  **The .22 Rossi because it's a rifle, you need**
6    **both hands, right, to use that rifle?**
7        A.  Yes.
8        Q.  **And for your 9 Shield Plus, it's a handgun.  So**
9    **you can use one hand for that firearm?**
10        A.  Well, two hands, to be safe, since it's a
11    smaller gun because you have more power in that handgun.
12    So you need a little bit more control.
13        Q.  **So two hands is preferred for more control, but**
14    **can you also just use it with one hand?**
15        A.  You could.
16        Q.  **And for your ammunition, what type of**
17    **ammunition do you have for the .22 Rossi?**
18        A.  Subsonic ammunition.
19        Q.  **Is there a particular size associated with that**
20    **or just subsonic ammunition?**
21        A.  Just subsonic.
22        Q.  **And then what type of ammunition do you use for**
23    **9 Shield Plus?**
24        A.  It's jacket hollow points.

|  | Page 54 |
|---|---|

1        Q.  **Say that one more time.**
2        A.  Jacket hollow points.  It's full metal jacket
3    and hollow points.
4        MS. JANG:  I think we can take a break.
5        (A recess was taken.)
6    BY MS. JANG:
7        Q.  **I just want to make sure that we're using the**
8    **same terminology.**
9            So your two firearms that you have, one is a
10    rifle, one is a handgun.
11            So what do you call your rifle?
12        A.  It's a regular rifle.
13        Q.  **Do you call it a .22 Rossi?  What do you refer**
14    **to it as?  What do you refer to it as?**
15        A.  Rossi.  That's it.
16        Q.  **Just Rossi?**
17        A.  Yeah.
18        Q.  **Okay.  And then your handgun, what do you refer**
19    **to that as?**
20        A.  Sometimes the Smith or sometimes the Shield.
21        Q.  **Okay.  So just Shield?**
22        A.  Yes.
23        Q.  **So throughout the rest of the deposition when I**
24    **just say "Rossi," you understand that it's referring to**

|  | Page 55 |
|---|---|

1    **the rifle that you own?**
2        A.  Yes.
3        Q.  **And then if we refer to "the Shield," then you**
4    **understand that's referring to the handgun, the 9 Shield**
5    **Plus that you own?**
6        A.  Yes.
7        Q.  **And what is the caliber for each of the guns?**
8    **What's the caliber for the Rossi.**
9        A.  .22 caliber rifle.
10        Q.  **And then what is the caliber for the Shield?**
11        A.  9 millimeter.
12        Q.  **And you said that you -- you said that you also**
13    **store the -- where do you store your shield?**
14        A.  In the same compartment as my Rossi.
15        Q.  **And is that under the bed -- under your bed?**
16        A.  Yes.
17        Q.  **Do you take out your Rossi or your shield?**
18        A.  Repeat that.
19        Q.  **Do you take your Rossi or your shield out of**
20    **the case that's under your bed?**
21        A.  Sometimes.
22        Q.  **Go ahead.**
23        A.  No.  I said sometimes.
24        Q.  **And when do you take your Rossi out of the case**

Royal Reporting Services, Inc.
312.361.8851

Cutberto Viramontes; et al. v. The Cook County; et al.
Deposition of Christopher Khaya - Taken 2/14/2022

Page 56

1 that's under the bed?
2    A.  I've took it out like around the end of October
3 to clean it.
4    Q.  Okay.  Any other time?
5    A.  That's it.
6    Q.  And how often do you clean your Rossi?
7    A.  Whenever I use it, but I haven't used it, so I
8 don't clean it.
9    Q.  Okay.  And then when do you take out your
10 Shield?
11    A.  My Shield, I took it out the three times I went
12 to the gun range and one time for cleaning.
13    Q.  And when was that that you did the cleaning?
14    A.  That was around -- around the first week of
15 December.
16    Q.  So except when you take either of those guns
17 out, whether it's for cleaning or when you take it to the
18 range, the case is locked, right?
19    A.  Yes.
20    Q.  And you said that you keep your ammunition in
21 two separate vaults; is that correct?
22    A.  Yes.
23    Q.  And when did you purchase the ammunition for
24 the Rossi?

Page 57

1    A.  I purchased it around the same time I purchased
2 the Shield.
3    Q.  Okay.  So is that November of 2021?
4    A.  Yes.
5    Q.  Have you restocked and purchased additional
6 ammunition for the Rossi since then?
7    A.  No.
8    Q.  And where did you purchase the ammunition for
9 the Rossi?
10    A.  Cabela's in Gurnee, Illinois.
11    Q.  Can you spell that?
12    A.  Cabela's, C-A-B-E-L-A'S.
13    Q.  Is that a dealer?
14    A.  It's a store where they sell hunting equipment.
15    Q.  Okay.  And when did you purchase the ammunition
16 for the Shield?
17    A.  I purchased it the third week of December.
18    Q.  And where did you purchase the ammunition for
19 the Shield?
20    A.  Cabela's, the same place where I got the
21 ammunition for the Rossi.
22    Q.  And what is the ammunition that you have for
23 the Shield?
24    A.  The ammunition, I have -- it's called -- the

Page 58

1 brand is called Sierra Outdoor.  It's the jacket hollow
2 point.
3    Q.  And have you just bought it that one time, or
4 have you replenished and gotten additional ammunition?
5    A.  I had one more ammunition, and that was the --
6 a different brand called Hydra-Shok, H-Y-D-R-A-S-H-O-K.
7    Q.  So that's a different type of ammunition for
8 your Shield?
9    A.  Yes.
10    Q.  And when did you buy that?
11    A.  I got that the third week of December of 2021.
12    Q.  And where did you purchase that?
13    A.  Cabela's.
14    Q.  And why did you buy the hydra-shok ammunition
15 even though you had the jacket hollow point ammunition
16 for your Shield?
17    A.  I bought it based on the review of the ammo.
18 So I looked for reviews on the ammo to see which one is
19 good and which one is not, and I just decided to purchase
20 it.
21    Q.  What did the reviews say that you followed?
22    A.  Customers' reviews on the Cabela's website.
23    Q.  And why did you decide to get the hollow points
24 instead of regular bullets?

Page 59

1    A.  They didn't have the bullets -- the regular
2 bullets at the time due to the ammo shortage.  So the
3 jacket hollow point, that's the only one they had in
4 stock.  So I was just like, "Okay."  I just purchased
5 that ammo at that point.
6    Q.  So the availability and the fact that the other
7 ammunition was not in stock, was that the only reason why
8 you purchased the hollow point bullets?
9    A.  That was it.  That was when I purchased the
10 Shield.
11    Q.  When you a couple weeks later went back, did
12 they have the hydra-shok in stock?
13    A.  No.  I ordered it online to get it shipped to
14 that store.
15    Q.  Okay.  Is there any other reason that we
16 haven't discussed about why you wanted to get or why you
17 got the hollow points?
18    A.  When I went there to buy -- I was picking up
19 the Shield, so I end up just getting that ammo.  That's
20 the only thing they had.  I asked for 9 millimeter ammo
21 that they have in stock, and the jacket hollow point is
22 the one that they currently had at the moment.  So I just
23 decided just to buy it.  I didn't use the ammo or
24 anything.  I just bought it.

17  (Pages 56 to 59)

Cutberto Viramontes; et al. v. The Cook County; et al.
Deposition of Christopher Khaya - Taken 2/14/2022

Page 60

1    Q.  And are you aware -- do you know whether the
2  jacket hollow point is illegal?
3    MR. BERGSTROM:  Objection to form.
4    THE WITNESS:  That's legal ammo.  That was just --
5  or else they would have not sold it.
6  BY MS. JANG:
7    Q.  So your basis for thinking that they are legal
8  is because they sold the ammunition to you?
9    A.  Yes.  The only ammunition that's illegal is the
10  armor-piercing rounds and dragon's breath.
11    Q.  Would you say that you're knowledgeable about
12  firearms?
13    A.  Yes.
14    Q.  Do you know what the different types of
15  handguns are?
16    MR. BERGSTROM:  Object to form.  You can answer,
17  Chris, when I object.
18    THE WITNESS:  Okay.  I know different brands,
19  different styles of the handgun, different features on
20  it.
21  BY MS. JANG:
22    Q.  Do you know the difference between a
23  center-fire pistol and a rim-fire pistol?
24    A.  Center-fire?  Center-fire, rim-fire?  No, I

Page 61

1  don't know the difference between those.
2    Q.  And between a semi-automatic and an automatic,
3  what is your understanding of what an automatic firearm
4  is?
5    A.  Automatic, you pull the trigger and it just
6  continues firing until you let go of the trigger.
7    Q.  What are, if any, advantages of having a
8  semi-automatic firearm versus an automatic firearm?
9    MR. BERGSTROM:  Objection; form.
10  BY MS. JANG:
11    Q.  Are there any advantages?
12    MR. BERGSTROM:  You can go ahead and answer.
13    THE WITNESS:  A semi-automatic has more advantage
14  than the fully auto because the rate of fire -- a fully
15  automatic it will continue to fire, which most likely
16  will cause the gun continuing to fire.  It might possibly
17  make the gun a little bit unstable because you're
18  continuing to fire the gun.  With a semi, you've got
19  control in the rate of fire just by pressing the finger
20  on the trigger each time you fire.
21  BY MS. JANG:
22    Q.  Is there any other reasons?
23    A.  No.
24    Q.  And what, if any, is the round capacity of a

Page 62

1  semi-automatic versus an automatic firearm?
2    A.  Pretty much the same standard, 10 rounds.
3    Q.  So both types of firearms, both the
4  semi-automatic and the automatic could hold 10 rounds?
5    A.  It could, yes.
6    Q.  And how many rounds per second do either the
7  semi-automatic or the automatic fire?
8    MR. BERGSTROM:  Objection; form.
9    THE WITNESS:  I don't know.
10  BY MS. JANG:
11    Q.  Do you consider a handgun a self-defense
12  weapon?
13    A.  Yes.
14    Q.  And why is that?
15    A.  Mainly it's useful -- mainly useful for
16  outside -- just for carrying outside.  The house too, but
17  mainly for outside.
18    Q.  Do you mean outside of your home?
19    A.  Yes.
20    Q.  Okay.  Would a handgun also be a good
21  self-defense weapon inside your home?
22    A.  Yes.
23    Q.  Is that because it's easier to store in a
24  location that's readily accessible in an emergency?

Page 63

1    A.  Yes.
2    MR. BERGSTROM:  Objection.
3  BY MS. JANG:
4    Q.  I'm sorry.  I didn't hear your answer.
5    A.  Yes.
6    Q.  Is it also because it can be stored next to
7  your bed?
8    MR. BERGSTROM:  Objection; form.
9    THE WITNESS:  Well, under my bed.
10  BY MS. JANG:
11    Q.  And would you agree that it can be used in the
12  house without endangering family members?
13    MR. BERGSTROM:  Objection; form.
14    THE WITNESS:  Yes.
15  BY MS. JANG:
16    Q.  Would you agree that it cannot be easily
17  redirected or wrestled away by an attacker?
18    MR. BERGSTROM:  Same objection.
19    THE WITNESS:  I don't know.
20  BY MS. JANG:
21    Q.  And would you agree that it's easier to use by
22  those without upper body strength needed to aim a long
23  gun?
24    MR. BERGSTROM:  Same objection.

18  (Pages 60 to 63)

Cutberto Viramontes; et al. v. The Cook County; et al.
Deposition of Christopher Khaya - Taken 2/14/2022

Page 64

1    THE WITNESS:  No.
2
3    BY MS. JANG:
4        Q.  You know what a long gun is, right?
5        A.  Yes.
6        Q.  And would you agree that you need to have both
7    hands and arms to lift a long gun?
8        A.  Yes.
9        Q.  And would you agree that you need upper body
10   strength to lift the long gun?
11       MR. BERGSTROM:  Objection; form.
12       THE WITNESS:  Yes.
13   BY MS. JANG:
14       Q.  And would you agree that a long gun is heavier
15   than a handgun?
16       MR. BERGSTROM:  Same objection.
17       THE WITNESS:  Not heavy.  It depends on the gun.
18   BY MS. JANG:
19       Q.  Would you agree that some long guns are heavier
20   than some handguns?
21       MR. BERGSTROM:  Same objection.
22       THE WITNESS:  Yeah, I agree.
23   BY MS. JANG:
24       Q.  So would you agree that for somebody using a

Page 65

1    long gun, they would need the upper body strength.  And
2    so it would be easier for those types of people to use a
3    handgun?
4        MR. BERGSTROM:  Same objection.
5        THE WITNESS:  You don't need much strength to carry
6    a rifle.
7    BY MS. JANG:
8        Q.  And would you agree that it's possible to aim a
9    handgun with one hand?
10       MR. BERGSTROM:  Same objection.
11       THE WITNESS:  No.
12   BY MS. JANG:
13       Q.  Do you know other people who have handguns?
14       A.  Some people.
15       Q.  How many people?
16       A.  About four I know.
17       Q.  Who are those people?
18       A.  My relative at the liquor store and then a few
19   of my brother's friends.
20       Q.  Do you know what kinds of handguns they own?
21       A.  Yes, I do.
22       Q.  What are they?
23       A.  Glock 40 -- no, Glock 23, 40 caliber.  And then
24   one is 6R, and then the other -- the remainder are

Page 66

1    Glocks, but I don't know which -- I don't know which
2    model.
3        Q.  Okay.  Would you say handguns are a popular
4    choice for self-defense?
5        MR. BERGSTROM:  Objection; form.
6        THE WITNESS:  For outside, yes, but inside, no.
7    BY MS. JANG:
8        Q.  And why do you say that?
9        A.  Because inside you're more likely to -- if you
10   hold it in one hand, you're more likely to make the gun
11   unstable.  You're going to most likely hit an innocent
12   bystander.  As compared to the rifle, you won't miss that
13   much because it's more stable, less easier to handle.
14       (Reporter clarification.)
15       THE WITNESS:  The rifle is more stable, easier to
16   handle.
17   BY MS. JANG:
18       Q.  So if you were to use either of your guns for
19   self-defense while you're in the home, which one would
20   you use?
21       A.  I would use the Rossi.
22       Q.  And why?
23       A.  Because it's less lethal, less likely to kill
24   someone.  I'm just there to stop the attack, not to kill.

Page 67

1        Q.  And why are you saying that it would be less
2    lethal?
3        A.  Because I don't want to kill someone.  I just
4    want them -- I just want them to stop.  That will be it.
5        Q.  Couldn't you do the same thing with your
6    handgun?
7        A.  Well, it's a 9 millimeter, and it depends where
8    you aim on the body.  It could kill them, it could save
9    them, not save them, it could injure them, or it could
10   kill them.
11       Q.  So would you agree that it depends on where the
12   attacker or victim was shot where on the body they had an
13   injury?
14       A.  Yes.
15       Q.  So it's possible that the rifle could be more
16   lethal than your handgun if the injury was in a different
17   spot where the person would be more injured or where it
18   would be fatal?
19       MR. BERGSTROM:  Objection; form.
20       THE WITNESS:  No.
21   BY MS. JANG:
22       Q.  So you're saying that if you shot someone in
23   the chest with your rifle, it would not be more lethal
24   than if you shot somebody in the leg with your handgun?

19  (Pages 64 to 67)

Royal Reporting Services, Inc.
312.361.8851

Cutberto Viramontes; et al. v. The Cook County; et al.
Deposition of Christopher Khaya - Taken 2/14/2022

Page 68

1  A. Yes, it'll be less lethal with the .22 caliber
2  because it's a smaller ammo compared to a 9 millimeter.
3  It's bigger ammo with a higher grain, meaning more
4  gunpowder.
5  Q. You said the ammo was bigger for the handgun
6  than for the rifle?
7  A. Yes, the 9 millimeter.
8  Q. Are there any circumstances in which a handgun
9  would be insufficient for self-defense?
10  A. If it's jammed or one of the parts of the gun
11  just breaks.
12  Q. Could the same be true of the rifle?
13  A. It depends on the brand of the rifle.
14  Q. Okay. What about your brand, which is the
15  Rossi .22?
16  A. It won't break as long as I maintain it.
17  Q. Do you read any magazines dedicated to
18  firearms?
19  A. No.
20  Q. And do you read any websites or go to any
21  websites dedicated to firearms?
22  A. A few websites.
23  Q. Let me actually just go back. What platform is
24  your rifle based on?

Page 69

1  A. Platform? I don't know.
2  Q. Is it similar to an AR-15?
3  MR. BERGSTROM: Objection; form.
4  THE WITNESS: No.
5  BY MS. JANG:
6  Q. And why is it not similar to an AR-15?
7  A. Because the stock and how the rifle is built is
8  way different than an AR, more like a hunting rifle.
9  Q. Which one is more like a hunting rifle?
10  A. The Rossi is.
11  Q. And why do you say the Rossi is more like a
12  hunting rifle?
13  A. Because it's built for hunting game.
14  Q. Okay. Did you earlier say that you thought the
15  Rossi would be better than your handgun if you had to use
16  some firearm for self-defense?
17  A. Yes.
18  Q. But you also just said the Rossi .22 rifle is
19  more like a hunting rifle?
20  A. Hunting rifle/self-defense.
21  Q. And describe what you mean when you said that a
22  Rossi is more like a hunting rifle and an AR-15 is not.
23  MR. BERGSTROM: Objection; form.
24  THE WITNESS: Well, a Rossi, it depends how you use

Page 70

1  it, and it depends on if you use it for hunting or
2  pleasure or not. An AR is pretty much the same thing.
3  It could be used for pleasure, hunting, or just
4  collecting.
5  BY MS. JANG:
6  Q. Okay. So they are similar. So the AR-15 and
7  the Rossi .22 rifle are similar?
8  MR. BERGSTROM: Objection; form.
9  THE WITNESS: Similar form but different calibers.
10  BY MS. JANG:
11  Q. I'm sorry. I didn't hear your answer.
12  A. Similar but different caliber.
13  Q. What is the caliber of an AR-15?
14  A. 2.26.
15  Q. And you said the caliber of your Rossi rifle
16  is .22?
17  A. It's .22, small ammo.
18  Q. Okay. So besides the difference in the caliber
19  of an AR-15 and the Rossi rifle that you own, is there
20  any other difference?
21  MR. BERGSTROM: Objection; form.
22  THE WITNESS: The stock. That's it. It's not that
23  similar -- well, similar but not that much the same.
24  BY MS. JANG:

Page 71

1  Q. And what do you mean by stock, that the stock
2  is different?
3  A. How the stock looks. The stock of the Rossi is
4  pretty much different than the AR, how it's built and
5  customized.
6  Q. Okay. So other than the stock and the caliber
7  difference, the AR-15 and the Rossi .22 rifle that you
8  own are similar?
9  MR. BERGSTROM: Objection; form.
10  THE WITNESS: I don't know.
11  BY MS. JANG:
12  Q. Would you agree that there are more
13  similarities than the caliber and stock difference of
14  those two firearms?
15  MR. BERGSTROM: Objection; form.
16  THE WITNESS: No.
17  BY MS. JANG:
18  Q. Are there any other differences?
19  A. Depends on where the weapon is built? One.
20  Second, is how it's customized, how the gun is -- how
21  it's built, the parts, functions differently, different
22  magazine clip. And that's the difference I can name at
23  the moment.
24  Q. But you said both the Rossi rifle you have and

20  (Pages 68 to 71)

Cutberto Viramontes; et al. v. The Cook County; et al.
Deposition of Christopher Khaya - Taken 2/14/2022

Page 72

1   the AR-15, they can both be used for hunting.  That's
2   what you said, correct?
3        A.  Yes.
4        Q.  And you said that both firearms can be used for
5   self-defense?
6        A.  Yes.
7        Q.  So what's the difference between the size of
8   the bullets for both firearms?
9        A.  Bullets, the .22 caliber is a little bit
10  smaller and a little bit -- a little bit cylinder round;
11  whereas, the AR-15 bullets are a little bit longer but
12  skinnier.
13       Q.  And is there a difference in the speed that the
14  bullets are fired?
15       MR. BERGSTROM:  Objection; form.
16       THE WITNESS:  No.
17  BY MS. JANG:
18       Q.  And is there a difference in the stopping power
19  for both of those types of firearms or bullets?
20       MR. BERGSTROM:  Same objection.
21       THE WITNESS:  No.
22  BY MS. JANG:
23       Q.  And is there a difference in the amount of
24  damage that both firearms or the two different types of

Page 73

1   bullets can render?
2        MR. BERGSTROM:  Same objection.
3        THE WITNESS:  Yeah.
4   BY MS. JANG:
5        Q.  Okay.  And what's the difference in the damage
6   that can be caused?
7        MR. BERGSTROM:  Objection; form.
8        THE WITNESS:  Not much, but, again, where you hit --
9   where you hit the person in the body, that's where it
10  depends where the damage is.
11  BY MS. JANG:
12       Q.  But the location of where the bullet goes, it
13  just depends on the shooter, right?  Whether they're
14  shooting -- whether they have better aim or worse aim,
15  whether or not they're using any type of firearm?
16       A.  Yeah.
17       Q.  So is the AR-15 -- you said the bullets are
18  longer and skinnier; is that correct?
19       A.  Yes.
20       Q.  So what are the advantages, if any, or
21  disadvantages of having a longer and skinnier bullet?
22       MR. BERGSTROM:  Objection; form.
23       THE WITNESS:  Less likely to hit arteries.  It's
24  less likely to be a fatal wound.

Page 74

1   BY MR. BERGSTROM:
2        Q.  Are you saying it's less likely to be a fatal
3   wound and less likely to hit arteries as compared to the
4   .22 caliber bullet?
5        A.  Yeah, because the .22 caliber, you won't --
6   you'll get hit and you won't feel it.  It'll feel almost
7   like an airsoft gun.
8        Q.  It'll feel like a what?
9        A.  More like an airsoft gun.  Like, you won't feel
10  anything when you get hit.  Like, you won't feel like you
11  got shot.  That's what I'm saying.
12       Q.  So the .22 caliber bullet is less likely to be
13  fatal, right?
14       A.  Yes.
15       Q.  So it's less likely to be fatal as compared to
16  the AR-15 bullet?
17       MR. BERGSTROM:  Objection; form.
18       THE WITNESS:  They're both less likely to be fatal.
19  Again, it all depends on the circumstances, such as
20  victim's body weight and where they've been hit.
21  BY MS. JANG:
22       Q.  Do you have an opinion as to which weapon --
23  and this is versus the Rossi rifle that you currently own
24  versus an AR-15.  Do you have an opinion as to which one

Page 75

1   is more dangerous?
2        MR. BERGSTROM:  Objection; form.
3        THE WITNESS:  In my opinion, none of them are
4   dangerous.
5   BY MS. JANG:
6        Q.  But you said one is more likely to injure the
7   arteries and more likely to be fatal?
8        A.  Yeah.
9        Q.  And why do you say that neither of those
10  firearms are dangerous?
11       A.  Because it depends on the person who's handling
12  it.
13       Q.  So are you essentially saying that it depends
14  on where the victim is shot?
15       A.  No.  I'm talking about depending on who handles
16  the firearm.
17       Q.  Okay.  So in what instances would a firearm be
18  dangerous depending on who the shooter is?
19       MR. BERGSTROM:  Objection; form.
20       THE WITNESS:  Actually, I was trying to clarify the
21  question.  I was saying depending on the person's intent
22  on how they're going to use that firearm.  That's how I
23  was trying to answer.
24  BY MS. JANG:

21  (Pages 72 to 75)

Cutberto Viramontes; et al. v. The Cook County; et al.
Deposition of Christopher Khaya - Taken 2/14/2022

---

Page 76

1    Q.  Okay.  What do you mean by the shooter's
2  intent?
3    A.  Like intent to harm somebody, to commit a
4  crime.  That's when it becomes dangerous.
5    Q.  So if the shooter intended to kill somebody,
6  that's when it would be more dangerous?
7    A.  Not the gun, but the person holding it will be.
8    Q.  What about if the injury was on the same spot?
9  So for instance, the shooter used an AR-15 and shot
10  somebody in the leg versus a shooter used the Rossi .22
11  rifle and shot somebody in the leg.  Comparing those two
12  injuries on the same part of the body and say that the
13  shooter has the same intent.
14    MR. BERGSTROM:  Objection; form.
15    THE WITNESS:  It won't produce the same injury.  As
16  long as it doesn't get hit near any artery or anywhere in
17  the arteries that are more likely to be fatal.
18  BY MS. JANG:
19    Q.  Okay.  So in that example, if two people were
20  hit in the same spot, they were both hit the leg, but one
21  was hit by an AR-15 and one was hit by a Rossi .22 rifle,
22  would there be any difference in their injuries?
23    MR. BERGSTROM:  Objection; form.  You can answer,
24  Christopher.

---

Page 77

1    THE WITNESS:  I'm sorry.  I said no.
2
3  BY MS. JANG:
4    Q.  And you said -- so there would be no
5  difference?
6    A.  No, there won't be.
7    Q.  Okay.  You said that you have gone to websites
8  dedicated to firearms?
9    A.  Yes, I have.
10    Q.  And what websites have you gone to?
11    A.  I've gone to the Wikipedia just to look up
12  firearms' names, and there's another site called IMFDB,
13  Internet Movie Firearm Database.
14    Q.  Okay.  Any other websites?
15    A.  That's it.
16    Q.  Are there any other YouTube videos that you
17  watch in regards to firearms besides The Gun Collectors
18  YouTube channel?
19    A.  There's a few that I watch.  One is called the
20  USCCA, the United States Concealed Carry Association.
21  And then another one would be -- and the one called Colin
22  Noir, C-O-L-I-N N-O-I-R.
23    Q.  Any others?
24    A.  No.  That's it.

---

Page 78

1    Q.  Is it your understanding that it's common to
2  own an assault weapon?
3    MR. BERGSTROM:  Objection; form.
4    THE WITNESS:  Not that common.
5  BY MS. JANG:
6    Q.  And why do you say that?
7    A.  Because some states have -- some counties or
8  states have banned assault weapons.  So that's why I'm
9  saying it's not common.
10    Q.  Do you know how many assault weapons are owned
11  by people in the United States?
12    MR. BERGSTROM:  Objection; form.
13    THE WITNESS:  I don't know.
14    Q.  How would you define an assault weapon?
15    MR. BERGSTROM:  Objection; form.
16    THE WITNESS:  I don't know.
17    Q.  Are you aware of the Cook County ordinance
18  banning assault weapons?
19    A.  Yes, the assault weapons ban.
20    Q.  And do you want to buy an assault weapon?
21    A.  If it was legal, yes.
22    Q.  And is an AR-15 an assault weapon?
23
24

---

Page 79

1    MR. BERGSTROM:  Objection; form
2    THE WITNESS:  More like a semi-automatic rifle
3  BY MS. JANG:
4    Q.  But the Rossi you have, is that also a
5  semi-automatic rifle?
6    A.  Yes, it is
7    Q.  So is your Rossi an assault weapon?
8    MR. BERGSTROM:  Objection; form
9    THE WITNESS:  No, it isn't  Assault weapon is a
10  loose term
11  BY MS. JANG:
12    Q.  And what do you mean by that?
13    A.  Meaning the problem with that is it could be
14  defined as anything that's semi-automatic is considered
15  an assault weapon
16    Q.  Can you repeat that answer?
17    A.  The assault weapon answer, the definition of
18  it?
19    Q.  Yes.
20    A.  The thing is they label anything as an assault
21  weapon but still semi-automatic  I don't know what that
22  assault weapon term means because it keeps changing
23    Q.  Okay.  You said that if it was made legal --
24  assault weapons were made legal in Cook County, you would

---

22  (Pages 76 to 79)

Cutberto Viramontes; et al. v. The Cook County; et al.
Deposition of Christopher Khaya - Taken 2/14/2022

Page 80

1    want to purchase one, right?
2       A.  Yes, I would.
3       Q.  And which one would you want to buy?
4       A.  My preferred one is an MII (sic) Galil,
5    G-A-L-I-L.
6       Q.  Galil?
7       A.  Yes.
8       Q.  And what about it makes it an assault weapon?
9       A.  Because it is similar but it's labeled in the
10   same category as an assault weapon along with the AR.
11      Q.  Do you know why it's categorized -- both the AR
12   and the Galil are categorized as an assault weapon?
13      MR. BERGSTROM:  Objection; form.
14      THE WITNESS:  Because the stock -- because the stock
15   of the weapon and the parts to it are such as the -- like
16   recoil and the -- the recoil and the -- the recoil and
17   the stock is why -- is why they labeled it an assault
18   weapon.
19   BY MS. JANG:
20      Q.  So you already own a semi-automatic rifle,
21   which is the Rossi.
22          And why do you want a Galil, which is also --
23   is a Galil also a semi-automatic rifle?
24      A.  Yes, it is.

Page 81

1       Q.  So why do you want another semi-automatic
2    rifle?  Why do you want the Galil?
3       A.  To add to my collection.
4       Q.  And what do you mean by that?
5       A.  Just to add to my firearms I own.
6       Q.  Do you want to own additional firearms?
7       A.  Yes.
8       Q.  To add to your collection?
9       I'm sorry.  Did you provide an answer?
10      A.  Yes.  I'm sorry.  I said yes.
11      Q.  And how many firearms would you like to have in
12   your gun collection?
13      A.  Whatever firearm I just like, not going to be
14   many.  So just whatever firearm I just like.  It could be
15   just 5, it could be 10.  It just depends.
16      Q.  And what firearms do you like?
17      A.  I don't know.  I'm still looking.
18      Q.  And what are the features that make a firearm a
19   firearm that you like?
20      A.  It's not really the features that I like, just
21   the way it's designed.
22      Q.  So is there a particular or specific reason why
23   you want to buy a Galil?
24      A.  Mainly because it was made in -- made in the

Page 82

1    Israel military, which they -- they had advanced
2    weaponry.  It makes the gun more safer and efficient and
3    more stable, less likely to fail.
4       Q.  So you already have the rifle, as well as your
5    handgun for self-defense; is that correct?
6       A.  Yes.
7       Q.  And what other uses would you have for the
8    Galil?
9       A.  The Galil I'm most likely to use at the range,
10   to be honest.
11      Q.  Okay.  So you wouldn't really use the Galil for
12   self-defense?
13      MR. BERGSTROM:  Objection; form.
14      THE WITNESS:  Well, if two of my firearms are out of
15   commission, then I would have to use it.
16   BY MS. JANG:
17      Q.  What do you mean if they're "out of
18   commission"?
19      A.  Meaning if the part is broken and each of those
20   firearms are -- like make it inoperable, such as the
21   barrel or something, like something in the gun that
22   breaks, and that's when I would have to use the Galil.
23      Q.  And how would you know that the two firearms
24   you currently own are not working?

Page 83

1       A.  Rust, a crack in the barrel, ammunition stuck,
2    or rust built into the firearm.
3       Q.  So if you needed a gun for self-defense, you
4    would first try to use either your Rossi or your rifle or
5    your handgun, right?
6       MR. BERGSTROM:  Objection; form.
7       THE WITNESS:  Yes, I would use...
8    BY MS. JANG:
9       Q.  Yes, you would use the rifle or the handgun
10   versus the Galil?
11      A.  The rifle and the handgun first.
12      Q.  Your rifle, is there anything wrong with it?
13   Is it still working?
14      A.  No.  It's working fine.
15      Q.  And your handgun, the Shield, is that working?
16      A.  No.  It's working.
17      Q.  And so those two firearms are sufficient for
18   self-defense, right?
19      A.  They're sufficient.
20      Q.  So are there any other reasons why you want to
21   have a Galil?
22      A.  No.
23      Q.  So would it be fair to say that you want to
24   purchase the Galil to just add to your gun collection?

23  (Pages 80 to 83)

Cutberto Viramontes; et al. v. The Cook County; et al.
Deposition of Christopher Khaya - Taken 2/14/2022

Page 84

1    MR. BERGSTROM: Objection; form.
2    THE WITNESS: Gun collection and just to see how it
3 is at the gun range.
4    MS. JANG: Can we take a break for five minutes?
5 Off the record.
6    (Discussion off the record.)
7    (A recess was taken.)
8 BY MS. JANG:
9    Q.  Your Galil that you would like to purchase,
10 what is the round capacity for that?
11    A.  I believe it was about 15.
12    Q.  So is that a large magazine size?
13    A.  Yeah.
14    MR. BERGSTROM: Christopher, you can answer.
15    THE WITNESS: Yes, it's a large magazine size.
16 BY MS. JANG:
17    Q.  And would you store it with the other two
18 firearms that you have?
19    A.  No. I would buy a vault at that point.
20    Q.  And would you store it loaded or unloaded?
21    A.  Unloaded.
22    Q.  And where would you store the ammunition?
23    A.  The compartment where I originally stored --
24 where I originally stored my weapons, in that storage

Page 85

1 case under my bed.
2    Q.  Okay.  So you would store the ammunition for
3 your Galil with your Rossi and your handgun?
4    A.  Not with the gun, but separate.
5    Q.  And then where would you store your rifle and
6 your handgun that you currently have?
7    A.  After I purchased the vault, I would store
8 it -- actually, I would store it with the Galil.
9    Q.  Oh, all three firearms in your vault?
10    A.  Yeah, in my vault. The ammo would be just
11 separated.
12    Q.  And what type of ammunition would you purchase
13 for your Galil?
14    A.  I don't know.
15    Q.  And can you describe what you believe
16 responsible ownership of an assault weapon or the Galil
17 would be?
18    MR. BERGSTROM: Objection; form.
19    THE WITNESS: Repeat that question.
20 BY MS. JANG:
21    Q.  Can you describe what you believe responsible
22 ownership of an assault weapon would be?
23    MR. BERGSTROM: Same objection.
24    THE WITNESS: It will be to properly store it and

Page 86

1 then properly use it when there's an imminent threat that
2 could produce great bodily harm resulting in serious
3 injury or death
4 BY MS JANG:
5    Q.  And would you agree that it's dangerous if it's
6 in the wrong hands?
7    MR BERGSTROM: Objection
8    THE WITNESS: To a criminal, yes
9 BY MS JANG:
10    Q.  Have you seen a gunshot wound in person?  Not
11 on video or not on TV, not on the Internet.
12    MR BERGSTROM: I'm going to object as to relevance
13    THE WITNESS: No
14 BY MS JANG:
15    Q.  Would it be fair to say you don't have any
16 experience with people who have had gunshot wounds then?
17    A  No  I've known one person who had a gunshot
18 wound
19    Q  What do you mean you know a person with a
20 gunshot wound?
21    A  Well, I know he got shot, but I never seen
22 the -- well, I seen the bullet wound, the after, but not
23 during when he got shot
24    Q.  Okay.  So you said you did not see the bullet

Page 87

1 wound until after the wound healed?
2    A.  Yeah.
3    Q.  And who was this person?
4    A.  One of my best friends' younger brother.
5    Q.  And what's his name?
6    A.  His name is Moie (phonetic).
7    Q.  Is that his first name?
8    A.  Yeah.
9    Q.  What's his last name?
10    A.  Ognubbni, O-G-N-U-B-B-N-I.
11    Q.  And when did he get shot?
12    A.  It was around -- I believe April of 2018.
13    Q.  Where was it?
14    A.  It was in -- it was on, if I remember
15 correctly, Rockwell and -- Rockwell and Thorndale.
16    Q.  And what happened?
17    A.  We were walking and there possibly was a
18 shootout with another group of people, and a bullet just
19 came towards his direction and hit him in the stomach.
20 He got caught in the crossfire.
21    Q.  Was he in a car or was he out?
22    A.  Just walking.
23    Q.  And how did you -- you were not there, right?
24    A.  I wasn't.

24  (Pages 84 to 87)

Cutberto Viramontes; et al. v. The Cook County; et al.
Deposition of Christopher Khaya - Taken 2/14/2022

Page 88

1   Q.   So you did not participate in the shootout?
2   A.   No.
3   Q.   And how did you know that it was a shootout?
4   A.   My best friend told me, his brother.
5   Q.   And did that person that got shot participate?
6   A.   No.
7   Q.   And did your friend participate in the
8   shootout?
9   A.   No.
10  Q.   And how did you find out about this incident?
11  A.   My friend texted me and told me he got shot,
12  but he was okay.  So I went to visit him at the hospital.
13  Q.   So when you visited him at the hospital, did he
14  already have his wound treated at that time?
15  A.   Yes.
16  Q.   Do you know what type of firearm it was that he
17  was shot with?
18  A.   No.
19  Q.   Do you know if it was a handgun?
20  A.   No, I don't know.
21  Q.   Do you know if it was an assault weapon?
22  A.   No, I don't know.
23  Q.   And do you know what kind of bullet it was?
24  A.   No.

Page 89

1   Q.   And how was the wound that you saw after it was
2   treated?
3   A.   The wound was a little bit round.  It was like
4   a little round circle.
5   Q.   Where was the wound located?
6   A.   Stomach.
7   Q.   Do you know if it hit any organs?
8   A.   No, it didn't hit any organs.  It missed
9   some -- it missed some organs.
10  Q.   Did your friend have surgery?
11  A.   Yes.
12  Q.   Do you know what of?
13  A.   Bacterial infection after the -- after the
14  treatment of the wound.
15  Q.   Do you know how long he was at the hospital?
16  A.   For a few weeks.
17  Q.   And it was just the one bullet that he got hit
18  with?
19  A.   Yes.
20  Q.   Is there any other gunshot wound that you've
21  personally seen?
22  A.   No.
23  Q.   Actually, do you know who the shooter was?
24  A.   No, we don't know.

Page 90

1   Q.   Do you know if they got convicted?
2   A.   No.
3   Q.   Do you know if they got arrested?
4   A.   No.
5   Q.   So not in person, but either on the video or on
6   the Internet have you seen any real gunshot wound?
7   A.   On the Internet, yeah.
8   Q.   Where?  Where on the Internet?
9   A.   On YouTube.
10  Q.   Which channels?
11  A.   One channel is called Bloody Chicago.  It's
12  like a journalist who goes into scenes of aftermath
13  shootings.
14  Q.   Okay.  So that journalist goes to the scenes
15  after the shooting has taken place?
16  A.   Yeah, after the scene or during -- yeah, after
17  the scene when the police tape up and do their
18  investigation.
19  Q.   Do they show any video of when the injury
20  happens?
21  A.   Injury happening, no.  But they do show the --
22  they show, like, the people getting taken in the
23  ambulance.  That's it.
24  Q.   So do they actually show the gunshot wound?

Page 91

1   A.   Not the wound but the person getting wounded.
2   Q.   At the moment that they get shot or after they
3   get shot?
4   A.   After.
5   Q.   So do you mean they show the wounded person on
6   video --
7   A.   No.
8   Q.   -- after they get shot?
9        And any other YouTube channels?
10  A.   That's it.
11  Q.   And any other places on the Internet?  Any
12  other websites that you've seen a real gunshot wound?
13  A.   No.
14  Q.   Have you seen a gunshot wound otherwise, like
15  on TV shows or something like that?
16  A.   No.
17  Q.   Have you seen any photographs or other images
18  of real gunshot wounds?
19  A.   No.
20  Q.   Have you been a victim of a violent crime?
21  A.   No.
22  Q.   You said you have not shot any firearm in
23  self-defense, right?
24  A.   No.

25  (Pages 88 to 91)

Cutberto Viramontes; et al. v. The Cook County; et al.
Deposition of Christopher Khaya - Taken 2/14/2022

Page 92

1    Q.  That's correct, right?
2    A.  Yes, correct.
3    Q.  Did you ever pull or brandish a firearm in
4    self-defense?
5    A.  No.
6    Q.  Were you ever present in a situation where
7    someone else did in self-defense?
8    A.  No.
9    Q.  Have you ever heard of an assault weapon being
10   misused?
11   A.  Yeah.
12   Q.  Okay.  When?
13   A.  Like heard of it?
14   Q.  Yes.
15   A.  Like the news, mostly criminals that misuse it.
16   Q.  And what have you heard on the news of an
17   assault weapon being misused?
18   A.  Mostly criminals that are shooting other
19   criminals, mass -- not mass shootings but shootouts or --
20   there's shootouts and that's it.
21   Q.  Are these shootouts in Cook County?
22   A.  Mostly in Cook County but South Side.
23   Q.  Do you acknowledge that these assault weapons
24   can be more dangerous than a non-automatic pistol?

Page 93

1    MR. BERGSTROM:  Objection; form.
2    THE WITNESS:  No.
3    BY MS. JANG:
4    Q.  But you have heard of assault weapons being
5    misused in these shootouts that occur in Cook County,
6    right?
7    A.  Some, but not at all.
8    Q.  What is your understanding of how shootings or
9    shootouts can be different when an assault weapon is used
10   versus when a non-assault weapon is used?
11   MR. BERGSTROM:  Objection; form.
12   THE WITNESS:  Shootouts are just similar to the
13   handgun and pistols.  They're pretty much the same.
14   BY MS. JANG:
15   Q.  So you don't believe that there are any
16   differences when assault weapons are used versus
17   non-assault weapons are used in a shootout?
18   MR. BERGSTROM:  Objection; form.
19   THE WITNESS:  There are no differences.
20   BY MS. JANG:
21   Q.  Do you have any knowledge as to the number of
22   people that are injured or killed when an assault weapon
23   is used versus a non-assault weapon?
24   A.  No.

Page 94

1    Q.  Have you ever personally been impacted by a
2    mass shooting?
3    A.  No.
4    Q.  Do you have any concern that a mass shooting
5    may occur at a public event you're attending or a public
6    place where you're present?
7    A.  No.
8    Q.  Do you have any knowledge generally about the
9    fatality rate of shootings when an assault weapon is used
10   versus a non-assault weapon?
11   A.  No.
12   Q.  You don't have any kids, right?
13   A.  No.
14   Q.  But do you have any relatives that are in
15   school?
16   A.  No.
17   Q.  Do you have any concern generally that a
18   shooting may happen at a school?
19   A.  Not really.
20   MS. JANG:  Can we take two minutes?
21   (A recess was taken.)
22   MS. JANG:  We have no further questions.  We thank
23   you very much for your time.
24   MR. BERGSTROM:  All right.  I'm not going to ask any

Page 95

1    questions, but we'll reserve signature.
2    MS. JANG:  We would like to order; PDF, please.
3    MR. BERGSTROM:  Us, too.
4    (Deposition concluded at 1:00 p.m.)
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24

26  (Pages 92 to 95)

Cutberto Viramontes; et al. v. The Cook County; et al.
Deposition of Christopher Khaya - Taken 2/14/2022

Page 96

 1              IN THE UNITED STATES DISTRICT COURT
                  NORTHERN DISTRICT OF ILLINOIS
 2                      EASTERN DIVISION

 3
     CUTBERTO VIRAMONTES, et al.,     )
 4                                    )
                      Plaintiffs,     )
 5                                    )
         -vs-                         )   No. 1:21-CV-04595
 6                                    )
     THE COUNTY OF COOK, et al.,      )
 7                                    )
                      Defendants.     )
 8   _____)

 9
             I, Christopher Khaya, being first duly sworn,
10   on oath say that I am the deponent in the aforesaid
     transcript of my deposition taken February 14, 2022,
11   consisting of pages 6 through 95, taken at the aforesaid
     time and place and that the foregoing is a true and
12   correct transcript of my testimony so given.

13
     _____ Corrections have been submitted
14

15   _____ No corrections have been submitted

16

17

18           Christopher Khaya, Deponent

19

20

21   SUBSCRIBED AND SWORN TO
     before me this      day
22   of                  , A.D., 2022.

23
         Notary Public
24

Cutberto Viramontes; et al. v. The Cook County; et al.
Deposition of Christopher Khaya - Taken 2/14/2022

Page 97

1    NORTHERN DISTRICT OF ILLINOIS    )
     EASTERN DIVISION                  )
2
     STATE OF ILLINOIS                 )
3                                      )    SS:
     COUNTY OF COOK                    )
4

5

6          I, Aneesha L. Williams, Registered Professional

7    Reporter in and for the County of Cook, State of

8    Illinois, do hereby certify that on the 14th day of

9    February, 2022, the deposition of witness, CHRISTOPHER

10   KHAYA, called by the Defendants, was taken before me,

11   reported stenographically and was thereafter reduced to

12   typewriting through computer-aided transcription.

13         The said witness, CHRISTOPHER KHAYA, was first duly

14   sworn to tell the truth, the whole truth, and nothing but

15   the truth, and was then examined upon oral

16   interrogatories.

17         I further certify that the foregoing is a true,

18   accurate and complete record of the questions asked of

19   and answers made by the said witness, at the time and

20   place hereinabove referred to.

21         The signature of the witness was not waived by

22   agreement.

23         Pursuant to Rule 30(e) of the Federal Rules of Civil

24   Procedure for the United States District Courts, if

Cutberto Viramontes; et al. v. The Cook County; et al.
Deposition of Christopher Khaya - Taken 2/14/2022

Page 98

1    deponent fails to read and sign this deposition

2    transcript within 30 days or make other arrangements for

3    reading and signing thereof, this deposition transcript

4    may be used as fully as though signed, and the instant

5    certificate will then evidence such failure to read and

6    sign this deposition transcript as the reason for

7    signature being waived.

8         The undersigned is not interested in the within

9    case, nor of kin or counsel to any of the parties.

10        Witness my official signature as a Registered

11   Professional Reporter, in and for Cook County, Illinois

12   on this 4th day of March, 2022.

13

14

15   _____
     Aneesha L. Williams,
16   Certified Shorthand Reporter
     License No. 084-004443
17   Royal Reporting Services
     161 North Clark Street
18   Suite 3050
     Chicago, Illinois 60601

19

20

21

22

23

24

Cutberto Viramontes; et al. v. The Cook County; et al.
Deposition of Christopher Khaya - Taken 2/14/2022

**A**

**A.D** 1:18 96:22
**a.m** 1:17
**ABC** 40:10
**able** 9:11 46:24
52:19
**accessible** 62:24
**accurate** 15:14
15:24 97:18
**accurately** 9:11
**acknowledge**
92:23
**activities** 19:11
20:4,15
**ad** 13:24
**add** 81:3,5,8
83:24
**additional** 57:5
58:4 81:6
**address** 7:17
8:11
**Adelman** 2:9
4:10
**administration**
4:5
**advanced** 82:1
**advantage** 61:13
**advantages** 61:7
61:11 73:20
**advice** 45:24
**affiliated** 26:9
**aforesaid** 96:10
96:11
**aftermath** 90:12
**agency** 32:5
**agree** 4:9,11
63:11,16,21
64:6,9,14,19
64:22,24 65:8
67:11 71:12
86:5
**agreement**
97:22
**ahead** 7:20

39:22 55:22
61:12
**aim** 63:22 65:8
67:8 73:14,14
**airsoft** 74:7,9
**al** 1:3,6 4:17,18
96:3,6
**Alan** 21:19
**allows** 35:23
**Amazon** 26:8,9
26:11 27:9,12
**ambulance**
90:23
**Amendment**
13:17 14:1
15:2 16:12,16
17:2,4,7,18
18:1,5 20:8,12
20:16 21:17,20
**ammo** 36:20
58:17,18 59:2
59:5,19,20,23
60:4 68:2,3,5
70:17 85:10
**ammunition**
50:18 51:4,6
53:16,17,18,20
53:22 56:20,23
57:6,8,15,18
57:21,22,24
58:4,5,7,14,15
59:7 60:8,9
83:1 84:22
85:2,12
**ammunitions**
50:21
**amount** 72:23
**Aneesha** 1:14
97:6 98:15
**answer** 5:5,17
5:20,23,23 6:1
6:7 14:14,16
60:16 61:12
63:4 70:11
75:23 76:23

79:16,17 81:9
84:14
**answers** 97:19
**anybody** 16:16
44:4
**apartment** 7:18
7:23 8:2,4,8
**appearance** 4:3
**APPEARAN...**
2:1
**applied** 28:4
33:5,6 35:18
**apply** 23:6 32:24
**applying** 22:22
**approximately**
28:21 35:19
44:3 51:21
**April** 27:13 31:8
31:16 87:12
**AR** 69:8 70:2
71:4 80:10,11
**AR-15** 69:2,6,22
70:6,13,19
71:7 72:1,11
73:17 74:16,24
76:9,21 78:24
**area** 36:3 37:11
39:13
**argument** 12:6
**Arizona** 8:14,15
**Armed** 39:14
**armor-piercing**
60:10
**arms** 64:7
**arrangements**
98:2
**arrested** 32:12
90:3
**arteries** 73:23
74:3 75:7
76:17
**artery** 76:16
**articles** 19:13
**asked** 59:20
97:18

**asking** 5:4,16
**assault** 21:5
78:2,8,10,15
78:20,21,22,24
79:7,9,15,17
79:20,22,24
80:8,10,12,17
85:16,22 88:21
92:9,17,23
93:4,9,16,22
94:9
**assistant** 4:21,24
**associate's** 22:2
22:5,14,24
**associated** 22:10
53:19
**Association** 21:7
77:20
**assume** 5:9,20
**assumed** 17:12
**assuming** 17:11
**attack** 66:24
**attacker** 63:17
67:12
**attend** 22:13
**attending** 23:7
24:7 25:20
94:5
**attorney** 4:22
5:1 9:20,21,23
10:1,2 14:13
**Attorney's** 2:7
5:1
**attorneys** 14:9
14:19
**August** 8:12
26:4
**auto** 61:14
**automatic** 61:2
61:3,5,8,15
62:1,4,7
**automatically**
17:5,11,15,17
17:23 20:8
**availability** 59:6

**Avenue** 2:3
**aware** 36:21
60:1 78:19

**B**

**back** 5:15 25:15
27:9 35:10
40:19 59:11
68:23
**background**
12:4,18
**Bacterial** 89:13
**ban** 12:21,22
21:5 78:21
**banned** 78:8
**banning** 78:20
**barrel** 82:21
83:1
**based** 58:17
68:24
**basement** 8:3
**basically** 12:23
18:12
**basis** 19:8 60:7
**bed** 50:7,13
55:15,15,20
56:1 63:7,9
85:1
**behalf** 2:6,12
4:11
**believe** 16:21
17:5,22 20:7
33:11 37:22
84:11 85:15,21
87:12 93:15
**Belmont** 41:19
**Bergstrom** 2:3
4:8,8 10:12
14:4,6,11
47:12 60:3,16
61:9,12 62:8
63:2,8,13,18
63:24 64:11,16
64:23 65:4,10
66:5 67:19

Cutberto Viramontes; et al. v. The Cook County; et al.
Deposition of Christopher Khaya - Taken 2/14/2022

Page 100

69:3,23 70:8
70:21 71:9,15
72:15,20 73:2
73:7,22 74:1
74:17 75:2,19
76:14,23 78:3
78:12,16 79:1
79:8 80:13
82:13 83:6
84:1,14 85:18
85:23 86:7,12
93:1,11,18
94:24 95:3
**best** 87:4 88:4
**better** 49:24
50:1 53:1
69:15 73:14
**bigger** 68:3,5
**bike** 31:11
**birth** 7:1
**bit** 5:15 9:5
53:12 61:17
72:9,10,10,11
89:3
**Bloody** 90:11
**bodily** 86:2
**body** 40:15
63:22 64:9
65:1 67:8,12
73:9 74:20
76:12
**bought** 58:3,17
59:24
**brand** 58:1,6
68:13,14
**brandish** 92:3
**Brandon** 21:22
**brands** 60:18
**break** 6:5,8
22:21 54:4
68:16 84:4
**breaks** 68:11
82:22
**breath** 60:10
**briefly** 24:13

**bring** 36:17
40:13 44:24
46:17,18
**broke** 47:12
**broken** 82:19
**brother** 44:5,7,9
44:10,14 46:14
46:22 87:4
88:4
**brother's** 45:10
65:19
**building** 7:24
37:2
**built** 69:7,13
71:4,19,21
83:2
**bullet** 73:12,21
74:4,12,16
86:22,24 87:18
88:23 89:17
**bullets** 42:11
58:24 59:1,2,8
72:8,9,11,14
72:19 73:1,17
**busser** 30:19
31:3
**buy** 48:14,18,20
49:21 50:2
51:16 58:10,14
59:18,23 78:22
80:3 81:23
84:19
**bystander** 66:12

— C —

**C-A-B-E-L-A'S**
57:12
**C-O-L-I-N**
77:22
**Cabela's** 57:10
57:12,20 58:13
58:22
**caliber** 34:17
55:7,8,9,10
65:23 68:1

70:12,13,15,18
71:6,13 72:9
74:4,5,12
**calibers** 70:9
**call** 35:5 54:11
54:13
**called** 1:10 6:11
18:10,11,17
24:1 26:8
27:20,22 30:1
30:18 34:17
41:16 57:24
58:1,6 77:12
77:19,21 90:11
97:10
**capacity** 48:4,6
61:24 84:10
**car** 36:19 37:13
87:21
**card** 32:17,18
32:21,22,24
33:5,8,10,13
33:16,18,21
34:2,5 35:12
35:14,18,20,22
35:23 46:15,17
**cards** 44:6 46:14
**carjackings**
39:14
**carried** 37:14,16
37:17,21,23,23
38:3,22,24
39:2
**carry** 35:12,14
35:18,22,23,24
36:1,6,10,12
36:13,14,15,22
36:22 37:1,4,7
37:10 38:3,6
38:11,15 41:17
52:2,11,17,20
52:20 65:5
77:20
**carrying** 37:12
38:16 62:16

**case** 7:13 16:5,8
50:5,6,8,13
55:20,24 56:18
85:1 98:9
**cash** 46:5
**categorized**
80:11,12
**category** 80:10
**caught** 87:20
**cause** 61:16
**caused** 73:6
**CCL** 36:8 41:8
43:10
**Center** 2:9
41:17
**center-fire**
60:23,24,24
**cents** 49:9
**certificate** 98:5
**certification**
23:19
**Certified** 98:16
**certify** 97:8,17
**challenging**
12:21 21:5
**chamber** 48:13
**changing** 79:22
**channel** 18:11
18:15,15,16,19
77:18 90:11
**channels** 18:8
90:10 91:9
**Cheesecake**
30:24 31:2
**chest** 67:23
**Chicago** 2:10
7:16,18,20,20
40:2,2,9,9,10
90:11 98:18
**Chief** 4:20
**choice** 66:4
**choose** 49:21
51:24
**Chris** 60:17
**Christopher**

1:10 3:3 4:15
6:10,16 14:11
76:24 84:14
96:9,18 97:9
97:13
**church** 37:2
**circle** 89:4
**circumstances**
68:8 74:19
**city** 8:15,16
43:18
**civil** 1:12 7:13
97:23
**clarification**
5:11 8:23 12:3
27:4 29:18
66:14
**clarify** 40:24
75:20
**Clark** 98:17
**classes** 23:16
24:7 41:15
**clean** 41:13 56:3
56:6,8
**cleaning** 56:12
56:13,17
**clip** 71:22
**closet** 50:22,23
50:24 51:1
**Coach** 27:20,22
27:23
**Coalition** 13:14
13:15 14:1,2,8
14:23 16:22,23
17:13,17,20,24
18:4,7,22 19:1
19:12,15 20:5
20:10 21:14,17
21:23
**code** 7:21
**Colin** 77:21
**collecting** 70:4
**collection** 81:3,8
81:12 83:24
84:2

Cutberto Viramontes; et al. v. The Cook County; et al.
Deposition of Christopher Khaya - Taken 2/14/2022

Page 101

Collectors 18:11
  18:17 77:17
College 22:4,13
  25:20
Combs 21:22
come 19:24
  39:18 46:19
commencing
  1:17
commission
  82:15,18
commit 76:3
common 78:1,4
  78:9
communication
  14:18
company 24:11
  24:20,21,21
  25:5,8 26:9,20
  26:23 27:1,5,7
  27:16,20 30:1
compared 52:14
  66:12 68:2
  74:3,15
Comparing
  76:11
compartment
  55:14 84:23
complaint 3:10
  10:18,20 13:5
  13:10,13,16,20
  13:21 14:8,10
  15:4,7,10,13
  15:17,20,23
complete 97:18
completed 28:10
COMPLEX 2:8
computer-aided
  97:12
conceal 35:23
  36:10,12,13,14
  36:15,21 37:1
  37:4,7 38:3,6
  38:22 39:2
  52:11,17,19,20

concealed 35:11
  35:14,18,22,23
  36:1,6,22
  37:14,16,17,21
  38:2,11 41:16
  52:2 77:20
concern 94:4,17
concluded 95:4
conditions 9:8
  9:16
connection
  47:12
consider 62:11
considered
  79:14
consisting 96:11
continue 61:15
continues 61:6
continuing
  61:16,18
contracting 28:2
  30:1
contractor
  24:10 26:7
control 50:1
  53:12,13 61:19
conversation
  12:9
convicted 32:10
  90:1
Cook 1:6,16 2:7
  4:17 5:1 7:16
  12:2,21 78:19
  79:24 92:21,22
  93:5 96:6 97:3
  97:7 98:11
COOPER 2:2
copy 15:20
correct 8:9 47:6
  50:14 56:21
  72:2 73:18
  82:5 92:1,2
  96:12
corrections
  96:13,15

correctly 87:15
cost 49:5 52:3,4
counsel 4:2 98:9
counties 78:7
County 1:6,16
  2:7 4:17,17 5:1
  7:16 12:2,21
  78:19 79:24
  92:21,22 93:5
  96:6 97:3,7
  98:11
couple 10:19
  11:10 18:8
  59:11
course 41:11
court 1:1 4:2,19
  5:24 7:3,10
  10:17 96:1
Courts 1:13
  97:24
cousin 44:5,7,8
  44:11,12,13
  45:1 46:14
cousin's 45:1
  46:19
crack 83:1
crime 32:10,12
  36:3 39:13
  76:4 91:20
crimes 39:14
criminal 7:13
  86:8
criminals 92:15
  92:18,19
crossfire 87:20
Crystal 8:21
currently 8:17
  23:5,7,22
  47:19 59:22
  74:23 82:24
  85:6
Customers'
  58:22
customized 71:5
  71:20

Cutberto 1:3
  4:16 16:2,4
  96:3
CV 4:18
CW 40:9
CWB 40:2
cylinder 72:10

D

D 3:1
dad 8:18 11:4
Daley 2:9
damage 72:24
  73:5,10
dangerous 75:1
  75:4,10,18
  76:4,6 86:5
  92:24
Database 77:13
date 7:1
dates 43:23
David 2:9 4:10
david.adelma...
  2:11
day 1:18 19:20
  20:1 28:15,16
  28:17,21 29:1
  29:2,2 38:9
  96:21 97:8
  98:12
days 38:9 98:2
DC 2:4
dealer 57:13
death 86:3
December 27:2
  27:21 28:4,7
  28:12,20 30:5
  30:7,12 37:22
  56:15 57:17
  58:11
decide 58:23
decided 25:14
  25:14 58:19
  59:23
deciding 20:24

dedicated 68:17
  68:21 77:8
defendant 7:12
defendants 1:7
  1:11 2:12 4:11
  5:2 96:7 97:10
define 78:15
defined 79:14
definition 79:17
degree 22:2,6,8
  22:14,24
deliver 24:14
delivered 26:12
  30:2 31:11
delivery 24:1,3
  24:6 25:15
department
  32:5
depending
  75:15,18,21
depends 20:2
  64:17 67:7,11
  68:13 69:24
  70:1 71:19
  73:10,13 74:19
  75:11,13 81:15
deponent 96:10
  96:18 98:1
deposition 1:10
  4:4,6,15 7:7
  9:19 10:15,24
  11:6,10,14,16
  11:19 13:1,7
  35:11 54:23
  95:4 96:10
  97:9 98:1,3,6
depositions 1:14
describe 24:13
  37:9 69:21
  85:15,21
designed 81:21
desk 46:5
Devon 43:17
difference 46:13
  52:19 60:22

Cutberto Viramontes; et al. v. The Cook County; et al.
Deposition of Christopher Khaya - Taken 2/14/2022

Page 102

61:1 70:18,20
71:7,13,22
72:7,13,18,23
73:5 76:22
77:5
**differences**
71:18 93:16,19
**different** 15:21
26:1 27:1
48:15,16 50:18
50:20 52:10
58:6,7 60:14
60:18,19,19
67:16 69:8
70:9,12 71:2,4
71:21 72:24
93:9
**differently**
71:21
**direction** 46:7
87:19
**directly** 14:22
15:1 16:15
17:6,10
**disadvantages**
73:21
**discuss** 11:8,12
11:24 12:15
**discussed** 59:16
**Discussion** 5:13
10:21 84:6
**dishwasher**
30:19,20
**District** 1:1,1,13
4:19,19 96:1,1
97:1,24
**DIVISION** 1:2
96:2 97:1
**documents**
10:10
**doing** 4:12
**DoorDash** 30:1
**dragon's** 60:10
**driver** 24:1,3,6
**driving** 20:24

24:24
**drove** 28:1
**due** 20:9 36:3
59:2
**dues** 18:24 19:3
20:12
**duly** 6:11 96:9
97:13
**Dundee** 42:6

─────── **E** ───────

**E** 3:1
**e-mail** 19:22,23
19:24
**earlier** 69:14
**easier** 52:12,13
52:16,17,21
62:23 63:21
65:2 66:13,15
**easily** 63:16
**EASTERN** 1:2
96:2 97:1
**education** 22:1,9
**educational**
22:23 23:16
**effect** 4:7
**efficient** 82:2
**either** 7:13
11:21 20:18
26:2 41:2,3,4
44:6 47:3,9
56:16 62:6
66:18 83:4
90:5
**elaborate** 39:13
**Email** 2:5,11
**emergency**
62:24
**employed** 23:22
32:2
**employment**
25:1,21 26:5
27:18 29:11
30:9,16,21,23
31:6,14

**endangering**
63:12
**ended** 52:8
59:19
**enforcement**
31:23 32:2,5
**enrolled** 20:8
**entire** 8:8 22:17
**entirely** 23:12
**equipment**
57:14
**essentially** 75:13
**estimate** 43:5,7
**estimated** 43:22
**et** 1:3,6 4:17,18
96:3,6
**event** 94:5
**evidence** 98:5
**exactly** 49:10
**examination**
1:11 3:4 6:13
**examined** 97:15
**example** 76:19
**Exhibit** 3:10
10:18 13:6,7
**EXHIBITS** 3:9
**experience**
86:16
**explain** 12:5,19
13:2
**express** 4:3
**extent** 14:12
**extra** 10:19

─────── **F** ───────

**fact** 59:6
**Factory** 30:24
31:2
**fail** 82:3
**fails** 98:1
**failure** 98:5
**fair** 5:10,21,22
83:23 86:15
**fall** 22:7 23:17
**familiar** 16:12

21:6
**family** 38:9,12
63:12
**fatal** 67:18
73:24 74:2,13
74:15,18 75:7
76:17
**fatality** 94:9
**father** 11:4,5,23
12:10,12,16,24
33:9,10,18
34:7,9 36:8
**father's** 8:20
**features** 60:19
81:18,20
**February** 1:18
96:10 97:9
**Federal** 1:12
97:23
**FedEx** 30:11,13
**feel** 74:6,6,8,9
74:10
**feeling** 9:4,5
38:16,16
**feet** 37:2,12
**FFL** 49:6,11
**filed** 11:22 15:5
15:11,14
**find** 18:6 88:10
**fine** 4:14 9:7
83:14
**finger** 46:8
61:19
**finish** 51:11
**fire** 49:19 61:14
61:15,16,18,19
61:20 62:7
**firearm** 33:1,2,4
33:20 34:1,4,7
34:10,12,21
35:24 36:10,12
36:16,22 37:15
37:17 38:3,7
38:11,14 40:15
41:1 42:19

46:4,7,24
47:10,16 49:11
53:9 61:3,8,8
62:1 69:16
73:15 75:16,17
75:22 77:13
81:13,14,18,19
83:2 88:16
91:22 92:3
**firearms** 13:14
13:15 14:1,2,7
14:23 16:22,23
17:12,16,19,24
18:3,6,21,24
19:12,15 20:4
20:9 21:14,16
21:16,22 32:21
35:10 36:13,14
41:3 42:20
47:9,22 48:14
50:19 54:9
60:12 62:3,7
68:18,21 71:14
72:4,8,19,24
75:10 77:8,17
81:5,6,11,16
82:14,20,23
83:17 84:18
85:9
**firearms'** 77:12
**fired** 41:2 72:14
**firing** 49:19 61:6
**first** 6:11 7:9 8:6
8:7 9:6 27:2
35:22 40:19
43:8 44:10,15
44:22 48:18
51:13,17,18
56:14 83:4,11
87:7 96:9
97:13
**first-aid** 32:14
**five** 22:15 43:7
43:22 44:3,24
45:17 84:4

Cutberto Viramontes; et al. v. The Cook County; et al.
Deposition of Christopher Khaya - Taken 2/14/2022

Page 103

**Flex** 26:8,11
27:9,12
**floor** 8:6,7,8
**floors** 7:23
**FOID** 32:17,18
32:20,22,24
33:5,8,10,13
33:16,18,21
34:1,5 35:19
44:6 46:14,15
46:17
**followed** 58:21
**follows** 6:12
**food** 30:2
**force** 4:6 20:24
**foregoing** 96:11
97:17
**form** 14:4 60:3
60:16 61:9
62:8 63:8,13
64:11 66:5
67:19 69:3,23
70:8,9,21 71:9
71:15 72:15
73:7,22 74:17
75:2,19 76:14
76:23 78:3,12
78:16 79:1,8
80:13 82:13
83:6 84:1
85:18 93:1,11
93:18
**found** 18:21
**Foundation**
13:17 15:2
16:13,16 17:3
17:4,8,18 18:1
20:8,13,16
21:17,20
**four** 44:12 65:16
**friend** 38:9 88:4
88:7,11 89:10
**friend's** 26:19
38:12
**friends** 65:19

**friends'** 87:4
**front** 46:5
**full** 54:2
**full-time** 30:3,4
31:4,12
**fully** 61:14,14
98:4
**functions** 71:21
**further** 94:22
97:17

——————
**G**
**G-A-L-I-L** 80:5
**G-A-L-L-E-R...**
43:15
**G-A-T** 42:4
**G-O** 24:1
**G-U-N-S** 42:4
**Galil** 80:4,6,12
80:22,23 81:2
81:23 82:8,9
82:11,22 83:10
83:21,24 84:9
85:3,8,13,16
**Galleries** 43:13
43:16,21,24
44:4,9,16
45:15,18,23
48:23
**game** 69:13
**Gat** 41:24 42:2,5
**General** 22:9
**generally** 94:8
94:17
**getting** 33:15
34:5 38:16
59:19 90:22
91:1
**give** 5:19
**given** 7:7 96:12
**Glock** 42:18
65:23,23
**Glocks** 66:1
**go** 5:12 7:20
22:17 24:1,4,6

24:10,20,24
25:15 35:10
38:7 39:22
40:8 42:22
43:12,23 44:4
44:8 45:2
55:22 61:6,12
68:20,23
**goes** 46:22 73:12
90:12,14
**going** 9:24 11:9
11:13 27:9
40:19 42:24
66:11 75:22
81:13 86:12
94:24
**good** 4:12 58:19
62:20
**gotten** 58:4
**Gottlieb** 21:19
**graduate** 31:18
**graduated** 31:21
**grain** 68:3
**great** 86:2
**grip** 53:1
**groceries** 24:14
26:12 31:11
**group** 87:18
**guess** 9:20
**guest** 46:18,19
46:20,21,22
47:1
**gun** 18:11,12,13
18:17 21:2,4
35:6 36:20
38:17 40:13
42:15,17 44:13
49:6 50:1 52:1
52:5,7 53:11
56:12 61:16,17
61:18 63:23
64:4,7,10,14
64:17 65:1
66:10 68:10
71:20 74:7,9

76:7 77:17
81:12 82:2,21
83:3,24 84:2,3
85:4
**gunpowder** 68:4
**guns** 18:12
41:24 42:2,5
44:13,15,18,18
47:4 55:7
56:16 64:19
66:18
**gunshot** 86:10
86:16,17,20
89:20 90:6,24
91:12,14,18
**Gurnee** 57:10
**guy** 18:12

——————
**H**
**H-Y-D-R-A-S...**
58:6
**Hampshire** 2:3
**hand** 53:9,14
65:9 66:10
**handgun** 35:3,8
50:5 52:10,20
52:21,21 53:8
53:11 54:10,18
55:4 60:19
62:11,20 64:15
65:3,9 67:6,16
67:24 68:5,8
69:15 82:5
83:5,9,11,15
85:3,6 88:19
93:13
**handguns** 60:15
64:20 65:13,20
66:3
**handle** 52:12,13
52:22 66:13,16
**handler** 30:14
**handles** 75:15
**handling** 75:11
**hands** 53:6,10

53:13 64:7
86:6
**happen** 94:18
**happened** 87:16
**happening**
90:21
**happens** 90:20
**harm** 76:3 86:2
**Harry** 22:4
**head** 6:1
**healed** 87:1
**hear** 5:24 63:4
70:11
**heard** 14:13
92:9,13,16
93:4
**heavier** 64:14,19
**heavy** 64:17
**held** 25:1,2,21
26:6,17,21
27:19 29:12
30:17 31:6,14
**Hellin** 2:8 4:10
4:21,24
**hellin.jang@c...**
2:11
**hereinabove**
97:20
**high** 31:18,21
**higher** 68:3
**highest** 22:1
**hit** 66:11 73:8,9
73:23 74:3,6
74:10,20 76:16
76:20,20,21,21
87:19 89:7,8
89:17
**hold** 24:23 62:4
66:10
**holding** 76:7
**hollow** 53:24
54:2,3 58:1,15
58:23 59:3,8
59:17,21 60:2
**holster** 40:16,19

Cutberto Viramontes; et al. v. The Cook County; et al.
Deposition of Christopher Khaya - Taken 2/14/2022

40:22
home 40:13 41:5
44:23 62:18,21
66:19
honest 82:10
hospital 88:12
88:13 89:15
hour 1:17 11:10
hours 11:10
24:15,17,18
28:15,21,24
29:2
house 34:4 50:3
62:16 63:12
household 33:7
36:5
housing 37:3
hunting 57:14
69:8,9,12,13
69:19,20,22
70:1,3 72:1
hydra-shok 58:6
58:14 59:12

**I**

identification
13:8 32:21
illegal 60:2,9
Illinois 1:1,17
2:10 4:19 7:19
7:20 41:12,16
42:6 57:10
96:1 97:1,2,8
98:11,18
images 91:17
IMFDB 77:12
imminent 86:1
impacted 94:1
impair 9:9
incident 88:10
incidents 39:16
included 49:10
increase 36:3
39:12
independent

24:10 26:7
28:1 29:24
INDEX 3:9
infection 89:13
info 12:20
information
14:15 23:15
injure 67:9 75:6
injured 67:17
93:22
injuries 76:12
76:22
injury 67:13,16
76:8,15 86:3
90:19,21
innocent 66:11
inoperable
82:20
inside 36:17
41:4 62:21
66:6,9
instance 76:9
instances 39:19
40:14 75:17
instant 98:4
instruction
45:24 46:10
instructors 46:4
insufficient 68:9
intend 23:6
intended 76:5
intent 75:21
76:2,3,13
intention 23:4
intentions 22:22
interested 21:13
21:14 98:8
interfere 9:14
9:17
Internet 40:4,6
40:8 77:13
86:11 90:6,7,8
91:11
interrogatories
97:16

interruption
4:23 5:8 29:17
investigation
90:18
involved 21:16
41:21
Israel 82:1
it'll 49:19,19
68:1 74:6,8

**J**

J 2:9
jacket 53:24
54:2,2 58:1,15
59:3,21 60:2
jammed 68:10
Janet 8:21
Jang 2:8 3:4
4:10,10,15,21
4:24,24 5:9,12
5:15,23 6:5,14
7:6 9:1 10:13
10:17,22 12:8
13:5,9 14:5,20
14:21 27:6
29:19 47:14,15
54:4,6 60:6,21
61:10,21 62:10
63:3,10,15,20
64:3,13,18,23
65:7,12 66:7
66:17 67:21
69:5 70:5,10
70:24 71:11,17
72:17,22 73:4
73:11 74:21
75:5,24 76:18
77:3 78:5,14
78:18 79:3,11
80:19 82:16
83:8 84:4,8,16
85:20 86:4,9
86:14 93:3,14
93:20 94:20,22
95:2

January 23:9,10
23:17 27:3,3
28:20 30:5
job 25:14 26:7
28:2,5,10
29:16
join 18:3 20:18
21:1
joined 16:22
17:16,18
journalist 90:12
90:14
Joyal 16:7,10
Judge 4:20
July 27:14 29:14
32:23
jump 14:11
June 25:2 27:13
30:22 31:1,9
31:19,21

**K**

K-H-A-Y-A
45:9
keep 40:15 46:8
49:19 50:6
51:9 56:20
keeps 79:22
Kevin 45:11
Khaya 1:10 3:3
4:12,16 6:10
6:16,21 8:20
8:21,22 13:10
15:16 45:3,5,8
96:9,18 97:10
97:13
kids 94:12
kill 66:23,24
67:3,8,10 76:5
killed 93:22
kin 98:9
kind 42:17
45:24 88:23
kinds 65:20
KIRK 2:2

know 5:7,19 6:6
11:11 13:19
14:7 16:2,7
18:13,14 21:19
21:22 25:19
32:17,20 39:8
51:11 60:1,14
60:18,22 61:1
62:9 63:19
64:4 65:13,16
65:20 66:1,1
69:1 71:10
78:10,13,17
79:21 80:11
81:17 82:23
85:14 86:19,21
88:3,16,19,20
88:21,22,23
89:7,12,15,23
89:24 90:1,3
knowledge
14:16 34:9
93:21 94:8
knowledgeable
60:11
known 6:23
86:17

**L**

L 1:14 97:6
98:15
label 79:20
labeled 80:9,17
large 84:12,15
law 31:23 32:2,4
laws 41:12
lawsuit 5:3
11:22 12:5,7
12:13,15,18
13:3 20:19
lawsuits 19:14
learn 39:18
learning 41:11
leave 37:13
left 40:23 44:22

Cutberto Viramontes; et al. v. The Cook County; et al.
Deposition of Christopher Khaya - Taken 2/14/2022

Page 105

left- 40:20
leg 67:24 76:10
76:11,20
legal 60:4,7
78:23 79:23,24
length 22:17
let's 18:10 32:17
47:24 48:17
51:15
lethal 66:23 67:2
67:16,23 68:1
level 22:1
license 36:2,6,22
38:3 49:6
98:16
life 19:9
lift 64:7,10
Lincolnwood
43:19
liquor 38:10,12
39:3,8 65:18
LITIGATION
2:8
little 5:15 9:5
31:20 53:12
61:17 72:9,10
72:10,11 89:3
89:4
live 7:15 8:13,17
lived 8:11
load 41:13
loaded 50:10,16
84:20
located 41:18
42:5 43:16,17
89:5
location 62:24
73:12
lock 36:20 38:19
locked 50:8,9,11
50:17 51:9
56:18
long 8:11 10:7
12:15 18:18
22:13 24:3

26:13 49:19
63:22 64:4,7
64:10,14,19
65:1 68:16
76:16 89:15
longer 72:11
73:18,21
look 77:11
looked 58:18
looking 81:17
looks 71:3
loose 79:10
Lyft 28:1,14
29:6

——— M ———
magazine 36:20
47:24 48:12
71:22 84:12,15
magazines
68:17
Maggiano's
30:18,21
maintain 68:16
major 22:10
March 16:21,24
26:18 98:12
mark 10:18
marked 13:8
mass 92:19,19
94:2,4
matter 4:16
McCormick
43:17
mean 17:15
19:18 21:3
37:9 44:18
49:23 62:18
69:21 71:1
76:1 79:12
81:4 82:17
86:19 91:5
meaning 17:16
17:17 68:3
79:13 82:19

means 50:1
79:22
medical 9:8,16
32:14
medications
9:13
meet 10:7
member 16:18
16:20 17:7,12
19:9 21:9,12
members 63:12
membership
17:23 19:2,3
20:9
memory 9:9,14
9:17
merged 51:12
met 9:21,22
metal 54:2
mid 44:2
middle 6:18
MII 80:4
military 32:7
82:1
millimeter
55:11 59:20
67:7 68:2,7
mind 33:4
mine 24:22
minimal 42:7
minutes 10:9
12:17 84:4
94:20
missed 89:8,9
misuse 92:15
misused 92:10
92:17 93:5
mixed 37:2
model 66:2
Moie 87:6
mom 8:18
moment 59:22
71:23 91:2
Monday 39:7
month 23:9,10

25:2 26:2 38:2
51:21,22
monthly 19:4
months 26:14,15
27:10,11,13
30:19 35:19
morning 4:12,13
11:7 12:11,13
12:16
mother 11:18
mother's 8:20
move 51:15
movie 29:13,20
77:13
Mozart 7:18
MP 34:24 35:1,2
multiple 39:5

——— N ———
N 3:1
N-O-I-R 77:22
name 4:21,24
6:15,18,21,23
8:20,21,21
18:13,14,15,16
45:1,9,10,12
71:22 87:5,6,7
87:9
names 8:19
77:12
National 21:6
nature 39:15
near 76:16
need 6:5 53:5,12
64:6,9 65:1,5
needed 63:22
83:3
neither 75:9
nervous 9:5
never 86:21
New 2:3
news 19:13,18
39:20,21,23
40:1,8 92:15
92:16

news-related
19:14
newsletter 19:17
19:19,22
newsletters 20:3
nod 6:1
Noir 77:22
non-assault
93:10,17,23
94:10
non-automatic
92:24
North 7:18
98:17
Northern 1:1
4:19 96:1 97:1
Notary 1:15
96:23
notice 1:11
November
29:14 37:23,24
38:21,23,24
39:1,11 40:14
44:2 45:18
51:18 57:3
NRA 21:6,9,12
21:13
number 5:4,16
43:5 93:21
NW 2:3

——— O ———
O-G-N-U-B-B...
87:10
oath 4:5,6 5:6,18
96:10
object 60:16,17
86:12
objection 10:12
14:4 60:3 61:9
62:8 63:2,8,13
63:18,24 64:11
64:16,21 65:4
65:10 66:5
67:19 69:3,23

Cutberto Viramontes; et al. v. The Cook County; et al.
Deposition of Christopher Khaya - Taken 2/14/2022

Page 106

70:8,21 71:9
71:15 72:15,20
73:2,7,22
74:17 75:2,19
76:14,23 78:3
78:12,16 79:1
79:8 80:13
82:13 83:6
84:1 85:18,23
86:7 93:1,11
93:18
**occur** 93:5 94:5
**October** 30:7,11
  35:15,15,16,17
  37:18 43:4,10
  44:1 45:18
  48:21 56:2
**Office** 2:7 5:2
**official** 98:10
**Ognubbni** 87:10
**Oh** 12:4 85:9
**okay** 6:8,9 11:15
  13:5,10,18
  14:20 15:10
  16:23 17:7,19
  23:2 25:6 26:5
  28:20 29:23
  30:9 31:23
  48:11,17 54:18
  54:21 56:4,9
  57:3,15 59:4
  59:15 60:18
  62:20 66:3
  68:14 69:14
  70:6,18 71:6
  73:5 75:17
  76:1,19 77:7
  77:14 79:23
  82:11 85:2
  86:24 88:12
  90:14 92:12
**old** 9:2
**older** 44:7
**on-and-off** 28:5
**once** 20:1 49:19

**ones** 18:9
**online** 19:21
  23:12 24:7
  59:13
**opinion** 74:22
  74:24 75:3
**oral** 97:15
**order** 42:8 95:2
**ordered** 59:13
**ordinance** 78:19
**organization**
  16:18
**organizations**
  13:18,19 20:18
  20:21,22 21:15
**organs** 89:7,8,9
**originally** 84:23
  84:24
**Outdoor** 58:1
**outside** 40:13
  41:4 43:9 47:4
  62:16,16,17,18
  66:6
**owned** 47:22
  78:10
**ownership**
  85:16,22

—————
**P**
—————
**P-U-F-F** 24:2
**p.m** 95:4
**package** 30:14
**packages** 26:12
  30:14
**page** 15:18,19
**pages** 40:7 96:11
**Pallmeyer** 4:20
**parents** 10:23
  11:2,21
**park** 37:2
**part** 76:12 82:19
**part-time** 29:16
  29:20 30:3
  31:4,5,12,13
**participate** 88:1

88:5,7
**particular** 33:4
  52:9 53:19
  81:22
**parties** 98:9
**parts** 68:10
  71:21 80:15
**party** 20:19
**pass** 42:8
**pay** 19:8
**PDF** 95:2
**penalty** 4:7
**pending** 4:18
  6:7
**people** 65:2,13
  65:14,15,17
  76:19 78:11
  86:16 87:18
  90:22 93:22
**perjury** 4:7
**person** 4:7 67:17
  73:9 75:11
  76:7 86:10,17
  86:19 87:3
  88:5 90:5 91:1
  91:5
**person's** 75:21
**personal** 14:16
**personally**
  89:21 94:1
**pertaining** 1:13
**Pete** 14:18
**Phoenix** 23:3,5
  23:6 24:8
**Phone** 2:4,10
**phonetic** 87:6
**photographs**
  91:17
**picking** 59:18
**pistol** 60:23,23
  92:24
**pistols** 93:13
**place** 4:4 57:20
  90:15 94:6
  96:11 97:20

**placed** 30:15
**places** 91:11
**plaintiff** 4:8
  7:12 16:5,7
**plaintiffs** 1:4 2:6
  4:16 96:4
**planning** 23:2
**platform** 68:23
  69:1
**please** 4:2 5:6,18
  5:23 6:17 95:2
**pleasure** 70:2,3
**PLLC** 2:2
**plus** 34:24 35:2
  35:5,7,8 37:5,8
  41:3 44:17,21
  44:24 47:20
  48:7,11,12,13
  50:12,16 51:15
  52:3,10,12
  53:8,23 55:5
**point** 12:5 15:8
  46:7 58:2,15
  59:3,5,8,21
  60:2 84:19
**points** 53:24
  54:2,3 58:23
  59:17
**police** 90:17
**Policy** 13:14,15
  14:1,2,7,23
  16:22,23 17:12
  17:17,19,24
  18:3,6,22,24
  19:12,15 20:5
  20:9 21:14,17
  21:23
**popular** 66:3
**position** 25:21
  26:1,2 27:9
  29:16,20
**positions** 24:23
  25:1 26:5,17
  26:21 27:18
  29:11 30:16,23

31:6,7,14
**possible** 65:8
  67:15
**possibly** 61:16
  87:17
**Postmates** 31:8
  31:20
**power** 53:11
  72:18
**preferred** 53:13
  80:4
**prepare** 9:19
**prepared** 9:22
  10:2 13:13,16
  13:20,21 14:8
**present** 92:6
  94:6
**press** 49:18
**pressing** 61:19
**pretty** 62:2 70:2
  71:4 93:13
**previous** 40:24
**printing** 26:19
  26:23
**prior** 8:13 12:12
  25:19 26:6,22
  26:23 27:24
  34:4
**privileged** 10:1
  14:14
**probably** 11:10
**problem** 79:13
**Procedure** 1:12
  97:24
**produce** 76:15
  86:2
**Professional**
  1:15 97:6
  98:11
**program** 22:23
  23:12
**prohibited**
  37:12
**pronounce** 6:21
**properly** 85:24

Cutberto Viramontes; et al. v. The Cook County; et al.
Deposition of Christopher Khaya - Taken 2/14/2022

Page 107

86:1
property 37:13
provide 42:15
  46:11 81:9
public 1:16 37:3
  37:13 94:5,5
  96:23
Puff 24:1,4,6,11
  24:20,24
pull 10:17 13:5
  49:20 61:5
  92:3
purchase 33:20
  51:24 52:10
  56:23 57:8,15
  57:18 58:12,19
  80:1 83:24
  84:9 85:12
purchased
  34:10 48:24
  51:13,22 57:1
  57:1,5,17 59:4
  59:8,9 85:7
pursuant 1:11
  1:12 97:23
put 36:18

**Q**
question 5:6,10
  5:18,20 6:6
  14:20 40:24
  47:13 75:21
  85:19
questioning
  12:23
questions 5:4,16
  10:19 14:14
  43:1 94:22
  95:1 97:18

**R**
R-A-M-I-Z 8:24
R-O-E-H-L
  27:5
R-O-S-S-I 34:17

34:20
rack 36:19
Ramiz 8:20,24
range 42:22
  43:2,6,9 44:14
  44:21 45:2,21
  46:16 47:4,7
  49:3 56:12,18
  82:9 84:3
ranges 45:14
rate 61:14,19
  94:9
re-ask 47:13
read 5:14 15:10
  19:13,18,19,21
  68:17,20 98:1
  98:5
readily 62:24
reading 20:3
  98:3
real 90:6 91:12
  91:18
really 37:11
  81:20 82:11
  94:19
reason 21:11
  22:20 59:7,15
  81:22 98:6
reasons 61:22
  83:20
Rebecca 4:20
receive 22:5
  32:22 33:10,13
  33:15 42:12
  45:24
received 22:23
  33:18 35:19
  38:2
receiving 22:14
recess 54:5 84:7
  94:21
recoil 50:1 53:1
  80:16,16,16
record 4:3 5:12
  5:13,14 10:21

84:5,6 97:18
redirected 63:17
reduced 97:11
refer 35:6 54:13
  54:14,18 55:3
referred 97:20
referring 54:24
  55:4
regarding 21:15
regards 77:17
register 17:3,6
  17:10
registered 1:15
  16:24 17:5,11
  17:14,24 97:6
  98:10
registers 46:5
regular 54:12
  58:24 59:1
relative 38:12
  65:18
relatives 94:14
relax 22:21
relevance 86:12
remainder
  65:24
remember
  27:11 38:21
  42:10,17 87:14
remote 4:5,5
render 73:1
rented 44:16
repeat 55:18
  79:16 85:19
rephrase 5:7,19
replenished
  58:4
reported 97:11
reporter 1:15
  4:2 5:11,24 7:3
  8:23 10:17
  12:3 27:4
  29:18 66:14
  97:7 98:11,16
reporting 4:5

98:17
representing 5:2
requested 5:14
required 33:12
  41:7 42:7
reserve 95:1
responsible
  85:16,21
rest 44:11,11,16
  44:23 54:23
restaurant
  30:18
restaurants 30:2
restocked 57:5
resulting 86:2
review 10:10
  58:17
reviewed 15:13
  15:23
reviewer 18:12
  18:13
reviews 18:12
  58:18,21,22
Richard 2:9
rifle 21:7 35:4
  49:12 52:14,18
  53:5,6 54:10
  54:11,12 55:1
  55:9 65:6
  66:12,15 67:15
  67:23 68:6,12
  68:13,24 69:7
  69:8,9,12,18
  69:19,22 70:7
  70:15,19 71:7
  71:24 74:23
  76:11,21 79:2
  79:5 80:20,23
  81:2 82:4 83:4
  83:9,11,12
  85:5
rifle/self-defe...
  69:20
rifles 21:5
right 16:13

17:20 24:20
  37:5 47:4 53:6
  56:18 64:4
  73:13 74:13
  80:1 83:5,18
  87:23 91:23
  92:1 93:6
  94:12,24
right-handed
  40:20,21
rights 18:5 21:2
  21:4
rim-fire 60:23
  60:24
robberies 39:14
Rockwell 87:15
  87:15
Roehl 27:1,5,15
room 51:1
Rossi 34:17,20
  35:3 41:3
  44:20,22,23
  47:20 48:1,6
  48:19 49:21
  50:2,4,10
  51:12,22 52:14
  52:17,20 53:5
  53:17 54:13,15
  54:16,24 55:8
  55:14,17,19,24
  56:6,24 57:6,9
  57:21 66:21
  68:15 69:10,11
  69:15,18,22,24
  70:7,15,19
  71:3,7,24
  74:23 76:10,21
  79:4,7 80:21
  83:4 85:3
round 48:3,6
  61:24 72:10
  84:10 89:3,4
rounds 48:2,13
  60:10 62:2,4,6
Royal 98:17

Royal Reporting Services, Inc.
312.361.8851

Cutberto Viramontes; et al. v. The Cook County; et al.
Deposition of Christopher Khaya - Taken 2/14/2022

**RS22** 34:18,20
  48:19
**Ruby** 16:7,10
**Rule** 97:23
**rules** 1:12 46:1,1
  46:2 97:23
**rust** 83:1,2

**S**

**S** 22:4
**S-C-H-I-E-N-...**
  25:7
**S-H-A-M-O-...**
  6:20
**S-H-O-R-E**
  43:15
**Sacramento**
  41:19
**safe** 53:10
**safely** 41:12,12
**safer** 82:2
**Saturday** 38:24
  39:2,7
**Saturdays** 39:5
**save** 67:8,9
**saw** 89:1
**saying** 52:13
  67:1,22 74:2
  74:11 75:13,21
  78:9
**scanned** 30:14
**scene** 90:16,17
**scenes** 90:12,14
**Schneider** 25:3
  25:4,6,24
**school** 11:17
  22:21 31:18,21
  37:2 41:16
  94:15,18
**score** 42:7,12
**screen** 10:20
  13:6,11
**scroll** 15:16
**second** 13:17,24
  15:2 16:12,16

17:2,3,7,18,24
  18:5 20:8,12
  20:15 21:17,19
  27:3 34:21
  35:6 38:23,24
  39:1 44:15
  47:13 51:24
  62:6 71:20
**SECTION** 2:8
**see** 13:10 15:18
  15:19 18:10,10
  38:15 58:18
  84:2 86:24
**seen** 86:10,21,22
  89:21 90:6
  91:12,14,17
**self-defense**
  47:10,17 50:3
  62:11,21 66:4
  66:19 68:9
  69:16 72:5
  82:5,12 83:3
  83:18 91:23
  92:4,7
**Self-employed**
  23:23
**self-paced** 23:13
**self-protection**
  33:3 36:4
**sell** 57:14
**semester** 22:19
**semi** 61:18
**semi-automatic**
  49:14,17,18
  61:2,8,13 62:1
  62:4,7 79:2,5
  79:14,21 80:20
  80:23 81:1
**send** 19:17
**sent** 14:9
**separate** 13:18
  36:20 49:4
  51:6,7 56:21
  85:4
**separated** 85:11

**separately** 50:22
  50:23
**September** 7:2,4
  7:5 24:5,24
  25:17,19 26:4
  30:22
**series** 42:24
**serious** 86:2
**served** 32:7
**Services** 98:17
**set** 24:15
**Shamoon** 6:16
**shield** 34:24
  35:2,5,7,8 37:5
  37:8 41:3
  44:17,21,24
  47:20 48:11,12
  50:12,16 51:15
  52:3,10,12
  53:8,23 54:20
  54:21 55:3,4
  55:10,13,17,19
  56:10,11 57:2
  57:16,19,23
  58:8,16 59:10
  59:19 83:15
**shipped** 59:13
**shoot** 41:14
  42:15
**shooter** 73:13
  75:18 76:5,9
  76:10,13 89:23
**shooter's** 76:1
**shooting** 41:20
  41:23 42:8,14
  42:22 43:2,6,9
  43:9 44:14,21
  45:2,14,19
  46:16 47:4,7
  49:2 73:14
  90:15 92:18
  94:2,4,18
**shootings** 39:15
  90:13 92:19
  93:8 94:9

**shootout** 87:18
  88:1,3,8 93:17
**shootouts** 92:19
  92:20,21 93:5
  93:9,12
**Shore** 43:13,16
  43:20,23 44:4
  44:9,16 45:15
  45:18,23 48:23
**shortage** 59:2
**Shorthand**
  98:16
**shot** 47:3 67:12
  67:22,24 74:11
  75:14 76:9,11
  86:21,23 87:11
  88:5,11,17
  91:2,3,8,22
**shoulder** 6:1
  40:16,16,19,22
**show** 10:19
  90:19,21,22,24
  91:5
**shows** 91:15
**shrug** 5:24
**sic** 25:7 80:4
**side** 40:22,23
  92:22
**Sierra** 58:1
**sign** 15:4,7,20
  17:19 36:18
  98:1,6
**signature** 15:18
  95:1 97:21
  98:7,10
**signed** 15:9,17
  98:4
**signing** 98:3
**similar** 19:14
  69:2,6 70:6,7,9
  70:12,23,23
  71:8 80:9
  93:12
**similarities**
  71:13

**Sir** 7:3
**sister** 8:18 9:2
  11:15,22
**sister's** 8:21
**site** 77:12
**situation** 92:6
**six** 28:15,21
**size** 47:24 48:12
  53:19 72:7
  84:12,15
**skinnier** 72:12
  73:18,21
**slide** 36:19
**small** 70:17
**smaller** 53:11
  68:2 72:10
**Smith** 34:24
  35:1 36:15
  54:20
**snacks** 24:14
**sold** 60:5,8
**somebody** 14:22
  15:1 46:2
  64:24 67:24
  76:3,5,10,11
**soon** 17:16
**sorry** 7:3 39:22
  47:12 63:4
  70:11 77:1
  81:9,10
**sources** 39:20,23
**South** 92:22
**speak** 10:14,23
  11:2,5,15,18
  11:21 12:12
  14:3,22 15:1
  16:15
**specialty** 22:10
**specific** 81:22
**specifically** 21:3
**speed** 72:13
**spell** 6:17 25:6
  42:3 43:14
  45:8 57:11
**spoken** 16:4,10

Cutberto Viramontes; et al. v. The Cook County; et al.
Deposition of Christopher Khaya - Taken 2/14/2022

| | | | | |
|---|---|---|---|---|
| **spot** 67:17 76:8 76:20 | 84:22 85:2,5,7 85:8,24 | **taken** 1:14 54:5 84:7 90:15,22 | 27:11,13 28:24 29:2 35:19 | **transfer** 49:6,11 52:5 |
| **SS** 97:3 | **stored** 63:6 | 94:21 96:10,11 | 37:16,17,20,23 | **treated** 88:14 |
| **stable** 49:22 | 84:23,24 | 97:10 | 37:23 38:3,22 | 89:2 |
| 53:2 66:13,15 | **Street** 7:18 | **talked** 10:1 | 40:14 44:17,23 | **treatment** 89:14 |
| 82:3 | 98:17 | **talking** 75:15 | 56:11 85:9 | **trigger** 46:8 |
| **stand** 18:5 21:2 | **strength** 63:22 | **tape** 90:17 | **till** 31:1,9 44:2 | 49:18,20 61:5 |
| **standard** 62:2 | 64:10 65:1,5 | **taxes** 49:11 52:6 | **time** 6:6 7:9 9:6 | 61:6,20 |
| **standing** 21:4 | **stuck** 83:1 | 52:8 | 11:11 19:4,5,9 | **truck** 30:15 |
| **stands** 32:20 | **studying** 23:14 | **Technical** 4:23 | 19:10 22:16,16 | **trucking** 25:5,8 |
| **start** 23:8 30:20 | **stuff** 46:1 | 5:8 29:17 | 22:17 24:24 | 27:1,7,15 |
| 48:1,17 | **styles** 60:19 | **technology** | 28:11,11 34:19 | **true** 68:12 96:11 |
| **started** 28:7,12 | **submitted** 96:13 | 23:15 | 42:1 43:8 44:9 | 97:17 |
| 31:16,20 51:11 | 96:15 | **tell** 46:2,6 97:14 | 44:10,11,15,15 | **Truman** 22:4,13 |
| 51:12 | **SUBSCRIBED** | **telling** 12:22 | 44:22 45:4 | 25:20 |
| **state** 1:16 4:3 | 96:21 | **term** 79:10,22 | 48:14 49:4 | **trunk** 36:19 |
| 97:2,7 | **subsonic** 53:18 | **terminology** | 54:1 56:4,12 | 38:19 |
| **state's** 2:7 4:22 | 53:20,21 | 54:8 | 57:1 58:3 59:2 | **truth** 97:14,14 |
| 5:1,1 | **sued** 5:2 | **terms** 46:15 | 61:20 88:14 | 97:15 |
| **statement** 15:8 | **sufficient** 83:17 | **test** 41:20,23 | 94:23 96:11 | **truthfully** 5:5,17 |
| **states** 1:1,13 | 83:19 | 42:8,14 43:9 | 97:19 | **try** 83:4 |
| 4:18 19:15 | **Suite** 98:18 | **testified** 6:12 | **times** 37:10,14 | **trying** 75:20,23 |
| 77:20 78:7,8 | **summary** 12:6,6 | 7:10 | 37:16,18,20,23 | **turn** 32:17 |
| 78:11 96:1 | **Sun** 8:16 | **testify** 9:11 | 38:4,8,18,22 | **TV** 40:4 86:11 |
| 97:24 | **Sun-Times** 40:3 | **testimony** 3:3 | 39:15 42:23 | 91:15 |
| **stenographica...** | 40:9 | 7:7 11:12 | 43:1,5,7,20,22 | **two** 13:18,19 |
| 97:11 | **Sunday** 44:1 | 96:12 | 44:3,12,17,23 | 28:24 29:2 |
| **stipulation** 4:4 | **sure** 15:13,24 | **texted** 88:11 | 44:24 45:17 | 30:19 34:15 |
| **stock** 59:4,7,12 | 24:19 47:14 | **thank** 94:22 | 48:15,16 49:2 | 35:10 38:8,9 |
| 59:21 69:7 | 54:7 | **theater** 29:21 | 56:11 | 38:18 41:2,3 |
| 70:22 71:1,1,3 | **surgery** 89:10 | **theaters** 29:13 | **today** 9:4,11 | 47:4 51:4 |
| 71:3,6,13 | **Surprise** 8:14,16 | **thereof** 98:3 | **told** 11:9,13 | 53:10,13 54:9 |
| 80:14,14,17 | **sworn** 4:1 6:12 | **thing** 48:3 59:20 | 12:1,1,4,19,20 | 56:21 71:14 |
| **stomach** 87:19 | 96:9,21 97:14 | 67:5 70:2 | 14:17 88:4,11 | 72:24 76:11,19 |
| 89:6 | | 79:20 | **topics** 19:14 | 82:14,23 83:17 |
| **stop** 66:24 67:4 | **T** | **think** 11:9 54:4 | **total** 43:5 52:8 | 84:17 94:20 |
| **stopping** 72:18 | **tagged** 44:11,12 | **thinking** 60:7 | **training** 23:20 | **type** 53:16,22 |
| **storage** 50:5,6,8 | **take** 4:4 5:24 6:5 | **third** 39:10,10 | 25:11,13 31:24 | 58:7 73:15 |
| 50:13 84:24 | 22:16,21 23:16 | 57:17 58:11 | 32:15 33:12,15 | 85:12 88:16 |
| **store** 38:10,12 | 36:16 38:14 | **Thorndale** | 41:7,17 42:19 | **types** 50:18 51:4 |
| 39:3,9 50:4,21 | 41:15,23 43:10 | 87:15 | 42:21 | 60:14 62:3 |
| 50:22,22 51:4 | 44:20 54:4 | **thought** 69:14 | **transcript** 96:10 | 65:2 72:19,24 |
| 55:13,13 57:14 | 55:17,19,24 | **threat** 86:1 | 96:12 98:2,3,6 | **typewriting** |
| 59:14 62:23 | 56:9,16,17 | **three** 8:1,3 | **transcription** | 97:12 |
| 65:18 84:17,20 | 84:4 94:20 | 26:14,15 27:10 | 97:12 | |

Cutberto Viramontes; et al. v. The Cook County; et al.
Deposition of Christopher Khaya - Taken 2/14/2022

Page 110

**U**

U.S.A 27:20,23
uncle's 26:19
undersigned
  98:8
understand 5:6
  5:18 13:1
  14:17 54:24
  55:4
understanding
  13:20 49:16
  61:3 78:1 93:8
understood 5:9
  5:20 6:3
United 1:1,13
  4:18 19:15
  77:20 78:11
  96:1 97:24
units 8:2,3
University 23:3
  23:5,6 24:8
unload 41:13
unloaded 50:10
  50:11,16,17
  84:20,21
unlocked 50:8
unsafe 46:7
unstable 61:17
  66:11
upper 63:22
  64:9 65:1
USCCA 77:20
use 41:12 44:14
  46:24 53:6,9
  53:14,22 56:7
  59:23 63:21
  65:2 66:18,20
  66:21 69:15,24
  70:1 75:22
  82:9,11,15,22
  83:4,7,9 86:1
useful 62:15,15
uses 82:7

**V**

V 2:3
vault 50:23 51:2
  51:5,9 84:19
  85:7,9,10
vaults 51:7
  56:21
version 15:21
versus 4:17
  46:14 52:10
  61:8 62:1
  74:23,24 76:10
  83:10 93:10,16
  93:23 94:10
victim 67:12
  75:14 91:20
victim's 74:20
video 86:11 90:5
  90:19 91:6
videoconference
  1:14 2:1
videos 42:20
  77:16
violent 39:14
  91:20
Viramontes 1:3
  4:17 16:2,5
  96:3
visit 88:12
visited 88:13
volunteered
  32:4
vs- 1:5 96:5

**W**

waived 97:21
  98:7
walking 87:17
  87:22
want 33:2 52:9
  54:7 67:3,4,4
  78:22 80:1,3
  80:22 81:1,2,6
  81:23 83:20,23
wanted 59:16
warehouse

26:19
Washington 2:4
wasn't 87:24
watch 39:21
  40:1,4 77:17
  77:19
watched 39:23
  42:20
watching 18:18
way 69:8 81:21
wbergstrom@...
  2:5
we'll 10:18
  35:10 95:1
we're 54:7
weapon 36:19
  40:17 41:13
  62:12,21 71:19
  74:22 78:2,15
  78:22,24 79:7
  79:9,15,17,21
  79:22 80:8,10
  80:12,15,18
  85:16,22 88:21
  92:9,17 93:9
  93:10,22,23
  94:9,10
weaponry 82:2
weapons 12:2,21
  12:22 36:18
  78:8,10,20,21
  79:24 84:24
  92:23 93:4,16
  93:17
website 58:22
websites 40:7
  68:20,21,22
  77:7,10,14
  91:12
Wednesday
  10:4 39:11
week 19:19 20:1
  24:17,18 25:2
  25:10,11,12
  26:18 27:2,3

27:16 38:23,24
  39:1,10,10
  44:2 51:17,18
  56:14 57:17
  58:11
weeks 59:11
  89:16
weight 74:20
went 43:1,4,4,7
  43:8,13 44:3,9
  44:14 45:17
  49:2 56:11
  59:11,18 88:12
Wesson 34:24
  35:1 36:15
WGN 40:10
Wikipedia
  77:11
William 2:3 4:8
Williams 1:15
  97:6 98:15
withdraw 14:5
witness 4:1,2,14
  5:22 6:4,9,11
  7:5 8:24 12:4
  27:5 39:16
  60:4,18 61:13
  62:9 63:9,14
  63:19 64:1,12
  64:17,22 65:5
  65:11 66:6,15
  67:20 69:4,24
  70:9,22 71:10
  71:16 72:16,21
  73:3,8,23
  74:18 75:3,20
  76:15 77:1
  78:4,13,17
  79:2,9 80:14
  82:14 83:7
  84:2,15 85:19
  85:24 86:8,13
  93:2,12,19
  97:9,13,19,21
  98:10

work 24:17,18
  26:23 28:10,13
  36:17 37:12
  38:8,9,19 39:2
  39:4,6
worked 25:10
  26:18,18 27:10
  27:11,15 28:15
  28:15,21,24
  29:13,24 30:11
  30:18 31:8
working 28:9
  82:24 83:13,14
  83:15,16
worse 73:14
worth 37:11
wouldn't 82:11
wound 73:24
  74:3 86:10,18
  86:20,22 87:1
  87:1 88:14
  89:1,3,5,14,20
  90:6,24 91:1
  91:12,14
wounded 91:1,5
wounds 86:16
  91:18
wrestled 63:17
wrong 83:12
  86:6

**X**

X 3:1

**Y**

yeah 8:10 9:22
  9:22 13:24
  14:20 25:22
  28:19 38:23
  48:8 54:17
  64:22 73:3,16
  74:5 75:8
  84:13 85:10
  87:2,8 90:7,16
  90:16 92:11

Cutberto Viramontes; et al. v. The Cook County; et al.
Deposition of Christopher Khaya - Taken 2/14/2022

Page 111

**year** 16:21 18:20
 25:2 26:15
 28:18 37:24
**yearly** 19:8
**years** 22:15
**younger** 87:4
**YouTube** 18:8
 18:11,15,15,16
 18:19 42:20
 77:16,18 90:9
 91:9

**Z**
**Z-A-C** 45:5,6,7
**Zac** 45:3,5
**ZIP** 7:21
**Zoom** 10:5,8

**0**
**04595** 4:18
**084-004443**
 98:16

**1**
**1** 3:10,10 7:18
 8:4 10:18 13:6
 13:7
**1,000** 37:1
**1:00** 95:4
**1:21-CV-04595**
 1:5 96:5
**10** 12:17 48:2,7
 48:13 62:2,4
 81:15
**100** 37:12
**13** 3:10
**14** 35:15 96:10
**14th** 1:18 97:8
**15** 84:11
**1523** 2:3
**16-hour** 41:11
**161** 98:17
**180** 49:7
**185** 49:8
**185.26** 49:7

**1996** 7:2,5

**2**
**2.26** 70:14
**20036** 2:4
**2011** 8:12,13
**2014** 35:16
**2015** 22:15,17
 31:1,8,9,16,19
 31:21
**2016** 30:7,11,12
 30:22,22 31:1
**2017** 28:4,7,12
 29:24 30:5,6,8
 33:11,19
**2018** 22:19
 28:13,14,17,20
 29:14,14,15
 33:11,11,19
 87:12
**2019** 27:20,21
 28:23,24,24
 29:3
**202** 2:4
**2020** 22:7,15,18
 23:17 24:5,24
 25:17,19 26:4
 26:4,15,19,22
 26:24 27:12
 29:5,6
**2021** 16:24 29:7
 32:23 34:5
 35:17 37:18
 38:1,21 40:14
 43:4,10 45:18
 48:21 51:19
 57:3 58:11
**2022** 1:18 23:10
 23:17 29:9
 96:10,22 97:9
 98:12
**21** 4:18 9:3
 42:11,13
**22** 34:17 35:3
 41:2 44:20

 47:19 48:1,6
 49:21 50:2,4
 50:10 51:22
 52:14,20 53:5
 53:17 54:13
 55:9 68:1,15
 69:18 70:7,16
 70:17 71:7
 72:9 74:4,5,12
 76:10,21
**220-9600** 2:4
**23** 65:23
**25** 19:7
**26** 49:9

**3**
**30** 10:9 42:11
 98:2
**30(e)** 97:23
**3050** 98:18
**312** 2:10

**4**
**40** 24:18 65:23
 65:23
**499** 52:4,7
**4th** 98:12

**5**
**5** 81:15
**50** 24:18
**500** 2:9
**530** 52:8,8

**6**
**6** 3:4 96:11
**603-5440** 2:10
**60601** 98:18
**60602** 2:10
**60645** 7:22
**6430** 7:18
**6R** 65:24

**7**
**7** 40:10

**8**
**8th** 7:2,5

**9**
**9** 34:24 35:2,5,7
 35:8 37:4,8
 41:3 42:18
 44:20 47:20
 48:11,12 50:12
 50:16 51:15
 52:3,10 53:8
 53:23 55:4,11
 59:20 67:7
 68:2,7
**9:30** 1:17
**95** 96:11

Cutberto Viramontes; et al. v. The Cook County; et al.
Deposition of Christopher Khaya - Taken 2/14/2022

Page 96

1          IN THE UNITED STATES DISTRICT COURT
              NORTHERN DISTRICT OF ILLINOIS
2                  EASTERN DIVISION

3

CUTBERTO VIRAMONTES, et al.,        )
4                                   )
                        Plaintiffs, )
5                                   )  No. 1:21-CV-04595
         -vs-                       )
6                                   )
THE COUNTY OF COOK, et al.,         )
7                                   )
                        Defendants. )
8                                   )
                                    )

9          I, Christopher Khaya, being first duly sworn,
   on oath say that I am the deponent in the aforesaid
10  transcript of my deposition taken February 14, 2022,
   consisting of pages 6 through 95, taken at the aforesaid
11  time and place and that the foregoing is a true and
   correct transcript of my testimony so given.
12

13          _____ Corrections have been submitted

14
            _____ No corrections have been submitted
15

16              cureedu

17
            Christopher Khaya, Deponent
18

19

20

21  SUBSCRIBED AND SWORN TO
   before me this   28ᵗʰ day
22  of  March            , A.D., 2022
                                        SONIA REYES
23                                      OFFICIAL SEAL
            Notary Public         Notary Public, State of Illinois
24                                 My Commission Expires
                                    September 02, 2025

              Royal Reporting Services, Inc.
                    312.361.8851