IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS

| | |
|---|---|
| CUTBERTO VIRAMONTES, et al. | : |
| Plaintiffs, | : |
| v. | : Case No. 1:21-cv-04595 |
| | : Chief Judge Rebecca R. Pallmeyer |
| THE COUNTY OF COOK, et al. | : |
| Defendants. | : |

**PLAINTIFFS' MEMORANDUM OF LAW IN SUPPORT OF SUMMARY JUDGMENT**

## INTRODUCTION

In *New York State Rifle & Pistol Association, Inc. v. Bruen*, 142 S. Ct. 2111 (2022), the Supreme Court explained that the Second Amendment "elevates above all other interests the right of law-abiding, responsible citizens to use arms for self-defense" and that it is not legislation, but "the traditions of the American people—that demands our unqualified deference." *Id.* at 2131 (quotation marks omitted).

The Supreme Court has now repeatedly said that the Second Amendment "protects the possession and use of weapons that are in common use." *Id.* at 2128 (quotation marks omitted). The firearms the County bans certainly satisfy this standard. They include many of the most commonly owned firearms in the country, including AR-15 type rifles, which alone are owned by some *twenty-four million* Americans, who overwhelmingly keep them for self-defense and other lawful purposes. As a result, the County's Ban on common semiautomatic firearms conflicts with "the traditions of the American people" and is unconstitutional.

## BACKGROUND

Cook County makes it illegal to "manufacture, sell, offer or display for sale, give, lend, transfer ownership of, acquire, carry or possess" common semiautomatic rifles, which it has

1

tendentiously labeled "assault weapons." *See* Code of Ordinances of Cook Cnty., Ill. §§ 54-211(7), 54-212(a) (Dec. 15, 2020), https://bit.ly/2Lcts75 (hereinafter "C.C. Ord."). Cook County identifies a long list of semiautomatic rifles as "assault weapons" by name, including all versions of the very popular AR-15, *id*. § 54-211, *Assault weapon* ¶ (7), and it also identifies them by feature, *id*. ¶ (1). A rifle that is not specifically named is considered an "assault weapon" if it can accept an ammunition magazine containing more than ten rounds of ammunition and has any of the following features:

> (A) Only a pistol grip without a stock attached;
> (B) Any feature capable of functioning as a protruding grip that can be held by the non-trigger hand;
> (C) A folding, telescoping or thumbhole stock;
> (D) A shroud attached to the barrel, or that partially or completely encircles the barrel, allowing the bearer to hold the firearm with the non-trigger hand without being burned, but excluding a slide that encloses the barrel; or
> (E) A muzzle brake or muzzle compensator.

*Id*.

Plaintiffs Cutberto Viramontes and Christopher Khaya are law-abiding residents of Cook County who wish to own AR-15 or similar style semiautomatic rifles for lawful purposes. Pls'. Rule 56.1 Statement of Material Facts ¶¶ 1–6. They are members of the Associational Plaintiffs, Firearms Policy Coalition, Inc. and Second Amendment Foundation. *Id*. ¶¶ 10, 15. The Associational Plaintiffs are nonprofit organizations dedicated to protecting the right to keep and bear arms who bring this suit on behalf of their members in Cook County who are hurt by the County's Ban, including the Individual Plaintiffs. *Id*. ¶¶ 7–16.

Plaintiffs initiated this lawsuit on August 27, 2021, *see* Compl., Doc. 1 (Aug. 27, 2021). The County answered. *See* Cnty. Defs.' Answer to Pls.' Compl., Doc. 17 (Nov. 15, 2021). Plaintiffs moved for judgment on the pleadings, acknowledging that their suit was, at the time, foreclosed by binding Seventh Circuit precedent, *see* Pls.' Br. in Supp. of Judgment on the

Pleadings, Doc. 21 (Dec. 3, 2021), and the Court denied that motion, *see* Notification of Docket Entry, Doc. 23 (Dec. 8, 2021). While the parties were engaged in discovery, the Supreme Court decided *Bruen*, abrogating the cases that had formerly bound this Court and foreclosed Plaintiffs' claims. On January 10, 2023, Illinois enacted a law which made it unlawful to "manufacture, deliver, sell, import, [] purchase" or "possess" any so-called "assault weapon." 720 ILL. COMP. STAT. 5/24-1.9(b) & (c). Almost immediately the law was challenged in court. Plaintiffs moved to stay this case for the duration of the litigation over the State Ban, *see* Pls.' Mot to Stay, Doc. 69 (Jan. 31, 2023), and the Court denied that motion, *see* Order, Doc. 88 (Mar. 8, 2023). The Illinois law is, at the time of filing, preliminarily enjoined. *See* Mem. and Order, *Barnett v. Raoul*, No. 23-cv-209, Doc. 99 (Apr. 28, 2023) ("*Barnett* slip op.").

The County moved for summary judgment, *see* Defs.' Mot. for Summ. J., Doc. 80 (Mar. 3, 2023), and Plaintiffs opposed that motion, *see* Pls.' Resp. in Opp'n to Defs.' Mot. for Summ. J., Doc. 97 (Apr. 24, 2023). Plaintiffs now move for summary judgment in their favor.

## ARGUMENT

In *Bruen*, and "in keeping with *Heller*," the Supreme Court held that "when the Second Amendment's plain text covers an individual's conduct, the Constitution presumptively protects that conduct. To justify its regulation, the government . . . must demonstrate that the regulation is consistent with this Nation's historical tradition of firearm regulation." 142 S. Ct. at 2126. Here, the Second Amendment's plain text covers the firearms Cook County bans, so it falls to the County to justify the ban as consistent with historical tradition rooted in the Founding. They cannot possibly do so, because *Bruen* has already established that there is no tradition of banning commonly possessed arms.

I. **The Banned Firearms Are Arms Within the Meaning of the Second Amendment.**

The Second Amendment states: "A well regulated Militia, being necessary to the security

3

of a free State, the right of the people to keep and bear Arms, shall not be infringed." U.S. CONST. amend. II. The challenged laws ban semiautomatic rifles based on their possessing specific features—for example, a rifle is banned if it can accept a detachable magazine and has a muzzle brake—or based on their inclusion in a list of specific models of banned arms.

These are "Arms" within the meaning of the Second Amendment's plain text. The Supreme Court has explained that "[t]he 18th-century meaning is no different from the meaning today. . . . '[A]rms' [means] 'any thing that a man wears for his defence, or takes into his hands, or useth in wrath to cast at or strike another.' " *District of Columbia v. Heller*, 554 U.S. 570, 581 (2008) (citation omitted). As a result, the Amendment presumptively protects Americans' rights to possess "all instruments that constitute bearable arms, even those that were not in existence at the time of the founding." *Heller*, 554 U.S. at 582; *accord Caetano v. Massachusetts*, 577 U.S. 411, 411 (2016); *see also Bruen*, 142 S. Ct. at 2132. Therefore, under *Bruen* the County has the burden to show that its Ban is consistent with this Nation's tradition of firearm regulation.

## II. The Ban Cannot Be Historically Justified.

### A. Only "Dangerous and Unusual" Arms Can Be Banned Consistent With Our Country's History.

If the Ban is to survive, the County must prove that it is "consistent with this Nation's historical tradition of firearm regulation." *Bruen*, 142 S. Ct. at 2126. Both *Bruen* and *Heller* have already established the relevant contours of the tradition at issue in this case: bearable arms cannot be banned unless doing so would fit into the "historical tradition" of restricting " 'dangerous and unusual weapons.' " *Id.* at 2128 (quoting *Heller*, 554 U.S. at 627). And a law, by definition, *will not* fit into that tradition if it bans "possession and use of weapons that are 'in common use.' " *Id.* (quoting *Heller*, 554 U.S. at 627); *see also Heller*, 554 U.S. at 625.

This test is based on historical practice and "the historical understanding of the scope of

4

the right." *Heller*, 554 U.S. at 625; *see also Bruen*, 142 S. Ct. at 2131 ("The test that we set forth in *Heller* and apply today requires courts to assess whether modern firearms regulations are consistent with the Second Amendment's text and historical understanding."); TRO at 10, *Rocky Mountain Gun Owners v. Town of Superior, Colo.*, No. 1:22-cv-01685, Doc. 18 (D. Col. July 22, 2022) (granting, post-*Bruen*, a temporary restraining order against enforcement of a similar ban on certain semiautomatic rifles and noting "the Court is unaware of historical precedent that would permit a governmental entity to entirely ban a type of weapon that is commonly used by law-abiding citizens for lawful purposes"). In the context of bans on bearable arms, in other words, *the Supreme Court has already done the historical spadework*—and the only restrictions of this kind that it has deemed consistent with the historical understanding of the right to keep and bear arms are restrictions limited to *dangerous and unusual* arms that *are not in common use*.

This Court's task is therefore a simple one: it must merely determine whether the banned firearms are "dangerous and unusual." "[T]his is a conjunctive test: A weapon may not be banned unless it is *both* dangerous *and* unusual." *Caetano*, 577 U.S. at 417 (Alito, J., concurring). And a firearm that is in common use for lawful purposes, by definition, *does not* fall within this category and *cannot be banned*. *Bruen*, 142 S. Ct. at 2143. "[T]he commonality of 'arms' banned under [the challenged law] is dispositive." *Barnett* slip op. 25. *Heller* explained that the historical reason for this understanding of the right is that "[t]he traditional militia was formed from a pool of men bringing arms 'in common use at the time' for lawful purposes like self-defense," and so the focus of this Court must be on the lawful use of firearms by law-abiding citizens, not on a criminal misuse by a small minority. *See Heller*, 554 U.S. at 624.

To determine whether a firearm is "unusual" the Supreme Court has likewise made clear that the Second Amendment focuses on the practices of the American people *nationwide*, not just

5

in Cook County. *See Bruen*, 142 S. Ct. at 2131 ("It is this balance—struck by the traditions *of the American people*—that demands our unqualified deference." (emphasis added)); *Heller*, 554 U.S. at 628 (handguns are "overwhelmingly chosen by *American society*" for self-defense (emphasis added)); *Caetano*, 577 U.S. at 420 (Alito, J., concurring) ("[S]tun guns are widely owned and accepted as a legitimate means of self-defense *across the country*." (emphasis added)). Therefore, the Amendment protects those who live in states or localities with a less robust practice of protecting the right to keep and bear firearms from outlier legislation (like Cook County's ban here) just as much as it protects those who live in jurisdictions that have hewed more closely to America's traditions.

Furthermore, courts and legislatures do not have the authority to second-guess the choices made by law-abiding citizens by questioning whether they really "need" the arms that ordinary citizens have chosen to possess. While *Heller* noted several "reasons that a citizen may prefer a handgun for home defense," the Court held that "[w]*hatever the reason*, handguns are the most popular weapon chosen by Americans for self-defense in the home, and a complete prohibition of their use is invalid." 554 U.S. at 629 (emphasis added). And in *Bruen* the Court reaffirmed that "the traditions of the American people"—which includes their choice of preferred firearms—"demand[ ] [the courts'] unqualified deference." 142 S. Ct. at 2131. Thus, unless the County can show that a certain type of firearm is "not typically possessed by law-abiding citizens for lawful purposes," *Heller*, 554 U.S. at 625, that is the end of the matter. Firearms owned by law-abiding citizens for lawful purposes cannot be banned.

Finally, the Second Amendment inquiry focuses on the choices commonly made by *contemporary* law-abiding citizens. *Heller* rejected as "bordering on the frivolous" "the argument . . . that only those arms in existence in the 18th century are protected." *Id*. at 582. And

in *Caetano*, the Supreme Court reiterated this point, holding that "Arms" protected by the Second Amendment need not have been "in existence at the time of the founding." 577 U.S. at 411–12 (quoting *Heller*, 554 U.S. at 582). The *Caetano* Court flatly denied that a particular type of firearm's being "a thoroughly modern invention" is relevant to determining whether the Second Amendment protects it. *Id.* at 412 (quotation omitted). And *Bruen* cements the point. Responding to laws that allegedly restricted the carrying of handguns during the colonial period, the Court reasoned that "even if these colonial laws prohibited the carrying of handguns because they were considered 'dangerous and unusual weapons' in the 1690s, they provide no justification for laws restricting the public carry of weapons that are unquestionably in common use today." *Bruen*, 142 S. Ct. at 2143.

### B. The Banned Firearms Are In Common Use.

This case thus reduces to the following, straightforward inquiry: are the arms banned by Cook County in "common use," according to the lawful choices of contemporary Americans? They unquestionably are.

The term "assault weapons" is a misnomer. "Prior to 1989, the term 'assault weapon' did not exist in the lexicon of firearms. It is a political term, developed by anti-gun publicists." *Stenberg v. Carhart*, 530 U.S. 914, 1001 n.16 (2000) (Thomas, J., dissenting) (citation and quotation marks omitted). But while "assault weapons" are not a recognized category of firearms, "semiautomatic" is. And it is semiautomatic rifles that Cook County labels as "assault weapons" and which Plaintiffs wish to acquire. The "automatic" part of "semiautomatic" refers to the fact that the user need not manually load another round in the chamber after each round is fired. But unlike an automatic rifle, a semiautomatic rifle will not fire continuously on one pull of its trigger; rather, a semiautomatic rifle requires the user to pull the trigger each time he or she wants to discharge a round. *See Staples v. United States*, 511 U.S. 600, 602 n.1 (1994).

Even accepting the County's framing, if the banned firearms *are* considered as a separate category of arms rather than simply examples of semiautomatic firearms, they still easily satisfy the common use test. The dispositive point under *Heller* and *Bruen* is that millions of law-abiding citizens choose to possess firearms in that category. Commonality in this case "is determined largely by statistics." *Duncan v. Becerra*, 970 F.3d 1133, 1147 (9th Cir. 2020), *rev'd sub nom. Duncan v. Bonta*, 19 F.4th 1087 (9th Cir. 2021) (en banc), *granted, vacated, and remanded in light of Bruen*, 142 S. Ct. 2895 (2022); *see also Ass'n of N.J. Rifle & Pistol Clubs, Inc.* ("*ANJRPC*") *v. Att'y Gen. of N.J.*, 910 F.3d 106, 116 (3d Cir. 2018), *abrogated by Bruen* (finding an "arm" is commonly owned because "[t]he record shows that millions . . . are owned"); *New York State Rifle & Pistol Ass'n, Inc. v. Cuomo*, 804 F.3d 242, 255 (2d Cir. 2015), *abrogated by Bruen* ("Even accepting the most conservative estimates cited by the parties and by amici, the assault weapons . . . at issue are 'in common use' as that term was used in *Heller*."); *Heller v. District of Columbia*, 670 F.3d 1244, 1261 (D.C. Cir. 2011) ("*Heller II*")("We think it clear enough in the record that semi-automatic rifles . . . are indeed in 'common use.' "). This is demonstrated by the AR-15 and other modern semiautomatic rifles, which epitomize the firearms that the County bans.

The AR-15 is America's "most popular semi-automatic rifle," *id.* at 1287 (Kavanaugh, J., dissenting), and in recent years it has been "the best-selling rifle type in the United States," Nicholas J. Johnson, *Supply Restrictions at the Margins of Heller and the Abortion Analogue*, 60 HASTINGS L.J. 1285, 1296 (2009). Today, the number of AR-rifles and other similar rifles in circulation in the United States exceeds **twenty-four million**. *Commonly Owned: NSSF Announces Over 24 Million MSRS in Circulation*, NSSF (July 20, 2022), https://bit.ly/3QBXiyv; *see also* William English, *2021 National Firearms Survey: Updated Analysis Including Types of Firearms Owned* at 1–2 (May 13, 2022), https://bit.ly/3yPfoHw (finding that an estimated 24.6

8

million American gun owners have owned AR-15s or similar rifles). In recent years they have been the second-most common type of firearm sold, at approximately 20% of all firearm sales, behind only semiautomatic handguns. *See* 2021 Firearms Retailer Survey Report at 9, NAT'L SHOOTING SPORTS FOUND., INC. (2021), https://bit.ly/3gWhI8E.

AR-style rifles are commonly and overwhelmingly possessed by law-abiding citizens for lawful purposes. In a 2021 survey of 16,708 gun owners, recreational target shooting was the most common reason (cited by 66% of owners) for possessing an AR-style firearm, followed closely by home defense (61.9% of owners) and hunting (50.5% of owners). English, *2021 Survey* at 33–34. This is consistent with the findings of another recent survey of over 2,000 owners of such firearms, in which home-defense again followed (closely) only recreational target shooting as the most important reason for owning these firearms. *See* Modern Sporting Rifle: Comprehensive Consumer Report at 5, NAT'L SHOOTING SPORTS FOUND., INC. (July 14, 2022), https://bit.ly/3SSrVjM. And very recently the Washington Post separately reached essentially identical results, finding that 20% of current firearm owners own an AR-15 or similar style rifle, with 60% of AR owners reporting target shooting was a "major reason" for their owning the firearm and 30% citing it as a "minor reason." *Poll of current gun owners* at 1, WASH. POST-IPSOS (Mar. 27, 2023), https://bit.ly/42jBqOn. Protection of self, family, and property was even *more* important in this survey, with 65% of owners citing it as a major reason and 26% noting it as a minor reason. *Id.* Yet another survey found that more than 20 million adults participated in target or sport shooting with firearms like those Cook County has banned. Sport Shooting Participation in the U.S. in 2020 at *iii*, NAT'L SHOOTING SPORTS FOUND., INC. (2021), https://bit.ly/3sPuEQl. These purposes are plainly lawful (and related), as "maintain[ing] proficiency in firearm use [is] an important corollary to . . . self-defense," *Ezell v. City of Chicago*, 651 F.3d 684, 708 (7th Cir.

9

2011). Overall, "AR-style rifles are popular with civilians and law enforcement around the world because they're accurate, light, portable, and modular. . . . [The AR-style rifle is] also easy to shoot and has little recoil, making it popular with women." FRANK MINITER, THE FUTURE OF THE GUN 35 (2014). Indeed, "the AR-15 is so user-friendly that a group called 'Disabled Americans for Firearms Rights' . . . says the AR-15 makes it possible for people who can't handle a bolt-action or other rifle type to shoot and protect themselves." *Id.*

The fact that "assault" rifles are used extremely rarely in crime underscores that AR-15s and other banned rifles are commonly possessed by law-abiding citizens for lawful purposes. Evidence indicates that "well under 1% [of crime guns] are 'assault rifles.'" GARY KLECK, TARGETING GUNS: FIREARMS AND THEIR CONTROL 112 (1997). From 2015 through 2020, only 2.4% of murders were committed with *any* type of rifle. *See Crime Data Explorer*, FBI, U.S. DEP'T OF JUST. (2020), https://bit.ly/3AA8Qwj; *Expanded Homicide Data Table 8: Murder Victims by Weapon, 2015–2019*, *Crime in the United States*, FBI, U.S. DEP'T OF JUST. (2019), https://bit.ly/31WmQ1V (72,781 total murders; 1,573 with rifles). Murder by "hands, fists, feet, etc." was more than twice as common, at 3,346, over the same time period—and murder by handgun, at over 30,000, was approximately *20 times* as common. *Id.* Even if a different modern semiautomatic rifle had been used in each rifle-related murder from 2015 to 2020, an infinitesimal percentage of the approximately 20 million of them in circulation in the United States during that time period—around .01 percent—would have been used for that unlawful purpose. More broadly, as of 2016, only .8 percent of state and federal prisoners reported using *any* kind of rifle during the offense for which they were serving time. Mariel Alper & Lauren Glaze, *Source and Uses of Firearms Involved in Crimes: Survey of Prison Inmates,* 2016 at 5 tbl. 3, U.S. DEP'T OF JUST., OFF. OF JUST. PROGS., BUREAU OF JUST. STATS. (Jan. 2019), https://bit.ly/31VjRa9.

The Supreme Court's decision in *Caetano* further confirms that the arms banned by Cook County are in common use for lawful purposes. That case concerned Massachusetts's ban on the possession of stun guns, which the Commonwealth's highest court had upheld on the basis that such weapons are not protected by the Second Amendment. *Caetano*, 577 U.S. at 411. With a brief *per curiam* opinion, the Supreme Court vacated that decision. *Id.* at 411–12. Though the Court remanded the case back to the state court without deciding whether stun guns are constitutionally protected, *see id.*, Justice Alito filed a concurring opinion concluding that those arms "are widely owned and accepted as a legitimate means of self-defense across the country," based on evidence that "hundreds of thousands of Tasers and stun guns have been sold to private citizens." *Id.* at 420 (Alito, J., concurring) (cleaned up) (citation omitted). Of course, that is far fewer than the millions of semiautomatic rifles sold to private citizens nationwide that Cook County bans.

The Massachusetts Supreme Judicial Court got the message. In a subsequent case, that Court, relying on *Caetano*, held that because "stun guns are 'arms' within the protection of the Second Amendment," the state's law barring "civilians from possessing or carrying stun guns, even in their home, is inconsistent with the Second Amendment and is therefore unconstitutional." *Ramirez v. Commonwealth*, 94 N.E.3d 809, 815 (Mass. 2018). The Illinois Supreme Court followed suit with a similar ruling in 2019, relying on *Caetano* and *Ramirez* to conclude that "[a]ny attempt by the State to rebut the *prima facie* presumption of [S]econd [A]mendment protection afforded stun guns and tasers on the grounds that the weapons are uncommon or not typically possessed by law-abiding citizens for lawful purposes would be futile." *People v. Webb*, 131 N.E. 3d 93, 96 (Ill. 2019) (citation omitted). This reasoning is sound, and necessarily entails the invalidity of the County's ban, which restricts arms that are much more common than stun guns.

Finally, in the wake of *Bruen* some district courts have attempted to draw a line between

11

firearms that are commonly *owned* and those that are commonly *used*, seeking to restrict the right to keep arms to only the latter. *See, e.g.*, *Hanson v. District of Columbia*, No. 22-2256, 2023 WL 3019777, at *10 (D.D.C. Apr. 20, 2023) (finding magazines holding more than ten rounds were not in common use in part because few self-defense encounters involve firing more than ten shots). But such a narrow view of "common use" is incompatible with the Second Amendment and with binding precedent. The Second Amendment protects the rights of Americans to "keep and bear Arms." By its plain terms then, it contemplates ways of "using" firearms other than just shooting them. In construing the word "bear," *Heller* explained the term meant "being *armed and ready* for offensive or defensive action in a case of conflict with another person." 554 U.S. at 584 (quoting *Muscarello v. United States*, 524 U.S. 125, 143 (1998) (Ginsburg, J., dissenting)) (emphasis added). Similarly, in *Bruen* the Court explained that "[a]lthough individuals often 'keep' firearms in their home, *at the ready for self-defense*, most do not 'bear' (*i.e.*, carry) them in the home beyond moments of actual confrontation. To confine the right to 'bear' arms to the home would nullify half of the Second Amendment's operative protections." 142 S. Ct. at 2134–35 (emphasis added). Permitting Cook County to ban a type of arm that is commonly *owned* but not commonly *fired* in self-defense would go further and nullify *both* of the Amendment's operative protections. It would also conflict with the way that Supreme Court justices have considered the phrase. In *Caetano*, Justice Alito concluded stun guns were "in common use" because "hundreds of thousands . . . [had] been sold to private citizens," 577 U.S. at 420 (Alito, J., concurring) (citation omitted). In *Friedman v. City of Highland Park*, Justice Thomas explained that a similar ban on so-called "assault weapons" was "highly suspect because . . . [r]oughly five million Americans own AR-style semiautomatic rifles." 577 U.S. 1039, 136 S. Ct. 447, 449 (Mem) (2015) (Thomas, J., dissenting from the denial of certiorari) (citation omitted). And in his dissent in *Heller II*, then-

Judge Kavanaugh also relied on sales figures to demonstrate that semiautomatic rifles are in common use. *See* 670 F.3d at 1287 (Kavanaugh, J., dissenting).

That the banned firearms, as a subset of semiautomatic firearms, are in common use ends the inquiry. The Court should not credit any argument that attempts to paint the banned firearms as different from other semiautomatic rifles. There are significant practical differences between automatic "machine guns" and semiautomatic rifles. According to the United States Army, for example, the maximum effective rate of fire for various M4- and M16-series firearms is between forty-five and sixty-five rounds per minute in semiautomatic mode, versus 150-200 rounds per minute in automatic mode. *Rifle Marksmanship: M16-/M4-Series Weapons*, DEP'T OF THE ARMY 2-1, tbl. 2-1 (Aug. 12, 2008), https://bit.ly/3pvS3SW. But "AW-type firearms do not operate differently than other comparable semiautomatics, nor do they fire more lethal ammunition." Christopher S. Koper, *Assessing the Potential to Reduce Deaths and Injuries from Mass Shootings Through Restrictions on Assault Weapons and Other High-Capacity Semiautomatic Firearms*, 19 CRIM'Y & PUB. POL'Y 147, 149 (2020). Indeed, the AR-15—the paradigmatic semiautomatic rifle targeted by "assault weapons" laws—is typically chambered for .223 Remington/5.56 NATO ammunition, *see, e.g.*, *Worman v. Healey*, 293 F. Supp. 3d 251, 258 (D. Mass. 2018), *aff'd*, 922 F.3d 26 (1st Cir. 2019), which "makes it safer to use as a home-defense gun because this lighter caliber is less likely to travel through walls," MINITER, *supra* at 35. The rifles Cook County bans also fire at the same rate as all other semiautomatics—one round for each pull of the trigger.

There is a long tradition in this country of lawful private ownership of semiautomatic firearms. The Supreme Court has held as much, concluding in *Staples* that semiautomatic rifles "traditionally have been widely accepted as lawful possessions." *Staples*, 511 U.S. at 612. Semiautomatic rifles have been commercially available for over a century. *See Heller II*, 670 F.3d

13

at 1287 (Kavanaugh, J., dissenting); David B. Kopel, *Rational Basis Analysis of "Assault Weapon" Prohibition*, 20 J. CONTEMP. L. 381, 413 (1994). Apart from the now-expired ten-year federal "assault weapons" ban, the Federal Government has not banned them. And currently the vast majority of States do not ban semiautomatic rifles deemed "assault weapons." *See* Shauna Sowersby, *WA becomes 10th state in the U.S. to ban assault weapons after Inslee signs bill into law*, THE OLYMPIAN (Apr. 25, 2023), https://bit.ly/40H6vdl. They are in common use and the Cook County Ban must be enjoined.

### III. *Bruen* abrogated the Seventh Circuit's decisions in *Friedman* and *Wilson*.

Prior to the Supreme Court's decision in *Bruen*, the Seventh Circuit upheld bans similar to those at issue here, but those decisions are no longer good law and should not be followed. In *Friedman v. City of Highland Park*, the Seventh Circuit upheld a municipal ban on so-called "assault weapons" and "large capacity magazines." 784 F.3d 406, 419 (7th Cir. 2015). In doing so, the court did not apply the text-and-history framework that *Bruen* has clarified must govern, nor did it assess whether the banned firearms were in common use for lawful purposes—which *Bruen* has demonstrated is the historical test for such laws—but rather the court thought "it better to ask whether a regulation bans weapons that were common at the time of ratification or those that have 'some reasonable relationship to the preservation or efficiency of a well regulated militia,' and whether law-abiding citizens retain adequate means of self-defense." *Id.* at 410 (citations omitted). And in *Wilson v. Cook County*, which involved the same ban at issue in this case, the Seventh Circuit declined to revisit *Friedman* and found it controlling. 937 F.3d 1028, 1036 (7th Cir. 2019). Not only is the test under *Friedman* not the test under *Bruen*, the factors *Friedman* looked at are essentially irrelevant under the *Bruen* analysis. Whether a type of firearm existed in the 1790s has no bearing on whether it is constitutionally protected; *Bruen* clarified that weapons that are protected are those "in common use *today*." 142 S. Ct. at 2143 (emphasis added).

14

The same is true for whether the banned arms have "some reasonable relationship to the preservation or efficiency of a well regulated militia." *Friedman*, 784 F.3d at 410 (citation omitted). In *Bruen*, the Supreme Court analyzed a late-19th-century case, *English v. State*, in which the Texas Supreme Court had concluded that the Second Amendment and the state's analogue only protected such arms "as are useful and proper to an armed militia." 35 Tex. 473, 474 (1871), *abrogated by Bruen*. The *Bruen* Court dismissed this rationale as an "outlier[]," 142 S. Ct. at 2153, and instead reiterated that the Second Amendment right to keep and bear arms "does not depend on service in the militia," *id.* at 2127 (quotation marks omitted). Instead, as discussed above, the only question in this case is whether the firearms in question are in common use. *Id.* at 2143.

As a result of these inconsistencies, it is not surprising that other courts in this district have concluded that *Friedman* and *Wilson* are no longer good law. In *Bevis v. City of Naperville*, the court explained it must assess a similar challenge "on a *tabula rasa*" because "*Friedman* cannot be reconciled with *Bruen*." --- F. Supp. 3d ----, 2023 WL 2077392, at *8 (N.D. Ill. Feb. 17, 2023), *appeal filed*, No. 23-1353 (7th Cir. 2023). Just as Plaintiffs have argued, the *Bevis* court noted that each of the bases for *Friedman*'s holding are irrelevant under *Bruen*, and "[t]he Supreme Court need not expressly overrule [] precedent . . . where an intervening Supreme Court decision fundamentally changes the focus of the relevant analysis," prior precedent should be disregarded. *Id.* (quoting *United States v. Rahimi*, 61 F.4th 4543, 450 (5th Cir. 2023)). Because their rationales are incompatible with *Bruen*, neither *Friedman* nor *Wilson* have any bearing on this case. *See, e.g., Thomas for Brown v. Sullivan*, 785 F. Supp. 788, 791 (C.D. Ill. 1992) (declining to apply Seventh Circuit precedent in light of intervening contrary Supreme Court decision).

## CONCLUSION

For the foregoing reasons, the Court should grant judgment in Plaintiffs' favor.

| | |
|---|---|
| Dated: May 1, 2023 | Respectfully Submitted, |
| | |
| | /s/ David H. Thompson |
| David G. Sigale (Atty. ID# 6238103) | David H. Thompson* |
| LAW FIRM OF DAVID G. SIGALE, P.C. | Peter A. Patterson* |
| 430 West Roosevelt Road | William V. Bergstrom* |
| Wheaton, IL 60187 | COOPER & KIRK, PLLC |
| (630) 452-4547 | 1523 New Hampshire Ave., N.W. |
| dsigale@sigalelaw.com | Washington, D.C. 20036 |
| | (202) 220-9600 |
| | (202) 220-9601 (fax) |
| | dthompson@cooperkirk.com |
| | ppatterson@cooperkirk.com |
| | wbergstrom@cooperkirk.com |
| | *Admitted *pro hac vice* |
| | |
| | *Attorneys for Plaintiffs* |