## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ILLINOIS
## EASTERN DIVISION

CUTBERTO VIRAMONTES, an individual
and resident of Cook County, Illinois, *et al.*,

      Plaintiffs,

      v.

THE COUNTY OF COOK, a body politic
and corporate, *et al.*,

      Defendants.

Case No.        1:21-cv-04595

Assigned Judge:    Rebecca R. Pallmeyer

Designated
Magistrate Judge:   Susan E. Cox

## DEFENDANTS' REPLY FILED IN SUPPORT OF THEIR FED. R. CIV. P. 56 MOTION FOR SUMMARY JUDGMENT

# TABLE OF CONTENTS

TABLE OF CONTENTS .................................................................................................... i

TABLE OF AUTHORITIES ............................................................................................ iii

ARGUMENT .................................................................................................................... 1

I.     **The *Bruen* Opinion Has Limited Applicability Here, as the Parties' Dispute Relates to the Plain Text Inquiry** ...................................................................................... 1

    A.     Plaintiffs unequivocally bear the burden on Step One and have failed to meet it ............................................................................................................ 1

    B.     Plaintiffs' concept of arms is contrary to *Heller* and *Bruen* and declines to perform the analysis required by *Bruen*. ..................................................................... 2

    C.     Only weapons that facilitate self-defense can potentially be considered arms within the text of the Second Amendment .................................................................. 5

        1. *Bruen* did not conduct a Step One analysis regrading the definition of arms .................. 5

        2.   The regulated weapons do not facilitate self-defense. ..................................... 6

        3.   Plaintiffs offer no authority to support a finding that the regulated weapons are commonly used for lawful purposes. ......................................... 8

        4.   Ownership and intent do not equate to "use" for self-defense. ...................... 10

    D.     A weapon that is dangerous and unusual cannot be considered in common use for lawful purposes and therefore cannot be a protected arm. .............................. 12

        1. "Dangerous and unusual" is a standard the Supreme Court has indicated applies when determining whether a weapon is a protected arm. ................... 12

        2. Plaintiffs do not and cannot contest the evidence showing the regulated weapons are dangerous and unusual. ............................................................. 13

        3. Protected arms do not include every weapon used in the militia/military. ...... 16

II.    **The Ordinance is Consistent with This Country's Historical Tradition of Regulating Dangerous and Unusual Weapons.** ........................................................... 17

    A.     The court should take a nuanced approach to the Ordinance. .............................. 17

        1. Single-shooter mass murder was not a problem at the time of the founding. .. 18

2. Technological advancement have made modern Assault Rifles into indiscriminate killing machines......................................................................... 20

B.      Regulations on the possession and storage of gunpowder are constitutionally analogous to the ordinance.................................................................................. 22

C.      The presence of assault weapons naturally cause fear in the general public. ....... 24

III.    ***Wilson* and *Friedman* are still the law of the Seventh Circuit.................................... 25**

CONCLUSION............................................................................................................................. 25

## TABLE OF AUTHORITIES

<u>Cases</u>                                                                                                                        <u>Pages</u>

*Andrews v. State*, 1871 Tenn. LEXIS 83 (1871) ............................................................. 19

*Aymette v. State*, 1840 Tenn. LEXIS 54 (1840)............................................................... 20

*Association of New Jersey Rifle & Pistol Clubs v. AG New Jersey*, 910 F.3d 106
     (3d Cir. 2018) ............................................................................................................9

*Caetano v. Massachusetts*, 577 U.S. 411 (2016) .............................................................2

*Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579 (1993) ............................ 15

*District of Columbia v. Heller*, 554 U.S. 570 (2008)..............................................1, passim

*Duncan v. Becerra*, 970 F.3d 1133 (9th Cir. 2020)...........................................................9

*Fife v. State*, 1876 Ark. LEXIS 69 (1876) ........................................................................ 19

*Fowler v. O'Leary*, No. 87 C 6671, 1993 U.S. Dist. LEXIS 3554 (N.D. Ill. Mar. 19, 1993).............7

*Friedman v. City of Highland Park*, 784 F.3d 406 (7th Cir. 2015) ....................................... 9, passim

*Heller v. District of Columbia*, 670 F.3d 1244 (2011)........................................................9

*New York State Rifle & Pistol Ass'n v. Bruen*, _____U.S.___, 142 S. Ct. 2111 (2022) ........ 1, passim

*People v. Morgan*, 187 Ill. 2d 500, 719 N.E.2d 681, 241 Ill. Dec. 552 (Ill. 1999)............................7

*Staples v. United States*, 511 U.S. 600 (1994) ............................................................ 9, 10

*U.S. v. Marzzarella*, 614 F.3d 85 (3d Cir. 2010).............................................................21

*U.S. v. Miller*, 307 U.S. 174 (1939) ........................................................................3, passim

*Wilson v. Cook Cty.*, 937 F.3d 1028 (7th Cir. 2019) ....................................................... 25

<u>Other Sources</u>

Hawkins, William, 1 PLEAS OF THE CROWN 136 (1716) ................................................ 24

WEBSTER'S II NEW COLLEGE DICTIONARY 226 (2001).................................................... 11

**ARGUMENT**

I.     **The *Bruen* Opinion Has Limited Applicability Here, as the Parties' Dispute Relates to the Plain Text Inquiry.**

   a.  **Plaintiffs unequivocally bear the burden on Step One and have failed to meet it.**

The parties to *Bruen* stipulated that the weapons regulated fall within the scope of Second Amendment protection – and that is simply not the case here. *New York State Rifle & Pistol Ass'n v. Bruen*, ___U.S.___ , ___, 142 S. Ct. 2111, 2134 (2022) (In considering whether the weapons regulated in *Bruen* fell within the plain text protection of the Second Amendment, the Court made note that the parties did not dispute that handguns "are weapons 'in common use' today for self-defense", citing *District of Columbia v. Heller*, 554 U.S. 570, 627 (2008)).  Defendants argue clearly and unequivocally that the regulated weapons are *not* in common use for a lawful purpose, and for that and various other reasons the regulated weapons fall outside the scope of the Second Amendment's protection.  Plaintiffs offer no response to this argument.

Defendants have amassed a fulsome and unrebutted record disputing that Assault Weapons fall within the plain text protection of the Second Amendment.  Yet Plaintiffs all but ignore the first step of the *Bruen* inquiry, arguing that the meaning of arms requires little analysis. Pl.'s Resp., at 4. They urge the court to disregard the "common use for lawful purposes such as self-defense" and "facilitate self-defense" standards at this step and to accept a broad definition of arms – one that is at odds with *Heller* and *Bruen*. *See Bruen* at 2132; *District of Columbia v. Heller*, 554 U.S. 570, 624 (2008).

*Bruen* states that Plaintiffs bear the initial burden, just as a plaintiff would in any litigation. In outlining the two-step test, the Court wrote: "When the Second Amendment's plain text covers an individual's conduct, the Constitution presumptively protects that conduct. The government must *then* justify it regulation by demonstrating that it is consistent with the Nation's historical

tradition of firearms regulation." *Bruen* at 2129-2130 (emphasis added). Plaintiffs therefore must show that their conduct is protected by the plain text of the Second Amendment before the Court will turn to analysis of historical tradition. *Id.* If the Court had intended the government to bear the burden at the initial step, it would have indicated as much.

*Heller* and *Bruen* make clear that the arms protected under the plain text of the Second Amendment are weapons that are in common use for lawful purposes such as self-defense, including weapons available at the time of the founding and "modern instruments" which "facilitate self-defense." Plaintiffs make no effort to meet this burden, and as a result, this Court should enter judgment in favor of Defendants. It need not reach the historical tradition analysis.

    **b. Plaintiffs' concept of arms is contrary to *Heller* and *Bruen* and fails to perform the analysis required by *Bruen*.**

Plaintiffs offer a facile definition of arms that is inconsistent with *Heller* and *Bruen*. Plaintiffs encourage the court to accept the premise that Assault Weapons are arms protected under the Second Amendment because *all* arms are protected arms, dissuading the court from performing any analysis of the meaning of the plain text. Pl.'s Resp. at 4-5, 10. But *Bruen* twice makes quite clear that the definition of arms does not refer to all weapons.

First, the *Bruen* Court recognized that the historical meaning of "arms" contained a self-defense component that continues today:

> [T]he Second Amendment extends, prima facie, to all instruments that constitute bearable arms, even those that were not in existence at the time of the founding. Thus, even though the Second Amendment's definition of 'arms' is fixed according to its historical understanding, the general definition covers modern instruments that facilitate self-defense.

*Bruen* at 2117, *citing* Cf., *Caetano v. Massachusetts*, 577 U.S. 411-412 (2016) (*per curiam*) (support for finding that a weapon that facilitates self-defense can be a protected arm even if modern). In other words, "facilitate self-defense" is a condition on the word arms that applies to

modern weapons. *Bruen* bases this limitation explicitly on the "historical understanding" of the word, not on an analysis of regulations.

Next, *Bruen* confirms another limitation on the when it resolves the meaning of "arms" by briefly noting that petitioners are part of "the people" protected by the Amendment and that the parties did not dispute whether "handguns are weapons in 'common use today' for self-defense," and then discussed the meaning of the phrase "bear arms." *Bruen* at 2134. Only after that discussion did the Court move on to analyzing the historical tradition of regulating the carrying of firearms. *See id.* at 2135.

If *Bruen* is not clear enough, *Heller* also demonstrates that the court should reject Plaintiffs' concept of arms at Step One. Plaintiffs' definition of arms begins and ends with one quote from *Heller*, ignoring the other instances in the *Bruen* opinion where the Court expands on its understanding of arms. *Id.* Plaintiffs rely on *Heller's* use of the founding-era dictionary definition of "arms" as "any thing that a man wears for his defence, or takes in his hands, or useth in wrath to cast at or strike another." Pl.'s Resp., at 4-5; *Heller* at 581. But this is merely a starting point for *Heller's* concept of arms. In the next sentence, *Heller* notes that "the term was applied, then as now, to weapons that were *not specifically designed for military use* and were not employed in a military capacity." *Id.* (emphasis added). This is directly contrary to Plaintiffs' assertion that the definition of arms must include all military weapons. See Pl.'s Resp., at 6-7. Indeed, *Heller* calls this very notion a "startling reading of *Miller*." *Heller* at 624.

*Heller's* discussion of dangerous and unusual weapons offers another boundary to the meaning of arms. *Heller* at 627; *See* Defs.' Memo. at 20. Plaintiffs insist that the "dangerous and unusual" analysis belongs only in Step Two, arguing that Defendants misunderstand *Heller's* reference to "the historical tradition of prohibiting the carrying of dangerous and unusual weapons"

as a note on the plain text and not merely an example of the historical tradition of regulation. Pl.'s Resp. at 6. But *Heller* is clear that it references the prohibition on dangerous and unusual weapons as *support* for the notion that protected arms are limited to those in common use for lawful purposes like self-defense. *Heller* at 627. *Heller* then acknowledged that this definition of arms would lead to the conclusion that "weapons that are most useful in military service – M-16s and the like" could be banned and explained why that fit within the prefatory clause of the Amendment. *Id*. At the time of ratification, citizens brought lawful weapons possessed at home to use during militia duty; such a militia today would require "sophisticated arms that are highly unusual in society at large." *Id.* The Court did not make this point merely as an observation of the historical tradition; it buttressed the notion that the definition of arms is limited and clarified that a weapon's military use does not guarantee its status as a protected arm under the Second Amendment. *See Id*. at 624-627. Notably, the specific arm referenced by the Supreme Court in in *Heller* – the M-16 – is the functional performance capacity twin of the regulated AR-15 subject to the instant litigation. See chart, Defs.' Memo. at 7.

This is reflected throughout *Heller's* discussion of *United States v. Miller*, 307 U.S. 174 (1939). *Heller* explains that the *Miller* Court held "that the *type of weapon at issue* was not eligible for Second Amendment protection" and that *Miller* stands for the proposition that "the Second Amendment right, whatever its nature, extends only to certain types of weapons." *Heller* at 622-623 (emphasis in original). *Heller* further states its understanding of "what types of weapons *Miller* permits." *Id*. at 624. In so doing, the *Heller* Court focused on *Miller's* statement that able-bodied men called to militia service were "expected to appear bearing arms supplied by themselves and of the kind in common use at the time." From there, *Heller* concludes that *Miller* found the Second Amendment to protect weapons that were "'in common use' at the time for lawful purposes like

self-defense." *Id*. Contrary to Plaintiffs' assertions, this is the same legal analysis of arms demonstrated clearly in *Bruen*. *Bruen* at 2134.

Plaintiffs' only attempt to directly rebut Defendants' textual definition of arms is to say that arms must include weapons that can be used for both offensive and defensive use. Pl.'s Resp., at 5. In support, Plaintiffs point again to "weapons of offence, or armour of defence." *Id*., quoting *Heller* at 581. Plaintiffs later point to *Heller's* statement that the right is not limited to weapons in existence in the 18th century. *Id*. at 12. But again, these concepts were merely starting points for *Heller's* analysis of the meaning of arms, from which the Court performed a comprehensive unpacking of the term, which Plaintiffs blithely cast aside. To properly perform an analysis at Step One, an examination of whether the modern weapons at issue facilitate armed self-defense and are "in common use for a lawful purpose like self-defense" is necessary. Plaintiffs have failed to perform this analysis.

### c. Only weapons that facilitate self-defense can potentially be considered arms within the text of the Second Amendment.

#### 1. *Bruen* did not conduct a Step One analysis regarding the definition of arms.

First, it should be noted that while *Bruen* articulated the two-step approach, it conducted only a limited application of Step One because the parties agreed that "handguns are weapons 'in common use' for self-defense today." *Id*. at 2134. With that matter resolved, the Court only performed a plain text analysis of the Amendment in order to address whether publicly carrying handguns fell within the scope of the Amendment. *Id*. Thus, although *Bruen* defines arms as weapons that facilitate armed self-defense and that are "in common use today for self-defense," it offers no guidance on *how to determine* whether an arm is in "common use for a lawful purpose such as self-defense." Defendants have provided expert opinion and data showing that the regulated weapons do not facilitate armed self-defense; are not commonly used for self-defense;

and in fact are commonly used for mass shootings and domestic terrorism. See Defs.' Memo. at 1-30. Plaintiffs offer no valid rebuttal.

### 2. The regulated weapons do not facilitate self-defense.

As discussed in Defendants' memorandum, the regulated weapons fall outside the plain text of the Second Amendment because they do not facilitate self-defense and are not in common use for self-defense. Defs.' Memo. at 5-18. *See Bruen* at 2132. First, they were designed and optimized for use in military offensives. Second, they are commonly used by civilians to carry out armed attacks resulting in mass casualties. Third, the characteristics and capabilities of the weapons render them practically and legally unsuitable for self-defense under Illinois law. See Defs.' Memo. at 5-18.

In their only attempt to explain how the regulated weapons facilitate self-defense, which they contend is not a Step One analysis, Plaintiffs refer to certain ancillary features delineated in the Ordinance, specifically pistol grips, adjustable stocks, and barrel shrouds, as aids for comfort and ease of use. Pl.'s Resp. at 25. James Yurgealitis, Defendants' firearms expert, testified that these same features make the weapons suitable for use in combat. See Defs.' R. 56.1 at ¶ 137-144. For example, a pistol grip and an adjustable stock would each increase the ability of the operator to conceal the weapon and fire from a position other than the shoulder. *Id*. at ¶ 137-141. A barrel shroud protects the operator from the heat of the barrel and is more common in military firearms than sporting rifles. *Id*. at ¶ 143-144. In fact, Mr. Yurgealitis opined that a shotgun or a pistol would be a more suitable weapon for self-defense in the home because they have stopping power and ease of use, but a low probability of over penetration. *Id*. at ¶ 33-35.

Plaintiffs do not provide evidence to refute Defendants' arguments regarding self-defense. Instead, Plaintiffs misstate Defendants' argument and claim that Defendants misconstrue Illinois

self-defense law. Pl.'s Resp. at 25. To be clear, Defendants do not argue that Illinois *per se* prohibits the use of a regulated weapon for self-defense. Rather, Defendants argue that the use of a regulated weapon would likely not support a claim for self-defense because its use would likely amount to excessive force and, in addition, would endanger bystanders in such a way to give rise to a potential separate criminal charge. Defs.' Memo. At 12-18; *See People v. Morgan*, 187 Ill. 2d. 500, 719 N.E.2d 681, 700, 241 Ill. Dec. (Ill. 1999) (a claim of self-defense requires, in part, a showing that the kind and amount of force actually used was necessary.). This is due in part to the regulated weapons' ability to deploy far greater firepower than handguns, the gold standard of self-defensive firearms. *Id*. at 15-16. Plaintiffs respond only to say that if lethal force is justified, it does not matter what weapon is used to administer lethal force. Pl.'s Resp. at 25. Not so. First, legal self-defense only permits a claimant to use the kind and amount of force necessary to stop the attack. *Fowler v. O'Leary*, No. 87 C 6671, 1993 U.S. Dist. LEXIS 3554, at *34 (N.D. Ill. Mar. 19, 1993) (Pallmeyer, J.). Plaintiffs' response ignores the risk to bystanders posed by using a regulated weapon for self-defense. While it may be permissible to discharge deadly force from a handgun in self-defense, it is not legal or permissible to spray bullets from an AR-15 in self-defense. Plaintiffs' premise shrugs its shoulders at the evidence offered by Defendants which shows that wounds from the regulated weapons are more likely to be lethal and/or to result in serious complications than wounds from a handgun or non-semi-automatic rifle, as well as the evidence that shows most shootings take place at close range and home defense and retail robberies rarely, if ever, demand extensive exchanges of gunfire. *See* discussion, *infra*; Defs.' Memo. at 24-27; Defs.' R. 56.1 at ¶ 28-29. These facts make clear the regulated weapons are not suited for, let alone necessary for, self-defense. Plaintiffs fail to rebut these points.

      **3. Plaintiffs offer no authority to support a finding that the regulated weapons are commonly used for lawful purposes.**

As noted above, whether a weapon is an arm depends on whether it is in common use for lawful purposes such as self-defense. *Heller* at 627. Instead of analyzing whether the regulated weapons are in common use for lawful purposes such as self-defense at Step One, where it is their burden, Plaintiffs address this point as "a concrete application of that historical analysis" and assert that the weapons are indeed in common use. See Pl.'s Resp., at 10. But Plaintiffs conflate "common use" with "common ownership," utterly failing to establish the former while taking a flailing stab at the latter.

Plaintiffs have submitted no facts of their own regarding the common use of the regulated weapons and offer no admissible evidence to this point.[1] *See* Dkt. 101, Pl.'s SOAF. Plaintiffs begin by asserting, without citing factual support, that the regulated weapons are "owned by millions of Americans who overwhelmingly use them for lawful purposes." Pl.'s Resp., at 13. Citing inadmissible evidence, Plaintiffs point to "the number of AR-rifles and other similar rifles in circulation in the United States;" their proportion of total firearms sales; and their use in crime. Pl.'s Resp. at 14-16. Even if any of Plaintiffs' purported evidence could be properly considered by this court, it would not demonstrate common use. First, it shows only the raw number of weapons in circulation; it does not show how many people own the regulated weapons or what total percentage of firearms owned by citizens are weapons that would be regulated under the Ordinance, two metrics that certainly are relevant to deciding whether a weapon is common. *See* Defs.' Memo., p. 23. In fact, the vast majority of Americans do not own any firearm. Defs.' R.56.1 at ¶ 92. Within the minority of people who do own a firearm, Assault Weapons tend to be concentrated among an even smaller subset. Defs.' R.56.1 at ¶ 95. Second, Plaintiffs' evidence does not establish how the weapons are actually *used*. See discussion, infra.

---

[1] Defendants have filed a Motion to Strike Plaintiffs' improper responses to Defendants' Local Rule 56.1 Statement of Facts as well as Plaintiffs' citations to inadmissible evidence. Dkt. 104.

Because they have failed to produce admissible evidence, Plaintiffs ask the court to rely upon four opinions from other Circuits to find that the regulated weapons are in common use. Pl.'s Resp., at 13-14. All four cases have been remanded or abrogated since *Bruen*, and none undertook a *Bruen* textual analysis. Two concerned large capacity magazines, not Assault Weapons, which are not at issue here. *Ass'n of N.J. Rifle & Pistol Clubs, Inc. v. Att'y Gen. N.J.*, 910 F.2d 106, 110-111 (3rd Cir. 2018); *Duncan v. Becerra*, 970 F.3d 1133.  *Heller II*, cited by Plaintiffs, could not conclude based on the record whether the Assault Weapons and magazines regulated in that case were commonly used for lawful purposes. *Heller v. District of Columbia*, 670 F.3d 1244, 1261 (D.C. Cir. 2011). Similarly, in *New York State Rifle & Pistol Ass'n v. Cuomo*, 804 F.3d 242 (2nd Cir. 2015), the Second Circuit concluded that the record lacked sufficient evidence to show that the weapons at issue were owned for lawful purposes. *Id*. at 257. Meanwhile, *this* Circuit has acknowledged prevalence *alone* does not preclude regulation. *Friedman v. City of Highland Park*, 784 F.3d 406, 409 (7th Cir. 2015) (the Tommy gun was all too common in Chicago before it was federally prohibited).

Plaintiffs' reliance on *Staples v. United States*, 511 U.S. 600 (1994) is misplaced. Pl.'s Resp. at 17. The issue in *Staples* was whether the government had to prove Staples knew his rifle was modified to fire automatically in order to convict him of criminally possessing a machine gun under the National Firearms Act. *Staples* at 602-604. It is key to note that the Court was determining whether an arm met a definition proscribed by statute, not interpreting the Second Amendment. *Id*. at 611-612. In its holding, the Court explained that "despite their potential for harm" many firearms can be owned legally and do not generally occupy a category of product that would put their owners on notice that they may be subject to regulation sufficient to satisfy criminal *mens rea*. *Id*. at 611-612. The Court did not evaluate whether Assault Weapons are in common

use, nor did it comment on the meaning of "common use." Plaintiffs cannot cobble together dicta from criminal cases to form a precedential opinion in a Second Amendment matter. *See Savory v. Cannot*, 947 F.3d 409, 421 (7th Cir. 2020). There is no precedential case law that requires this court to accept Plaintiffs' definition of "common" and apply it to the regulated weapons; the court need only look to the record to make this determination.

### 4. Ownership and intent do not equate to "use" for self-defense.

The Supreme Court opinions in *Heller* and *Bruen* do not employ the phrases "commonly owned" or "commonly purchased" when discussing weapons that can be regulated. The Court uses the phrase "common *use*." *Heller* at 624; *Bruen* at 2134; *See* Defs.' Memo. at 23. Yet Plaintiffs purport to show use of the regulated weapons by referring to sales and owners' self-reported reason for purchasing the weapons. Pl.'s Resp., at 14-15. Again, none of the evidence cited by Plaintiffs is admissible. But more importantly, this argument asks the court to simply ignore the Court's repeated word choice and turn a blind eye to the facts Defendants have clearly shown: (1) the weapons are not appropriate for self-defense; (2) there is no evidence that the weapons are used for self-defense; and (3) there is ample evidence that the weapons are used for mass murder. Defs. Memo. at 1-30.

Plaintiffs' reading of "use" is further negated by looking at the historical understanding of the word. The "common use" test was derived from the common law principle that unusual weapons were not protected, and Blackstone would have understood the term "usual" to refer to the frequency of actual use, since that term was originally understood to mean "accordant with *usage*." https://www.merriam-webster.com/dictionary/usual (emphasis added).[2]

---

[2] This is reflected in the etymology of the word "usual" as a direct lineal descendant of the Latin term *usus*, which was itself derived from the Latin term *uti*, which meant "make use of, profit by, take advantage of." Given the frequent use of Latin in his writings, Blackstone would have been well aware of this lineage.

Determining "use" merely by sales requires the court to employ a reading that defies *Heller* and *Bruen* and to ignore the facts in the record. The evidence in the record indicates that the regulated weapons are rarely used for self-defense, despite Plaintiffs' claim that owners report self-defense as a reason for purchasing them. See, e.g., Defs.' R. 56.1 at ¶ 39. Indeed, the weapons subject to regulation are used in 85% of mass shootings in the United States. Defs.' R. 56.1 at ¶ 187. Plaintiffs' reliance on the number of weapons in circulation and the owners' stated reasons for purchasing the weapon has little bearing on whether the weapons are in common use. First, "intent" is not a synonym for "use." Moreover, the number of weapons in existence tells the court nothing about the prevalence of the weapons among the population. It sheds no light on the number of people own semi-automatic rifles in the U.S. or the number that own more than one. Of the people who own multiple semi-automatic rifles, Plaintiffs cannot provide evidence that those owners in fact use each rifle for self-defense or other lawful purposes. The inadequacy of using sales numbers to show "common use" is made clear by its logical conclusion: if sales are the only metric by which to understand "common use," then a handful of people with adequate funds can become the sole arbiters of what weapons are and are not legal to possess, regardless of the nature of the weapon or the rest of the population's access to that weapon. Indeed, Plaintiffs seem to agree with this premise. They suggest the machine gun ban may violate the Second Amendment (Pl.'s. Resp. at 32-33) and make the rather broad and startling statement that "the 'common use' test makes clear that courts and legislatures do not have the authority to second-guess the choices made by law-abiding citizens by questioning whether they really 'need' the arms that ordinary citizens have chosen to possess." Pl.'s Resp. at 12. The implication of Plaintiffs' unrestricted statement is clear: if enough of a weapon is sold, the nation is powerless to regulate it, regardless of whether that weapon is a handgun or a grenade launcher.

Finally, it should be noted that Plaintiffs' concept of "use" destroys the "common use" test entirely. Plaintiffs point to *Heller*'s interpretation of "bear" and state that the Second Amendment "by its plain terms, [ ] contemplates ways of 'using' firearms other than just shooting them." Pl.'s Resp., at 18. This much is true – the Second Amendment does protect the right to have certain firearms in certain contexts without shooting them. But from there, Plaintiffs somehow arrive at the conclusion that "common use" cannot actually mean "use" because "keep and bear" guarantees a broader right than usage. *Id*. Plaintiffs are arguing against a concept of their own invention. "Common use" is not a modifier on the term "keep and bear" and no court has said as much. "Common use" is a limitation on the definition of arms. *See* discussion, *supra*. If it were not, then the "common use for lawful purposes such as self-defense" standard *Heller* derived from *Miller*, and which the Court specifically reiterated in *Bruen*, serves no purpose at all because "keep and bear" would guarantee a broader right. In Plaintiffs' circular understanding, people have the right to have a weapon if people have that weapon. This is a reading of the law that the court cannot abide.

### d. A weapon that is dangerous and unusual cannot be considered in common use for lawful purposes and therefore cannot be a protected arm.

#### 1. "Dangerous and unusual" is a standard the Supreme Court has indicated applies when determining whether a weapon is a protected arm.

Plaintiffs attempt to frame the "dangerous and unusual" concept only as an example of the historical tradition of firearms regulation and having no application to the plain text analysis at Step One. Pl.'s Resp., at 5-6. This restrictive reading of *Heller* is incorrect. Plaintiffs misconstrue *Bruen's* explanation of *Heller's* use of the phrase to support their contention that "dangerous and unusual" has no application to the plain text analysis. Quoting *Bruen*, Plaintiffs argue *Heller* was "rel[ying] on the historical understanding of the Amendment to demark the limits on the exercise of that right" when it considered dangerous and unusual weapons. Pl.'s Resp., at 11. However, the

*Bruen* court's use of the phrase "historical understanding" is not synonymous with "historical tradition." The word understanding suggests interpretation and comprehension, not regulatory action. Immediately following the sentence quoted by Plaintiffs, the *Bruen* court goes on to quote *Heller*, which said "From Blackstone through the 19th-century cases, commentators and courts routinely explained that the right was not a right to keep and carry any weapon whatsoever in any manner whatsoever and for whatever purpose." *Bruen* at 2128, quoting *Heller* at 626. *Bruen* and *Heller's* references to Blackstone, 19th century cases, commentators, and courts make clear that they were discussing interpretation of the text of the Amendment, not the historical tradition of regulations.

### 2. Plaintiffs do not and cannot contest the evidence showing the regulated weapons are dangerous and unusual.

Defendants offered evidence that the regulated weapons are likely to cause wounds that are deadlier and more incapacitating; are likely to cause more wounds generally; are unusually attractive to people wanting to cause mass death and terror; are used frequently in mass shootings that cause widespread psychological effects to victims and their communities; have a chilling effect on the expression of free speech; and present unique challenges to law enforcement, who are often not prepared and not able to counter a shooter. Defs.' Memo. at 24-30. Taken in its entirety, the record shows that the regulated weapons are dangerous and unusual, and is not offered to support an interest-balancing test as Plaintiffs claim. Pl.'s Resp. at 22. In the absence of any evidence to refute Defendants' facts, Plaintiffs conclude that the weapons cannot be dangerous and unusual because they are common by their definition based on one factor – the number in circulation. Pl.'s Resp., at 20. Defendants have already addressed the shortcomings of this argument. Plaintiffs go on to mistakenly state that Defendants did not identify a comparator for

the regulated weapons. Defendants repeatedly compare the regulated weapons to the comparators identified by Plaintiffs, handguns and non semi-automatic rifles. Defs.' Memo. at 24-27.

Plaintiffs address Defendants' points but make no persuasive argument. First, Plaintiffs state that the regulated weapons cannot be more apt for illegal activity than handguns because handguns are concealable and overwhelmingly the weapons of choice for criminals. Pl.'s Resp. at 21. However, handguns are much more prevalent than the regulated weapons and so it follows that they would account for more overall criminal activity. The regulated weapons, on the other hand, are used in mass shootings at a disproportionately high rate that exceeds their prevalence and, when used in mass shootings, result in in more death per instance than crimes committed with handguns. Defs.' R. 56.1 at ¶ 104, 107, 113.

Next, Plaintiffs attack Defendants' evidence of psychological trauma inflicted by mass shootings by stating that Defendants failed to connect mass shootings to the regulated weapons. Pl.'s Resp. at 22-23. This is false, and the record is replete with evidence that mass shootings tend to be carried out with semi-automatic weapons such as the ones regulated by the Ordinance and are responsible for a high percentage of mass shooting deaths. Defs.' R. 56.1 at ¶ 106, 107.

Perhaps most egregiously, Plaintiffs deny that the regulated weapons cause more serious wounds than non-assault weapons and leave victims at a greater risk for immediate and long-term complications. In support of this denial, Plaintiffs point to an article that was not produced or disclosed in discovery and which compares "AW-type firearms" to "other comparable semiautomatics" while not defining either of those terms. Pl.'s Resp., at 23-24. Plaintiffs also cite to another article that was not produced or disclosed but which states that wounds caused by the regulated weapons do not cause more severe wounds than other comparable semiautomatics. Pl.'s Resp., at 23-24. Even if this evidence were admissible, it does not refute Defendants' unchallenged

experts' testimony. Dr. Colwell, for example, compared the wounds from Assault Weapons to non-assault weapons, not just to "comparable semi-automatics." Defs'. Memo. at 25. Plaintiffs accuse Defendants of "greatly overstat[ing]" the wounding power of the ammunition typically used in the regulated weapons, the 5.56mm/.223 caliber bullet. Pl.'s Resp. at 24. In support, Plaintiffs reference a 27-year-old article by a doctor who was not disclosed as a witness. The article opines that even "the most expert" person could not tell the difference between the wounds from a handgun bullet or a "military rifle" bullet. Defendants' three medical experts' (Dr. Colwell, Dr. Schreiber, and Dr. Hargarten) reports rely on more modern data and contradict that unsupported and untested statement. See Defs.' R. 56.1 at ¶ 55-58, 62-81. Plaintiffs neither challenged *any* of Defendants' experts under *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579 (1993), nor produced rebuttal witnesses; therefore, Defendants' expert testimony prevails.

Plaintiffs also take issue with Defendants' arguments as to the lethality of the regulated weapons because Defendants do not prohibit the caliber of ammunition frequently used in the regulated weapons. Pl.'s Resp., at 24. Even if this argument were logically sound, it is precisely the kind of means-end analysis *Bruen* prohibits. And, again, Plaintiffs have not challenged the expertise of Defendants' experts, neither have they provided any rebuttal witnesses or admissible evidence to the contrary.

Next, Plaintiffs assert that Defendants' law enforcement and security experts, Chief Larry Snelling and Phil Andrew, are simply wrong in their statements about the impact of Assault Weapons on law enforcement and the ability of Assault Weapons to pierce standard police body armor. Pl.'s Resp. at 26-27. Plaintiffs have no evidence to support their conclusions, but the document they do point to does not address the issue of body armor because it refers to the ability to pierce *soft* body armor, which Chief Snelling and Mr. Andrew do not specifically discuss.

Plaintiffs have not challenged the expertise of Chief Snelling and Mr. Andrew under *Daubert* and have not produced rebuttal witnesses or evidence.

Finally, Plaintiffs deny that the regulated weapons are not the weapon of choice for mass shootings and deny that they are increasingly being sought by gang members. Pl.'s Resp. at 27. Plaintiffs do not rebut Defendants' expert testimony that Assault Weapons are used disproportionately in mass shootings. Defs.' R. 56.1 at ¶ 104. Instead, Plaintiffs take issue with the definition of mass shooting. Pl.'s Resp. at 27; Pl.'s R. 56.1(e) at ¶ 103. Rather than rebut Chief Snelling's testimony, Plaintiffs compare the top twenty firearms models seized by Chicago Police in 2014 to the percentage of guns traced by the ATF from 2017-2021 that fell into the broad category of "rifles." Plaintiffs' response is inapposite and wholly fails to show that the regulated weapons are not dangerous and unusual.

### 3. Protected arms do not include every weapon used in the militia/military.

Plaintiffs contend that all weapons used in military service are "arms" within the plain text of the Amendment. This is plainly refuted by *Heller*. *Heller* at 624 (arms referred to weapons men would be expected to have at home and to bring to militia service), 627 (weapons most useful in military service are dangerous and unusual). Plaintiffs also contend that military usefulness alone does not make a weapon subject to regulation. Plaintiffs misstate Defendants' argument to this point. Defendants do not argue that the regulated weapons are not protected solely because they are used in the military. Rather, the fact that the regulated weapons are *most* useful in military service and bear major similarities to M-16s goes to show that they are dangerous and unusual and fall outside the Amendment's protection. Defendants' position squarely reflects *Heller*'s statement that "weapons that are most useful in military service – M-16s and the like" are dangerous and unusual. *Heller* at 627.

Plaintiffs offer a tortured dissection of *Heller's* statement but ultimately arrive in agreement with Defendants: *Heller* referenced weapons that are "most useful in military service – M-16s and the like" as an example of weapons that are dangerous and unusual. Pl.'s Resp at 7. The regulated weapons are substantially similar to M-16s in all respects (including muzzle velocity, effective range, and maximum range) except the ability to switch to fully automatic fire. Defs.' Memo. at 7-8. Plaintiffs offer no evidence to refute these facts.

## II. The Ordinance Is Consistent with This Country's Historical Tradition of Regulating Dangerous and Unusual Weapons.

Even if the weapons regulated by the Ordinance fell within the plain text scope of Second Amendment protection, the Ordinance does not constitutionally impair the Plaintiffs' rights under the historical tradition of regulating dangerous and unusual weapons.

### a. The court should take a nuanced approach to the Ordinance.

*Bruen* directs us to take a "nuanced approach" to analyzing the historical traditions of a weapons regulation where unprecedented social concerns or dramatic technological changes so require. *Bruen*, 142 S. Ct. at 2132. In this case, this court should take a nuanced approach to its analysis precisely because rapid mass slaughter by a single armed individual was not a problem in revolutionary America, and because the combination of traits which qualify a weapon for regulation under the Ordinance constitute the kind of dramatic technological changes which facilitate the kind of lone wolf mass murder which largely unknown to the founding generation. R.56.1, ⁋⁋ 238-242. Plaintiffs are dismissive of the nuanced approach, reformulating the Supreme Court's own analysis as a request for "greater leeway." Pl.'s Resp., at 29. Plaintiffs maintain that the technological changes which arose between the muzzle loading weapons of the Eighteenth Century (R.56.1, ⁋ 241) and the modern Assault Rifle are not constitutionally significant, and push the claim that "gun violence" was a problem in some places at the time of

the founding and is therefore not a new societal problem. Pl.'s Resp., at 29-30. Defendants address each position in turn.

### 1. Single-shooter mass murder was not a problem at the time of the founding.

Plaintiffs' focus on so-called 'gun violence' at the time of the founding is a strawman. Defendants have never claimed that gun violence did not exist in 18th century America and decline to do so now. Assault Weapons are regulated by the Ordinance because they are uniquely implicated in the perpetration of *mass* shootings (emphasis added). R. 56.1, ¶ 104. Plaintiffs cite to irrelevant statistics about the percentage of crimes committed with firearms versus other weapons (Pl.'s Resp., at 15-16), but utterly ignores Defendants' arguments about mass shooting incidents. See generally, Pl.'s Resp. It isn't hard to understand Plaintiffs' strategy, which requires they downplay the central role Assault Weapons play in the modern mass shooting. R.56.1, ¶¶ 105-108. Plaintiffs' turn away from mass shootings and towards crime generally is a misdirection which disregards the modern societal problem of individuals, acting alone, shooting and killing large numbers of innocents in one incident. R.56.1, ¶¶ 238-239, 105-108.

In support of their 'gun violence' feint, the Plaintiffs assert that in some places, at some times during the first century of our country's history, "periods of staggering gun violence can be found." Pl.'s Resp., at 30. Notably, Plaintiff's source for this claim, the book "American Homicide," was not disclosed during discovery. Plaintiffs conflate the mass shootings the Ordinance is intended to prevent with casualties of America's Revolutionary War. See, e.g., Pl.'s Exh. 80, at p. 150 ("Once the Revolution got underway, it became difficult to distinguish between homicide and an act of war.") Plaintiffs do not (and cannot) provide evidence of an equivalent social problem with the mass shootings of the type and frequency we experience in modern America, so they instead compare contemporary acts of mass murder to war between the American

revolutionaries and the British army. While it may be difficult to determine which killings in revolutionary America were actually acts of war, there is no equivalent doubt over the modern mass shooting committed by a lone gunman.

To the limited extent Plaintiffs address the difference between the comparatively rare homicide and the modern phenomenon of mass shootings, they do so by attacking Defendants' historical expert. *Pl.'s Resp. to Def.'s R.56.1 SOF* ¶ 232 (asserting that Dr. Saul Cornell is not a 'reliable' source on the history of firearms regulation because he criticized the decision in *Bruen* in a blog post.) Plaintiffs' *Ad hominem* attacks are not a substitute for historical scholarship and this court should utterly disregard them. Further, Plaintiffs have not challenged any of Defendants' expert reports under *Daubert* and have failed to provide the court with any rebuttal reports.

The rise of the modern individual mass shooting presents a hellish societal concern that the founding generation did not face. Accordingly, the court should take a nuanced approach to the historical analysis *Bruen* requires to determine the constitutionality of the Ordinance. And while the analysis of "dangerous and unusual" weapons rightly determines whether a weapon is covered by the scope of the Second Amendment, there is significant historical evidence of use of this standard dating back to the construction era. Plaintiffs make no answer to the country's history of regulating weapons which are most commonly used in unlawful ways. See Pl.'s Resp., at 33-35. The *Bruen* historical analysis takes into consideration legal history from the Reconstruction period. *Bruen*, 142 S. Ct. at 2120, 2132. To the extent the burden on this issue belongs to Defendants, they have affirmatively demonstrated that since at least the Reconstruction period, various state courts have construed the Second Amendment to permit the regulation of weapons in common use for unlawful purposes. See, e.g. *Fife v. State*, 1876 Ark. LEXIS *10 (1876); *Andrews v. State*, 1871

Tenn. LEXIS 83 *29 (1871); *Aymette v. State*, 1840 Tenn. LEXIS 54, *9 (1840); *Hill v. State*, 1874 Ga. LEXIS 509, *7-8 (1874).

**2. Technological advancements have made modern Assault Rifles into indiscriminate killing machines.**

Compared to handguns, the technological advancements inherent to Assault Weapons allow a single person to murder or injure as many people as possible in a short period of time. R.56.1, ⁋ 335. Assault weapons are effective at a far greater distance than handguns. R.56.1, ⁋ 189. Assault Weapon rounds travel further and faster than handgun rounds. R.56.1, ⁋⁋ 76, 274, 276). Unlike handgun rounds, Assault Weapon rounds yaw when they strike human flesh. R.561., ⁋ 275-276. Defendants exhaustively described the uniquely devastating injuries that Assault Weapons inflict on their human victims. See Defendants' Memorandum in Support of Summary Judgment ("Defs.' MSJ", Dkt. 82) at 26-27.

Plaintiffs declined to address the technological changes which make the modern Assault Rifle into an offensive killing machine. Pl.'s Resp., at 29-30. Instead, Plaintiffs erroneously claim that the Supreme Court implicitly ruled out Assault Weapons regulations when it observed that the Second Amendment's protections cover "modern instruments that facilitate armed self-defense." Pl.'s Resp., at 29 citing *Bruen*, 142 S. Ct. at 2132. Plaintiffs approach is wrong for multiple reasons. First, Plaintiffs urge this court to abandon the historical analysis required under *Bruen*. Even if this court finds that Assault Weapons are arms within the plain text of the Second Amendment, they may still be regulated if there is an analogous historical tradition of regulation. *Id.* at 2131-32. Plaintiffs' maximalist position would obliterate the historical analysis portion of the test, and instead mandate that all arms which fall within the plain text of the Second Amendment are categorically immunized from regulation.

Plaintiffs' position would also make the Supreme Court's 'nuanced approach' superfluous because it effectively rules out all regulations on bearable arms of any kind, so long as those arms, in Plaintiffs' view, facilitate armed self-defense. No modern firearm could possibly show the kinds of technological advancements which would satisfy such a test. Plaintiffs' position is perfectly circular. The Court's nuanced approach to historical analysis is not idle musing or an intellectual exercise, and therefore Plaintiffs' view of the law cannot be accurate.

Finally, Plaintiffs make an apples-to-oranges comparison. The cited language discusses the scope of the plain text of the Second Amendment, and not whether there is an analogous historical tradition of firearm regulation. *Bruen*, 142. S. Ct. at 2132. The Court was affirming the proposition (which Defendants do not challenge) that modern firearms do not fall outside the scope of the Second Amendment merely because they are different from the arms in use at the time of the founding. *Id.*

Plaintiffs' only serious effort to grapple with Assault Weapons' dramatic technological changes is to claim that the Defendants' position implicitly implicates handguns as well because handguns are materially different from the muzzle loading weapons owned and used by the founding generation. Pl.'s Resp., at 29-30. Handgun regulations are not at issue in this case, nor do Defendants argue that a blanket handgun ban would be constitutional. What's more, Plaintiffs' seize on the similarities between handguns and Assault Weapons which are not chiefly responsible for the Assault Weapons' outsized role in mass killings. *Id.* at 30. Plaintiffs offer no comment as to the dramatic technological differences between handguns and Assault Weapons which make the former primarily defensive weapons, and the latter primarily offensive instruments of terror and mass murder. *Id.*

**b. Regulations on the possession and storage of gunpowder are constitutionally analogous to the ordinance.**

In order to validate a regulation on arms covered by the Second Amendment, the government must identify a "well-established and representative historical analogue" to the regulation. *Bruen*, 142 S. Ct. at 2133. Defendants have met their burden by identifying historical regulations on the possession and storage of gunpowder, a necessary component of the functioning of any firearm. Defs.' MSJ at 37-39. Plaintiffs attempts to distinguish gunpowder are unavailing.

First, Plaintiffs call the gunpowder regulations "public safety regulations." Pl.'s Resp., at 31. Defendants agree. Like with the Ordinance, the purpose of the gunpowder regulations was to protect the health and safety of the people from sudden mass casualty events. R.56.1, ⁋⁋ 245-248. Defendants need not propose a "historical twin" to their regulation, so long as it is constitutionally similar. *Bruen*, 142 S. Ct. at 2133. Nevertheless, Plaintiffs split hairs between the Ordinance and gunpowder regulations by claiming that the purpose of ancient gunpowder regulations was the prevention of "accidental explosions and fires." Pl.'s Resp., at 31. Plaintiffs focus on the 'accidental' nature of the danger gunpowder explosions exposed to early Americans as a distinguishing factor, but propose no explanation for why this difference is constitutionally significant. *Id.* The outcome Plaintiffs urge is as follows: If the danger the regulation preempts is accidental mass death, the government is free to act. However, if the danger the regulation preempts is *intentional* mass death, the government is powerless to act until the aspiring mass murderer opens fire.

Even if this court were to find that the intent of the killer is constitutionally significant, the gunpowder laws are still good analogues because of the danger that the purportedly defensive use of Assault Weapons places on third parties due to excessive discharge of ammunition and overpenetration of common household building materials. R.56.1, ⁋⁋ 21-23. And none of Plaintiffs' arguments apply to the seventeenth-century Guy Fawkes plot, an intentional attempt to

commit mass murder so significant it is recognized every November 5th by Great Britain *to this day*. R.56.1, ⁋ 246. Plaintiffs outsource the remainder of their historical reasoning to a pair of California district court opinions construing gunpowder regulations. Pl.'s Resp., at 31. Plaintiffs make small effort to explain why this court should find the reasoning of those courts persuasive, and it should not. To paraphrase *Bruen*, this court should not give disproportionate weight to a pair of out of state district court opinions construing the scope of the Second Amendment. See *Bruen*, 142 S. Ct. at 2153.

Plaintiffs close their limited discussion of the gunpowder analogy with the legally unsupported conclusion that gunpowder laws are different because, unlike the Ordinance, they did not "preclude ownership of any sort of firearm." This is exactly backwards. Regulations barring the possession of large quantities of gunpowder create a similarly limited burden on the right to armed self-defense for the founding generation that the Ordinance has on modern Plaintiffs. The gunpowder regulations did not prevent early Americans from engaging in armed self-defense. Instead, they limited the ability of those same individuals to cause mass casualties. The Ordinance accomplishes the same purpose. Plaintiffs can engage in constitutionallyguaranteed armed self-defense using handguns, the "quintessential self-defense weapon" (Pl.'s Resp., at 34 citing *Heller*, 554 U.S. at 629), but not to possess or use the weapons of choice for domestic terrorists in mass shootings. R.56.1, ⁋⁋ 106-107.

Defendants have met their burden by raising historical regulations with analogous purpose: the prevention of mass casualty events caused by a single individual. The intent of the killer is irrelevant to the constitutional analysis but, even if this court were to agree with Plaintiffs, Assault Weapons still place such an immense risk on third parties that the Ordinance is analogous to gunpowder regulations.

### c. The presence of Assault Weapons naturally cause fear in the general public.

The law of affray prohibits the carrying of arms which are likely to terrify the public. See, e.g., William Hawkins, 1 PLEAS OF THE CROWN 136 (1716). Defendants have offered overwhelming evidence that the use, possession, or display of Assault Weapons in Cook County will terrify its citizens. Nevertheless, Plaintiffs misconstrue *Bruen* to create a specific intent requirement before anyone can be guilty of affray. Pl.'s Resp., at 30-31.

Plaintiffs' approach is wrong for two reasons. First, the *Bruen* court considered affray in the context of the public carry of handguns. *Bruen*, S. Ct. at 2143. The question of public carry of handguns is not before this court. In direct contrast, the public display of a weapon of war, which is primarily used by civilians in committing acts of terror and mass murder, is likely to induce panic. The proper way to understand the 'intent' requirement of affray is as a general understanding of the likely response by others to the public display of arms. We can infer that the public bearer of an Assault Weapon intends the likely outcome of his actions, and therefore the intent element is satisfied.

Second, the likelihood that the presence of an Assault Weapon will incite fear is itself evidence that these weapons are not in "common use". R.561, ⁋ 174-177, 187 (evincing the large proportion of Americans who fear becoming a victim of a mass shooting, 85% of which are perpetrated by killers with an AR-15 type Assault Weapon.) As *Bruen* acknowledges, the act of publicly carrying a handgun became unlikely to incite terror in others by the 18th century precisely because handguns were in common use for the lawful purpose of self-defense. *Bruen*, 142 S. Ct. at 2142-43. The clear implication is that, as a weapon becomes common, its ability to incite terror through its mere presence is reduced. Assault Weapons, which are largely used in civilian contexts

for massacres, retain their power to terrify the populace, which is clear evidence that these weapons are not in common use for a lawful purpose.

**III.**   ***Wilson* and *Friedman* are still the law of the Seventh Circuit.**

Plaintiff suggests that this court can disregard the precedent set in *Wilson* and *Friedman* and find the Ordinance unconstitutional under *Bruen*. But *Bruen* does not cast doubt on the resolutions of *Wilson* and *Friedman*. In fact, the concurrences in *Bruen* made clear that it (1) did not "decided anything about the kinds of weapons that people may possess" *Bruen* at 2157 (Alito, J., concurring); and (2) did not undermine the Court's previous statements that the Second Amendment allows the regulation of "dangerous and unusual" weapons. *Id.* at 2162 (Kavanaugh, J & Roberts, C.J., concurring). *Bruen* explicitly adopts and continues the Court's reasoning in *Miller* and *Heller*, the latter of which explained that the Second Amendment's protections were not historically extended to weapons which are not in common use for lawful purposes. *Heller*, 540 U.S. at 625. Notably, both *Friedman* and *Wilson* held that Assault Weapons are not in common use for a lawful purpose. *Friedman*, 784 F. 3d at 409; *Wilson*, 937 F. 3d at 1032. The "common use for a lawful purpose" test remains good law and nothing in *Bruen* calls into question the Seventh Circuit's findings in either case. *Friedman* and *Wilson* control here unless and until they are reversed or abrogated by the Seventh Circuit or the Supreme Court.

## CONCLUSION

The Cook County Ordinance is consistent with the plain text of the Second Amendment and with the United States' historical tradition of firearms regulation. There is no genuine issue of material fact, and Defendants are entitled to an award of summary judgment.

Dated May 8, 2023

 KIMBERLY M. FOXX
*Cook County State's Attorney*
*Counsel for Defendants*

 JONATHON BYRER
Supervisor, Appeals & Special Projects
DAVID A. ADELMAN
Supervisor, Affirmative & Complex
Litigation Section
JAMES BELIGRATIS
ELIZABETH BROGAN
Assistant State's Attorneys
Civil Actions Bureau
500 W. Richard J. Daley Center Place
Chicago, IL 60602
(312) 603-6934
(312) 603-5463

By *s/ Jessica M. Scheller*

JESSICA M. SCHELLER
Chief; Advice, Business & Complex
Litigation Division
PRATHIMA YEDDANAPUDI,
Supervisor; Advice, Transactions &
Litigation Section
MEGAN HONINGFORD
SILVIA MERCADO MASTERS
EDWARD M. BRENER
JESSICA L. WASSERMAN
Assistant State's Attorneys
Jessica.Scheller@cookcountyil.gov
Prathima.Yeddanapudi@cookcountyil.gov