**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHEREN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

| | |
|---|---|
| CUTBERTO VIRAMONTES, an individual and resident of Cook County, Illinois, *et al.*, | |
| Plaintiffs, | Case No.      1:21-cv-04595 |
| v. | Assigned Judge:    Rebecca R. Pallmeyer |
| THE COUNTY OF COOK, a body politic and corporate, *et al.*, | Designated Magistrate Judge:    Susan E. Cox |
| Defendants. | |

**DEFENDANTS' RESPONSE TO PLAINTIFFS'**
**MOTION FOR SUMMARY JUDGMENT**

Defendants, The County of Cook, a body politic and corporate, Toni Preckwinkle, in her official capacity as County Board President and Chief Executive Officer of Cook County, Kimberly M. Foxx, in her official capacity as State's Attorney, and Thomas Dart, in his official capacity as Sheriff (collectively the "Defendants"), by their attorney, Kimberly M. Foxx, State's Attorney of Cook County, hereby responds to Plaintiffs' Motion for Summary Judgment:

**ARGUMENT**

Plaintiffs are not entitled to summary judgment where they have failed to show that the Second Amendment's plain text covers the regulated weapons since they are 1) not in common use for a lawful purpose, such as self-defense, and 2) dangerous and unusual. And, even if the regulated weapons are protected, the Cook County Ordinance passes constitutional muster because it is consistent with this nation's historical tradition of regulation.

**I.      Plaintiffs cannot sustain their burden in step one under *Bruen*.**

Plaintiffs have the burden at the initial threshold inquiry: whether the plain text of the Amendment covers the conduct at issue. *New York State Rifle & Pistol Ass'n v. Bruen*, 142 S. Ct.

2111, 2129–2130 (2022). Only *then* does the burden shift to the government to justify its regulation. *Id*. Plaintiffs cannot sustain their burden in step one because they fail to establish that the Regulated Weapons are covered by the plain text of the Second Amendment.

### a. Plaintiffs cannot establish that Assault Weapons are "arms" protected by the Second Amendment.

Plaintiffs' definition of arms is overbroad. They define arms as "any thing that a man wears for his defence, or takes into his hands, or useth in wrath to cast at or strike another." *District of Columbia v. Heller*, 554 U.S. 570, 581 (2008) (internal quotations omitted). But *Bruen* adds to this definition, specifically acknowledging a self-defense component: "Thus, even though the Second Amendment's definition of 'arms' is fixed according to its historical understanding, the general definition covers modern instruments that facilitate self-defense." *Bruen*, 142 S.Ct. at 2117. The phrase "facilitate self-defense" is a conditional limitation on the definition of arms. Thus, Plaintiffs cannot bypass step one by simply proclaiming all bearable arms are protected.

Plaintiffs further argue that any consideration of whether a weapon is dangerous and unusual belongs in step two of the *Bruen* analysis. (Pls. Mem. at 4.) As an initial matter, *Bruen* did not conduct a step one analysis, as the parties there agreed that "handguns are weapons 'in common use' for self-defense today." *Bruen*, 142 S.Ct. at 2134. In any event, *Heller* provides a further boundary on the definition of "arms" in its discussion of dangerous and unusual weapons. *Heller* distinguished dangerous and unusual weapons from weapons in common use at the time, thereby limiting the type of weapon considered an arm protected by the Second Amendment. *Heller*, 554 U.S. at 627. *Heller* further acknowledged that weapons most useful for military service, such as the M-16, may be banned. *Id.* This reinforces the concept that not every weapon is protected and that a weapon's military utility is no guarantee of constitutional protection. It is Plaintiffs' burden

2

to establish that Assault Weapons are in common use for a lawful purpose and are not dangerous or unusual. Plaintiffs fail to sustain their burden.

### b. The Regulated Weapons are not in common use for a lawful purpose.

#### i. Plaintiffs cite no binding precedent that Assault Weapons must be considered common.

Plaintiffs cite no binding precedent that Assault Weapons are common, instead relying on a host of unpersuasive or abrogated cases. They first cite a Colorado district court case, *Rocky Mountain Gun Owners v. Town of Superior*, which is neither precedential nor persuasive, as it did not undertake any analysis on the issue of common use. No. 1:22-cv-01685, Doc. 18 (D. Col. July 22, 2022). Plaintiffs also rely on three cases concerning large capacity magazines, which are not at issue here. *Duncan v. Becerra*, 970 F.3d 1133 (9th Cir. 2020), *Duncan v. Bonta*, 19 F.4th 1087 (9th Cir. 2021), *Ass'n of N.J. Rifle & Pistol Clubs, Inc. v. Att'y Gen. N.J.*, 910 F.2d 106 (3rd Cir. 2018). Plaintiffs' reliance on *Heller II* is mistaken as the court could not conclude *based on the record* whether the Assault Weapons and magazines were commonly used for lawful purposes. *Heller v. District of Columbia*, 670 F.3d 1244, 1261 (D.C. Cir. 2011). Similarly, in *New York State Rifle & Pistol Ass'n v. Cuomo*, 804 F.3d 242 (2d Cir. 2015), the Second Circuit concluded that the record lacked sufficient evidence to show that the weapons at issue were owned for lawful purposes. *Id*. at 257. Meanwhile, *this* Circuit has acknowledged prevalence *alone* does not preclude regulation. *Friedman v. City of Highland Park*, 784 F.3d 406, 409 (7th Cir. 2015) (the Tommy gun was all too common in Chicago before it was federally prohibited).

#### ii. Possession and popularity do not establish "common use."

Plaintiffs focus on common ownership and possession rather than on common use, the standard set forth in *Heller* and *Bruen*. They rely on sales figures and the self-reporting of gun owners to establish that the Regulated Weapons are in common use. (Pls. Mem. at 8–9.) Even

assuming such evidence were admissible, *see supra* at 1–3, it merely shows intent and not actual use. The number of weapons sold does not tell us how many *people* own the weapons, or for what purpose. Plaintiffs appear to believe that ownership is a use in and of itself, arguing that the Second Amendment's protection of the right to "keep and bear Arms" encompasses ways of using firearms other than just shooting them. (Pls. Mem. at 12.) But this approach renders the "common use for lawful purposes such as self-defense" standard *Heller* derived from *Miller*, and which the Court specifically reiterated in *Bruen*, meaningless. Extending Plaintiffs' argument to its logical conclusion means arms are protected if commonly owned, with no further limitation.

Plaintiffs also argue that because the Regulated Weapons are used "extremely rarely" in crime, they must be commonly possessed by law-abiding citizens for lawful purposes. (Pls. Mem. at 10.) But pointing to instances where assault weapons are not used does not establish their actual use. And this data ignores evidence that Assault Weapons like the AR-15 are the weapon of choice in 85 percent of the deadliest mass shootings in the United States and used increasingly often in organized crime. (Def. Mem., ECF 82, at 11, 28.)

Further, Plaintiffs cite no binding precedent that Assault Weapons are in common use for a lawful purpose. Instead, they rely on a concurrence in *Caetano* coupled with dissenting opinions in *Friedman* and *Heller II* to support their argument that common ownership is indistinguishable from common use. (Pls. Mem. at 11.) But Plaintiffs cannot cobble together arguments from dissenting and concurring opinions as if they were precedent on this court. *See Savory v. Cannot*, 947 F.3d 409, 421 (7th Cir. 2020). Nor are the remainder of their non-precedential opinions persuasive. A Massachusetts Supreme Court opinion concluded that stun guns were "arms" under the Second Amendment without any analysis as to whether they were in common use for a lawful purpose. *Ramirez v. Commonwealth*, 94 N.E.3d 809, 815 (Mass. 2018). Likewise, Plaintiffs'

reliance on *People v. Webb*, 131 N.E.3d 93, 96 (Ill. 2019), is unconvincing as the State conceded in that case that stun guns were arms under the Second Amendment. Finally, Plaintiffs' reliance on *Staples v. United States* (Pls. Mem. at 13) is misguided as the *Staples* Court determined whether an "arm" fit within the definition proscribed by statute, not the Second Amendment. 511 U.S. 600, 612 (1994).

### iii. Plaintiffs present insufficient evidence that the Regulated Weapons are "used" for a lawful purpose like self-defense.

Plaintiffs contend that whether a weapon is actually appropriate for self-defense is irrelevant—all that matters is that it is the popular choice. (Pls. Mem. at 6.) However, *Heller* explained that handguns are protected not only because of their widespread public adoption, but also because they include numerous attributes that an individual might find preferable or necessary to achieve effective self-defense. *Heller*, 554 U.S. at 629 ("There are many reasons that a citizen may prefer a handgun for home defense: It is easier to store in a location that is readily accessible in an emergency; it cannot easily be redirected or wrestled away by an attacker; it is easier to use for those without the upper-body strength to lift and aim a long gun; it can be pointed at a burglar with one hand while the other hand dials the police."). While the Court went on to state "whatever the reason," *after* listing these valid reasons, this does not imply the actual reason is meaningless.

To support their argument that the Regulated Weapons are used for self-defense, Plaintiffs rely on surveys which only show the stated intent of gunowners and not actual use, and which show that gunowners participate in target practice which Plaintiffs claim is related to maintaining proficiency in firearm use as an "important corollary to …self-defense." (Pls. Mem. at 9, *citing Ezell v. City of Chicago*, 651 F.3d 684, 708 (7th Cir. 2011)). But the *Ezell* court made no finding that the firearms used in target practice are actually used for self-defense and Plaintiffs cannot use this survey to establish common use.

5

Defendants have presented compelling evidence that the Regulated Weapons do not facilitate self-defense, nor are they commonly used for self-defense. (ECF 82 at 5–18.) Plaintiffs point to differences between automatic weapons and semi-automatic rifles (Pls. Mem. at 13) but ignore the fact that other than rate of fire, the M-16 and AR-15 share the same performance characteristics in terms of muzzle velocity, range, and type of ammunition. (ECF 82, chart, at 7.)

Plaintiffs argue that the Regulated Weapons do not operate differently than comparable semiautomatics nor fire more lethal ammunition (Pls. Mem. at 13) but these weapons' lethality is based not on the size of the ammunition but on the velocity with which they are discharged and the resulting impact on human flesh. (ECF 82 at 16.) Plaintiffs have offered no expert testimony or admissible evidence establishing that the Regulated Weapons facilitate self-defense.

Beyond Plaintiffs' failure to present evidence that the Regulated Weapons facilitate self-defense, there is significant evidence showing that using these weapons in self-defense would be unlawful in Illinois. (ECF 82 at 14.) The use of Regulated Weapons would likely amount to excessive force and, in addition, would endanger bystanders in such a way to give rise to a potential separate criminal charge. (ECF 82 at 12–18); *See People v. Morgan*, 187 Ill. 2d. 500, 719 N.E.2d 681, 700, 241 Ill. Dec. (Ill. 1999) (a claim of self-defense requires, in part, a showing that the kind and amount of force actually used was necessary.). Because Assault Weapons can deploy far greater firepower than handguns, the gold standard of self-defensive firearms, their use would likely be considered excessive force which is no longer considered self-defense under Illinois law. (ECF 82 at 15–16); *See People v. Murillo*, 225 Ill. App. 3d 286, 293 (1st Dist. 1992). Legal self-defense only permits a claimant to use the kind and amount of force necessary to stop the attack. *Fowler v. O'Leary*, No. 87 C 6671, 1993 U.S. Dist. LEXIS 3554, at *34 (N.D. Ill. Mar. 19, 1993) (Pallmeyer, J.). Considering the population density of Cook County (5,583 people per square mile)

6

and the City of Chicago (12,059.8 people per square mile), discharging an Assault Weapon in self-defense could potentially cause greater risk of harm to innocent bystanders further demonstrating that these weapons do not facilitate self-defense. (ECF 82 at 16–17.)

   c.   **Weapons that are dangerous and unusual are not protected.**

Plaintiffs concede that dangerous and unusual weapons can be banned but argue that the standard applies only in the context of the historical tradition of firearm regulation, rather than in the plain text analysis of step one. (Pls. Mem. at 4.) Plaintiffs rely on *Heller and Bruen* for the proposition that "bearable arms cannot be banned unless doing so would fit into the 'historical tradition' of restricting 'dangerous and unusual weapons.'" *Id. citing Bruen*, 142 S.Ct. at 2128, *quoting Heller*, 554 U.S. at 627. According to Plaintiffs, this test fits into "the historical understanding **of the scope**" of the right to bear arms. (Pls. Mem. at 4–5, citing *Heller*, 554 U.S. at 625 and *Bruen*, 142 S.Ct at 2131 (emphasis added)). But Plaintiffs misinterpret *Heller* and *Bruen*. "Historical tradition" as discussed in *Bruen* pertains to the tradition of regulation, whereas "historical understanding" pertains to the interpretation of the text of the Amendment. Plaintiffs thus bear the burden of establishing that the regulated weapons are not dangerous and unusual as a threshold question to determine if they are arms protected by the Second Amendment.

Plaintiffs rely heavily on the notion that Assault Weapons are in common use, and based on their commonness cannot be considered unusual. As previously discussed, Plaintiffs fail to establish that Assault Weapons are in common use. *See supra* Sect. II, b. But even if they did, "common use" is not the only determining factor – if it were, the "dangerous" portion of the "dangerous and unusual" test would be rendered meaningless. Plaintiffs' only discussion of dangerousness is to note that Assault Weapons use smaller caliber ammunition and a slower rate of fire than automatic weapons. (Pls. Mem. at 13.) But Defendants presented ample evidence that

7

Assault Weapons are dangerous not based on the size of ammunition but due to the velocity at
which it is discharged which causes catastrophic injuries. (ECF 82 at 24–27.) Beyond physical
injuries, Assault Weapons cause psychological damage to victims and bystanders, creating a
generalized fear in the public, and adversely impact law enforcement in their efforts to ensure
public safety. *Id.* at 27–29. Plaintiffs offer no expert testimony or evidence to dispute that Assault
Weapons are exceptionally dangerous. As Plaintiffs have failed to establish Assault Weapons are
not dangerous and unusual, they fall outside of the protection of the Second Amendment.

## II.        Plaintiffs ignore the Second Step of the *Bruen* Analysis

In any event, the assault weapons ban survives constitutional scrutiny. The second step of
the *Bruen* analysis requires courts to first determine whether the regulation addresses a
longstanding "perceived societal problem" that the founders could have addressed but either did
not or did through materially different means. *Bruen*, 142 S. Ct. at 2132. Alternatively, if the
problem implicates "unprecedented societal concerns or dramatic technological changes," then "a
more nuanced approach" is warranted. *Id*. at 2132. In such cases, courts evaluate whether a modern
firearm regulation finds support in analogous historical regulations, looking in particular to "how
and why the regulations burden a law-abiding citizen's right to armed self-defense." *Id.* at 2133.

Assault weapons implicate both unprecedented societal concerns and dramatic
technological changes. As to the former, it is undisputed that mass shootings were not an issue at
the time of the founding. And regarding the latter, assault weapons involve significant
technological changes. Plaintiffs attempt to minimize these changes, arguing that assault weapons
are not "different from other semiautomatic rifles." (Pls. Mem. at 13.) Notably, they do not provide
any admissible evidence in support of this contention. *See* Section IV, *infra*.  They contend the
AR-15 is "safer to use as a home-defense gun" because its ammunition is "less likely to travel

through walls," but they do not explain to what weapon they are comparing the AR-15. (Pls. Mem. at 13.)[1] Nor do they address Defendants' admissible evidence that the regulated weapons are unique in their likelihood of causing wounds that are more deadly; effectiveness at great distance; attractiveness to those wanting to cause mass death and terror; and unique challenges for law enforcement. (ECF 81, Def. SOF at ¶¶ 56, 61–81, 91, 189, 196, 198.)

Thus, the assault weapons ban is constitutional if it finds support in an analogous historical regulation. Such an analogue exists here: gunpowder regulations.[2] Such regulations can be traced back to at least 1580, when London prohibited gunpowder storage in houses inside city limits, before later modifying that rule to allow two pounds of gunpowder so long as it was not stored near a street frontage. *Stephen Porter, Accidental Explosions: Gunpowder in Tudor & Stuart London*, available at https://www.historyextra.com/period/tudor/accidental-explosions-gunpowder-in-tudor-and-stuart-london/ (last accessed May 17, 2023). By the 1700s, it was settled in the English courts that the storage of large amounts of gunpowder in one's home constituted an indictable offense against the crown. This was true regardless of the fact that gunpowder was considered to "be a necessary thing, and for defence of the kingdom." *Anonymous*, 12 Mod. 342 (King's Bench); *accord, e.g., Dominus Rex. v. Taylor*, 2 Str. 1167 (King's Bench).

These regulations carried over to the United States, where the use of gunpowder proliferated in part due to is "obvious importance for public defense, frontier security, and hunting." William J. Novak, *The People's Welfare: Law & Regulation in Nineteenth-Century America* 63 (U.N.C. Press 2000). Despite its usefulness for such purposes, courts recognized that "the keeping of gunpowder…in large quantities in the vicinity of one's dwelling-house or place of

---

[1] This fact was not included in Plaintiffs' 56.1 Statement of Material Fact and the cited source cannot be accessed by Defendants.

[2] Defendants raise additional historical analogues in their memorandum in support for summary judgment. *See* Defs. Mem. Of Law in Support of Their Mot. for Summary Judgment, ECF 82, at 31–43.

business is a nuisance per se, and may be abated as such by action at law, or injunction." H.G. Wood, A PRACTICAL TREATISE ON THE LAW OF NUISANCES 142 § 142 (1875). Early American cities were incorporated with the express authority to regulate gunpowder, e.g., *An Act to Incorporate the City of Key West*, ch. 58, § 8, 1838 Fla. Laws 70, and multiple states limited the amount of gunpowder a person could possess, Saul Cornell & Nathaniel DeDino, *A Well Regulated Right: The Early American Origins of Gun Control*, 73 FORDHAM L. REV. 487, 510–12 (2004) (describing numerous gunpowder storage laws).

The history of gunpowder regulation is analogous to assault weapons bans in both "why" and "how" they burden the right to armed self-defense. As to the "why," the purpose behind each regulation was to prevent the rapid, mass loss of human life. Possession of large amounts of gunpowder gave even a single citizen the ability to kill large numbers of people quickly. These dangers also were not limited to accidental killings, as demonstrated by the famed Gunpowder Plot of 1605, in which Guy Fawkes and his coconspirators amassed gunpowder in a failed attempt to level the House of Lords. *See generally*, Alan Haynes, THE GUNPOWDER PLOT (History Press 1994). Thus, regulations were enacted because a "deposit of a large quantity of gunpowder in the midst of a populous city" could lead to an explosion, "and such would be the terrible and wide-spread destruction from it that the whole population would live in dread of some horrible catastrophe." *Cheatham v. Shearon*, 31 Tenn. 213, 216 (1851).

The rationale behind an assault weapons ban is the same. Like stockpiles of gunpowder, assault weapons give a single individual the extraordinary ability to kill great numbers of people in minutes. Also like gunpowder, the mere knowledge that assault weapons were possessed "in the heart of populous city" would lead "few of the inhabitants [to] feel at ease." *Cheatham*, 31 Tenn. at 216. Just as knowledge that stockpiles of gunpowder could lead to an explosion caused "the

10

whole population [to] live in dread of some horrible catastrophe" at the time of the founding, *Cheatham*, 31 Tenn. at 216, nearly eighty percent of adults in the United States today report feeling stressed about mass shootings. (ECF 81, Def. SOF at ¶ 174). An assault weapons ban reduces fear of these mass shootings just as historic gunpowder restrictions allowed the public to feel safe from the threat of explosion. *See Friedman v. City of Highland Park*, 784 F.3d 406, 412 (7th Cir. 2015) ("If a ban on semiautomatic guns and large-capacity magazines reduces the perceived risk from a mass shooting, and makes the public feel safer as a result, that's a substantial benefit.")

Gunpowder regulations and assault weapons bans are also relevantly similar in "how" they affect law-abiding citizens' right to armed self-defense. *Bruen*, 142 S. Ct. at 2133. Both impose a minimal burden. Of course, restrictions gunpowder storage imposed *some* burden on the ability of an individual to engage in armed self-defense, because they "would at the very least have made it difficult to reload the gun to fire a second shot unless the homeowner happened to be…where the extra gunpowder was required to be kept. *Heller*, 554 U.S. at 685 (Breyer, J. dissenting). But, as the *Heller* majority recognized, this burden was minimal, particularly in comparison to "an absolute ban on handguns." *Id*. at 632. An assault weapons ban arguably imposes an even lesser burden, because assault weapons are not well suited for home defense at all, whereas some amount of gunpowder was necessary for any defensive firearm to function. (ECF 81, Def. SOF at ¶ 21.) But to the extent assault weapons have any defensive value, they far exceed what is necessary for self-defense. Much like the *Heller* majority was unconcerned about the minimal hindrance laws limiting one's ability to repeatedly reload a gun had on self-defense, a limit on assault weapons is not concerning because modern home defense situations similarly rarely, if ever, involve lengthy shootouts with extensive exchanges of gunfire. (ECF 81, Def. SOF at ¶ 28.)

   III.    ***Bruen* does not abrogate binding Seventh Circuit Precedent.**

11

As a final matter, the Seventh Circuit has already concluded that "bans on assault weapons and large-capacity magazines do not contravene the Second Amendment." *Wilson v. Cook Cty.*, 937 F.3d 1028, 1035 (7th Cir. 2019); *see also Friedman v. City of Highland Park*, 784 F.3d 406 (7th Cir. 2015). Plaintiffs contend that this precedent should be disregarded in light of *Bruen*. But *Bruen* casts no doubt on the holdings in *Wilson* or *Friedman*. In concluding that assault weapons may be banned, the Seventh Circuit stressed that the Supreme Court had not "attempt[ed] to define the entire scope of the Second Amendment—to take all questions about which weapons are appropriate for self-defense out of the people's hands." *Friedman*, 784 F.3d at 412. This did not change with *Bruen*, which did not "decide anything about the kinds of weapons that people may possess." *Bruen*, 142 S.Ct. at 2157 (Alito, J., concurring). Thus, this court remains bound by Seventh Circuit precedent. *See Cross v. United States*, 895 F.3d 288, 303 (7th Cir. 2018).

Plaintiffs nonetheless argue that *Friedman* runs afoul of *Bruen* because its analysis included consideration of whether the banned weapons were common at the time of ratification. (Pls. Mem. at 14.) They contend that *Friedman* was incorrectly decided because "[w]hether a type of firearm existed in the 1790s has no bearing on whether it is constitutionally protected." (Pls. Mem. at 14.) But *Friedman* did not hold that a weapon needed to exist at the time of the founding to be constitutionally protected. It could not have: *Heller* had already made clear that the Second Amendment "extends…to…arms…that were not in existence at the time of the founding." *Heller*, 554 U.S. at 582. Instead, *Friedman* properly considered the technological changes between assault weapons and guns in existence at the time of the framing as one step in its analysis. *See Friedman*, 784 F.3d at 410. This is exactly consistent with *Bruen*, which explained that whether an issue "has persisted since the 18th century" is relevant to a court's Second Amendment analysis because, if it did, "the lack of a distinctly similar historical regulation addressing that problem is relevant

12

evidence that the challenged regulation is inconsistent with the Second Amendment." *Bruen*, 142 S. Ct at 2131. *Bruen* went on to explain that cases involving "dramatic technological changes," like those features of assault weapons enumerated by the *Friedman* court, may "require a more nuanced approach." *Bruen*, 142 S. Ct at 2132; *Friedman*, 784 F.3d at 410.

Plaintiffs also criticize *Friedman* for holding that a weapon must have "some reasonable relationship to the preservation or efficiency of a well regulated militia." (Pls. Mem. at 15 (quoting *Friedman*, 784 F.3d at 410)). Plaintiffs stress that "the Second Amendment right to keep and bear arms 'does not depend on service in the militia.'" (Pls. Mem. at 15 (quoting *Bruen*, 142 S. Ct at 2127.)) *Heller* already made this clear. Examining *Miller*, 307 U.S. 174, *Heller* explained that the Second Amendment did not apply to two men's indictment for transporting an unregistered short-barreled shotgun. The Court explained that the reason the Second Amendment did not apply was "*not* that the defendants were bearing arms…for nonmilitary use," but instead because "the *type of weapon at issue* was not eligible for Second Amendment protection." *Heller*, 554 U.S. at 622 (emphasis in original). And the concept that the Second Amendment protects arms that "have some reasonable relationship to the preservation or efficiency of a well regulated militia" comes directly from *Heller*, which *Bruen* did not purport to overturn. *Heller*, 554 U.S. at 622. In any event, *Friedman* did not uphold the assault weapons ban on this ground. In fact, *Friedman* held that banned weapons *do* "bear a relation to the preservation and effectiveness of state militias." *Friedman*, 784 F.3d at 410. The court merely reasoned that governments "should be allowed to decide when civilians can possess military-grade firearms." *Friedman*, 784 F.3d at 410.

Nor does the remainder of *Bruen* contradict the *Friedman* analysis. The *Friedman* court considered "whether law-abiding citizens retain adequate means of self-defense" and concluded that the assault weapons ban did not impermissibly restrict the citizens' ability to defend

themselves. *Friedman*, 784 F.3d at 410. Notably, the *Bruen* court did not need to apply the "nuanced approach" it indicated may be necessary in other cases "implicating unprecedented societal concerns or dramatic technological changes." *Bruen,* 142 S. Ct. at 2132. The Court did, however, recognize the importance "a law-abiding citizen's right to armed self-defense" plays in the Second Amendment analysis. *See Bruen*, 142 S. Ct. at 2133. Particularly given *Bruen*'s emphasis on self-defense as "the central component of the Second Amendment right," *id.,* Plaintiffs offer no explanation why *Friedman*'s emphasis on self-defense is improper.

IV.     **Plaintiffs' Motion for Summary Judgment fails as it is not supported by admissible evidence.**

Plaintiffs fail to cite the factual record and to specific paragraphs in their 56.1 Statement of Facts to support the arguments contained in their memorandum, in violation of Local Rule 56.1. N.D. Ill. R. 56.1(a) and (g). Compliance with Local Rule 56.1 "ensures the facts material to the issues in the case and the evidence supporting such facts are clearly organized and presented for the court's summary judgment determination." *Curtis v. Costco Wholesale Corp.*, 807 F.3d 215, 219 (7th Cir. 2015). Rather than citing to their Rule 56.1 Statement of Material Facts, Plaintiffs base the entirety of their legal argument on new facts, which they support with citations to an assortment of surveys, books, and articles not referenced in their 56.1 Statement. (ECF 101.) This court may strike these improperly asserted facts. *See Igasaki v. Ill. Dep't of Fin. & Prof'l Regulation*, 988 F.3d 948, 956–57 (7th Cir. 2021) (explaining that district court may enforce strict compliance with the requirements of Local Rule 56.1); *see also* ECF 104, Def. Motion to Strike Pls. Responses and Objections to Defs. Rule 56.1 Statement of Material Facts and Exhs.

Regardless, even if this court overlooks Plaintiffs' failure to comply with Local Rules, their arguments are not supported by admissible evidence. Any materials presented in support of summary judgment must be admissible in evidence or point to evidence that would be admissible

14

at trial. *See Eisenstadt v. Centel Corp.*, 113 F.3d 738, 742 (7th Cir. 1997); FED. R. CIV. P. 56(c)(4). But every piece of evidence offered in support of Plaintiffs' assertions that assault weapons are "commonly and overwhelmingly possessed by law-abiding citizens for lawful purposes," (Pls. Mem. at 9), such as books and publications, is inadmissible hearsay. *See Eisenstadt v. Centel Corp.*, 113 F.3d 738, 742 (7th Cir. 1997) (affirming exclusion on summary judgment of newspaper and magazine articles because they constitute hearsay). Thus, unless covered by an exception, these hearsay statements are inadmissible. FED. R. EVID. 801(c)(2).

Plaintiffs also heavily rely on survey evidence which is inadmissible here. To be admissible, a survey "almost always requires expert testimony." *Uncommon, LLC v. Spigen, Inc.*, 926 F.3d 409, 416 (7th Cir. 2019). This is because "no survey is 'foolproof,' and examiners make a range of decisions about sample size, question design, survey format, and statistical analysis— all of which can impact reliability." *Id*. Thus, expert testimony is needed "to explain the survey's methodology and attest to its compliance with principles of the profession." *Id*. (*citing* FED. R. EVID. 702). So, in addition to satisfying hearsay requirements, Plaintiffs had to comply with Federal Rule of Civil Procedure 26(a), which mandates that parties timely disclose any expert who may testify and to provide an expert report. They failed to do so. Accordingly, although Plaintiffs insist that this case hinges solely on whether "the arms banned by Cook County [are] in 'common use,'" (Pls. Mem. at 7), they have provided no admissible evidence in support of their claim that these weapons are commonly possessed for lawful purposes. As such, their assertion that assault weapons are in common use is entirely unsupported.

## CONCLUSION

For each of the foregoing reasons, Defendants respectfully request that this Honorable Court grant judgment in their favor and against the Plaintiffs.

Dated June 1, 2023

KIMBERLY M. FOXX
*Cook County State's Attorney*
*Counsel for Defendants*

JONATHON BYRER
Supervisor, Appeals & Special Projects
DAVID A. ADELMAN
Supervisor, Affirmative & Complex
Litigation Section
JAMES BELIGRATIS
ELIZABETH BROGAN
Assistant State's Attorneys
Civil Actions Bureau
500 W. Richard J. Daley Center Place
Chicago, IL 60602
(312) 603-6934
(312) 603-5463

By *s/ Jessica M. Scheller*

JESSICA M. SCHELLER
Chief; Advice, Business & Complex
Litigation Division
PRATHIMA YEDDANAPUDI,
Supervisor; Advice, Transactions &
Litigation Section
MEGAN HONINGFORD
SILVIA MERCADO MASTERS
EDWARD M. BRENER
JESSICA L. WASSERMAN
Assistant State's Attorneys
Jessica.Scheller@cookcountyil.gov
Prathima.Yeddanapudi@cookcountyil.gov

16

**CERTIFICATE OF SERVICE**

I, Jessica M. Scheller, hereby certify that on June 1, 2023 I caused a true and correct copy of the Defendants' Response to Plaintiffs' Motion for Summary Judgment be sent via e-filing to all counsel of record in accordance with the rules regarding the electronic filing and service of documents.

> */s/ Jessica M. Scheller*
> Jessica M. Scheller
> Cook County Assistant State's Attorneys
> 50 W. Washington, 5th Floor
> Chicago, Illinois 60602
> (312) 603-6934
> Jessica.Scheller@cookcountyil.gov

17