## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ILLINOIS

| | | |
|---|---|---|
| CUTBERTO VIRAMONTES, et al. | : | |
|    Plaintiffs, | : | |
| | : | Case No. 1:21-cv-04595 |
| v. | : | |
| | : | Chief Judge Rebecca R. Pallmeyer |
| THE COUNTY OF COOK, et al. | : | |
|    Defendants. | : | |

### PLAINTIFFS' REPLY IN SUPPORT OF THEIR MOTION
### FOR SUMMARY JUDGMENT

In seeking to justify its ban on common semiautomatic rifles, the County proposes a faulty analysis for this case, conflating the textual and historical inquiries required by *Bruen* and then proposing to justify its ban by comparison to historical fire safety regulations governing gunpowder storage. The Court should reject the County's arguments at every point. Given that this is an arms ban case, under *Heller* the plain text protects the conduct in question (possessing a bearable arm) and the County has not (and cannot) show that the banned arms are dangerous *and unusual*, as they currently are the second-most popular type of firearm in the country after semiautomatic handguns. And *Heller* already rejected the gunpowder regulation comparison the County proposes. The County additionally reiterates its baseless suggestion that Seventh Circuit precedent still governs this case, but because it did not analyze the Second Amendment through the dual lenses of text and history, that precedent has been abrogated. Finally, the County reiterates its argument that Plaintiffs should not be permitted to rely upon publicly available sources for support, but because the facts at issue in this case are exclusively legislative facts, Plaintiffs' motion for summary judgment is adequately supported and should be granted.

### ARGUMENT

**I.   The Banned Firearms Are Arms.**

Because the banned semiautomatic rifles are bearable arms, they are protected by the plain

text of the Second Amendment. *See* Pls.' Mem. of Law in Supp. of Summ. J. at 3–4, Doc. 102 (May 1, 2023) ("Pls.' MSJ"). The County cannot get around *Heller*'s express holding that as a matter of plain text, the Second Amendment's protection of "arms" extends to "all instruments that constitute bearable arms." *District of Columbia v. Heller*, 554 U.S. 570, 582 (2008). The County claims that *Bruen* "added to the Second Amendment's definition of 'arms'" when it said that "the general definition covers modern instruments that facilitate self-defense." Defs.' Resp. to Pls.' Mot. for Summ. J., at 2, Doc. 116 (June 1, 2023) ("County Resp.") (quoting *N.Y. State Rifle & Pistol Ass'n, Inc. v. Bruen*, 142 S. Ct. 2111, 2132 (2022)). But *Bruen* in no way purported to *limit Heller*'s interpretation of "arms." Indeed, in the paragraph from which the County takes this quote, *Bruen* did not analyze the text of the Amendment at all. Instead, it was highlighting the way *Heller* had already conducted the same sort of analysis that *Bruen* was now describing. 142 S. Ct. at 2132. *Bruen* was elsewhere very clear that it was not altering *Heller* but building on it and admonishing the circuit and district courts that had failed to follow "*Heller*'s methodology [which] centered on constitutional text and history." *Id.* at 2128–29.

The County also makes reference to the argument that "weapons most useful for military service, such as the M-16, may be banned," which the County argues "reinforces the concept that not every weapon is protected and that a weapon's military utility is no guarantee of constitutional protection." County Br. 2. The County makes this argument much more fulsomely in its own brief for summary judgment, and as Plaintiffs explained in response, it is built on a misreading of *Heller*, Pls.' Resp. in Opp'n to Defs.' Mot. for Summ. J. at 5–9, Doc. 97 (Apr. 24, 2023) ("Pls.' Resp."). While Plaintiffs agree that "not every weapon is protected" by the Second Amendment and that a firearm's *military* utility is not the test for whether it is protected, County Br. at 2, at the textual level *all* instruments that constitute bearable arms are referenced in the Amendment and so

regulations restricting them are unconstitutional unless justified by the government via historical analogue.

**II.    There Is No Historical Justification for the Ban.**

    **A.  Because the Banned Firearms Are In Common Use, the Ban Is Without Historical Justification.**

Because the Second Amendment's plain text protects all bearable arms, such arms can be banned only if consistent with the nation's history of firearm regulation. And the Supreme Court has now twice explained exactly what history teaches in this regard: only "dangerous and unusual" arms may be banned, and thus arms "in common use for lawful purposes" cannot. *Bruen*, 142 S. Ct. at 2128; *Heller*, 554 U.S. at 627. The County errs in trying to make these limitations part of the *text*, *see* County Resp. 1–8, but *Heller* explained that this limitation was "fairly supported by . . . historical tradition," 554 U.S. at 627, and *Bruen*, reading this passage in *Heller*, explained that *Heller* was "rel[ying] on the historical understanding of the Amendment to demark the limits on the exercise of th[is] right," 142 S. Ct. at 2128. The County takes issue with this reading, trying to divine a difference between the use of the phrase "historical tradition" and "historical understanding," suggesting that the latter relates, somehow, to the plain text and not to the analysis of history. County Resp. 7. Nothing in *Bruen* supports this reading. In fact, *Bruen* quotes *Heller*'s use of the phrase "historical tradition" to describe exactly the dangerous and unusual/in common use dichotomy Plaintiffs propose, making clear that this dichotomy is drawn from history, not plain text. 142 S. Ct. at 2128.

*Bruen* was clear that once this Court turns to history, the onus is on the County to prove the law in question fits within a valid tradition of regulation; that means the County has the burden to show the banned firearms are not in common use. It has totally failed to carry that burden, preferring instead to fight against the test the Supreme Court has said must govern this case. In

3

any event, the burden would be impossible for the County to carry, given the overwhelming evidence that supports the conclusion that the firearms in question are owned by tens of millions of Americans. *See* Pls.' MSJ at 7–10. Although the County makes all of its "common use" arguments at the textual level, Plaintiffs will continue to treat them in the historical section of their briefing, where they belong.

### 1. A Commonly Possessed Firearm Is a Commonly Used Firearm

The County faults Plaintiffs for focusing "on common ownership and possession rather than on common use." County Br. 3. The County suggests ownership "shows intent and not actual use," and would require these firearms to be commonly fired in self-defense before it would acknowledge they are protected by the Second Amendment. But *Heller* forecloses this argument. It has already explained that the text enshrines a right to be "*armed and ready* for offensive or defensive action in a case of conflict with another person." 554 U.S. at 584 (quoting *Muscarello v. United States*, 524 U.S. 125, 143 (1998) (Ginsburg, J., dissenting) (emphasis added). Similarly, in *Bruen* the Court explained that "[a]lthough individuals often 'keep' firearms in their home, *at the ready for self-defense*, most do not 'bear' (*i.e.*, carry) them in the home beyond moments of actual confrontation. To confine the right to 'bear' arms to the home would nullify half of the Second Amendment's operative protections." 142 S. Ct. at 2134–35 (emphasis added). The County's requirement that a gun must be frequently fired in self-defense to be protected would go further and nullify *both* the Second Amendment's operative protections, since even in situations where an individual actively uses a firearm in self-defense, the firearm is most often not fired at all. William English, *2021 National Firearms Survey: Updated Analysis Including Types of Firearms Owned* at 9, GEO. MCDONOUGH SCH. OF BUS. RSCH. (May 13, 2022), https://bit.ly/3yPfoHw. If the purpose is to be "ready", then the Second Amendment must protect those firearms which are kept for that purpose.

4

The County complains that Plaintiffs have not cited binding precedent holding the banned firearms are in common use and instead "rely on a concurrence in *Caetano* coupled with dissenting opinions in *Friedman* and *Heller II*" for support. County Br. 3–4. But it is no small thing that three active Supreme Court justices, all in the *Bruen* majority and including *Bruen*'s author, have applied the common use test after *Heller*, and they all have done so in a way that comports with Plaintiffs' approach. Pls.' MSJ at 12–13. And although several of the pre-*Bruen* decisions Plaintiffs cited focused on "large capacity magazines," that does not diminish the fact that courts interpreting *Heller* have repeatedly concluded that common ownership is common use.

The County also argues that, to sustain the conclusion that the banned firearms are in common use, Plaintiffs must prove that they are "actually appropriate for self-defense." County Resp. 5. And the County apparently believes, in the absence of a decision on that score from this Court, *it* is qualified to make that decision. But under *Heller* and *Bruen* it is "the American people," not their municipal governments, that are empowered to decide what firearms are appropriate for self-defense and so constitutionally protected. *Bruen*, 142 S. Ct. at 2131; *see also Heller*, 554 U.S. at 629 ("It is enough to note, as we have observed, that the American people have considered the handgun to be the quintessential self-defense weapon."). In *Heller*, after surveying "many reasons that a citizen may prefer a handgun for home defense," the Court concluded that "whatever the reason, handguns are the most popular weapon *chosen by Americans* for self-defense in the home, and a complete prohibition of their use is invalid." *Id*. (emphasis added). The County claims this conclusion "does not imply the actual reason is meaningless." County Resp. 5. But that is precisely what it says. The Court in *Heller* was, in this passage, dismissing the arguments that are essentially the obverse of the County's argument here. In *Heller*, handguns were banned and rifles were permitted, so the argument ran that "the handgun is the *least* effective firearm for self-defense for

all but a small group of exceptionally well-trained individuals" while "shotguns and rifles are much more effective." Br. of Violence Policy Center and the Police Chiefs of Los Angeles, Minneapolis, and Seattle as *Amici Curiae* in Support of Pet'rs at 29–30, *District of Columbia v. Heller*, No. 07-290 (Jan 11, 2008) (quotations omitted and emphasis in original). Purported subject-matter experts were cited in support of that claim too and they noted, for example that "handguns—compared with larger shotguns and rifles that are designed to be held with two hands—require a greater degree of dexterity" and that surges of adrenaline resulting in the "loss of fine motor skills" result in even more difficulty in manipulating a handgun, which they warned "can easily result in the killing of an innocent bystander." *Id.* at 30–32. The County's brief reads as almost a mirror image of the Violence Policy Center brief from *Heller* and demonstrates that these arguments could be made against every type of firearm, with some favoring the handgun in support of bans on rifles, others favoring rifles over handguns, and still others rejecting both in favor of shotguns. What *Heller* held in this critical passage was that experts, counties, and states do not get to decide what firearms are "actually appropriate for self-defense." The American people do, and the American people have chosen the AR-15 and other similar banned rifles, just as they have chosen the handgun, as a crucial tool of self-defense.

The County reiterates its argument that the banned firearms cannot facilitate self-defense because, under Illinois law, use of such a firearm is "likely to amount to excessive force" and to "endanger bystanders." County Resp. 6–7. There are two problems with this, both of which Plaintiffs have raised before, *see* Pls.' Resp. at 25, neither of which the County makes any effort to rebut here. First, if in fact Illinois cases made a distinction among the firearms used for self-defense and made it a crime (or nullified a self-defense defense to a criminal charge) to use an arm protected by the Second Amendment, that would, *itself* be a violation of the Second Amendment,

as an infringement of the pre-existing right to self-defense. *See Heller*, 554 U.S. at 592. Second, Illinois cases make no such distinction. While it is true that Illinois forbids the use of excessive force in self-defense, the County has not cited a single case that suggests using one type of firearm could be "excessive" when use of another type would have been justified. Such a rule would be nonsensical and disconnected from the reality of defensive firearm use, where in general, an individual suddenly threatened with loss of life or limb does not have time to choose between use of one firearm or another. All Illinois law requires is that an individual may not kill in self-defense unless threatened "with such means or force as to induce a reasonable belief that he is in danger of loss of life or of suffering great bodily harm." *People v. White*, 409 N.E.2d 73, 75 (Ill. App. Ct. 1980). Where deadly force is authorized, there is no support for the claim that *some* deadly force may still be unreasonable if Cook County dislikes the type of weapon used.

### 2. A Firearm That Is "In Common Use" Is Not "Dangerous *and Unusual*."

The County makes several arguments that the Firearm Ban is constitutional because the banned firearms are dangerous. "Dangerous and unusual," however, "is a conjunctive test: A weapon may not be banned unless it is *both* dangerous *and* unusual." *Caetano v. Massachusetts*, 577 U.S. 411, 417 (2016) (Alito, J., concurring); *see also* Pls.' MSJ at 5. The County takes issue with this reading and suggests that by stating that any firearm that is "in common use" is by definition not "dangerous and unusual," Plaintiffs have "rendered meaningless" the " 'dangerous' portion of the 'dangerous and unusual' test." County Resp. at 7. But this is backwards. The County, not Plaintiffs, would render part of the test meaningless; by permitting firearms to be banned *exclusively* because they can be shown to be dangerous, the County would read out of the test the requirement that a banned firearm must also be unusual. For Plaintiffs, "dangerousness" matters in that a firearm that is not "in common use" (*i.e.* a firearm that *is* unusual), is still a protected arm

7

if it is not *also* dangerous—and not simply dangerous but dangerous compared to firearms that are in common use. That is not an issue raised by this case, because the banned firearms *are* in common use. In such a case, the two elements, "dangerous" and "unusual" collapse into one, given that it would be impossible for a firearm that is actually in common use to be "dangerous" compared to firearms that are in common use—nothing is "dangerous" compared to itself. But it is important to note that Plaintiffs' interpretation gives meaning to both elements of the test, while the County's does not. Furthermore, that a firearm "in common use" will *necessarily* pass the "dangerous and unusual" test is clear from *Heller*, which specifically derived its rule that "the sorts of weapons protected were those 'in common use at the time' " from that historical tradition. 554 U.S. at 627.

In any case, the County has failed to show the arms it bans are dangerous in a constitutionally meaningful sense. For instance, the County argues that the banned firearms discharge bullets at high velocity "which causes catastrophic injuries." County Resp. at 8. But while "the .223-caliber round typically fired by AR-15 style rifles does have a relatively high muzzle velocity . . . other cartridges, fired by guns that are not considered 'assault weapons,' equal or surpass it." Jacob Sullum, *Neither 'Capacity' Nor 'Power' Distinguishes 'Assault Weapons' From Other Firearms*, REASON (Oct. 31, 2018), https://bit.ly/41mELfr distinguishes/. Furthermore, velocity is just *one* element of a round's lethality, *id.*, and it is primarily determined by the type of round fired, not by the cosmetic features of the rifle from which it is shot, *see Rifle Caliber Chart: A Ballistics Performance and Usage Guide for Hunting*, Sportsman's Warehouse, https://bit.ly/43D0qAG (last visited June 7, 2023) (providing velocities for dozens of rifle rounds). It is a "fallacy" that "wounds produced by [the banned firearms] are more severe than those due to regular military rifle and hunting rifles. In fact, the wounds are less severe, even when compared to such venerable hunting rifles as the Winchester M-94 (introduced in 1894) and its cartridge the

.30-30 (introduced in 1895)." Vincent J.M. DiMaio, GUNSHOT WOUNDS: PRACTICAL ASPECTS OF FIREARMS, BALLISTICS, AND FORENSIC TECHNIQUES (2d ed. 1999). The banned firearms are considerably less "powerful" than traditional shotguns, which, at ranges under ten feet, "produce[] the most devastating injuries of all small arms." Panagiotis K. Stefanopoulos et al., *Wound Ballistics of Firearm-Related Injuries—Part 1: Missile Characteristics and Mechanisms of Soft Tissue Wounding*, 43 INT'L J. ORAL & MAXILLOFACIAL SURGERY 1445, 1454 tbl.2 (2014).

The County also suggests the banned firearms are dangerous because, although they cannot fire in a fully-automatic fashion, they have the "same performance characteristics" as an M-16 "in terms of muzzle velocity, range, and type of ammunition." County Br. at 6. But those are unimportant similarities in the face of that major difference. The Supreme Court said as much, almost thirty years ago, when it held that an AR-15 was among the firearms that "traditionally have been widely accepted as lawful possessions" precisely because it was not a "machinegun[]" capable of automatic fire. *Staples v. United States*, 511 U.S. 600, 611–12 (1994). The banned firearms simply "do not operate differently than other comparable semiautomatics," Christopher S. Koper, *Assessing the Potential to Reduce Deaths and Injuries from Mass Shootings Through Restrictions on Assault Weapons and Other High-Capacity Semiautomatic Firearms*, 19 CRIM. & PUB. POL'Y 147, 149 (2020), they are not M-16s.

The County also argues the banned firearms are dangerous because they are used in mass shootings—specifically, the County claims "Assault Weapons like the AR-15 are the weapon of choice in 85 percent of the deadliest mass shootings in the United States." County Br. at 4. This is incorrect. *See* Pls.' Resps. and Objs. to Defs.' Rule 56.1 Statement of Material Facts ¶ 187, Doc. 98 (Apr. 24, 2023). The 85% figure comes from a discredited study by DiMaggio, *et al.*, which counted *all* semiautomatic firearms used in mass shootings, including common handguns, as

"assault weapons" and inspired a letter to the editor from the County's own expert, Louis Klarevas, who noted that of the study's three principle findings: "the first two findings are incorrect, calling into question the third finding and any broader conclusion that can be drawn from the study regarding the impact of the AWB." Louis Klarevas, *Letter to the editor re: DiMaggio, C., Et al. "Changes in U.S. mass shooting deaths associated with the 1994-2004 federal assault weapons ban: Analysis of open-source data*, 86 J. OF TRAUMA & ACUTE CARE SURGERY 926–28 (2019); *see also* Charles DiMaggio, et al., *Author's response: "Changes in U.S. mass shooting deaths associated with the 1994-2004 federal assault weapons ban. Analysis of open-source data*, 87 J. OF TRAUMA & ACUTE CARE SURGERY 1003–04 (admitting to counting all semiautomatic firearms as "assault weapons").

**B. The Historical Tradition of Regulating Gunpowder Storage Is Disanalogous to a Firearm Ban.**

As Plaintiffs have explained, the appropriate historical analysis in this case is limited to analyzing "the historical tradition of prohibiting the carrying of 'dangerous and unusual weapons,'" by applying the Supreme Court's rule that arms "in common use at the time" are protected and cannot be banned. *Heller*, 554 U.S. at 627; *see also* Pls.' MSJ at 4–5. The County advances a different historical argument, which this Court should reject.

First, the County claims that the banned firearms represent "both unprecedented societal concerns and dramatic technological changes." County Br. at 8. The County is wrong that this case involves either, *see* Pls.' Resp. 29–30, but that ultimately matters very little. There is no getting around the requirement that a historical analysis be conducted and this Court must still "reason by analogy" to find regulations that "impose a comparable burden on the right of armed self-defense and [for which] that burden is comparably justified." *Bruen*, 142 S. Ct. at 2133–32. And here the historical tradition the County proposes as analogous to the Firearm Ban—regulations on the

10

method or location of storing gunpowder—is not like the Firearm Ban in either way.

As to the way the gunpowder storage laws and the Firearm Ban impact the Second Amendment right (the "how"), the County asserts that "both impose a minimal burden." County Br. at 11. The gunpowder restrictions would have, the County supposes, "made it difficult to reload the gun to fire a second shot unless the homeowner happened to be . . . where the extra gunpowder was required to be kept." *Id.* (quoting *Heller*, 554 U.S. at 685 (Breyer, J., dissenting)) (ellipsis in *Heller*). And as for the Firearm Ban, that "arguably imposes an even lesser burden, because assault weapons are not well suited for home defense at all." *Id.*

In fact, the burdens on the right of armed self-defense are totally unlike one another for these two regulations. Despite *Bruen* making clear that the County, to support its ordinance, must come forward with *actual laws* against which it might be compared, the County speaks of these gunpowder laws at only the highest level of generality, leaving it unclear from the discussion exactly how they worked. At risk of doing the County's job for it, Plaintiffs will provide one typical example, from New Hampshire, just two years after the ratification of the Second Amendment:

> That if any person or persons, shall keep in any dwelling-house, store or other building on land, within the limits of said Portsmouth, except the magazine aforesaid, more than ten pounds of gun-powder at any one time, which ten pounds shall be kept in a tin canister, properly secured for the purpose, such person or persons shall forfeit the powder so kept to the firewards of said Portsmouth . . . .

1793 N.H. Laws 464–65. Such a law really does *minimally* burden the right of armed self-defense. It permits an individual to keep up to ten pounds of gunpowder in the home, provided it is properly secured and, to state the obvious, it does not prevent anyone from owning any type of firearm. The Firearm Ban, by contrast, entirely forbids anyone who lives in Cook County from owning some of the most preferred firearms in the nation. That the County suggests the burden is lessened because no one should want to use the banned firearms anyway is just question begging. The County could,

11

by the same trick, have assumed away the burden imposed by the handgun ban in *Heller*. The Firearm Ban imposes a more severe burden on the right than gunpowder regulations did.

The justifications for these laws (the "why") are also not relevantly similar. The County tries to equate them by suggesting that the Firearm Ban and the gunpowder regulations were both imposed "to prevent the rapid, mass loss of human life." County Br. 10. This is too high a level of generality to look at this question; arguably every firearm law ever passed was enacted to prevent the loss of life and certainly historical laws outlawing concealed carriage would have been successfully equated to New York's "proper cause" requirement in *Bruen* had this been the standard. But it is not. The County's aim in passing the Firearm Ban ostensibly is to reduce crime with guns. The gunpowder restrictions, however, were purely fire safety regulations, as is evident from the fact that the "firewards" in New Hampshire were charged with enforcing them, and the fact that gunpowder stored in the house was required to be in a sealed metal cannister.

The Court need not do any new work to reject the County's poor historic analogue for the Firearm Ban. *Heller* already disposed of this argument. Just as in this case, the law in *Heller* banned a firearm that Americans had chosen for self-defense in large numbers. And just as in this case, the proponents of that law tried to justify it by reference to restrictions on gunpowder storage. The Supreme Court dismissed the comparison in two sentences:

> The other laws Justice BREYER cites are gunpowder-storage laws that he concedes did not clearly prohibit loaded weapons, but required only that excess gunpowder be kept in a special container or on the top floor of the home. Nothing about those fire-safety laws undermines our analysis; they do not remotely burden the right [to] self-defense as much as an absolute ban on handguns.

*Heller*, 554 U.S. at 632. The same is true here.

### III.     *Friedman* **Is Not Controlling.**

The County yet again reserves for the end of its brief that claim that none of the foregoing

matters, because the Seventh Circuit's pre-*Bruen* decisions in *Friedman v. City of Highland Park*, 784 F.3d 406 (7th Cir. 2015) and *Wilson v. Cook County*, 937 F.3d 1028 (7th Cir. 2019), remain binding on this Court and dispositive of these issues. Most of its defense of *Friedman* boils down to the odd suggestion that, since *Friedman*'s approach was inconsistent with *Heller* (which predated it), that it is also inconsistent with *Bruen* should not matter much. *See, e.g.*, County Resp. at 13 (responding to Plaintiffs' argument that *Friedman* inappropriately required some connection between a firearm and the preservation of a militia by noting that *Heller* already explained that connection was unnecessary). But just because *Friedman* was wrong when it was decided, that does not diminish the fact that it has been overruled now. After all, *Bruen* did not announce a new rule to replace *Heller*. Instead, it made explicit what was implicit in *Heller* and had been widely misinterpreted by the courts of appeals. *See Bruen*, 142 S. Ct. at 2131. After *Bruen*, all Second Amendment cases must proceed first by analyzing the text of the Second Amendment and then by considering historical analogues for the modern law proposed by the government. *Id.* That neither *Friedman* nor *Wilson* conducted that analysis means they cannot govern this case.

## IV. Plaintiffs' Motion Is Proper and the Court Can Consider All of Plaintiffs' Arguments and Evidence.

Finally, the County claims that the Court can disregard Plaintiffs' motion for summary judgment because Plaintiffs included "new facts" in their legal argument "which they support with citations to an assortment of surveys, books, and articles not referenced in their [Local Rule] 56.1 Statement" and because the evidence on which Plaintiffs rely is not "admissible" and should have come in through experts. County Br. at 14. The County is wrong on all counts.

As Plaintiffs explained in opposing the County's motion to strike, *see generally* Doc. 111 (May 22, 2023), "only legislative facts are relevant to the constitutionality of the [challenged] gun law," *Moore v. Madigan*, 702 F.3d 933, 942 (7th Cir. 2012), and legislative facts are not treated

like "adjudicative facts," or the facts specific to a given case. Plaintiffs will not reiterate the entire content of their opposition to that motion here, but there was nothing inappropriate about the way Plaintiffs briefed these issues; unlike adjudicative facts, "[legislative] facts and the sources from which they are derived could be incorporated in the argument section of the brief, but they can with equal propriety be set forth in the statement of facts." *Wiesmueller v. Kosobucki*, 547 F.3d 740, 742 (7th Cir. 2008) (discussing Seventh Circuit Rule 28). This is because legislative facts are integral parts of legal rules, *see Prentis v. Atl. Coast Line Co.*, 211 U.S. 210, 227 (1908) (Holmes, J.), which are obviously appropriate for the argument section of a legal brief.

The County's argument that survey evidence demonstrating that the banned firearms are in common use is inadmissible hearsay and expert testimony is likewise baseless. Surveys are a frequent source for legislative facts, indeed, a survey Plaintiffs have cited in this case was indirectly relied upon by the Supreme Court in *Heller* to establish that handguns are "the most preferred firearm in the nation to 'keep' and use for the protection of one's home and family." 554 U.S. at 628–29 (citing *Parker v. District of Columbia*, 478 F.3d 370, 400 (D.C. Cir. 2007), which in turn cited Gary Kleck & Marc Gertz, *Armed Resistance to Crime: The Prevalence & Nature of Self-Defense with a Gun*, 86 J. CRIM. L. & CRIMINOLOGY 150 (1995)); *see also Indiana Harbor Belt R.R. Co.*, 916 F.2d at 1182 ("[F]acts relevant to shaping a general rule . . . more often are facts reported in books and other documents not prepared specially for litigation or refined in its fires."). And there is nothing wrong with this since the Rules of Evidence generally, and the rule against hearsay specifically, do not apply to legislative facts. 1 MUELLER & KIRKPATRICK, FED. EVID. § 2:12 (4th ed. 2013). As Professor Kenneth Culp Davis—whose taxonomy of adjudicative facts and legislative facts the Advisory Committee adopted in 1972—has explained, "[t]he hearsay provisions of the Federal Rules of Evidence clearly should not apply (Rule 803(8), for instance)"

14

to legislative facts. Kenneth Culp Davis, *Facts in Lawmaking*, 80 COLUM. L. REV. 931, 941 (1980).

The County suggests that the rules of evidence must apply since *Bruen* noted the "historical inquiry . . . relies on various evidentiary principles and default rules" like "the principle of party presentation" so that courts can "decide a case based on the historical record compiled by the parties." *Bruen*, 142 S. Ct. at 2130 n.6 (quoting W. Baude & S. Sachs, *Originalism and the Law of the Past*, 37 L. & HIST. REV. 809, 810–11 (2019)); *see* Defs.' Reply in Support of Defs.' Mot. to Strike and Objs. To Defs'. Rule 56.1 Statement of Material Facts, at 2, Doc. 117 (June 5, 2023). But the "evidentiary principles" the Court was referring to are not the rules of evidence, but rather inferential practices courts use in all sorts of cases to resolve uncertainty:

> As to both law and fact, our legal system contains a wealth of shortcuts, default rules, and burdens of proof to resolve disputed questions when we lack certainty about the actual answers. Thus, if there are no sources on Maryland's riparian rights dating precisely from 1801, when Congress froze the law, that is no great catastrophe for a lawyer. A fleeting reference two decades before or after might be poor evidence for a careful historical study, but it would amply discharge a party's burden in a legal proceeding.

Baude & Sachs, *Originalism*, at 8. And *Bruen* itself engaged in a detailed, lengthy historical analysis on review of an order granting a motion to dismiss, so the case cannot require that courts limit review to evidence introduced to the record pursuant to the rules of evidence.

Nor is there any requirement that such facts come in through expert testimony. The County suggests that "[t]o be admissible, a survey 'almost always requires expert testimony.' " County Br. at 15 (quoting *Uncommon, LLC v. Spigen, Inc.*, 926 F.3d 409, 416 (7th Cir. 2019)). But the survey in *Spigen* was about an adjudicative fact, unlike the survey evidence in this case. *See* 926 F.3d at 414 (survey regarding consumer associations in trademark case).

## CONCLUSION

The Court should grant summary judgment in Plaintiffs' favor.

Dated: June 13, 2023

David G. Sigale (Atty. ID# 6238103)
LAW FIRM OF DAVID G. SIGALE, P.C.
430 West Roosevelt Road
Wheaton, IL 60187
(630) 452-4547
dsigale@sigalelaw.com

Respectfully Submitted,

/s/ David H. Thompson
David H. Thompson*
Peter A. Patterson*
William V. Bergstrom*
COOPER & KIRK, PLLC
1523 New Hampshire Ave., N.W.
Washington, D.C. 20036
(202) 220-9600
(202) 220-9601 (fax)
dthompson@cooperkirk.com
ppatterson@cooperkirk.com
wbergstrom@cooperkirk.com
    *Admitted *pro hac vice*

*Attorneys for Plaintiffs*

16