**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

| | |
|---|---|
| **CUTBERTO VIRAMONTES, an individual and resident of Cook County, Illinois; Christopher Khaya, an individual and resident of Cook County, Illinois; SECOND AMENDMENT FOUNDATION; and FIREARMS POLICY COALITION, INC.,** ) ) ) ) ) ) ) | |
| **Plaintiffs,** ) | |
| ) | |
| **v.** ) | **No. 21 C 4595** |
| ) | |
| **THE COUNTY OF COOK, a body politic and corporate; TONI PRECKWINKLE, in her official capacity as County Board President and Chief Executive Officer of Cook County; KIMBERLY M. FOXX, in her official capacity as State's Attorney; and THOMAS DART, in his official capacity as Sheriff,** ) ) ) ) ) ) ) ) ) | **Judge Rebecca R. Pallmeyer** |
| **Defendants.** ) | |

## <u>MEMORANDUM OPINION AND ORDER</u>

In several recent cases, gun-rights advocates have challenged Illinois state and local regulations on certain semiautomatic rifles defined by law as "assault weapons." This is one of those cases. Plaintiffs Cutberto Viramontes, Christopher Khaya, the Second Amendment Foundation, and Firearms Policy Coalition, Inc.[1] challenge the constitutionality of Cook County's assault-weapons ban, naming as Defendants Cook County and county officials Toni Preckwinkle, Kimberly M. Foxx, and Thomas Dart. Before the court are the parties' competing motions for summary judgment [80, 100], as well as Defendants' motion to strike Plaintiffs' responses to Defendants' Rule 56.1 statements [104]. During the pendency of this case, and while the parties engaged in discovery on the merits, the Seventh Circuit decided *Bevis v. City of Naperville*, 85

---

[1] Rubi Joyal, a former Plaintiff in the case, was removed in April 2022. (*See* Minute Entry [34].)

F.4th 1175 (7th Cir. 2023), rejecting a preliminary injunction against enforcement of the State of Illinois's assault-weapons ban.  Although this case presents a different procedural posture, the Seventh Circuit's *Bevis* opinion has greatly simplified the question presented for this court.

For the reasons discussed below, the court grants Defendants' summary judgment motion, denies Plaintiffs', and denies Defendants' motion to strike as moot.

## BACKGROUND

Cutberto Viramontes and Christopher Khaya both live in Cook County.  (Pls.' Rule 56.1 Statement of Material Facts in Supp. of Summ. J. (hereinafter "PSOF") [101] ¶¶ 1, 4.)[2]  They are members of Firearms Policy Coalition, Inc., a nonprofit dedicated to using "legislative advocacy, grassroots advocacy, litigation and legal efforts" to, in its view, "defend and promote the People's rights—including the right to keep and bear arms—advance individual liberty, and restore freedom." (*Id.* ¶¶ 7–8, 10.)  Viramontes and Khaya are also members of the Second Amendment Foundation, a nonprofit devoted to similar educational and legal advocacy concerning gun rights. (*Id.* ¶¶ 12–13, 15.)  Viramontes stated in his deposition that he hopes "to own a Smith & Wesson M&P 15 rifle," which is an "AR-15 style rifle" that he intends to use for self-defense.  (*Id.* ¶¶ 2–3.) Khaya wants an "IMI [Israeli Military Industries] Galil semiautomatic rifle"[3] (*id.* at ¶ 5), which, he testified, he is "most likely to use at the range, to be honest." (Tr. of the Dep. of Christopher Khaya, Ex. 2 to PSOF [101-2] at 82:7–10.)  He went on to say that if the other two guns he owns—a handgun and different (permitted) semi-automatic rifle—"are out of commission, then [he] would have to use" the Galil for self-defense.  (*Id.* at 82:11–15.)

---

[2]     The court broadly relies on the parties' Rule 56.1 statements for its factual recounting.  Where a fact or characterization of part of the record is disputed, the court cites directly to the record.

[3]     In their response to Defendant's Rule 56.1 statements, Plaintiffs agreed with Defendants' description of this weapon as an "Israel Military Industries Galil AR-15 style semiautomatic rifle".  (Pl.'s Responses & Objections to Def.'s Rule 56.1 Statement of Material Facts [98] at 8.)   Plaintiffs then amended their response in a footnote to their own Rule 56.1 statement, clarifying that "[t]he firearm in question is not an AR-15 style rifle but is largely based on the AK-47 design . . . ."  (PSOF ¶ 6 n.1.)

Cook County's Blair Holt Assault Weapons Ban (the "Ordinance"), enacted in November of 2006 and revised in July 2013, makes it "unlawful for any person to manufacture, sell, offer or display for sale, give, lend, transfer ownership of, acquire, carry or possess any assault weapon or large capacity magazine in Cook County." (Cook County, Ill. Code §§ 54-212(a); Defs.' Local Rule 56.1 Statement of Undisputed Material Facts in Supp. of their Mot. for Summ. J. (hereinafter "DSOF") [81] ¶¶ 130–31.) The weapons Viramontes and Khaya would like to own are among those banned by the Ordinance. (DSOF ¶¶ 12, 15.)

Plaintiffs filed this lawsuit on August 27, 2021 arguing that the Ordinance violated the Second Amendment and seeking declaratory and injunctive relief. (Compl. [1] ¶ 71.) In their Complaint, Plaintiffs acknowledged the hurdle they faced: their claims were, in Plaintiffs' own words, "contrary to" Seventh Circuit precedent. (*Id.* ¶ 5.) Specifically, in *Friedman v. City of Highland Park*, 784 F.3d 406 (7th Cir. 2015), the Seventh Circuit held that Highland Park, Illinois's assault-weapons ban did not violate the Second Amendment. More recently, in *Wilson v. Cook County*, 937 F.3d 1028, 1029, 1034 (7th Cir. 2019), the Seventh Circuit rejected a Second Amendment challenge to the very same Cook County Ordinance at issue in this case, which the court and parties agreed was "materially indistinguishable" from the Highland Park ban at issue in *Friedman*. Plaintiffs "institute[d] this litigation to . . . seek to have *Wilson* and *Friedman* overruled." (Compl. ¶ 5.)

Eager to achieve that goal, Plaintiffs in early December 2021 moved for judgment on the pleadings in favor of *Defendants*. (Pls.' Mot. for J. on the Pleadings [20].) Recognizing that their claims "are foreclosed by *Wilson* . . . and *Friedman*," which themselves relied on general national evidence in upholding the weapons ban, Plaintiffs saw no need to "'develop a factual record on which to distinguish *Friedman* . . . .'" (Pls.' Brief in Supp. of J. on the Pleadings [21] at 1, 4, (quoting *Wilson*, 937 F.3d at 1036).) Plaintiffs noted that if the Seventh Circuit were to reverse *Friedman* and *Wilson,* Defendants could always ask to remand for "further factual development under correct legal standards." (*Id.* at 6.)

For their part, Defendants declined the offer of an easy victory. In a hearing on December 8, 2021, Defendants asked the court to deny Plaintiffs' request for a judgment in Defendants' favor. Instead, Defendants asked that discovery proceed on the issue of whether assault weapons (as defined by the Ordinance) were "dangerous and unusual"—and thus outside the Second Amendment's ambit. (Tr. of Proceedings held on Dec. 8, 2021 (hereinafter "Hearing Tr.") [24] at 4–5; *see also Friedman*, 784 F.3d at 407–08 (noting the longstanding practice of banning dangerous and unusual weapons).) They pointed out that *Friedman* declined to answer that threshold question, instead assuming that the Second Amendment was implicated, but nevertheless upholding the ban. (Hearing Tr. at 4–5; *see also Friedman*, 784 F.3d at 411 ("Since the banned weapons can be used for self-defense, we must consider whether the ordinance leaves residents of Highland Park ample means to exercise the inherent right of self-defense that the Second Amendment protects." (quotation omitted)).) In other words, in the case before this court, Defendants hoped to develop a record on assault weapons' dangerousness and use this record as "an additional basis pursuant to which we could potentially win on the merits." (Hearing Tr. at 5.) Plaintiffs countered that the relevant evidence bearing on that question amounted to "legislative facts"—in other words, universal facts about the weapons having nothing to do specifically with Cook County—and that to engage in discovery would be "a waste of judicial resources." (*Id.* at 7–8.) Ultimately, recognizing "powerful arguments in both directions," the court granted Defendants' request to develop a record in this respect, and discovery commenced. (*Id.* at 15.)

The subsequent two years saw numerous twists and turns. First, as discovery was ongoing, the Supreme Court decided *New York State Rifle & Pistol Association v. Bruen*, which announced a new standard applicable to Second Amendment claims:

> When the Second Amendment's plain text covers an individual's conduct, the Constitution presumptively protects that conduct. The government must then justify its regulation by demonstrating that it is consistent with the Nation's historical tradition of firearm regulation.

597 U.S. 1, 24 (2022). Importantly, this new test explicitly rejected subjecting such laws to means-end scrutiny, holding instead that to justify a restriction, "the government must affirmatively prove that its firearms regulation is part of the historical tradition that delimits the outer bounds of the right to keep and bear arms." *Id.* at 19.

On January 10, 2023, Illinois passed its own statewide assault-weapons ban. (Mem. of Law in Supp. of Pls.' Mot. to Stay (hereinafter "Stay Motion") [70] at 1; *see also* 720 Ill. Comp. Stat. 5/24-1.9.) That state law spawned challenges in several district courts across the Seventh Circuit. Plaintiffs asked the court to stay this case pending resolution of the Illinois ban's constitutionality, recognizing that the new law's scope, "while not identical" to that of the Cook County ordinance, "would equally bar Plaintiffs from acquiring their chosen firearms." (Stay Motion at 1.) The court set a hearing date in March of 2023 to decide whether to grant Plaintiffs' request (*see* Ord. [77]), but in the intervening months Judge Virginia M. Kendall issued an order denying a preliminary injunction that would have prevented enforcement of both the Illinois ban and a similar ban employed by the City of Naperville, finding that both the state law and the local ordinance would likely survive constitutional scrutiny, *see Bevis v. City of Naperville, Illinois*, 657 F. Supp. 3d 1052 (N.D. Ill. 2023), *aff'd*, 85 F.4th 1175 (7th Cir. 2023). On March 3, 2023, Defendants filed their motion for summary judgment. (*See* Def.'s Mot. for Summ. J. [80].) Five days later, after a hearing, the court declined to stay this case, noting the possibility that the Seventh Circuit's ruling in the appeal from *Bevis* (and other cases addressing assault weapons bans) might not resolve this one. (Ord. [88] at 1.) The court also observed that this case is the only one where the parties were developing a factual record. (*Id.*)

Briefing on Defendants' motion for summary judgment and on Plaintiffs' own motion for summary judgment (*see* Pl.'s Mot. for Summ. J. [100]) continued and was complete by mid-June. In September 2023, declining a motion for reassignment of a yet another assault-weapons-ban challenge case pending before Judge Harry D. Leinenweber, the court observed that the Seventh

Circuit had by then heard oral argument in *Bevis*, and its decision there "may well have substantial influence on, or control, this one." (Ord. [120] at 1–2.)

Then on November 3, 2023, the Seventh Circuit issued a single opinion addressing *Bevis* and the other consolidated cases challenging Illinois' statewide and local assault-weapons bans on appeal. The Court of Appeals refused to enjoin enforcement of any of these laws. *Bevis v. City of Naperville, Illinois*, 85 F.4th 1175, 1182, 1203 (7th Cir. 2023) (addressing the Illinois state law, a City of Chicago ordinance, a City of Naperville ordinance, and the Cook County Ordinance). In doing so, the court affirmed the "continuing vitality" of *Friedman*. *Id.* at 1184. The court noted that *Friedman* was "basically compatible with *Bruen*, insofar as *Friedman* anticipated the need to rest the analysis on history, not on a free-form balancing test." *Id.* at 1189. In defending this conclusion, the court noted that *Wilson* included a "gloss" on *Friedman*; that is, *Wilson* suggested that *Friedman* had done some sort of means-end scrutiny when upholding Highland Park's assault-weapons ban. That suggestion, the *Bevis* court said, was *dicta*; *Wilson* never explicitly characterized *Friedman* as having applied means-end scrutiny. *Id.* at 1191. That *Friedman* included a "fleeting reference to the city's reasons for adopting [its] ordinance" was not enough to "undermine the central analysis in the case," which focused on history. *Id.*

On the merits*, Bevis* considered whether challenges to these state and local assault-weapons bans were likely to succeed—a showing necessary for entry of a preliminary injunction against their enforcement. The court's Second Amendment analysis involved two successive inquiries: first, whether the weapons regulated by these laws are "Arms" within the meaning of the Second Amendment; and second, if so, whether the regulation comported with the history and tradition of firearms regulation.

At the first step, the court noted that the Amendment only applies to "bearable arms," which the court defined as "weapons in common use for a lawful purpose . . . [which] is at its core the right to individual self-defense." *Id.* at 1193 (relying on *District of Columbia v. Heller*, 554 U.S. 570, 624–25 (2008)). Plaintiffs therefore must show "that the weapons addressed in the pertinent

legislation are Arms that ordinary people would keep at home for purposes of self-defense, not weapons that are exclusively or predominantly useful in military service, or weapons that are not possessed for lawful purposes." *Id.* at 1194. Plaintiffs were not likely to meet that burden, the court concluded, pointing out that *Heller* "stated that M16s [military machineguns] are not among the Arms covered by the Second Amendment," and that the AR-15 (and similar weapons) were more like military weapons than those useful for self-defense. *Id.* at 1195 (citing *Heller*, 554 U.S. at 624, 627). Comparing the AR-15 and the M16, the court stressed that "[b]oth models use the same ammunition, deliver the same kinetic energy . . . the same muzzle velocity . . . and the same effective range . . . ." *Id.* at 1196. The "only meaningful distinction" the court found between the two weapons "is that the AR-15 has only semiautomatic capability (unless the user takes advantage of some simple modifications that essentially make it fully automatic), while the M16 operates both ways." *Id.* at 1195. The court also found irrelevant the fact that the "M16 has an automatic firing rate of 700 rounds per minute, while the [unmodified] AR-15 has a semiautomatic rate of 'only' 300 rounds per minute . . . ." *Id.* at 1196. This distinction made no difference for numerous reasons. For one, AR-15s could easily be modified with a bump stock to "mak[e] it, in essence, a fully automatic weapon." *Id.* And there was "a serious question" whether it would make sense to consider the AR-15 an Arm "as sold" if it could easily be modified to a military-like weapon; calling the AR-15 an Arm protected by the Amendment would, thus, "be a road map for assembling machineguns and avoiding legitimate regulations of their private use and carry." *Id.*

Importantly, the court concluded this threshold inquiry with a caveat:

Better data on firing rates might change the analysis of whether the AR-15 and comparable weapons fall on the military or civilian side of the line. We note in this connection that it is one thing to say that the AR-15 is capable of firing at a rate of 300 rounds per minute and the comparable rate for the M16 is 700 rounds per minute, but quite another to address actual firing capacity, which accounts for the need to change magazines. No one here has suggested that the M16 comes with a 700-round magazine, or for that matter that the AR-15 comes with a 300-round magazine. Either one must be reloaded multiple times to fire so many rounds. Factoring in the reloading time, the record may show that the two weapons differ more—or less—than it appears here.

*Id.* at 1197.  The court also found that "large-capacity magazines . . . can lawfully be reserved for military use," and that "[a]nyone who wants greater firepower" could buy "three 10-round magazines" instead of one 30-round magazine.  *Id.*  The court concluded by stating that "there thus will be more to come, and we do not rule out the possibility that the plaintiffs will find other evidence that shows a sharper distinction between AR-15s and M16s (and each one's relatives) than the present record reveals."  *Id.*

For the sake of completeness, the court also considered the second step "of the *Bruen* framework"—namely, whether "these laws [are] consistent with the history and tradition of firearms regulation . . . ."  *Id.*  at 1197–98.  Here, too, the court concluded that plaintiffs were unlikely to succeed on the merits.   The court began by tackling the question of whether assault weapons were in "common use" for self-defense—an inquiry it chose to conduct at the second step as opposed to the first.  *Id.* at 1198.  On that question, the court found "the analysis in *Friedman* to be particularly useful," in recognizing that "common use" was not tied to "numbers alone" concerning how many people owned the weapons, as this would make a ban constitutional at one time and unconstitutional at another.  *Id.* at 1198–99.  Instead, *Bevis* decided that "the relevant question is what are the modern analogues to the weapons people used for individual self-defense in 1791, and perhaps as late as 1868," and concluded those modern analogues include the non-military weapons that cases like *Heller* had in mind, "not a militaristic weapon such as the AR-15, which is capable of inflicting the grisly damage described in some of the briefs."  *Id.* at 1199.

The *Bevis* court also addressed the history of regulation of dangerous weapons to protect the public.  *Id.* at 1200.  There is, the court held, a "long-standing tradition of regulating the especially dangerous weapons of the time, whether they were firearms, explosives, Bowie knives, or other like devices."  *Id.* at 1199, 1201.  The slate of assault-weapons bans at issue in *Bevis* thus "respect[ed] and rel[ied] on" what the court deemed "a long tradition, unchanged from the time when the Second Amendment was added to the Constitution, supporting a distinction

between weapons and accessories designed for military or law-enforcement use, and weapons designed for personal use." *Id.* at 1202.

After the *Bevis* decision issued, Defendants in this case filed a notice of supplemental authority, noting that *Bevis* "relied upon the analysis in *Friedman*" in reaching its conclusion as to *Bruen*'s second (history-minded) step. (*See* Notice of Supp. Authority [122] at 2.) Plaintiffs responded, admitting that "the legal conclusions in *Bevis* are binding here," but arguing that *Bevis* leaves open the possibility that further evidence, especially concerning the differences between AR-15s and M16s, could change its analysis. (Pls.' Resp. to Defs.' Supp. Authority (hereinafter "Pls.' *Bevis* Resp.") [123] at 1.) They contend that "[b]etter data" is available here, noting certain of their responses to Defendants' Rule 56.1 statements. (*Id.* at 2.) Specifically, they challenge *Bevis*' assumption that AR-15s shoot at a maximum rate of 300 rounds per minute (as compared with M16s' supposed rate of 700 per minute):

> The effective rate of fire of the M-16 rifle is 45–65 rounds per minute in semiautomatic mode and 150–200 rounds per minute in automatic mode. Unlike the M-16, the AR-15 is solely semiautomatic. It thus has an effective rate of fire that is one-third of the rate of the M-16 in automatic mode, and one-fifth of the rate posited by the Seventh Circuit.

> (*Id.* at 2 (citations omitted).) This data, Plaintiffs argue, effectively distinguishes their case

from *Bevis* on both prongs of the test identified by the Seventh Circuit, as both prongs rely to some extent on the distinction between military and civilian weapons. In other words, "[b]ecause the record in this case distinguishes AR-15s from M-16s, this tradition cannot support banning the AR-15 and other semiautomatic firearms." (*Id.*) Finally, *Bevis*' having left Illinois' assault-weapons ban intact left the court with questions about this case's justiciability. Accordingly, the court asked the parties to brief the issue of how Plaintiffs still have standing to challenge Cook County's ban. (Minute Ord. [125].)

## DISCUSSION

This case presents an awkward procedural puzzle with a simple solution. On the one hand, *Bevis* made clear that *Friedman* and *Wilson* remain good law, all but foreclosing Plaintiffs'

claim.  On the other hand, *Bevis* also suggested that on remand, its merits analysis on the bans at issue (including Cook County's) might change based on a more fully developed factual record. In theory, this case—which has proceeded through discovery—might present just such a record to pick up where *Bevis* left off.  But because Plaintiffs surface nothing from this record that might justify departing from binding precedent, the court grants summary judgment for Defendants.

The standards governing this case are familiar.  Summary judgment is appropriate when "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  FED. R. CIV. P. 56(a).  The court views the facts "in the light most favorable" to the nonmoving party when making this determination.  *Lord v. Beahm*, 952 F.3d 902, 903 (7th Cir. 2020).  And the "substantive law will identify which facts are material." *Id.* (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)).

## I.      Whether Plaintiffs Have Standing

Illinois' assault-weapons ban, which is unchallenged here, prohibits Plaintiffs from owning the same weapons that the challenged Cook County Ordinance does.  The court thus asked the parties to explain how Plaintiffs' injuries are redressable by a ruling in their favor.  Both parties urged that Plaintiffs do retain standing.  Plaintiffs argue (1) that they have asked for nominal damages, which entitle them to *some* relief; and (2) that Defendant Foxx (the Cook County State's Attorney) is tasked with enforcing both state and county law.  Thus, Plaintiffs assert, a ruling in their favor concerning the county's ban would strongly imply that the state ban is also unconstitutional, and would likely dissuade Foxx from enforcing the state law while independent challenges to its constitutionality proceed elsewhere.  (*See* Pl.'s Resp. to Ord. to Show Cause [128].)

Defendants also argue that standing exists, for different reasons.  First, Defendants contend that the Ordinance fully prohibits ownership of assault weapons, while Illinois' ban "allows gun owners to retain possession of assault weapons purchased prior to October 1, 2023, if registered."  (Def.'s Mem. in Resp. to ECF No. 125 [127] at 4.)  Defendants tacitly admit that

neither side has shown that any Plaintiff in fact owned covered weapons before October of 2023, but they make the common-sense assumption that the organizational "Plaintiffs here likely represent" such people. (*Id.* at 5.) Secondly, Defendants note that the Ordinance allows for larger penalties than Illinois' ban does, such that a ruling in Plaintiffs' favor would insulate them from harsher forms of punishment. (*Id.* at 6–7.)

The fact that the Plaintiffs seek nominal damages, and that the two bans are similar enough that the unconstitutionality of one would likely fall with the other, persuade the court that the case remains justiciable. *See N.Y. State Rifle & Pistol Ass'n, Inc. v. City of New York, New York*, 140 S. Ct. 1525, 1536 (2020) (Alito, J., dissenting) ("[I]t is widely recognized that a claim for nominal damages precludes mootness."). Accordingly, the court proceeds to the merits.

## II. Whether *Friedman* and *Wilson* control this case

It is undisputed that this court is bound by Seventh Circuit precedent "unless 'powerfully convinced that the [Seventh Circuit] would overrule it at the first opportunity.'" *Brenner v. Brown*, 814 F. Supp. 717, 718 (N.D. Ill. 1993) (quoting *Colby v. J.C. Penney Co.*, 811 F.2d 1119, 1123 (7th Cir. 1987)). The court follows Seventh Circuit precedent even if it believes those decisions are wrong or mistaken. *Reiser v. Residential Funding Corp.*, 380 F.3d 1027, 1029 (7th Cir. 2004).

*Friedman* affirmed a grant of summary judgment in favor of Highland Park and held that its assault-weapons ban did not violate the Second Amendment. 784 F.3d at 406. And in 2019, *Wilson* affirmed dismissal of a complaint challenging the same Cook County Ordinance at issue in this case,[4] holding that *Friedman* was controlling because the two ordinances were "materially indistinguishable" and "the plaintiffs ha[d] not come forward with a compelling reason to revisit" that earlier decision. 937 F.3d at 1029. If this were not enough, the parties have expressly agreed that, if they are still good law, *Friedman* and *Wilson* control the case. Plaintiffs themselves made this point in their December 2021 motion for judgment on the pleadings (in favor of Defendants),

---

[4] The Ordinance has not been amended in the interim; it has remained the same since July 2013. *See* Cook County, Ill. Code §§ 54-210 *et seq.*

admitting that "the claims at issue in this case are foreclosed by *Wilson* . . . and *Friedman*," and that "[a]ll parties agree that the Court is bound by these decisions . . . ." (Pls.' Brief in Supp. of J. on the Pleadings at 1.) Defendants see it in the same way. In their March 2023 motion for summary judgment, Defendants argue that Plaintiffs' "claims are foreclosed by the Seventh Circuit's decisions in *Wilson* . . . and *Friedman* . . . ." (Defs.' Mem. of Law in Supp. of Their Mot. for Summ. J. [82] at 46.)

The only hope for Plaintiffs' claim was that the Seventh Circuit would hold that *Friedman* and *Wilson* are inconsistent with *Bruen* and thus call them into serious doubt or overrule them. But crucially, the court in *Bevins* went well beyond simply refusing to overrule *Friedman* (and *Wilson* by extension); *Bevis* made a point of stressing *Friedman*'s "continuing vitality . . . ." 85 F.4th at 1184, 1190–91. And Plaintiffs conceded after *Bevins* came down that its legal conclusions are binding on this court. (Pls.' *Bevis* Resp. at 1.) Plaintiffs' claims are thus squarely foreclosed by binding precedent.

### III. Whether Any Evidence Distinguishes this Case from *Bevis*, *Friedman*, or *Wilson*

Nor, to the extent dicta in *Bevis* suggests that firing-rate differentials between M16s and AR-15s could change the calculus, have Plaintiffs offered evidence meaningfully doing so. First, it is not at all clear that the papers, surveys, and other online sources to which Plaintiffs cite are even admissible in this case. (*See* Defs.' Reply Filed in Supp. of Defs.' Mot. to Strike [117] at 5 (noting that Plaintiffs rely largely on "opinions set forth by alleged experts" without disclosing them in discovery and thus "circumvent[ing] th[e] court's discovery orders").)

But even considering the sources the Plaintiffs *do* cite, their evidence falls far short of meaningfully distinguishing AR-15s from M16s. Plaintiffs claim that the M16 and AR-15 both have a lower "effective" rate of fire than the rates contemplated by the Seventh Circuit in *Bevis*. Recall that *Bevis* appeared to assume that the M16 as an automatic weapon was capable of firing a maximum of 700 rounds per minute while the semiautomatic AR-15's comparable maximum rate was 300 rounds per minute. 85 F.4th at 1196. Plaintiffs note, contrarily, that the *effective* rate of

12

fire of the M16 rifle is 'only' 150–200 (not 700) rounds per minute in automatic mode and 45–65 (not 300) rounds per minute in semiautomatic mode, which would be the same for the AR-15, as it is semiautomatic.  (Pls.' *Bevis* Resp. at 2.)  This leads Plaintiffs to claim that the AR-15 "has an effective rate of fire that is one-third of the rate of the M-16 in automatic mode, and one-fifth of the rate posited by the Seventh Circuit."  (*Id.*)

This is truly a distinction without a difference.  *Bevis* made clear that the relevant distinction is not how fast the AR-15 shot in isolation, but how its firing rate compares with that of an M16, which (as recognized in *Heller*) was appropriately subject to regulation.  *Id.* at 1197 ("[W]e do not rule out the possibility that the plaintiffs will find other evidence that shows a sharper distinction between AR-15s and M16s . . . than the present record reveals.")  By the court's math, pre-modification with bump stocks or other devices, the AR-15 shot about 40% as many rounds in a minute as did the M16 (300 versus 700).   The difference is similar, though, using Plaintiffs' numbers: if the M16 can "effective[ly]" shoot at 150–200 rounds a minute and the AR-15 can, pre-modification, shoot at 45–65 rounds a minute, then the AR-15 can shoot about 33% as many rounds in a minute as the M16 does.  There is no indication in *Bevis* that this percentage difference in minute-to-minute firing capacity would render AR-15s different enough from M16s (which the court assumed were military weapons) to render them subject to Second Amendment protection.  Moreover, the court in *Bevis* made a point of stressing that AR-15s can easily be modified with bump stocks or other devices to at least "double the rate at which" they can fire, further demonstrating the practical similarity between the two weapons.  *See id.* at 1196.   Nothing Plaintiffs have presented casts this into doubt.  Additionally, *Bevis* appeared more concerned with whether the firing-rate differentials between AR-15s and M16s were exacerbated by things like "[f]actoring in reloading time" and the size of the typical magazines used with each weapon, and

Plaintiffs point to no evidence suggesting any such difference. *See id.* at 1197; *see also generally* Pls.' Resps. & Objections to Defs.' Rule 56.1 Statement of Material Facts [98].[5]

More importantly, it appears that the Seventh Circuit had this evidence before it in some form when deciding *Bevis.* In his dissent, Judge Manion points to a report from one of the compiled cases "listing the M16's maximum semiautomatic effective rate at 45 rounds per minute" to argue that the AR-15, which would have that same semiautomatic firing rate, was significantly lower than the M16 firing in automatic mode. *Bevis*, 85 F.4th at 1224 (Manion, J., dissenting). The *Bevis* majority was evidently unmoved by this distinction.

## <u>CONCLUSION</u>

For the foregoing reasons, the court grants Defendants' motion for summary judgment [80] and denies Plaintiffs' [100]; it also denies Defendants' motion to strike [104] as moot. The Clerk is directed to enter judgment in favor of Defendants. This ruling is final and appealable.

ENTER:

Dated: March 1, 2024

_____
REBECCA R. PALLMEYER
United States District Judge

---

[5] Indeed, Plaintiffs' evidence in this case appears to have been broadly similar to that addressed in *Bevis*, as Plaintiffs seem to have relied on publicly available studies and information as opposed to producing expert reports during discovery. (*See* Motion to Strike at 6–7 (pointing out that Plaintiffs did not disclose exhibits they use to challenge Defendants' Rule 56.1 statements during discovery).) For example, in addition to the firing-rate evidence discussed above, *Bevis* was not troubled by statistics about the apparent popularity of the weapons at issue including "[o]ne brief['s] assert[ion] that at least 20 million AR-15s and similar rifles are owned by some 16 million citizens," and Plaintiffs stress similar figures here. (*Bevis*, 85 F.4th at 1198; Pls.' Mem. of Law in Supp. of Summ. J. [102] at 8.)